## TRANSLATOR'S AFFIDAVIT

The undersigned, Mr. Karel Thijs, hereby declares:

I am a certified translator and have been sworn in as such before the Court of First Instance of Aruba in accordance with the applicable Aruban legislation.

Attached hereto as Exhibit A is a certified translation, done by me, of an application for interlocutory proceedings dated July 23, 2007, submitted to the Court of First Instance of Aruba by the attorney Mr. H.S. Croes on behalf of the limited liability company Aruba Hotel Enterprises N.V., as well as the original text (Exhibit B). In evidence of the above, I have duly stamped and initialed each page of the translation and signed the last page. My initials and signature are on file with the Ministry of Justice of Aruba.

Aruba, October 11, 2007

Karel Thijs, certified translator
karelthijs@gmail.com



Seen for legalisation of the signature of
...Karel...Thijs...........................................
residing in ......Aruba........................., by me,
Dr. R.E. YARZAGARAY, notary in Aruba,
on this ...17th... day of ...October..., 2007..........



CROES WEVER TCHONG

INTERLOCUTORY PROCEEDINGS

FILE COPY

To the Honorable Judge at the
Court of First Instance of Aruba

Respectfully states:

The limited liability company **ARUBA HOTEL ENTERPRISES N.V.** ("AHE"), having its registered office and principal place of business in Aruba, choosing domicile for the present case in the ARULEX CENTER in Punta Brabo z/n (unnumbered) in Oranjestad at the office of the partnership of lawyers and tax consultants CROES WEVER TCHONG, of which all lawyers affiliated with this partnership declare to have been authorized by the plaintiff to act on its behalf, specifically also to sign and submit this application for it and on its behalf;

1.  AHE hereby institutes interlocutory proceedings and therefore requires an immediate, provisionally enforceable measure that cannot be postponed, against the defendant, the limited liability company **DIAMOND GAMING CORPORATION N.V.** ("Diamond Gaming"), having its registered office and principal place of business at J.E. Irausquin Boulevard 77 in Oranjestad, Aruba, with regard to the following.

**Introduction**

2.  AHE is the owner of the building in which Wyndham Aruba Beach Resort & Casino used to be established and in which Westin Aruba Resort & Hotel (the "Hotel") is currently established. The operator of the Hotel is Westin Aruba Hotel Management LLC (the "Operator"), a partnership affiliated with Starwood Hotels & Resorts Worldwide, Inc. ("Starwood"). Starwood is the owner of the Westin trademark. Both the Operator and Starwood are companies under the laws of the United States and shall hereinafter also be referred to as "Westin". AHE is also holder of the gambling license (**EXHIBIT 1**) for the casino established in the Hotel.

3.  Diamond Gaming is the operator of the casino of the Hotel. The legal relationship between these entities has been laid down in a rental/operating agreement dated November 1, 2005, the "Original Casino Lease" (**EXHIBIT 2**), which was amended on April 21, 2006, the "First Casino Lease Amendment" (**EXHIBIT 3**). The Original Casino Lease and the First Casino Lease Amendment shall hereinafter be referred to as the "Casino Lease", which will be elaborated on below.

**Facts**

4.  On May 3, 2006, the shares in A.H.E. Holding N.V. were acquired by BCP Sunset Holdings II N.V., a company established under the laws of the Netherlands Antilles ("BCP II"). BCP II is a subsidiary of an American citizen called Michael Belfonti ("Belfonti"). A.H.E. Holding N.V. owns all shares in AHE. As a consequence of this acquisition, AHE became a subsidiary of Belfonti's concern ("Belfonti Concern"), an

overview of which is hereby submitted as **EXHIBIT 4**. From that moment on, AHE was economically controlled by Belfonti.

5.  In order to finance the aforementioned acquisition, two separate loans were taken out. The first loan, also dated May 3, 2006, was granted to AHE by WIBC Aruba N.V., a subsidiary of Wachovia Bank, National Association, a bank having its registered office in the United States ("Wachovia"), for an amount of US$230,000,000.00 (the "WIBC Loan" or the "Wachovia Loan"). The WIBC Loan was recorded in a mortgage loan agreement dated May 3, 2006, secured by the hotel building, which agreement can be found on the CD submitted as **EXHIBIT 5**.

6.  On or around June 9, 2006, a second loan for an amount of US$19,450,000.00 was granted by Petra Mortgage Capital Corp. LLC ("Petra") to BCP Florin LLC ("BCP Florin"), a subsidiary of the Belfonti Concern (the "Petra Loan"). The Petra Loan was recorded in a loan and security agreement ("Mezzanine Loan Agreement"), which can be found on the CD submitted as **EXHIBIT 6**.

7.  The Petra Loan was a so-called non-recourse loan, meaning that the loan was exclusively covered by the shares in Twilight Holdings, LLC ("Twilight Holdings") owned by BCP Florin. Twilight Holdings was a subsidiary of the Belfonti Concern indirectly owning the shares in AHE (see **EXHIBIT 4**). Therefore, in case of default or breach of contract by BCP Florin, Petra would only be able to recover its damage from the shares in Twilight Holdings.

8.  Back in June 2006, Petra agreed to grant the loan because, particularly due to the significant revenue that was to be received from the casino under the conditions of the Casino Lease to be discussed in the next paragraph, it expected AHE and BCP to be able to comply with their obligations towards Petra.

9.  With a view to the financing of the purchase of the Hotel, the Original Casino Lease (see **EXHIBIT 2**) was amended on April 21, 2006: the First Casino Lease Amendment (see **EXHIBIT 3**). In accordance with the First Casino Lease Amendment of April 21, 2006, Diamond Gaming must pay to AHE a monthly rent of US$275,000.00 (instead of the US$220,000.00 stipulated in the Original Casino Lease), this amount being a fixed rent, which cannot be changed during the term of the agreement (ten years), as was stipulated explicitly in that agreement (see **EXHIBIT 3**, article 5). In accordance with the First Casino Lease Amendment, Diamond Gaming furthermore had to pay an additional rent of 50% of the profit exceeding a profit of US$416,667.00 per month (see **EXHIBIT 3**, article 6). This agreement may be terminated by either party subject to thirty (30) days' notice (see **EXHIBIT 3**, article 7). Obviously, the agreement may always be terminated in case of breach of contract. In case the rent installments due and payable by Diamond Gaming in accordance with the contract are not or not fully paid and this obligation is not complied with within the ten-day *terme de grâce* specified in the agreement, AHE is allowed to terminate the agreement (see **EXHIBIT 2**, article 14 (b)). Article 7 of the Original Casino Lease, which remained unchanged in the First Casino Lease Amendment, stipulates:

> "Should the rent remain due and unpaid for ten (10) days after receipt of written notice to [...] [Diamond Gaming, *HSC*] that such rent is past due and payable, [AHE, *HSC*]

shall have the option of declaring the balance of the rent for the term of this lease to be immediately due and payable and [AHE, *HSC*] may then proceed immediately to collect all of the unpaid rent called for by this lease, including costs and reasonable attorney's fees, by any remedy provided by law. For each day after the fifth (5th) day that [Diamond Gaming, *HSC*] is in default in paying the rent a daily penalty charge of $5,000 (five thousand US dollars) must be paid by [Diamond Gaming, *HSC*]."

10. Even before the loans dated May 3, 2006 and June 9, 2006 were granted by WIBC and Petra respectively, Belfonti Capital Partners, LLC ("BCP"), a real estate investment company of which Belfonti owns all shares and over which he therefore had complete economic control, on April 21, 2006 secretly entered into a so-called put and call agreement with the then owner and sole shareholder of Diamond Gaming, Casablanca Gaming Management Company S.A., and its principal and sole shareholder, Alfonso Riveroll Estrada ("Riveroll") (**EXHIBIT 7**). Riveroll was (ultimately) co-owner of the Hotel until May 3, 2006 and managing director of AHE until December 27, 2006 (**EXHIBIT 8**).

11. Please note that the put and call agreement was entered into on the same day as the First Casino Lease Amendment. Belfonti had notified WIBC and Petra of the First Casino Lease Amendment and he had used the rental income to lure WIBC and Petra into granting the loans to the Belfonti companies. However, neither WIBC nor Petra were informed about the put and call agreement simultaneously entered into. On December 4, 2006, Riveroll used his put option (**EXHIBIT 9**) and around December 2006, Diamond Gaming was acquired by BCP for a mere US$1,000.00 and, from that moment on, was economically controlled by Belfonti.

12. As could be expected, all this was deliberately concealed by Belfonti from Petra and WIBC (Wachovia).

13. In early 2007, it turned out that both AHE and BCP Florin were having trouble complying with their repayment obligations arising from the loan agreements with Petra and WIBC. Belfonti deliberately accepted the risk of both BCP Florin and AHE being unable in the short term to comply with their respective payment obligations arising from the Petra Loan and the Wachovia Loan. When Belfonti notified Petra of his financial problems, Petra clearly told Belfonti that Petra would use its right to levy execution if he failed to comply with his obligations arising from the loan. Around early April, Belfonti must have known, or at least he could have known, that BCP Florin would default shortly and that, in case of such default, Petra would use its right to levy execution, in which case Petra would obtain full authority and control over BCP Florin's subsidiary of Twilight Holdings and its indirect subsidiaries, including AHE.

14. In early April 2007, Belfonti saw to it that the two entities he economically controlled – i.e. AHE and Diamond Gaming – secretly changed the Casino Lease. We hereby submit a letter dated January 22, 2007 of the director of Diamond Gaming, Mr. Barrow, addressed to Mr. Belfonti, who is referred to as the Managing Director of AHE, in which letter Mr. Barrow requests confirmation of a number of further agreements regarding the Casino Lease (**EXHIBIT 10**). This letter, which will hereinafter be

referred to as the "Purported Casino Lease Amendment", was signed for approval by Belfonti as "a Director". The historical extract from the trade register (**EXHIBIT 11**) shows that Mr. Belfonti resigned as Managing Director of AHE as of January 1, 2007 and was appointed as a Supervisory Director on January 1, 2007. Nevertheless, he signed the letter on behalf of AHE with the word "Agreed" (see **EXHIBIT 10**, page 2).

15.  AHE's new Managing Director, Ms. Marieta Rufina Ras ("Ms. Ras"), who took up her position on December 15 (see **EXHIBIT 11**), also signed on behalf of AHE, but did so *by hand* and without mentioning on what date the letter was supposedly signed for approval. Ms. Ras's statement of July 18, 2007 (**EXHIBIT 12**) shows that Mr. Belfonti showed her the letter in early April 2007 requesting her to sign it as Managing Director of AHE; given that Belfonti was her boss, she felt pressured to comply with his request (see **EXHIBIT 12**, part 8):

> "In or about early April 2007, Belfonti presented me with a letter agreement, dated January 22, 2007, between AHE and Diamond Gaming. The letter agreement purported to be an amendment to the Casino Lease (the "Purported Amendment"). I had never seen or heard any reference to this document before. Belfonti asked me to sign the Purported Amendment in my capacity as Managing Director of AHE. He told me that he had discussed the Purported Lease Amendment with Starwood, the company that operates the Hotel. Belfonti was my boss and I felt pressure to do as he asked, so I signed the Purported Amendment ."

Belfonti did all this without notifying Petra and without asking Petra's permission to do so. By virtue of article 2.34 (c) (viii) of the Petra Loan (see **EXHIBIT 6**), Belfonti and the companies associated with him were not allowed to change the Casino Lease without permission from Petra. Under the terms of the WIBC Loan, Belfonti and the companies associated with him also needed permission from WIBC to change the Casino Lease. Belfonti and AHE also needed to be granted permission by operator Westin. Even though Belfonti, who economically controlled both AHE and Diamond Gaming, was very well aware of the fact that he needed prior permission from Petra, WIBC, and Westin, he never requested such permission from Petra, WIBC, and Westin, let alone that he was given such permission.

16.  Ms. Ras told Mr. Belfonti that the second amendment needed to be approved by the Board of Supervisory Directors (see **EXHIBIT 12**, part 9).

17.  In a letter dated April 12, 2007, Wachovia declared AHE to be in default (**EXHIBIT 13**), and in a letter dated April 13, 2007, Petra declared BCP Florin to be in default (**EXHIBIT 14**).

18.  In the late afternoon of April 13, 2007, Belfonti ordered Ms. Ras to move certain AHE files concerning the casino from the AHE office to the office of Diamond Gaming (see **EXHIBIT 12**, part 12). On April 14, 2007, Belfonti, accompanied by two people, removed two file cabinets from the AHE office (see **EXHIBIT 12**, part 13). Those cabinets contained documents dating back to the time before Diamond Gaming was even involved in the operation of the casino!

19. Later, on April 14, 2007, Belfonti told Ms. Ras that he was going to leave Aruba forever and Ms. Ras realized for the first time that Belfonti's subsidiaries had not complied with their obligations under the loans (see **EXHIBIT 12**, part 14). Since Ms. Ras was expecting new owners to present themselves shortly, she wanted to have certain Board decisions still approved by the Board of Supervisory Directors. On April 16, 2007, she called a meeting of the Board of Supervisory Directors by e-mail and by fax subject to less than 24 hours' notice (**EXHIBIT 15**). According to the minutes of the meeting, which was held by phone on April 17, 2007 (**EXHIBIT 16**), 2 of the 3 members of the Board of Supervisory Directors were present; Supervisory Director Rosenberg, appointed by WIBC ("Wachovia"), was absent. During the meeting, the "[…] lease amendment with Diamond Gaming Corporation N.V. signed on January 22, 2007" was approved by the two Supervisory Directors who were present (**EXHIBIT 14**, item 3, on the second page). The Purported Casino Lease Amendment's purpose was to reduce Diamond Gaming's monthly rent payment obligation from US$275,000.00 to only US$60,000.00. Further, the Purported Casino Lease Amendment's purpose was to eliminate the 30-day notice and to restrict it to cases of default, in which case AHE would/might be bound to a thirty-year lease running up to the year 2037. AHE hereby submits a list of the most important changes arising from the Purported Casino Lease Amendment (**EXHIBIT 17**), which clearly shows that Diamond Gaming and Belfonti considerably benefited from the Purported Casino Lease Amendment.

20. The fact that the Purported Casino Lease Amendment did not take place in January 2007 but only in April 2007 can also be deduced from the fact that Diamond Gaming paid the rent of US$275,000.00 in accordance with the Casino Lease until March 2007 and started paying a rent of merely US$60,000.00 by virtue of the Purported Casino Lease Amendment only in April 2007. Also, the management of the casino's bar was not taken over by Diamond Gaming until April 1, 2007 (see **EXHIBIT 10**, part 1, last sentence). Belfonti and Diamond Gaming would still have to explain why AHE was given such a substantial mitigation of its payment obligations and why other important concessions were never given any follow-up between January 22, 2007 and April 17, 2007.

21. The Purported Casino Lease Amendment is a classic example of an illegal self-dealing transaction and is, therefore, a completely unilateral transaction. Its effect was that AHE (the entity Belfonti was obviously expecting to become economically controlled by Petra), without any consideration of AHE's company interests, would see a drastic drop in its monthly revenue. At the same time, the Purported Casino Lease Amendment resulted in a substantial economic benefit for Diamond Gaming (the entity Belfonti would continue to own) of no less than US$215,000.00 a month, and this possibly for the next thirty years.

22. Not long after Belfonti had left Aruba, Diamond Gaming blocked AHE's electronic access to Diamond Gaming's financial information and AHE appeared to be no longer able to view the images from the casino's surveillance cameras (see **EXHIBIT 12**, part 14).

23. After AHE and BCP Florin had been declared in default (see **EXHIBIT 13** and **EXHIBIT 14**), Petra exercised its right to levy execution with regard to BCP Florin in May 2007, as a consequence of which Petra, through its subsidiary NFO Holdings Ltd, acquired control and authority over the shares in AHE (**EXHIBIT 18**). Only after this

did Petra become aware of the existence of the secret put and call agreement between Casablanca and BCP (read: Belfonti) and of the fact that Belfonti deliberately concealed it from Petra, given that, among other things, this secret agreement was not part of the so-called Borrower's Certificate that BCP Florin issued to Petra in connection with the loan to be granted (**EXHIBIT 19**). In the past four months, i.e. in April, May, June, and July 2007, AHE has noted that Diamond Gaming has failed to pay to AHE the monthly rent of US$275,000.00, but instead has only paid US$60,000.00 per month. As a consequence, there are now rent arrears of approximately US$860,000.00, to be increased by the penalty stipulated in article 7 of the Original Casino Lease (see paragraph 9 above: US$5,000.00 for each day of default after the fifth day), while the outstanding rents have become forthwith due and payable. Moreover, Diamond Gaming owes AHE an interest of 18% per year on the outstanding amounts.

24. On June 21, 2007, AHE was handed a letter from the Unusual Transactions Reporting Office (UTRO) dated March 8, 2007 (**EXHIBIT 20**), in which the casino was notified, among other things, that the UTRO had learned that the casino had no written procedures with regard to requirements arising from the National Ordinance on the Obligation to Disclose Unusual Transactions (Law Gazette 1995 no. 85, LvMOT) and the National Ordinance on Identification in Financial Services (Law Gazette 1995 no. 86, LvIFD). In a letter of July 4, 2007, the undersigned answered that letter on behalf of AHE (the casino permit is in its name) (**EXHIBIT 21**). In reply to this letter, the undersigned's office received a letter from Diamond Gaming dated July 11, 2007 (**EXHIBIT 22**). The reply is disconcerting, because it shows that Diamond Gaming clearly fails to appreciate both the seriousness of the UTRO letter and AHE's interest in complying with legal obligations: not a word is said in reply to the defaults established by the UTRO.

25. Diamond Gaming's reply (see **EXHIBIT 22**), added to the fact that the company is economically controlled by one single person, i.e. Belfonti, who, it appears, is involved in a case of large-scale fraud, shows that Diamond Gaming is unsuitable to operate a casino and that the continued operation by Diamond Gaming could jeopardize AHE's gambling license. It is Diamond Gaming which is operating the casino and it is Diamond Gaming's failure, not AHE's, which has led to the shortcomings signaled by the UTRO. Diamond Gaming should have taken measures to prevent those shortcomings, or should at least have corrected them without delay. After all, it is the reputation of AHE and the casino for which AHE holds a license which is at stake.

26. Also, in case of continued operation by Diamond Gaming, Diamond Gaming will be a threat to the reputation and integrity of the casino and, therefore, of the Hotel. Therefore, the potential damage to AHE in case of continued operation of the casino by Diamond Gaming is impossible to calculate.

27. On May 25, 2007, Diamond Gaming instituted legal proceedings against AHE, demanding compliance with the Purported Casino Lease Amendment (**EXHIBIT 23**). Strikingly, in its application, Diamond Gaming fails to mention the fact that Belfonti is ultimately the owner of Diamond Gaming and that, at the time the Purported Casino Lease Amendment was entered into, it was he who had economic control over both parties to the Purported Casino Lease Amendment – which amendment was in detriment of AHE and only benefited Diamond Gaming – and who prompted those parties to effect this amendment (contrary to the right of Petra, WIBC, and Westin to grant or

deny permission) because he knew, or was supposed to know or at least realize, that Petra was soon to gain control over AHE while he would remain in control of Diamond Gaming.

28. In its application (see **EXHIBIT 23**), Diamond Gaming emphasizes the fact that AHE's director, Ms. Ras, signed the Purported Casino Lease Amendment and called the meeting of AHE's Board of Supervisory Directors at which the Purported Casino Lease Amendment was "approved". However, not much value should be attached to these acts. As shown by **EXHIBIT 12**, Ms. Ras felt forced to sign the Purported Statement.

29. Ms. Ras is not an experienced Managing Director; she was only appointed as Managing Director in late December 2006. Ms. Ras is not a lawyer either, and just before BCP Florin defaulted and Belfonti left Aruba on April 14, 2007, Ms. Maura Brown, who had been AHE's lawyer for years, told Ms. Ras she was withdrawing as AHE's lawyer while staying on as an attorney for Belfonti and Diamond Gaming! Without any assistance from AHE's lawyer, knowing that many acts had been performed under Belfonti's rule, including the Purported Casino Lease Amendment, which had not been approved by AHE's Board of Supervisory Directors even though they required such approval, and knowing that AHE was going to get a new owner due to AHE's and BCP Florin's default, Ms. Ras took the decision, based on naïveté, to call a meeting of the Board of Supervisory Directors to still get those acts, including the Purported Casino Lease Amendment, approved for administrative reasons.

30. This meeting was called subject to less than 24 hours' notice. Only two supervisory Directors of the Board of Supervisory Directors participated <u>by phone</u>: Belfonti and his American attorney. The third, and only impartial, Supervisory Director, i.e. Rosenberg, who had been appointed by WIBC, did not take part in this meeting, which had been called subject to such short notice, and, therefore, did not take part in the decision-making either. Belfonti himself was represented during the meeting by AHE's lawyer of many years, Ms. Maura Brown, who had abandoned AHE in favor of Belfonti. As Ms. Brown confirmed in a letter recently received from her by AHE, dated July 16, 2007 (**EXHIBIT 24**), AHE was not represented at this meeting by a qualified lawyer. Therefore, during that meeting of the Board of Supervisory Directors, Belfonti had both the advantage of having his American attorney voting with him and the advantage of the presence of Ms. Brown, who had changed sides from AHE to Belfonti. No qualified lawyer was present to represent AHE's interests! Ms. Brown abused the position of trust she had occupied until recently in AHE. Afterwards, both Belfonti and his American attorney resigned as Supervisory Directors of AHE.

31. In sum, Ms. Ras's signature under the Purported Casino Lease Amendment in April 2007 was the result of coercion or undue influence by Belfonti, while the subsequent meeting of the Board of Supervisory Directors was nothing but an attempt, based on ignorance and inexperience, to clean up the chaos left behind by Belfonti, which only served the interests of Belfonti and not those of AHE.

32. In a letter dated June 8, 2007, Petra warned Belfonti, in connection with Diamond Gaming's default, to pay the full rent of US$275,000.00 per month for the months of April, May, and June 2007 (**EXHIBIT 25**). Up to the present day, Diamond Gaming has failed to comply with this order and it is, therefore, in serious default. Given that Petra owns AHE, which was also the case on June 8, 2007, this letter must be considered a

notification of default addressed to Diamond Gaming, which failed to cure its default within the period of 10 days stipulated in the Casino Lease. Therefore, the Casino Lease must be considered dissolved by virtue of Diamond Gaming's sustained, uncured failure to pay the rent.

33. AHE does not recognize the Purported Casino Lease Amendment and in a letter of July 17, 2007 invoked the nullity of this Amendment and of the resolutions on which it is based, which nullity is hereby invoked again insofar as required (**EXHIBIT 26**). The Purported Casino Lease Amendment is null and void, or at least voidable, because
    (i)   it does not meet the standard of due care that must be observed between bodies of AHE, which Diamond Gaming (read: Belfonti) was aware of;
    (ii)  the rent cannot be changed by virtue of the provisions of article 6 of the First Casino Lease Amendment (see **EXHIBIT 3**);
    (iii) the provisions of the Purported Casino Lease Amendment are the result of a self-dealing transaction, orchestrated by Belfonti when he had full authority and control over both AHE and Diamond Gaming. The transaction was contrary to AHE's company interests (*ultra vires*, see the Netherlands Supreme Court judgment of February 24, 2006, LJN: AU6938, R041085HR) and did not benefit AHE in any way, but was exclusively carried out for Belfonti's own personal gain and in order to reduce the value of the security of AHE's creditor, Petra, and thus frustrate any possibilities of recovery.

34. Furthermore, it would be unacceptable, according to the standards of reasonableness and fairness, if AHE were bound in this case by the Purported Casino Lease Amendment, considering specifically this illegal self-dealing transaction. Therefore, the Purported Casino Lease Amendment has no value whatsoever to AHE, or is nonexistent.

    Further, as pointed out above, Belfonti prompted AHE to sign the Purported Casino Lease Amendment not only in violation of Petra's right to grant permission, but also in violation of WIBC's right to grant permission. As a result, AHE is in default with regard to the WIBC loan. In case the Purported Casino Lease Amendment turns out to be enforceable, Petra (ultimately the new owner of AHE) will be unable to cure AHE's default towards WIBC. This would put AHE in an impossible position.

35. In the letter of July 17, 2007 (see **EXHIBIT 26**), AHE terminated the Casino Lease, subject to the 30 days' notice agreed on, also by virtue of the following, non-restrictive, violations of the Casino Lease by Diamond Gaming:
    (i)   Diamond Gaming has failed to pay the monthly rent of US$275,000.00 for the months of April 2007 through July 2007, as required by article 5 of the First Amendment. This is a violation of article 14 (b) of the Casino Lease.
    (ii)  As shown by the letter of the Director of the Unusual Transactions Reporting Office (UTRO), Diamond Gaming has failed to run the casino "in strict accordance with the Gambling License and the law", which is a violation of article 1.2 in conjunction with article 21 of the Original Casino Lease.
    (iii) Diamond Gaming has provided no financial statements to AHE since March 2007, which is a violation of article 10 of the Original Casino Lease;
    (iv)  Diamond Gaming has failed to provide AHE in due time with proof of payment of all its tax obligations related to the operation of the casino (which is a violation of article 6 ("Taxes") of the Casino Lease);

Beëdigd Vertaler
Sworn Translator Traductor Jurado
LIC. KAREL THIJS

8

    (v)  Diamond Gaming has failed to notify AHE of the place and disposal of certain slot machines, which were replaced with new ones, which is a violation of article 17 of the Original Casino Lease;

   (vi)  Diamond Gaming has failed to provide the insurance policies required in accordance with the Original Casino Lease;

  (vii)  Diamond Gaming has blocked all AHE's possibilities to monitor the activities in the casino through surveillance cameras.

In addition, Diamond Gaming has probably violated its contractual obligation to continue the AHE procedures related to the operation of the casino.

## The law

36. As pointed out above, AHE does not recognize the aforementioned Purported Casino Lease Amendment and the resolutions on which it is based, and has even invoked their nullity. The Purported Casino Lease Amendment of January 22, 2007 is null and void, or at least voidable, because the Purported Casino Lease Amendment is the result of a self-dealing transaction, deceit, and abuse of circumstances, orchestrated by Belfonti when he had full authority and control over (read: economically controlled) both AHE and Diamond Gaming. The transaction was contrary to AHE's company interests and, therefore, also contrary to reasonableness and fairness, and it did not benefit AHE in any way, but was only carried out for Belfonti's own personal gain and that of Diamond Gaming in order to reduce the value of the security of AHE's creditor, Petra, and other creditors, such as Wachovia, and thus frustrate any possibilities of recovery; moreover, it would be unacceptable, according to the standards of reasonableness and fairness, if AHE were bound in this case by the Purported Casino Lease Amendment, considering specifically this illegal self-dealing transaction. Therefore, the Purported Casino Lease Amendment has no value whatsoever to AHE, or is nonexistent

37. As pointed out above, AHE also terminated the Casino Lease in its aforementioned letter of July 17, 2007.

38. Diamond Gaming has failed to pay the monthly rent of US$275,000.00 for the past four months, as required by article 5 of the First Casino Lease Amendment, which it has also been notified of. This is a violation of article 14 (b) of the Original Casino Lease.

39. Considering the above, Diamond Gaming is in serious breach of contract and acting unlawfully.

40. Considering all of the above, AHE has good reasons to fear that Diamond Gaming can inflict serious damage to it, amounting to millions of dollars, during this term of notice; that Diamond Gaming's assets will disappear from Aruba; and that Diamond Gaming will not (be able to) comply with its obligations. Therefore, AHE has no option but to request Your Honor permission, for the protection of its gambling license, to remove Diamond Gaming from the casino.

41. Finally, AHE reserves the right to further complement the above grounds during its oral pleading.

42. Due to the aforementioned breach of contract and unlawful way of acting by Diamond Gaming, AHE has suffered, is suffering, and will suffer foreseeable damage and,

Beëdigd Vertaler
Sworn Translator  Traductor Jurado
LIC. KAREL THIJS

therefore, AHE is entitled to and has an interest in the demands to be specified below in order to limit its damage and prevent any further unlawful acts by Diamond Gaming.

43.  AHE will appear voluntarily.

**MAY YOUR HONOR THEREFOR SEE FIT**

I.  as a provisional measure of order, by a judgment provisionally enforceable before execution has been issued and on all days and at all times, to forbid Diamond Gaming, pending these interlocutory proceedings, from getting rid of any goods, monetary values, property rights, etc., related to the operation of the casino – except for customary monthly or biweekly expenses – particularly by transferring, in whatever way, monetary values to Belfonti or any company controlled by Belfonti, subject to a lump sum penalty of AWG. 500,000.00 payable to AHE for each violation of this prohibition or any other suitable measure to be determined by Your Honor;

II.  further, principally, by a judgment provisionally enforceable before execution has been issued and on all days and at all times, to order Diamond Gaming to leave and vacate the building of the casino at issue within two times 24 hours after notice of this judgment has been served, removing all persons and goods (insofar as they are not the property of AHE) and leaving behind the keys and seeing to an orderly transfer of the operation of the casino to AHE, subject to a penalty of AWG. 250,000.00 per day payable to AHE for each day Diamond Gaming fails to comply with this order, and/or to authorize AHE to cause this vacation to be carried out, with the help of the police, if required, in case the defendant fails to comply with the vacation order; alternatively, to order Diamond Gaming; as a second alternative, to order Diamond Gaming to immediately continue all control procedures and instructions of AHE that existed before April 2006 with regard to the operation of the casino, subject to a penalty of AWG. 250,000.00 per day to be paid to AHE for each day Diamond Gaming fails to comply with this order;

III.  costs to be determined by the Court.

Aruba, July 23, 2007

On behalf of AHE,
Mr. H.S. Croes
On his behalf,
(*signature*)

Beëdigd Vertaler
Sworn Translator Traductor Jurado
LIC. KAREL THIJS



CROES WEVER TCHONG

**KORT GEDING**

FILE COPY

De Edelachtbare Heer/Vrouwe
Rechter in het Gerecht in
Eerste Aanleg van Aruba

Geeft eerbiedig te kennen:

De naamloze vennootschap **ARUBA HOTEL ENTERPRISES N.V.
("AHE")**, gevestigd en kantoorhoudende in Aruba, voor deze zaak domicilie
kiezende in het ARULEX CENTER te Punta Brabo z/n te Oranjestad aldaar
ten kantore van de maatschap van advocaten en belastingadviseurs CROES
WEVER TCHONG, waarvan ieder der aldaar verbonden advocaten
verklaren door eiseres te zijn gemachtigd ten deze voor haar te occuperen,
bepaaldelijk ook om dit verzoekschrift voor en namens haar te ondertekenen
en in te dienen;

1. AHE stelt hierbij in een référé en behoeft mitsdien een spoedeisende,
   geen uitstel duldende, voorziening bij voorraad tegen gedaagde de
   naamloze vennootschap **DIAMOND GAMING CORPORATION N.V.**
   ("Diamond Gaming"), gevestigd en kantoorhoudende aan de J.E.
   Irausquin Boulevard 77, Oranjestad, alhier, zulks terzake het navolgende.

**Inleiding**

2. AHE is eigenaresse van het gebouw, waarin voorheen de Wyndham
   Aruba Beach Resort & Casino was gevestigd en waarin momenteel de
   Westin Aruba Resort & Hotel (het "Hotel") is gevestigd. De "operator"
   van het Hotel is Westin Aruba Hotel Management LLC (de "Operator"), een
   met Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") verbonden
   vennootschap. Starwood is rechthebbende is op het Westin merk. De
   Operator en Starwood zijn beide vennootschappen naar het recht van de
   Verenigde Staten en worden hierna ook aangeduid met "Westin". AHE is
   tevens houdster van de casinovergunning (**PROD. 1**) van de in het Hotel
   gevestigde casino.

3. Diamond Gaming is de "operator" van het casino van het Hotel. De
   rechtsbetrekking tussen voormelde entiteiten is vastgelegd in een huur-
   exploitatieovereenkomst, gedateerd 1 november 2005, de
   "Oorspronkelijke Casino Lease (**PROD. 2**), welke op 21 april 2006 is
   geamendeerd, de "Eerste Casino Lease Amendering" (**PROD. 3**), de

1

CROES WEVER TCHONG

Oorspronkelijke Casino Lease en de Eerste Casino Lease Amendering zullen hierna worden aangeduid met: de "Casino Lease", waarover hierna meer.

**Feiten**

4.  Op 3 mei 2006 zijn de aandelen van A.H.E. Holding NV verworven door BCP Sunset Holdings II N.V., een vennootschap opgericht naar het recht van de Nederlandse Antillen ("BCP II"). BCP II is een dochteronderneming van een Amerikaanse burger, genaamd Michael Belfonti ("Belfonti"). A.H.E. Holding NV houdt alle aandelen AHE. Door deze verwerving werd AHE een dochteronderneming in het concern van Belfonti ("Belfonti-concern"), waarvan hierbij een overzicht als, **PROD. 4,** wordt overgelegd. Vanaf dat tijdstip werd AHE economisch beheerst door Belfonti.

5.  Om voormelde koop te financieren zijn twee afzonderlijke leningen afgesloten. Eveneens gedagtekend 3 mei 2006, is de eerste lening, verstrekt aan AHE door WIBC Aruba N.V., een dochteronderneming van Wachovia Bank, National Association, een bank gevestigd in de Verenigde Staten ("Wachovia"), voor een bedrag van US$ 230.000.000,= (de "WIBC Lening" of de "Wachovia Lening"). De WIBC Lening is vastgelegd in een hypothecaire leenovereenkomst, gedateerd 3 mei 2006, met als onderpand het hotelgebouw, te vinden op de CD welke hierbij, als **PROD. 5**, wordt overgelegd.

6.  Op of omstreeks 9 juni 2006 is een tweede lening ten bedrage van US$ 19.450.000,=, verstrekt door Petra Mortgage Capital Corp. LLC ("Petra"), aan BCP Florin LLC ("BCP Florin"), een dochteronderneming in het Belfonti-concern (de "Petra Lening"). De Petra Lening is vastgelegd in een "loan and security agreement" ("Mezzanine Loan Agreement"), te vinden op de CD welke hierbij, als **PROD. 6**, wordt overgelegd.

7.  De Petra Lening was een zogeheten "non-recourse" lening; dat wil zeggen, dat de lening enkel werd "gedekt" door de aandelen "Twilight Holdings, LLC" ("Twilight Holdings"), die BCP Florin bezat. Twilight Holdings was een dochteronderneming in het Belfonti-concern, die middellijk de aandelen AHE bezat (vide **PROD. 4**). Derhalve, in geval van verzuim casu quo wanprestatie aan de kant van BCP Florin, zou Petra enkel zich kunnen verhalen op de aandelen Twilight Holdings.

8.  Destijds, in juni 2006, heeft Petra ingestemd met het verstrekken van de lening, omdat zij, met name vanwege de significante inkomsten die van het casino onder de voorwaarden van de in de navolgende paragraaf te bespreken Casino Lease zouden worden ontvangen, verwachtte dat AHE en BCP Florin in staat zouden zijn om aan hun verplichtingen jegens Petra te voldoen.

9. De Oorspronkelijke Casino Lease (vide **PROD. 2**), werd, met het oog op de financiering van de aankoop van het Hotel, op 21 april 2006 geamendeerd: de Eerste Casino Lease Amendering (vide **PROD. 3**). Op grond van de Eerste Casino Lease Amendering van 21 april 2006, dient Diamond Gaming maandelijks als huursom US$ 275.000,= (in plaats van US$ 220.000,= zoals neergelegd in de Oorspronkelijke Casino Lease) aan AHE te betalen, zijnde een "fixed rent", welke gedurende de duur van de overeenkomst (tien jaren) niet gewijzid kan worden, zoals uitdrukkelijk in die overeenkomst opgenomen (vide **PROD. 3**, artikel 5). Op grond van de Eerste Casino Lease Amendering moest Diamond Gaming voorts een additionele huur betalen 50% van de winst uitgaande boven een winst van US$ 416.667,= per maand (vide **PROD. 3**, artikel 6). Deze overeenkomst kan door ieder der partijen worden opgezegd met inachtneming van een termijn van dertig (30) dagen (vide **PROD. 3**, artikel 7). Uiteraard kan de overeenkomst steeds op grond van wanprestatie worden beëindigd. Ingeval de door Diamond Gaming contractueel verschuldigde en verschenen huurtermijnen niet of onvolledig zijn betaald, en nakoming van die verplichting niet geschiedt binnen de in de overeenkomst aangegeven "terme de grâce" van tien dagen, dan kan de overeenkomst door AHE worden beëindigd (vide **PROD. 2**, artikel 14 (b)). Artikel 7 van de Oorspronkelijke Casino Lease, welke bepaling niet wijzigde door de Eerste Casino Lease Amendering bepaalt:

> "Should the rent remain due and unpaid for ten (10) days after receipt of written notice to [...] [Diamond Gaming, *HSC*] that such rent is past due and payable, [AHE, *HSC*] shall have the option of declaring the balance of the rent for the term of this lease to be immediately due and payable and [AHE, *HSC*} may ,then proceed immediately to collect all of the unpaid rent called for by this lease, including costs and reasonable attorney's fees, by any remedy provided by law. For each day after the fifth (5th) day that [Diamond Gaming, *HSC*] is in default in paying the rent a daily penalty charge of $5,000 (five thousand US dollars) must be paid by [Diamond Gaming, *HSC*]."

10. Nog vóórdat de leningen door WIBC, gedagtekend 3 mei 2006, c.q. door Petra, gedagtekend 9 juni 2006, werden verstrekt, is Belfonti Capital Partners, LLC ("BCP"), een "real estate investment company", waarvan Belfonti alle aandelen in handen heeft en dus waarover hij het volledige economische beheer uitoefende, in het geheim, gedagtekend 21 april 2006, een zogeheten "put and call" overeenkomst, aangegaan met de toenmalige eigenaresse en enig aandeelhoudster van Diamond Gaming, Casablanca Gaming Management Company S.A., en haar principaal en enig aandeelhouder Alfonso Riveroll Estrada ("Riveroll") (**PROD. 7**). Riveroll was tot 3 mei 2006 (uiteindelijk) mede eigenaar van het Hotel en tot 27 december 2006, "managing director" van AHE (**PROD. 8**).

11. Let op: de "put and call" overeenkomst is op dezelfde dag gesloten als de Eerste Casino Lease Amendering. De Eerste Casino Lease Amendering

3

was door Belfonti aan WIBC en Petra bekend gemaakt en de huur inkomsten van de Casino Lease waren door Belfonti gebruikt om WIBC en Petra te verleiden om de leningen aan de Belfonti vennootschappen te verstrekken. Maar noch WIBC noch Petra werden geïnformeerd over de gelijktijdig afgesloten "put and call" overeenkomst. Op 4 december 2006 maakte Riveroll gebruik van zijn put optie (**PROD. 9**) en kwam Diamond Gaming, omstreeks december 2006, voor het luttele bedrag van US$ 1.000,=, in handen van BCP en werd sedertdien economisch beheerst door Belfonti.

12. Dit alles was, het kan ook bijna niet anders, opzettelijk voor Petra en WIBC (Wachovia) verborgen gehouden door Belfonti.

13. Begin 2007 bleken AHE en BCP Florin problemen te hebben met het voldoen aan hun aflossingsverplichtingen voortvloeiende uit de overeenkomsten van geldlening met Petra en WIBC. Belfonti heeft bewust het risico op de koop toe genomen, dat BCP Florin en AHE aan hun respectieve betalingsverplichtingen, voortvloeiende uit de Petra Lening en de Wachovia Lening, op korte termijn niet meer zouden kunnen voldoen. Toen Belfonti zijn financiële problemen aan Petra bekend maakte, heeft Petra Belfonti duidelijk laten weten, dat, indien hij niet aan zijn verplichtingen voortvloeiende uit de lening zou voldoen, Petra gebruik zou maken van haar executierecht. Belfonti moet omstreeks begin april hebben geweten, althans hebben kunnen weten, dat BCP Florin op korte termijn in verzuim zou raken en dat, ingeval van verzuim, Petra gebruik zou maken van haar executierecht, in welk geval Petra volledige zeggenschap en controle zou krijgen over BCP Florin's dochter Twilight Holdings en haar middellijke dochters, waaronder AHE.

14. Begin april 2007, heeft Belfonti ervoor gezorgd, dat de twee entiteiten die hij economisch beheerste - t.w. AHE en Diamond Gaming - heimelijk de Casino Lease hebben gewijzigd. Overgelegd wordt een brief gedagtekend 22 januari 2007 van de directeur van Diamond Gaming, de heer Barrow, aan de met "Managing Director" van AHE aangeduide heer Belfonti, waarin de eerstgenoemde verzoekt om bevestiging van een aantal nadere afspraken over de Casino Lease (**PROD. 10**). Deze brief, welke hierna zal worden aangeduid met de "Vermeende Casino Lease Amendering", is voor akkoord getekend door Belfonti als "a director": bestuurder? Blijkens het historisch uittreksel uit het handelsregister (**PROD. 11**) blijkt de heer Belfonti met ingang van 1 januari 2007 als directeur ("Managing Director") van AHE te zijn uitgetreden en op 1 januari 2007 tot commissaris te zijn bedoeld. Niettemin tekent hij de brief namens AHE met "Agreed" (vide **PROD. 10**, blz. 2).

15. De op 15 december in functie getreden nieuwe directeur van AHE, mevrouw Marieta Rufina Ras ("mevrouw Ras") (vide **PROD 11**) tekent ook namens AHE maar dan *met de hand geschreven* en zonder dat vermeld wordt op welke datum die brief voor akkoord zou zijn getekend. Uit de verklaring van mevrouw Ras van 18 juli 2007 (**PROD. 12**) blijkt, dat de brief haar door Belfonti begin april 2007 is aangeboden en dat

4

Belfonti haar heeft verzocht die brief als directrice van AHE te
ondertekenen; omdat Belfonti haar baas was voelde zij zich onder druk
gezet om te doen wat hij haar vroeg (vide **PROD. 12**, onderdeel 8):

> "In or about early April 2007, Belfonti presented me with a
> letter agreement, dated January 22, 2007, between AHE and
> Diamond Gaming. The letter agreement purported to be an
> amendment to the Casino Lease (the "Purported Amendment").
> I had never seen or heard any reference to this document before.
> Belfonti asked me to sign the Purported Amendment in my
> capacity as Managing Director of AHE. He told me that he had
> discussed the Purported Lease Amendment with Starwood, the
> company that operates the Hotel. Belfonti was my boss and I felt
> pressure to do as he asked, so I signed the Purported
> Amendment."

Belfonti deed dit alles zonder Petra daarvan in kennis te stellen en zonder
van Petra daarvoor toestemming te vragen. Op grond van artikel 2.34 (c)
(viii) van de Petra Lening (vide **PROD. 6**)was het Belfonti en de met
hem verbonden ondernemingen verboden de Casino Lease te wijzigen
zonder toestemming van Petra. Belfonti en de met hem verbonden
ondernemingen moesten onder de WIBC Lening, ook toestemming van
WIBC hebben om de Casino Lease te wijzigen. Belfonti en AHE
moesten ook toestemming verkrijgen van operator Westin. Alhoewel
Belfonti, die zowel AHE als Diamond Gaming economisch beheerste,
zeer wel op de hoogte was van het feit dat hij voorafgaande toestemming
van Petra, WIBC en Westin nodig had, werd nimmer de toestemming
van Petra, WIBC en Westin gevraagd laat staan ontvangen.

16. Mevrouw Ras heeft Belfonti nog voorgehouden, dat de tweede
amendering de goedkeuring van de Raad van Commissarissen behoefde
(vide **PROD. 12**, onderdeel 9).

17. Per brief van 12 april 2007 heeft Wachovia AHE (**PROD. 13**), en per
brief van 13 april 2007 heeft Petra BCP Florin (**PROD. 14**) in gebreke
gesteld.

18. Laat in de namiddag van 13 april 2007 heeft Belfonti mevrouw Ras
opdracht gegeven om bepaalde AHE dossiers het casino betreffend, te
verplaatsen van het kantoor van AHE naar die van Diamond Gaming
(vide **PROD. 12**, onderdeel 12). Op 14 april 2007 heeft Belfonti,
vergezeld door 2 personen twee kasten met dossiers uit het kantoor van
AHE verwijderd (vide **PROD. 12**, onderdeel 13). Die kasten bevatten
nog documenten uit de tijd voordat Diamond Gaming bij de exploitatie
van het casino betrokken raakte!

19. Later, op 14 april 2007, heeft Belfonti mevrouw Ras gezegd dat hij
Aruba voorgoed ging verlaten en begreep mevrouw Ras voor het eerst,
dat de Belfonti dochterondernemingen niet aan hun verplichtingen onder
de leningen hadden voldaan (vide **PROD. 12**, onderdeel 14). Omdat

mevrouw Ras verwachtte dat er nieuwe eigenaren zich op korte termijn zouden aandienen, wilde zij bepaalde directiebesluiten alsnog door de Raad van Commissarissen laten goedkeuren. Op 16 april 2007 heeft zij per e-mail en fax, en met inachtneming van minder dan 24 uur een vergadering van de Raad van Commissarissen bijeen geroepen (**PROD. 15**). Blijkens de notulen van de op 17 april 2007 per telefoon gehouden vergadering (**PROD. 16**) waren er 2 van de 3 leden van de Raad van Commissarissen aanwezig; afwezig was de door WIBC ("Wachovia") benoemde commissaris Rosenberg. Tijdens die vergadering is de "[...] lease amendment with Diamond Gaming Corporation N.V. signed on January 22, 2007" door de twee aanwezige commissarissen goedgekeurd (vide **PROD. 14**, onder punt 3 op de tweed bladzijde). De Vermeende Casino Lease Amendering had tot doel om Diamond Gaming's maandelijkse huurbetalingsverplichting ad US$ 275.000,= te verlagen naar slechts US$ 60.000,=. De Vermeende Casino Lease Amendering had tevens tot doel om de opzeggingsbepaling van 30 dagen te elimineren en te beperken tot gevallen van "default", waarbij wel AHE aan een dertig jarige lease lopende tot 2037 zou (kunnen) worden gebonden. AHE legt hierbij over een overzicht van de belangrijkste wijzigen voortvloeiende uit de Vermeende Casino Lease Amendering (**PROD. 17**) en waaruit gevoeglijk kan worden afgeleid, dat Diamond Gaming en Belfonti door de Vermeende Casino Lease Amendering behoorlijk zijn bevoordeeld.

20. Dat de Vermeende Casino Lease Amendering niet in januari 2007 heeft plaatsgevonden maar pas in april 2007 kan ook worden afgeleid uit het feit, dat Diamond Gaming tot maart 2007 de huur van US$ 275.000,= conform de Casino Lease heeft betaald en pas met ingang van april 2007 is begonnen met het betalen van een huur van slechts US$ 60.000,= op grond van de Vermeende Casino Lease Amendering. Ook is het beheer van de bar van de casino pas op 1 april 2007 door Diamond Gaming overgenomen (vide **PROD. 10**, onderdeel 1, laatste zin). Belfonti en Diamond Gaming zouden nog altijd moeten uitleggen waarom zulk een substantiële verlichting van haar betalingsverplichtingen aan AHE is gegeven en waarom andere belangrijke tegemoetkomingen tussen 22 januari 2007 en 17 april 2007 zonder "follow up" zijn gebleven.

21. De Vermeende Casino Lease Amendering is nu een klassiek voorbeeld van een ongeoorloofde "self-dealing" transactie en is dus een volledig eenzijdig tot stand gekomen transactie. Het zorgde ervoor, dat AHE (de entiteit waarvan Belfonti kennelijk ten volle verwachtte, dat die onder Petra's economische controle zou komen te vallen) zonder enige consideratie van AHE's vennootschappelijke belangen haar maandelijkse inkomen drastisch zou zien verminderd. Tegelijkertijd leverde de Vermeende Casino Lease Amendering voor Diamond Gaming (de entiteit waarvan Belfonti eigenaar zou blijven) een substantieel economisch voordeel op van zegge en schrijve US$ 215.000,= per maand en mogelijk voor de komende dertig jaar.

22. Niet lang nadat Belfonti Aruba had verlaten, heeft Diamond Gaming de elektronische toegang van AHE tot de financiële gegevens van Diamond Gaming geblokkeerd en bleek AHE niet langer in staat om de video beelden van de bewakingscamera's in het casino te bezichtigen (vide **PROD. 12**, onderdeel 14).

23. Nadat AHE en BCP Florin in gebreke waren gesteld (vide **PROD. 13** en vide **PROD. 14**), heeft Petra in mei 2007 haar executierecht ten aanzien van BCP Florin uitgeoefend, waardoor Petra, middels haar dochter NFO Holdings Ltd, controle en zeggenschap kreeg over de aandelen van AHE (**PROD. 18**). Het is pas daarna, dat Petra op de hoogte kwam van het bestaan van de geheime "put and call" overeenkomst tussen Casablanca en BCP (lees: Belfonti) en dat zulks bewust door Belfonti aan Petra is onthouden, immers maakte onder meer die geheime overeenkomst geen onderdeel uit van de zogeheten "Borrowers's Certificate", welke door BCP Florin aan Petra in het kader van de te verstrekken geldlening is verstrekt (**PROD. 19**). AHE heeft de afgelopen vier maanden, derhalve april, mei, juni en juli 2007 moeten constateren, dat Diamond Gaming heeft verzuimd om AHE de maandelijkse huursom van US$ 275.000,= te betalen, doch in plaats daarvan slechts US$ 60.000,= per maand heeft betaald. Bijgevolg is er thans sprake van een huurachterstand van om en nabij US$ 860.000,= vermeerderd met de bedongen boete als bedoeld in artikel 7 van de Oorspronkelijke Casino Lease (zie sustenu 9 hierboven: US$ 5.000.= voor elke dag verzuim na de vijfde dag) terwijl verschuldigde huren direct opeisbaar zijn geworden. Bovendien is Diamond Gaming AHE rente verschuldigd ad. 18% per jaar over de uitstaande bedragen.

24. Op 21 juni 2007 kreeg AHE een brief van het meldpunt ongebruikelijke transacties ("MOT") in handen gedagtekend 8 maart 2007 (**PROD. 20**). In die brief werd het casino ondermeer bericht, dat de MOT had vernomen dat het casino geen schriftelijke procedures had met betrekking tot vereisten die voortvloeien uit de Landsverordening meldplicht ongebruikelijke transacties (AB 1995 no. 85, LvMOT) en de Landsverordening identificatie bij financiële dienstverlening (AB 1995 no. 86, LvIFD). Per brief van 4 juli 2007 heeft ondergetekende namens AHE, de casinovergunning staat op haar naam, die brief beantwoord (**PROD. 21**). Naar aanleiding van laatstgenoemde brief, ontving het kantoor van ondergetekende een brief van Diamond Gaming gedagtekend 11 juli 2007 (**PROD. 22**). Het antwoord is onthutsend omdat daaruit spreekt, dat Diamond Gaming duidelijk zich noch de ernst van de brief van de MOT realiseert noch het belang dat AHE bij het nakomen van wettelijke verplichtingen heeft: met geen woord wordt ingegaan op de door de MOT geconstateerde verzuimen.

25. Het antwoord van Diamond Gaming (vide **PROD. 22**), gevoegd bij het feit, dat deze economisch beheerst wordt door een persoon, Belfonti, die verwikkeld is in, naar het zich laat aanzien, een omvangrijke fraude, toont aan dat Diamond Gaming niet geschikt is om een casino te exploiteren en dat voortgezette exploitatie door Diamond Gaming AHE's

CROES WEVER TCHONG

casino vergunning in gevaar kan brengen. Het is Diamond Gaming die het casino exploiteert en het is het falen van Diamond Gaming en niet dat van AHE dat tot de door de MOT gesignaleerde tekortkomingen heeft geleid. Diamond Gaming had maatregelen moeten treffen om die tekortkomingen te voorkomen althans terstond moeten corrigeren. Immers de reputatie van AHE en het casino waarvan AHE vergunninghoudster is, is in geding.

26. Ook zal Diamond Gaming bij voortgezette exploitatie een bedreiging zijn voor de reputatie en integriteit van het casino en daarom van het Hotel. Derhalve is de mogelijke schade voor AHE bij voortgezette exploitatie van het casino door Diamond Gaming niet te becijferen.

27. Op 25 mei 2007 heeft Diamond Gaming een bodemprocedure tegen AHE aangespannen waarin zij nakoming van de Vermeende Casino Lease Amendering vordert (**PROD. 23**). Het is opvallend, dat in haar verzoekschrift Diamond Gaming geen gewag maakt van het feit, dat Belfonti uiteindelijk eigenaar is van Diamond Gaming en dat hij, ten tijde van het totstandkomen van de Vermeende Casino Lease Amendering, beide partijen tot de Vermeende Casino Lease Amendering economisch beheerste – welke amendering ten detrimente van AHE en alleen ten voordele van Diamond Gaming strekte – en die partijen tot die amendering heeft aangezet (in strijd met het recht van Petra, WIBC en Westin om toestemming te geven of te onthouden) omdat hij wist, of behoorde te weten dan wel te beseffen, dat Petra spoedig controle over AHE zou krijgen terwijl hij juist de controle over Diamond Gaming zou behouden.

28. In haar verzoekschrift (vide **PROD. 23**) benadrukt Diamond Gaming het feit dat AHE's directeur, en mevrouw Ras, de Vermeende Casino Lease Amendering heeft getekend en de vergadering van de raad van commissarissen van AHE tijdens welke de Vermeende Casino Lease Amendering was "goedgekeurd", bijeen had geroepen. Maar aan deze handelingen behoort niet veel waarde te worden gehecht. Zoals uit **PROD. 12** blijkt, voelde mevrouw Ras zich gedwongen de Vermeende Verklaring te tekenen.

29. Mevrouw Ras is geen ervaren directeur, ze is pas eind december 2006 tot directeur benoemd. Mevrouw Ras is ook geen advocaat en, vlak voordat BCP Florin in verzuim raakte en Belfonti op 14 april 2007 Aruba verliet, heeft mr. Maura Brown, jarenlang AHE's advocaat, mevrouw Ras medegedeeld dat zij zich terugtrok als advocaat van AHE terwijl zij aanbleef als advocaat voor Belfonti en Diamond Gaming! Zonder te kunnen beschikken over bijstand van AHE's advocaat, met de wetenschap dat vele handelingen waren verricht gedurende de tijd dat Belfonti de scepter zwaaide, waaronder de Vermeende Casino Lease Amendering, die niet was goedgekeurd door de raad van commissarissen van AHE alhoewel die goedkeuring wel behoefden, en in de wetenschap dat door het verzuim van AHE en BCP Florin AHE een nieuwe eigenaar zou krijgen, heeft mevrouw Ras de op naïviteit

gebaseerde beslissing genomen om een vergadering van de raad van commissarissen bijeen te roepen om die handelingen om administratieve redenen alsnog goedgekeurd te krijgen, waaronder de Vermeende Casino Lease Amendering.

30. Die vergadering is bijeen geroepen met inachtneming van een oproepingstermijn van nog geen 24 uur. Slechts 2 commissarissen van de raad van commissarissen namen per telefoon deel: Belfonti en zijn Amerikaanse advocaat. De derde, en enige onpartijdige, door WIBC benoemde commissaris Rosenberg, nam geen deel aan die met zo een korte oproepingstijd bijeen geroepen vergadering en dus ook niet aan de besluitvorming. Belfonti zelf was tijdens de vergadering vertegenwoordigd door AHE's advocaat van vele jaren, mevrouw mr. Maura Brown, die AHE had verlaten ten faveure van Belfonti. Zoals mr. Brown in een recent door AHE van haar ontvangen brief d.d. 16 juli 2007 (**PROD. 24**) bevestigd, was AHE tijdens die vergadering niet door een gekwalificeerde advocaat vertegenwoordigd. Derhalve had Belfonti én het voordeel, dat tijdens die vergadering van de raad van commissarissen zijn Amerikaanse advocaat met hem meestemde, én het voordeel van de aanwezigheid van mevrouw mr. Brown die overgelopen was van het kamp van AHE naar die van Belfonti. Geen gekwalificeerde advocaat was aanwezig om AHE's belangen te verdedigen! Mevrouw mr. Brown maakte misbruik van de vertrouwenspositie die zij tot voor kort in AHE had bekleed. Daarna dienden Belfonti en zijn Amerikaanse advocaat hun ontslag als commissaris van AHE in.

31. Per slot van rekening was de handtekening door mevrouw Ras in april 2007 onder de Vermeende Casino Lease Amendering gezet, het resultaat van dwang dan wel "undue influence" door Belfonti, terwijl de daarop volgende vergadering van de raad van commissarissen niet meer was dan een uit onwetendheid en onervarenheid geboren poging om de door Belfonti achtergelaten chaos op te ruimen, waarmee alleen de belangen van Belfonti en niet die van AHE werden gediend.

32. Per brief van 8 juni 2007 heeft Petra Belfonti gesommeerd terzake van het verzuim van Diamond Gaming om het volledige huurbedrag van US$ 275.000,= per maand te voldoen over de maanden april, mei en juni 2007 (**PROD. 25**). Diamond Gaming heeft tot op heden daaraan niet voldaan en is dus ernstig en thans in verzuim. Sinds Petra AHE bezit, dat was ook zo op 8 juni 2007, dient die brief als een in gebreke stelling aan Diamond Gaming te worden gezien welk verzuim niet is hersteld binnen de periode van 10 dagen als bepaald in de Casino Lease. Derhalve dient de Casino Lease als ontbonden te worden beschouwd op grond van Diamond Gaming's langdurig, niet hersteld verzuim om de huur te voldoen.

33. AHE erkent de Vermeende Casino Lease Amendering niet en heeft bij schrijven van 17 juli 2007 de nietigheid daarvan en de daaraan ten grondslag liggende besluiten ingeroepen en voor zover nodig worden die

hierbij nogmaals ingeroepen (**PROD. 26**). De Vermeende Casino Lease Amendering is nietig, althans vernietigbaar omdat

(i) deze niet aan de maatschappelijke zorgvuldigheid voldoet, die betaamt tussen organen van AHE, hetgeen aan Diamond Gaming (lees: Belfonti) bekend was;

(ii) de huursom niet kan worden gewijzigd op de voet van het bepaalde in artikel 6 van de Eerste Casino Lease Amendering (vide **PROD. 3**);

(iii) de bepalingen van de Vermeende Casino Lease Amendering een product zijn van een "self-dealing" transactie georkestreerd door Belfonti, toen hij volledig zeggenschap en controle had over zowel AHE, als Diamond Gaming. De transactie was strijdig met AHE's vennootschappelijke belangen (ultra vires, zie HR 24 februari 2006 LJN: AU6938, R04/085HR) en leverde geen voordeel op voor AHE, doch was uitsluitend en alleen aangegaan voor Belfonti's eigen persoonlijk gewin en om de waarde van het onderpand van AHE's creditrice, Petra, te doen verminderen en aldus eventuele verhaalsmogelijkheden te frustreren.

34. Naar maatstaven van de redelijkheid en billijkheid zou het tevens onaanvaardbaar zijn, indien AHE in casu gebonden zou zijn aan de Vermeende Casino Lease Amendering, juist gelet op de onderhavige ongeoorloofde "self-dealing" transactie. Derhalve is de Vermeende Casino Lease Amendering voor AHE van nul en generlei waarde, althans is zulks non-existent.

Verder, zoals eerder opgemerkt, had Belfonti AHE bewogen om de Vermeende Casino Lease Amendering te tekenen in strijd met niet alleen het recht van Petra om toestemming te verlenen, maar ook die van WIBC. Aldus is AHE in gebreke voor wat betreft de WIBC Lening. Indien de Vermeende Casino Lease Amendering afdwingbaar blijkt te zijn, zal Petra (als nieuwe uiteindelijk eigenaar van AHE) niet in staat zijn om AHE's verzuim jegens WIBC te herstellen. Dit zou AHE in een onmogelijke positie brengen.

35. In de brief van 17 juli 2007 (vide **PROD. 26**) heeft AHE heeft de Casino Lease, met inachtneming van de overeengekomen periode van 30 dagen, opgezegd ook op grond van de navolgende, niet limitatief bedoelde, overtredingen van de Casino Lease door Diamond Gaming:

(i) Diamond Gaming heeft verzuimd om de maandelijks huur ad US$ 275.000,= over de maanden april 2007 t/m juli 2007 te betalen, als vereist in artikel 5 van de Eerste Amendering. Dit is een schending van artikel 14 (b) van Casino Lease.

(ii) Zoals blijkt uit het schrijven van de Directeur van het Meldpunt Ongebruikelijke Transacties (MOT), heeft Diamond Gaming verzuimd om de casino te leiden " in strict accordance with the Gambling License and the law", zulks in strijd met artikel 1.2 j.o. artikel 21 van de Oorsponkelijke Casino Lease.

(iii) Geen "financial statements" zijn bezorgd door Diamond Gaming aan AHE sedert maart 2007, in strijd met artikel 10 van de Oorsponkelijke Casino Lease;

CROES WEVER TCHONG

(iv) Diamond Gaming heeft verzuimd om tijdig aan AHE te verstrekken bewijzen van betaling van al haar belastingverplichtingen met betrekking tot de casino exploitatie (zulks in strijd met artikel 6 ("Taxes") van Casino Lease);

(v) Diamond Gaming heeft verzuimd AHE op de hoogte te stellen omtrent de plaats en beschikking van zekere slotmachines, die werden vervangen door nieuwe, zulks in strijd met artikel 17 van de Oorsponkelijke Casino Lease;

(vi) Diamond Gaming heeft verzuimd de verzekeringspolissen te verstrekken, welke polissen vereist zijn conform de Oorsponkelijke Casino Lease;

(vii) Diamond Gaming AHE's mogelijkheden om de activiteiten in de casino te monitoren via beveiligingscamera's heeft geblokkeerd. Daaraan kan worden toegevoegd, dat Diamond Gaming de contractueel vastgelegde plicht om de procedures van AHE betreffende de casino exploitatie vermoedelijk heeft geschonden.

**Recht**

36. Naar hiervoor gezegd, erkent AHE voormelde de Vermeende Casino Lease Amendering en de daaraan ten grondslag liggende besluiten niet en heeft zelfs de nietigheid ervan ingeroepen. De Vermeende Casino Lease Amendering van 22 januari 2007 is nietig, althans vernietigbaar, omdat de Vermeende Casino Lease Amendering een product is van een "self-dealing" transactie, bedrog en misbruik van omstandigheden, georkestreerd door Belfonti, toen hij de volledige zeggenschap en controle had over zowel AHE als Diamond Gaming (lees: economisch beheerste). De transactie was strijdig met AHE's vennootschappelijke belangen en dus tevens strijdig met de redelijkheid en billijkheid en leverde geen voordeel op voor AHE, doch was uitsluitend en alleen aangegaan voor Belfonti's eigen persoonlijk gewin en die van Diamond Gaming om de waarde van het onderpand van AHE's creditrice, Petra, en andere crediteuren, zoals Wachovia, te doen verminderen en aldus eventuele verhaalsmogelijkheden te frustreren; naar maatstaven van de redelijkheid en billijkheid zou het tevens onaanvaardbaar zijn, indien AHE in casu gebonden zou zijn aan de Vermeende Casino Lease Amendering, juist gelet op de onderhavige ongeoorloofde "self-dealing transactie". Derhalve is deze Vermeende Casino Lease Amendering voor AHE van nul en generlei waarde, althans is zulks non-existent.

37. Naar hierboven gesteld, heeft AHE eveneens bij voormeld schrijven van 17 juli 2007 de Casino Lease beëindigd.

38. Diamond Gaming heeft verzuimd om de maandelijks huur ad US$ 275.000,= over de afgelopen vier maanden te betalen, als vereist in artikel 5 van de Eerste Casino Lease Amendering, hetgeen haar ook is aangezegd. Dit is een schending van artikel 14 (b) van de Oorspronkelijke Casino Lease.

11

39. Gelet hierop en het hierin gestelde pleegt Diamond Gaming ernstige wanprestatie en handelt zij tevens onrechtmatig.

40. Gelet op al het vorenstaande heeft AHE gegronde redenen om te vrezen, dat Diamond Gaming in deze opzeggingsperiode haar ernstige schade in de miljoenen belopende, kan berokkenen, dat het vermogen van Diamond Gaming uit Aruba zal verdwijnen en dat Diamond Gaming haar verplichtingen niet zal (kunnen) nakomen, zodat AHE genoodzaakt is U E.A. te verzoeken haar alvast te vergunnen ter bescherming van haar casinovergunning Diamond Gaming uit het casino gebeuren te verwijderen.

41. AHE behoudt zich tenslotte het recht voor om vorenstaande gronden nader aan te vullen ter gelegenheid van pleidooi.

42. Door voormelde wanprestatie en onrechtmatige handelwijze van Diamond Gaming leed, lijdt en zal AHE voorzienbare schade lijden en heeft derhalve AHE recht en belang bij de na te melden vorderingen ter beperking van haar schade en ter voorkoming van verder onrechtmatig handelen zijdens Diamond Gaming.

43. AHE zal vrijwillig verschijnen.

**MITSDIEN HET U E.A. MOGE BEHAGEN** I als voorlopig ordemaatregel bij provisioneel vonnis, uitvoerbaar bij voorraad op enkel vertoon van de minuut en op alle dagen en uren Diamond Gaming te verbieden, hangende dit kort geding, zich te ontdoen van goederen, geldswaarden, vermogensrechten, enzovoorts, verband houdende met de exploitatie van het casino – de gebruikelijke maandelijks of tweewekelijks verschijnende kosten uitgezonderd – in het bijzonder door op welke wijze dan ook geldswaarden over te maken naar Belfonti of enige door Belfonti gecontroleerde onderneming op verbeurte van een aan AHE ineens te betalen dwangsom van Afl. 500.000,00 per overtreding hiervan of andere passende maatregel door U.E.A. te bepalen, II wijders primair bij vonnis, uitvoerbaar bij voorraad, op de minuut en op alle dagen en uren, Diamond Gaming te veroordelen om binnen twee maal 24 uren na betekening van dit vonnis het gebouw van het onderhavige casino te verlaten en te ontruimen met alle personen en goederen (voorzover niet eigendom van AHE) met achterlating van de sleutels en met zorg voor een ordentelijke overdracht van de exploitatie van het casino aan AHE, op straffe van een aan AHE te betalen dwangsom van Afl. 250.000,00 per dag voor elke dag, dat Diamond Gaming ingebreke blijft aan de veroordeling te voldoen, dan wel met machtiging van AHE om die ontruiming zelf te doen uitvoeren, zo nodig met behulp van de sterke arm, indien gedaagde in gebreke blijft aan de veroordeling tot ontruiming te voldoen; subsidiair Diamond Gaming te gelasten; meer subsidiair Diamond Gaming te gelasten om alle voor april 2006 bestaande controleprocedures en instructies van AHE omtrent de exploitatie van het casino onverwijld te continueren op verbeurte van een aan AHE te betalen dwangsom van Afl. 250.000,00 per dag voor elke dag, dat Diamond Gaming in gebreke zou zijn hieraan te voldoen, III kosten rechtens.

12

CROES WEVER TCHONG

Aruba, 23 juli 2007

Namens AHE,

Mr H.S. Croes

13

