# EXHIBIT A

LOAN AGREEMENT

Dated as of May 3, 2006

By and Among

ARUBA HOTEL ENTERPRISES N.V.,
as Borrower,

and

WIBC ARUBA N.V.,
as Lender

# TABLE OF CONTENTS

**Page**

## I. DEFINITIONS; PRINCIPLES OF CONSTRUCTION

| | | |
|---|---|---|
| Section 1.1 | Definitions | 1 |
| Section 1.2 | Principles of Construction | 24 |

## II. THE LOAN

| | | |
|---|---|---|
| Section 2.1 | The Loan; the Term. | 24 |
| 2.1.1 | Agreement to Lend and Borrow | 24 |
| 2.1.2 | Single Disbursement to Borrower | 24 |
| 2.1.3 | The Note | 24 |
| 2.1.4 | Use of Proceeds | 24 |
| 2.1.5 | Component Notes | 24 |
| Section 2.2 | Interest Rate. | 25 |
| 2.2.1 | Applicable Interest Rate | 25 |
| 2.2.2 | Interest Calculation | 25 |
| 2.2.3 | Determination of Interest Rate | 25 |
| 2.2.4 | Usury Savings | 27 |
| Section 2.3 | Loan Payments. | 28 |
| 2.3.1 | Payments Before Maturity Date | 28 |
| 2.3.2 | Payment on Maturity Date; Extensions of Maturity Date | 28 |
| 2.3.3 | Interest Rate and Payment after Default | 30 |
| 2.3.4 | Late Payment Charge | 31 |
| 2.3.5 | Method and Place of Payment | 31 |
| Section 2.4 | Prepayments. | 31 |
| 2.4.1 | Voluntary Prepayments | 31 |
| 2.4.2 | Mandatory Prepayments | 32 |
| 2.4.3 | Prepayments After Default | 32 |
| Section 2.5 | Taxes. | 33 |
| Section 2.6 | Non-Confidentiality of Tax Treatment. | 35 |

## III. REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 3.1 | Borrower Representations. | 35 |
| 3.1.1 | Organization | 35 |
| 3.1.2 | Proceedings | 36 |
| 3.1.3 | No Conflicts | 36 |
| 3.1.4 | Litigation | 36 |
| 3.1.5 | Agreements | 36 |
| 3.1.6 | Consents | 37 |
| 3.1.7 | Title | 37 |

3.1.8     No Plan Assets ............................................................
3.1.9     Compliance .............................................................37
3.1.10    Financial Information ...............................................37
3.1.11    Condemnation .........................................................37
3.1.12    Utilities and Public Access .......................................38
3.1.13    Separate Lots ...........................................................38
3.1.14    Assessments ............................................................38
3.1.15    Enforceability .........................................................38
3.1.16    Security Documents .................................................38
3.1.17    Insurance ................................................................38
3.1.18    Licenses ..................................................................38
3.1.19    Intentionally Omitted ...............................................39
3.1.20    Physical Condition ...................................................39
3.1.21    Boundaries ..............................................................39
3.1.22    Leases .....................................................................39
3.1.23    Filing and Recording Taxes ......................................39
3.1.24    Single Purpose ........................................................39
3.1.25    Tax Filings ..............................................................40
3.1.26    Solvency .................................................................44
3.1.27    Federal Reserve Regulations ....................................44
3.1.28    Organizational Chart ................................................44
3.1.29    Bank Holding Company ............................................44
3.1.30    No Other Debt ..........................................................44
3.1.31    Investment Company Act ..........................................44
3.1.32    Access/Utilities .......................................................44
3.1.33    No Bankruptcy Filing ...............................................45
3.1.34    Full and Accurate Disclosure ....................................45
3.1.35    No Change in Facts or Circumstances; Disclosure .......45
3.1.36    Management and Franchise Agreements ......................45
3.1.37    Perfection of Accounts ..............................................45
3.1.38    Ground Lease ...........................................................46
3.1.39    Trade Name; Other Intellectual Property ....................46
3.1.40    U.S. Business ...........................................................47
Section 3.2     Survival of Representations ...................................48

IV.   BORROWER COVENANTS

Section 4.1     Borrower Affirmative Covenants ............................48
4.1.1     Existence; Compliance with Legal Requirements .......48
4.1.2     Taxes and Other Charges ..........................................48
4.1.3     Litigation ................................................................48
4.1.4     Access to Property ...................................................48
4.1.5     Further Assurances; Supplemental Mortgage Affidavits ...49
4.1.6     Financial Reporting ..................................................49
4.1.7     Title to the Property .................................................49
4.1.8     Estoppel Statement ..................................................51

| | | |
|---|---|---|
| 4.1.9 | Leases | |
| 4.1.10 | Alterations | 51 |
| 4.1.11 | Interest Rate Cap | 52 |
| 4.1.12 | Material Agreements; Indemnity Escrow Agreement; Purchase and Sale Agreement; Hotel Budgets and Plans; PIP | 52 |
| 4.1.13 | Performance by Borrower | 55 |
| 4.1.14 | Costs of Enforcement/Remedying Defaults | 56 |
| 4.1.15 | Business and Operations; Restaurant Operator and Space Operator; Licenses and Permits | 56 |
| 4.1.16 | Loan Fees | 57 |
| 4.1.17 | Ground Lease | 57 |
| 4.1.18 | PIP Work | 57 |
| 4.1.19 | IRS Form 8832 Election | 58 |
| 4.1.20 | Certain Additional Rights of Lender (VCOC) | 58 |
| Section 4.2 | Borrower Negative Covenants | 58 |
| 4.2.1 | Due on Sale and Encumbrance; Transfers of Interests | 59 |
| 4.2.2 | Liens | 59 |
| 4.2.3 | Dissolution | 59 |
| 4.2.4 | Change in Business | 59 |
| 4.2.5 | Debt Cancellation | 59 |
| 4.2.6 | Affiliate Transactions; Dividend Distributions | 59 |
| 4.2.7 | Zoning | 60 |
| 4.2.8 | Assets | 60 |
| 4.2.9 | No Joint Assessment | 60 |
| 4.2.10 | Principal Place of Business | 60 |
| 4.2.11 | Intentionally Omitted | 60 |
| 4.2.12 | ERISA | 60 |
| 4.2.13 | Material Agreements | 61 |

## V.    INSURANCE, CASUALTY AND CONDEMNATION

| | | |
|---|---|---|
| Section 5.1 | Insurance | |
| 5.1.1 | Insurance Policies | 61 |
| 5.1.2 | Insurance Company | 66 |
| 5.1.3 | Political Risk Insurance | 67 |
| 5.1.4 | | 67 |
| Section 5.2 | Casualty and Condemnation | 67 |
| 5.2.1 | Casualty | 67 |
| 5.2.2 | Condemnation | 67 |
| 5.2.3 | Casualty Proceeds | 68 |
| Section 5.3 | Delivery of Net Proceeds | 68 |
| 5.3.1 | Minor Casualty or Condemnation | 68 |
| 5.3.2 | Major Casualty or Condemnation | 68 |

# VI. RESERVE FUNDS

Section 6.1    Deposits into Lockbox Accounts..................................................
Section 6.2    Debt Service Funds...........................................................71
6.2.1    Deposit of Debt Service Funds........................................72
6.2.2    Release of Debt Service Reserve Fund.............................72
Section 6.3    Tax Funds....................................................................73
6.3.1    Deposits of Tax Funds..................................................73
6.3.2    Release of Tax Funds....................................................73
Section 6.4    Insurance Funds.............................................................73
6.4.1    Deposits of Insurance Funds.........................................73
6.4.2    Release of Insurance Funds...........................................73
Section 6.5    PIP Funds.....................................................................74
6.5.1    PIP Work...................................................................74
6.5.2    Release of PIP Funds....................................................74
Section 6.6    Ground Rent Funds.........................................................74
6.6.1    Deposit of Ground Rent Funds......................................74
6.6.2    Release of Ground Rent Reserve Funds...........................74
Section 6.7    Additional Deposit on Extension of Maturity Date.............74
Section 6.8    Profits Tax Funds...........................................................75
6.8.1    Deposit of Profits Tax Fund..........................................75
6.8.2    Release of Profits Tax Reserve Fund..............................75
Section 6.9    Additional Amounts.......................................................75
Section 6.10    Application of Reserve Funds...........................................75
Section 6.11    Security Interest in Reserve Funds...................................75
6.11.1    Grant of Security Interest.............................................75
6.11.2    Income Taxes.............................................................75
6.11.3    Prohibition Against Further Encumbrance......................76
Section 6.12    Cash Management.........................................................76
6.12.1    Permitted Investments.................................................76
6.12.2    Earnings on Fund Collateral; Monthly Statements...........76

# VII. PROPERTY MANAGEMENT

Section 7.1    The Management Agreements; Starwood Agreements...........76
Section 7.2    Prohibition Against Termination or Modification.................77
Section 7.3    Replacement of Manager.................................................78

# VIII. TRANSFERS

Section 8.1    Lender's Reliance; No Transfers.......................................78
Section 8.2    Permitted Transfers.......................................................79

# IX. SALE AND SECURITIZATION OF MORTGAGE

Section 9.1    Sale of Mortgage and Securitization..................................81

| Section 9.2 | Securitization Indemnification | 84 |
| Section 9.3 | Asset Management | 86 |

## X.   DEFAULTS

| Section 10.1 | Event of Default | 86 |
| Section 10.2 | Remedies | 89 |
| Section 10.3 | Right to Cure Defaults | 90 |
| Section 10.4 | Remedies Cumulative | 91 |

## XI.   MISCELLANEOUS

| Section 11.1 | Successors and Assigns | 91 |
| Section 11.2 | Lender's Discretion | 91 |
| Section 11.3 | Governing Law | 91 |
| Section 11.4 | Modification, Waiver in Writing | 93 |
| Section 11.5 | Delay Not a Waiver | 93 |
| Section 11.6 | Notices | 94 |
| Section 11.7 | Trial by Jury | 95 |
| Section 11.8 | Headings | 95 |
| Section 11.9 | Severability | 95 |
| Section 11.10 | Preferences | 95 |
| Section 11.11 | Waiver of Notice | 96 |
| Section 11.12 | Remedies of Borrower | 96 |
| Section 11.13 | Expenses; Indemnity | 96 |
| Section 11.14 | Schedules Incorporated | 97 |
| Section 11.15 | Offsets, Counterclaims and Defenses | 97 |
| Section 11.16 | No Joint Venture or Partnership; No Third Party Beneficiaries | 98 |
| Section 11.17 | Publicity | 98 |
| Section 11.18 | Waiver of Marshalling of Assets | 98 |
| Section 11.19 | Waiver of Offsets/Defenses/Counterclaims | 98 |
| Section 11.20 | Conflict; Construction of Documents; Reliance | 99 |
| Section 11.21 | Brokers and Financial Advisors | 99 |
| Section 11.22 | Exculpation | 100 |
| Section 11.23 | Prior Agreements | 102 |
| Section 11.24 | Servicer | 102 |
| Section 11.25 | Joint and Several Liability | 103 |
| Section 11.26 | Creation of Security Interest | 103 |
| Section 11.27 | Set-Off | 103 |
| Section 11.28 | Wachovia Bank, National Association | 103 |

## SCHEDULES

Schedule I      –     Plan Showing Hotel, Casino and Spa
Schedule II     –     Rent Roll and Leases
Schedule III    –     Organizational Chart
Schedule IV     –     Property Improvement Plan

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of May 3, 2006 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between WIBC ARUBA N.V., an Aruban limited liability company having an address c/o Wachovia Bank, National Association, 301 South College Street, NC 0166, Charlotte, North Carolina 28288-0166, Attention:   Real Estate Capital Markets, Commercial Real Estate Finance ("Lender"), and ARUBA HOTEL ENTERPRISES N.V., an Aruban limited liability company having an address c/o Belfonti Capital Partners, 31 West 52nd Street, Suite 1770, New York, New York 10019 ("Borrower").

All capitalized terms used herein shall have the respective meanings set forth in Article I hereof.

### W I T N E S S E T H:

WHEREAS, Borrower desires to obtain the Loan from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower subject to and in accordance with the conditions and terms of this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

## I.     DEFINITIONS; PRINCIPLES OF CONSTRUCTION

### Section 1.1     Definitions.

For all purposes of this Agreement, except as otherwise expressly provided:

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common ownership or control with such Person or is a director or officer of such Person or of an Affiliate of such Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agent" shall mean Wachovia Bank, National Association and any successor Eligible Institution thereto.

"AHE Holding" shall mean AHE Holding N.V., the one hundred percent (100%) owner of Borrower.

"Alteration Threshold" shall mean Five Million and No/100 Dollars ($5,000,000.00).

"Amoco" shall mean Amoco Development Inc.

"Annual Budget" shall mean the operating and capital budget for the Property setting forth Borrower's good faith estimate of Gross Revenue, Operating Expenses and Capital Expenditures for the applicable Fiscal Year.

"Applicable Interest Rate" shall mean, with respect to each Component, the applicable Initial Interest Rate for the first Interest Period and thereafter either (i) the LIBOR Interest Rate plus the applicable Spread for such Component with respect to any period when the Loan is a LIBOR Loan or (ii) the Substitute Rate plus the Substitute Spread with respect to any period when the Loan is a Substitute Rate Loan; provided, however, that in no event shall the Applicable Interest Rate (with respect to each Component) ever be less than the Initial Interest Rate (for such Component).

"Approved Accountant" shall mean John Chicoski, CPA, of the firm Chicoski, Skelly & Co. (having an address at 211 Schraffts Drive, Waterbury Connecticut 06705).

"Approved Annual Budget" shall have the meaning set forth in Section 4.1.12(e).

"Asset Management Fee" shall have the meaning set forth in Section 9.3.

"Assignment Documents" shall mean, collectively, the Assignments (Purchase and Sale Agreement and Escrow), the Assignment of Protection Agreement and the Assignment of Westin Franchise and License Agreement.

"Assignments (Purchase and Sale Agreement and Escrow)" shall mean (i) that certain Assignment of Rights and Claims Under Purchase and Sale Agreement and Guaranty dated as of the date hereof among BCP Sunset and Lender, (ii) that certain Assignment of Indemnity Escrow Agreement dated as of the date hereof among Lender, BCP Sunset, Riveroll, Amoco, Caledonia International Properties Inc., AHE Overseas N.V. and First American Title Insurance Company of New York, and (iii) that certain Pledge and Security Agreement (Escrow Agreement) dated as of the date hereof among BCP Sunset and Lender.

"Assignment of Protection Agreement" shall mean that certain Assignment of Interest Rate Protection Agreement of even date herewith between Borrower and Lender and acknowledged by Counterparty and any other Assignment of Interest Rate Protection Agreement hereafter delivered.

"Assignment of Westin Franchise and License Agreement" shall mean that certain Hotel Manager's and Licensor's Consent, Assignment and Subordination of Management Agreement dated the date hereof among Westin, Borrower, Westin Licensor, Starwood and Lender.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules

and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"Basic Carrying Costs" shall mean the sum of the following costs associated with the Property for the relevant Fiscal Year or payment period: (i) Taxes, (ii) Insurance Premiums and (iii) Ground Rent.

"BCP Sunset" shall mean BCP Sunset Holdings II N.V., the one hundred percent (100%) owner of AHE Holding.

"Belfonti" shall mean Belfonti Capital Partners, LLC.

"Borrower" shall mean Aruba Hotel Enterprises N.V., together with its permitted successors and permitted assigns.

"Breakage Costs" shall have the meaning provided in Section 2.2.3(f).

"Broker" shall have the meaning provided in Section 11.21.

"Business Day" shall mean any day other than a Saturday, a Sunday or a legal holiday on which national banks in any of the following locations are not open for business: (i) Aruba, (ii) the State of New York, (iii) the state where the corporate trust office of the Trustee is located, or (iv) the state where the servicing offices of the Servicer are located.

"Capital Expenditures" for any period shall mean amounts expended for replacements, alterations or additions to the Property and required to be capitalized according to GAAP.

"Capped LIBOR Rate" shall mean 5.05%.

"Casino" shall mean either the area identified on the plan attached as Schedule I or the casino operations being conducted therein, as the context shall require.

"Cash Management Agreement" shall mean that certain Cash Management Agreement of even date herewith among Lender, Borrower, Vense, Westin and Agent.

"Casualty" shall mean the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"Casualty Consultant" shall have the meaning set forth in Section 5.3.2(c).

"Casualty Retainage" shall have the meaning set forth in Section 5.3.2(d).

"Closing Date" shall mean the date of funding the Loan.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Component A" shall mean that portion of the Loan in the amount of Two Hundred Million and 00/100 Dollars ($200,000,000) made by Lender to Borrower pursuant to this Agreement.

"Component A Spread" shall mean 2.562%.

"Component B" shall mean that portion of the Loan in the amount of Thirty Million and 00/100 Dollars ($30,000,000) made by Lender to Borrower pursuant to this Agreement.

"Component B Spread" shall mean 13.20%.

"Components" shall mean, collectively, Component A and Component B.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"Counterparty" shall mean (a) the counterparty under the Interest Rate Protection Agreement or (b) a Person that guarantees such counterparty's obligations under the Interest Rate Protection Agreement or otherwise provides to such counterparty credit support acceptable to Lender or, after a Securitization, the Rating Agencies, provided, however, that such guarantor shall be deemed the "Counterparty" only for so long as the long-term credit rating issued by the Rating Agencies to such guarantor is better than the long-term credit rating of the actual counterparty under the Interest Rate Protection Agreement.

"Consumer Price Index" or "CPI" means the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, in the area where an Individual Property is located. All Items (1993-95=100), or any successor index thereto, appropriately adjusted (or, if the Consumer Price Index ceases to be published and there is no successor thereto, such other index as Lender and Borrower shall mutually agree upon).

"CPI Increase" shall be an increase, on a percentage basis, in an amount equal to the increase in the Consumer Price Index as measured over the calendar year (or other period) in which such increase is being determined.

"Debt" shall mean the outstanding principal amount of the Loan together with all interest accrued and unpaid thereon (including, without limitation, any interest that would accrue on the outstanding principal amount of the Loan through and including the end of any applicable Interest Period, even if such Interest Period extends beyond any applicable Monthly Payment Date, Prepayment Date or the Maturity Date) and all other sums (including, without limitation, the Spread Maintenance Premium and any Breakage Costs) due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage, the Environmental Indemnity or any other Loan Document.

"Debt Service" shall mean, with respect to any particular period of time, scheduled principal, if any, and interest payments under the Note.

"Debt Service Coverage Ratio" shall mean the ratio of (i) Net Cash Flow for the twelve (12) calendar month period immediately preceding the date of calculation to (ii) the projected Debt Service that would be due for the twelve (12) calendar month period immediately following such calculation based upon an assumed interest rate for such period equal to nine percent (9%) per annum. The Debt Service Coverage Ratio shall be determined by Lender quarterly, during the term of the Loan.

"Debt Service Funds" shall have the meaning set forth in Section 6.2.1.

"Debt Service Reserve Account" shall have the meaning set forth in Section 6.2.1.

"Deed of Pledge (AHE Holding)" shall mean that certain Deed of Pledge dated as of the date hereof among AHE Holding and Lender, pursuant to which AHE Holding grants to Lender a pledge and security interest in the shares of Borrower.

"Deed of Pledge (BCP Sunset)" shall mean that certain Deed of Pledge dated as of the date hereof among BCP Sunset and Lender, pursuant to which BCP Sunset grants to Lender a pledge and security interest in the shares of AHE Holding.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"Default Rate" shall mean, with respect to each Component, a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Applicable Interest Rate.

"Deposit Account" shall have the meaning provided in the Cash Management Agreement.

"Determination Date" shall mean, with respect to each Interest Period, the date that is two (2) London Business Days prior to the fifteenth (15th) day of the calendar month in which such Interest Period commences; provided, however, that Lender shall have the right to change the Determination Date to any other day upon notice to Borrower (in which event such change shall then be deemed effective) and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change.

"Disclosure Document" shall have the meaning set forth in Section 9.2(a).

"Eligible Institution" shall mean a federal or state chartered depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's, and F-1+ by Fitch, Inc. in the case of accounts in which funds are held for thirty (30) days or less or, in the case of accounts in which funds are held for more than thirty (30) days, the long term

unsecured debt obligations of which are rated at least "A" by Fitch and S&P and "A2" by Moody's.

"Environmental Indemnity" shall mean that certain Environmental Indemnity Agreement dated as of the date hereof executed by Borrower in connection with the Loan for the benefit of Lender.

"ERISA" shall have the meaning set forth in Section 3.1.8.

"Event of Default" shall have the meaning set forth in Section 10.1.

"Exchange Act" shall have the meaning set forth in Section 9.2(a).

"Exchange Act Filing" shall have the meaning set forth in Section 9.1(c).

"Exit Fee" shall mean, in the case of any repayment of principal of the Loan, including following an acceleration of the Loan, a non-refundable exit fee payable to Lender in an amount equal to one and one-half percent (1.5%) of the principal amount being repaid.

"Extension Fee" shall mean, (i) with respect to the Second Extension Period, one half of one percent (0.5%) of the outstanding principal amount of the Loan on the first day of the Second Extension Period, and (ii) with respect to the Third Extension Period, three quarters of one percent (0.75%) of the outstanding principal amount of the Loan on the first day of the Third Extension Period, each payable in connection with Borrower's option, subject to and in accordance with the terms of this Agreement, to extend the term of the Loan for the applicable Extension Period.

"Extension Period" shall mean the First Extension Period, the Second Extension Period or the Third Extension Period, as the context shall require.

"Extraordinary Expense" shall have the meaning set forth in Section 4.1.12(f).

"FF&E" shall mean all fixtures, furniture, furnishings, equipment (including operating equipment, operating supplies and fixtures attached to and forming part of the Improvements), apparatus and other personal property used in, or held in storage for use in (or if the context so dictates, required in connection with), or required for the operation of the Improvements in accordance with this Agreement, including, without limitation, (i) office furnishings and equipment, (ii) specialized hotel, spa and casino equipment necessary for the operation of the Improvements, including equipment for kitchens, laundries, dry cleaning facilities, bars, restaurants, public rooms, commercial and parking space, spa and recreational facilities, and (iii) all other furnishings and equipment as Borrower deems necessary or desirable for the operation of the Improvements in accordance with this Agreement. Anticipated FF&E expenses shall be set forth in the Approved Annual Budget.

"First Extended Maturity Date" shall mean April 9, 2009.

"First Extension Period" shall mean a period of twelve (12) consecutive months following the Initial Maturity Date.

"Fiscal Year" shall mean each twelve month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"Fitch" shall mean Fitch, Inc.

"Foreign Exchange Tax" shall mean the tax imposed and regulated by the Foreign Exchange Commission pursuant to Articles 2 and 3 of the State Ordinance (Foreign Exchange Commission), and all interest and penalties charged in connection therewith.

"Funding Loan" shall mean that certain loan being made this day by Wachovia Bank, National Association to Lender in the amount of $230,000,000.00.

"Funding Loan Agreement" shall mean that certain Funding Loan Agreement dated as of the date hereof between Wachovia Bank, National Association (as lender) and Lender (as borrower), as the same may be amended, modified, supplemented, extended or renewed from time to time.

"Funding Loan Documents" shall mean, collectively, the Funding Loan Agreement and all other documents evidencing, securing or otherwise entered into in connection with the Funding Loan (as the same may be amended, modified, supplemented, extended or renewed from time to time).

"GAAP" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession. Every reference herein to statements or other materials being in accordance with or complying with GAAP shall mean and be construed as meaning "in accordance with the Uniform System of Accounts, and reconciled in accordance with GAAP".

"Governmental Authority" shall mean any government or any court, board, agency, commission, office or authority of any nature whatsoever (foreign or domestic) or any governmental unit (federal, state, county, district, municipal, city, foreign or otherwise) having jurisdiction over the matter in question, whether now or hereafter in existence, and whether located in the United States or in any State thereof, in Aruba, in the Netherlands Antilles or in the Netherlands.

"Ground Lease" shall mean that certain Notarial Deed dated as of the date hereof between the Island Authority of Aruba and Borrower, as the same may be amended or restated from time to time (only with Lender's prior written consent).

"Ground Rent" shall mean any rent, additional rent or other charge payable by Borrower, as tenant, under the Ground Lease.

"Ground Rent Funds" shall have the meaning set forth in Section 6.6.1.

"Ground Rent Reserve Account" shall have the meaning set forth in Section 6.6.1.

"Gross Revenue" shall mean all revenue derived from the ownership and operation of the Property from whatever source, including, but not limited to, amounts paid to or collected by Borrower under the Management Agreements and Starwood Agreements, Rents, but excluding non-recurring revenues as determined by Lender, payments received by Borrower under the Interest Rate Protection Agreement, proceeds from the sale or refinancing of the Property (or of any ownership interest in the Property), security deposits (except to the extent determined by Lender to be properly utilized to offset a loss of Rent), refunds and uncollectible accounts, proceeds of casualty insurance and Awards (other than business interruption or other loss of income insurance related to business interruption or loss of income for the period in question), and any disbursements to Borrower from the Reserve Funds or any other fund established by the Loan Documents.    Gross Revenues shall include accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its or their agents or employees from any and all sources arising from or attributable to the Property, including, without limitation, all hotel, Casino and Spa receipts, revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the Property (including, without limitation, from the rental of guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), any license, lease, sublease and concession fees and rentals, any food and beverage wholesale and retail sales, any service charges, any vending machine sales and proceeds, if any, and the proceeds of any business interruption or other loss of income insurance.

"Guarantor" shall mean Michael Belfonti and Richard Belfonti, jointly and severally.

"Guaranty" shall mean that certain Guaranty of Recourse Obligations of even date herewith from Guarantor for the benefit of Lender.

"Guaranty of Deed of Pledge" shall mean that certain Guaranty dated as of the date hereof made by AHE Holding and BCP Sunset for the benefit of Lender.

"High Pointe Litigation" shall mean that certain lawsuit commenced by High Pointe (naming Amoco, Riveroll and Luis Fernandez de Caleya as defendants) and referred to as AHE Case No. 1590/95 and 108/96-H-330/00.

"Hotel" shall mean the operations of a hotel (including a Casino, Spa, dining, retail and related services) at the Property, as currently conducted (or as shall be conducted in accordance with the provisions of the Westin Management Agreements).

"Improvements" shall mean the building and all improvements, structures and additions situated on the Land from time to time.

"Indebtedness" shall mean, for any Person, without duplication:  (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"Indemnified Liabilities shall have the meaning set forth in Section 11.13(b).

"Indemnity Escrow Agreement" shall mean that Indemnity Escrow Agreement dated as of the date hereof among Lender, BCP Sunset, Riveroll, Amoco, Caledonia International Properties Inc., AHE Overseas N.V. and First American Title Insurance Company of New York.

"Independent Director" shall have the meaning set forth in Section 3.1.24(p).

"Initial Interest Rate" shall mean (i) with respect to Component A, a rate per annum equal to 7.631% and (ii) with respect to Component B, a rate per annum equal to 18.268%.

"Initial Maturity Date" shall mean April 9, 2008.

"Insolvency Opinion" shall mean that certain bankruptcy nonconsolidation opinion letter dated the date hereof delivered by Paul, Hastings, Janofsky & Walker LLP in connection with the Loan or any other bankruptcy non-consolidation opinion delivered to Lender in connection with the Loan.

"Insurance Funds" shall have the meaning set forth in Section 6.4.1.

"Insurance Premiums" shall have the meaning set forth in Section 5.1.1(b).

"Insurance Reserve Account" shall have the meaning set forth in Section 6.4.1.

"Inter-Company Loan" shall mean, collectively, (i) that certain loan made this day by Borrower to BCP Sunset II Holdings N.V. pursuant to the Inter-Company Loan Documents, and (ii) any unsecured loans made, from time to time, after the date hereby by Borrower to BCP Sunset Holdings II N.V. and, in turn, by BCP Sunset Holdings II N.V. and/or its direct and indirect constituent owners to the other direct and indirect constituent owners pursuant to loan documents in substantially the same form as, and containing substantially the same substance (excepting as to principal amount) as, the Inter-Company Loan Documents (individually and collectively, the "Future IC Loan Documents").

"Inter-Company Loan Documents" shall mean, collectively, (i) that certain Note made this day by BCP Sunset II Holdings N.V. (for the benefit of Borrower), (ii) that certain Loan Agreement made this day by and between Borrower and BCP Sunset II Holdings N.V. and (iii) any Future IC Loan Documents.

"Interest Period" shall mean, with respect to any Monthly Payment Date, the period commencing on the ninth (9th) day of the preceding calendar month and terminating on the eighth (8th) day of the calendar month in which such Monthly Payment Date occurs; provided, however, that (i) no Interest Period shall end later than the Maturity Date (other than for purposes of calculating interest at the Default Rate), and (ii) the first Interest Period under this Agreement commenced on the Closing Date and shall end on May 8, 2006.

"Interest Rate Protection Agreement" shall have the meaning set forth in Section 4.1.11.

"Land" shall mean the premises demised to Borrower under the Ground Lease.

"Lease" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property (but excluding, in each case, hotel guests), and every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"Legal Requirements" shall mean all Aruban, foreign or domestic federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

"Lender" shall mean WIBC Aruba N.V., an Aruban limited liability company, together with its successors and assigns.

"Lender Indemnitees" shall have the meaning set forth in Section 11.13(b).

"Lender's Notice" shall have the meaning set forth in Section 2.2.3(b).

"Liabilities" shall have the meaning set forth in Section 9.2(b).

"LIBOR" shall mean, with respect to each Interest Period, the rate (expressed as a percentage per annum and rounded upward, if necessary, to the next nearest 1/1000 of 1%) for

deposits in U.S. dollars, for a one-month period, that appears on Telerate Page 3750 (or the successor thereto) as of 11:00 a.m., London time, on the related Determination Date. If such rate does not appear on Telerate Page 3750 as of 11:00 a.m., London time, on such Determination Date, LIBOR shall be the arithmetic mean of the offered rates (expressed as a percentage per annum) for deposits in U.S. dollars for a one-month period that appear on the Reuters Screen Libor Page as of 11:00 a.m., London time, on such Determination Date, if at least two such offered rates so appear. If fewer than two such offered rates appear on the Reuters Screen Libor Page as of 11:00 a.m., London time, on such Determination Date, Lender shall request the principal London Office of any four major reference banks in the London interbank market selected by Lender to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a one-month period as of 11:00 a.m., London time, on such Determination Date for the then outstanding principal amount of the Loan. If at least two such offered quotations are so provided, LIBOR shall be the arithmetic mean of such quotations. If fewer than two such quotations are so provided, Lender shall request any three major banks in New York City selected by Lender to provide such bank's rate (expressed as a percentage per annum) for loans in U.S. dollars to leading European banks for a one-month period as of approximately 11:00 a.m., New York City time on the applicable Determination Date for the then outstanding principal amount of the Loan. If at least two such rates are so provided, LIBOR shall be the arithmetic mean of such rates. LIBOR shall be determined by Lender or its agent and at Borrower's request, Lender shall provide Borrower with the basis for its determination. Notwithstanding anything to the contrary set forth herein, in no event shall LIBOR ever be less than 5.069%.

"LIBOR Interest Rate" shall mean, with respect to each Interest Period, the quotient of (i) LIBOR applicable to the Interest Period divided by (ii) a percentage equal to 100% minus the Reserve Requirements applicable to the Interest Period.

"LIBOR Loan" shall mean the Loan at any time in which the Applicable Interest Rate is calculated at LIBOR Interest Rate plus the Spread in accordance with the provisions of Article II hereof.

"Lien" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof or Borrower, or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"Loan" shall mean the loan in the original principal amount of Two Hundred Thirty Million and No/100 Dollars ($230,000,000.00) made by Lender to Borrower pursuant to this Agreement, which Loan is comprised of the Components.

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Mortgage, the Assignments (Purchase and Sale Agreement and Escrow), the Security Documents (Aruba), the Lockbox Agreement (Wachovia), the Lockbox Agreement (Caribbean Mercantile Bank), the Cash Management Agreement, the Assignment of Westin Management and Franchise

Agreement, the PIP Escrow Agreement, the Starwood SNDA, the Environmental Indemnity, the Guaranty, the Guaranty of Deed of Pledge, the Assignment of Protection Agreement, and any other document pertaining to the Property as well as all other documents now or hereafter executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Loan-to-Value Ratio" means, with respect to the specified period, the ratio obtained by dividing (a) the outstanding principal amount of the Loan by (b) the stabilized value of the Property as set forth in the appraisal obtained by Lender (at the sole cost and expense of Borrower) in connection with its underwriting of the Loan or any update thereto. The appraisal value shall be subject to review and confirmation as to valuation by Lender's internal appraisal staff, whose decision shall be final absent manifest error.

"Lockbox Account (Caribbean Mercantile Bank)" means that certain collection account established by Borrower with Lockbox Bank (Caribbean Mercantile Bank) into which Borrower and Manager shall cause certain Gross Revenues (including Rents), to the extent of cash receipts collected at the Hotel, to be deposited in accordance with the terms and conditions of this Agreement and the Lockbox Agreement (Caribbean Mercantile Bank).

"Lockbox Account (Wachovia)" means that certain collection account established by Borrower with Lockbox Bank (Wachovia) into which Borrower and Manager shall cause certain Gross Revenues (including Rents) to be deposited in accordance with the terms and conditions of the Lockbox Agreement (Wachovia).

"Lockbox Accounts" means, collectively, the Lockbox Account (Caribbean Mercantile Bank) and the Lockbox Account (Wachovia).

"Lockbox Agreement (Caribbean Mercantile Bank)" means that certain Deposit Account Control Agreement (No Notification) dated as of the date hereof, among Borrower, Lender and Lockbox Bank (Caribbean Mercantile Bank).

"Lockbox Agreement (Wachovia)" means that certain Deposit Account Control Agreement (No Notification) dated as of the date hereof, among Borrower, Lender and Lockbox Bank (Wachovia).

"Lockbox Bank (Caribbean Mercantile Bank)" means Caribbean Mercantile Bank, together with its successors and assigns.

"Lockbox Bank (Wachovia)" means Wachovia Bank, National Association, together with its successors and assigns.

"London Business Day" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks in London, England or New York, New York are not open for business.

"Major Lease" shall mean (i) the Lease for the Casino, (ii) the Lease for the Spa, and (iii) any Lease covering more than 2,500 rentable square feet at the Property or made with a Tenant that is a Tenant under another Lease at the Property or that is an Affiliate of any other

Tenant under a Lease at the Property, if the Leases together cover more than 2,500 rentable square feet.

"Major Tenant" shall mean any Tenant under a Major Lease.

"Manager" shall mean, as of any point in time, the manager that shall then be managing the hotel (under the Riveroll Management Agreement or the Westin Management Agreement, or a replacement management agreement as described in this Agreement, as applicable).

"Management Agreements" shall mean, collectively, the Riveroll Management Agreement and the Westin Management Agreements.

"Material Agreements" means each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property, other than the Ground Lease, the Westin Management Agreements, the Riveroll Management Agreement and the Leases, under which there is an obligation of Borrower to pay more than $250,000.00 per annum. Any room block agreement with any third-party operator of any portion of the Property (irrespective of the consideration to be paid to Borrower thereunder) shall be considered a Material Agreement. Any agreement for the operation of any "third-party operated area" at the Property (such as the Casino or Spa) shall be considered a Material Agreement.

"Maturity Date" shall mean the Initial Maturity Date or such earlier date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise; provided, however, that (i) if Borrower exercises its right to extend the term of the Loan for the First Extension Period and, in accordance with the terms of this Agreement, the term of the Loan is so extended, from and after such extension of the term of the Loan "Maturity Date" shall mean the First Extended Maturity Date or such earlier date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise, (ii) if Borrower exercises its right to extend the term of the Loan for the Second Extension Period and, in accordance with the terms of this Agreement, the term of the Loan is so extended, from and after such extension of the term of the Loan "Maturity Date" shall mean the Second Extended Maturity Date or such earlier date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise, and (iii) if Borrower exercises its right to extend the term of the Loan for the Third Extension Period and, in accordance with the terms of this Agreement, the term of the Loan is so extended, from and after such extension of the term of the Loan "Maturity Date" shall mean the Third Extended Maturity Date or such earlier date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"Maximum Legal Rate" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan

Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"Minimum Counterparty Rating" shall mean (a) either a short term credit rating from S&P (and if Fitch rates the entity, from Fitch) of at least "A-1" or a long term credit rating from S&P (and if Fitch rates the entity, from Fitch) of at least "A+" and (b) either (i) a long term credit rating from Moody's of at least "Aa3" or (ii) a long term credit rating from Moody's of at least "A1" and a short term credit rating from Moody's of "P-1". After a Securitization of the Loan, only the ratings of those Rating Agencies rating the Securities shall apply.

"Monthly Payment Date" shall mean the ninth (9th) calendar day of each calendar month during the term of the Loan, and if such day is not a Business Day, then the Business Day immediately preceding such day, commencing on June 9, 2006 and continuing to and including the Maturity Date.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgage" shall mean that certain first priority Mortgage, dated the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Net Cash Flow" shall mean, for purposes of calculating the Debt Service Coverage Ratio, (i) the excess of Gross Revenue over Operating Expenses for the twelve (12) calendar month period immediately preceding the date of calculation, less (ii) without duplication, any Section 2.5 Taxes anticipated to be paid during the twelve (12) calendar month period immediately following the date of calculation, and less (iii) any Extraordinary Expenses anticipated to be paid during the twelve (12) calendar month period immediately following the date of calculation. Lender's calculation of Net Cash Flow (including determination of items that do not qualify as Gross Revenue or Operating Expenses) shall be calculated by Lender based upon Lender's determination of Rating Agency criteria and shall be final absent manifest error.

"Net Proceeds" shall mean: (i) the net amount of all insurance proceeds payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such Award.

"Net Proceeds Deficiency" shall have the meaning set forth in Section 5.3.2(f).

"New Owner" shall have the meaning set forth in Section 8.2.

"Non-Excluded Taxes" shall have the meaning set forth in Section 2.5(c).

"Note" shall mean, collectively, Note A and Note B, as any of the same may hereafter be amended, supplemented, restated, increased, extended, consolidated or severed from time to time.

"Note A" shall mean that certain Promissory Note A, dated the date hereof, executed by Borrower and payable to the order of Lender which represents Component A of the Loan, as the same may hereafter be amended, supplemented, restated, increased, extended, consolidated or severed from time to time.

"Note B" shall mean that certain Promissory Note B, dated the date hereof, executed by Borrower and payable to the order of Lender which represents Component B of the Loan, as the same may hereafter be amended, supplemented, restated, increased, extended, consolidated or severed from time to time.

"Notice" shall have the meaning set forth in Section 11.6.

"Officer's Certificate" shall mean a certificate delivered to Lender by Borrower, which is signed by an authorized senior officer of Borrower.

"Operating Expenses" shall mean all costs and expenses relating to the operation, maintenance and management of the Property, including, without limitation, utilities, repairs and maintenance, insurance, property taxes and assessments, and the Operating Fees under (and as defined in) the Management Agreement. Operating Expenses shall exclude Capital Expenditures, Debt Service, any expense (including legal, accounting and other professional fees, expenses and disbursements) incurred in connection with the making of the Loan, depreciation, amortization, any expenses which in accordance with GAAP should be capitalized and deposits required to be made to the Reserve Funds pursuant to this Agreement and the Cash Management Agreement. All Operating Expenses shall be subject to adjustment by Lender to normalize such costs and expenses.

"Other Charges" shall mean all maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"Other Taxes" shall have the meaning set forth in Section 2.5(b).

"Otherwise Rated Insurer" shall have the meaning set forth in Section 5.1.2.

"Permitted Encumbrances" shall mean, collectively, (i) the Liens and security interests created by the Loan Documents, (ii) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (iv) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"Permitted Investments" shall have the meaning set forth in the Cash Management Agreement.

"Permitted Prepayment Date" shall mean May 9, 2007.

"Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any federal,

state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Physical Conditions Report" shall mean a report prepared by a company satisfactory to Lender regarding the physical condition of the Property, satisfactory in form and substance to Lender in its sole discretion, which report shall, among other things, (i) confirm that the Property and its use comply, in all material respects, with all applicable Legal Requirements (including, without limitation, zoning, subdivision and building laws) and (ii) include a copy of a final certificate of occupancy with respect to all Improvements.

"PIP Escrow Agreement" shall mean that certain Escrow Agreement Regarding PIP dated as of the date hereof among Lender, Borrower and Westin.

"PIP Funds" shall have the meaning set forth in Section 6.5.1.

"PIP Reserve Account" shall have the meaning set forth in Section 6.5.1.

"PIP Work" shall have the meaning set forth in Section 4.1.18.

"Plan Asset Regulations" shall have the meaning set forth in Section 3.8.1.

"Policies" shall have the meaning specified in Section 5.1.1(b).

"Prepayment Date" shall have the meaning set forth in Section 2.4.1(a).

"Prepayment Fee" shall mean, (i) with respect to any prepayment received by Lender on or after May 9, 2007 and before August 9, 2007, an amount equal to one percent (1%) of the principal amount of the Loan being prepaid, and (ii) with respect to any prepayment received by Lender on or after August 9, 2007 and before November 9, 2008, an amount equal to three-quarters of one percent (0.75%) of the principal amount of the Loan being prepaid. No Prepayment Fee shall be due or paid in connection with any prepayment received by Lender after November 9, 2008.

"Prescribed Laws" shall mean, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (The USA PATRIOT Act), (b) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (c) the International Emergency Economic Power Act, 50 U.S.C. §1701 et seq. and (d) all other Legal Requirements relating to money laundering or terrorism.

"Profits Tax" shall mean the tax codified in article 1, letter a of the State Ordinance Profits Tax, and all interest and penalties charged in connection therewith.

"Profits Tax Funds" shall have the meaning set forth in Section 6.8.1.

"Profits Tax Reserve Account" shall have the meaning set forth in Section 6.8.1.

"Profits Tax Ruling" shall mean that certain ruling made by the Tax Collector in respect of the Profits Tax imposed on the transactions contemplated in this Agreement and in the Funding Loan Agreement.

"Property" shall mean the parcel of real property (on the island of Aruba in the kingdom of the Netherlands), the Improvements thereon and all personal property owned by Borrower, together with all rights pertaining to such property and Improvements, including under the Ground Lease.

"Purchase and Sale Agreement" shall mean that certain Purchase and Sale Agreement made as of September 1, 2005, by and among Amoco, Riveroll and Belfonti, as amended by First Amendment dated November 30, 2005, by Second Amendment dated March 24, 2006, by Third Amendment dated April 5, 2006 and by Fourth Amendment dated May 3, 2006, and as assigned by Belfonti Capital Partners LLC to BCP Sunset Holdings II N.V.

"Qualified Transferee" shall mean any of the following Persons:

(a)    a pension fund, pension trust or pension account that immediately prior to such transfer owns, directly or indirectly, total gross real estate assets of at least $1,000,000,000;

(b)    a pension fund advisor who (i) immediately prior to such transfer, Controls, directly or indirectly, at least $1,000,000,000 of total gross real estate assets and (ii) is acting on behalf of one or more pension funds that, in the aggregate, satisfy the requirements of clause (a) of this definition;

(c)    an insurance company which is subject to supervision by the insurance commissioner, or a similar official or agency, of a state or territory of the United States (including the District of Columbia) (i) with a net worth, determined as of a date no more than six (6) months prior to the date of the transfer of at least $500,000,000 and (ii) which, immediately prior to such transfer, controls, directly or indirectly, total gross real estate assets of at least $1,000,000,000;

(d)    a corporation organized under the banking laws of the United States or any state or territory of the United States (including the District of Columbia) (i) with, immediately prior to such transfer, a combined capital and surplus of at least $500,000,000 and (ii) which, immediately prior to such transfer, controls, directly or indirectly total gross real estate assets of at least $1,000,000,000;

(e)    any Person (i) with a long-term unsecured debt rating from the rating agencies of "BBB+" (or its equivalent) or (ii) who (x) owns or operates at least five (5) properties (exclusive of the Property) of a type, quality and size similar to the Property totaling in the aggregate no less than 2,000 hotel rooms (exclusive of the Property), (y) has a net worth, determined as of a date no more than six (6) months prior to the date of such transfer, of at least $500,000,000 and (z) immediately prior to such transfer, Controls, directly or indirectly, total gross real estate assets of at least $1,000,000,000, provided such Person is reasonably acceptable to Lender based upon, among other things, its credit history and general reputation; or