(f)    any Person in which more than fifty percent (50%) of the ownership interests are owned directly or indirectly by any of the entities listed in subsections (c) through (e) of this definition of "Qualified Transferee", or any combination of more than one such entity, and which is controlled directly or indirectly by such entity or entities;

in each event (i) with respect to which Lender shall have received information satisfactory to it confirming that neither the proposed Qualified Transferee nor any Affiliate of the proposed Qualified Transferee is on the OFAC List or would, if such Person assumes the Loan or obtains an interest in Borrower, cause Lender to be in violation of Legal Requirements and (ii) with respect to which such Person and its property manager shall have sufficient experience in the ownership and management of properties similar to the Property, as determined by Lender in its reasonable discretion, and Lender shall have been provided with reasonable evidence thereof (and Lender reserves the right to approve the proposed transferee without approving the substitution of the Manager).

"Rating Agencies" shall mean, prior to the final Securitization of the Loan, each of S&P, Moody's and Fitch, or any other nationally-recognized statistical rating agency which has been designated by Lender and, after the final Securitization of the Loan, shall mean any of the foregoing that have rated any of the Securities.

"Rating Agency Confirmation" shall mean a written affirmation from each of the Rating Agencies that the credit rating of the Securities by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.

"Registration Statement" shall have the meaning set forth in Section 9.2(b).

"Regulation AB" shall have the meaning set forth in Section 9.1(c).

"Related Loan" shall have the meaning set forth in Section 9.1(c).

"Related Property" shall have the meaning set forth in Section 9.1(c).

"Relevant Sections" shall have the meaning set forth in Section 9.2(b).

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System from time to time in effect, including any successor or other Regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

"Rents" shall mean all rents, operating expense pass throughs, moneys payable as damages or in lieu of rent, forfeited or applied deposits (including, without limitation, prepaid rents and security deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its or their agents or employees in each case from any Tenants under Leases at the Property.

"Reserve Funds" shall mean, collectively, the Equity Funds, the Debt Service Funds, the Tax Funds, the Insurance Funds, the PIP Funds, the Profits Tax Funds, the Foreign Exchange Tax Funds and the Ground Rent Funds.

"Reserve Accounts" shall mean, collectively, the Debt Service Reserve Account, the Tax Reserve Account, the Insurance Reserve Account, the PIP Reserve Account, the Profits Tax Reserve Account and the Ground Rent Reserve Account.

"Reserve Requirements" means with respect to any Interest Period, the maximum rate of all reserve requirements (including, without limitation, all basic, marginal, emergency, supplemental, special or other reserves and taking into account any transitional adjustments or other schedule changes in reserve requirements during the Interest Period) which are imposed under Regulation D on eurocurrency liabilities (or against any other category of liabilities which includes deposits by reference to which LIBOR is determined or against any category of extensions of credit or other assets which includes loans by a non-United States office of a depository institution to United States residents or loans which charge interest at a rate determined by reference to such deposits) during the Interest Period and which are applicable to member banks of the Federal Reserve System with deposits exceeding one billion dollars, but without benefit or credit of proration, exemptions or offsets that might otherwise be available from time to time under Regulation D. The determination of the Reserve Requirements shall be based on the assumption that Lender funded 100% of the Loan in the interbank eurodollar market. In the event of any change in the rate of such Reserve Requirements under Regulation D during the Interest Period, or any variation in such requirements based upon amounts or kinds of assets or liabilities, or other factors, including, without limitation, the imposition of Reserve Requirements, or differing Reserve Requirements, on one or more but not all of the holders of the Loan or any participation therein, Lender may use any reasonable averaging and/or attribution methods which it deems appropriate and practical for determining the rate of such Reserve Requirements which shall be used in the computation of the Reserve Requirements. Lender's computation of same shall be final absent manifest error.

"Restaurant Operator" shall mean The Blossoms Group N.V.

"Restoration" shall have the meaning set forth in Section 5.2.1.

"Restoration Threshold" shall mean Two Million and no/100 Dollars ($2,000,000.00).

"Riveroll" shall mean Alfonso Riveroll Estrada, together with his heirs and representatives.

"Riveroll Guaranty" shall mean that certain Guaranty delivered on the date hereof by Riveroll, pursuant to the Purchase and Sale Agreement.

"Riveroll Management Agreement" shall mean that certain Management Agreement dated as of the date hereof between Borrower and Vense, as the same may be amended, renewed, supplemented or restated.

"S&P" shall mean Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc.

"Second Extended Maturity Date" shall mean April 9, 2010.

"Second Extension Period" shall mean a period of twelve (12) consecutive months following the First Extended Maturity Date.

"Secondary Market Transaction" shall have the meaning set forth in Section 9.1(a).

"Security Documents (Aruba)" shall mean, collectively, (i) the Mortgage, (ii) the Deed of Pledge (AHE Holding), (iii) the Deed of Pledge (BCP Sunset), (iv) that certain Pledge of Receivables dated as of the date hereof between Borrower and Lender, (v) that certain Pledge of Accounts dated as of the date hereof between Borrower and Lender, (vi) that certain Pledge of Insurance Policies dated as of the date hereof between Borrower and Lender, (vii) that certain Non-Possessory Pledge of Tangible Assets dated as of the date hereof between Borrower and Lender, and (viii) that certain Fiduciary Assignment of Management Agreement dated as of the date hereof between Vense and Lender.

"Section 2.5 Taxes" shall have the meaning set forth in Section 2.5(c).

"Securities" shall have the meaning set forth in Section 9.1(a).

"Securities Act" shall have the meaning set forth in Section 9.2(a).

"Securitization" shall have the meaning set forth in Section 9.1(a).

"Servicer" shall have the meaning set forth in Section 11.24.

"Servicing Agreement" shall have the meaning set forth in Section 11.24.

"Severed Loan Documents" shall have the meaning set forth in Section 10.2(c).

"Spa" shall mean either the area identified on the plan attached as Schedule I or the fitness center and spa operations being conducted therein, as the context shall require.

"Spa Operator" shall mean The Spa at the Beach N.V.

"SPC Party" shall have the meaning set forth in Section 3.1.24(o).

"Spread" shall mean (i) the Component A Spread, in the case of Component A, and (ii) the Component B Spread, in the case of Component B.

"Spread Maintenance Premium" shall mean, in connection with a prepayment of all or any portion of the outstanding principal balance of the Loan pursuant to Section 2.4.3 hereof, an amount equal to the present value, discounted at LIBOR on the most recent Determination Date with respect to any period when the Loan is a LIBOR Loan (or, with respect to any period when the Loan is a Substitute Rate Loan, discounted at an interest rate that

Lender believes, in its judgment, would equal LIBOR on such Determination Date if LIBOR was then available), of all future installments of interest which would have been due hereunder through and including the end of the Interest Period in which the Permitted Prepayment Date occurs, on the portion of the outstanding principal balance of the Loan being prepaid as if interest accrued on such portion of the principal balance being prepaid at an interest rate per annum equal to the greater of (a) the Spread or (b) the Spread plus the difference between (i) 5.069% and (ii) LIBOR on such Determination Date with respect to any period when the Loan is a LIBOR Loan (or, with respect to any period when the Loan is a Substitute Rate Loan, an interest rate that Lender believes, in its judgment, would equal LIBOR on such Determination Date if LIBOR was then available). The Spread Maintenance Premium shall be calculated by Lender and shall be final absent manifest error.

"Starwood" shall mean Starwood Hotels & Resorts Worldwide, Inc., and its successors.

"Starwood Agreements" shall mean, collectively, (a) the Starwood Hotel Facilities Use and Amenities Access Agreement, (b) the Starwood Management Fee Sharing Agreement, (c) the Starwood Room Block Agreement, (d) the Starwood Sales and Marketing Access Agreement and (e) the Starwood Sales Center Lease Agreement.

"Starwood Hotel Facilities Use and Amenities Access Agreement" shall mean that certain Hotel Facilities Use and Amenities Access Agreement dated as of the date hereof between Owner and SVO.

"Starwood Management Fee Sharing Agreement" shall mean that certain Management Fee Sharing Agreement dated as of the date hereof between Owner, SVO and SVO's designee in its capacity as manager of the adjacent resort property.

"Starwood Room Block Agreement" shall mean that certain Room Block Agreement dated as of the date hereof among Owner, Westin and SVO.

"Starwood Sales and Marketing Access Agreement" shall mean that certain Sales and Marketing Access Agreement dated as of the date hereof among Owner, Westin and SVO.

"Starwood Sales Center Lease Agreement" shall mean that certain Sales Center Lease Agreement dated as of the date hereof among Owner, Westin and SVO.

"Starwood SNDA" shall mean that certain Subordination, Non-Disturbance and Attornment Agreement dated as of the date hereof between Lender and SVO.

"Substitute Rate" shall have the meaning set forth in Section 2.2.3(b).

"Substitute Rate Loan" shall mean the Loan at any time in which the Applicable Interest Rate is calculated at the Substitute Rate plus the Substitute Spread in accordance with the provisions of Article II hereof.

"Substitute Spread" shall have the meaning set forth in Section 2.2.3(b).

"Survey" shall mean a survey of the Property prepared by a surveyor licensed in Aruba and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"SVO" shall mean SVO International Holdings Limited.

"Tax Funds" shall have the meaning set forth in Section 6.3.1.

"Tax Reserve Account" shall have the meaning set forth in Section 6.3.1.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

"Technical Services Agreement" shall mean that certain Technical Services Agreement between Borrower and Starwood, as the same may be amended, renewed, supplemented or restated.

"Tenant" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"Terrorism Premium Limit" shall mean $1,780,654, as such amount shall be adjusted annually (commencing on the first anniversary of the date hereof) by a CPI Increase.

"Third Extended Maturity Date" shall mean April 9, 2011.

"Third Extension Period" shall mean a period of twelve (12) consecutive months following the Second Extended Maturity Date.

"Title Insurance Policy" shall mean a mortgagee title insurance policy issued on the First American Title Insurance Company International Loan Policy Form 4600 (2/99) (and otherwise in form and substance acceptable to Lender) with respect to the Property and insuring the lien of the Mortgage.

"Transfer" shall mean any voluntary or involuntary sale by operation of law or otherwise, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of: (a) all or any part of the Property or any estate or interest therein including, but not limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments, (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder and its affiliates or (iii) a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (b) any direct or indirect ownership interest in (i) Borrower or any owner of any interest in Borrower, (ii) any indemnitor or guarantor of any obligations of Borrower or any other Person hereunder or under any other Loan Documents, or (iii) any corporation, partnership, limited liability company, trust or other entity owning, directly or indirectly, any interest in Borrower or any indemnitor or guarantor of any obligations of Borrower or any other Person hereunder or under any other Loan Documents;

or (c) the control of, or the right or power to control, directly or indirectly the day-to-day management and operations of the Property or any entity that controls directly or indirectly the Borrower.

"Trustee" shall mean any trustee holding the Loan in a Securitization.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State of New York.

"Underwriter Group" shall have the meaning set forth in Section 9.2(b).

"Uniform System of Accounts" shall mean the most recent edition of the Uniform System of Accounts for Hotels, as adopted by the American Hotel and Motel Association.

"Updated Information" shall have the meaning set forth in Section 9.1(b)(i).

"U.S. Obligations" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption.

"Vense" shall mean Vense Corporation, N.V., an entity that is one hundred percent (100%) owned (directly or indirectly) by Riveroll.

"Wachovia" shall mean Wachovia Bank, National Association, together with (i) its successors and (ii) transferees and assigns under the Funding Loan Agreement, including any trustee under a Securitization.

"Wachovia Group" shall have the meaning set forth in Section 9.2(b).

"Westin Franchise Agreement" shall mean that certain Trademark License Agreement dated as of the date hereof between Borrower and Westin Licensor, as the same may be amended, renewed, supplemented or restated.

"Westin Licensor" shall mean Westin Hotel Management, L.P.

"Westin Management Agreement" shall mean that certain Operating Agreement dated as of the date hereof between Borrower and Westin, as the same may be amended, renewed, supplemented or restated.

"Westin Management Agreements" shall mean, collectively, the Westin Management Agreement, the Westin Franchise Agreement and the Technical Services Agreement.

"Westin" shall mean Westin Aruba Hotel Management, LLC or its successors.

"Wyndham" shall mean Wyndham Worldwide, Inc. or its successors.

"Wyndham Franchise Agreement" shall mean that certain Wyndham Hotel Franchise Agreement dated as of January 1, 2006 between Wyndham, as franchisor, and Borrower, as franchisee, as the same may be amended, renewed, supplemented or restated.

**Section 1.2    Principles of Construction.**  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.  Any reference in this Agreement or in any other Loan Document to any Loan Document shall be deemed to include references to such documents as the same may hereafter be amended, modified, supplemented, extended, replaced and/or restated from time to time (and, in the case of any note or other instrument, to any instrument issued in substitution therefor).

## II.    THE LOAN

### Section 2.1    The Loan; the Term.

**2.1.1    Agreement to Lend and Borrow.**  Subject to and upon the terms and conditions set forth herein, Lender shall make the Loan to Borrower and Borrower shall accept the Loan from Lender on the Closing Date.

**2.1.2    Single Disbursement to Borrower.**  Borrower shall receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

**2.1.3    The Note.**  The Loan shall be evidenced by the Note in the aggregate principal amount of Two Hundred Thirty Million and No/100 Dollars ($230,000,000.00) and shall be repaid in accordance with the terms of this Agreement and the Note.

**2.1.4    Use of Proceeds.**  Borrower shall use proceeds of the Loan to (i) deposit the Reserve Funds, (ii) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (iii) pay and discharge any existing loans relating to or encumbering the Property, (iv) pay all past-due Basic Carrying Costs, if any, in respect of the Property, (v) make the Inter-Company Loan to BCP Sunset and (vi) retain the balance, if any.

**2.1.5    Component Notes.**  Lender shall have the right, at any time prior to a Securitization, to modify the Loan in order to create additional Components, reduce the number of Components, reallocate the principal balances of the Components or eliminate the Component structure of the Loan provided that (a) the total principal balance of the Loan as of the effective date of such modification equals the outstanding principal balance of the Loan immediately prior to such modification, and (b) the weighted average of the interest rates for all Components at all times (except by reason of application of payments during an Event of Default) immediately after the effective date of such modification equals the weighted average of the interest rates for all components immediately prior to such modification.  Any prepayments of principal made after the creation of "component" notes pursuant to this Agreement (except following the occurrence and during the continuance of an Event of Default) shall be allocated on a pro-rata basis such that the overall interest rate and debt service payments on the Loan do not increase after any such prepayment(s).  Lender shall have the right to modify the

Components in accordance with this <u>Section 2.1.5</u> upon prior notice to Borrower (in which event such modification shall then be deemed effective). Lender shall promptly provide certified copies of any modification of the Components to Borrower. Borrower shall, at Borrower's expense, cooperate with all reasonable requests of Lender in order to accomplish the above and shall execute and deliver such documents as shall reasonably be required by Lender and any Rating Agency in connection therewith. Notwithstanding the foregoing, Lender shall be responsible for Borrower's reasonable out-of-pocket expenses in complying with this <u>Section 2.1.5</u> and <u>Section 9.1(b)</u> hereof to the extent that such expenses exceed $50,000 in the aggregate.

**Section 2.2     Interest Rate.**

2.2.1   <u>Applicable Interest Rate</u>.  Except as herein provided with respect to interest accruing at the Default Rate, interest on the principal balance of the Loan outstanding from time to time shall accrue from the Closing Date up to and including the Maturity Date (including, without limitation, all interest that would accrue on the outstanding principal balance of the Loan through the end of the Interest Period during which the Maturity Date occurs (even if such period extends beyond the Maturity Date)) at the Applicable Interest Rate. Interest on the outstanding principal balance of the Loan existing on the commencement of an Interest Period shall accrue for the entire Interest Period and shall be owed by Borrower for the entire Interest Period regardless of whether any principal portion of the Loan is repaid prior to the expiration of such Interest Period.

2.2.2   <u>Interest Calculation</u>.  Interest on the outstanding principal balance of each Component shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Applicable Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the outstanding principal balance of each such Component.

2.2.3   <u>Determination of Interest Rate</u>.

(a)     Any change in the rate of interest hereunder due to a change in the Applicable Interest Rate shall become effective as of the first day on which such change in the Applicable Interest Rate shall become effective. Each determination by Lender of the Applicable Interest Rate shall be conclusive and binding for all purposes, absent manifest error.

(b)     In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of circumstances affecting the interbank eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR, then Lender shall, by notice to Borrower ("<u>Lender's Notice</u>"), which notice shall set forth in reasonable detail such circumstances, establish the Applicable Interest Rate at Lender's then customary spread (the "<u>Substitute Spread</u>"), taking into account the size of the Loan and the creditworthiness of Borrower, above a published index used for variable rate loans as reasonably determined by Lender (the "<u>Substitute Rate</u>").

(c)     If, pursuant to the terms of this Agreement, the Loan has been converted to a Substitute Rate Loan and Lender shall determine (which determination shall be conclusive

and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice thereof to Borrower, and the Substitute Rate Loan shall automatically convert to a LIBOR Loan on the effective date set forth in such notice. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to convert a LIBOR Loan to a Substitute Rate Loan.

(d)    If any requirement of law or any change therein or in the interpretation or application thereof shall hereafter make it unlawful for Lender to make or maintain a LIBOR Loan as contemplated hereunder, (i) the obligation of Lender hereunder to make a LIBOR Loan shall be cancelled forthwith and (ii) Lender may give Borrower a Lender's Notice, establishing the Applicable Interest Rate at the Substitute Rate plus the Substitute Spread, in which case the Applicable Interest Rate shall be a rate equal to the Substitute Rate in effect from time to time plus the Substitute Spread. In the event the condition necessitating the cancellation of Lender's obligation to make a LIBOR Loan hereunder shall cease, Lender shall promptly notify Borrower of such cessation and the Loan shall resume its characteristics as a LIBOR Loan in accordance with the terms herein from and after the first day of the Interest Period next following such cessation. Borrower hereby agrees promptly to pay Lender, upon demand, any additional amounts necessary to compensate Lender for any out-of-pocket costs incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the LIBOR Loan hereunder. Lender's notice of such costs, as certified to Borrower, shall be set forth in reasonable detail and Lender's calculation shall be conclusive absent manifest error.

(e)    In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(i)    shall hereafter have the effect of reducing the rate of return on Lender's capital (other than as a result of an increase in taxes) as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material;

(ii)    shall hereafter impose, modify, increase or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the rate hereunder (other than as a result of an increase in taxes); or

(iii)    shall hereafter impose on Lender any other condition and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender deems to be material as determined by Lender; provided, however, that Borrower shall not be required under this Section 2.2.3 to pay Lender additional amounts for additional costs or reduced amounts receivable that are attributable to an increase in taxes imposed on the Lender as a result of the foregoing. If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(f), Borrower shall not be required to pay same unless they are the result of requirements imposed generally on lenders similar to Lender and not the result of some specific reserve or similar requirement imposed on Lender as a result of Lender's special circumstances. If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.3(f), Lender shall provide Borrower with not less than thirty (30) days written notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence, executed by an authorized signatory of Lender and submitted by Lender to Borrower shall be conclusive in the absence of manifest error. This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Agreement and the Loan Documents.

(f)    Borrower agrees to indemnify Lender and to hold Lender harmless from any loss or expense (other than consequential and punitive damages) which Lender sustains or incurs as a consequence of (i) any default by Borrower in payment of the principal of or interest on a LIBOR Loan, including, without limitation, any such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder, (ii) any prepayment (whether voluntary or mandatory) of the LIBOR Loan on a day that (A) is not a Monthly Payment Date or (B) is a Monthly Payment Date if Borrower did not give the prior written notice of such prepayment required pursuant to the terms of this Agreement, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the LIBOR Loan hereunder and (iii) the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Applicable Interest Rate to the Substitute Rate plus the Substitute Spread with respect to any portion of the outstanding principal amount of the Loan then bearing interest at a rate other than the Substitute Rate plus the Substitute Spread on a date other than the first day of an Interest Period, including, without limitation, such loss or expenses arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain a LIBOR Loan hereunder (the amounts referred to in clauses (i), (ii) and (iii) are herein referred to collectively as the "Breakage Costs"). Lender will provide to Borrower a statement detailing such Breakage Costs and the calculation thereof.

(g)    The provisions of this Section 2.2.3 shall survive payment of the Note in full and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

2.2.4    Usury Savings.    This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If by the terms of

this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

### Section 2.3    Loan Payments.

**2.3.1    Payments Before Maturity Date.** (a) Borrower shall make a payment to Lender of interest only on the Closing Date for the period from (and including) the Closing Date through May 8, 2006. On the Monthly Payment Date occurring in June, 2006 and on each Monthly Payment Date thereafter to and including the Maturity Date, Borrower shall make a payment to Lender of interest accruing hereunder for the entire Interest Period that ended on the eighth (8th) calendar day of the calendar month in which such Monthly Payment Date occurs, calculated in the manner set forth herein. In addition, during the First Extension Period, the Second Extension Period and the Third Extension Period, together with each monthly payment of interest, Borrower shall make payments to Lender of (and to reduce the) principal amount of the Loan equal to (i) in the case of payments made during the First Extension Period, payments based on a thirty (30)-year self-liquidating amortization schedule commencing on the first day of the First Extension Period and assuming an imputed interest rate of nine percent (9%) per annum, (ii) in the case of payments made during the Second Extension Period, payments based on a twenty-five (25)-year self-liquidating amortization schedule commencing on the first day of the Second Extension Period and assuming an imputed interest rate of nine percent (9%) per annum, and (iii) in the case of payments made during the Third Extension Period, payments based on a twenty (20)-year self-liquidating amortization schedule commencing on the first day of the Third Extension Period and assuming an imputed interest rate of nine percent (9%) per annum. Provided no Event of Default shall have occurred and is continuing, each payment (including payments of principal, determined as aforesaid) shall be applied pro rata and pari passu (a) first to accrued and unpaid interest on all of the Components and (b) the balance shall be applied to principal of all the Components.

(b) In addition, on each Monthly Payment Date (or each date) on which Borrower shall make a payment to Lender of principal hereunder, Borrower shall also make a payment to Lender of any Exit Fee accruing on the amount of the prepayment, calculated in the manner set forth herein.

**2.3.2    Payment on Maturity Date; Extensions of Maturity Date.** (a) Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, the Exit Fee and all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents, including, without limitation, all interest that would accrue on the outstanding principal balance of the Loan through and including

the end of the Interest Period in which the Maturity Date occurs (even if such Interest Period extends beyond the Maturity Date).

(b)     Borrower will have three (3) options to extend the Maturity Date of the Loan for consecutive one (1) year periods. Borrower shall have a first option to extend the term of the Loan until the First Extended Maturity Date, subject to satisfaction of the following conditions: (i) Borrower shall have given Lender written notice of such extension by no later than thirty (30) days prior to the Initial Maturity Date nor any earlier than ninety (90) days prior to the Initial Maturity Date; (ii) no monetary Default and no Event of Default shall have occurred and be continuing at the time of the delivery of the written extension notice or on the Initial Maturity Date; (iii) Lender shall have received a title continuation indicating no change in the condition of title to the Property from that existing on the date hereof, except for Permitted Encumbrances; (iv) Borrower shall have paid all costs and expenses actually incurred by Lender in connection with such extension, including underwriting, title and reasonable legal fees and costs; (v) Borrower shall have deposited into the Deposit Account the amounts required to be deposited under Section 6.7 hereof (on account of Ground Rent, Profits Tax and otherwise) for the First Extension Period; (vi) Borrower delivers (from a Counterparty having a Minimum Counterparty Rating) an Interest Rate Protection Agreement that complies with (and the related documents, including a collateral assignment and opinion of counsel to the Counterparty, that comply with) the provisions of Section 4.1.11 and with a LIBOR strike rate equal to or less than the Capped LIBOR Rate; (vii) Lender receives evidence that the insurance described in Section 5.1.1(a) will be maintained during the First Extension Period and that the political risk insurance policy required by Lender shall have been purchased for the First Extension Period; (viii) Borrower receives evidence that the Profits Tax Ruling shall have been extended (without any change or amendment) for the First Extension Period; (ix) the Loan-to-Value Ratio is not greater than eighty percent (80%); (x) the Debt Service Coverage Ratio is at least 1.15 to 1.00 (assuming, for purposes of such calculation, interest as provided herein and in the Note and a thirty (30) year amortization schedule); and (xi) Borrower shall have completed (or caused the completion of) the PIP Work.

(c)     Borrower shall have a second option to extend the term of the Loan until the Second Extended Maturity Date, with the payment to Lender of the non-refundable Extension Fee, subject to satisfaction of the following conditions: (i) Borrower shall have given Lender written notice of such extension by no later than thirty (30) days prior to the First Extended Maturity Date nor any earlier than ninety (90) days prior to the First Extended Maturity Date (such notice to include the Extension Fee); (ii) no monetary Default and no Event of Default shall have occurred and be continuing at the time of the delivery of the written extension notice or on the First Extended Maturity Date; (iii) Lender shall have received a title continuation indicating no change in the condition of title to the Property from that existing on the date hereof, except for Permitted Encumbrances; (iv) Borrower shall have paid all costs and expenses actually incurred by Lender in connection with such extension, including underwriting, title and reasonable legal fees and costs; (v) Borrower shall have deposited into the Deposit Account the amounts required to be deposited under Section 6.7 hereof (on account of Ground Rent, Profits Tax and otherwise) for the Second Extension Period; (vi) Borrower delivers (from a Counterparty having a Minimum Counterparty Rating) an Interest Rate Protection Agreement that complies with (and the related documents, including a collateral assignment and opinion of counsel to the Counterparty, that comply with) the provisions of Section 4.1.11 and with a

LIBOR strike rate equal to or less than the Capped LIBOR Rate; (vii) Lender receives evidence that the insurance described in Section 5.1.1(a) will be maintained during the Second Extension Period and that the political risk insurance policy required by Lender shall have been purchased for the Second Extension Period; (viii) Borrower receives evidence that the Profits Tax Ruling shall have been extended (without any change or amendment) for the Second Extension Period; (ix) the Loan-to-Value Ratio is not greater than seventy-five percent (75%); and (x) the Debt Service Coverage Ratio is at least 1.20 to 1.00 (assuming, for purposes of such calculation, interest as provided herein and in the Note and a twenty-five (25) year amortization schedule).

(d)    Borrower shall have a third option to extend the term of the Loan until the Third Extended Maturity Date, with the payment to Lender of the non-refundable Extension Fee, subject to satisfaction of the following conditions: (i) Borrower shall have given Lender written notice of such extension by no later than thirty (30) days prior to the Second Extended Maturity Date nor any earlier than ninety (90) days prior to the Second Extended Maturity Date (such notice to include the Extension Fee); (ii) no monetary Default and no Event of Default shall have occurred and be continuing at the time of the delivery of the written extension notice or on the Second Extended Maturity Date; (iii) Lender shall have received a title continuation indicating no change in the condition of title to the Property from that existing on the date hereof, except for Permitted Encumbrances; (iv) Borrower shall have paid all costs and expenses actually incurred by Lender in connection with such extension, including underwriting, title and reasonable legal fees and costs; (v) Borrower shall have deposited into the Deposit Account the amounts required to be deposited under Section 6.7 hereof (on account of Ground Rent, Profits Tax and otherwise) for the Third Extension Period; (vi) Borrower delivers (from a Counterparty having a Minimum Counterparty Rating) an Interest Rate Protection Agreement that complies with (and the related documents, including a collateral assignment and opinion of counsel to the Counterparty, that comply with) the provisions of Section 4.1.11 and with a LIBOR strike rate equal to or less than the Capped LIBOR Rate; (vii) Lender receives evidence that the insurance described in Section 5.1.1(a) will be maintained during the Third Extension Period and that the political risk insurance policy required by Lender shall have been purchased for the Third Extension Period; (viii) Borrower receives evidence that the Profits Tax Ruling shall have been extended (without any change or amendment) for the Third Extension Period; (ix) the Loan-to-Value Ratio is not greater than seventy percent (70%); and (x) the Debt Service Coverage Ratio is at least 1.25 to 1.00 (assuming, for purposes of such calculation, interest as provided herein and in the Note and a twenty-five (25) year amortization schedule).

2.3.3    Interest Rate and Payment after Default. In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan shall accrue interest at the Default Rate, calculated from the date the Default occurred which led to such an Event of Default without regard to any grace or cure periods contained herein. If all or any part of the principal amount of the Loan is prepaid upon acceleration of the Loan following the occurrence of an Event of Default prior to the Permitted Prepayment Date, Borrower shall be required to pay to Lender, in addition to all other amounts then payable hereunder (including, without limitation, if such prepayment is made on a Monthly Payment Date, all interest on the principal balance of the Note then being prepaid through such date, and if such prepayment is made on a day other than a Monthly Payment Date, all interest on the principal balance of this Note then being prepaid which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond

such prepayment date), the Exit Fee, a prepayment fee equal to one percent (1%) of the amount of principal being repaid and a Spread Maintenance Premium calculated with respect to the amount of principal being repaid and Breakage Costs.

2.3.4   <u>Late Payment Charge</u>.   If any principal, interest, Exit Fee, Asset Management Fee or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Mortgage and the other Loan Documents.

2.3.5   <u>Method and Place of Payment</u>.   (a) Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(b)   Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the Business Day immediately preceding such day.

(c)   All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

Section 2.4   Prepayments.

2.4.1   <u>Voluntary Prepayments</u>.   Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part.  On and after the Permitted Prepayment Date, and provided no Event of Default has occurred, Borrower may, at its option, prepay the Debt in whole but not in part, provided, the following conditions are satisfied:

(a)   Borrower shall provide prior written notice to Lender specifying the date upon which the prepayment is to be made (the "<u>Prepayment Date</u>"), which notice shall be delivered to Lender not less than thirty (30) days prior to such Prepayment Date (or such shorter period of time as may be permitted by Lender in its sole discretion) and which notice shall be irrevocable;

(b)   Borrower shall pay to Lender simultaneously with such prepayment the Prepayment Fee, if any, the Exit Fee and all other amounts due to Lender under the Loan Documents;

(c)   no prepayment shall be permitted on any date during the period commencing on the first calendar day immediately following a Monthly Payment Date to, but

not including, the Determination Date in such calendar month, unless consented to by Lender in its sole discretion; and

(d) if such prepayment is made on a Monthly Payment Date, then in connection with such prepayment Borrower shall pay to Lender, simultaneously with such prepayment, all interest on the principal balance of the Note then being prepaid through the Prepayment Date; and, if such prepayment is made on a day other than a Monthly Payment Date (subject to the lockout period set forth in clause (c) above), then in connection with such prepayment Borrower shall pay to Lender, simultaneously with such prepayment, all interest on the principal balance of this Note then being prepaid which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond the Prepayment Date.

### 2.4.2  Mandatory Prepayments.

On each date on which Lender actually receives a distribution of Net Proceeds, and if Lender does not make such Net Proceeds available to Borrower for a Restoration, Borrower shall, at Lender's option, prepay the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds together with (i) the Exit Fee and (ii) if such prepayment is made on a Monthly Payment Date, all interest on the principal balance of the Note then being prepaid through such date, and if such prepayment is made on a day other than a Monthly Payment Date, all interest on the principal balance of this Note then being prepaid which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond such prepayment date. No Spread Maintenance Premium shall be due in connection with any prepayment made pursuant to this Section 2.4.2. Provided no Event of Default shall then exist, the full amount of any such principal prepayment shall be applied to Component A and, upon prepayment of Component A in whole, to Component B. Any prepayment received by Lender pursuant to this Section 2.4.2 on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan in an interest bearing account, with such interest accruing to the benefit of Borrower, and shall be applied by Lender on the next Monthly Payment Date.

### 2.4.3  Prepayments After Default.

If after an Event of Default, payment of all or any part of the principal of the Loan is tendered by Borrower, a purchaser at foreclosure or any other Person, such tender shall be deemed an attempt to circumvent the prohibition against prepayment set forth in Section 2.4.1 and Borrower, such purchaser at foreclosure or other Person shall pay, in addition to the outstanding principal balance, the Spread Maintenance Premium, all accrued and unpaid interest (including, without limitation, if such prepayment is made on a Monthly Payment Date, all interest on the principal balance of the Note then being prepaid through such date, and if such prepayment is made on a day other than a Monthly Payment Date, all interest on the principal balance of this Note then being prepaid which would have accrued through the end of the Interest Period then in effect notwithstanding that such Interest Period extends beyond such prepayment date), the Exit Fee, a prepayment fee equal to one percent (1%) of the amount of principal being repaid and Breakage Costs and other amounts payable under the Loan Documents. Any amounts received by Lender following the occurrence and continuance of a Event of Default shall be applied by Lender toward the payment of interest and/or principal of any of the Components and/or any other amounts due under the

Loan Documents in such order, priority and proportions as Lender in its sole discretion shall deem proper.

Section 2.5    Taxes.

(a)    Borrower hereby agrees to pay any Profits Tax, any Foreign Exchange Tax and any and all present or future taxes, levies, imposts or charges that are or may be payable in connection with (i) the revenues or Rents from or any item of income from the Property, (ii) this Agreement, the Note or any of the Loan Documents, or any payment (of any nature, including in the nature of fees, charges or reimbursement of expenses) made under this Agreement, the Note or any of the Loan Documents, (iii) the Funding Loan Documents and any payments made by Lender or Agent thereunder, (iv) any amounts transferred by wire or otherwise from the Lockbox Account (Caribbean Mercantile Bank) to the Lockbox Account (Wachovia), and (v) any payments made by or for the account of Borrower (including from monies in the Lockbox Accounts or the Deposit Account or any sub-account thereof, or any reserve or account therein), and that in each case are Non-Excluded Taxes, in each case directly to the appropriate Governmental Authority and on a timely basis (in advance of the respective dates on which penalties or interest shall accrue in connection with any such payments). Borrower shall timely make (and deliver simultaneously to Lender copies of) all filings required to be made by Borrower in connection with any and all such taxes, imposts or charges.

(b)    Borrower hereby agrees to pay any import duties, excise taxes, Casino license fees and room or Hotel taxes (relating to or arising from the operation of the Property, or any portion thereof, including the Casino), and any present or future stamp, recording, documentary, excise or similar taxes, charges or levies that arise from the execution, delivery, recordation, filing or registration of, any performance under, or otherwise with respect to, this Agreement, the Note, the Mortgage or any other Loan Document or the Funding Loan Documents (collectively, "Other Taxes"), and that in each case are Non-Excluded Taxes, directly to the appropriate Governmental Authority and on a timely basis (in advance of the respective dates on which penalties or interest shall accrue in connection with any such payments). Borrower shall timely make (and deliver simultaneously to Lender copies of) all filings required to be made by Borrower in connection with any and all such Other Taxes.

(c)    Any and all payments (of any nature, including in the nature of fees, charges or reimbursement of expenses) by Borrower to or on behalf of Lender under or in respect of this Agreement or any other Loan Document, all payments made by Lender to Wachovia under or in respect of the Funding Loan Documents, all transfers from the Lockbox Account (Caribbean Mercantile Bank) to Lockbox Account (Wachovia), and all payments to Lender from the Property, the Lockbox Accounts or the Deposit Account (or otherwise from the Property), shall be made free and clear of, and without deduction or withholding for or on account of, any Profits Tax, any Foreign Exchange Tax or any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities (including penalties, interest and additions to tax) with respect thereto, including without limitation Other Taxes, whether now or hereafter imposed, levied, collected, withheld or assessed by any taxation authority or other Governmental Authority (collectively, "Section 2.5 Taxes"). If Borrower shall be required under any applicable Legal Requirement to deduct or withhold any Section 2.5 Taxes from or in respect of any sum payable under or in respect of this Agreement or any of the other Loan Documents to or on

behalf of Lender, or if Lender shall be required to pay (or withhold or deduct) any Section 2.5 Taxes under or in respect of payments made by Lender to Wachovia under the Funding Loan Documents, or if Section 2.5 Taxes shall be required to be withheld or deducted from any payments out of the Lockbox Accounts or the Deposit Accounts to Lender, to Wachovia or otherwise, (i) Borrower shall make all such deductions and withholdings in respect of Section 2.5 Taxes, (ii) Borrower shall pay the full amount deducted or withheld in respect of Section 2.5 Taxes directly to the relevant taxation authority or other Governmental Authority in accordance with the applicable Legal Requirement, and (iii) the sums payable by Borrower to Lender shall be increased as may be necessary so that after Borrower has made all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 2.5) and/or payments, Lender, Agent and Wachovia (in its capacity as lender under the Funding Loan Documents), as the case may be, each receives an amount equal to the sum it would have received had no such deductions or withholdings been made or amounts been payable in respect of Non-Excluded Taxes. For purposes of this Agreement "Non-Excluded Taxes" are taxes that are imposed on the overall net income (and franchise taxes imposed in lieu thereof) of Lender or Wachovia or other holders of the Funding Loan by the laws of the United States or any political subdivision thereof (other than Section 2.5 Taxes).

(d)     Borrower hereby agrees to make all filings required in connection with any Section 2.5 Tax promptly when due, and to provide copies of all such filings simultaneously to Lender. Lender shall instruct Agent to provide such information to Borrower as Borrower shall require to make Foreign Exchange Tax filings when due. Borrower hereby agrees to pay for (or reimburse Lender for) any fees or costs (including reasonable third-party professional expenses) incurred by Lender in connection with any tax filings required to be made by Lender in Aruba (if any).

(e)     Borrower hereby agrees to indemnify Lender (and its successors and assigns), Agent and Wachovia for, and to hold each of them harmless against, the full amount Section 2.5 Taxes of any kind imposed by any jurisdiction, imposed on or paid by Lender, Agent or Wachovia, as the case may be, and any liability (including penalties, additions to tax, interest and expenses, and reasonable third-party costs of filing or preparing tax filings or returns) arising therefrom or with respect thereto. The indemnity by Borrower provided for in this Section 2.5(e) shall apply and be made whether or not the Section 2.5 Taxes for which indemnification hereunder is sought have been correctly or legally asserted. Amounts payable by Borrower under the indemnity set forth in this Section 2.5(e) shall be paid within ten (10) days from the date on which Lender, Agent or Wachovia, as the case may be, makes written demand therefor.

(f)     Lender shall take all reasonable actions (consistent with its internal policy and legal and regulatory restrictions) requested by Borrower to assist Borrower, at the sole expense of Borrower, to recover from the relevant taxation authority or other Governmental Authority any Section 2.5 Taxes in respect of which amounts were paid by Borrower pursuant to Sections 2.5(a) through (d). However, Lender and Agent will not be required to take any action that would be, in the sole judgment of Lender and Agent, legally inadvisable, or commercially or otherwise disadvantageous to Lender or Agent in any respect, and in no event shall Lender be required to disclose any tax returns or any other information that, in the sole judgment of Lender is confidential.

NYLIB4 753059.14

-34-

(g)    Without limiting the generality of any of the foregoing, Borrower agrees that it (or any Person making such payment on behalf of Borrower) shall furnish to Lender, Agent and Wachovia, within thirty (30) days after the date of any payment of Section 2.5 Taxes, a certified copy of the original official receipt evidencing payment thereof. In the case of any payment under or in respect of this Agreement or any of the other Loan Documents by or on behalf of Borrower through an account or branch outside the United States, or on behalf of Borrower by a payor that is not a United States person, if Borrower determines that no Section 2.5 Taxes are payable in respect thereof, Borrower shall furnish, or shall cause such payor to furnish, to Lender, Agent and Wachovia an opinion of counsel reasonably acceptable to Lender, Agent and Wachovia stating that such payment is exempt from Section 2.5 Taxes. For purposes of this Section 2.5(g), the terms *"United States"* and *"United States person"* shall have the meanings specified in Section 7701 of the Internal Revenue Code.

### Section 2.6    Non-Confidentiality of Tax Treatment.

Notwithstanding anything to the contrary contained in this Agreement, all persons may disclose to any and all persons, without limitations of any kind, the purported or claimed U.S. federal income tax treatment or Aruban tax treatment of this Agreement, any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment or Aruban tax treatment of this Agreement, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal income tax treatment or Aruban tax treatment or fact, other than the name of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, and any pricing terms or other nonpublic business or financial information that is unrelated to the purported or claimed federal or Aruban tax treatment of the Agreement to the taxpayer and is not relevant to understanding the purported or claimed federal or Aruban tax treatment of the Agreement to the taxpayer.

### III.    REPRESENTATIONS AND WARRANTIES

### Section 3.1    Borrower Representations.

Borrower represents, warrants and agrees that:

3.1.1    <u>Organization</u>. (a) Borrower and each SPC Party is (and, to the best of Borrower's knowledge, since its date of formation Borrower has been) and will be duly organized, validly existing and in good standing with full power and authority to own its assets and conduct its business, and is (and, to the best of Borrower's knowledge, since its date of formation Borrower has been) duly qualified in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a material adverse effect on its ability to perform its obligations hereunder. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform its obligations under this Agreement, the other Loan Documents and all the transactions contemplated hereby.

(b)    Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement. Borrower is an organization of the type specified in the first paragraph of this

Agreement. Borrower is incorporated or organized under the laws of Aruba. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding ten (10) years and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change). Borrower's tax identification number is 98-0490747. Borrower is not subject to back-up withholding taxes.

### 3.1.2. Proceedings.

This Agreement and the other Loan Documents have been duly authorized, executed and delivered by Borrower and constitute a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

### 3.1.3 No Conflicts.

The execution and delivery of this Agreement and the other Loan Documents by Borrower, and the performance of its obligations hereunder and thereunder will not conflict with any provision of any law or regulation to which Borrower is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of any of Borrower's organizational documents or any agreement or instrument to which Borrower is a party or by which it is bound, or any order or decree applicable to Borrower, or result in the creation or imposition of any lien on any of Borrower's assets or property (other than pursuant to the Loan Documents).

### 3.1.4 Litigation.

There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower or AHE Holding in any court or by or before any other Governmental Authority which would materially and adversely affect the ability of Borrower, Guarantor or any other Person to carry out the transactions contemplated in this Agreement (including the sale of shares in AHE Holding) or to operate the Property, renovate the Hotel and implement the transactions contemplated herein (or in any of the other Loan Documents) and in the Management Agreements and Starwood Agreements. The High Point Litigation will not affect the ability of Borrower, Guarantor or any other Person to carry out the transactions contemplated in this Agreement (including the sale of shares in AHE Holding) or to operate the Property, renovate the Hotel and implement the transactions contemplated herein (or in any of the other Loan Documents) and in the Management Agreements and Starwood Agreements. The shares of Borrower and AHE Holding are free (beyond any final appeal) of any restriction, embargo or injunction restricting transfer, and no such restriction, embargo or injunction is in place or continues on the date hereof.

### 3.1.5 Agreements.

Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of Borrower or its properties or might have consequences that would adversely affect its performance hereunder.

3.1.6  <u>Consents</u>. No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, this Agreement or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

3.1.7  <u>Title</u>. Borrower has good, marketable and insurable title to the Ground Lease and good title to the balance of the Property (including all Improvements) owned by it, free and clear of all Liens whatsoever except the Permitted Encumbrances. The Mortgage, when properly recorded in the appropriate records, together with the Security Documents (Aruba), will create (i) a valid, first priority, perfected lien on the Property, subject only to Permitted Encumbrances and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances. There are no mechanics', materialman's or other similar liens or claims which have been filed for work, labor or materials affecting the Property which are or may be liens prior to, or equal to or coordinate with, the lien of the Mortgage. None of the Permitted Encumbrances, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage, the Security Documents (Aruba), this Loan Agreement and any of the other Loan Documents, materially and adversely affect the value of the Property, impair the use or operations of the Property or impair Borrower's ability to pay its obligations in a timely manner.

3.1.8  <u>No Plan Assets</u>. As of the date hereof and throughout the term of the Loan (a) Borrower is not nor will it be an "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether or not subject to Title I of ERISA, or a "plan" as defined in Section 4975 of the Code, (b) none of the assets of Borrower constitute or will constitute "plan assets" of one or more such plans within the meaning of U.S. Department of Labor Regulation 29 C.F.R. Section 2510.3101 (the "<u>Plan Assets Regulation</u>") and (c) transactions by or with Borrower are not and will not be subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans, as defined in Section 3(32) of ERISA.

3.1.9  <u>Compliance</u>. (a) Borrower, the SPC Parties and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes and Prescribed Laws. Currently, the Property standing alone (and as currently constructed and, in the case of parking, paved) has sufficient parking spaces under law.

(b)  Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower. Borrower has not committed any act which may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

3.1.10  <u>Financial Information</u>. All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of the Property, Borrower and AHE Holding (i) are true, complete

and correct in all material respects, (ii) accurately represent the financial condition of the Property and such Persons as of the date of such reports, and (iii) have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein. To the extent that any financial data provided by Borrower to Lender in respect of the Property or the operations of the Hotel at the Property was prepared by (or on behalf of) the prior owner of Borrower, the representations made in the preceding sentence shall be made to the best knowledge of Borrower. Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof, except as referred to or reflected in said financial statements. Since the date of the financial statements, there has been no material adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

3.1.11 <u>Condemnation</u>. No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

3.1.12 <u>Utilities and Public Access</u>. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses.

3.1.13 <u>Separate Lots</u>. The Property is comprised of one (1) or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot not a part of the Property.

3.1.14 <u>Assessments</u>. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

3.1.15 <u>Enforceability</u>. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

3.1.16 <u>Security Documents</u>. The Security Documents (Aruba), the Assignment Documents and the other Loan Documents create valid assignments of, or valid security interests in, the rents, insurance policies, accounts, fixtures, contracts and other matters (including claims) which are the subject thereof. No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents (or any matter that is the subject of any of the Security Documents (Aruba) or the Assignment Documents) due and payable or to become due and payable thereunder.

3.1.17 <u>Insurance</u>. Borrower has obtained and delivered to Lender original or certified copies of all of the Policies, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims

have been made under any of the Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**3.1.18  Licenses.**   All permits and approvals, including without limitation, certificates of occupancy required by any Governmental Authority for the use, occupancy and operation of the Property in the manner in which the Property is currently being used, occupied and operated have been obtained and are in full force and effect.

### 3.1.19  Intentionally Omitted.

**3.1.20  Physical Condition.**   The Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

**3.1.21  Boundaries.**  All of the improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the improvements, so as to affect the value or marketability of the Property except those which are insured against by title insurance.

**3.1.22  Leases.**  With respect to any existing Leases: (a) the rent roll attached hereto as Schedule II is true, complete and correct, and the Property is not subject to any Leases other than the Leases described in Schedule II, (b) the Leases identified on Schedule II are in full force and effect and there are no defaults thereunder by either party, (c) the copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto, (d) no Rent (including security deposits) has been paid more than one (1) month in advance of its due date, (e) all work to be performed by Borrower under each Lease has been performed as required and has been accepted by the applicable Tenant, (f) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any Tenant has already been received by such Tenant and (g) all security deposits are being held in accordance with Legal Requirements.

**3.1.23  Filing and Recording Taxes.**  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid under applicable Legal Requirements in connection with all of the transactions contemplated herein and effected herewith, including, without limitation, the acquisition of the shares in AHE Holding, the issuance of the Ground Lease and the Funding Loan, have been paid or are being paid simultaneously herewith. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid under applicable Legal Requirements in connection with the

execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage, the Security Documents (Aruba) and the Assignment Documents, have been paid or are being paid simultaneously herewith. All taxes and governmental assessments due and owing in respect of the Property have been paid.

### 3.1.24 Single Purpose. Borrower hereby represents and warrants to, and covenants with, Lender that as of the date hereof (or, where specifically noted below, in each case to the best of Borrower's knowledge, since the date of formation of Borrower) and until such time as the Debt shall be paid in full:

(a)  Borrower has never owned, does not own and will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for the ownership or operation of the Property.

(b)  Borrower has not engaged and is not engaged (and will not engage) in any business other than the ownership, management and operation of the Property and the ownership of fifty percent (50%) of the common shares in the Restaurant Operator and Spa Operator and Borrower will conduct and operate its business as presently conducted and operated.

(c)  Borrower has not entered into or, except for capital contributions and capital distributions, will not enter into any contract or agreement with any Affiliate of Borrower, any constituent party of Borrower or any Affiliate of any constituent party, except upon terms and conditions that were (or are) intrinsically fair and substantially similar to those that would be available on an arm's-length basis with third parties other than any such party.

(d)  Borrower has not incurred and will not incur any Indebtedness other than (i) the Debt, (ii) unsecured trade payables and operational debt not evidenced by a note and (iii) Indebtedness incurred in the financing of equipment and other personal property used on the Property provided that any Indebtedness incurred pursuant to subclauses (ii) and (iii) shall be (x) not in excess of $500,000.00 in the aggregate, (y) paid not more than sixty (60) (days) incurred as to the matters in subclause (ii) above and not more than sixty (60) days from the date due as to the matters in subclause (iii) above and (z) incurred in the ordinary course of business. No Indebtedness other than the Debt may be secured (subordinate or *pari passu*) by the Property.

(e)  Borrower has not made and will not make a loan or advance to any third party (including any Affiliate or constituent party), other than the Inter-Company Loan, and has not and shall not acquire obligations or securities of its Affiliates, and has not and shall not form, hold or acquire any subsidiaries.

(f)  Borrower will remain solvent; and Borrower has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(g)  Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not, nor will Borrower permit any constituent party to amend, modify or otherwise change the articles of incorporation and bylaws or other organizational documents of Borrower or such constituent

party without the prior written consent of Lender in any manner that (i) violates the single purpose covenants set forth in this Section 3.1.24, or (ii) amends, modifies or otherwise changes any provision thereof that by its terms cannot be modified at any time when the Loan is outstanding or by its terms cannot be modified without Lender's consent.

(h)     Borrower has maintained (and will maintain) separate books, records, financial statements and bank accounts (and such books, records and other materials shall also be maintained separately from those of any Affiliate or constituent party or Borrower). Borrower's assets have not been (and will not be) listed as assets on the financial statement of any other Person, provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet. Borrower has filed (and will file) its own tax returns (to the extent Borrower is required to file any such tax returns) and will not file a consolidated federal income tax return with any other Person. Borrower has maintained (and shall maintain) its books, records, resolutions and agreements as official records.

(i)     Borrower has always been, will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower or any constituent party of Borrower), and shall correct any known misunderstanding regarding its status as a separate entity. Borrower has always conducted (and shall conduct) business in its own name, has not identified (and shall not identify) itself or any of its Affiliates as a division or part of the other and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(j)     Borrower has maintained and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k)     Neither Borrower nor any constituent party has sought, will seek or effect the liquidation, dissolution, winding up, liquidation, consolidation or merger, in whole or in part, of Borrower.

(l)     Borrower has not and will not commingle the funds and other assets of Borrower with those of any Affiliate or constituent party or any other Person, and will hold all of its assets in its own name.

(m)     Borrower has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(n)     Borrower has not guaranteed, and will not guarantee or become obligated for the debts of any other Person and has not, does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o)   Each owner of interests in Borrower up to and including Twilight Holdings LLC (as shown on the organizational chart attached hereto as Schedule III) (each such entity, up to and including Twilight Holdings LLC, an "SPC Party") shall be a limited liability company whose sole asset is its direct or indirect interest in Borrower and each such SPC Party will at all times comply, and will cause Borrower to comply, with each of the representations, warranties, and covenants contained in this Section 3.1.24 as if such representation, warranty or covenant was made directly by each such SPC Party.  Upon the withdrawal or the disassociation of an SPC Party from Borrower, Borrower shall immediately appoint a new SPC Party whose articles of incorporation or operating agreements (as the case may be) are substantially similar to those of such SPC Party and deliver a new non-consolidation opinion to the Rating Agency or Rating Agencies, as applicable, with respect to the new SPC Party and its equity owners.

(p).   Borrower and each SPC Party shall at all times cause there to be at least one duly appointed member of the board of directors of Borrower or SPC Party who is provided by a nationally-recognized company that provides professional independent directors (each, an "Independent Director") who will be selected by Lender and who shall not have been at the time of such individual's appointment or at any time while serving as a director of Borrower or such SPC Party, and may not have been at any time during the preceding five years (i) a stockholder, director (other than as an Independent Director), officer, employee, trustee, partner, attorney or counsel of Borrower or any Affiliate, (ii) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with Borrower or any Affiliate, (iii) a Person or other entity controlling or under common control with any such stockholder, partner, customer, supplier or other Person, or (iv) a member of the immediate family by blood or marriage of any such stockholder, director, officer, employee, trustee, partner, customer, supplier or other Person. A natural person who otherwise satisfies the foregoing definition of Independent Director except for being the independent director, manager or special member of a "special purpose entity" affiliated with the Borrower that does not own a direct or indirect equity interest in the Borrower shall not be disqualified from serving as an Independent Director if such individual is at the time of initial appointment, or at any time while serving as an Independent Director, an Independent Director of a "special purpose entity" affiliated with the Borrower (other than any entity that owns a direct or indirect equity interest in the Borrower) if such individual is an independent manager, director or special member provided by a nationally-recognized company that provides professional independent managers, directors or special members.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

(q)   Borrower shall not cause or permit the board of directors of Borrower to take any action which, under the terms of any certificate of incorporation, by-laws or any voting trust agreement with respect to any common stock or under any organizational document of Borrower, requires a vote of the board of directors of Borrower unless at the time of such action there shall be at least one member who is an Independent Director.

(r)   Borrower shall conduct its business so that the assumptions made with respect to Borrower in the Insolvency Opinion shall be true and correct in all respects.  In connection with the foregoing, Borrower hereby covenants and agrees that it will comply with or cause the compliance with, (i) all of the facts and assumptions (whether regarding the Borrower

or any other Person) set forth in the Insolvency Opinion, (ii) all the representations, warranties and covenants in this Section 3.1.24, and (iii) all the organizational documents of the Borrower.

(s)    Borrower has not permitted (and will not permit) any Affiliate or constituent party independent access to its bank accounts.

(t)    Borrower has paid and shall pay the salaries of its own employees (if any) from its own funds and has maintained and will maintain a sufficient number of employees (if any) in light of its contemplated business operations.

(u)    Borrower shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred.

(v)    Borrower has allocated and will allocate fairly and reasonably any overhead expenses that have been or will be shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate or Related Party.

(w)    Borrower has not pledged and will not pledge its assets to secure the obligations of any other Person, and no such pledge remains outstanding except in connection with the Loan.

(x)    Borrower has not had and will not have any of its obligations guaranteed by an affiliate, except for guarantees that have been either released or discharged (or that will be discharged as a result of the closing of the Loan) or guarantees that are expressly contemplated by the Loan Documents.

(y)    Borrower has and no judgments or liens of any nature against it except for tax liens not yet due.

(z)    Borrower is in compliance with all laws, regulations and orders applicable to it and, except as otherwise disclosed in this Agreement, has received or will receive all permits necessary for it to operate.

(aa)    Borrower is not involved in any dispute with any taxing authority.

(bb)    Borrower has paid and will pay all taxes which it owes.

(cc)    Borrower is not now party to any lawsuit, arbitration, summons or legal proceeding that is still pending or that resulted in a judgment against it that has not been paid in full.

(dd)    Borrower has provided Lender with complete financial statements that reflect a fair and accurate view of the entity's financial condition.

(ee)    Borrower has obtained a current Phase I environmental site assessment (ESA) prepared consistent with ASTM Practice E 1527 and the ESA has not identified any recognized environmental conditions that require further investigation or remediation.

(ff)     Borrower has no contingent or actual obligations not related to the Property.

**3.1.25  Tax Filings.** To the extent required, Borrower has timely filed all tax returns required to be filed and have paid or made adequate provision for the payment of all taxes, charges and assessments payable by Borrower. Borrower believes that its tax returns properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the applicable tax authority upon audit.

**3.1.26  Solvency.** Borrower has (a) not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

**3.1.27  Federal Reserve Regulations.** No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

**3.1.28  Organizational Chart.** The organizational chart attached as Schedule III hereto, relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.

**3.1.29  Bank Holding Company.** Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**3.1.30  No Other Debt.** Borrower has not borrowed or received debt financing (other than permitted pursuant to this Agreement) that has not been heretofore repaid in full.

**3.1.31  Investment Company Act.** Borrower is not (1) an "investment company" or a company "controlled" by an "investment company," within the