meaning of the Investment Company Act of 1940, as amended; (2) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (3) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

3.1.32  Access/Utilities.  All public utilities necessary to the continued use and enjoyment of the Property as presently used and enjoyed are located in the public right-of-way abutting the Property. All roads necessary for the full utilization of the Property for its current purpose have been completed and dedicated to public use and accepted by all governmental authorities or are the subject of access easements for the benefit of the Property.

3.1.33  No Bankruptcy Filing.  Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of its assets or property, and Borrower does not have any knowledge of any Person contemplating the filing of any such petition against it.

3.1.34  Full and Accurate Disclosure.  To the best of Borrower's knowledge, no information contained in this Agreement, the other Loan Documents, or any written statement furnished by or on behalf of Borrower pursuant to the terms of this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which materially adversely affects, or is reasonably likely to materially adversely affect, the Property, Borrower or its business, operations or condition (financial or otherwise).

3.1.35  No Change in Facts or Circumstances; Disclosure.  To the best of Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make the financial statements, rent rolls, reports, certificates or other documents submitted in connection with the Loan inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects the business operations or the financial condition of Borrower or the Property.

3.1.36  Management and Franchise Agreements.  (a)  The Wyndham Franchise Agreement has been terminated effective and as of the date hereof, and none of Borrower or its Affiliates have any outstanding obligations or liabilities to Wyndham under the Wyndham Franchise Agreement or otherwise. The Riveroll Management Agreement is in full force and effect.

(b)  All of the representations and warranties with respect to the Management Agreements, the Riveroll Agreement and the Starwood Agreements set forth in Article VII of this Agreement are true and correct in all respects.

**3.1.37** <u>Perfection of Accounts</u>.  Borrower hereby represents and warrants to Lender that:

(a)    This Agreement, together with the other Loan Documents, create a valid and continuing security interest (as defined in the Uniform Commercial Code) in the Accounts (as defined in the Cash Management Agreement) in favor of Lender, which security interest is prior to all other Liens, other than Permitted Encumbrances, and is enforceable as such against creditors of and purchasers from Borrower.  Other than in connection with the Loan Documents and except for Permitted Encumbrances, Borrower has not sold or otherwise conveyed the Accounts;

(b)    The Accounts constitute "deposit accounts" or "securities accounts" within the meaning of the Uniform Commercial Code, as set forth in the Cash Management Agreement;

(c)    Pursuant and subject to the terms hereof, Agent has agreed to comply with all instructions originated by Lender, without further consent by Borrower, directing disposition of the Accounts and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities; and

(d)    The Accounts are not in the name of any Person other than Borrower, as pledgor, or Lender, as pledgee.  Borrower has not consented to Agent's complying with instructions with respect to the Accounts from any Person other than Lender.

**3.1.38** <u>Ground Lease</u>.  Borrower hereby represents and warrants to Lender the following with respect to the Ground Lease:

(a)    <u>Recording; Modification</u>.  The Ground Lease has been duly registered, the Ground Lease permits the interest of the Borrower to be encumbered by a mortgage, and the consent of landlord under the Ground Lease is not required for the encumbrance of the Property by the Mortgage.  The Ground Lease may not be canceled, terminated, surrendered or amended without the prior written consent of Lender (other than (i) in accordance with Article 13 of the General Terms and Conditions for Letting Land on Lease set forth in the Ground Lease after a default or (ii) by expropriation for the public benefit in accordance with established legal procedures).

(b)    <u>No Liens</u>.  The Borrower's interest in the Ground Lease is not subject to any liens or encumbrances superior to, or of equal priority with, the Mortgage other than the landlord's related fee interest.

(c)    <u>Ground Lease Assignable</u>.  Borrower's interest in the Ground Lease is assignable to Lender upon notice to, but without the consent of, the landlord (or, if any such consent is required, it has been obtained prior to the date hereof).  The Ground Lease is further assignable by Lender, its successors and assigns upon notice to, but without a need to obtain the consent of, the landlord, provided, the ground rent in respect of the current year has been paid,

and subject to the instrument of transfer containing an election of domicile invariably within the Insular Territory.

(d)  Notice.  The Ground Lease, or an estoppel letter received by the Lender from the landlord, further provides that notice of termination given under the Ground Lease is not effective against Lender unless a copy of the notice has been delivered to Lender in the manner described in the Ground Lease.

(e)  Cure.  Lender is permitted the opportunity within 30 days to cure any default under the Ground Lease, which is curable after the receipt of notice of such default before landlord thereunder may terminate the Ground Lease.

(f)  Term.  The Ground Lease has a term which extends not less than ten (10) years beyond the Maturity Date of the Loan.

(g)  Insurance Proceeds.  Under the terms of the Ground Lease and this Agreement, taken together, any related insurance and condemnation proceeds will be applied either to the repair or restoration of all or part of the Hotel, with Lender having the right to hold and disburse the proceeds as the repair or restoration progresses, or to the payment of the outstanding principal balance of the Loan together with any accrued interest thereon.

(h)  Subletting.  The terms of the Ground Lease do not impose any restrictions on any subletting of the Property.

3.1.39    Trade Name; Other Intellectual Property.  Borrower owns and possesses or licenses (as the case may be), and will maintain, all such patents, patent rights, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights, websites, domain names and copyrights as Borrower considers necessary for the conduct of its business as the "Aruba Resort, Spa and Casino" (which Borrower represents is the name that Borrower will use for the Hotel prior to the date on which the Hotel shall be re-flagged, under the Westin Franchise Agreement, as the "Aruba Westin") without, individually or in the aggregate, any infringement upon rights of other Persons.  There is no individual patent, patent right, trademark, trademark right, trade name, trade name right, service mark, service mark right or copyright the loss of which would (i) materially and adversely affect the value of the Property, (ii) impair the use and operation of the Property or (iii) impair Borrower's ability to pay its obligations in a timely manner.  Borrower does not intend to do business under any trade name with respect to the Property other than the "Aruba Resort, Spa and Casino".

**3.1.40** U.S. Business. Borrower has not engaged in any trade, business or activity that would cause it (or either of them) to be treated as a resident of the United States for purposes of Section 861 of the Internal Revenue Code or the Treasury Regulations promulgated thereunder.

**Section 3.2    Survival of Representations.** The representations and warranties set forth in Section 3.1 shall survive, and any covenants contained in Section 3.1 shall continue, for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents.

## IV.    BORROWER COVENANTS

**Section 4.1    Borrower Affirmative Covenants.**

Borrower hereby covenants and agrees with Lender that:

**4.1.1** Existence; Compliance with Legal Requirements. Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply with all Legal Requirements applicable to it and the Property, including, without limitation, Prescribed Laws.

**4.1.2** Taxes and Other Charges. Borrower shall pay (or cause the Manager to pay) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable. Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not permit or suffer and shall promptly discharge any lien or charge against the Property. After prior notice to Lender, Borrower (at its own expense) may contest by appropriate legal proceeding, conducted in good faith and with due diligence, the amount or validity of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of Taxes or Other Charges from the Property; and (vi) Borrower shall deposit with Lender cash, or other security as may be approved by Lender, in an amount equal to one hundred twenty-five percent (125%) of the contested amount, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may pay over any such cash or other security held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established.

**4.1.3** Litigation. Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower which might materially adversely affect the Property or Borrower's ability to perform its obligations hereunder or under the other Loan Documents.

**4.1.4** <u>Access to Property</u>.    Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

**4.1.5** <u>Further Assurances; Supplemental Mortgage Affidavits</u>. Borrower shall, at Borrower's sole cost and expense:

(a)    execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require; and

(b)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

### 4.1.6 <u>Financial Reporting</u>.

(a)    Borrower shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, in accordance with GAAP, reflecting the financial affairs of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to Borrower to examine such books and records at the office of Borrower or other Person maintaining such books and records and to make such copies or extracts thereof as Lender shall desire.

(b)    Borrower shall furnish Lender annually, within one hundred twenty (120) days following the end of each Fiscal Year, a complete copy of Borrower's annual financial statements audited by a "Big Four" accounting firm or other independent certified public accountant acceptable to Lender prepared in accordance with GAAP covering the Property, including statements of income and expense and cash flow for Borrower and the Property and a balance sheet for Borrower.  Such statements shall set forth gross revenue and operating expenses for the Property.  Borrower's annual financial statements shall be accompanied by a certificate executed by the chief financial officer of Borrower and a certificate executed by the chief financial officer of Borrower in each case stating that such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property. Together with Borrower's annual financial statements, Borrower shall furnish to Lender an Officer's Certificate certifying as of the date thereof whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower or any other Person under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c)    Borrower will furnish Lender on or before the forty-fifth (45th) day after the end of each fiscal quarter (based on Borrower's Fiscal Year), the following items, accompanied by certificate from the chief financial officer of Borrower certifying that such items

are true, correct, accurate and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP as applicable:

    (i)    quarterly and year-to-date statements of income and expense and cash flow prepared for such quarter with respect to the Property, with a balance sheet for such quarter for Borrower;

    (ii)    a calculation reflecting the Debt Service Coverage Ratio as of the last day of such quarter, for such quarter and the last four quarters;

    (iii)    a current rent roll for the Property; and

    (iv)    a comparison of the budgeted income and expenses and the actual income and expenses for such quarter and year to date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such period and year to date.

    (d)    Prior to the last Securitization of any portion of the Loan and upon request by Lender, Borrower will furnish Lender on or before the thirty-fifth (35th) day after the end of each calendar month, the following items, accompanied by a certificate from the chief financial officer of Borrower certifying that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in a manner consistent with GAAP, as applicable:

    (i)    monthly and year-to-date statements of income and expense and cash flow prepared for such month with respect to the Property, including with such materials such statements as are provided to Borrower monthly by Manager; and

    (ii)    a current rent roll for the Property.

    (e)    Borrower shall furnish to Lender, within five (5) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender, including, without limitation, a comparison of the budgeted income and expenses and the actual income and expenses for each quarter (and year to date) for the Property, together with a detailed explanation of any variances of more than the greater of five percent (5%) or $500,000 between budgeted and actual amounts for each quarter (and the greater of five percent (5%) or $2,000,000 between budgeted and actual amounts for each year).

    (f)    Borrower shall furnish to Lender copies of all statements, reports and Budgets delivered to Borrower by the Managers, in each case within no more than five (5) days following receipt of same.

    (g)    Borrower shall cause Guarantor to furnish to Lender within one hundred twenty (120) days following the end of each calendar year, a complete copy of Guarantor's annual financial statements prepared by the Approved Accountant or other independent certified public accountant reasonably acceptable to Lender and certified as true and correct by Guarantor.

(h)    Borrower shall furnish to Lender, within two (2) Business Days after receipt thereof, any notice received from a Tenant threatening non-payment of Rent or other default, alleging or acknowledging a default by landlord, requesting a termination of a Lease or a material modification of any Lease or notifying Borrower of the exercise or non-exercise of any option provided for in such Tenant's Lease, or any other similar material correspondence received by Borrower from Tenants during the subject fiscal quarter.

**4.1.7   Title to the Property.**  Borrower will warrant and defend the validity and priority of the Liens of the Mortgage, the Security Documents (Aruba) and the other Loan Documents against the claims of all Persons whomsoever, subject only to Permitted Encumbrances.  Borrower will warrant and defend the validity and priority of the security interest granted in the Deed of Pledge (AHE Holding) and the Deed of Pledge (BCP Sunset).

**4.1.8   Estoppel Statement.**

(a)    After request by Lender, Borrower shall within five (5) Business Days furnish Lender with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the date installments of interest and/or principal were last paid, (iii) any offsets or defenses to the payment of the Debt, if any, (iv) that this Agreement and the other Loan Documents have not been modified or if modified, giving particulars of such modification, and are in full force and effect.

(b)    Borrower shall deliver to Lender, upon request, an estoppel certificate from each Tenant under any Lease (provided that Borrower shall only be required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant not required to provide an estoppel certificate under its Lease); provided that such certificate may be in the form required under such Lease; provided further that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year.

**4.1.9   Leases.**

(a)    All Leases and all renewals of Leases executed after the date hereof shall (i) provide for rental rates comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms, (iii) provide that such Lease is subordinate to the Mortgage and that the lessee will attorn to Lender and any purchaser at a foreclosure sale and (iv) not contain any terms which would materially adversely affect Lender's rights under the Loan Documents.  All Major Leases and all renewals, amendments and modifications thereof executed after the date hereof shall be subject to Lender's prior approval, which approval shall not be unreasonably withheld or delayed.

(b)    Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner, provided, however, Borrower shall not terminate or accept a surrender of a Major Lease without Lender's prior approval; (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as

contemplated by the Loan Documents); (v) shall not alter, modify or change any Lease so as to change the amount of or payment date for rent, change the expiration date, grant any option for additional space or term, materially reduce the obligations of the lessee or increase the obligations of lessor; and (vi) shall hold all security deposits under all Leases in accordance with Legal Requirements. Upon request, Borrower shall furnish Lender with executed copies of all Leases.

4.1.10 **Alterations.** Lender's prior approval shall be required in connection with any alterations to any Improvements (except the performance of the PIP Work and any tenant improvements under any Lease approved by Lender or under any Lease for which approval was not required by Lender under this Agreement) (a) that may have a material adverse effect on Borrower's financial condition, the value of the Property or the ongoing revenues and expenses of the Property or (b) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold, which approval may be granted or withheld in Lender's sole discretion. If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (i) cash, (ii) Letters of Credit (iii) U.S. Obligations, (iv) other securities acceptable to Lender, provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same, or (v) a completion bond, provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same. Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (other than such amounts to be paid or reimbursed by Tenants under the Leases) over the Alteration Threshold and Lender may apply such security from time to time at the option of Lender to pay for such alterations. Lender shall return such security (or the unused balance thereof) to Borrower upon the completion of the alterations in question, as reasonably determined by Lender.

4.1.11 **Interest Rate Cap.** (a) Prior to or contemporaneously with the Closing Date and, in addition, as a condition to the exercise of any extension option as provided in Section 2.3.2, Borrower shall have entered into one or more interest rate protection products (each, together with all schedules and confirmations thereof, collectively, the "Interest Rate Protection Agreement") with a Counterparty having a Minimum Counterparty Rating and otherwise reasonably acceptable to Lender, in form and substance satisfactory to Lender in its reasonable discretion (which Interest Rate Protection Agreement shall be a so-called "cap" form of interest rate protection) for an aggregate notional amount at least equal to the outstanding principal amount of the Loan, which shall effectively hedge LIBOR with respect to such notional amount until the Maturity Date with a LIBOR ceiling equal to the Capped LIBOR Rate. Promptly upon obtaining any Interest Rate Protection Agreement, Borrower shall deliver the same to Lender.

(b)    Borrower shall comply with all of its obligations under the terms and provisions of any Interest Rate Protection Agreement. Borrower shall take all action reasonably requested by Lender to enforce Lender's rights under the Interest Rate Protection Agreement(s) in the event of a default by any Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder. Borrower shall not (a) without the prior written consent of Lender,

modify, amend or supplement the terms of any Interest Rate Protection Agreement, (b) without the prior written consent of Lender, cause the termination of any Interest Rate Protection Agreement prior to its stated maturity date, (c) without the prior written consent of Lender, waive or release any obligation of the Counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) under any Interest Rate Protection Agreement, (d) without the prior written consent of Lender, consent or agree to any act or omission to act on the part of the Counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) which, without such consent or agreement, would constitute a default under any Interest Rate Protection Agreement, (e) fail to exercise promptly and diligently each and every material right which it may have under any Interest Rate Protection Agreement, (f) take or omit to take any action or suffer or permit any action to be omitted or taken, the taking or omission of which would result in any right of offset against sums payable under any Interest Rate Protection Agreement or any defense by the Counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) to payment or (g) fail to give prompt notice to Lender of any notice of default given by or to Borrower under or with respect to any Interest Rate Protection Agreement, together with a complete copy of such notice.

(c)     Prior to or contemporaneously with entering into any Interest Rate Protection Agreement, Borrower shall collaterally assign to Lender, pursuant to an Assignment of Interest Rate Protection Agreement, all of its right, title and interest to receive any and all payments under the applicable Interest Rate Protection Agreement and any related guarantee, if any), shall deliver to Lender an executed counterpart of such Interest Rate Protection Agreements, and shall notify the Counterparty of such collateral assignment and obtain the agreement (either in such Interest Rate Protection Agreement or by separate instrument) of such Counterparty to make any payments to become payable under or pursuant to the Agreement directly to Lender (to be applied by Lender to fund interest due or coming due under the Loan, provided there shall not be any Event of Default existing at such time). Upon the occurrence and during the continuance of an Event of Default, Lender, at its option, may apply any and all payments received under the Interest Rate Protection Agreement (and any related guarantee, if any) to payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion, and such right shall be in addition to all other rights and remedies provided to Lender under the Loan Documents. At such time as the Loan is repaid in full, all of Lender's right, title and interest in the Interest Rate Protection Agreements shall terminate and Lender shall execute and deliver at Borrower's sole cost and expense, such documents as may be required to evidence Lender's release of the Interest Rate Protection Agreement and to notify the Counterparty of such release.

(d)     If for any reason the Counterparty's rating shall fall below the Minimum Counterparty Rating, Borrower shall within ten (10) Business Days following receipt of notice thereof from Lender or any other Person, procure a new interest rate protection product from a Counterparty having a rating of at least the Minimum Counterparty Rating substantially in the form of the Interest Rate Protection Agreement and shall pledge same to Lender pursuant to the assignment form then generally utilized by Lender and accompanied by an opinion letter from counsel to such new Counterparty in form and substance reasonably satisfactory to Lender.

(e)     In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Protection Agreement as and when required hereunder, Lender may purchase the

Interest Rate Protection Agreement and the cost incurred by Lender in purchasing the Interest Rate Protection Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is paid to Lender.

(f)    In connection with an Interest Rate Protection Agreement, Borrower shall obtain and deliver to Lender an opinion of counsel from counsel for the Counterparty thereunder (upon which Lender and its successors and assigns may rely) which shall provide, in relevant part, that:

(1)    the Counterparty under the Interest Rate Protection Agreement is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Protection Agreement;

(2)    the execution and delivery of the Interest Rate Protection Agreement by the Counterparty thereunder, and any other agreement which such Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(3)    all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Protection Agreement, and any other agreement which such Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(4)    the Interest Rate Protection Agreement, and any other agreement which the Counterparty thereunder has executed and delivered pursuant thereto, has been duly executed and delivered by such Counterparty and constitutes the legal, valid and binding obligation of such Counterparty, enforceable against such Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(g)    Depending on the nature of the transaction, the Counterparty Opinion shall contain such additional opinions on such other matters relating to the Interest Rate Cap Agreement and/or and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which the Counterparty thereunder has executed and delivered pursuant thereto, as Lender shall reasonably require, including, without limitation, the following additional opinions if the Counterparty is a foreign entity:

(1)    the jurisdiction where Counterparty is located will respect and give effect to the choice of law provisions of the Interest Rate Cap Agreement and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which the Counterparty thereunder has executed and delivered pursuant thereto; and

(2)    a judgment obtained in the courts of the State of New York is enforceable in the jurisdiction where Counterparty is located.

(h)    Borrower's failure to comply with any or all of the foregoing covenants set forth in this Section 4.1.11 within thirty (30) days after Lender's notice to Borrower of such failure shall constitute an Event of Default hereunder.

**4.1.12 Material Agreements; Indemnity Escrow Agreement; Purchase and Sale Agreement; Hotel Budgets and Plans; PIP.** (a) Borrower shall not enter into any Material Agreement without the prior approval of Lender. Without limiting the generality of the foregoing, Borrower shall not select any third party operator for any portion of the Property without the prior approval of Lender not to be unreasonably withheld or delayed.

(b)    Borrower shall (i) promptly perform and/or observe all of the material covenants and agreements required to be performed and observed by it under each Material Agreement to which it is a party, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (ii) promptly notify Lender in writing of the giving of any notice of any default by any party under any Material Agreement of which it is aware and (iii) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the other party under each Material Agreement to which it is a party in a commercially reasonable manner.

(c)    Borrower shall (i) promptly perform and/or observe all of the material covenants and agreements required to be performed and observed by it under the Indemnity Escrow Agreement, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (ii) promptly notify Lender in writing of the giving of any notice by any Person (other than Borrower) thereunder, and simultaneously copy Lender on any notice it delivers thereunder, (iii) promptly notify Lender of any default by any Person under the Indemnity Escrow Agreement, and (iv) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the other parties to the Indemnity Escrow Agreement in a commercially reasonable manner.

(d) Borrower shall (i) promptly notify Lender in writing of the giving of any notice by any Person (other than Borrower) under the Purchase and Sale Agreement, and simultaneously copy Lender on any notice it delivers thereunder, and (ii) promptly enforce the performance and observance of all of the material covenants and agreements required to be performed and/or observed by the other parties to the Purchase and Sale Agreement in a commercially reasonable manner.

(e) Borrower shall submit the Pre-Opening Budget (as such term is defined in the Westin Management Agreement) and any Operating Plan (as such term is defined in the Westin Management Agreement) and budgets including Pre-Opening Budgets (and any revisions or modifications thereto or thereof) submitted by or on behalf of Manager to Borrower not later than, in each case, three (3) days after receipt of any such materials. Without limiting the generality of the foregoing, Borrower shall submit the Pre-Opening Budget and the Annual Budget to Lender not later than sixty (60) days prior to the commencement of each Fiscal Year. Lender shall have the right to approve the Pre-Opening Budget, any Operating Plan and any Annual Budget (and any revisions or modifications thereto or thereof) (which approval shall not be unreasonably withheld, conditioned or delayed). Annual Budgets and Operating Plans approved by Lender shall hereinafter be collectively referred to as an "Approved Annual Budget."

(f) In the event that Borrower incurs an extraordinary operating expense or extraordinary capital expenditure not set forth in the Approved Annual Budget (each, an "Extraordinary Expense"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval (which approval shall not be unreasonably withheld, conditioned or delayed).

(g) Borrower shall not, without obtaining the prior written consent of Lender in each case, (i) enter into any agreement amending, modifying or terminating the PIP or materially changing or altering the scope of the PIP or the scope of work to be performed in each phase of the PIP, (ii) terminate the PIP without cause or shorten the term thereof, or (iii) assign the PIP or any of its obligations or liabilities thereunder.

**4.1.13 Performance by Borrower.** Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by Borrower without the prior consent of Lender.

**4.1.14 Costs of Enforcement/Remedying Defaults.** In the event (a) that the Mortgage is foreclosed in whole or in part or the Note or any other Loan Document (including, without limitation, any of the Security Documents (Aruba) or the Assignment Documents) is foreclosed or put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of or exercise of any remedies in respect of or under any Lien, mortgage or security interest prior to or subsequent to the Mortgage (or any of the Security Documents (Aruba), Assignment Documents or any of the other Loan Documents) in which proceeding Lender is made a party, (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower, any Affiliate of Borrower or Guarantor, or an

assignment by Borrower, any Affiliate of Borrower or Guarantor for the benefit of its creditors, or (d) Lender shall remedy or attempt to remedy any Event of Default hereunder, Borrower shall be chargeable with and agrees to pay all costs incurred by Lender as a result thereof, including costs of collection and defense (including reasonable attorneys', experts', consultants' and witnesses' fees and disbursements) in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, which shall be due and payable on demand, together with interest thereon from the date incurred by Lender at the Default Rate, and together with all required service or use taxes.

4.1.15  <u>Business and Operations; Restaurant Operator and Space Operator; Licenses and Permits.</u>  (a)  Borrower will continue to engage in the businesses currently conducted by it as and to the extent the same are necessary for the ownership and leasing of the Property.  Borrower will qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership and leasing of the related Property.

(b)  Borrower shall cause Restaurant Operator to continue its current operations at the Property and, in addition, shall ensure that the Restaurant Operator is not conducting any business other than its current operations at the Property.  Borrower shall cause Spa Operator to continue its current operations at the Property and, in addition, shall ensure that the Spa Operator is not conducting any business other than its current operations at the Property.

(c)  Borrower shall at all times cause the Property to be maintained as a first-class hotel with associated casino and spa facilities.  Borrower shall cause the Hotel licenses, Casino licenses and other licenses required for the continued operations at the Property (as a Hotel, including a Casino and Spa) to be issued and remain in full force and effect at all times.

(d)  Lender shall have the right to approve (such approval not to be unreasonably withheld or delayed) any discount policies or procedures (whether with respect to discounts on room charges, or food and beverage or other services at the Property) implemented by Borrower (or Manager) for the Property, and, in addition, any policies or procedures relating to the provision of complimentary guest room nights at the Hotel.  Borrower shall keep Lender apprised of all such policies and procedures, and shall provide Lender (promptly upon receipt of any Lender's request therefor) with information regarding the impact of such policies or procedures on the operations and Gross Revenues of the Hotel.

4.1.16  <u>Loan Fees</u>.  Borrower shall pay all fees and costs (including, without limitation, all origination and commitment fees) required of Borrower pursuant to the terms of that certain term sheet between The Carlton Group and Wachovia dated February 9, 2006.

4.1.17  <u>Ground Lease</u>.  (a)  Borrower shall (i) pay all rent, additional rent or other charges payable under the Ground Lease as and when such rent or other charge is payable (unless waived by the landlord under the Ground Lease), (ii) perform all terms, covenants or conditions in the Ground Lease on the part of Borrower to be observed or performed (unless waived by the landlord under the Ground Lease), or (iii) not modify, change,

supplement, alter or amend any of the terms, covenants or conditions of the Ground Lease without the consent of Lender except as otherwise permitted by this Agreement. Without limiting the generality of subclause (i) of the preceding sentence, Borrower represents and warrants that it has, simultaneously herewith, prepaid to Ground Lessor one (1) years' rent (and additional rent) under the Ground Lease.

(b)     Borrower shall provide to Lender any notice received from the Ground Lessor under the Ground Lease within no more than one (1) Business Day following receipt thereof.

4.1.18   **PIP Work.** (a) Borrower shall perform the restoration and improvement work at the Property described in the Project Improvement Plan attached hereto as Schedule IV (such plan, the "PIP"; and such work, the "PIP Work") and the Technical Services Agreement, and Borrower shall complete (and pay for) such restoration and improvement work on or before the respective deadline for each item of work or repair as set forth on Schedule IV.

(b)   The PIP Work shall be performed in a good and workmanlike manner, in compliance with all Legal Requirements and in compliance with the PIP Escrow Agreement. Borrower shall bond or remove any mechanic's, materialmen's or other lien filed in connection with the performance of any of the PIP Work within no more than ten (10) days following the filing of any such lien (and shall provide to Lender evidence of such bonding or removal within no more than five (5) days thereafter).

(c)   Borrower represents and warrants that Starwood has reviewed and approved the plans and specifications for the PIP Work and the budget for the PIP Work.

4.1.19   **IRS Form 8832 Election.**   On or prior to the Closing Date, Borrower shall have elected to be treated as a disregarded entity for U.S. federal income tax purposes by filing IRS Form 8832 in the manner prescribed by Treasury Regulations Section 301.7701-3(c), and Borrower shall not change such election or elect to be treated as a corporation for U.S. federal income tax purposes.

4.1.20   **Certain Additional Rights of Lender (VCOC).** Notwithstanding anything which may be contained in this Agreement to the contrary, Lender shall have:

(a)     the right to routinely consult with Borrower's management regarding the significant business activities and business and financial developments of Borrower. Consultation meetings should occur at Lender's request on a regular basis (no more frequently than quarterly) with Lender having the right to call special meetings at any reasonable times and upon reasonable advance notice;

(b)     the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any time upon reasonable notice;

(c)     the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any assets

other than the Property and other than such assets as shall be used solely in connection with the management and operation of the Property; and

        (d).    the right, in accordance with the terms of this Agreement, to receive monthly, quarterly and year end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness.

        The rights described above may be exercised by any entity which owns and controls, directly or indirectly, substantially all of the interests in Lender.

### Section 4.2. Borrower Negative Covenants.

        Borrower covenants and agrees with Lender that:

        **4.2.1  Due on Sale and Encumbrance; Transfers of Interests.** Without the prior written consent of Lender, neither Borrower nor any other Person having a direct or indirect ownership or beneficial interest in Borrower shall sell, convey, mortgage, grant, bargain, encumber, pledge, assign or transfer any interest, direct or indirect, in the Borrower, any entity having a direct or indirect interest in Borrower, the Property or any part thereof, whether voluntarily or involuntarily, in violation of the covenants and conditions set forth in the Mortgage (or any of the Security Documents (Aruba), Assignment Documents or any of the other Loan Documents, including this Agreement).

        **4.2.2  Liens.** Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property, or on the shares in Borrower or any Affiliate of Borrower, except for Permitted Encumbrances.

        **4.2.3  Dissolution.** Borrower shall not (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Property, (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents, or (iv) cause, permit or suffer Borrower to (A) dissolve, wind up or liquidate or take any action, or omit to take an action, as a result of which Borrower would be dissolved, wound up or liquidated in whole or in part, or (B) amend, modify, waive or terminate the certificate of incorporation or bylaws of Borrower, in each case without obtaining the prior written consent of Lender.

        **4.2.4  Change in Business.** Borrower shall not enter into any line of business other than the ownership and operation of the Property and the ownership of fifty percent (50%) of the common shares in the Restaurant Operator and Spa Operator.

        **4.2.5  Debt Cancellation.** Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**4.2.6  Affiliate Transactions; Dividend Distributions.**  (a) Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the partners of Borrower except for the Inter-Company Loan Documents and, in addition, except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

(b)  Borrower shall only declare (and pay) dividends from cash it may receive under the Cash Management Agreement, and not otherwise.

**4.2.7  Zoning.**  Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**4.2.8  Assets.**  Borrower shall not purchase or own any property other than the Property and any property necessary or incidental for the operation of the Property and the ownership of fifty percent (50%) of the common shares in the Restaurant Operator and Spa Operator.

**4.2.9  No Joint Assessment.**  Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**4.2.10  Principal Place of Business.**  Borrower, AHE Holding and BCP Sunset shall not (i) change their principal place of business or name from the address and name set forth in the introductory paragraph hereof or, in the case of AHE Holding or BCP Sunset, in the Deed of Pledge (AHE Holding) or Deed of Pledge (BCP Sunset) without, in each instance, (A) giving Lender thirty (30) days' prior written notice thereof and (B) taking all action required by Lender for the purpose of perfecting or protecting the Lien and security interest of Lender created pursuant to this Agreement and the other Loan Documents or (ii) change its organizational structure without (A) obtaining the prior written consent of Lender and (B) taking all action required by Lender for the purpose of perfecting or protecting the Lien and security interest of Lender created pursuant to this Agreement and the other Loan Documents.

**4.2.11  Intentionally Omitted.**

**4.2.12  ERISA.**  (a) Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code.

(b)  Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion,

that (A) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "plan" within the meaning of Section 4975 of the Code; (B) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans as defined in Section 3(32) of ERISA; and (C) one or more of the following circumstances is true:

        (i)    Equity interests in Borrower are publicly offered securities, within the meaning of the Plan Assets Regulation;

        (ii)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of the Plan Assets Regulation; or

        (iii)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of the Plan Assets Regulation.

        **4.2.13** <u>Material Agreements</u>. Borrower shall not, without Lender's prior written consent: (a) enter into, surrender or terminate any Material Agreement to which it is a party (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Material Agreement to which it is a party, except as provided therein or on an arms'-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement to which it is a party in any material respect, except on an arm's-length basis and commercially reasonable terms.

## V.    INSURANCE, CASUALTY AND CONDEMNATION

Section 5.1    Insurance.

        **5.1.1** <u>Insurance Policies</u>. (a) Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

        (i)    comprehensive all risk insurance on the Improvements and the personal property at the Property in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value with a waiver of depreciation; (B) containing an agreed amount endorsement waiving all co-insurance provisions; (C) providing for no deductible in excess of Twenty-Five Thousand and No/100 Dollars ($25,000) for all such insurance coverage (except that deductibles for earth movement, flood and wind insurance may be greater with the written approval of Lender, which approval shall be in Lender's sole discretion); (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses and (E) including, without limitation, liability for (i) Demolition Costs in an amount not less than Five Million and No/100 Dollars ($5,000,000), (ii) Increased Costs of Construction in an amount not less than

Twenty Five Million and No/100 Dollars ($25,000,000), and (iii) Undamaged Portion Limit equal to 100% of the Full Replacement Cost. In addition, Borrower shall obtain: (x) flood hazard insurance, including, without limitation, seepage, underground water, water main breaks, and the back up of sewers and drains, in an amount not less than Twenty Five Million and No/100 Dollars ($25,000,000) or such greater amount as Lender shall require; (y) sinkhole insurance for 100% of the Full Replacement Costs and (z) earth movement (other than sinkhole) insurance in an amount not less than Twenty Five Million and No/100 Dollars ($25,000,000), provided that the insurance pursuant to clauses (x), (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i). All policies in this subsection (i) shall be endorsed with a priority of payments endorsement;

(ii)     commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property with limits not less than (a) One Million and No/100 Dollars ($1,000,000) per occurrence, (b) Two Million and No/100 Dollars ($2,000,000) in the general aggregate, (c) Two Million and No/100 Dollars ($2,000,000) Products and Completed Operations Aggregate, (d) One Million and No/100 Dollars ($1,000,000) Personal and Advertising Injury per occurrence and (e) One Million and No/100 Dollars ($1,000,000) for innkeeper's liability. The commercial general liability insurance required in this subsection (ii) shall: (A) be on the so-called "occurrence" form; (B) cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts; (5) personal and advertising injury; (6) contractual liability covering the indemnities contained in Article 9 of the Mortgage to the extent the same is available and (7) innkeeper's liability insurance; and (C) not contain an exclusion for explosion, collapse or underground perils, an exclusion for injuries sustained by one employee from another; or exclusion for cross-liability;

(iii)     business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above for a period commencing at the time of loss for such length of time as it takes to repair or replace with the exercise of due diligence and dispatch; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twenty-four (24) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected gross income from the Property for a period of twenty-four (24) months. The waiting period under any such business income insurance shall not be greater than 72 hours. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Property for the succeeding twenty-four (24) month period. All proceeds payable to Lender pursuant to this subsection (iii) shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note;

provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Property coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy, with limits (including umbrella coverage) in each case acceptable to Lender; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including, without limitation, permission to occupy the Property, hard costs, soft costs, and Delay of Opening coverage, and (4) with an agreed amount endorsement waiving co-insurance provisions. Liability coverage for all tiers of contractors shall be in amounts and on forms acceptable to Lender. In lieu of the foregoing liability coverage, Borrower may opt to provide coverage through use of an Owner's or Contractor's Controlled Insurance Program with coverage acceptable to Lender. In no circumstance may structural construction commence unless and until Lender has approved in writing all coverage related thereto, including, without limitation as to the amount and the scope of coverage;

(v)    workers' compensation and employer's liability insurance (or equivalent coverage), subject to the limits required by law but in no event less than One Million and No/100 Dollars ($1,000,000) per accident and per disease per employee, and issued by a financially sound and responsible insurance company authorized to do business in Aruba and having a claims paying ability rating of "A+" or better by S&P and Fitch;

(vi)    comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)    umbrella liability insurance in addition to primary coverage in an amount not less than One Hundred Million and No/100 Dollars ($100,000,000) per occurrence and in the aggregate with terms at least as broad as all underlying coverage, including, without limitation, (i) the commercial general liability insurance policy required under subsection (ii) above, (ii) the motor vehicle insurance policy under subsection (viii) below, (iii) the employers liability insurance (including injury or disease to employees) required under subsection (v) above and (iv) the "dramshop" insurance under subsection (xi) below;

(viii)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles with a combined single limit of One Million and No/100 Dollars ($1,000,000) covering, without limitation, recreational vehicles, garagekeeper's coverage and valet services. To the extent any of the foregoing cannot be

covered by the motor vehicle liability policy, appropriate other coverage with similar limits satisfactory to Lender shall be obtained;

(ix)     so-called "dramshop" insurance or other liability insurance required in connection with the sale of alcoholic beverages with a limit of not less than One Million and No/100 Dollars ($1,000,000);

(x)     insurance against employee dishonesty in an amount not less than one (1) month of gross revenue from the Property and with a deductible not greater than Ten Thousand and No/100 Dollars ($10,000). The insurance described in this subsection (x) shall in any event include, without limitation, Computer Fraud coverage under a Commercial Crime form in an amount not less than One Million and No/100 Dollars ($1,000,000);

(xi)     if "acts of terrorism" or other similar acts or events or "fire following" are hereafter excluded from Borrower's comprehensive all risk insurance policy or policies required under Sections 5.1.1(a)(i) and 5.1.1(a)(iii) above, Borrower shall obtain an endorsement to such policy or policies, or a separate policy from an insurance provider which maintains at least an investment grade rating from S&P (that is, "BBB-") and, if they are rating the Securities and if they rate the insurer from Fitch (that is, "BBB-") and from Moody's (that is, "Baa3"), insuring against all such excluded acts or events and "fire following", to the extent such policy or endorsement is available, in an amount determined by Lender in its sole discretion (but in no event more than an amount equal to the sum of 100% of the "Full Replacement Cost" and twelve (12) months business interruption insurance (unless such amount shall exceed the outstanding principal amount of the Loan, in which case the amount of such insurance shall be the outstanding principal amount of the Loan), provided, however, Borrower shall not be required to pay annual premiums in excess of the Terrorism Premium Limit for the coverage required under this Section 5.1.1(a)(xi) for the Property, it being agreed that the endorsement or policy shall be in form and substance reasonably satisfactory to Lender;

(xii)     Intentionally Omitted; and

(xiii)     upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)     All insurance provided for or contemplated in Sections 5.1.1(a) and 5.1.3 shall be obtained under valid and enforceable policies (collectively, the "Policies" or in the singular, the "Policy") and, to the extent not specified above, shall be subject to the approval of Lender as to deductibles, loss payees and insureds. Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "Insurance Premiums"), shall be delivered by Borrower to Lender.

(c)     Any blanket insurance Policy (which may include coverage required under Section 5.1.1(a)(xi)) shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.1.1(a).

(d)     All Policies of insurance provided for or contemplated by Section 5.1.1(a) shall be primary coverage and, except for the Policy referenced in Section 5.1.1(a)(v), shall name Borrower as the insured and Lender and its successors and/or assigns as the additional insured, as its interests may appear, and in the case of property damage, boiler and machinery, flood, earthquake and terrorism insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender (as Loss-Payee).  Borrower shall not procure or permit any of its constituent entities to procure any other insurance coverage which would be on the same level of payment as the Policies or would adversely impact in any way the ability of Lender or Borrower to collect any proceeds under any of the Policies.  Borrower shall obtain a waiver of subrogation in favor of Lender on all Policies of insurance provided for or contemplated by Section 5.1.1(a).

(e)     All Policies of insurance provided for or contemplated in Section 5.1.1(a), except for the Policies referenced in Section 5.1.1(a)(v) and (a)(viii) shall contain clauses or endorsements to the effect that:

(i)     no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)     the Policy shall not be canceled without at least thirty (30) days' written notice to Lender and any other party named therein as an additional insured and, if obtainable by Borrower using commercially reasonable efforts, shall not be materially changed (other than to increase the coverage provided thereby) without such a thirty (30) day notice; and

(iii)     Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Mortgage (and the Security Documents (Aruba) and all other Loan Documents) and shall bear interest at the Default Rate.

(g)     In the event of foreclosure of or remedies exercised under the Mortgage (or any of the other Loan Documents) or other transfer of title to the Property in extinguishment

in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(h)    In addition to the insurance coverage described above, Borrower shall cause all contractors engaged in the construction or renovation of the ballroom and all Tenants or operators at the Hotel, including, without limitation, the operator of the Casino and the Spa Operator, each to obtain and maintain commercial general liability insurance with a limit of not less than One Million and No/100 Dollars ($1,000,000) per occurrence and not less than Two Million and No/100 Dollars ($2,000,000) in the aggregate, covering at least the following hazards: (1) products and completed operations (in an amount not less than Two Million and No/Dollars ($2,000,000) in the aggregate); (2) personal and advertising injury (in an amount not less than One Million and No/Dollars ($1,000,000)); (3) legal liability (in an amount not less than Fifty Thousand and No/Dollars ($50,000)) and (4) medical payments (in an amount not less than Five Thousand and No/Dollars ($5,000)). In addition, Borrower shall cause all contractors engaged in the construction or renovation of the ballroom and all Tenants or operators at the Hotel, including, without limitation, the operator of the Casino and the Spa Operator, to obtain and maintain coverage (other than that described above) which is relevant to the unique exposures of each such contractor or Tenant or operator, as the case may be, as determined by Lender in its sole discretion. Lender, in its sole discretion, may increase the limits and coverage required under this subsection (h) based on the size or nature of the operation of any such contractor or Tenant or operator. All Policies of insurance provided for or contemplated in this subsection (h) shall name Lender and its successors and/or assigns as the additional insured. Borrower shall provide certificates of insurance evidencing the Policies described in this subsection (h).

(i)    Borrower shall comply with all insurance laws and regulations of all the jurisdictions in which the Property is located.

### 5.1.2  Insurance Company.

The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in Aruba and having (i) a claims paying ability rating of "A" or better by S&P and Fitch (except as noted in Section 5.1.1(a)(v) hereof), (ii) an insurance financial strength rating of "A2" or better by Moody's and (iii) a rating of "A(VIII)" or better by A.M. Best Company, Inc (provided, however, Lender, in its sole discretion, may waive the requirement of this subsection (iii)). If a Securitization occurs, (i) the foregoing required insurance company rating by a Rating Agency not rating any Securities shall be disregarded and (ii) if the insurance company complies with the aforesaid S&P required rating (and S&P is rating the Securities) and the other Rating Agencies rating the Securities do not rate the insurance company, such insurance company shall be deemed acceptable with respect to such Rating Agency not rating such insurance company. Notwithstanding the foregoing, Borrower shall be permitted to maintain the Policies with insurance companies which do not meet the foregoing requirements (an "Otherwise Rated Insurer"), provided Borrower obtains a "cut-through" endorsement (that is, an endorsement which permits recovery against the provider of such endorsement) with respect to any Otherwise Rated Insurer from an insurance company which meets the claims paying ability ratings required above. Moreover, if Borrower desires to maintain insurance required hereunder from an

insurance company which does not meet the claims paying ability ratings set forth herein but the parent of such insurance company, which owns at least fifty-one percent (51%) of such insurance company, maintains such ratings, Borrower may use such insurance companies if approved by the Rating Agencies (such approval may be conditioned on items required by the Rating Agencies including a requirement that the parent guarantee the obligations of such insurance company).

        **5.1.3  Political Risk Insurance.**  Lender shall purchase a Political Risk Insurance For Lenders insurance policy (the "PR Policy"). The PR Policy shall have a maximum limit of liability of $230,000,000.00 and shall provide Lender with coverage for Expropriatory Acts, Currency Inconvertibility and Non-Transfer as respects the Mortgage, subject to the terms, conditions and exclusions therein. Borrower shall pay all premiums, fees, costs and expenses incurred by Lender regarding the PR Policy.

**Section 5.2    Casualty and Condemnation.**

        **5.2.1  Casualty.**  If the Property shall sustain a Casualty, Borrower shall give prompt notice of such Casualty to Lender and shall promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty (a "Restoration") and otherwise in accordance with Section 5.3, it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty provided the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty. Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower. In the event of a Casualty where the loss does not exceed Restoration Threshold, Borrower may settle and adjust such claim; provided that (a) no Event of Default has occurred and is continuing and (b) such adjustment is carried out in a commercially reasonable and timely manner. In the event of a Casualty where the loss exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and adjust such claim only with the consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any such adjustments. Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

        **5.2.2  Condemnation.**  Borrower shall give Lender prompt notice of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all papers served in connection with such proceedings. Provided no Event of Default has occurred and is continuing, in the event of a Condemnation where the amount of the taking does not exceed the Restoration Threshold, Borrower may settle and compromise such Condemnation; provided that the same is effected in a commercially reasonable and timely manner. In the event a Condemnation where the amount of the taking exceeds the Restoration Threshold or if an Event of Default then exists, Borrower may settle and compromise the Condemnation only with the consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's cost, in any litigation and settlement discussions in respect thereof and Borrower

shall from time to time deliver to Lender all instruments requested by Lender to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement. Lender shall not be limited to the interest paid on the Award by any Governmental Authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by any Governmental Authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 5.3. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

5.2.3  **Casualty Proceeds.**  Notwithstanding the last sentence of Section 5.1.1(a)(iii) and provided no Event of Default exists hereunder, proceeds received by Lender on account of the business interruption insurance specified in Subsection 5.1.1(a)(iii) above with respect to any Casualty shall be deposited by Lender directly into the Deposit Account but (a) only to the extent it reflects a replacement for (i) lost Rents that would have been due under Leases existing on the date of such Casualty, and/or (ii) lost Rents under Leases that had not yet been executed and delivered at the time of such Casualty which Borrower has proven to the insurance company would have been due under such Leases (and then only to the extent such proceeds disbursed by the insurance company reflect a replacement for such past due Rents) and (b) only to the extent necessary to fully make the disbursements required by Section 3.4(a)(i) through (viii) of the Cash Management Agreement. All other such proceeds shall be held by Lender and disbursed in accordance with Section 5.3 hereof.

Section 5.3    Delivery of Net Proceeds.

5.3.1  **Minor Casualty or Condemnation.**  If a Casualty or Condemnation has occurred to the Property and the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, and provided no Event of Default shall have occurred and remain uncured, the Net Proceeds will be disbursed by Lender to Borrower. Promptly after receipt of the Net Proceeds, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement. If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant to the terms hereof, such Net Proceeds shall, until completion of the Restoration, be held in trust for Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of Restoration in accordance with the terms hereof.

5.3.2  **Major Casualty or Condemnation.**  (a) If a Casualty or Condemnation has occurred to the Property and the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration is equal to or greater than the Restoration Threshold, Lender shall make the Net Proceeds available for the Restoration, provided that each of the following conditions are met: