(i)     no Event of Default shall have occurred and be continuing;

(ii)     (A) in the event the Net Proceeds are insurance proceeds, less than twenty-five percent (25%) of the total floor area of the Improvements at the Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (B) in the event the Net Proceeds are an Award, less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is the subject of the Condemnation;

(iii)     the Management Agreements for the Property shall remain in full force and effect during and after the Restoration or the Manager shall otherwise be replaced by a manager or franchisor acceptable to Lender in its sole discretion;

(iv)     Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion;

(v)     Lender shall be satisfied that any operating deficits and all payments of principal and interest under the Note will be paid during the period required for Restoration from (A) the Net Proceeds, or (B) other funds of Borrower;

(vi)     Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (A) the date six (6) months prior to the Maturity Date, (B) the earliest date required for such completion under the terms of the Management Agreements, the Ground Lease and any Major Lease at the Property (if applicable), (C) such time as may be required under applicable Legal Requirements in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or to as nearly as possible the condition it was in immediately prior to such Condemnation, as applicable or (D) the expiration of the insurance coverage referred to in Section 5.1.1(a)(iii);

(vii)     the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(viii)     the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements; and

(ix)     such Casualty or Condemnation, as applicable, does not result in the loss of access to the Property or the related Improvements.

(b)     The Net Proceeds shall be paid directly to Lender and held by Lender in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 5.3.2, shall constitute additional security for the Debt. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all requirements set forth in Section 5.3.2(a) have been satisfied, (B) all materials installed and work and labor performed

(except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (C) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(c)     All plans and specifications required in connection with the Restoration shall be subject to prior approval of Lender and an independent architect selected by Lender (the "Casualty Consultant"). The plans and specifications shall require that the Restoration be completed in a first-class workmanlike manner at least equivalent to the quality and character of the original work in the Improvements (provided, however, that in the case of a partial Condemnation, the Restoration shall be done to the extent reasonably practicable after taking into account the consequences of such partial Condemnation), so that upon completion thereof, the Property shall be at least equal in value and general utility to the Property prior to the damage or destruction; it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty provided the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty. Borrower shall restore all Improvements such that when they are fully restored and/or repaired, such Improvements and their contemplated use fully comply with all applicable material Legal Requirements. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to approval of Lender and the Casualty Consultant. All costs and expenses incurred by Lender in connection with recovering, holding and advancing the Net Proceeds for the Restoration including, without limitation, reasonable attorneys' fees and disbursements and the Casualty Consultant's fees and disbursements, shall be paid by Borrower.

(d)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, less the Casualty Retainage. The term "Casualty Retainage" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 5.3.2(d), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.3.2(d) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's,

subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy, and Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the lien of the Mortgage and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(e)    Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(f)    If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.3.2 shall constitute additional security for the Debt.

(g)    The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 5.3.2, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under any of the Loan Documents; provided, however, the amount of such excess returned to Borrower in the case of a Condemnation shall not exceed the amount of Net Proceeds Deficiency deposited by Borrower with the balance being applied to the Debt in the manner provided for in subsection 5.3.2(h).

(h)    All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 5.3.2(g) may be retained and applied by Lender toward the payment of the Components, whether or not then due and payable, in such order, priority and proportions as Lender in its sole discretion shall deem proper, or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate.

## VI.    RESERVE FUNDS

### Section 6.1    Deposits into Lockbox Accounts.

(a)    Pursuant to the Cash Management Agreement, Borrower and Manager have instructed the credit card banks and the credit card companies with which Borrower and/or Manager have entered into agreements for the clearance of credit card receipts at or from the

Property to wire all credit card receipts (or other Gross Revenues collected by such companies) from or relating to the Property directly to, in the case of American Express, Lockbox Account (Wachovia), and in the case of all other credit card companies, Lockbox Account (Caribbean Mercantile Bank).    Likewise, pursuant to the Cash Management Agreement, simultaneously herewith, Borrower and Manager have instructed the Tenants under Leases to forward all Rents (and other amounts payable under the respective Leases of each such Tenant) directly to the Lockbox Account (Wachovia).

(b)    Pursuant to the Cash Management Agreement, Borrower or Manager shall cause all Gross Revenues (including Rents paid by Tenants under Leases) to be deposited as follows: (i)  all Gross Revenues from the Property, other than cash receipts including Rents collected at the Property (to the extent received by Borrower or Manager rather than collected directly by the credit card companies and/or credit card banks, as aforesaid), shall be deposited by Owner or Manager directly into the Lockbox Account (Wachovia), and (ii) all cash receipts and Rents collected by Borrower or Manager at the Property shall be deposited by Owner or Manager directly into the Lockbox Account (Caribbean Mercantile Bank).    All such deposits shall be made within one (1) Business Day of receipt.

(c)    Pursuant to the Cash Management Agreement, Borrower or Manager shall instruct Starwood to deposit all amounts payable to Borrower directly into the Lockbox Account (Wachovia).    Borrower shall deposit all amounts paid by Starwood to Borrower (under the Starwood Agreements or otherwise), if any, into the Lockbox Account (Wachovia) within one (1) Business Day of receipt of same.

(d)    Borrower shall cause all payments made under the Interest Rate Cap Agreement or any replacement Interest Rate Cap Agreement to be deposited directly into the Deposit Account.    Borrower shall deposit all amounts collected by Borrower under the Indemnity Escrow Agreement directly into the Lockbox Account (Wachovia) within one (1) Business Day of receipt of same. Borrower shall deposit all amounts collected by Borrower under any business interruption insurance maintained by Borrower directly into the Lockbox Account (Wachovia) within one (1) Business Day of receipt of same.

(e)    As provided in the Lockbox Account Agreement (Caribbean Mercantile Bank), all amounts on deposit in the Lockbox Account (Caribbean Mercantile Bank) shall be swept therefrom on a daily basis and wired directly to the Lockbox Account (Wachovia).

(f)    Monies held in the Lockbox Account (Wachovia) shall be disbursed as provided in the Lockbox Agreement (Wachovia) and the Cash Management Agreement.

Section 6.2    Debt Service Funds.

6.2.1  Deposit of Debt Service Funds.  On the Closing Date, Borrower shall deposit with Agent the amount of Ten Million and No/100 Dollars ($10,000,000.00) on account of Debt Service payments due under the Note.  The Amount so deposited shall hereinafter be referred to as the "Debt Service Funds" and the account in which such amount is held shall hereinafter be referred to as the "Debt Service Reserve Account".

**6.2.2   Release of Debt Service Reserve Fund.**   The Debt Service Funds shall be disbursed to Lender monthly, on each Monthly Payment Date, on account of Debt Service payments as more fully provided in (and subject to the conditions for release set forth in) the Cash Management Agreement.

### Section 6.3    Tax Funds.

**6.3.1   Deposits of Tax Funds.**   On each Monthly Payment Date commencing on June 9, 2006, Borrower shall deposit with Lender an amount equal to one twelfth (1/12th) of the Taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate sufficient funds to pay all such Taxes at least ten (10) days prior to their respective due dates.  Amounts deposited pursuant to this Section 6.3.1 are referred to herein as the "Tax Funds" and the account in which such amounts are held shall hereinafter be referred to as the "Tax Reserve Account".  If at any time Lender reasonably determines that the Tax Funds will not be sufficient to pay the Taxes, Lender shall notify Borrower of such determination and the monthly deposits for Taxes shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least ten (10) days prior to the respective due dates for the Taxes; provided that if Borrower receives notice of any deficiency after the date that is ten (10) days prior to the date that Taxes are due, Borrower will deposit such amount within one (1) Business Day after its receipt of such notice.

**6.3.2   Release of Tax Funds.**   Lender shall have the right to apply the Tax Funds (if collected as described in Section 6.3.1) to payments of Taxes.  In making any payment relating to Taxes, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If the amount of the Tax Funds shall exceed the amounts due for Taxes, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax Funds.

### Section 6.4    Insurance Funds.

**6.4.1   Deposits of Insurance Funds.**   On each Monthly Payment Date commencing on June 9, 2006, Borrower shall deposit with Lender an amount equal to one twelfth (1/12th) of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (together with the Foreign Exchange Tax due in connection with such amount, as certified by Borrower to Lender and Agent).  Amounts deposited pursuant to this Section 6.4.1 are referred to herein as the "Insurance Funds" and the account in which such amounts are held shall hereinafter be referred to as the "Insurance Reserve Account".  If at any time Lender reasonably determines that the Insurance Funds will not be sufficient to pay the Insurance Premiums, Lender shall notify Borrower of such determination and the monthly deposits for Insurance Premiums shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the Policies.

6.4.2  <u>Release of Insurance Funds</u>.  Lender shall have the right to apply the Insurance Funds (if collected as described in <u>Section 6.4.1</u>) to payment of Insurance Premiums. In making any payment relating to Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the insurer or its agent, without inquiry into the accuracy of such bill, statement or estimate. If the amount of the Insurance Funds shall exceed the amounts due for Insurance Premiums, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Insurance Funds.

Section 6.5    PIP Funds.

6.5.1  <u>PIP Work</u>.  On the Closing Date, Borrower shall deposit with Agent the amount of Sixteen Million and No/100 Dollars ($16,000,000.00) to be applied to the payment of Phases 1, 2 and 3 of the PIP Work (such Phases being described in the PIP).  The amount deposited pursuant to this <u>Section 6.5.1</u> is referred to herein as the "<u>PIP Funds</u>" and the account in which such amount is held shall hereinafter be referred to as the "<u>PIP Reserve Account</u>".

6.5.2  <u>Release of PIP Funds</u>.  PIP Funds shall be disbursed to Borrower, to fund Phases 1, 2 and 3 of the PIP Work, in accordance with the provisions of the PIP Escrow Agreement.

Section 6.6    Ground Rent Funds.

6.6.1  <u>Deposit of Ground Rent Funds</u>.  Borrower shall have paid the Ground Rent to the Ground Lessor on or prior to the date hereof for the balance of calendar year 2006. On the Monthly Payment Date occurring in June, 2006, and on each Monthly Payment Date thereafter (but subject to the provisions of <u>Sections 2.1.5</u> and <u>6.7</u> relating to deposits to be made on account of Ground Rent in the case of an extension of the Maturity Date), Borrower shall deposit an amount equal to one-twelfth (1/12th) of the amount that Lender estimates will be due and payable during the next ensuing twelve (12) months on account of Ground Rent.  Amounts so deposited, and amounts deposited on account of Ground Rent on any extension of the Maturity Date as provided in <u>Section 6.7</u> below, shall hereinafter be referred to as the "<u>Ground Rent Funds</u>" and the account in which such amounts are held shall hereinafter be referred to as the "<u>Ground Rent Reserve Account</u>".

6.6.2  <u>Release of Ground Rent Reserve Funds</u>.  Lender shall apply Ground Rent Funds to the payment of the Ground Rent (and may rely on any bill, statement or estimate procured from Ground Lessor, without inquiry into the accuracy of such bill, statement or estimate, in making such payment).

**Section 6.7    Additional Deposit on Extension of Maturity Date.** If Borrower exercises any of its options to extend the Maturity Date (as provided in and subject to satisfaction of the conditions set forth in <u>Section 2.1.5</u>), Borrower shall deposit with Agent or cause Borrower to deposit with Agent (as a condition of each such extension) an amount equal to the sum of the Ground Rent and Profits Tax due during the applicable Extension Period (as determined by Lender), less, in each case, any amounts held as of the Initial Maturity Date, the First Extended Maturity Date or the Second Extended Maturity Date, as applicable, on account of Ground Rent and Profits Tax.

**Section 6.8    Profits Tax Funds.**

**6.8.1    <u>Deposit of Profits Tax Fund</u>.** On the Closing Date, Borrower shall deposit with Agent $288,750.00, representing the Profits Tax estimated to be due in connection with the Loan (and any payments to be made under this Agreement and the other Loan Documents) until the Initial Maturity. Amounts so deposited, and amounts deposited on account of Profits Tax on any extension of the Maturity Date as provided in <u>Section 6.7</u> above, shall hereinafter be referred to as the "<u>Profits Tax Funds</u>" and the account in which such amounts are held shall hereinafter be referred to as the "<u>Profits Tax Reserve Account</u>".

**6.8.2    <u>Release of Profits Tax Reserve Fund</u>.** Lender shall apply Profits Tax Funds to the payment of any Profits Tax (and may relay in making any such payment on any bill, statement or estimate procured from any Governmental Authority, without inquiry into the accuracy of such bill, statement or estimate).

**Section 6.9    Additional Amounts.**

**Section 6.10    Application of Reserve Funds.**

(a)    Any Reserve Funds remaining after the Debt has been paid in full shall be shall be paid to Borrower or, at Borrower's election, shall be credited against the Debt simultaneously with the satisfaction of the balance of the Loan.

(b)    Notwithstanding any provision hereof or of any Loan Document to the contrary, upon the occurrence of an Event of Default, Lender, at its option, may withdraw the Reserve Funds and apply the Reserve Funds to the items for which the Reserve Funds were established or to payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion. Lender's right to withdraw and apply the Reserve Funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

**Section 6.11    Security Interest in Reserve Funds.**

**6.11.1    <u>Grant of Security Interest</u>.** Borrower shall be the owner of the Reserve Funds. Borrower hereby pledges, assigns and grants a security interest to Lender, as security for payment of the Debt and the performance of all other terms, conditions and covenants of the Loan Documents on Borrower's part to be paid and performed, in all of Borrower's right, title and interest in and to the Reserve Funds. The Reserve Funds shall be under the sole dominion and control of Lender.

**6.11.2 Income Taxes.**  Borrower shall report on its tax returns all interest or income accrued on the Reserve Funds.

**6.11.3 Prohibition Against Further Encumbrance.**  Borrower shall not, without the prior consent of Lender, further pledge, assign or grant any security interest in the Reserve Funds or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or permit the filing of any financing or other statement evidencing any lien or encumbrance except those naming Lender as the secured party.

### Section 6.12   Cash Management.

**6.12.1 Permitted Investments.**  Lender shall invest any balances of the Funds in such Permitted Investments as Lender shall determine in its sole discretion, which Permitted Investments shall be under the sole dominion and control of Lender and subject at all times to the terms hereof.  No investment shall be made unless Lender shall have and continue to have a perfected first priority lien in such Permitted Investment securing the Obligations of Borrower hereunder and under the other Loan Documents and all filings and other actions necessary to ensure the validity, perfection, and first priority of such lien shall have been taken.  Lender shall have no liability for any loss of such funds that are invested in Permitted Investments and no such loss shall affect Borrower's obligations to make the deposits to the Funds as required hereunder.

**6.12.2 Earnings on Fund Collateral; Monthly Statements.**  All interest or other income (whether by virtue of Permitted Investments or otherwise) accruing on the Funds shall, in each case, be held as if a part of the Funds, so invested.  All risk of loss in respect of the investments shall be borne by Borrower.  Lender shall instruct Agent to provide to Borrower a monthly statement of account showing deposits into and disbursements (or transfers or reallocations, as the case may be) with respect to the Funds.

## VII.   PROPERTY MANAGEMENT

### Section 7.1   The Management Agreements; Starwood Agreements.

(a)  Borrower shall cause Riveroll to manage the Property in accordance with the terms of the Riveroll Management Agreement from the date hereof until the date on which the Westin Management Agreements become operative (and on which Westin commences its management of the Hotel).  The Westin Management Agreements shall become operative (and Westin shall commence its management of the Hotel) no later than ninety (90) days from date hereof.

(b)  Borrower shall cause Westin Manager to manage the Property in accordance with the terms of the Westin Management Agreements from and after the date on which such Agreement shall become operative (as described in paragraph (a) above).  It shall be an Event of Default hereunder if the Property is not managed under either the Riveroll Management Agreement or the Westin Management Agreements (unless Lender otherwise agrees).

(c)     Borrower shall (i) diligently perform and observe in all material respects all of the terms, covenants and conditions of the Management Agreements on the part of Borrower to be performed and observed, and (ii) promptly notify Lender of any notice to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of any of the Management Agreements on the part of Borrower to be performed and observed.

(d)     If Borrower shall default in the performance or observance of any material term, covenant or condition of any of the Management Agreements on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Management Agreements, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the applicable Management Agreement on the part of Borrower to be performed or observed.

(d)     Borrower shall (i) diligently perform and observe in all material respects all of the terms, covenants and conditions of the Starwood Agreements on the part of Borrower to be performed and observed, and (ii) promptly notify Lender of any notice to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of any of the Starwood Agreements on the part of Borrower to be performed and observed.

(e)     If Borrower shall default in the performance or observance of any material term, covenant or condition of any of the Starwood Agreements on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Starwood Agreements, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the applicable Starwood Agreement on the part of Borrower to be performed or observed.

Section 7.2     Prohibition Against Termination or Modification.

(a) Borrower terminated the Wyndham Franchise Agreement effective on May 2, 2006 and has paid all amounts (including, without limitation, all fees, reimbursables and other expenses) due to Wyndham under the Wyndham Franchise Agreement or otherwise.

(b) Except as described in subparagraph (a) above, Borrower shall not surrender, terminate, cancel, modify, renew or extend the Management Agreements, or enter into any other agreement relating to the management or operation of the Property with Manager or any other Person (other than the Starwood Agreements), or consent to the assignment by the Manager of its interest under the (applicable) Management Agreement, in each case without the express consent of Lender, which consent shall not be unreasonably withheld or delayed; provided, however, with respect to a new manager such consent may be conditioned upon such new manager and Borrower executing an assignment(s) of management agreement (and related documents) and, if such manager is an Affiliate of Borrower, a subordination of management fees substantially in

the form then used by Lender and if such manager is an Affiliate of Borrower, Borrower shall deliver a new nonconsolidation opinion acceptable to Lender and the Rating Agencies with respect to such Affiliate Manager.

(c) Borrower shall not surrender, terminate, cancel, modify, renew or extend the Starwood Agreements, or enter into any other agreement relating to the management or operation of the Property (or any other matter) with Starwood or any other Person (other than the Management Agreements), or consent to the assignment by Starwood of its interest under the (applicable) Starwood Agreement, in each case without the express consent of Lender, which consent shall not be unreasonably withheld or delayed; provided, however, with respect to a new operator of the adjacent property such consent may be conditioned upon such new operator and Borrower executing an assignment in substantially the same form as the Starwood SNDA.

(d) In no event shall Borrower agree to policies or procedures, or any operating criteria, under or in connection with any of the Starwood Agreements, or to any budget to be implemented in connection with any matter governed by the Starwood Agreements, without Lender's prior approval (which approval shall not be unreasonably withheld, conditioned or delayed).

Section 7.3     Replacement of Manager.

Lender shall have the right to require Borrower, to terminate the Westin Management Agreements and the Technical Services Agreement, and to replace Westin with a Person chosen by Borrower and approved by Lender or at Lender's option, selected by Lender in its sole discretion, upon the occurrence of any one or more of the following events: (a) if Westin shall become bankrupt or insolvent, and/or (b) if a default occurs under the Westin Management Agreements beyond any applicable grace and cure periods or an Event of Default occurs (for purposes of this clause only, as defined in the Westin Management Agreements).

## VIII.  TRANSFERS

Section 8.1     Lender's Reliance; No Transfers.

(a)  Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, members and principals in owning and operating properties such as the Property in agreeing to enter into this Agreement and make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of Borrower's Obligations under the Loan Documents. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of Borrower's Obligations under the Loan Documents, Lender can recover the Debt by a sale of the Property.

(b)  Except as may otherwise be provided in Section 8.2, no Transfer shall be permitted without Lender's prior written consent (which may be granted or denied in Lender's sole and absolute discretion).

### Section 8.2     Permitted Transfers.

(a)     Notwithstanding the provisions of <u>Section 8.1</u>, Borrower may, with Lender's prior consent (to be granted or withheld by Lender in its reasonable discretion), convey the Property or one hundred percent (100%) of the direct or indirect interests in Borrower to a transferee ("<u>New Owner</u>") provided that (a) Lender receives an assumption fee equal to one-half of one percent (0.5%) of the outstanding principal amount of the Loan (on the assumption date) upon approval of the assumption, (b) Lender shall have received such documents, certificates and legal opinions as it may reasonably request, (c) no Event of Default shall have occurred and be continuing and (d) Borrower shall pay all reasonable out-of-pocket costs and expenses of Lender in connection with such Transfer. In addition to Borrower's satisfaction of the foregoing requirements, in connection with any conveyance of the Property or one hundred percent (100%) of the direct or indirect interests in Borrower, conditions to Lender's consent shall be (A) acceptable credit and financial reviews of the transferee and its parent ownership, (B) evidence that the Property shall continue to be managed by the Manager managing the Property immediately prior to the Transfer of the Property or such ownership interests by a qualified property manager reasonably acceptable to the Rating Agencies and acceptable to the Rating Agencies, (C) evidence that the New Owner shall qualify as a single purpose, bankruptcy remote entity under criteria established by the Rating Agencies (including the delivery of a non-consolidation opinion reasonably acceptable to the Rating Agencies and Lender), (D) that the New Owner (i) shall assume (a) the Loan and the Loan Documents and (b) all the agreements of Borrower under the Loan Documents, (ii) shall be a bankruptcy-remote single purpose entity, and (iii) shall otherwise have a legal, financial and ownership structure that is (a) substantially the same as Borrower or (b) at least as favorable to Lender, as determined by Lender in its reasonable discretion, as the legal, financial and ownership structure of Borrower, (E) that all of the entities which own interests in the transferee (i) shall each be a bankruptcy-remote single purpose entity, and (ii) shall otherwise have a legal, financial and ownership structure that is (a) substantially the same as Borrower or (b) at least as favorable to the Lender, as determined by the Lender in its reasonable discretion, as the legal, financial and ownership structure of Borrower, (F) that all of the entities which own interests in the transferee shall have executed pledges of shares (and documentation in substantially the same form and substance, and effecting the same pledges) as exist on the date hereof, and (G) Rating Agency Confirmation.

(b)     The restrictions on transfers set forth in <u>Section 8.1</u> shall not apply to the sale, assignment or transfers of up to forty percent (40%), in the aggregate, of the direct or indirect interests in Borrower directly or indirectly in one or a series of transfers <u>provided</u> that Michael Belfonti retains control of Borrower and remains in control of the day-to-day operations at the Property and Lender reasonably approves of any such transferee. As a further condition to each such sale, assignment or transfer, (i) Lender shall receive not less than twenty (20) days prior notice of such proposed sale or transfer, (ii) no such sale, assignment or transfer of any direct ownership interests in Borrower or in any SPC Party shall be permitted, (iii) Borrower shall pay or cause to be paid any and all costs imposed or incurred as a result of any such sale, assignment or transfer, including, without limitation, any transfer taxes, and (iv) if after giving effect to any such sale, assignment or transfer, more than forty-nine percent (49%) in the aggregate of direct or indirect interests in Borrower are owned by any Person and its Affiliates that owned less than forty-nine percent (49%) direct or indirect interest in Borrower as of the Closing Date, Borrower shall deliver to Lender a substantive nonconsolidation opinion

acceptable to Lender and the Rating Agencies.  As used in this Section 8.2, the term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

(c)     Notwithstanding the foregoing or any provision hereof to the contrary, the following transfers shall be deemed to be permitted transfers not requiring consent of the Lender or, except as otherwise specifically provided herein, the payment of any assumption fees to Lender:  (i) a transfer of up to thirty percent (30%) in any indirect owner of Borrower to Riveroll, provided that Michael Belfonti retains control of Borrower and remains in control of the day-to-day operations at the Property, and (ii) a preferred equity or other investment by Petra Fund REIT Corp. or any Affiliate thereof of not more than Fifteen Million and No/100 Dollars ($15,000,000.00) plus not more than an additional Four Million and Five Hundred Thousand and No/100 Dollars ($4,500,000.00) as a reserve in BCP Petra Holdings, LLC or another indirect owner of Borrower reasonably satisfactory to Lender and any conversion of such preferred equity into common equity (it being agreed that, upon the exercise of any rights and remedies by Petra Fund REIT Corp. or any Affiliate thereof, the requirement that Michael Belfonti retain control of Borrower and remain in control of the day-to-day operations at the Property shall no longer apply).  As a further condition to each such transfer, (i) Lender shall receive not less than twenty (20) days prior notice of such proposed transfer unless such transfer is in connection with a conversion of preferred equity into common equity, (ii) Borrower shall pay or cause to be paid any and all costs and fees imposed or incurred as a result of any such transfer, including, without limitation, any transfer taxes, (iii) if after giving effect to any such transfer, more than forty-nine percent (49%) in the aggregate of direct or indirect interests in Borrower are owned by any Person and its Affiliates that owned less than forty-nine percent (49%) direct or indirect interest in Borrower as of the Closing Date, Borrower shall deliver to Lender a substantive nonconsolidation opinion acceptable to Lender and the Rating Agencies and (iv) with respect to a transfer contemplated by clause (ii) of the first sentence in this Section 8.2(c), (A) Lender shall have reasonably approved and, subject to a Securitization, the Rating Agencies shall have issued a Rating Agency Confirmation and (B) Borrower shall have paid to Lender a transfer fee which shall be imposed by Lender and determined by Lender at the time of transfer.

(d)     The provisions of this Section 8.2(d) shall only be applicable in the event Petra Fund REIT Corp. or such Affiliate shall have exercised its remedies under the documents evidencing its preferred equity or other investment as contemplated by clause (c) above.  Notwithstanding the provisions of Section 8.1, Petra Fund REIT Corp. or any Affiliate thereof may, without Lender's prior consent and without the payment of any assumption fee, cause the conveyance of the Property or of one hundred percent (100%) of the direct or indirect interests in Borrower to a Qualified Transferee provided that (a) Lender shall have received such documents, certificates and legal opinions as it may reasonably request, (b) no Event of Default shall have occurred and be continuing, and (c) Borrower shall pay all reasonable out-of-pocket costs and expenses of Lender in connection with such Transfer.  In addition to Borrower's satisfaction of the foregoing requirements, in connection with any conveyance of the Property or one hundred percent (100%) of the direct or indirect interests in Borrower, conditions to Lender's consent shall be (A) evidence that the Property shall continue to be managed by the Manager managing the Property immediately prior to the Transfer of the Property or such ownership interests by a qualified property manager reasonably acceptable to Lender and acceptable to the Rating

Agencies, (B) evidence that the Qualified Transferee shall qualify as a single purpose, bankruptcy remote entity under criteria established by the Rating Agencies (including the delivery of a non-consolidation opinion reasonably acceptable to the Rating Agencies and Lender to the extent required by the Rating Agencies pursuant to Rating Agency guidelines then used), (C) that the Qualified Transferee shall assume (or cause Borrower to ratify) (i) the Loan and the Loan Documents and (ii) all the agreements of Borrower under the Loan Documents, and (D) that all of the entities which own interests in the transferee shall have executed pledges of shares (and documentation in substantially the same form and substance, and effecting the same pledges) as exist on the date hereof.

## IX.   SALE AND SECURITIZATION OF MORTGAGE

### Section 9.1    Sale of Mortgage and Securitization.

(a)    Lender shall have the right (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan, (ii) to sell participation interests in the Loan, and (iii) to securitize the Loan or any portion thereof, in a single asset securitization or a pooled loan securitization. The lender under the Funding Loan shall have the right (i) to sell or otherwise transfer the Funding Loan or any portion thereof as a whole loan, (ii) to sell participation interests in the Funding Loan, and (iii) to securitize the Funding Loan or any portion thereof, in a single asset securitization or a pooled loan securitization. (The transaction referred to in the preceding sentences shall hereinafter be referred to collectively as "Secondary Market Transactions" and the transactions referred to in clause (ii) of the preceding two sentences shall hereinafter be referred to as a "Securitization". Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "Securities").

(b)    If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with any Secondary Market Transactions, including, without limitation, to:

(i)    (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower and the Manager, (B) provide updated budgets relating to the Property and (C) provide updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "Updated Information"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies;

(ii)    provide opinions of counsel, which may be relied upon by Lender, the Rating Agencies and their respective counsel, agents and representatives, as to non-consolidation, fraudulent conveyance, and true sale or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property, Borrower and Affiliates, which counsel and opinions shall be satisfactory to Lender and the Rating Agencies;

(iii)    provide updated, as of the closing date of the Secondary Market Transaction, representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require; and

(iv)    execute amendments to the Loan Documents and Borrower's (or any SPC Party's) organizational documents reasonably requested by Lender; provided, however, that, except as otherwise provided in Section 2.1.5 hereof, Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (A) change the interest rate, the stated maturity or the amortization of principal as set forth herein or in the Note, or (B) modify or amend any other material economic term of the Loan.

Notwithstanding any provision hereof to the contrary, Lender shall be responsible for Borrower's reasonable out-of-pocket expenses in complying with this Section and with the provisions of Section 2.5.1 to the extent that such expenses exceed $50,000 in the aggregate.

(c)    If, at the time one or more Disclosure Documents are being prepared for a Securitization, Lender expects that Borrower and one or more Affiliates of Borrower collectively, or the Property, will be a "Significant Obligor", as that term is defined in Item 1101(k) of Regulation AB (as defined below), Borrower shall furnish to Lender upon request (i) the selected financial data or, if applicable, information regarding income and expenses required under Item 1112(b)(1) of Regulation AB, if Lender expects that the principal amount of the Loan together with any other loans made to an Affiliate of Borrower or secured by a Related Property (as defined below) that is included in a Securitization with the Loan (each, a "Related Loan") as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization or (ii) the financial statements required under Item 1112(b)(2) of Regulation AB if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such Securitization and at any time during which the Loan and any Related Loans are included in a Securitization does, equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization. Such financial data or financial statements shall be furnished to Lender (A) within ten (10) Business Days after notice from Lender in connection with the preparation of Disclosure Documents for the Securitization, (B) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (C) not later than seventy-five (75) days after the end of each fiscal year of Borrower; provided, however, that Borrower shall not be obligated to furnish financial data or financial statements pursuant to clauses (B) or (C) of this sentence with respect to any period for which a filing pursuant to the Exchange Act in connection with or relating to the Securitization (an "Exchange Act Filing") is not required. If requested by Lender, Borrower shall use commercially reasonable efforts to furnish to Lender financial data and/or financial statements for any tenant of the Property (other than a tenant that is a reporting company under the Exchange Act) if, in connection with a Securitization, Lender expects there to be, with respect to such tenant or group of affiliated tenants, a concentration within all of the

mortgage loans included or expected to be included, as applicable, in the Securitization such that such tenant or group of affiliated tenants would constitute a Significant Obligor. For purposes hereof, the term "Related Property" shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related", within the meaning of the definition of Significant Obligor, to the Property. For purposes hereof, the term "Regulation AB" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

(d)    All financial data and financial statements provided by Borrower hereunder pursuant to Section 9.1(c) shall be prepared in accordance with GAAP, and all financial statements shall meet the requirements of Regulation AB and other applicable legal requirements. All financial statements referred to in clause (ii) of Subsection 9.1(c) shall be audited by independent accountants of Borrower acceptable to Lender in accordance with Regulation AB and all other applicable legal requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation AB and all other applicable legal requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing, all of which shall be provided at the same time as the related financial statements are required to be provided. All financial data and financial statements (audited or unaudited) provided by Borrower under this Section 9.1 shall be certified by the chief financial officer or administrative member of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this Section 9.1.

(e)    If requested by Lender, Borrower shall provide Lender, promptly upon request, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall determine to be required pursuant to Regulation AB or any amendment, modification or replacement thereto or other legal requirements in connection with any Disclosure Document or any Exchange Act Filing or as shall otherwise be reasonably requested by the Lender.

(f)    In the event Lender determines, in connection with a Securitization, that the financial data and financial statements required in order to comply with Regulation AB or any amendment, modification or replacement thereto or other legal requirements are other than as provided herein, then notwithstanding the provisions of Sections 9.1(c) and (d), Lender may request, and Borrower shall promptly provide, such other financial statements as Lender determines to be necessary or appropriate for such compliance.

(g)    Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a diskette, and (iii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form and prepared using a Microsoft Word for Windows or WordPerfect for Windows files (which files may be prepared using a spreadsheet program and saved as word processing files). Borrower agrees that Lender may disclose information regarding the Property

and Borrower that is provided to Lender pursuant to this Section in connection with the Securitization to such parties requesting such information in connection with such Securitization.

Section 9.2    Securitization Indemnification.

(a)    Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in disclosure documents in connection with the Securitization, including, without limitation, an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, an "Disclosure Document") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and may be made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization.

(b)    Borrower shall provide in connection with each of (i) a preliminary and a final private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an agreement (A) certifying that Borrower has examined such Disclosure Documents specified by Lender and that each such Disclosure Document, as it relates to Borrower, Borrower Affiliates, the Property, Manager and all other aspects of the Loan (the "Relevant Sections") does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 9.2, Lender hereunder shall include its officers and directors), Wachovia, the Affiliate of Wachovia that has filed the registration statement relating to the Securitization (the "Registration Statement"), each of its directors, each of its officers who have signed the Registration Statement and each Person that controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Wachovia Group"), and Wachovia, its Affiliates and any placement agent or underwriter with respect to the Securitization, each of their respective directors and each Person who controls or is Affiliated with Wachovia or any other placement agent or underwriter within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "Underwriter Group") for any losses, claims, damages or liabilities (collectively, the "Liabilities") to which Lender, the Wachovia Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Relevant Sections or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in the Relevant Sections or necessary in order to make the statements, in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Wachovia Group and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Wachovia Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower, operating statements and rent rolls with

respect to the Property. This indemnity agreement will be in addition to any liability which Borrower may otherwise have.

(c)     In connection with Exchange Act Filings, Borrower shall (i) indemnify Lender, the Wachovia Group and the Underwriter Group for Liabilities to which Lender, the Wachovia Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact in the Relevant Sections of the Disclosure Document or upon the omission or alleged omission to state in the Disclosure Document a material fact required to be stated in the Disclosure Document in order to make the statements in the Disclosure Document related to Relevant Sections, in light of the circumstances under which they were made, not misleading and (ii) reimburse Lender, the Wachovia Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Wachovia Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)     Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.2, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party. The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.2(b) or (c) is for any reason held to be unenforceable as to an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation

(within the meaning of <u>Section 11(f)</u> of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Wachovia's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f)    The liabilities and obligations of Borrower and Lender under this <u>Section 9.2</u> shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

### Section 9.3    Asset Management.

Borrower understands that Lender may retain an asset manager to manage the Loan, review the operations of Borrower or the Managers or to confirm the compliance, by the Managers, of their obligations under the Management Agreements. Such asset management will be at the expense of Borrower in an amount not to exceed a maximum cost of $200,000 per year (the "<u>Asset Management Fee</u>").

### X.    DEFAULTS

### Section 10.1   Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "<u>Event of Default</u>"):

(i)    if (A) any monthly installment of principal and/or interest due under the Note or the payment due on the Maturity Date is not paid when due or (B) any other portion of the Debt is not paid when due and such non-payment continues for five (5) days following notice to Borrower that the same is due and payable;

(ii)    if any of the Section 2.5 Taxes are not paid when due; or if any Taxes or Other Charges are not paid when due unless any such amount is not paid when due solely as a result of the failure of Lender to cause such amount to be paid out of the Tax Reserve Account provided that sufficient amounts have been deposited therein for the payment of such amounts pursuant to this Agreement and no other Event of Default then exists;

(iii)    if the Policies are not kept in full force and effect, unless any such amount is not paid when due solely as a result of the failure of Lender to cause such amount to be paid out of the Insurance Reserve Account provided that sufficient amounts have been deposited therein for the payment of such amounts pursuant to this Agreement and no other Event of Default then exists;

(iv)    if the Policies are not kept in full force and effect;

(v)    if Borrower, AHE Holding or BCP Sunset, as applicable, breaches or permits or suffers a breach of any provision of the Mortgage, any of the Security Document (Aruba) or any of the Assignment Documents (in each case beyond any notice and/or grace period (if applicable) provided under such documents, with respect to any such breach);

(vi)    if Guarantor breaches or permits or suffers a breach of the Guaranty; or if BCP Sunset or AHE Holding breaches or permits or suffers a breach of the Guaranty of Deed of Pledge (in each case beyond any notice and/or grace period (if applicable) provided under such documents, with respect to any such breach);

(vii)    if any representation or warranty made by Borrower or Guarantor (or AHE Holding or BCP Sunset, as applicable) herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(viii)    if Borrower, any Guarantor, any SPC Party or Guarantor shall make an assignment for the benefit of creditors;

(ix)    if a receiver, liquidator or trustee shall be appointed for Borrower, any SPC Party or Guarantor, or if Borrower, any SPC Party or Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, any SPC Party or Guarantor, or if any proceeding for the dissolution or liquidation of Borrower, any SPC Party or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, any SPC Party or Guarantor, upon the same not being discharged, stayed or dismissed within thirty (30) days;

(x)    if Borrower, Guarantor or any SPC Party attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(xi)    if any of the assumptions contained in the Insolvency Opinion, or in any other non-consolidation opinion delivered to Lender in connection with the Loan, or in any other non-consolidation delivered subsequent to the closing of the Loan, is or shall become untrue in any material respect;

(xii)    if Borrower or any SPC Party breaches any representation, warranty or covenant contained in Section 3.1.24 hereof;

(xiii)    if Borrower fails to comply with the covenants as to Prescribed Laws set forth in Section 4.1.1;

(xiv)    if Borrower shall default in the performance of its obligations under the Cash Management Agreement, the Lockbox Agreement (Caribbean Mercantile Bank)

and/or the Lockbox Agreement (Wachovia) (in each case beyond any notice and/or grace period (if applicable) provided under such documents, with respect to any such breach);

(xv)    if (A) Borrower shall fail in the payment of any rent, additional rent or other charge mentioned in or made payable by the Ground Lease as and when such rent or other charge is payable (unless waived in writing by the landlord under the Ground Lease), (B) there shall occur any default by Borrower, as tenant under the Ground Lease, in the observance or performance of any term, covenant or condition of the Ground Lease on the part of Borrower, to be observed or performed (unless waived in writing by the landlord under the Ground Lease), (C) if any one or more of the events referred to in the Ground Lease shall occur which would cause the Ground Lease to terminate without notice or action by the landlord under the Ground Lease or which would entitle the landlord to terminate the Ground Lease and the term thereof by giving notice to Borrower, as tenant thereunder (unless waived in writing by the landlord under the Ground Lease), (D) if the leasehold estate created by the Ground Lease shall be surrendered or the Ground Lease shall be terminated or canceled for any reason or under any circumstances whatsoever or (E) if any of the terms, covenants or conditions of the Ground Lease shall in any manner be modified, changed, supplemented, altered, or amended without the consent of Lender except as otherwise permitted by this Agreement;

(xvi)    if Borrower is in default under any of the Management Agreements or any of the Starwood Agreements beyond any applicable cure period set forth therein which would give the Manager thereunder or Starwood, as applicable, the right to terminate such Management Agreement or Starwood Agreement;

(xvii)    if Borrower shall fail to perform the work described in the PIP in accordance with the provisions hereof and of the Westin Management Agreements;

(xviii)    if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xvii) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such 30-day period and provided further that Borrower shall have commenced to cure such Default within such 30-day period and thereafter diligently and expeditiously proceeds to cure the same, such 30-day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days; or

(xix)    if there shall be default under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents, whether as to Borrower, any Affiliate of Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

NYLIB4 753059.14

-88-

(b)    Upon the occurrence of an Event of Default (other than an Event of Default described in clause (vii), (viii) or (ix) above) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower or any other Person and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower or any other Person and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi), (vii) or (viii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

### Section 10.2    Remedies.

(a)    Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower or any other Person under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)    Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of sums secured by the Mortgage and not previously recovered.