## EXHIBIT A

Description of the Premises

CURRENT 8555596v8

**Parcel One:** A tract of land known as Lot 4, described in further detail in DLV fieldwork number 20050308, and labeled SUA-MD No. 968/2006 on survey prepared by S.L. Maduro of Surveying Unlimited Aruba N.V. on February 21, 2006 and labeled "Projectnr.: 103-2006", with an approximate surface area of 13 square meters, and subdivided from a parcel of land Recorded at No. 432, Section C of the Second Chapter of the Land Registry of Aruba

**Parcel Two:** A tract of land known as Lots 5 and 8, described in further detail in DLV fieldwork number 20050308, and labeled SUA-MD No. 970/2006 and SUA-MD No. 971/2006 on survey prepared by S.L. Maduro of Surveying Unlimited Aruba N.V. on February 21, 2006 and labeled "Projectnr.: 103-2006", with an approximate surface area of 3,395.00 square meters, and is the remainder of a parcel of land Recorded at No. 431, Section C of the Second Chapter of the Land Registry of Aruba

**Parcel Three:** A tract of land known as Lot 6 and labeled SUA-MD No. 972/2006 on survey prepared by S.L. Maduro of Surveying Unlimited Aruba N.V. on February 21, 2006 and labeled "Projectnr.: 103-2006", with an approximate surface area of 21,120 square meters, and Recorded at Number 229, Section C of the Second Chapter of the Land Registry of Aruba

**Parcel Four:** A tract of land known as Lot 7, described in further detail in DLV fieldwork number 20050308, and labeled SUA-MD No. 969/2006 on survey prepared by S.L. Maduro of Surveying Unlimited Aruba N.V. on February 21, 2006 and labeled "Projectnr.: 103-2006", with an approximate surface area of 3,210 square meters, and subdivided from a parcel of land Recorded at No. 432, Section C of the Second Chapter of the Land Registry of Aruba

All four Parcels have a purported address of No. 77 J.E. Irausquin Boulevard and are commonly known as the Wyndham Aruba Beach Resort and Casino and are located in Noord, Aruba

EXHIBIT B

Unpaid Principal Balance of Mortgage Loan:  $230,000,000.00

## EXHIBIT C

## CERTAIN DEFINED TERMS

"Accounts" shall have the meaning set forth in Section 2.27.

"ACH" shall have the meaning set forth in Section 2.27.

"Affiliate" of any specified Person shall mean any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

"Agreement" shall have the meaning set forth in the recitals hereto.

"Appraisal" shall mean the appraisal of the Property and any and all supplemented reports.

"Approved Annual Budget" shall mean each Annual Budget approved by Lender in accordance with terms hereof.

"Approved Manager Standard" shall mean the standard of business operations, practices and procedures customarily employed by entities having a senior executive with at least seven (7) years' experience in the management of properties similar in quality (as of the Closing Date), size, value and location to the Property which manage not less than five (5) such properties having an aggregate number of at least 5,000 rooms.

"Borrower" shall mean Borrower named herein and its successors and assigns.

"Business Day" shall mean any day other than (a) a Saturday or Sunday, or (b) a day on which banking and savings and loan institutions in the State of New York are authorized or obligated by law or executive order to be closed, or at any time during which the Loan is an asset of a Securitization, the cities, states and/or commonwealths used in the comparable definition of "Business Day" in the Securitization documents.

"Closing Date" shall mean the date of the Note.

"Code" shall mean the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto.

"Collateral" shall mean (a) the Equity Interests, (b) all additional Equity Interests acquired by Borrower, (c) all rights of Borrower, if any, as creditor of the Pledged Entities, (d) any and all Remaining Rents from time to time available in the Mezzanine Lockbox Account and required by the terms of the Mortgage Loan Documents as now in effect or amended with the consent of Lender, to be deposited by the Mortgage Lender into the Mezzanine Lockbox Account; (e) the Accounts and all cash, checks, drafts, securities entitlements, securities, securities accounts, funds or other accounts maintained or deposited with Lender and other investment property, certificates, instruments and other property, including, without limitation,

all deposits and/or wire transfers from time to time deposited or held in, credited to or made to Accounts; (f) all interest, dividends, cash, instruments, securities, securities entitlements and other investment property, and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing or purchased with funds from the Accounts; (g) all of Borrower's interests in the Rate Cap Agreement; (h) all rights of Borrower in, to and under an Equity Holder's certificate of formation, limited liability company agreement and all other organizational documents of Equity Holders (collectively, the "Owner Organizational Documents"), or any other agreement or instrument relating to the Pledged Interests, including, without limitation, (i) all rights of Borrower to receive moneys due and to become due under or pursuant to Owner Organizational Documents, (ii) all rights of Borrower to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to Owner Organizational Documents, (iii) all claims of Borrower for damages arising out of or for breach of or default under Owner Organizational Documents, and (4) any right of Borrower to perform thereunder and to compel performance and otherwise exercise all rights and remedies thereunder; and (i) all Proceeds. The inclusion of Proceeds in the Agreement does not authorize Borrower to sell, dispose of or otherwise use the Collateral in any manner not specifically authorized hereby.

"Condemnation Proceeds" shall mean all of the proceeds in respect of any Taking or purchase in lieu thereof.

"Contractual Obligation" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of the property owned by it is bound.

"Control" means, when used with respect to any specific Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, beneficial interests, by contract or otherwise. The definition is to be construed to apply equally to variations of the word "Control" including "Controlled," "Controlling" or "Controlled by."

"Corporations" shall mean the corporations identified on Schedule 1 hereto.

"Counterparty" shall have the meaning set forth in Section 2.27.

"Debt" shall have the meaning set forth in the recitals hereto.

"Debt Service Payment Account" shall mean an account established by Lender into which sums shall be deposited for debt service on the Loan.

"Default" shall mean any Event of Default or event which would constitute an Event of Default if all requirements in connection therewith for the giving of notice, the lapse of time, and the happening of any further condition, event or act, had been satisfied.

"Default Rate" shall mean the lesser of (a) the highest rate allowable at law and (b) ten percent (10%) above the Interest Rate (as defined the Note).

"<u>Default Rate Interest</u>" shall mean, to the extent the Default Rate becomes applicable, interest in excess of the interest which would have accrued on (a) the principal amount of the Loan which is outstanding from time to time and (b) any accrued but unpaid interest, if the Default Rate was not applicable.

"<u>Distributions</u>" shall mean all dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits to which Borrower is entitled with respect to any one or more Equity Interests, whether or not received by or otherwise distributed to Borrower, in each case whether cash or non-cash and whether such dividends, distributions, liquidation proceeds, cash, profits, instruments and other property and economic benefits are paid or distributed by the Pledged Entities in respect of operating profits, sales, exchanges, refinancings, condemnations or insured losses of the relevant Pledged Entity's assets, the liquidation of such Pledge Entity's assets and affairs, management fees, guaranteed payments, repayment of loans, or reimbursement of expenses or otherwise in respect of or in exchange for any or all of the Equity Interests.

"<u>DTC</u>" shall have the meaning set forth in Section 2.01.

"<u>Eligible Account</u>" shall mean a segregated account which is either (a) an account or accounts maintained with a depository institution or trust company the long term unsecured debt obligations of which are rated by each of the Rating Agencies (or, if not rated by Fitch, Inc. ("<u>Fitch</u>"), otherwise acceptable to Fitch, as confirmed in writing that such account would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) in its highest rating category at all times by each of the Rating Agencies (or, if not rated by Fitch, otherwise acceptable to Fitch, as confirmed in writing that such account would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) or, if the funds in such account are to be held in such account for less than thirty (30) days, the short term obligations of which are rated by each of the Rating Agencies (or, if not rated by Fitch, otherwise acceptable to Fitch, as confirmed in writing that such account would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) in its highest rating category at all times or (b) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution is subject to regulations substantially similar to 12 C.F.R. § 9.10(b), having in either case a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal and state authority, or otherwise acceptable (as evidenced by a written confirmation from each Rating Agency that such account would not, in and of itself, cause a downgrade, qualification or withdrawal of the then current ratings assigned to any certificates issued in connection with a Securitization) to each Rating Agency, which may be an account maintained by Lender or its agents. Eligible Accounts may bear interest. The title of each Eligible Account shall indicate that the funds held therein are held in trust for the uses and purposes set forth herein.

"<u>Equity Interests</u>" shall mean the LLC Interests, the Partnership Interests and the Pledged Interests.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and, as of the relevant date, any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean any corporation or trade or business that is a member of any group of organizations (a) described in Section 414(b) or (c) of the Code of which Borrower is a member and (b) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which Borrower is a member.

"Event of Default" shall have the meaning set forth in Section 3.01.

"Environmental Problem" shall mean any of the following:

(a)     the presence of any Hazardous Material on, in, under, or above all or any portion of the Property;

(b)     the release or threatened release of any Hazardous Material from or onto the Property;

(c)     the violation or threatened violation of any Environmental Statute with respect to the Property; or

(d)     the failure to obtain or to abide by the terms or conditions of any permit or approval required under any Environmental Statute with respect to the Property.

A condition described above shall be an Environmental Problem regardless of whether or not any Governmental Authority has taken any action in connection with the condition and regardless of whether that condition was in existence on or before the date hereof.

"Environmental Report" shall mean the environmental audit report for the Property and any supplements or updates thereto, previously delivered to Lender in connection with the Loan.

"Environmental Statute" shall mean any federal, state or local statute, ordinance, rule or regulation, any judicial or administrative order (whether or not on consent) or judgment applicable to Borrower, any Equity Holder, Owner or the Property including, without limitation, any judgment or settlement based on common law theories, and any provisions or condition of any permit, license or other authorization binding on Borrower, any Equity Holder or Owner relating to (a) the protection of the environment, the safety and health of persons (including employees) or the public welfare from actual or potential exposure (or effects of exposure) to any actual or potential release, discharge, disposal or emission (whether past or present) of any Hazardous Materials or (b) the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any Hazardous Materials and all rules, regulations and guidance documents promulgated or published thereunder.

"Equipment" shall mean all machinery, equipment, fittings, apparatus, appliances, furniture, furnishings, tools, fixtures (including, but not limited to, all heating, air conditioning, ventilating, waste disposal, sprinkler and fire and theft protection equipment, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon, or in, and used in connection with the Premises or the Improvements, or appurtenant thereto, and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon, or in, and used in connection with the Premises or the Improvements or appurtenant thereto.

"Exit Additional Interest Payment" shall have the meaning set forth in Section 6.02.

"Extraordinary Expense" shall mean an extraordinary operating expense or capital expense not set forth in the Approved Annual Budget.

"Fiscal Year" shall mean the twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of this Agreement, or such other fiscal year of Borrower as Borrower may select from time to time with the prior written consent of Lender.

"Fixtures" shall mean all Equipment and any replacements, modifications, alterations and additions thereto, to the extent permitted by applicable law.

"General Partner" shall mean, if Borrower is a partnership, each general partner of Borrower and, if Borrower is a limited liability company, each managing member of Borrower and in each case, if applicable, each general partner or managing member of such general partner or managing member. In the event that Borrower or any General Partner is a single member limited liability company, the term "General Partner" shall include such single member.

"Governmental Authority" shall mean, with respect to any Person, any government or any court, board, agency, commission, office or authority of any nature whatsoever (foreign or domestic) or any governmental unit (federal, state, county, district, municipal, city, foreign or otherwise), in each case having jurisdiction over such applicable Person or such Person's property and any stock exchange on which shares of capital stock of such Person are listed or admitted for trading, whether now or hereafter in existence, and whether located in the United States or in any State thereof, in Aruba, in the Netherlands Antilles or in the Netherlands.

"Ground Lessor" shall mean the fee owner of the Premises.

"Guarantor" shall mean any Person guaranteeing, in whole or in part, the obligations of Borrower under the Loan Documents.

"Hazardous Material" shall mean any flammable, explosive or radioactive materials, hazardous materials or wastes, hazardous or toxic substances, pollutants or related materials, asbestos or any material containing asbestos, molds, spores and fungus which may pose a risk to human health or the environment or any other substance or material as defined in or regulated by any Environmental Statutes.

"Independent" shall mean, when used with respect to any Person, a Person who (a) is in fact independent, (b) does not have any direct financial interest or any material indirect financial interest in Borrower, or in any Affiliate of Borrower or any constituent partner, shareholder, member or beneficiary of Borrower, (c) is not connected with Borrower or any Affiliate of Borrower or any constituent partner, shareholder, member or beneficiary of Borrower as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions and (d) is not a member of the immediate family of a Person defined in (b) or (c) above. Whenever it is herein provided that any Independent Person's opinion or certificate shall be provided, such opinion or certificate shall state that the Person executing the same has read this definition and is Independent within the meaning hereof.

"Institutional Lender" shall mean any of the following Persons: (a) any bank, savings and loan association, savings institution, trust company or national banking association, acting for its own account or in a fiduciary capacity, (b) any charitable foundation, (c) any insurance company or pension and/or annuity company, (d) any fraternal benefit society, (e) any pension, retirement or profit sharing trust or fund within the meaning of Title I of ERISA or for which any bank, trust company, national banking association or investment adviser registered under the Investment Advisers Act of 1940, as amended, is acting as trustee or agent, (f) any investment company or business development company, as defined in the Investment Company Act of 1940, as amended, (g) any small business investment company licensed under the Small Business Investment Act of 1958, as amended, (h) any broker or dealer registered under the Securities Exchange Act of 1934, as amended, or any investment adviser registered under the Investment Adviser Act of 1940, as amended, (i) any government, any public employees' pension or retirement system, or any other government agency supervising the investment of public funds, or (j) any other entity all of the equity owners of which are Institutional Lenders; provided that each of said Persons shall have net assets in excess of $1,000,000,000 and a net worth in excess of $500,000,000, be in the business of making commercial mortgage loans, secured by properties of like type, size and value as the Property and have a long term credit rating which is not less than "BBB-" (or its equivalent) from each Rating Agency.

"Insurance Proceeds" shall mean all of the proceeds received under the insurance policies required to be maintained by Owner pursuant to the Mortgage Loan Documents.

"Interest Accrual Period" shall have the meaning set forth in the Note.

"Interest Shortfall" shall mean any shortfall in the amount of interest required to be paid with respect to the Loan on any Payment Date.

"IRR" shall mean an internal rate of return (with reference to "XIRR" on Excel) on $15,000,000 at the rate of 40%, compounded monthly, based on a 365 day year for the actual number of days elapsed, commencing on the Closing Date, taking into account the timing and amounts of all payments of interest made pursuant to the terms of the Note.

"Late Charge" shall have the meaning set forth in Section 3.11 hereof.

"Lease" means all leases and other agreements or arrangements affecting the use, enjoyment or occupancy of all or any portion of the Premises now in effect or hereafter entered

into (including, without limitation, all lettings, subleases, licenses, concessions, tenancies and other occupancy agreements covering or encumbering all or any portion of the Premises), whether before or after the filing by or against Owner of any petition for relief under the Bankruptcy Code, together with any guarantees, supplements, amendments, modifications, extensions and renewals of the same, and all additional remainders, reversions, and other rights and estates appurtenant thereto.

"Legal Requirement" shall mean as to any Person, the certificate of incorporation, by-laws, certificate of limited partnership, agreement of limited partnership or other organizational or governing documents of such Person, and any law, statute, order, ordinance, judgment, decree, injunction, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority and all covenants, agreements, restrictions and encumbrances contained in any instruments, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Lender" shall mean Lender named herein and its successors and assigns.

"LIBOR Margin" shall have the meaning set forth in the Note.

"LIBOR Rate" shall have the meaning set forth in the Note.

"LLC Interests" shall mean, with respect to Borrower, all membership, equity or ownership and/or other interests now or hereafter owned by Borrower in the LLCs, and including all of Borrower's right, title and interest in and to: (a) any and all now existing and hereafter acquired membership, equity or ownership interest of Borrower in the LLCs, whether in capital, profits or otherwise; (b) any and all now existing and hereafter arising rights of Borrower to receive Distributions or payments from the LLCs, whether in cash or in kind and whether such Distributions or payments are on account of Borrower's interest as owner of a membership, equity or ownership interest of the LLCs or as a creditor of the LLCs or otherwise, and all other economic rights and interests of any nature of Borrower in the LLCs; (c) any and all now existing and hereafter acquired management and voting rights of Borrower of, in, or with respect to the LLCs, whether as an owner of a membership, equity or ownership interest in the LLCs or otherwise, and whether provided for under the Operating Agreements and/or applicable law, and all other rights of and benefits to Borrower of any nature arising or accruing under the Operating Agreements; (d) any and all now existing and hereafter acquired rights of Borrower to any specific property owned by the LLCs; (e) if the LLC Interests are evidenced in certificate form, the LLC Interests shall include all such certificates, delivered to Lender accompanied by Powers duly executed in blank; and (f) all Proceeds of the foregoing Collateral.

"LLCs" shall mean the limited liability companies identified on Schedule 1 hereto.

"Loan" shall have the meaning set forth in the recitals hereto.

"Loan Amount" shall have the meaning set forth in the Recitals hereto.

"Loan Documents" shall have the meaning set forth in the recitals hereto.

"Loss Proceeds" shall mean insurance proceeds and the proceeds of any Taking.

"Loan Year" shall mean each 365 day period (or 366 day period if the month of February in a leap year is included) commencing on the first day of the month following the Closing Date (provided, however, that the first Loan Year shall also include the period from the Closing Date to the end of the month in which the Closing Date occurs).

"Lockbox Agreement" shall mean that certain mezzanine lockbox agreement dated as of the date hereof between Borrower and Lender.

"Material Adverse Effect" shall mean any event or condition that has a material adverse effect on (a) the Collateral or the Property, (b) the business, prospects, profits, management, operations or condition (financial or otherwise) of Borrower, Equity Holders or Owner, (c) the enforceability, validity, perfection or priority of the lien of any Loan Document or (d) the ability of Borrower to perform any obligations under any Loan Document.

"Maturity" shall mean the Maturity Date set forth in the Note or such other date pursuant to the Loan Documents on which the final payment of principal, and premium, if any, on the Note becomes due and payable as therein or herein provided, whether at stated maturity or by declaration of acceleration, or otherwise.

"Maturity Date" shall have the meaning set forth in the Note.

"Mezzanine Lockbox Account" shall have the meaning set forth in Section 2.27.

"Mortgage" shall have the meaning set forth in the recitals hereto.

"Mortgage Lender" shall have the meaning set forth in the recitals hereto.

"Mortgage Loan" shall have the meaning set forth in the recitals hereto.

"Mortgage Lockbox Account" shall mean, collectively, the Lockbox Accounts as defined in the Mortgage Loan Agreement.

"Mortgage Loan Agreement" shall have the meaning set forth in the recitals hereto.

"Mortgage Note" shall have the meaning set forth in the recitals hereto.

"Mortgage Securitization" shall mean a public or private offering of securities by Mortgage Lender or any of its Affiliates or their respective successors and assigns which are collateralized, in whole or in part, by the Mortgage Loan.

"Multiemployer Plan" shall mean a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been, or were required to have been, made by Borrower, Guarantor or any ERISA Affiliate and which is covered by Title IV of ERISA.

"Net Proceeds" shall mean the excess of (a)(i) the purchase price actually received by Lender with respect to the Collateral as a result of the exercise by Lender of its rights, powers, privileges and other remedies after the occurrence of an Event of Default, or (ii) in the event that Lender (or Lender's nominee) is the purchaser of the Collateral by credit bid, then the amount of

such credit bid, in either case, over (b) all costs and expenses, including, without limitation, all Section 2.26 Taxes (if any) and all attorneys' fees and disbursements and any brokerage fees, if applicable, incurred by Lender in connection with the exercise of such remedies, including the sale of the Collateral after the acquiring by Lender of the Collateral.

"Note" shall have the meaning set forth in the recitals hereto.

"OFAC List" means the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

"Officer's Certificate" shall mean a certificate delivered to Lender by Borrower which is signed on behalf of Borrower by an authorized representative of Borrower which states that the items set forth in such certificate are true, accurate and complete in all respects.

"Operating Agreements" shall mean the operating agreements and articles of organization, certificates of formation or other formation documents and all other agreements, certificates and other documents provided to and approved by Lender and which govern the existence, operation and ownership of the LLCs, as the same are in effect as of the date hereof and as the same hereafter may be modified from time to time in accordance with this Agreement.

"Organizational Documents" shall mean (i) the articles or certificate of incorporation (including any amendments thereto or restatements thereof), bylaws and any certificate or statement of designation of the Corporations, (ii) the Operating Agreements and (iii) the Partnership Agreements.

"Owner" shall have the meaning set for in the recitals hereto.

"Partnership Agreements" shall mean the partnership agreements together with all agreements, certificates and other documents provided to and approved by Lender and which govern the existence, operation and ownership of the Partnerships.

"Partnership Interests" shall mean all partnership, equity or ownership and/or other interests now or hereafter owned by Borrower in the Partnerships, and including all of Borrower's right, title and interest in and to: (a) any and all now existing and hereafter acquired membership, equity or ownership interest of Borrower in the Partnerships whether in capital, profits or otherwise; (b) any and all now existing and hereafter arising rights of Borrower to receive Distributions or payments from the Partnerships, whether in cash or in kind and whether such Distributions or payments are on account of Borrower's interest as an owner of a partnership, equity or ownership interest in the Partnerships or as a creditor of the Partnerships or otherwise, and all other economic rights and interests of any nature of Borrower in the Partnerships; (c) any and all now existing and hereafter acquired management and voting rights of Borrower of, in, or with respect to the Partnerships, whether as an owner of a partnership, equity or ownership interest in the Partnerships or otherwise, and whether provided for under the Partnership Agreements and/or applicable law, and all other rights of and benefits to Borrower of any nature arising or accruing under the Partnership Agreements; (d) any and all now existing and hereafter acquired rights of Borrower to any specific property owned by the Partnerships; (e) if the Partnership Interests are evidenced in certificate form, the Partnership Interests shall

include all such certificates, delivered to Lender accompanied by Powers duly executed in blank; and (f) all Proceeds of the foregoing Collateral.

"Partnerships" shall mean the partnerships identified on Schedule 1 attached hereto.

"Payment Date" shall have the meaning set forth in the Note.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established under ERISA, or any successor thereto.

"Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Plan" shall mean an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate during the five-year period ended prior to the date of this Agreement or to which Borrower or any ERISA Affiliate makes, is obligated to make or has, within the five year period ended prior to the date of this Agreement, been required to make contributions (whether or not covered by Title IV of ERISA or Section 302 of ERISA or Section 401(a) or 412 of the Code), other than a Multiemployer Plan.

"Pledged Entities" shall mean the Corporations, the LLCs and the Partnerships.

"Pledged Interests" shall mean with respect to Borrower, (a) all shares of capital stock of the Corporations, now owned or hereafter acquired by Borrower, and the certificates representing the shares of such capital stock and any interest of Borrower in the entries on the books of any financial intermediary pertaining to such shares (such now-owned shares being identified on Schedule 1 attached hereto), and all options and warrants for the purchase of shares of the stock of the Corporations now or hereafter held in the name of Borrower, (b) all certificated LLC Interests or Partnership Interests, now owned or hereafter acquired by Borrower, and the certificates representing such interests and any interest of Borrower in the entries on the books of any financial intermediary pertaining to such certificated interests (such now-owned certificated interests being identified on Schedule 1 attached hereto), and all options and warrants for the purchase of certificated interests in such LLCs or Partnership now or hereafter held in the name of Borrower, (c) all additional shares of stock or certificated interests of the Corporations, LLCs, or Partnerships from time to time acquired by Borrower in any manner, and the certificates representing such additional shares and any interest of Borrower in the entries on the books of any financial intermediary pertaining to such shares and interests, and all securities convertible into and options, warrants, dividends, cash, instruments and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares, (including all rights to request or cause the issuer thereof to register any or all of the Collateral under federal and state securities laws to the maximum extent possible under any agreement for such registration rights, and all put rights, tag-along rights or other rights pertaining to the sale or other transfer of such Collateral, together in each case with all rights under any agreements, articles or certificates of incorporation or otherwise pertaining to such rights; and (d) all voting rights and rights to cash and non-cash dividends, securities, securities

C-10

entitlements and other investment property, instruments and other property from time to time received, receivable or otherwise distributed in respect of, or in exchange for, any or all of the foregoing Collateral, and (e) all Proceeds of the foregoing Collateral.

"Powers" shall mean transfer powers in the form of Schedule 4 attached hereto.

"Premises" shall have the meaning set forth in the recitals hereto.

"Principal Amount" shall mean the Loan Amount as such amount may be reduced from time to time pursuant to the terms of this Agreement, the Note or the other Loan Documents.

"Proceeds" shall mean (a) all "proceeds" (as such term is defined in the UCC) and "products" (as such term is defined in the UCC) with respect to the Collateral and (b) includes, without limitation: whatever is receivable or received when Collateral is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary; all rights to payment, including return premiums, with respect to any insurance relating thereto; all interest, dividends and other property receivable or received on account of the Collateral or proceeds thereof, (including all Distributions or other income from the Equity Interests, all collections thereon or all Distributions with respect thereto); and proceeds of any indemnity or guaranty payable to Borrower or Lender from time to time with respect to any Collateral.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Property Agreements" shall mean all agreements, grants of easements and/or rights-of-way, reciprocal easement agreements, permits, declarations of covenants, conditions and restrictions, disposition and development agreements, planned unit development agreements, parking agreements, party wall agreements or other instruments affecting the Property, but not including any brokerage agreements, management agreements, service contracts, space leases or the Mortgage Loan Documents.

"Rate Cap Agreement" shall mean that certain interest rate protection agreement (together with the confirmation and schedules relating thereto) with a notional amount which shall not at any time be less than the Principal Amount and a LIBOR Rate strike price equal to 7.05% entered into by Borrower in accordance with the terms hereof or of the other Loan Documents and any similar interest rate cap or collar agreements subsequently entered into in replacement or substitution therefor by Borrower with respect to the Loan.

"Rating Agency" shall mean each of Standard & Poor's Ratings Services, Inc., a division of The McGraw-Hill Company, Inc. ("Standard & Poor's"), Fitch, Inc. and Moody's Investors Service, Inc. ("Moody's") and any successor to any of them; provided, however, that at any time after a Securitization, "Rating Agency" shall mean those of the foregoing rating agencies that from time to time rate the securities issued in connection with such Securitization.

"Remaining Rents" shall have the meaning set forth in Section 2.27.

"Section 2.26 Taxes" shall have the meaning set forth in Section 2.26 hereof.

"Securities Act" shall have the meaning set forth in Section 3.02(d).

"Securitization" shall mean a public or private offering of securities by Lender or any of its Affiliates or their respective successors and assigns which are collateralized, in whole or in part, by this Agreement.

"Single Purpose Entity" shall mean a corporation, partnership, joint venture, limited liability company, trust or unincorporated association, which is formed or organized solely for the purpose of holding, directly, an ownership interest in the Collateral, does not engage in any business unrelated to the Collateral, does not have any assets other than those related to its interest in the Collateral or any indebtedness other than as permitted by this Agreement or the other Loan Documents, has its own separate books and records and has its own accounts, in each case which are separate and apart from the books and records and accounts of any other Person, holds itself out as being a Person separate and apart from any other Person and which otherwise satisfies the criteria of the Rating Agency for a special-purpose bankruptcy-remote entity.

"Solvent" shall mean, as to any Person, that (a) the sum of the assets of such Person, at a fair valuation, exceeds its liabilities, including contingent liabilities, (b) such Person has sufficient capital with which to conduct its business as presently conducted and as proposed to be conducted and (c) such Person has not incurred debts, and does not intend to incur debts, beyond its ability to pay such debts as they mature. For purposes of this definition, "debt" means any liability on a claim, and "claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. With respect to any such contingent liabilities, such liabilities shall be computed in accordance with GAAP at the amount which, in light of all the facts and circumstances existing at the time, represents the amount which can reasonably be expected to become an actual or matured liability.

"Space Leases" shall mean any Lease or any other agreement providing for the use and occupancy of a portion of the Property as the same may be amended, renewed or supplemented.

"Substitute CMA Agreement" shall have the meaning set forth in Section 2.27.

"Taking" shall mean a condemnation or taking pursuant to the lawful exercise of the power of eminent domain.

"Transfer" shall mean any conveying, assigning, selling, mortgaging, encumbering, pledging, hypothecating, granting of a security interest in, granting of options with respect to or other disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise and whether or not for consideration or of record) of all or any portion of any legal or beneficial interest in the Collateral, Borrower, any Equity Holder, Owner, the Premises or any other portion of the Property.

C-12

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Unscheduled Payments" shall mean insurance proceeds that have been applied to the repayment of the Debt, any funds representing a voluntary or involuntary principal prepayment and proceeds of any foreclosure action or UCC sale.

"Welfare Plan" shall mean an employee welfare benefit plan as defined in Section 3(1) of ERISA established or maintained by Borrower, Guarantor or any ERISA Affiliate or that covers any current or former employee of Borrower, Guarantor or any ERISA Affiliate.

EXHIBIT D

"OPT IN" LANGUAGE

Section ___.    Shares and Share Certificates

a.    Shares.  A [Member's limited liability company interest in the Company]
[Partner's limited partnership interest in the Partnership] shall be represented by
the Shares issued to such [Member by the Company][Partner of the Partnership] .
All of a [Member's][Partner's] Shares, in the aggregate, represent such
[Member's][Partner's] entire [Partner by the Partnership] [limited liability
company interest in the Company [limited partnership interest in the Partnership].
The [Member][Partner] hereby agrees that its interest in the
[Company][Partnership] and in its Shares shall for all purposes be personal
property. A [Member] [Partner] has no interest in specific
[Company][Partnership] property.  "Share" means a [limited liability company
interest][limited partnership interest] in the [Company][Partnership] held by a
[Member][Partner].

b.    Share Certificates.

i.    Upon the issuance of Shares to any [Member][Partner] in accordance with
the provisions of this Agreement, the [Company][Partnership] shall issue
one or more Share Certificates in the name of such [Member][Partner].
Each such Share Certificate shall be denominated in terms of the number
of Shares evidenced by such Share Certificate and shall be signed by the
[Member][Partner] on behalf of the [Company][Partnership].  "Share
Certificate" means a non-negotiable certificate issued by the
[Company][Partnership] substantially in the form of Schedule __ hereto,
which evidences the ownership of one or more Shares.  Each Share
Certificate shall bear the following legend:  "This certificate evidences an
interest in _____and shall be a security interest for
purposes of Article 8 of the Uniform Commercial Code of the State of
_____ and the Uniform Commercial Code of any other
Jurisdiction."  This provision shall not be amended, and no such purported
amendment to this provision shall be effective until all outstanding
certificates have been surrendered for cancellation.

ii.    The [Company][Partnership] shall issue a new Share Certificate in place
of any Share Certificate previously issued if the holder of the Shares
represented by such Share Certificate, as reflected on the books and
records of the [Company][Partnership]:

(1)    makes proof by affidavit, in form and substance satisfactory to the
[Company][Partnership], that such previously issued Share
Certificate has been lost, stolen or destroyed.

D-1

(2)   requests the issuance of a new Share Certificate before the [Company][Partnership] has notice that such previously issued Share Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(3)   if requested by the [Company][Partnership], delivers to the [Company][Partnership] a bond, in form and substance satisfactory to the [Company][Partnership], with such surety or sureties as the [Company][Partnership] may direct, to indemnify the [Company][Partnership] against any claim that may be made on account of the alleged loss, destruction or theft of the previously issued Share Certificate; and

(4)   satisfies any other reasonable requirements imposed by the [Company][Partnership].

iii.   Subject to the restrictions set forth in [describe Loan Agreement/Mezzanine Loan Agreement restrictions] upon a [Member's][Partner's]'s Transfer in accordance with the provisions of this Agreement of any or all Shares represented by a Share Certificate, the Transferee of such Shares shall deliver such Share Certificate to the [Company][Partnership] for cancellation, and the [Company][Partnership] shall thereupon issue a new Share Certificate to such Transferee for the number of Shares being Transferred and, if applicable, cause to be issued to such [Member][Partner] a new Share Certificate for that number of Shares that were represented by the canceled Share Certificate and that are not being Transferred. "Transfer" means, with respect to any Shares, when used as a verb, to sell or assign such Shares, and, when used as a noun, shall have a meaning that correlates to the foregoing. "Transferee" means an assignee or transferee. "Transferor" means the Person making a Transfer.

c.   Free Transferability.  Except as limited by the [describe Loan Agreement/Mezzanine Loan Agreement restrictions], to the fullest extent permitted by the Act, any [Member][Partner] may, at any time or from time to time, without the consent of any other Person, Transfer, pledge or encumber any or all of its Shares. Subject to the restrictions of the [describe Loan Agreement/Mezzanine Loan Agreement restrictions], the Transferee of any Shares shall be admitted to the [Company][Partnership] as a substitute member of the [Company][Partnership] on the effective date of such Transfer upon (i) such Transferee's written acceptance of the terms and provisions of this Agreement and its written assumption of the obligations hereunder of the Transferor of such Shares, which shall be evidenced by such Transferee's execution and delivery to the [Company][Partnership] of an Application for Transfer of Shares on the reverse side of the Share Certificate representing the Shares being transferred, and (ii) the recording of such Transferee's name as a Substitute [Member][Partner] on the books and records of the [Company][Partnership]. Any Transfer of any

Shares pursuant to this Section __ shall be effective as of the later of (i) the close of business on the day on which such Transfer occurs, or (ii) the effective date and time of such Transfer that is designated in the Application for Transfer of Shares delivered by the Transferee to the [Company][Partnership].

D-3

EXHIBIT E

INSURANCE CERTIFICATE (FORM)

ARUBHOTE

## ACORD™  EVIDENCE OF PROPERTY INSURANCE

DATE (MM/DD/YY)
06/08/06

THIS IS EVIDENCE THAT INSURANCE AS IDENTIFIED BELOW HAS BEEN ISSUED, IS IN FORCE, AND CONVEYS ALL THE RIGHTS AND PRIVILEGES AFFORDED UNDER THE POLICY.

| PRODUCER | PHONE (A/C, No, Ext): 516 327-2700 | COMPANY |
|---|---|---|
| BWD Group LLC<br>BWD Plaza, P.O. Box 9050<br>113 South Service Road<br>Jericho, NY 11753 | | American Home Assurance Company<br>70 Pine Street<br>New York, NY 10270 |

| CODE: | SUB CODE: |
|---|---|
| AGENCY CUSTOMER ID #: 5391 | |

| INSURED | | LOAN NUMBER | POLICY NUMBER |
|---|---|---|---|
| Aruba Hotel Enterprises, N.V.<br>J.E. Irausquin Blvd. 77<br>Palm Beach, Aruba, NT | | | 210677646 |
| | | EFFECTIVE DATE<br>05/03/06 | EXPIRATION DATE<br>05/03/07 | CONTINUED UNTIL TERMINATED IF CHECKED |
| | | THIS REPLACES PRIOR EVIDENCE DATED: | |

### PROPERTY INFORMATION

LOCATION/DESCRIPTION
J.E. Irausquin Blvd. 77 Palm Beach, Aruba, NT

## DRAFT

### COVERAGE INFORMATION

| COVERAGE/PERILS/FORMS | AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| Commercial Property Real & Personal | $205,000,000 | $25,000 |
| Business Interruption and/or loss of Rental Income | 55,000,000 | 3 Days |
| Coverage: Flood Aggregate | 25,000,000 | $2 |
| Coverage: Earthquake Aggregate | 25,000,000 | 5% |
| Coverage: Boiler & Machinery | 200,000,000 | $25,000 |
| Coverage: Building Ordinance | 5,000,000 | |
| Coverage: Demolition and Increased Cost of Construction | 5,000,000 | |
| Coverage: Demolition | $5,000,000 | |
| Coverage: Sinkhole & Mine Subsidence | 25,000,000 | |
| Coverage: Valuable Papers | 100,000 | |
| Coverage: Guests' Personal Property | 25,000 | |
| Coverage: Unnamed Locations - Limit | 50,000 | |
| (See Attached Coverage Info.) | | |

### REMARKS (Including Special Conditions)

Valuation: Agreed Amount / Replacement Cost - Real & Personal Property.
Business Interruption - Actual Loss Sustained - Coverage for 18 Months
Causes of Loss: All Risk of Direct Physical Loss to Property including
Windstorm, Earthquake, Flood, Boiler & Machinery, Business Income.
Business Income Includes 6 Months Extended Period of Indemnity.
*Notwithstanding the notice of cancellation conditions it is hereby
understood and agreed that the insurance carrier agrees to notify mortgage and
(See Attached Remarks)

### CANCELLATION

THE POLICY IS SUBJECT TO THE PREMIUMS, FORMS, AND RULES IN EFFECT FOR EACH POLICY PERIOD. SHOULD THE POLICY BE TERMINATED, THE COMPANY WILL GIVE THE ADDITIONAL INTEREST IDENTIFIED BELOW 60 DAYS WRITTEN NOTICE, AND WILL SEND NOTIFICATION OF ANY CHANGES TO THE POLICY THAT WOULD AFFECT THAT INTEREST, IN ACCORDANCE WITH THE POLICY PROVISIONS OR AS REQUIRED BY LAW.

### ADDITIONAL INTEREST :

| NAME AND ADDRESS | | | |
|---|---|---|---|
| Petra Mortgage Capital Corp. LLC ISAOA,<br>ATIMA<br>1370 Avenue of the Americas<br>New York, NY 10019 | MORTGAGEE<br>LOSS PAYEE | X | ADDITIONAL INSURED |
| | LOAN # | | |
| | AUTHORIZED REPRESENTATIVE<br>*Stuart B. Culkin* | | |

ACORD 27 (3/93)   1 of   3      4386                    TIDES© ACORD CORPORATION 1993

## COVERAGE INFORMATION (Continued from page 1.)

COVERAGE/PERIL S/FORMS

| | AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| Coverage: Civil Authority | | |
| Coverage: Newly Acquired Property | 5,000,000 | |
| Coverage: Glass Coverage Including Vandalism - Included | 1,000,000 | |
| Coverage: Outside Signs - Included | | |
| Coverage: Trees & Shrubs - Included | | |
| Coverage: Vacancy Permit Endorsement | | |
| Coverage: 60 Days Notice of Cancellation / Non Renewal | | |
| Coverage: Accounts Receivable | 100,000 | |

# DRAFT

CISGEM 27.3 (3/93) 2    of    3    4386

TIDES

| REMARKS (Continued from page 1.) |
| --- |

additional insured within 5 business days that a notice of cancellation has
been issued.

# DRAFT

CISGEM 27.4 (3/93)3   of   3    4386                          TIDES

## Schedule 1

Corporations, Limited Liability Companies and Partnerships

100% of all membership, equity and ownership interests in Twilight Holdings, LLC, a Delaware limited liability company, evidenced by the Certificate

Schedule 2

Ownership Chart

CURRENT 8555596v8



**POST-RESTRUCTURING ORGANIZATIONAL CHART**

70707330.1

<u>Schedule 3</u>

Organizational Documents

Schedule 4

Stock Power

A transfer power in form and substance acceptable to Lender.

Schedule 5

The Certificate

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
## TWILIGHT HOLDINGS, LLC

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).**

Certificate Number 001

100% Percentage Interest

Twilight Holdings, LLC, a Delaware limited liability company (the "Company"), hereby certifies that BCP Florin, LLC (together with any assignee of this Certificate, the "Holder") is the registered owner of 100 percent of the limited liability company interests in the Company. The rights, powers, preferences, restrictions and limitations of the limited liability company interests in the Company are set forth in, and this Certificate and the limited liability company interests in the Company represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Amended and Restated Limited Liability Company Agreement of the Company dated as of _____, 2006, as the same may be amended or restated from time to time (the "Limited Liability Company Agreement"). By acceptance of this Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the limited liability company interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Limited Liability Company Agreement. The Company will furnish a copy of the Limited Liability Company Agreement to the Holder without charge upon written request to the Company at its principal place of business. Transfer of any or all of the limited liability company interests in the Company evidenced by this Certificate is subject to certain restrictions in the Limited Liability Company Agreement and can be effected only after compliance with all of those restrictions and the presentation to the Company of the endorsed Certificate, accompanied by the completed Application for Transfer of Interests, which is on the reverse side of this Certificate.

Each limited liability company interest in the Company represented by this Certificate evidences an interest in the Company and shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware and New York and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code as the Company has "opted-in" to such provisions).

This Certificate and the limited liability company interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Twilight Holdings, LLC

Dated: _____, 2006          By: _____

Name: Michael Belfonti
Title:  President

LEGAL_US_E # 70949956          E-1

(REVERSE SIDE OF CERTIFICATE)

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ (insert name and Social Security or other taxpayer identification number of transferee), the following specified percentage of limited liability company interests in the Company: 100% effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints _____ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: _____

BCP Florin, LLC

By: _____
Name: Michael Belfonti
Title: President

## CONSENT AND WAIVER

As a material inducement for Lender to enter into the Loan and Security Agreement ("Loan Agreement") dated as of the 9th day of June 2006 between BCP Florin, LLC, a Delaware limited liability company ("Borrower"), and Petra Mortgage Capital Corp. LLC, a Delaware limited liability company ("Lender"), and for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, as of the 9th day of June 2006, hereby consents to the pledge of the Collateral contained in the Loan Agreement and ratifies all encumbrances and terms contained therein.

The undersigned agrees that, by acceptance of the Loan Agreement, Lender assumes no obligations with respect to the Pledged Entities or to the constituent members, partners, or shareholders in the Pledged Entities and, without the prior written consent of Lender, the undersigned shall not: (a) terminate or materially amend or modify the Organizational Documents of the Pledged Entities or consent thereto; or (b) take any action that would operate to dilute the interest of Borrower in the Pledged Entities.

The undersigned agrees that, upon written notice from Lender stating that an Event of Default has occurred under the Loan Agreement, all Distributions, dividends, or other sums payable to Borrower in connection with the Pledged Entities shall be made payable to and delivered to Lender. The undersigned further agrees that, upon written notice from Lender that it has foreclosed upon the Collateral described in the Loan Agreement following an Event of Default, Borrower shall be removed as a manager, managing member or general partner in the Pledged Entity, as applicable, and replaced with the assignee designated in such notice, which assignee shall be Lender or its nominee. In connection therewith, the undersigned agrees to request (and use reasonable efforts to ensure) that Lender is provided with a written statement of Borrower's defaults under the Organizational Documents and agrees that Lender be entitled to rely on such statement in determining whether to become a substitute member, shareholder or partner in the applicable Pledged Entity. If Lender so requests, the undersigned covenants and agrees to consent to the execution of an amendment to the Organizational Documents to reflect any such assignee's substitution in place of Borrower, as applicable.

The undersigned further consents and agrees to (a) Borrower's assignment to Lender for security purposes, of Borrower's Equity Interests, (b) any foreclosure and/or subsequent sale by Lender or its nominee of its rights with respect to such Equity Interests and the substitution of Lender or nominee of its rights with respect to such Equity Interests, (c) the exercise of any remedy by Lender or its nominee under the Loan Agreement and (d) notwithstanding anything to the contrary contained in the Organizational Documents of the Pledged Entities, Lender, its nominee or any third-party purchaser at a foreclosure sale becoming a member, partner or shareholder, or a substitute manager, managing member or general partner, as applicable, in a Pledged Entity, with all of the rights enjoyed by Borrower prior to such foreclosure. Any such foreclosure will not require any further consent of the undersigned or any other member, shareholder, or partner in the applicable Pledged Entity and will not cause the dissolution of any LLC or Partnership.

The undersigned agrees that neither the execution and delivery of the Loan Agreement, the enforcement by Lender of any of its rights thereunder, nor the transfer (or agreement to

transfer) by Lender of any of its rights in the Pledged Entities or under the Loan Agreement shall constitute a default under the Organizational Documents, and the undersigned expressly waives any rights it may have under the Organizational Documents as a result of the foregoing. The undersigned hereby waives any and all rights under the Organizational Documents which, whether exercised by the undersigned or not, would prevent, inhibit or interfere with the granting of a security interest in the Collateral to Lender, the foreclosure of such security interest in the Collateral by Lender or the full realization by Lender of any of its other rights under the Loan Agreement.

The undersigned acknowledges that Lender is materially relying on the undersigned's execution of this Consent and Waiver in entering into the Loan Agreement and the other Loan Documents.

All capitalized terms not otherwise defined herein shall have the meaning set forth in the Loan Agreement.

IN WITNESS WHEREOF, the undersigned has duly executed this consent and waiver as of this ___ day of June 2006.

TWILIGHT HOLDINGS, LLC

By: _____
     Name: Michael Belfonti
     Title: President