# EXHIBIT D

SAP# _____

WESTIN ARUBA RESORT
OPERATING AGREEMENT

BETWEEN

ARUBA HOTEL ENTERPRISES N.V.

AND

WESTIN ARUBA HOTEL MANAGEMENT LLC

MAY 3, 2006

ARTICLE 1    DEFINITIONS AND EXHIBITS ............................................................. 1

1.1   Definitions ........................................................................................... 1
1.2   Exhibits ............................................................................................... 1

ARTICLE 2    GRANT OF AUTHORITY ...................................................................... 2

2.1   Grant of Authority .............................................................................. 2
2.2   Limitations on Grant of Authority ..................................................... 5
2.3   Other Operations of Operator ............................................................ 6
2.4   Operating Term .................................................................................. 8

ARTICLE 3    FEES AND EXPENSES ........................................................................ 8

3.1   Operating Fees ................................................................................... 8
3.2   Centralized Services Charges ............................................................ 9
3.3   Reimbursable Expenses ..................................................................... 9
3.4   Interest ............................................................................................... 9
3.5   Payment of Fees and Expenses ......................................................... 9
3.6   Application of Payments ................................................................. 10
3.7   Taxes ............................................................................................... 10
3.8   Currency Conversion ...................................................................... 11
3.9   Restrictions on Payments in U.S .................................................... 11

ARTICLE 4    CENTRALIZED SERVICES ............................................................... 11

4.1   Centralized Services ....................................................................... 11

ARTICLE 5    OPERATION OF THE HOTEL ............................................................ 13

5.1   Operating Plan ................................................................................ 13
5.2   Maintenance and Repair; Capital Improvements ........................... 16
5.3   Personnel ......................................................................................... 18
5.4   Bank Accounts ................................................................................ 19
5.5   Funds for Operation of the Hotel .................................................... 21
5.6   Purchasing ....................................................................................... 21
5.7   Technology Systems ....................................................................... 22
5.8   Hotel Parking .................................................................................. 23
5.9   Use of Affiliates by Operator ......................................................... 23
5.10  Limitation on Operator's Obligations ............................................. 23
5.11  Third-Party Operated Areas ............................................................ 24
5.12  Owner Complimentary Rooms ....................................................... 25
5.13  Owner Apartment ........................................................................... 25
5.14  Owner's Controller ......................................................................... 25

ARTICLE 6    CONVERSION OF THE HOTEL ........................................................ 25

6.1   Conversion of the Hotel .................................................................. 25
6.2   Compliance with Laws ................................................................... 27

ARTICLE 7    PROPRIETARY RIGHTS .................................................................... 27

7.1   Trademarks ...................................................................................... 27
7.2   Use of Proprietary Rights ............................................................... 28
7.3   Acknowledgment of Operator's Rights .......................................... 28
7.4   Infringement .................................................................................... 28
7.5   Improvements to System ................................................................ 28

ARTICLE 8       CONFIDENTIALITY ................................................................................29

    8.1     Disclosure by Owner ..........................................................................................29
    8.2     Disclosure by Operator.......................................................................................29
    8.3     Public Statements ...............................................................................................30

ARTICLE 9       MARKETING ........................................................................................30

    9.1     Marketing ...........................................................................................................30

ARTICLE 10      BOOKS AND RECORDS .....................................................................31

    10.1    Maintenance of Books and Records....................................................................31
    10.2    Financial Reports ................................................................................................31
    10.3    Certified Financial Reports .................................................................................31
    10.4    Hotel Guest Information......................................................................................32
    10.5    Consultation with Senior Executive Personnel ..................................................32

ARTICLE 11      TRANSFERS ..........................................................................................32

    11.1    Transfers Restricted ...........................................................................................32
    11.2    Permitted Transfers by Operator ........................................................................32
    11.3    Permitted Transfers by Owner ...........................................................................33
    11.4    Effect of Permitted Transfer ...............................................................................33

ARTICLE 12      INSURANCE AND INDEMNIFICATION ..........................................34

    12.1    Insurance .............................................................................................................34
    12.2    Waiver of Liability ..............................................................................................35
    12.3    Indemnification ...................................................................................................35

ARTICLE 13      MORTGAGES ........................................................................................36

    13.1    Mortgages Subject to Operator's Approval.........................................................36
    13.2    Mortgagee's Right of Access ..............................................................................37
    13.3    Disclosure of Mortgages ....................................................................................37
    13.4    Nondisturbance ...................................................................................................37
    13.5    Loan Documentation ...........................................................................................38

ARTICLE 14      BUSINESS INTERRUPTION ..............................................................38

    14.1    Funds Provided by Owner ..................................................................................38
    14.2    Proceeds of Business Interruption Insurance .....................................................39

ARTICLE 15      CASUALTY OR CONDEMNATION ...................................................39

    15.1    Casualty ...............................................................................................................39
    15.2    Condemnation .....................................................................................................40

ARTICLE 16      DEFAULTS AND TERMINATIONS ...................................................40

    16.1    Event of Default ..................................................................................................40
    16.2    Remedies for Event of Default............................................................................42
    16.3    Notice of Termination .........................................................................................42
    16.4    Special Termination Rights of Operator .............................................................42
    16.5    Special Termination Rights of Owner – Performance Test .................................43
    16.6    Cross-Termination with Other Agreements ........................................................44
    16.7    Actions To Be Taken on Termination..................................................................44
    16.8    Notice of Termination to Employees...................................................................46

ARTICLE 17    DISPUTE RESOLUTION .................................................................................46

    17.1    Alternative Dispute Resolution ...............................................................46
    17.2    Prevailing Party's Expenses ....................................................................48
    17.3    Jurisdiction and Venue .............................................................................48
    17.4    WAIVERS ................................................................................................48
    17.5    Survival and Severance ............................................................................49

ARTICLE 18    REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGEMENTS ..........49

    18.1    Operator's Representations and Warranties ..............................................49
    18.2    Owner's Representations and Warranties .................................................50
    18.3    Owner's Covenants ..................................................................................51
    18.4    ACKNOWLEDGEMENTS ......................................................................52

ARTICLE 19    GENERAL PROVISIONS ............................................................................53

    19.1    Governing Law .........................................................................................53
    19.2    Construction of this Agreement ...............................................................53
    19.3    Limitation on Operator's Liabilities ........................................................54
    19.4    Waivers .....................................................................................................55
    19.5    Notices ......................................................................................................55
    19.6    Owner's Representative ............................................................................56
    19.7    Further Assurances ...................................................................................56
    19.8    Relationship of the Parties .......................................................................56
    19.9    Force Majeure ..........................................................................................56
    19.10   Terms of Other Operating Agreements ....................................................57
    19.11   Translations ..............................................................................................57
    19.12   Foreign Corrupt Practices Act .................................................................57
    19.13   Governmental Approvals .........................................................................57
    19.14   Execution of Agreement ..........................................................................58
    19.15   Limitation on Owner's Liability ..............................................................58
    19.16   Guaranty ...................................................................................................58

## LIST OF EXHIBITS

EXHIBIT A    -    HOTEL AND OWNER INFORMATION; PRINCIPAL BUSINESS TERMS
EXHIBIT B    -    DEFINITIONS
EXHIBIT C    -    RESTRICTED AREA
EXHIBIT D    -    CENTRALIZED SERVICES
EXHIBIT E    -    TECHNOLOGY SYSTEMS AND SERVICES
EXHIBIT F    -    PRE-OPENING SERVICES
EXHIBIT G    -    OPENING AND EXPIRATION DATE CONFIRMATION
EXHIBIT H    -    INSURANCE
EXHIBIT I    -    EXISTING AGREEMENTS
EXHIBIT J    -    ENVIRONMENTAL REPORT
EXHIBIT K    -    PROPERTY IMPROVEMENT PLANS
EXHIBIT L         FORM OF ESCROW AGREEMENT WITH OWNER'S LENDER
EXHIBIT M         INTERIM TERM OPERATIONS
EXHIBIT N         FORM OF CASH MANAGEMENT AGREEMENT
EXHIBIT O         FORM OF HOTEL MANAGER'S AND LICENSOR'S CONSENT, ASSIGNMENT
                  AND SUBORDINATION OF MANAGEMENT AGREEMENT

## OPERATING AGREEMENT

This Operating Agreement (this "Agreement") is entered into as of the Effective Date, between ARUBA HOTEL ENTERPRISES N.V., an Aruba limited liability company ("Owner"), and WESTIN ARUBA HOTEL MANAGEMENT LLC, a Delaware limited liability company ("Operator"). Owner and Operator are sometimes referred to collectively in this Agreement as the "Parties" and individually as a "Party."

## RECITALS

A.     Owner is a wholly-owned subsidiary of BCP and leases the premises described in Exhibit A (the "Premises"), on which is located a hotel having the facilities described in Exhibit A (the "Hotel"), as well as a casino and spa/fitness center.

B.     Operator is an Affiliate (as defined below) of Starwood Hotels & Resorts Worldwide, Inc. ("Starwood"), and is knowledgeable and experienced in operating hotels under the Brand (as defined below).

C.     Owner desires to engage Operator to operate the Hotel under the Brand, and Operator desires to operate the Hotel under the Brand.

D.     Contemporaneously with the execution of this Agreement, Owner has entered into a Trademark License Agreement (the "Trademark License Agreement") with Westin Hotel Management, L.P. (the "Trademark Licensor"), an Affiliate of Starwood, pursuant to which Trademark Licensor has agreed to provide to Owner and Operator the right to use the Trademarks in the Operation of the Hotel.

E.     Contemporaneously with the execution of this Agreement, Owner has entered into a Technical Services Agreement (the "Technical Services Agreement") with Starwood (the "Consultant"), pursuant to which Consultant has agreed to provide to Owner certain services with respect to the Conversion of the Hotel.

## AGREEMENT

NOW THEREFORE in consideration of the recitals, promises and covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the Parties, the Parties agree:

## ARTICLE 1

## DEFINITIONS AND EXHIBITS

1.1     **Definitions**. All capitalized terms used without definition in this Agreement shall have the meanings assigned to such terms in Exhibit B.

1.2     **Exhibits**. The exhibits listed in the table of contents and attached hereto are incorporated in, and deemed to be an integral part of, this Agreement.

## ARTICLE 2

## GRANT OF AUTHORITY

### 2.1    Grant of Authority

2.1.1    Engagement of Operator.  Subject to the terms of this Agreement, including, without limitation, the terms of Section 2.1.2(b)(ii), Owner hereby engages Operator, and Operator hereby accepts such engagement, to Operate all aspects of the Hotel for and on behalf of Owner and as the exclusive operator of the Hotel during the Operating Term; provided, however, that nothing in this Agreement shall be deemed to permit Operator, or for Operator to be deemed, to Operate any casino or timeshare aspects of the Premises.

2.1.2    General Grant of Authority.  Subject to the terms of this Agreement:

(a)    Owner hereby grants to Operator the exclusive right, authority, discretion and duty during the Operating Term, and instructs Operator during the Operating Term, to take all such actions for and on behalf of Owner which Operator deems reasonably necessary or advisable to Operate the Hotel (i) at a level of service and quality generally considered to be first class and equal to or better than the level of service and quality prevailing from time to time at the Operated Brand Hotels, subject to the restrictions set forth in this Agreement, (ii) in accordance with the standards, policies and programs in effect from time to time that are applicable to the Operation of the Operated Brand Hotels, (iii) in accordance with the requirements and limitations set forth in this Agreement, including those relating to the Operating Plan, and (iv) in a manner reasonably expected to (A) protect and preserve the assets that comprise the Hotel; and (B) optimize over the Operating Term the financial performance of the Hotel (collectively, the "Operating Standards").  Operator shall provide Owner with a written or electronic description of any material changes to the standards, policies and programs described in clause (ii) as soon as such changes are required to be implemented at the Hotel and, if available at such time, the estimated cost of such changes (which costs, in any event, shall be incorporated into the Operating Plan prepared for the succeeding Operating Year); provided, however, that Operator shall have no liability for estimates provided in good faith.

(b)    Notwithstanding Section 2.1.2(a), from and after the Effective Date until such time as the Pre-Flagging PIP for the Conversion of the Hotel (including the implementation of Brand Operating Standards) has been completed to the extent provided in Section 6.1.2 of this Agreement so as to permit the Hotel to be Operated as a Brand Hotel pursuant to this Agreement and identified as a Brand Hotel pursuant to the Trademark License Agreement (the "Flagging Date"), the Hotel shall be Operated: (i) first, by Owner or a third party and (ii) thereafter, within 90 days of the Effective Date (unless Wyndham shall have filed for or obtained an injunction or comparable equitable relief which prevents Operator from Operating the Hotel), by Operator as an independent hotel in accordance with the provisions contained in Exhibit M attached hereto until the Hotel is Operated under the Brand as of the Flagging Date, pursuant to the terms hereof.  Operator shall include the Hotel as an independent hotel with access to Starwood's reservation systems as applicable for an independent hotel (which will result in the Hotel being listed on the Starwood website categorized under Aruba and being made available to guests via Starwood's toll free reservations line) for the same reservations fees as are charged to substantially all owners of other Operated Brand Hotels, pursuant to the terms of Exhibit M attached hereto; provided, however, that Owner shall ensure that no reservations are made on any other reservations system to reserve use of Guest Rooms for periods during the Interim Term.

(c)    Operator shall include the Hotel as a Brand Hotel in Starwood's central reservation system at least six months prior to the expected Flagging Date, as reasonably agreed upon by

the Parties, for guests to reserve use of Guest Rooms for periods from and after the Flagging Date; provided, however, that Owner shall ensure that no reservations are made on any other reservations system to reserve use of Guest Rooms for periods from and after the Flagging Date from and after the date Operator includes the Hotel in Starwood's central reservation system.

(d)     From and after the Flagging Date, Operator shall Operate the Hotel as a Brand hotel. If Starwood at any time during the Operating Term creates a luxury-level brand using the Westin® marks, Operator shall consider identifying the Hotel under such brand, provided Owner agrees to complete any required improvements in accordance with a Property Improvement Plan satisfying the Design Guide for such brand.

2.1.3   Specific Actions Authorized by Owner. Without limiting the generality of the foregoing in Section 2.1.2, and subject only to the limitations set forth in Section 2.2, Owner's general grant of authority under Section 2.1.2 shall specifically include the exclusive right, title and authority of Operator to take any of the actions set forth in this Section 2.1.3, as follows:

(a)     establish rates for the usage of all Guest Rooms and other Hotel facilities, including all (i) room rates for individuals and groups, (ii) charges for room service, food and beverage, (iii) charges for recreational and other guest amenities at the Hotel, (iv) subject to Section 5.12, policies with respect to discounted and complimentary room, food and beverage and other services at the Hotel, (v) billing policies (including entering into agreements with credit card organizations), (vi) price and rate schedules, and (vii) subject to the limitations of Section 2.2, rents, fees and charges for all leases, concessions or other rights to use or occupy any public space in the Hotel;

(b)     supervise, direct and control the collection of income of any nature from the Operation of the Hotel and issue receipts with respect to, and use reasonable efforts to collect all charges, rent and other amounts due from guests, lessees and concessionaires of the Hotel, and use those funds, as well as funds from other sources as may be available to the Hotel, in accordance with this Agreement;

(c)     use commercially reasonable efforts to collect and account for and remit to Governmental Authorities all applicable excise, sales, occupancy and use taxes and all other taxes, assessments, duties, levies and charges imposed by any Governmental Authority and collectible by the Hotel directly from patrons or guests (including those based on the sales price of any goods, services or displays, gross receipts or admission);

(d)     subject to the terms and conditions of Section 5.6.3, supervise and purchase or lease, or arrange for the purchase or lease of, all FF&E and Supplies Operator deems necessary or advisable for the Operation of the Hotel;

(e)     negotiate, enter into and administer, in the name of Owner, all service contracts and licenses Operator deems necessary or advisable for the Operation of the Hotel, including contracts and licenses for (i) health and life safety systems, (ii) maintenance of all electrical, mechanical, plumbing, HVAC, elevator, boiler and all other building systems, (ii) electricity, gas, telecommunications (including television and internet service), (iv) cleaning, laundry and dry cleaning, (v) use of copyrighted materials (including music and videos) and (vi) entertainment;

(f)     negotiate, enter into and administer, in the name of Owner, contracts for the use of Guest Rooms, banquet and meeting facilities and other Hotel facilities by individuals and groups;

(g)    subject to Section 2.2(b), negotiate and administer, in the name of Owner, leases, licenses and concession agreements or other agreements for the right to use or occupy any public space at the Hotel, including any store, office or lobby space;

(h)    institute in its own name, or in the name of Owner or the Hotel, all legal actions or proceedings to (i) collect charges, rent or other income derived from the Hotel's operations, (ii) oust or dispossess guests, tenants or other Persons in possession therefrom, or (iii) terminate any lease, license or concession agreement for the default thereunder by the tenant, licensee or concessionaire;

(i)    at the direction and expense of Owner (and not as an Operating Expense), take actions to challenge, protest, appeal and/or litigate to final decision in any appropriate court or forum any Applicable Laws affecting the Hotel or any alleged non-compliance with, or violation of, any Applicable Law; provided, that (i) the non-compliance with, or violation of, Applicable Law during such challenge, protest, appeal or litigation does not result in the closing of the Hotel or any portion or facility of the Hotel, and does not impose any risk of criminal or civil liability on Operator or Owner (other than civil liability for which Owner provides Operator with an indemnity reasonably satisfactory to Operator), and (ii) Owner complies with, or remedies such violation of, Applicable Law to the extent necessary to prevent any such closure or risk of liability;

(j)    appoint counsel, defend and control any and all legal actions or proceedings relating to the Hotel (i) in which Operator is a named party, (ii) that relate to legal actions or proceedings involving more than one Operated Brand Hotel, or (iii) that relate to policies, procedures or business practices of Operator or its Affiliates, but excluding legal actions or proceedings pertaining to property related claims not involving the Operation of the Hotel (such as zoning disputes, structural defects and title disputes); provided, however, that in determining what portion, if any, of the cost of any legal actions or proceedings described in clause (i), (ii) or (iii) above is to be allocated to the Hotel, due consideration shall be given to the potential impact of such legal action or proceeding on the Hotel as compared with the potential impact on Operator or its Affiliates or on other Operated Brand Hotels; provided, further, that (x) this provision shall not be deemed to authorize Operator to incur fees or costs on behalf of the Hotel in connection with any claim or action or threatened claim or action which is unrelated to the Hotel and as to which neither the Hotel nor Owner has been made a party and (y) if Owner is also a named party in such legal actions or proceedings, Owner, at its sole cost and expense, shall have the right to appoint separate counsel to defend its interests. Notwithstanding anything to the contrary, Owner shall have the right reasonably to approve of the defense of any legal actions or proceedings (including, without limitation, reasonable approval of Operator's selection of counsel and reasonable approval or disapproval of Operator's decision to settle or litigate the claim, in any such event which approval shall not be unreasonably withheld or delayed) which do not relate to policies, procedures or business practices of Operator or its Affiliates which would cause Owner to incur in excess of $100,000 in legal fees or other potential liability;

(k)    reasonably cooperate with Owner and any prospective purchaser, lessee, Mortgagee or other lender in connection with any proposed sale, lease or financing of or relating to the Hotel; provided, however, that (i) Operator shall not be required to release any Confidential Information to any Person and (ii) Owner shall reimburse Operator for any Out-of-Pocket Expenses incurred by Operator in connection with such cooperation when such expense is not otherwise paid or reimbursed under this Agreement;

(l)    subject to subsection (i) above, take such actions within Operator's reasonable control as Operator deems necessary or advisable to comply with all Applicable Laws (provided, however, Operator shall not be a guarantor of the Hotel's compliance with such Applicable Laws) and the terms of all insurance policies;

(m)      at the direction and expense of Owner (and not as an Operating Expense), take actions within Operator's reasonable control to discharge any lien, encumbrance or charge against the Hotel or any component of the Hotel;

(n)      take such actions as Operator deems necessary or advisable to perform all duties and obligations required to be performed by Operator under this Agreement; and

(o)      take such actions as are customary and usual in the operation of a hotel in accordance with the Operating Standards, and subject to the remaining terms of this Agreement, implement standards, policies and programs in effect for the Brand; and

(p)      supervise and maintain complete books of account and records relating to or reflecting the results of operation of the Hotel in accordance with GAAP and, to the extent applicable, the Uniform System.

2.2      **Limitations on Grant of Authority.**  Notwithstanding the grant of authority given to Operator in Section 2.1, and without limiting any of the other circumstances under which Owner's approval is specifically required under this Agreement, Owner's approval (which shall not be unreasonably withheld or delayed) shall be required for:

(a)      the prosecution or defense of any Claim arising out of the Operation of the Hotel which involves an amount in excess of $100,000 which is not covered by insurance or as to which the insurance company denies coverage or "reserves rights" as to coverage, except with respect to Operator's rights of defense provided for in Section 2.1.2(j). The amount specified in this clause (a) shall be increased on January 1 of each Operating Year by the percentage increase in the Index since January 1 of the prior Operating Year;

(b)      the execution of (i) any contract having a term in excess of one year unless such contract can be terminated by Owner, or Operator on behalf of Owner, without penalty and upon notice of 90 days or less; or (ii) any lease for space (A) in excess of 500 square feet; (B) which contemplates tenant improvements of $5,000 or more or (C) is for a rental which is less than a fair market rental compared to comparable spaces on the Island of Aruba;

(c)      the execution of any equipment lease (or series of leases relating to the same equipment) or other contract for goods or services (or series of contracts for the same or similar goods or services) which requires aggregate annual payments in excess of $50,000, other than contracts for (i) Centralized Services, (ii) consumable supplies, (iii) utilities and (iv) employee compensation or benefits. The amount specified in this clause (c) shall be increased on January 1 of each Operating Year by the percentage increase in the Index since January 1 of the prior Operating Year;

(d)      the borrowing of any money or execution of any credit obligation in the name and on behalf of Owner, except in connection with trade payables for goods and services incurred in the ordinary course of business in the Operation of the Hotel in accordance with this Agreement;

(e)      the acquisition of any land or interest therein on behalf of Owner;

(f)      the acquisition of any capital assets (as determined under GAAP) or interest therein, including under capital leases, except (i) to the extent contemplated by an approved Capital Budget and/or (ii) FF&E and Hotel Operating Supplies (to the extent the same constitute capital assets) in the ordinary course of business as provided for in this Agreement;

(g)     the financing, refinancing or Mortgaging of any portion of the Hotel or the revenue due to Owner therefrom;

(h)     the Operation of the Hotel in any manner or for any purposes other than as contemplated hereby;

(i)     the abandonment of the Hotel, except in the case of a national emergency;

(j)     the making, authorizing or permitting of any material modifications or alterations to the Hotel, except as expressly authorized by this Agreement; and

(k)     subject to the rights and obligations of Owner and Operator in connection with the Vereniging Team Workers Union as set forth in Section 5.3.6, the execution of any collective bargaining, recognition, neutrality or other labor agreements involving the Hotel, except as required by Applicable Law.  With respect to the foregoing, Operator shall keep Owner informed regarding all material aspects of any significant labor matters involving the Hotel, advise Owner of all discussions and negotiations with unions and give due consideration to any recommendations, advice and other input of Owner.  Operator shall use commercially reasonable efforts to provide Owner sufficient advance notice for Owner or Owner's Representative to participate in the negotiation of such agreements.

## 2.3     Other Operations of Operator.

2.3.1     Restricted Area.  (a)     During the Initial Term, neither Operator nor any of its Affiliates shall own, Operate or license a Brand hotel (including a so-called "condo hotel" or similar transient lodging facility) that is located within the area described in Exhibit C hereto (the "Restricted Area"), provided this restriction shall not apply to, and therefore shall not restrict Operator or its Affiliates from, owning, Operating or licensing any (i) Other Starwood Brand hotels located within the Restricted Area, except as provided in (b) below, or (ii) vacation, time-share or interval ownership or timeshare estate, timeshare license or fractional ownership (including fractional interests in vacation condominiums or residences) facilities or non-equity or equity clubs or any other form of interest in or rights to any travel-related products or services or vacation ownership program, including, without limitation, any interest in or rights to any form of exchange or reservation system, club or network sold, marketed or Operated (including the rental thereof) under the Brand or any Other Starwood Brand and located within the Restricted Area; provided, however, that Owner's Representative may consult with Operator with respect to any concerns Owner may have regarding the rentals of any time-share facilities being sold, marketed or Operated under the Brand or any Other Starwood Brand on the property immediately adjacent to the Hotel acquired or ground leased on or about the Effective Date, as described in Exhibit C hereto, and Operator shall, in good faith, consider the concerns and comments expressed by Owner's Representative in connection therewith.  Owner agrees that any ownership, Operation or licensing of Brand hotels, as well as Other Starwood Brand hotels, located outside the Restricted Area is completely unrestricted.  During the Extension Terms (if any), if Operator or any of its Affiliates owns, operates or licenses another Brand hotel (including a so called "condo-hotel" or similar transient lodging facility) that is located within the Restricted Area, then Owner shall have the right to terminate this Agreement without the payment of any termination fee, penalty or other damages, upon not less than 60 days' prior written notice to Operator; provided, however, that such right of termination shall be Owner's sole and exclusive remedy for such an event.

(b)     For so long as SVO International Holdings Limited, an Affiliate of Starwood, or any other Affiliate of Starwood, owns or is the ground lessee of the parcel of land immediately adjacent to the Hotel being acquired or ground leased on or about the Effective Date, as

described in Exhibit C hereto, neither Operator nor any of its Affiliates shall own, Operate or license any hotel under the Brand or any Other Starwood Brand on such parcel of land; provided, however, that the restrictions in this Section 2.3.1(b) shall not apply to any vacation, time-share or interval ownership or timeshare estate, timeshare license or fractional ownership (including fractional interests in vacation condominiums or residences or any so-called "condo hotel" (except for any Brand "condo hotel")) facilities or non-equity or equity clubs or any other form of interest in or rights to any travel-related products or services or vacation ownership program, including, without limitation, any interest in or rights to any form of exchange or reservation system, club or network sold, marketed or Operated (including the rental thereof) under the Brand or any Other Starwood Brand on such parcel of land.

   2.3.2   Operation of Other Starwood Hotels and Lodging Facilities. Owner acknowledges that: (a) Owner has selected Operator to Operate the Hotel on behalf of Owner in substantial part because of the chain of Brand hotels which are owned, Operated or franchised by Operator and its Affiliates, (b) Owner has determined, on an overall basis, that the benefits of Operation as part of the chain of Brand hotels are substantial, notwithstanding that the hotels in the chain of Brand hotels might not benefit equally, and (c) in certain respects all hotels compete on an international, regional and local basis with other hotels, and that conflicts may; from time to time, arise between the Hotel and other hotels, time-share, interval ownership facilities, vacation clubs, and other lodging facilities and residences that are owned, Operated or franchised by Operator or its Affiliates under the Brand, Other Starwood Brands, third-party brands or no brand. Accordingly, Owner consents to the ownership, Operation or franchise by Operator or its Affiliates of all hotels, time-share, interval ownership facilities, vacation clubs and other lodging facilities and residences under the Brand, Other Starwood Brands, third-party brands or no brand, whenever existing and wherever located, except to the extent otherwise expressly prohibited under Section 2.3.1. Notwithstanding the foregoing, Operator agrees that it shall use reasonable efforts to minimize conflicts among its operated hotels and will proceed, both in its Operation of the Hotel and in the operation of its other hotels, in a good faith manner reasonably intended to serve the interests of all its operated hotels on a long-term basis. The Parties agree that this Section 2.3 shall constitute the entirety of Operator's obligations with respect to any such potential conflicts of interest regarding competition between the Hotel and such other hotels, time-share, interval ownership facilities, vacation clubs and other lodging facilities and residences that are owned, Operated or franchised by Operator or its Affiliates under the Brand, Other Starwood Brands, third-party brands or no brand.

   2.3.3   Placement Rights.

      (a)   Placement Programs. Notwithstanding anything to the contrary in this Agreement, Operator shall have the right, from time to time, at Operator's expense, to market, promote and/or sell any products or services offered by Operator or any of its Affiliates or any other Person designated by Operator or any of its Affiliates as a Brand partner (a "Designated Brand Partner") at the Hotel, including timeshare, fractional and other lodging, spa or residential products or services (a "Placement Program"); provided, however, that any Placement Program shall be consistent with Operator's, or any of its Affiliates', strategy for the Brand and shall not detract from the Brand or the image of Hotel, all as reasonably determined by Operator. Owner and Operator shall cooperate in good faith to avoid any material negative impact on the Hotel from any Placement Program. Operator shall have the right to use space, facilities, equipment or personnel at the Hotel for such Placement Programs as reasonably required for the Placement Program and agreed to by the Parties; provided, however, that if any such Placement Program requires more than a de minimus use of space, facilities, equipment, utilities or personnel, then the Parties shall negotiate in good faith to agree on an arm's length compensation for such use (the "Placement Charge"). If the Parties cannot agree on the appropriate facilities, equipment, utilities or personnel to be used for a Placement Program, or the Placement Charge for a Placement Program (if applicable), within 30 days after Operator notifies Owner of such Placement Program, then either Party shall have the right to submit such matter for resolution in accordance with Article 17.

(b)      Competition with Placement Programs.  In furtherance of Operator's rights under Section 2.3.3(a) (the "Placement Rights"), Owner shall not market, promote or sell, or enter into any agreement or other arrangement to market, promote or sell, any products or services at the Hotel that, in Operator's reasonable judgment, would compete with any products or services offered by Operator or any of its Affiliates or a Designated Brand Partner pursuant to a Placement Program.  If Owner has entered into any agreement or other legally binding arrangement to provide any such competitive products or services prior to the time that Operator has provided Owner with notice of the applicable Placement Program, then Operator shall have the right to require Owner to terminate such agreement or other arrangement at the earliest time at which it can be terminated without cost or penalty. Operator also shall have the right to require such termination at a time which would result in a cost or penalty; provided, however, if such pre-existing agreement or arrangement is for a term of (i) no longer than one year or otherwise previously approved in writing by Operator, then Operator shall reimburse Owner for any costs or penalties (if any) to the Person providing such competitive products or services as a result of such termination or (ii) longer than one year and was not previously approved in writing by Operator, then Owner shall be responsible for all costs or penalties required to be paid to the Person providing such competitive products or services as a result of such termination.

(c)      No Participation in Placement Programs.  Except as the Parties may otherwise agree in writing, Owner acknowledges that (i) Owner shall have no right to any revenues or other amounts derived from, or otherwise participate in, any Placement Programs, except for the Placement Charges and (ii) Owner shall not acquire any other right, title or interest in any Placement Programs, or the products, services or goodwill associated with such Placement Programs.  Owner further acknowledges that the Placement Programs are intended to promote the goodwill and public image of the Brand, either directly or by association with a Designated Brand Partner, but that neither Operator, Starwood nor any Designated Brand Partner, nor any of their respective Affiliates or designees, undertake any obligation in administering the Placement Programs to ensure that any licensee or hotel benefits directly or pro rata from the Placement Program.

2.4      Operating Term.

2.4.1    Initial Term.  This Agreement shall be for a period (the "Initial Term") commencing on the Flagging Date and expiring without notice on the Expiration Date, unless terminated earlier in accordance with the terms of this Agreement; provided, however, that from the Effective Date until the Flagging Date, the Parties shall be governed by the provisions of this Agreement applicable by its terms to such period, including without limitation, under Sections 2.1.2(b), 5.11, 6.1, 12.3, 13.1, Article 15 through and including Article 19 and all of the Exhibits attached hereto, including, without limitation, Exhibit M attached hereto, which is applicable during the Interim Term.

2.4.2    Extension Rights.

(a)      Operator shall have the right to extend the Operating Term of this Agreement for up to two additional terms following the Initial Term (each, an "Extension Term") of five years each, by providing written notice to Owner no more than one year and no less than 180 days prior to the Expiration Date or the expiration of the preceding Extension Term (as the case may be).  If Operator does not provide a notice of extension within such time period, Operator shall have no further right to extend the Operating Term of this Agreement.  Each Extension Term shall commence on the day following the Expiration Date or the expiration of the preceding Extension Term (as the case may be), and shall be on the same terms set forth in this Agreement, except for the number of remaining Extension Terms that may be exercised by Operator.

(b)      Notwithstanding the foregoing, Operator shall not have the right to extend the Operating Term if (i) an Event of Default by Operator exists and is uncured at the time Operator exercises such extension or (ii) the Performance Test has been failed during the last five years of the Initial Term, as to the first Extension Term, or during the first Extension Term, as to the second Extension Term. If the Parties are unable to resolve any dispute as to whether an Operator has the right to extend the Operating Term, the matter shall be submitted to the dispute resolution procedures in accordance with Article 17. If the Parties are unable to resolve the dispute or the Arbitrator has not yet adjudicated the dispute prior to the commencement of the Extension Term in question, Operator shall continue to Operate the Hotel as though the option for such Extension Term were properly exercised. If the Arbitrator determines that Operator improperly exercised the option for such Extension Term, this Agreement shall terminate 30 days after the entry of such decision by the Arbitrator.

## ARTICLE 3

### FEES AND EXPENSES

3.1    Operating Fees.

3.1.1    Payment of Operating Fees.  For the services to be provided by Operator under this Agreement, Owner shall pay to Operator the Operating Fees; provided, however, in no event shall the sum of the Base, Fee, the Incentive Fee and the License Fee exceed the sum of the Base Fee and Incentive Fee payable hereunder (calculated without reference to the payment of any License Fee). The Incentive Fee shall be reconciled monthly. Accordingly, Owner shall pay the Incentive Fee monthly in arrears based on the Incentive Income accrued from the beginning of the applicable Operating Year through the end of the immediately preceding month. All Operating Fees shall be set forth in the Operating Reports required under Section 10.2.

3.1.2    Reconciliation of Operating Fees.  Within 30 days after Owner receives the Certified Financial Statements for any Operating Year, Operator shall cause to be prepared and delivered to Owner a reconciliation statement showing the calculation and payment of the Operating Fees for such Operating Year, and appropriate adjustments shall be made for any overpayment or underpayment of the Operating Fees during such Operating Year. The Party owing money as a result of such adjustment shall pay such amount to the other Party within 30 days after such reconciliation statement has been delivered by Operator to Owner.  The parties acknowledge and agree that the Incentive Fee shall only be paid to the extent Incentive Income from the Operation of the Hotel is sufficient to pay such Incentive Fee after payment of such amounts as are deducted from Gross Operating Profits for purposes of calculating Incentive Income.

3.2    Centralized Services Charges.  Owner shall pay the Centralized Services Charges monthly in arrears for all (a) mandatory Centralized Services for the Hotel for the immediately preceding month, and (b) optional Centralized Services for the immediately preceding month for such period during which Owner elects to participate. Operator shall apply such Centralized Services Charges to the applicable Centralized Services. All Centralized Services Charges shall be set forth in the Operating Reports required under Section 10.2.

3.3    Reimbursable Expenses.  Owner shall reimburse Operator for all Reimbursable Expenses incurred by Operator in accordance with this Agreement, the applicable approved Operating Plan or as otherwise approved in writing by Owner.  In addition, Reimbursable Expenses shall be set forth in the Operating Reports required under Section 10.2.

3.4     Interest.  If any fee or other amount due by Owner to Operator or its Affiliates or designees under this Agreement is not paid within 30 days after such payment is due, Owner shall pay, in addition to the amount due, interest equal to the lesser of (a) the daily equivalent of 12% of such overdue amount per year or (b) the highest rate then permitted by Applicable Law, for each day the amount is past due, which shall be compounded monthly, if permitted by Applicable Law; provided, that no interest shall be payable on amounts owed by Owner to Operator which Operator is authorized to pay itself pursuant to the terms of this Agreement (provided, that the Operating Account has sufficient funds to satisfy such amounts).

3.5     Payment of Fees and Expenses.

3.5.1     Due Dates.  The Operating Fees and Centralized Services Charges shall be due upon delivery to Owner of the Operating Reports required under Section 10.2.  The Reimbursable Expenses and all other amounts payable by Owner under this Agreement shall be due, at Operator's option and subject to notification in writing by Operator to Owner of such option, upon delivery to Owner of the Operating Reports required under Section 10.2, or 10 days after notice to Owner.

3.5.2     No Offset.  All payments by Owner under this Agreement and all related agreements between the Parties or their respective Affiliates shall be made pursuant to independent covenants, and Owner shall not set off any claim for damages or money due from Operator or any of its Affiliates to Owner.

3.5.3     Place and Means of Payment.  All fees and other amounts due to Operator or its Affiliates under this Agreement shall be paid to Operator in U.S. Dollars, in immediately available funds, at the location(s) specified by Operator to Owner in writing from time to time.  Operator may pay such fees and other amounts owed to Operator or its Affiliates directly from the Operating Account, and if sufficient funds are not then available in the Operating Account, Operator shall have the right to pay such amounts from the Reserve Fund, in which case Owner shall replenish the Reserve Fund in the amount of such withdrawal by Operator within 30 days of notice to Owner.  In addition, Operator may require that any such payments be effected through electronic debit/credit transfer of funds programs specified by Operator from time to time, and Owner agrees to execute such reasonable documents (including independent transfer authorizations), pay such reasonable fees and costs and do such things as Operator deems necessary to effect such transfers of funds.

3.6     Application of Payments.  All payments by Owner, or Operator on behalf of Owner, pursuant to this Agreement and all related agreements shall be applied as designated by Operator.

3.7     Taxes.

3.7.1     Taxes on Operator's Fees.  Owner shall pay to Operator or, at Owner's option, directly to the relevant Governmental Authority (provided Owner simultaneously therewith delivers evidence of such payment to Operator) an amount equal to any sales, use, gross receipts, value added, foreign exchange, excise or similar tax assessed against Operator by any Governmental Authority, which are calculated on continuing payments required to be paid by Owner under this Agreement, other than income, profits or franchise taxes assessed against Operator.  To the extent any such taxes are actually paid, Operator shall reasonably cooperate with Owner in completing and submitting all applications in connection with Owner's recovery thereof.

3.7.2     Withholding Taxes.  In addition, all amounts payable to Operator shall be paid by Owner without deduction for any withholding, value added or other taxes, duties or other deductions (the "Withholding Taxes"), and all payments to Operator shall be increased to the extent necessary to provide

Operator with the same net amount it would have received if no Withholding Taxes had been applicable to such payments; provided, however, in no event shall Owner be required to increase payments to Operator on account of income tax withholdings. Owner nevertheless shall (a) remit to the applicable Governmental Authority, on a timely basis, all Withholding Taxes applicable to any payments to Operator, (b) provide to Operator an official receipt issued by such Governmental Authority for payment of such Withholding Taxes within 30 days of such payment and (c) set forth in a remittance report to be submitted to Operator within 15 days of each such payment, the amount of such Withholding Taxes and the payments to Operator related to the Withholding Taxes. Owner shall be responsible for the determination of the correct amount of Withholding Taxes payable in accordance with the tax laws and tax treaties for the jurisdiction in which the Hotel is located, and Owner shall indemnify and hold harmless Operator and its Affiliates, and their respective shareholders, trustees, beneficiaries, directors, officers, employees and agents from and against all claims and liabilities for unpaid or underpaid Withholding Taxes, including any claims and liabilities for the payment of interest, surcharges, penalties, damages and expenses of any kind, which may be imposed, levied or assessed by the applicable Governmental Authority.

        3.7.3    Foreign Tax Credit. If Operator uses a foreign tax credit to reduce its U.S. federal income tax liability based on the grossing up of the payments described this Section 3.7.2, Operator shall refund to Owner an amount representing the amount of foreign tax credit actually received. The payment of any such refund due in any year will be made by Operator within a reasonable time after filing its federal income tax returns for the year in which the foreign tax credit is used and received by Operator. The Parties shall make adjustments to any refunded amount as necessary for changes in the use of Operator's foreign tax credit, including in the event of a federal income tax audit or amendment of its U.S. federal income tax filings.

    3.8    Currency Conversion. Unless expressly stated to the contrary, all amounts referenced in this Agreement (whether using the $ symbol or otherwise) shall refer to U.S. Dollars, except if an amount referenced in this Agreement is expressly denoted in terms of the applicable local currency. All amounts payable to Operator under this Agreement shall be payable in U.S. Dollars or other currency designated by Operator from time to time, and calculated and converted (to the extent necessary) using the exchange rate as reported by the Wall Street Journal or such other financial institution as the Parties may agree in writing, as follows:

        (a)    When calculating the Operating Fees, Centralized Services Charges or any other amounts due to Operator under this Agreement (other than amounts covered in Sections 3.8.2 and 3.8.3), such amounts shall, to the extent necessary, be converted using the exchange rate in effect on the date such payment is due, or if payments are invoiced, the date of Operator's invoice, which shall be sent in accordance with its normal business practices.

        (b)    When calculating the amounts due to Operator under this Agreement in respect of Reimbursable Expenses incurred in currencies other than U.S. Dollars, such amounts shall be converted using the exchange rate in effect on the date such Reimbursable Expenses were incurred.

        (c)    When calculating overdue payments and related interest payable to Operator under this Agreement, these amounts shall be converted using the exchange rate that will yield the greatest U.S. Dollars in effect either (i) in accordance with the payment dates specified for such amounts in this Agreement or (ii) at the time of payment.

    3.9    Restrictions on Payments in U.S. Dollars. If at any time any legal restrictions are imposed upon the purchase of U.S. Dollars, or the transfer of U.S. Dollars from the jurisdiction in which the Hotel is located or in which Owner may be domiciled, or the transfer or credit of U.S. Dollars by

Owner to Operator, Owner shall notify Operator immediately, in which case Operator shall have the right (but not the obligation) to direct Owner to make payment to Operator in such other currency and in such other country or jurisdiction as permitted under Applicable Laws, as Operator may select. If Operator directs Owner to make payments in another currency, then any payments shall be calculated and converted (to the extent necessary) according to the exchange rate as reported by an authorized foreign exchange bank designated by Operator on the applicable date provided in Section 3.8. The acceptance by Operator of payment in a currency other than U.S. Dollars shall not release Owner from its obligations to make future payments in U.S. Dollars to the extent permitted by Applicable Law. Notwithstanding the foregoing, Owner shall use all available means to obtain any consents or authorizations necessary to effect payment in U.S. Dollars, and if within 30 days Owner is unable to obtain consent or authorization of a method and manner of payment reasonably acceptable to Operator, then Operator shall have the right to terminate this Agreement immediately, by providing written notice to Owner, with no liability to Owner whatsoever as a result of such termination.

## ARTICLE 4

## CENTRALIZED SERVICES

4.1    **Centralized Services.**  Owner acknowledges that (a) certain centralized services are provided or made available to the Operated Brand Hotels (the "Centralized Services"), and (b) the Centralized Services are an essential element in maintaining conformity in the operation of the Operated Brand Hotels. Any Centralized Services to be provided under this Agreement may be provided by Operator, Starwood or an Affiliate of either of them (the "Starwood Centralized Services"), or by a third party designated by Operator, Starwood or an Affiliate of either of them (the "Third-Party Centralized Services").

4.1.1    Mandatory Centralized Services.  Owner acknowledges and agrees that (a) the Hotel shall participate in all mandatory Centralized Services, and (b) Owner shall pay all Centralized Services Charges for, and comply with all terms and requirements of, such mandatory Centralized Services. Exhibit D sets forth all Starwood Centralized Services that are mandatory for all or substantially all of the Operated Brand Hotels, as well as the Centralized Services Charges for such Starwood Centralized Services, in each case as of the Effective Date and subject to change from time to time in accordance with Section 4.1.4.

4.1.2    Optional Centralized Services.  Owner shall have the right, but not the obligation, to participate in any Centralized Service that Operator, in its discretion, may make available from time to time to the Operated Brand Hotels as an optional Centralized Service. If Owner elects to participate in any optional Centralized Service, Owner shall provide notice to Operator, in which case Operator shall make such optional Centralized Service available to Owner upon Owner's purchase and installation of any required equipment and Technology Systems and training of Hotel Personnel and completion of all other requirements for participation, and Owner shall pay all Centralized Services Charges for, and comply with all terms of, such optional Centralized Services. If Owner elects to terminate the Hotel's participation in any optional Centralized Service, Owner shall provide at least 90 days notice to Operator prior to such termination.

4.1.3    Centralized Services Charges.

(a)    The amounts charged to the Hotel for the Centralized Services (the "Centralized Services Charges") shall be determined on the same basis as such amounts are determined for substantially all of the other Operated Brand Hotels which are participating in such Centralized Services, and may include amounts reasonably calculated to cover the overhead and other costs incurred

by Operator, Starwood or their Affiliates (as applicable) in providing (or arranging for the provision of) such Centralized Services, including: (i) compensation and employee benefits of Corporate Personnel directly involved in providing the Centralized Services, (ii) recovery of development costs and promotion costs for such Centralized Services, (iii) costs of equipment employed in providing the Centralized Services and (iv) costs of operating, maintaining and upgrading the Centralized Services. In addition, Owner shall pay all costs for the installation and maintenance of any equipment and Technology Systems at the Hotel used in connection with the Centralized Services. Operator, its Affiliates and any third-party providing any Centralized Services shall have the right to increase or decrease any or all of the Centralized Services Charges from time to time, upon 60 days notice to Owner; provided, that any such changes in the Centralized Services Charges are applied to substantially all of the Operated Brand Hotels.

(b)    Operator represents and warrants to Owner that (i) the Centralized Services Charges for the mandatory Starwood Centralized Services do not include a profit component (i.e., a mark-up in addition to the cost items described in Section 4.1.3(a)), and (ii) the intent of Operator's policy regarding allocation of its overhead costs is to allocate such costs to mandatory Starwood Centralized Services in a manner that allows Operator to recover its costs for developing and providing such mandatory Starwood Centralized Services. Owner acknowledges that from time to time there might be a current surplus or current deficit of funds for any one or more Centralized Services, and that any retention of funds for use at a later date (including interest earned thereon) shall not constitute a profit. Notwithstanding the foregoing, Owner acknowledges that the Centralized Services Charges for Third-Party Centralized Services may include a profit component to such third-party, and Operator shall have the right to include a profit component in the Centralized Services Charges for any of the optional Starwood Centralized Services. Further, nothing in this Agreement shall be construed to prevent Operator or its Affiliates from including a profit component in any amount charged for Starwood Centralized Services to any third-party owners of non-Starwood brand properties. If Operator and/or its Affiliates deliver audits of any of the Centralized Services in the ordinary course of business to the Operated Brand Hotels, Operator shall also deliver to Owner copies of such audits.

(c)    Operator shall have the right (but not the obligation) to pay (directly or through an Affiliate) any amounts due to a third-party for any Third-Party Centralized Services provided to the Hotel, in which case, notwithstanding anything to the contrary in this Agreement, such amounts shall be deemed to be Reimbursable Expenses for all purposes under this Agreement.

4.1.4    <u>Modification of Centralized Services</u>. Owner acknowledges that the Centralized Services are an integral part of Operator's Operation of the Operated Brand Hotels, and Operator needs the flexibility to modify the Centralized Services to respond to market trends, customer demands, economic conditions, technological advances and other factors affecting the Operation of Operated Brand Hotels, as they may change from time to time. Accordingly, Owner agrees that Operator shall have the right to (a) modify the structure, scope, delivery, fees, costs and terms of any Centralized Services, (b) add a new, or discontinue an existing, Centralized Service or (c) make a mandatory Centralized Service optional, or make an optional Centralized Service mandatory, as Operator deems advisable from time to time, each such change to be implemented upon no less than 60 days notice to Owner, provided that any such changes in the Centralized Services are similarly applied to substantially all of the Operated Brand Hotels. Operator shall throughout the Operating Term: (x) maintain a marketing and sales program which promotes the brand identity of Operator and its Affiliates, advertises to Operator's and its Affiliates' markets and secures bookings for hotels and resorts, including the Hotel, operated under the Brand; (y) coordinate the Hotel's individual marketing program with the program maintained in accordance with (x) and, as appropriate, include the Hotel in the brand identity and international advertising programs conducted as part of the Centralized Marketing Program; and (z) shall secure bookings for the Hotel through Operator's sales and reservations offices and other distribution and sales

systems and shall encourage the use of the Hotel by tourists, special groups, travel congresses, travel agencies, airlines and other recognized sources of hotel business.

## ARTICLE 5

## OPERATION OF THE HOTEL

5.1     Operating Plan.

5.1.1     Proposed Operating Plan.  On or before 60 days prior to the anticipated Opening Date, Operator shall prepare and deliver to Owner a proposed budget for the first Operating Year (which may be included in the Pre-Opening Budget), which shall include projections of Gross Operating Revenue and Operating Expenses for such period.  On or before November 1 of each Operating Year thereafter, Operator shall prepare and deliver to Owner, for its review and approval, a proposed Operating Plan for the next Operating Year, prepared in accordance with Operator's standard planning and budgeting requirements, which shall include monthly and annualized projections of the following items:

(a)     estimated results of operations (including estimated Gross Operating Revenue, Operating Expenses and Gross Operating Profit), together with the following supporting data: (i) estimates of total labor costs, including both fixed and variable labor, (ii) estimates of the average daily rate and occupancy and (iii) estimates of Operating Fees, Centralized Services Charges, Reimbursable Expenses and other amounts payable by Owner to Operator and its Affiliates under this Agreement;

(b)     a description of proposed Routine Capital Improvements, Building Capital Improvements and ROI Capital Improvements to be made during such Operating Year and itemized estimated capital expenditures related thereto, including capitalized lease expenses and a contingency line item, as set forth in Section 5.1.2 (the "Capital Budget");

(c)     a statement of cash flow, including a schedule of any anticipated requirements for funding by Owner;

(d)     a marketing plan for the activities to be undertaken by Operator pursuant to Article 9, which plan shall include a description of the Hotel's target markets, the Hotel's relative position in those markets, the proposed room rate structures for each market segment, the current and future sales plan for the Hotel, the advertising and public relations plan for the Hotel, and the proposed staffing for the sales and marketing activities of the Hotel

(e)     proposed room rates and food and beverage rates;

(f)     a summary of credit policies;

(g)     a summary of employment and hiring plans and a compensation plan for Hotel Personnel; and

(h)     a description of the current status of pending material suits, actions, proceedings or formal inquiries or investigations concerning the Hotel.

5.1.2     Approval of Operating Plan.  Owner shall have the right to review and approve or disapprove the proposed Operating Plan and, in furtherance thereof, shall provide Operator with any objections to such proposed Operating Plan in writing, in reasonable detail, within 30 days after receipt of the proposed Operating Plan from Operator.  Owner shall be deemed to have approved that portion of any

proposed Operating Plan to which Owner has not objected in writing within such time period. If Owner objects to any portion of the proposed Operating Plan in accordance with this Section 5.1.2, the Parties shall meet within 14 days after Operator's receipt of Owner's objections and discuss such objections with Owner, and then Operator shall submit written revisions to the proposed Operating Plan after such discussion. The Parties shall use good faith efforts to reach an agreement on the Operating Plan prior to January 1 of the applicable Operating Year. The proposed Operating Plan, as modified to reflect the revisions either agreed to by the Parties or determined by resolution pursuant to Section 5.1.3, shall become the Operating Plan for the next Operating Year. Owner shall act reasonably and exercise prudent business judgment in approving of, or objecting to, all or any portion of the Operating Plan. In furtherance of the foregoing, Owner shall not have the right to object to the following in any proposed Operating Plan: (a) any expenditures required to be made under the express terms of this Agreement, including Operating Fees, Centralized Services Charges, Hotel Personnel Costs and other Reimbursable Expenses; (b) any expenditures relating to or associated with standards, policies or programs which are requirements for the Brand (including mandatory Centralized Services) and charged to substantially all Operated Brand Hotels; (c) any expenditures reasonably necessary to prevent an imminent threat to life, health or safety of persons or damage to the Hotel or other property; (d) compensation levels for all Hotel Personnel (including employee and fringe benefits for Hotel Personnel administered on a corporation, regional or Brand basis); (e) any employee and fringe benefits for Hotel Personnel administered on a corporate, regional or Brand level; or (f) the contingency line item in the Capital Budget up to $100,000 (but Owner may object to any excess over such amount).

     5.1.3   <u>Resolution of Disputes for Operating Plan</u>. If the Parties, despite their good faith efforts, are unable to reach final agreement on the Operating Plan for an Operating Year by January 1 of such Operating Year, those portions of such Operating Plan which are not in dispute shall become effective on January 1 of such Operating Year and the matter(s) in dispute may be submitted by either Party for resolution in accordance with Article 17 of this Agreement. Pending the resolution of such dispute, the prior year's Operating Plan shall govern the items in dispute, except that the budgeted expenses provided for such item(s) in the prior year's Operating Plan (or, if earlier, the last Operating Plan in which the budgeted expenses for such disputed item(s) were approved) shall be increased by the percentage increase in the Index from January 1 of the prior Operating Year (or, if applicable, each additional Operating Year between the prior Operating Year and the Operating Year in which there became effective the last Operating Plan in which the budgeted expenses for such disputed item(s) were approved). Upon the resolution of any such dispute (whether by agreement of the Parties or through the procedures described in Article 17), such resolution shall control as to such item(s).

     5.1.4   <u>Operation in Accordance with Operating Plan</u>. Operator shall use commercially reasonable efforts to operate the Hotel in accordance with the Operating Plan for the applicable Operating Year. Nevertheless, the Parties acknowledge that preparation of the Operating Plans is inherently inexact and that Operator may vary from any Operating Plan to the extent Operator reasonably determines that such variance is required for compliance with the Operating Standards; provided, that (a) Operator shall not incur costs or expenses or make expenditures that would cause the (i) expenditures for any line item (as shown on the summary page of the applicable Operating Plan) to exceed the budgeted amount of such line item (as shown on such summary page of the applicable Operating Plan) by more than 10%, or (ii) total expenditures for the Operation of the Hotel to exceed the aggregate amount of expenditures provided in the Operating Plan by more than 5%, in each case without Owner's prior approval, and (b) Operator shall not exceed the Capital Budget for any Building Capital Improvements or ROI Capital Improvements by any amount without Owner's prior approval. Any approval required from Owner under this Section 5.1.4 shall not be unreasonably withheld, and shall be deemed given if not denied with 10 days after request.

5.1.5    Exceptions to Operating Plan. Notwithstanding the foregoing in Section 5.1.4, Owner acknowledges and agrees as follows:

(a)    The amount of certain expenses provided for in the Operating Plan for any Operating Year will vary based on the occupancy and use of the Hotel and, accordingly, to the extent that occupancy and use of the Hotel for any Operating Year exceeds the occupancy and use projected in the Operating Plan for such Operating Year, such Operating Plan shall be deemed to include corresponding increases in such variable expenses.

(b)    The amount of certain expenses provided for in the Operating Plan for any Operating Year are not within the ability of Operator to control, including real estate and personal property taxes, utilities, insurance premiums, license and permit fees and certain charges provided for in contracts and leases entered into pursuant to this Agreement ("Uncontrollable Expenses"), and accordingly, Operator shall have the right to pay all such Uncontrollable Expenses without reference to the amounts provided for with respect thereto in the Operating Plan for such Operating Year. Notwithstanding the foregoing, however, but subject to Section 2.1.3(i), Operator hereby covenants and agrees to use commercially reasonable efforts throughout the Operating Term to control, whenever reasonably possible, at Owner's expense, the Uncontrollable Expenses related to the Hotel and the Operation thereof (including, by way of example, contesting, when reasonably appropriate, the amount and/or imposition of Taxes).

(c)    If any expenditures are required on an emergency basis to avoid potential injury to persons or damage to the Hotel or other property, Operator shall have the right to make such expenditures, whether or not provided for, or within the amounts provided for, in the Operating Plan for the Operating Year in question, as may reasonably be required to avoid or mitigate such injury or damage, and such expenditures shall be treated as Operating Expenses or Capital Expenditures, as otherwise determined in accordance with this Agreement; provided, however, that Operator initially shall make such expenditures out of the Reserve Fund, in which case Operator shall notify Owner as promptly as reasonably possible of the making of any such withdrawal from the Reserve Fund, and Owner shall replenish the Reserve Fund in the amount of such withdrawal within 30 days after such notice from Operator to Owner. In connection with any emergency expenditure which was not specifically contemplated in the Operating Plan, Operator shall to the extent reasonably practicable (i) use commercially reasonable efforts to notify Owner prior to the time that the expenditures in question are made and shall in any event notify Owner as soon as reasonably possible after such expenditures are made and (ii) cooperate with Owner to develop a strategy for responding to the emergency in a reasonable and prudent, but cost-efficient manner (i.e., in a manner which will minimize to the extent reasonably possible the expenses to Owner in responding to the subject emergency).

(d)    If any expenditures are required to comply with, or cure or prevent any violation of, any Applicable Law (subject to Owner's right to direct Operator to contest such non-compliance with, or violation of, any Applicable Law pursuant to Section 2.1.3(i)), Operator shall have the right to make such expenditures, whether or not provided for or within the amounts provided for in the Operating Plan for the Operating Year in question, as may be necessary to comply with, or cure or prevent the violation of, such Applicable Law, and such expenditures shall be treated as Operating Expenses or Capital Expenditures, as otherwise determined in accordance with this Agreement; provided, however, that Operator may initially make such expenditure out of the Reserve Fund, in which case Operator shall notify Owner as promptly as reasonably possible of the making of any such withdrawal from the Reserve Fund, and Owner shall replenish the Reserve Fund in the amount of such withdrawal within 30 days after such notice from Operator to Owner.