5.1.6    Modification to Operating Plan. Operator shall have the right from time to time during each Operating Year to propose modifications to the portion of the Operating Plan then in effect for the remainder of such Operating Year based on actual operations during the elapsed portion of the applicable Operating Year and Operator's judgment as to what will transpire during the remainder of such Operating Year. Any such modifications shall be subject to Owner's approval pursuant to this Section 5.1, and any dispute relating to a proposed modification of an Operating Plan may be submitted by either Party for resolution in accordance with Article 17.

5.2    **Maintenance and Repair; Capital Improvements.**

5.2.1    Required Maintenance and Repair and Capital Improvements. Operator, at Owner's expense, shall perform or cause to be performed all ordinary maintenance and repair and all such Routine Capital Improvements and Building Capital Improvements (a) as Operator deems reasonably necessary or advisable to (i) keep the Hotel in good working order and condition in accordance with the Capital Budget and, subject to the terms and conditions of this Agreement, in compliance with the Operating Standards or (ii) comply with, and cure or prevent the violation of, any Applicable Laws or to respond to any emergency to avoid personal injury to Persons or damage to the Hotel or other property and (b) as otherwise contemplated by the applicable Operating Plan or approved in advance in writing by Owner.

5.2.2    Discretionary Capital Improvements. Operator, at Owner's expense, shall cause to be performed all ROI Capital Improvements as provided in the applicable Operating Plan or proposed by Operator and approved by Owner, unless (a) Owner notifies Operator that Owner will perform or supervise such work, or (b) Operator notifies Owner that Operator will not perform or supervise such work, and in either such case Owner shall perform or supervise such work and ensure that the performance of such work is undertaken in a manner reasonably calculated to avoid or minimize interference with the Operation of the Hotel or inconvenience to Hotel guests. Except as provided in the applicable Operating Plan or proposed by Operator and approved by Owner (which approval may be granted or withheld in Owner's sole and absolute discretion), Owner shall not make any ROI Capital Improvements, without the prior written consent of Operator, in its reasonable discretion, in each instance. In addition, if Owner or any of its Affiliates owns or leases any land adjacent to the Premises or as part of a master development that includes the Premises, Owner shall not perform any construction on such land, without the prior approval of Operator, in its sole discretion, in each instance. For the avoidance of doubt, any ROI Capital Improvements, Routine Capital Improvements or Building Capital Improvements other than those referenced in Section 5.2.1 shall be subject to Owner's prior written approval (which may be granted or withheld in Owner's sole and absolute discretion).

5.2.3    Reserve Fund Contributions. To facilitate the funding of Routine Capital Improvements, Operator shall set aside on a monthly basis an amount equal to the Reserve Fund Contribution by transferring funds from the Operating Account to the Reserve Fund. All interest earned in the Reserve Fund shall be added to the Reserve Fund, but shall not be credited against amounts required to be deposited in the Reserve Fund. At the end of each Operating Year, all amounts not expended from the Reserve Fund shall be carried forward to the next Operating Year, but shall not be credited against the amount of the Reserve Fund Contribution for any subsequent Operating Year. Owner acknowledges that setting aside the required amount of funds in the Reserve Fund does not guaranty that the Reserve Fund will supply sufficient funds to meet Owner's obligations under this Agreement, and that Owner shall remain responsible for providing any additional funds required to perform its obligations under this Section 5.2. Any funds remaining in the Reserve Fund at the expiration or earlier termination of this Agreement shall be disbursed to Owner.

5.2.4   Use of Reserve Fund. Except as otherwise expressly set forth in this Agreement, the Reserve Fund shall be used solely for the purpose of funding Routine Capital Improvements included in the Operating Plan, or otherwise proposed by Operator and approved by Owner, provided that Operator also may expend up to the amount of the contingency line item in the Capital Budget from the Reserve Fund during each Operating Year to pay any Routine Capital Improvements that Operator may reasonably determine to be necessary for items not included in the Operating Plan. Operator shall attempt to notify Owner prior to the time that expenditures are made from the Reserve Fund that were not specifically included in the Operating Plan, and in any event shall notify Owner promptly after such expenditures are made. Operator shall use reasonable efforts to schedule Routine Capital Improvements so as to endeavor, to the greatest extent possible, not to cause Owner to fund such Routine Capital Improvements in excess of amounts contributed to the Reserve Fund.

5.2.5   Remediation of Design or Construction Defect. If the design or construction of the Hotel is defective, and the defective condition (a) creates a reasonable likelihood of injury to persons or damage to the Hotel or other property or (b) results in non-compliance with any Operating Standards or Applicable Law, then Owner shall cause to be performed all work necessary to remedy such design or construction defect in the Hotel as expeditiously as possible; provided, however, Owner shall maintain the right to challenge in good faith the existence of any alleged defective condition and/or materiality of such alleged defect, each solely as it may relate to (a) above, and, until such challenge is settled, Owner shall have no obligation to remedy any such alleged defect under (a) above. Owner acknowledges that such work shall be performed at Owner's expense, that Owner may not use funds in the Operating Account or the Reserve Fund in remedying such defects, and that any amounts expended by Owner in effecting the remedy of such defect shall not be deducted in determining Gross Operating Revenue or Gross Operating Profit.

5.2.6   Material Changes. Any alteration improvement, replacement, renewal and/or addition to the Hotel or on or about the Premises, which is capitalized under GAAP and involves a material change in the primary use of, or a material physical expansion, alteration or improvement of the Hotel and/or the Premises, shall require the prior written approval of Operator.

5.2.7   Limitations on Changes to Design Guide or Operating Standards. Without the consent of Owner, no changes, amendments or other modifications to the Design Guide or Operating Standards shall apply to the Hotel which, after completion of the Post-Flagging PIP, would require Owner to (i) alter the structural elements of the Hotel, except for the repair or replacement thereof when any such elements become unserviceable, inoperable or beyond acceptable wear and tear and reaches the end of its useful life or (ii) replace any FF&E which at the time of purchase had a cost of greater than $1,000, until the item becomes unserviceable, inoperable or beyond acceptable wear and tear and reaches the end of its useful life.

5.3   Personnel. During the Interim Term and the Operating Term, Operator shall manage all aspects of the Hotel's human resources functions, for and on behalf of Owner, as set forth in this Section 5.3.

5.3.1   Employment of Hotel Personnel. All Hotel Personnel shall be employees of Owner or an Affiliate of Owner, except, at Operator's election, for the Senior Executive Personnel at the Hotel as determined by Operator, who shall be employees of Operator or an Affiliate of Operator. Operator shall, and shall be deemed, at all times to be acting in the name, on behalf of and for the benefit and account of Owner in all Hotel Personnel matters. Operator shall comply with local Applicable Law and shall reasonably consider Owner's concerns and suggestions with respect to the termination of Hotel Personnel, including without limitation, obtaining court approval where appropriate.

5.3.2    Senior Executive Personnel. Operator shall recruit, screen, appoint, hire, pay, train, supervise, instruct and direct the Hotel's Senior Executive Personnel, and they, or other Hotel Personnel to whom they may delegate such authority, shall recruit, screen, appoint, hire, pay, train, supervise, instruct and direct all other Hotel Personnel necessary or advisable for the Operation of the Hotel, and discipline, transfer, relocate, replace, terminate and dismiss any Hotel Personnel. Notwithstanding the foregoing, Owner shall have the right to interview and approve each candidate selected by Operator as Senior Executive Personnel. Accordingly, prior to appointing any Senior Executive Personnel, Operator shall provide Owner with a written summary of such candidate's professional experience and qualifications, and offer Owner the opportunity to interview the candidate at the Hotel or another mutually acceptable location. Owner will forego its right to interview any such candidate if Owner or its authorized representative is unwilling or unable to participate in the interview within five days after Operator's offer. Owner shall not unreasonably withhold or delay its approval of any such candidate, and Owner shall be deemed to have approved the candidate, unless Owner delivers notice of its disapproval of such appointment within 10 days after Operator's offer to Owner to interview any such candidate. Owner acknowledges that it may not reject more than three candidates proposed by Operator for any of such positions. Operator agrees to consider in good faith Rob Smith, current General Manager at the Hotel, for the position of General Manager.

5.3.3    Terms of Employment. All terms of employment, personnel policies and practices relating to the Hotel Personnel shall be established by Operator for and on behalf of Owner, subject to Operator's good faith consideration of Owner's input, including (a) subject to the remaining terms of this Section 5.3, giving due consideration to the hiring of qualified Arubans and, with regard to the hiring of any non-Arubans, considering Owner's concerns and suggestions, (b) terms of employment, including recruiting, screening, appointment, hiring, compensation, bonuses, severance, pension plans and other employee benefits, training, supervision, instruction, direction, discipline, transfer, relocation, replacement, termination and dismissal of Hotel Personnel and (c) subject to Section 2.2(k) above, the exercise of any rights or remedies under any Applicable Laws relating to labor matters in relation to the Hotel and the Hotel Personnel, including union organization, recognition and withdrawal of recognition, union elections, contract negotiation on a single-employer or multi-employer basis, grievances, unfair labor practice charges, strikes and lockouts. Operator, on behalf of Owner, shall process the payroll and benefits for Hotel Personnel. Notwithstanding the foregoing, Operator recognizes the importance of maintaining the stability among the Senior Executive Personnel at the Hotel and shall use commercially reasonable efforts to minimize turnover among such Senior Executive Personnel. Accordingly, if (i) Operator initiates the transfer of any member of the Senior Executive Personnel (as opposed to any bona fide, independent and unsolicited transfer which is initiated or requested by Owner or such member of the Senior Executive Personnel) to another hotel owner or operated by Operator or its Affiliates within one year following the hiring of such person or (ii) Operator initiates the termination of any member of the Senior Executive Personnel (as opposed to a termination requested by Owner) within one year following the hiring of such person, with the intention at the time of circumventing subsection (i) above, and Operator or its Affiliates rehires such member of the Senior Executive Personnel within six months following the termination at another hotel owned or operated by Operator or its Affiliates, Owner shall not be responsible for the costs associated with the relocation of such person to such other hotel, or the costs of relocating the replacement of such person. In addition, Operator shall in good faith consider any reasonable requests by Owner to replace Senior Executive Personnel that Owner believes are not properly fulfilling the applicable job requirements; provided, that the ultimate decision whether or not to replace any such Senior Executive Personnel shall be within Operator's decision.

5.3.4    Non-Solicitation. Owner hereby agrees, on behalf of itself and its Affiliates, and their respective successors and assigns, and any Person acting for or on behalf of any of them, not to solicit the employment of any of the Senior Executive Personnel, without Operator's prior written

consent, at any time during the Interim Term or the Operating Term or within 12 months after the expiration or termination of this Agreement.

       5.3.5    <u>Corporate Personnel</u>. All Corporate Personnel who travel to the Hotel to perform technical assistance or other services shall be permitted to stay at the Hotel and use its facilities (including food and beverage consumption), without charge to Operator or such Corporate Personnel. All Corporate Personnel and other personnel of Starwood or any of its Affiliates shall be permitted to stay at the Hotel for business or non-business purposes at reduced rates in accordance with policies with respect to such stays in effect from time to time which are applicable to the Operated Brand Hotels.

       5.3.6    <u>House Union</u>. Owner represents that nearly all employees at the Hotel are currently affiliated with the Vereniging Team Workers Union. Operator agrees to (i) recognize the Vereniging Team Workers Union (as such exists in accordance with the Articles of Foundation of the Vereniging Team Workers Union dated March 10, 2004) and (ii) subject to Applicable Law, refrain from negotiating with, approaching or entering into any agreement with any other union or labor organization without Owner's prior approval, which approval may be withheld in Owner's sole and absolute discretion (unless required by Applicable Law). In addition, Owner shall promptly inform Operator of all discussions it may have with the Vereniging Team Workers Union, or any other union or labor organization, and include Operator in all such discussions; provided that the ultimate decision whether or not to hold any such discussions or the consequences thereof shall ultimately be within Owner's ultimate decision.

    5.4    <u>Bank Accounts</u>.

       5.4.1    <u>Administration of Bank Accounts</u>. During the Interim Term and the Operating Term, Operator shall establish and administer the bank accounts listed in this Section 5.4 (the "Bank Accounts") on Owner's behalf at a bank or banks selected by Operator and approved by Owner. All Bank Accounts shall, to the extent reasonably practicable, be with banks on the Island of Aruba, be established in the name of Owner, doing business as Westin Aruba Resort and use the taxpayer identification number of Owner. Operator shall, to the extent reasonably practicable, attempt to limit the need of multiple transfers of cash to and from the Island of Aruba. The Bank Accounts may include:

       (a)    one or more accounts for the purposes of depositing all funds received in the Operation of the Hotel and paying all Operating Expenses and all fees and other amounts due to Operator under this Agreement (collectively, the "Operating Account");

       (b)    one or more accounts into which amounts sufficient to cover all Hotel Personnel Costs shall be deposited from time to time by Operator (by transfer of funds from the Operating Account) or Owner (if sufficient funds are not then available in the Operating Account) (collectively, the "Payroll Account");

       (c)    a separate interest-bearing account into which the Reserve Fund Contributions shall be deposited from time to time by Operator (by transfer of funds from the Operating Account) or Owner (if sufficient funds are not then available in the Operating Account) in accordance with Section 5.2.3 (the "Reserve Fund"); and

       (d)    such other accounts as Operator deems reasonably necessary.

       5.4.2    <u>Authorized Signatories</u>. Operator's designees shall be the only Persons authorized to draw funds from the Bank Accounts, and Operator shall be entitled to make deposits in all of the Bank Accounts in accordance with this Agreement and Operator's standard accounting policies and

practices. Operator shall establish reasonable controls to ensure accurate reporting of all transactions involving the Bank Accounts and, if Operator deems necessary or advisable, the Bank Accounts shall require positive pay and electronic reconciliation features to reduce possibilities of fraud.

        5.4.3    <u>Liability for Loss in Bank Accounts</u>. Owner shall bear all losses suffered in any of the Bank Accounts, or in any investment of funds into any such Bank Account, and Operator shall have no liability or responsibility for such losses, except to the extent due to Operator's Gross Negligence or Willful Misconduct.

        5.4.4    <u>Disbursement of Funds to Owner</u>. Subject to the CMA, or unless the Parties agree otherwise, on or about the 25th day of each calendar month, Operator shall disburse to Owner, as directed by Owner, any funds remaining in the Operating Account at the end of the immediately preceding month after (a) payment of all Operating Expenses, (b) payment of all other amounts payable from the Operating Account in accordance with the Agreement, (c) deposit of the Reserve Fund Contribution due for such month in the Reserve Fund, and any deficiencies in the Reserve Fund and (d) retention by Operator of an amount sufficient to cover (i) all accrued but unpaid Operating Fees, Centralized Services Charges and Reimbursable Expenses, (ii) all known and reasonably foreseeable Operating Expenses payable under this Agreement for the ensuing month, (iii) any other amounts necessary to maintain the Operating Standards and comply with, and cure or prevent any violation of, any Applicable Law, (iv) an amount of working capital as reasonably determined to be prudent by Operator (and in any event not less than the amount of the Initial Working Capital) to provide reserves for emergency expenditures or Operating Expenses payable less frequently than monthly or to cover anticipated operating shortfalls and (v) such other amounts as may be agreed to by the Parties from time to time. Any amounts remaining in the Operating Account on the expiration or termination of this Agreement shall be disbursed to Owner; provided, however, that Operator may deduct and retain prior to such disbursement all amounts owed by Owner to Operator and its Affiliates under this Agreement.

    5.5    **Funds for Operation of the Hotel**. Without limiting in any way Owner's covenants, duties and obligations in any other provision in this Agreement, Owner shall provide the financial and other resources, and otherwise take such actions as necessary to permit the Hotel to be operated in accordance with the Operating Standards.

        5.5.1    <u>Initial Working Capital</u>. In furtherance of Owner's obligations under this Section 5.5, Operator shall provide to Owner approximately 60 days prior to the anticipated Opening Date (and updated as necessary thereafter) an estimate of (a) the amount of initial working capital required for the commencement of Operations at the Hotel, including the working capital required to fund initial food and beverage inventories, initial minibar inventories, initial retail inventories and initial house bank balances, and (b) the Hotel's working capital requirements for at least the first month of Operation, and for such longer period as Operator may reasonably determine based on the Operator's estimate of the Hotel's cash flow and the time of year in which the Opening Date occurs (the amounts described in clauses (a) and (b) above being referred to collectively as the "Initial Working Capital"), and Owner shall deposit or cause to be deposited by Owner's Lender the Initial Working Capital into the Operating Account at least 30 days prior to the anticipated Opening Date. The Initial Working Capital is separate from, and in addition to, any funds that Owner may be required to fund for Pre-Opening Services, including purchasing initial inventories of FF&E and Supplies. The Parties currently anticipate that the amount of the Initial Working Capital will be at least the amount set forth in Exhibit A as the "Anticipated Initial Working Capital."

        5.5.2    <u>Additional Funds</u>. In furtherance of Owner's obligations under this Section 5.5, if Operator determines at any time during the Interim Term or the Operating Term that (a) the available funds in the Operating Account are insufficient to allow for the uninterrupted and efficient Operation of the Hotel in accordance with this Agreement or (b) the available funds in the Reserve Fund are

insufficient to allow for payment of all Routine Capital Improvements, Building Capital Improvements and ROI Capital Improvements then contemplated in the Operating Plan or otherwise approved by Owner or authorized this Agreement, Operator shall notify Owner of the existence and amount of the shortfall (a "Funds Request"), and Owner shall deposit or cause to be deposited by Owner's Lender into the Operating Account or the Reserve Fund, as applicable, the amount requested by Operator in the Funds Request, within 15 days after the delivery of the Funds Request.

        5.5.3    <u>Failure to Provide Funds</u>. If Owner fails to deposit all or any portion of the Initial Working Capital or the amount requested in a Funds Request, Operator shall have the right, but not the obligation, to use or pledge its credit in paying, on Owner's behalf, (a) ordinary and customary Operating Expenses or (b) Routine Capital Improvements, Building Capital Improvements or ROI Capital Improvements then contemplated in the Operating Plan or otherwise approved by Owner or authorized by this Agreement, in which case Owner shall pay for such goods or services when such payment is due. In addition, if Owner fails to pay for such goods or services when such payment is due, then Operator shall have the right, but not the obligation, to pay for such goods or services, in which case Owner shall reimburse Operator immediately upon demand by Operator (and Operator shall be entitled to reimburse itself from any available funds from the Operation of the Hotel, including the Operating Account and the Reserve Fund) for all amounts advanced by Operator, together with interest thereon in accordance with Section 3.4.

    5.6    **Purchasing**.

        5.6.1    <u>Purchasing Programs</u>. Operator or its Affiliates may, in its discretion, make purchasing programs available to the Brand hotels (whether on an international, regional or other basis) (each, a "Purchasing Program"). Operator may elect, in its discretion, but subject to the terms of this Section 5.6, to purchase any FF&E and Supplies for the Operation of the Hotel from a Purchasing Program maintained by Operator or its Affiliates; provided, that Operator shall use commercially reasonable efforts to cause the prices and terms of the FF&E and Supplies to be purchased under such Purchasing Program to be competitive with the prices and terms of goods and services of equal quality available from other suppliers. In making such determination, the prices and terms for the FF&E and Supplies will be compared to the prices and terms which would be charged by reputable and qualified unrelated third parties on an arm's length basis for similar FF&E and Supplies sold to similar companies in the hospitality industry, and may be grouped in reasonable categories (such as weighted market baskets), rather than being compared item by item. Owner acknowledges and agrees that Operator and its Affiliates shall have the right to (a) modify the fees, costs or terms of any such Purchasing Program, including adding FF&E and Supplies to, and deleting FF&E and Supplies from, such Purchasing Program, (b) terminate all or any portion of any such Purchasing Program, from time to time, upon 60 days notice to Owner, (c) subject to this Section 5.6, receive payments, fees, commissions or reimbursements from suppliers and third parties in respect of such purchases and (d) subject to this Section 5.6, own or have investments in such suppliers. Notwithstanding the foregoing in this Section 5.6.1, but subject to the provisions of Section 5.6.3, Owner shall have the right, by providing notice to Operator in accordance with Section 5.1, to opt out of any Purchasing Program with respect to all purchases or only such items as Owner may designate in such notice, in which case Operator thereafter shall purchase such items outside the Purchasing Program with respect to such items as to which owner has elected to opt out. If Owner shall elect to opt out of any Purchasing Program with respect to all purchases, Owner acknowledges and agrees that Owner shall have no further right(s): (i) with respect to any Technology Systems related to such Purchasing Program, including, without limitation, any right of access or use and/or (ii) to participate in such Purchasing Program or receive any benefit from, or take advantage of, the terms and conditions of any vendor contracts, arrangements or other agreements available to participating hotel owners pursuant to the Purchasing Program. Operator reserves the right to offer FF&E and Supplies for sale to Owners and other Persons, and to designate itself and/or any of its

Affiliates as the sole supplier for any FF&E and Supplies. Operator shall act in a commercially reasonably prudent manner when purchasing items for the Hotel outside of any Purchasing Program.

  5.6.2 <u>Supplier Funds</u>. Subject to the foregoing, as of the Effective Date, Operator maintains the Purchasing Program as an Optional Centralized Service. Under the Purchasing Program in effect as of the Effective Date, Operator may accept funds from any suppliers (the "Supplier Funds"), which Supplier Funds shall be expended as agreed to or as directed by such suppliers. In such case, the Supplier Funds will be used for programs intended to benefit the Brand and/or Other Starwood Brands participating in such Purchasing Program. Upon Owner's request, Operator will provide Owner with an annual accounting of any Supplier Funds. If Operator receives any Supplier Funds which are not allocated to programs intended to benefit the Brand, such Supplier Funds shall be distributed among the hotels participating in such Purchasing Program, as reasonably determined by Operator.

  5.6.3 <u>Placement Program</u>. In furtherance of Operator's Placement Rights, Operator reserves the right to require Owner to purchase certain FF&E and Supplies from a designated vendor or supplier pursuant to a Placement Program, provided that Operator shall use reasonable efforts to cause the prices and terms of the FF&E and Supplies to be purchased under such Placement Program to be comparable to the prices and terms for similarly situated Operated Brand Hotels.

  5.7 <u>Technology Systems</u>. Operator and its Affiliates shall provide Technology Systems in the Operation of the Hotel on the terms set forth in Exhibit E, and Owner shall perform its obligations with respect to such Technology Systems as set forth in Exhibit E. Owner and Operator acknowledge that the Hotel's computers and Technology Systems are not, by definition, FF&E as contemplated in Section 5.2.7 above, and Owner shall be obligated to fund any modifications, upgrades, replacements or introductions of such items which are required for substantially all Operated Brand Hotels.

  5.8 <u>Hotel Parking</u>. Owner shall cause to be available for the Hotel's exclusive use, at no incremental cost to the Hotel, parking sufficient for the Operation of the Hotel, including the parking spaces identified as part of the Hotel in Exhibit A. Operator shall operate, or cause to be operated by a third party, the Hotel's parking facility as a department of the Hotel.

  5.9 <u>Use of Affiliates by Operator</u>. In performing its obligations under this Agreement, Operator from time to time may use the services of one or more of its Affiliates. If an Affiliate of Operator performs services Operator is required to provide under this Agreement, Operator shall be ultimately responsible to Owner for its Affiliate's performance, and Owner shall not pay more for the Affiliate's services than Operator would have been entitled to receive under this Agreement had Operator performed the services. If an Affiliate of Operator provides goods to the Hotel, such goods shall be supplied at prices and on terms at least as favorable in the aggregate to the Hotel as generally available in the relevant market and consistent with terms made available to other similar hotels within the group of Operated Brand Hotels. Upon Owner's request, Operator shall provide Owner with a list identifying the Affiliates of Operator which are providing serves to the Hotel and a description of such services. The Parties agree that this Section 5.9 shall constitute the entirety of all limitations or restrictions on Operator's transactions and dealings with its Affiliates.

  5.10 <u>Limitation on Operator's Obligations</u>.

  5.10.1 <u>Availability of Sufficient Funds</u>. Operator's obligations under this Agreement are subject in all respects to the availability of sufficient funds from the Operation of the Hotel, or which are otherwise provided by Owner or Owner's Lender. Except as otherwise expressly provided in this Agreement, all costs and expenses of Operating the Hotel shall be payable out of funds from the Operation of the Hotel, or which are otherwise provided by Owner or Owner's Lender. In no event shall

Operator be obligated to pledge or use its own credit or advance any of its own funds to pay any such costs or expenses for the Hotel. Accordingly, notwithstanding anything to the contrary in this Agreement, Operator shall be relieved from its obligations to Operate the Hotel in compliance with the Operating Standards and in accordance with this Agreement whenever and to the extent that Operator is prevented or restricted in any way from doing so by reason of (a) the occurrence of a Force Majeure Event, (b) Owner's breach of any term of this Agreement (including Owner's obligation to provide sufficient funds as required under this Agreement) or (c) any limitation or restriction in this Agreement on Operator's authority or ability to expend funds in respect of the Hotel.

5.10.2 Pre-Existing Conditions and External Events. If any environmental, construction, personnel, real property-related or other problems arise at the Hotel during the Interim Term or the Operating Term that (a) relate to the Operation or condition of the Hotel, or activities undertaken at the Hotel or on the Premises, prior to the Interim Term or (b) are caused by or arise from sources outside of the Hotel, Operator's services under this Agreement shall not extend to management of any remediation, abatement or other correction of such problems, and Owner shall retain full managerial and financial responsibility and liability for and control over the remediation, abatement and correction of such problems, and shall take such actions in a timely manner with as little disturbance or interruption of the use and enjoyment of the Hotel as practicable. Notwithstanding the foregoing, Operator shall have the right, but not the obligation, to take reasonable appropriate steps, at Owner's expense, to (i) comply with, or cure or prevent the violation of, any Applicable Laws as provided in this Agreement, (ii) avoid or minimize any actual or potential injury to persons or damage to the Hotel or other property and (iii) avoid or minimize any risk of criminal or civil liability to Operator and its Affiliates.

5.10.3 Pre-Opening Period. Owner acknowledges that, notwithstanding anything to the contrary in this Agreement, except for the Pre-Opening Services, the services to be provided under or as contemplated by Exhibit M of the Agreement during the Interim Term and the services to be provided by Consultant pursuant to the Technical Services Agreement, Operator and its Affiliates shall have no obligations to provide any services for the Operation of the Hotel prior to the commencement of the Operating Term on the Opening Date.

5.11 Third-Party Operated Areas.

(a) The Parties acknowledge that certain areas of the Hotel, such as the casino, restaurant and bar ("Third-Party Operated Areas"), may be operated by third parties (the "Third-Party Operators") under a lease, operating agreement, franchise agreement or similar agreement. The operation of any Third-Party Operator Areas by a Third-Party Operator, and the selection of a Third-Party Operator for such Third-Party Operated Areas, shall be subject to approval of both Owner and Operator; provided, that, if requested by Owner, Operator shall have the right to control the process of selecting any Third-Party Operators, including the right to conduct a request for proposal to select the Third-Party Operators, which selection shall be subject to the approval by Owner. Any lease, operating agreement, franchise agreement or similar agreement with a Third-Party Operator shall: (i) be consistent with the terms of this Agreement; (ii) require the Third-Party Operators to operate the Third-Party Operated Areas in accordance with the Operating Standards and all other terms of this Agreement; and (iii) be subject to the review and reasonable prior written approval of Operator. In connection with any such approval by Operator of a casino Third-Party Operator, Operator shall be entitled to make a probity check of such proposed casino Third-Party Operator and Owner shall in good faith cooperate with Operator in providing such information as Operator shall reasonably require in connection therewith. In addition, if the Hotel does not have a separate room service/banquet kitchen, then at least one of the Third-Party Operators of the Hotel food and beverages services shall be required to (1) serve breakfast, lunch and dinner in the restaurant, (2) provide food for room service on a 24 hours a day, 7 days a week basis, and (3) supply food and beverages to the Hotel on a cost plus a nominal charge basis (to be approved by Owner and

Operator) for banquets, catering and room service, with the understanding that all banquets, catering and room service shall be operated by Operator and the revenues from all banquets, catering and room service shall be included in the Gross Operating Revenue of the Hotel.

(b) Operator agrees that all existing leases at the Hotel (consisting of leases for restaurants and a spa/fitness center) shall continue for their respective initial terms, subject to the terms and conditions of such leases. Operator agrees to waive compliance with clauses (i) through (iii) of subsection (a) above with respect to such leases, subject to compliance by the applicable Third-Party Operators with the terms thereof, until the expiration of the initial term of each such respective lease. Owner hereby represents and warrants that, to Owner's knowledge, (i) all of such existing leases and other agreements relating to or affecting the Hotel or Owner are listed on Exhibit I hereto (the "Existing Agreements"), (ii) Owner has heretofor provided true, complete and correct copies of all of the Existing Agreements to Operator, (iii) all of such Existing Agreements remain in full force and effect and are enforceable in accordance with their terms, (iv) none of such Existing Agreements have been amended, modified, waived, supplemented or otherwise changed, except as specifically set forth on Exhibit I hereto and (v) no other agreements, contracts, undertakings, commitments, understandings or other arrangements exist relating to or otherwise affecting the Hotel and Operator's rights and obligations hereunder, other than as set forth on Exhibit I hereto. Owner further agrees to provide Operator with copies of all other Existing Agreements of which it may become aware from time to time.

(c) Operator acknowledges that the casino operated on the Premises is and shall be a Third-Party Operated Area. For the purpose of offering incentives to VIP gaming customers, and subject to a room block agreement to be entered into between the casino Third-Party Operator or lessee and Operator, the casino Third-Party Operator or lessee shall have the right during the Operating Term to purchase Guest Rooms from the Hotel at the same rate and on similar terms as Starwood may purchase rooms from the Hotel under its room block agreement with SVO International Holdings Limited, an Affiliate of Starwood; provided, however, that if there is no existing room block agreement with SVO International Holdings Limited, the casino Third Party Operator or lessee shall have the right to obtain Guest Rooms from the Hotel, under a room block agreement between such casino Third Party Operator and Operator, at a market rate comparable to rates available for other bookings of similar volumes of Guest Rooms at the Hotel by any other third-party. In addition, Operator agrees that Owner may maintain a single office in a mutually agreed-upon location in the Hotel for the casino's asset manager or other Owner's Representative. The costs associated with such office shall be an Operating Expense; provided, however, that for purposes of determining the Incentive Fees payable to Operator hereunder, such costs shall be deemed deducted from the amount of such Operating Expenses.

5.12 **Owner Complimentary Rooms.** Operator shall provide no more than 150 complimentary Guest Room nights for each Operating Year to Owner at no charge and on a space-available basis, provided that such provision of Guest Rooms does not displace any customers willing to pay for such guest Rooms who have booked a reservation at least 14 days prior to the night(s) in question. The Parties shall mutually agree, on an annual basis, on an acceptable food and beverage discount policy for those guests staying at the Hotel in any such complimentary Guest Room, which amount shall be no greater than such amount charged to Starwood's Corporate Personnel on leisure travel. All employees and agents of Owner, who travel to the Hotel to perform technical assistance or other services at the Hotel, shall be permitted to stay at the Hotel and use its facilities (including food and beverage consumption in accordance with the travel policies for Starwood's Corporate Personnel), without charge to such Owner or such Person. The costs associated with such stays shall be an Operating Expense; provided, however, that for purposes of determining the Incentive Fees payable to Operator hereunder, such costs shall be deemed deducted from the amount of such Operating Expenses. All employees and agents of Owner, Owner's Representative or Affiliates thereof, shall be permitted to stay at the Hotel for business or non-business purposes at reduced rates in accordance with policies with respect to such stays

in effect from time to time which are applicable to the Starwood's Corporate Personnel for Operated Brand Hotels. In addition, Owner and Operator shall coordinate efforts to plan and execute a grand opening celebration at a mutually agreed-upon date following the Flagging Date, which would include the offering of complimentary Guest Rooms to invitees of Owner and Operator for such event.

5.13    <u>Owner Apartment</u>. Owner shall have the right, at no cost to Owner, to retain Suite 500 at the Hotel as living quarters for Owner's designated asset manager, who may act as Owner's Representative. The costs associated with such Suite 500 shall be an Operating Expense; provided, however, that for purposes of determining the Incentive Fees payable to Operator hereunder, such costs shall be deemed deducted from the amount of such Operating Expenses.

5.14    <u>Owner's Controller</u>. Owner shall have the right to engage as its own employee a controller or other financial officer ("Owner's Controller") independent of Operator's controller. The cost of Owner's Controller shall be an Operating Expense; provided, however, that for purposes of determining the Incentive Fees payable to Operator hereunder, such costs shall be deemed deducted from the amount of such Operating Expenses.

## ARTICLE 6

### CONVERSION OF THE HOTEL

6.1    <u>Conversion of the Hotel</u>.

6.1.1    <u>Property Improvement Plans</u>. Owner shall (a) provide or obtain all financial and other resources necessary to complete the Conversion of the Hotel in accordance with this Agreement, the Technical Services Agreement and the Pre-Flagging PIP and the Post-Flagging PIP, it being acknowledged that Operator shall not be required to provide any funds for the Conversion of the Hotel, (b) perform all work reasonably necessary to cause the Conversion to be completed within the time periods set forth in the Property Improvement Plans (subject to extension as provided in Section 6.1.2 and 6.1.3 below), with time being of the essence. Owner shall cause the Conversion of the Hotel to be performed and completed in accordance with the Property Improvement Plans in Exhibit K (consisting of the Pre-Flagging PIP and the Post-Flagging PIP) and Applicable Laws, with time being of the essence (subject to extension as provided in Sections 6.1.2 and 6.1.3 below). After Conversion of the Hotel in accordance with the Property Improvement Plans in Exhibit K, the Hotel shall be deemed in compliance with the Operating Standards and all Design Guides for the Brand as of the Flagging Date and any non-compliance with such Operating Standards or Design Guides shall be deemed waived by Operator. OWNER ACKNOWLEDGES OPERATOR HAS RECOMMENDED OWNER NOT TERMINATE THE EXISITING WYNDHAM AGREEMENT PRIOR TO THE FLAGGING DATE AND HAS INFORMED OWNER OF THE SIGNIFICANT COST OF TRANSITIONING THE HOTEL TO BEING A NON-BRANDED HOTEL FOLLOWED BY A SECOND TRANSITION TO BEING OPERATED AS A BRAND HOTEL. IN ADDITION, OWNER ACKNOWLEDGES OPERATOR HAS DISCLOSED THE RISKS OF REDUCED OCCUPANY AND A SIGNIFICANT DECREASE IN GROSS OPERATING REVENUE ASSOCIATED WITH THE TRANSITION PROCESS, THE DISRUPTIONS WHICH WILL LIKELY BE CAUSED DUE TO THE CONSTRUCTION INVOLVED IN THE IMPLEMENTATION OF THE PROPERTY IMPROVEMENT PLANS AND REMOVING THE WYNDHAM BRAND FROM THE HOTEL PRIOR TO THE FLAGGING DATE. OPERATOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE PERFORMANCE OF THE HOTEL PRIOR TO THE COMPLETION OF THE PROPERTY IMPROVEMENT PLANS AS A CONSEQUENCE OF THE FOREGOING FACTORS.

6.1.2    Pre-Flagging PIP. The Pre-Flagging PIP shall be completed by Owner by no later than July 1, 2007; provided, however, Owner would have the right to extend the time necessary to complete the Pre-Flagging PIP by (a) a period equal to six months if Owner provides Operator at least 15 business days' prior written notice of such extension or (b) in the case of a Force Majeure Event, an additional extension period equal to the period of time by which Owner was delayed as a result of such Force Majeure Event, but in no event under this clause (b) beyond December 31, 2007. Notwithstanding the immediately preceding sentence, at such time as (x) the Guestroom and bathroom requirements of Item B of the Pre-Flagging PIP have been substantially completed (as determined in Operator's good faith determination) in compliance with the Pre-Flagging PIP for not less than 300 Guestrooms (which shall be converted on a floor-by-floor basis), (y) Item C of the Pre-Flagging PIP (relating to Guestroom corridors and elevator lobbies) has been substantially completed (as determined in Operator's good faith determination) in compliance with the Pre-Flagging PIP as to all floors on which such 300 or more Guestrooms have been completed, and (z) all other items of the Pre-Flagging PIP, subject to the limitations in (x) and (y) above, have been substantially completed (as determined in Operator's good faith determination) in compliance with the Pre-Flagging PIP, then Operator agrees to Operate the Hotel as a Brand Hotel, in compliance with the terms and conditions of this Agreement. Notwithstanding the foregoing, Operator agrees to Operate the Hotel as a Brand Hotel, in compliance with the terms and conditions of this Agreement, and identify the Hotel a Brand Hotel, in accordance with the terms and conditions of the Trademark License Agreement, from and after the date Owner has applied funds in an aggregate amount of $18,000,000 for the purposes of completing the Pre-Flagging PIP. Upon request by Owner to Operator to fund any such expenditure out of the Reserve Fund and the written approval by Operator of each such expenditure to be paid therefrom, Owner may make such expenditures out of the Reserve Fund. If Owner is unable to complete the Pre-Flagging PIP in accordance with its terms and in compliance with the time periods established in this Section 6.1.2 (including any applicable extension periods as described in the first sentence of this Section 6.1.2), Operator would have the right to (1) terminate this Operating Agreement and no termination fee, penalty or other damages shall be payable to Operator, (2) draw upon the funds held in an escrow account by Owner's Lender, in an aggregate amount of $16,000,000, for the purposes of completing the Pre-Flagging PIP, in accordance with the terms and conditions of the Escrow Agreement, (3) make such expenditures out of the Reserve Fund, in which case Operator shall notify Owner as promptly as reasonably possible of the making of any such withdrawal from the Reserve Fund or (4) to the extent for any reason the funds held in accordance with the Escrow Agreement and/or in the Reserve Fund are not made available to Operator or are inadequate to complete such Pre-Flagging PIP, advance Operator's own funds necessary to complete the Pre-Flagging PIP, which funds Owner shall repay to Operator plus interest equal to the lesser of the daily equivalent of 12% of such advance per year or the highest rate then permitted by Applicable Law, for each day the amount is past due; provided, however, that (A) no distributions may be made by Owner to any of its equity owners or their Affiliates, whether by distribution or otherwise, until such advance and all accrued interest thereon have been paid in full and (B) at Operator's option, such advance shall be further evidenced by such loan documentation as shall be mutually satisfactory to the Parties.

6.1.3    Post-Flagging PIP. The Post-Flagging PIP, including, without limitation, the Phase II PIP and Phase III PIP as provided therein, shall be completed by Owner in accordance with its terms, within the timeframes indicated. Upon request by Owner to Operator to fund any such expenditure out of the Reserve Fund and the written approval by Operator of each such expenditure to be paid therefrom, Owner may make such expenditures out of the Reserve Fund. If Owner fails to complete either the Phase II PIP or the Phase III PIP in accordance with the timelines set forth in the Post-Flagging PIP (including any applicable extension periods for Force Majeure in accordance with Section 6.1.1 above, but in no event beyond December 31, 2008, as to the Phase II PIP, or December 31, 2009, as to the Phase III PIP), Operator would have the right to complete the Phase II PIP or the Phase III PIP, as the case may be, by (a) drawing upon the funds remaining in the escrow account established in accordance with Section 6.1.2 above and subject to the terms and conditions of, the Escrow Agreement, (b) utilizing

Operating funds of the Hotel, the Reserve Fund or otherwise in accordance with the terms of this Agreement, (c) make such expenditures out of the Reserve Fund, in which case Operator shall notify Owner as promptly as reasonably possible of the making of any such withdrawal from the Reserve Fund or (d) to the extent for any reason the funds held in accordance with the Escrow Agreement and/or in the Reserve Fund are not made available to Operator or are inadequate to complete such Post-Flagging PIP and/or the amounts under (b) above are inadequate to complete such Post-Flagging PIP, advance Operator's own funds necessary to complete the Post-Flagging PIP, which funds Owner shall repay to Operator plus interest equal to the lesser of the daily equivalent of 12% of such advance per year or the highest rate then permitted by Applicable Law, for each day the amount is past due; provided, however, that at Operator's option, such advance shall be further evidenced by such loan documentation as shall be mutually satisfactory to the Parties. Notwithstanding any conflict between the items required by the Pre-Flagging PIP and the Post-Flagging PIP, upon completion of the Pre-Flagging PIP and the Post-Flagging PIP, the Hotel shall be deemed to be in compliance with then-current Operating Standards.

6.2     **Compliance with Laws.** As of the earlier to occur of the commencement of the Interim Term or the Commencement of Conversion and continuing thereafter throughout the Operating Term, (a) the Hotel and the Premises will be in compliance with all Applicable Laws (including all Approvals), (b) all Approvals required for the Conversion and Operation of the Hotel in accordance with this Agreement will have been issued and will be in full force and effect and (c) no condition will exist at the Hotel or the Premises which, with notice or the passage of time, would result in a violation of any Applicable Laws or Approvals.

## ARTICLE 7

## PROPRIETARY RIGHTS

7.1     **Trademarks.** Owner acknowledges and agrees that this Agreement does not grant to Owner any license, use or other proprietary right, title or interest whatsoever in any of the Trademarks of Operator or its Affiliates whatsoever, and that all of Owner's rights therein, if any, are governed solely by the Trademark License Agreement. If the Trademark License Agreement is terminated, but this Agreement remains in effect, Operator shall Operate the Hotel under the Hotel name identified in Exhibit A using the Trademarks.

7.2     **Use of Proprietary Rights.** As part of Operator's services under this Agreement for the Operation of the Hotel, Operator shall use any Proprietary Rights in the Operation of the Hotel as Operator deems appropriate or advisable. Operator shall have the exclusive right to determine the use of any Proprietary Rights in the Operation of the Hotel, including the marketing, sales, advertising and promotion of the Hotel and any goods or services relating to the Hotel. Operator reserves the sole right and discretion to: (a) establish operating standards for the use of any Proprietary Rights for the Hotel, which must be satisfied as a condition of Operating the Hotel under the Brand and (b) require Owner, Hotel Personnel and any other Person Operator deems reasonably necessary to sign a commercially reasonable confidentiality agreement as a condition to the disclosure and/or use of any Proprietary Rights by such Person, which shall supplement the terms set forth in Article 7.

7.3     **Acknowledgment of Operator's Rights.** Owner acknowledges the rights of Operator and its Affiliates in and to the Proprietary Rights and agrees that (a) Owner has not acquired, and Owner will not represent in any manner that Owner has acquired, in any manner any ownership rights in the Proprietary Rights, (b) Operator may use and grant to others the right to use any Proprietary Right, except as expressly provided otherwise in this Agreement and (c) the restrictions and limitations with respect to Owner's use of the Proprietary Rights under this Agreement apply to all forms and formats, including print, video, electronic and other media (including Identifiers and all other identifications and elements

used in commerce. Owner shall not use any of the Proprietary Rights in any manner for any purpose whatsoever in (i) any publications, Identifiers or other materials or information disseminated to the general public or (ii) any prospectus, offering circular, financing document or marketing materials, in each case without Operator's prior consent, and if consented to by Operator, then only as expressly permitted in (and subject to such restrictions as may be set forth in) such consent. Owner acknowledges and agrees that no default by Operator under this Agreement, or the expiration or termination of this Agreement, shall confer on Owner or any Person claiming by or through Owner, any right or remedy to use any of the Proprietary Rights in the Operation of the Hotel or otherwise.

    7.4    **Infringement**. Owner agrees that, from and after the Effective Time and through the Operating Term and thereafter, Owner shall not, directly or indirectly, (a) apply for any rights or interests in the Proprietary Rights in any jurisdiction, (b) infringe Operator's rights in the Proprietary Rights in any way, (c) contest or aid others in contesting the validity, ownership or right to use the Proprietary Rights or (d) take any other action in derogation of the Proprietary Rights. Owner shall use commercially reasonable efforts promptly to notify Operator of any unauthorized attempt to use any of the Proprietary Rights, or any legal action instituted against Owner with respect to any Proprietary Rights. Owner shall assist Operator and its Affiliates in taking such reasonably necessary action as Operator may request to stop such activities, but shall take no action nor incur any expenses on Operator's behalf without Operator's prior written approval. Operator shall have the right to select legal counsel and control all litigation with respect to any action brought against Owner or Operator by a third party with respect to the Proprietary Rights, at Operator's sole cost and expense. If Operator undertakes the defense or prosecution of any litigation relating to the Proprietary Rights, Owner shall execute any and all fact-finding documents and take or not take such other actions as may, in the opinion of Operator's legal counsel, be reasonably necessary to carry out such defense or prosecution, and Operator shall reimburse Owner for its actual out-of-pocket expenses in taking any such actions. This Section 7.4 shall survive the expiration or termination of this Agreement.

    7.5    **Improvements to System**. All intellectual property rights to the improvements in Operator's system for Operating the Operated Brand Hotels (including improvements to any Proprietary Rights and Technology Systems) developed or suggested by Owner or any of its Affiliates (the "System Improvements") are hereby irrevocably assigned by Owner to Operator and upon creation shall be and become the exclusive property of Operator, and neither Owner nor any of its Affiliates shall have any ownership rights in any System Improvements. Operator may incorporate any such System Improvements into its system for Operating the Operated Brand Hotels and shall have the exclusive right to all intellectual property rights (including patent, copyright and industrial design rights) in and to the System Improvements, and to register and protect such System Improvements in Operator's own name to the exclusion of Owner, who shall have no rights to use such System Improvements, except as specifically granted to Owner under this Agreement. Owner agrees to execute a commercially reasonable assignment or other commercially reasonable documents Operator may request to evidence its ownership or to assist Operator in securing intellectual property rights to the System Improvements.

## ARTICLE 8

## CONFIDENTIALITY

    8.1    **Disclosure by Owner**. Owner acknowledges that Operator will provide certain Confidential Information to Owner in connection with the Operation of the Hotel, and that such Confidential Information is proprietary to Operator and its Affiliates, and includes trade secrets. Accordingly, from and after the Effective Date, during the Operating Term and thereafter: (a) Owner shall not use the Confidential Information in any other business or capacity, and Owner acknowledges such use is an unfair method of competition; (b) Owner shall use all commercially reasonable efforts to maintain

the confidentiality of, and shall not disclose to any third Person (including the media), any Confidential Information or the terms of this Agreement, except to its shareholders, partners, trustees, beneficiaries, directors, officers, employees, agents, legal counsel, accountants and lenders, but only on a "need to know" basis in connection with its ownership of the Hotel including, without limitation, in connection with obtaining financing for the Hotel; (c) Owner shall not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form; and (d) Owner shall make every effort to ensure that none of its shareholders, partners, members, trustees, beneficiaries, directors, officers, employees, agents and representatives use, disclose or copy any Confidential Information, disclose any terms of this Agreement or take any other actions that are otherwise prohibited under this Section 8.1. Notwithstanding the foregoing, the restrictions on the use and disclosure of Confidential Information shall not apply to (i) information or techniques which are or become generally known in the lodging industry or otherwise (other than through Owner's own disclosure), (ii) the extent such disclosure is required under Applicable Laws, including reporting requirements applicable to public companies or (iii) information obtained by Owner independently from a third party, which itself was not the subject of any confidentiality restrictions. Owner acknowledges that the disclosure or unauthorized use of information in violation of this Section 8.1 will cause irreparable injury to Operator and/or its Affiliates, for which monetary damages would not provide an adequate remedy. This Section 8.1 shall survive the expiration or termination of this Agreement.

8.2    **Disclosure by Operator.**  During the Interim Term, Operating Term and thereafter, (a) Operator shall use all commercially reasonable efforts to maintain the confidentiality of, and not disclose to any third Person (including the media), any (i) terms of this Agreement or (ii) financial information regarding the Operation of the Hotel, except in each case (A) to its shareholders, trustees, beneficiaries, partners, directors, officers, employees, agents, legal counsel, accountants and lenders on a "need to know" basis in connection with the Operation of the Hotel, and (B) with respect to the financial information regarding the Operation of the Hotel, to Smith Travel Reports and similar data gathering and reporting Persons, and (b) Operator shall make every effort to ensure that none of its shareholders, partners, members, trustees, beneficiaries, directors, officers, employees, agents and representatives disclose any terms of this Agreement or any financial information regarding the Operation of the Hotel (except as otherwise permitted hereunder) or take any other actions that are otherwise prohibited under this Section 8.2. Notwithstanding the foregoing, the restrictions on disclosure and use of Confidential Information shall not apply (x) to information which is or becomes generally known in the lodging industry (other than through Operator's own disclosure) or (y) to the extent such disclosure is required under Applicable Laws, including reporting requirements applicable to public companies. Operator acknowledges that the disclosure or unauthorized use of information in violation of this Section 8.2 will cause irreparable injury to Owner and/or its Affiliates, for which monetary damages would not provide an adequate remedy. This Section 8.2 shall survive the expiration or termination of this Agreement.

8.3    **Public Statements.**  The Parties shall cooperate with each other on all press releases and other public statements relating to the Hotel and neither Party shall issue any press release or other public statement relating to the Hotel without the prior written approval of the other Party, except for any public statement required under Applicable Law. With respect to any public statement required under Applicable Law, the issuing Party and shall provide the other Party with a reasonable opportunity to review and comment upon any such statement prior to its issuance.

ARTICLE 9

MARKETING

9.1    Marketing.

9.1.1 <u>Hotel Marketing Program</u>. In addition to the Hotel's participation in any Marketing Program included as part of the Centralized Services, Operator shall develop and implement a specific marketing program for the Hotel, which shall provide for the planning, publicity, internal communications, organizing and budgeting activities to be undertaken, and which may include the following (a) production, distribution and placement of promotional materials relating to the Hotel, including materials for the promotion of employee relations; (b) development and implementation of promotional offers or programs that benefit the Hotel and are undertaken by Operator or by a group of hotels that includes the Hotel; (c) attendance of Hotel Personnel at conferences, conventions, meetings, seminars and travel congresses; (d) selection of and guidance to advertising agency and public relations personnel; and (e) preparation and dissemination of news releases for national and international trade and consumer publications. Owner shall not publish any advertising materials or otherwise implement any marketing, advertising or promotion program for the Hotel on its own, without Operator's prior approval.

9.1.2 <u>Development and Implementation</u>. The development and implementation of the Hotel's specific marketing program shall be effected substantially by Hotel Personnel, with periodic assistance from Corporate Personnel with marketing and sales expertise. Any such assistance provided by any Corporate Personnel shall be at no cost to Owner or the Hotel for such personnel's time, but Owner shall pay for the reasonable Out-of-Pocket Expenses incurred by Operator in connection with such assistance. The Hotel's specific marketing program shall comply with the sales, advertising and public relations policies and guidelines and corporate identity requirements established by Operator, as they may be modified from time to time. Operator shall have the right to engage a Person on behalf of Owner to perform such marketing and public relations activities for the Hotel pursuant to this Article 9.

9.1.3 <u>Content</u>. Operator shall have the right to obtain, or at the request of Operator, Owner shall obtain and provide to Operator, updated photographs, descriptive content and other media, such as video and floor plans, of the Hotel (collectively, "Content") from time to time, but not less frequently than every two years, in accordance with Operator's specifications for Content. If Owner obtains Content, Owner shall ensure that any such Content includes unlimited usage rights for the benefit of Operator.

## ARTICLE 10

## BOOKS AND RECORDS

10.1 <u>Maintenance of Books and Records.</u> Operator shall keep books of account and other records relating to or reflecting the results of the Operation of the Hotel in accordance with GAAP and, to the extent applicable, the Uniform System, consistent with the then existing policies and standards applicable to Operated Brand Hotels. Subject to Section 10.5 hereof, all books of account and other financial records of the Hotel shall be available to Owner at all reasonable times for examination, audit, inspection and copying. All of the financial books and records of the Hotel, including books of account and front office records (but excluding any Proprietary Rights) shall be the property of Owner.

10.2 <u>Financial Reports</u>. Operator shall cause to be prepared and delivered to Owner reasonably detailed monthly operating reports, based on information available to Operator, which reflect the operational results of the Hotel for each month of each Operating Year. Operator shall deliver each operating report to Owner on or before the 20th day of the month following the month (or partial month) to which such operating report relates. The reports shall be in a format (which may be amended from time to time) substantially similar to the operating reports provided by Operator or its Affiliates for other Operated Brand Hotels, and in such other format and including such additional information as reasonably may be required by Owner or any first Mortgagee (the "Operating Reports"). At a minimum, the Operating Reports shall include: (a) a balance sheet including current month and prior year-end

comparisons and differences in reasonable detail, (b) an income and expense statement for such month and for the elapsed portion of the current Operating Year through the end of such month, (c) a statement of net cash flow from operations in reasonable detail for such month and such elapsed portion of the current Operating Year through the end of such month, (d) a statement of the amount of the Operating Fees, Centralized Services Charges, Reimbursable Expenses and any other amounts payable to Operator or its Affiliates and (e) a schedule of capital expenditures for all Routine Capital Improvements, and any Building Capital Improvements or ROI Capital Improvements, showing in reasonable detail, items budgeted, actual expenditures to date and the amount of expenditures projected for completion. The Operating Reports also shall set forth variances that have occurred and that are anticipated between the applicable Operating Plan and actual results in a monthly variance report (along with the statements mentioned above).

10.3   Certified Financial Reports. Operator shall cause to be prepared and delivered to Owner no later than April 30 of each Operating Year (beginning with April 30 of the second Operating Year, for the first Operating Year), financial statements for the preceding Operating Year (consisting of a balance sheet, a statement of earnings and retained earnings and a statement of cash flows), which shall include a certificate of the Designated Accountant to the effect that, subject to any qualifications therein, the financial statements fairly present, in conformity with GAAP, the financial position, results of operations and cash flows of the Hotel for the Operating Year then ended (the "Certified Financial Statements"). Notwithstanding the foregoing, Operator shall not be obligated to prepare such statements if Owner does not supply all information necessary for Operator to cause the Certified Financial Statements to be prepared and delivered, or such information is not otherwise available to Operator. Nevertheless, Owner shall deliver to Operator any similar financial statements that Owner causes to be prepared. The Certified Financial Statements delivered pursuant to this Section 10.3, and all information therein, shall be binding and conclusive on the Parties unless, within 60 days after the delivery of such statements to the Parties, either Party shall deliver written notice to the other Party of its objection thereto, setting forth in reasonable detail the nature of such objection. If the Parties are unable thereafter to resolve any disputes with respect to the matters set forth in the Certified Financial Statements within 60 days after delivery by either Party of such notice, either Party shall have the right to cause such dispute to be resolved in accordance with Article 17. All costs incurred in connection with the preparation and certification of the Certified Financial Statements shall be Operating Expenses of the Hotel.

10.4   Hotel Guest Information. Operator shall maintain as part of the books and records of the Hotel any guest profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and email addresses), histories, preferences and other information obtained in the ordinary course of business from guests of the Hotel during such guests' stay at the Hotel or during such guests' use of the facilities associated with the Hotel (the "Hotel Guest Information"). During the Interim Term and the Operating Term, Owner shall have access to the Hotel Guest Information, and may use the Hotel Guest Information in any reasonable manner, so long as such use will not (a) violate the terms of this Agreement, any Applicable Law or any of privacy policies of Operator or any of its Affiliates, (b) interfere with, or be detrimental to, the use and exclusive Operation of the Hotel by Operator pursuant to the terms and conditions of this Agreement or (c) interfere with, or be detrimental to, the financial performance of the Hotel. Owner and Operator jointly shall own all Hotel Guest Information.

10.5   Consultation with Senior Executive Personnel. In addition to Operator's obligations to maintain books and records, upon Owner's reasonable request made not more frequently than once monthly or as may be reasonably necessary and without causing any interference with the Hotel's Operations, Operator shall cause the Hotel's General Manager (and not any other Senior Executive Personnel) to be reasonably available to consult with and advise Owner or Owner's designees (not to include the Owner's asset manager, Owner's Controller or other Owner designees based at the Hotel) regarding the Operation of the Hotel. Notwithstanding the foregoing, the asset manager appointed by