Owner (and designated as such in writing by Owner to Operator) shall have the right to participate in meetings regularly scheduled by the Operator of the Senior Executive Personnel of the Hotel, but no more than once per week. Neither Owner, Owner's Representative, Owner's asset manager or Owner's Controller nor any of Owner's designees shall contact any of the Hotel's Senior Executive Personnel, other than the Hotel's general manager, or any Hotel Personnel, except as specifically provided in this Section 10.5. In no event shall Owner, Owner's Representative, Owner's asset manager or Owner's Controller nor any of Owner's designees have any right to supervise or direct any Hotel Personnel or Senior Executive Personnel. If Operator shall have notified Owner more than once in any 12-month period of any violations of this Section 10.5, Operator shall have the right to demand that Owner replace Owner's Representative, Owner's asset manager, Owner's Controller or Owner's designees, as the case may be, and Operator shall thereafter be under no obligation under this Agreement to have to consult or receive advice from with any such person until a successor or replacement has been made. Owner also has the right to propose the names of the parties providing professional services to the Hotel, subject to Operator's reasonable approval.

## ARTICLE 11

## TRANSFERS

   11.1   **Transfers Restricted.** Except as otherwise permitted in Article 13 or this Article 11, neither Party may cause, permit or suffer a Transfer without the prior consent of the other Party, which may be withheld in such Party's sole and absolute discretion. Any Transfer by a Party in violation of the terms of this Article 11 shall be void and of no force or effect as between the Parties and shall constitute an Event of Default governed by the terms of Article 16.

   11.2   **Permitted Transfers by Operator.** Notwithstanding the provisions of Section 11.1, Operator shall have the right, without Owner's consent, to effect an Assignment of this Agreement, in whole or in part, to (a) any Affiliate of Operator so long as Operator remains liable hereunder or (b) any Person that acquires, whether by purchase of assets, merger, consolidation, reorganization, all or substantially all of the business and assets of Operator and/or its Affiliates related to the Operation of the Operated Brand Hotels, including, without limitation, as to any such transaction, the Trademarks required by the Hotel to Operate under the Brand.

   11.3   **Permitted Transfers by Owner.**

      11.3.1   Transfers without Operator's Consent. Notwithstanding the provisions of Section 11.1, as long as Owner is not in default under this Agreement or any other agreement with Operator or any of its Affiliates relating to the Hotel, including the Technical Services Agreement, Owner shall have the right to effect a Transfer of Ownership Interests or an Assignment of Owner's entire interest in this Agreement in connection with a Hotel Transfer after the Flagging Date, provided that (a) neither the proposed transferee nor any of its direct or indirect Equity Owners, is a Prohibited Transferee, and (b) the conditions described in Section 11.3.2 are satisfied in connection with such Transfer. For purposes of this Section 11.3.1, a "Prohibited Transferee" means any Person that:

            (a)   in Operator's reasonable judgment does not have sufficient financial resources and liquidity to satisfy Owner's ongoing financial obligations to Operator and its Affiliates under this Agreement and any other agreement relating to the Hotel, including the Technical Services Agreement (provided that this paragraph (a) shall not apply with respect to a Transfer of Ownership Interests which, by itself or collectively with one or more other related Transfers, would not result in a Transfer of Control; provided, further, that any Person who acquires the Hotel in a Transfer and pays 15%

or more of the purchase price therefor in good funds from equity contributions shall be deemed to have sufficient financial resources and liquidity under this paragraph (a));

    (b)  is a Competitor;

    (c)  in Operator's reasonable judgment is generally recognized in the community as being a Person of ill repute or is in any other manner a Person with whom a prudent businessperson would not wish to associate in a commercial venture; or

    (d)  in Operator's reasonable judgment is a Person that would jeopardize the Hotel's liquor license or Operator's or its Affiliates' compliance with any Gaming Laws or Anti-Terrorism Laws.

  11.3.2 Conditions to Transfer. Notwithstanding anything to the contrary in Section 11.3.1, any Transfer by Owner shall be subject to the following conditions (provided that (x) the conditions set forth in this Section 11.3.2 shall not apply to any transfers of stocks or certificates that are traded on a nationally recognized stock exchange or other transfers of Ownership Interests that do not result in a Transfer of Control and (y) paragraph (b) of this Section 11.3.2 shall not apply to Transfers of Ownership Interests (except that Operator may require a confirmation or ratification agreement to be entered into by Owner if such Transfer of Ownership interests results in a Transfer of Control)):

    (a)  Owner shall provide written notice to Operator at least 30 days prior to the Transfer, specifying in reasonable detail the nature of the Transfer, including an updated Exhibit A showing all of the Equity Owners and Parent Companies, if any, both prior to and after such proposed Transfer and the nature and extent of their respective Ownership Interests and such additional information as Operator may reasonably request to determine whether the proposed transferee is a Prohibited Transferee; and

    (b)  the transferee shall assume the obligations of Owner under this Agreement and shall agree in writing to be bound by this Agreement from and after the date of the Transfer, and Owner shall provide Operator with a copy of such agreement, together with copies of all other documents affecting such Transfer, within 10 days following the date of the Transfer.

  11.4 **Effect of Permitted Transfer**. A consent to any particular Transfer shall not be deemed to be a consent to any other Transfer or a waiver of the requirement that consent be obtained in the case of any other Transfer. Upon any Transfer by Owner or Operator permitted under this Article 11 or consented to by the other Party, the transferor shall be relieved of all liabilities and obligations under this Agreement accruing from and after the effective date of such assignment. No such Transfer shall relieve the transferor from its liabilities or obligations under this Agreement accruing prior to the effective date of the Transfer and, in the event of a Hotel Transfer, the assignee shall succeed to and assume responsibility for all obligations and liabilities including vacation, sick leave, severance and other benefits based on length of service accrued for Hotel Personnel as of the effective date of the Hotel Transfer.

## ARTICLE 12

## INSURANCE AND INDEMNIFICATION

 12.1 Insurance.

  12.1.1 Insurance Policies. Owner, at its expense, shall obtain and maintain the insurance policies required under the Insurance Requirements set forth as Exhibit H. The insurance

policies shall be effective upon the earlier of the date of Commencement of Conversion of the Hotel and the commencement of the Interim Term, or such other time as required by Operator. Owner acknowledges that Operator needs the flexibility to modify the Insurance Requirements to respond to insurance market trends, customer demands, economic conditions, technological advances and other factors affecting the hotel industry and its risks, as they may change from time to time. Accordingly, Owner agrees that Operator shall have the right to modify the Insurance Requirements as Operator deems advisable from time to time, each such change to be implemented upon no less than 60 days notice to Owner, provided that any such changes in the Insurance Requirements are applied to substantially all of the Operated Brand Hotels. In addition to the foregoing, Owner shall comply with each and every insurance requirement imposed on it by Owner's Lender which exceeds any of the Insurance Requirements, so that Owner shall have complied with or exceeded the Insurance Requirements and the insurance requirements of Owner's Lender.

12.1.2  **Insurance Program**. Operator or its Affiliates may, in its discretion, make insurance programs available to Owner (the "Insurance Program"). Owner shall have the right to elect to participate in the Insurance Program to the extent made available to Owner, or obtain such insurance policies from third-party insurers; provided, however, that as long as the Hotel Personnel are the employees of Operator or its Affiliates, Operator shall have the right to require that Owner obtain any worker's compensation, employer's liability, crime and employment practices liability insurance policies through the Insurance Program. Owner acknowledges that (a) the premiums charged under the Insurance Program include certain third-party pass-through costs, such as brokers' commissions and insurance services performed by third parties and (b) some or all of the insurance in the Insurance Program may be provided by an Affiliate, and such Affiliate will have a profit or loss for its insurance business from time to time, depending on the amount of premiums received, and claims paid, by such Affiliates during the relevant period.

12.1.3  **Evidence of Insurance**. Owner (for insurance policies obtained through third-party insurers) and Operator (for insurance policies obtained through the Insurance Program) shall provide the other Party with insurance certificates evidencing that the insurance policies comply with the Insurance Requirements. The insurance certificates shall be provided to the other Party as soon as practicable prior to (a) the effective date of coverage for a new insurance policy or (b) the date of renewal for an existing insurance policy. In addition, upon a Party's request, the other Party promptly shall provide to the requesting Party a schedule of insurance obtained by such Party, listing the insurance policy numbers, the names of the insurers, the names of the Persons insured, the amounts of coverage, the expiration dates and the risks covered thereunder.

12.1.4  **Payment of Premiums**. Operator shall have the right to pay premiums for any insurance required to be maintained under this Section 12.1 using funds from the Operating Account.

12.1.5  **Incidents Covered by Insurance**. Operator promptly shall (a) cause to be investigated all loss, damage to or destruction of the Hotel, as it becomes known to Operator, and report to Owner any such incident that is material, together with the estimated cost or repair of such loss, damage or destruction, (b) at the request of Owner, prepare all reports required by any insurance company as the result of the event resulting in such loss, damage or destruction, acting as sole agent for all other named insureds, additional insureds, Mortgagees and loss payees; (c) retain on behalf of Owner, at Owner's expense, all consultants and experts, including architects, engineers, accountants and attorneys, as Operator deems necessary or advisable, in analyzing any loss, damage or destruction, determining the nature and cost of the repair and presenting any proofs of loss or claims to any insurers; and (d) cause to be investigated all accidents and claims for damage relating to the operation and maintenance of the Hotel, as they become known to Operator, and shall report to Owner any such incident which is material.

12.2 **Waiver of Liability.**

12.2.1 **WAIVER OF LIABILITY.** AS LONG AS A PARTY AND ANY AFFILIATES REQUESTED BY SUCH PARTY ARE A NAMED INSURED OR ADDITIONAL INSURED UNDER THE OTHER PARTY'S INSURANCE POLICIES, OR THE POLICIES OTHERWISE PERMIT IF SUCH PARTY OR ITS AFFILIATES ARE NOT SO NAMED, SUCH PARTY HEREBY RELEASES THE OTHER PARTY, AND ITS AFFILIATES, AND ITS AND THEIR TRUSTEES, BENEFICIARIES, DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS, AND THE SUCCESSORS AND ASSIGNS OF EACH OF FOREGOING, FROM ANY AND ALL LIABILITY, DAMAGE, LOSS, COST OR EXPENSE INCURRED BY THE RELEASING PARTY, WHETHER OR NOT DUE TO THE NEGLIGENT OR OTHER ACTS OR OMISSIONS OF THE PERSONS SO RELEASED TO THE EXTENT SUCH LIABILITY, DAMAGE, LOSS, COST OR EXPENSE IS COVERED BY THE INSURANCE POLICIES OF THE RELEASING PARTY.

12.2.2 **Reliance on Owner's Advisors.** Owner acknowledges that neither Operator nor any insurance broker that Operator or its Affiliates may retain makes any representation, warranty or guaranty whatsoever regarding (a) the advisability or sufficiency of the insurance required or obtained under this Agreement, (b) whether the insurance made available under the insurance program maintained by Operator or its Affiliates is sufficient to protect Owner, the Hotel and its Operations against all liability, damage, loss, cost or expense that might be incurred or (c) any other insurance that Owner should consider for the protection of Owner, the Hotel and its Operations, and Owner agrees to rely exclusively on its own insurance advisors with respect to all insurance matters.

12.3 **Indemnification.**

12.3.1 **Indemnification by Owner.** Subject to Sections 12.3.3 and 12.3.4, Owner shall defend, indemnify and hold harmless Operator and its Affiliates, and their respective trustees, beneficiaries, directors, officers, employees and agents, and the successors and assigns of each of the foregoing (collectively, the "Operator Indemnified Parties") for, from and against any and all Claims which Operator Indemnified Parties incur, except to the extent such Claims are caused by Operator's Gross Negligence or Willful Misconduct. Operator shall promptly notify Owner in writing of any Claim brought against it by a third party which may result in an indemnification by Owner; provided, however, that no failure to promptly provide such notice shall affect the indemnification obligations of Owner hereunder.

12.3.2 **Indemnification by Operator.** Subject to Sections 12.3.3 and 12.3.4, Operator shall defend, indemnify, and hold harmless Owner and its Affiliates, and their respective trustees, beneficiaries, directors officers, employees and agents, and the successors and assigns of each of the foregoing (collectively, the "Owner Indemnified Parties") for, from and against any and all Claims that any Owner Indemnified Parties incur to the extent caused by Operator's Gross Negligence or Willful Misconduct.

12.3.3 **Insurance Coverage.** Notwithstanding anything to the contrary in this Section 12.3, the Parties shall look first to the appropriate insurance coverages in effect pursuant to this Agreement prior to seeking indemnification under this Section 12.3 in the event any claim or liability occurs as a result of injury to persons or damage to property, regardless of the cause of such claim or liability; provided, however, if the insurance company denies coverage or reserves rights as to coverage, then the Indemnified Parties shall have the right to seek indemnification, without first looking to such insurance coverage. In addition, nothing contained in this Section 12.3 shall in any way affect the releases set forth in Section 12.2.1.

12.3.4  Indemnification Procedures. Any Indemnified Party shall be entitled, upon written notice to the Indemnifying Party, to the timely appointment of counsel by the Indemnifying Party for the defense of any Claim, which counsel shall be subject to the approval of the Indemnified Party. If, in the Indemnified Party's judgment, a conflict of interest exists between the Indemnified Party and the Indemnifying Party at any time during the defense of the Indemnified Party, the Indemnified Party may appoint independent counsel of its choice for the defense of the Indemnified Party as to such Claim. In addition, regardless of whether the Indemnified Party has appointed counsel or selects independent counsel (a) the Indemnified Party shall have the right to participate in the defense of any Claim and approve any proposed settlement of such Claim and (b) all reasonable costs and expenses (including reasonable attorneys fees and costs) of the Indemnified Party shall be paid by the Indemnifying Party. If the Indemnifying Party fails to timely pay such costs and expenses (including reasonable attorneys' fees and costs), the Indemnified Party shall have the right, but not the obligation, to pay such amounts and be reimbursed by the Indemnifying Party for the same, together with interest thereon in accordance with Section 3.5 until paid in full. The Parties hereby acknowledge that it shall not be a defense to a demand for indemnity that less than all Claims asserted against the Indemnified Party are subject to indemnification.

12.3.5  Survival. This Section 12.3 shall survive the expiration or any termination of this Agreement.

## ARTICLE 13

## MORTGAGES

13.1  Mortgages Subject to Operator's Approval. Operator acknowledges that Owner, from time to time, will obtain equity and/or debt financing for the development, construction, furnishing, equipping and/or Operation of the Hotel, and Owner agrees that all such financing shall be subject to the reasonable approval of Operator; provided, however, that Operator's approval shall be limited to (a) reviewing the overall amount of the financing to ensure that the same is reasonably adequate to enable Owner to comply with its obligations under this Agreement and the Technical Services Agreement, including Owner's funding obligations for the Pre-Opening Services, Initial Working Capital and the continued and uninterrupted Operation of the Hotel after the Opening Date and (b) reviewing the amount of debt service in relation to anticipated operating results of the Hotel. Subject to the foregoing and unless Operator otherwise agrees in writing, Owner shall have the right to encumber all of the assets that comprise the Hotel, or any portion thereof or interest therein (including the real estate on which the Hotel is located, the Hotel building and all improvements thereto and all FF&E and Supplies located at or used in the Operation of the Hotel), and assign to any Mortgagee all of Owner's right, title and interest in this Agreement as collateral security for any loan secured by the Mortgage; provided, however, that (i) any such Mortgage must meet the requirements and limitations and be consistent with the terms of this Agreement, (ii) Owner shall not grant a Mortgage or security interest of any type in the Operating Account or the Reserve Fund unless the Mortgagee expressly recognizes in writing the rights of Operator to use all funds in such accounts for the purposes contemplated by this Agreement, (iii) Owner shall not grant a Mortgage or security interest of any type in the Payroll Account, (iv) Owner shall not grant a Mortgage or security interest of any type in, or name a Mortgagee as insured with respect to, or assign to a Mortgagee before or after a loss, that portion of any Business Interruption Insurance covering the Hotel or its operations that is intended to be available to Operator or Owner for payment of continuing Operating Expenses, the Operating Fees, Centralized Services Charges, Hotel Personnel Costs and all other Reimbursable Expenses, and other costs and expenses that necessarily continue notwithstanding the business interruption and (v) the Mortgagee must be a Person to whom Owner would have the right to transfer this Agreement pursuant to Article 11. Notwithstanding the foregoing, Owner and its Affiliates shall not incur any indebtedness at the time the initial and any subsequent debt financing is obtained

(including to Affiliates) which is secured by a Mortgage or other security interest in the Hotel or any portion thereof, unless Owner obtains a non-disturbance agreement from Owner's Lender(s), including the Subordination Agreement, that, as long as Operator is not in material default under this Operating Agreement, Operator shall have the right to occupy and operate the Hotel during the term of, and in accordance with, this Agreement, without any interference or ejection by Owner or any person or entity claiming under, through or by right of Owner; provided, however, any such non-disturbance agreement under any subsequent debt financing (and not under the initial debt financing) may provide that in the event of any foreclosure and termination of this Agreement, Operator and Owner's Lender (as successor to Owner's interest in the Hotel) shall enter into a Westin Franchise Agreement on then-current standard terms and conditions for a term expiring 10 years from and after the date of such foreclosure. Upon the request of Owner or Owner's Lender, Operator shall execute a subordination agreement on terms reasonably acceptable to Operator.

       13.2    <u>Mortgagee's Right of Access</u>. Upon reasonable advance notice from an approved Mortgagee, Operator shall permit such Mortgagee and its agents and representatives to enter any part of the Hotel at any reasonable time for the purposes of examining or inspecting the Hotel, or examining or copying the books and records of the Hotel; provided, however, that (a) any expenses incurred in connection with such activities shall be Operating Expenses of the Hotel and (b) Owner shall use commercially reasonable efforts to cause such Mortgagee to agree to treat as confidential (including execution and delivery of a confidentiality agreement acceptable to Operator) any information such Mortgagee obtains from examining the books and records of the Hotel provided by Owner to Operator, including the Operating Plan.

       13.3    <u>Disclosure of Mortgages</u>. Owner represents and warrants that (a) as of the Effective Date, the Initial Mortgage as set forth in Exhibit A is the only Mortgage encumbering the Hotel or any portion thereof or interest therein and (b) Owner has provided Operator with a true and complete copy of the Initial Mortgage and all documents related to the financing secured by the Initial Mortgage in effect as of the Effective Date prior to executing this Agreement. Owner shall provide Operator with a true and complete copy of any new Mortgage and all documents related to the financing secured by such new Mortgage within 30 days of the execution of such documents.

       13.4    <u>Nondisturbance</u>. Subject to Section 13.1, Owner shall ensure that this Agreement shall remain in effect throughout the Interim Term and the Operating Term, free from interference by any Mortgagee, including under the Subordination Agreement, any ground lessor or any other Person claiming under, through, or by right of Owner. In furtherance of such obligation, Owner shall (a) maintain title to the Hotel free and clear of any encumbrances (other than Mortgages permitted under this Agreement) that could jeopardize Operator's rights under this Agreement, (b) pay and discharge any Tax relating to the Hotel and, at Owner's expense, prosecute all actions necessary to assure Operator receives the full benefits of this Agreement at all times during from the Effective Date through the expiration of the Operating Term and (c) ensure that all existing and future Mortgagees and, to the extent requested by Operator, ground lessors provide Operator with nondisturbance agreements in form and content reasonably acceptable to Operator, which agreements shall, among other things, preclude a Hotel Transfer to any Prohibited Transferee.

       13.5    <u>Loan Documentation</u>.

       13.5.1    <u>Estoppel Certificates</u>. Upon written request at any time from the Effective Date and through the Operating Term, Operator shall issue to Owner or Mortgagee, within no less than 30 days after Operator's receipt of such request from Owner, an estoppel certificate: (a) certifying that this Agreement has not been modified and is in full force and effect (or, if there have been modifications, specifying the modifications and that the same is in full force and effect as modified) and (b) stating

whether, to the knowledge of the signatory of such certificate, any default by Owner exists, and if so, specifying each default of which the signatory has knowledge; provided, however, that in no event shall Operator be required to agree to any modifications or waivers with respect to this Agreement or other agreements in effect between the Parties. Similarly, Operator shall be entitled to an estoppel certificate from Owner, any Mortgagee (with respect to any Mortgage) or any ground lessor (with respect to any ground lease), upon the same notice and terms for an estoppel certificate issued by Operator.

13.5.2  Other Loan Documents. If Owner or Owner's Lender requests Operator to execute or consent to any documentation relating to a Mortgage or other financing of Owner other than an estoppel certificate, then (a) Owner shall provide any such documentation to Operator at least 30 days prior to the anticipated closing of the applicable financing transaction and (b) Owner shall pay to Operator all costs and expenses incurred by Operator in connection with such documentation and its review, including attorneys fees; provided, however, that the foregoing shall not in any way obligate Operator to execute or consent to any such documentation to the extent Operator deems it to be inconsistent with this Agreement.

## ARTICLE 14

## BUSINESS INTERRUPTION

14.1  Funds Provided by Owner.

14.1.1  Payments to Operator. Subject to Section 14.1.3, if any event occurs that results in an interruption in the Operation of the Hotel, Owner nevertheless shall be obligated to pay to Operator all fees and other amounts that would be due to Operator under this Agreement had such event not occurred for the period of the business interruption, regardless of whether any Business Interruption Insurance proceeds are available to Owner to cover such amounts. In the event of such business interruption, the Operating Fees and Centralized Services Charges shall be calculated based on projections of Gross Operating Revenue, Gross Operating Profit and Incentive Income which would have been generated had the business interruption event not occurred. The projections regarding Gross Operating Revenue, Gross Operating Profit and Incentive Income shall be derived from then-accepted practices in the hotel and insurance industries for such matters, with due consideration given to the Operating Plan for the Operating Year in which the business interruption occurred, and any financial projections for the Hotel most recently prepared by Operator prior to the business interruption event.

14.1.2  Funding Hotel Operations. Subject to Section 14.1.3, if any event occurs which results in any interruption in the Operation of the Hotel, Owner nevertheless shall be obligated to pay all expenses of operating and maintaining the Hotel at the level that is reasonably determined by Operator to be practicable given the business interruption event that has occurred, regardless of whether any Business Interruption Insurance proceeds are available to Owner to cover such amounts, and Owner shall deposit all amounts necessary for the Operation of the Hotel in the Operating Accounts in accordance with Article 6 during the period of the business interruption.

14.1.3  Participation in the Insurance Program. Notwithstanding the foregoing in this Section 14.1, if Owner maintains Business Interruption Insurance through the Insurance Program at the time of the business interruption, then subject to Section 14.2, Owner's obligations to provide funds under this Section 14.1 shall be limited to making available to Operator all proceeds under such Business Interruption Insurance to the extent required under this Article 14, and Owner shall not be required to provide any additional funds in respect of such business interruption.

14.2 **Proceeds of Business Interruption Insurance**. If the business of the Hotel is interrupted by any event or peril covered by Business Interruption Insurance, the proceeds of any such Business Interruption Insurance shall be deposited in the Operating Account and used by Operator in the same manner as funds generated from the Operation of the Hotel are used by Operator in accordance with this Agreement, including the payment of Operating Expenses, the Operating Fees, Centralized Services Charges and Hotel Personnel Costs and all other Reimbursable Expenses.

## ARTICLE 15

## CASUALTY OR CONDEMNATION

15.1 **Casualty**.

15.1.1 **Restoration of Hotel**. If the Hotel or any portion thereof is damaged or destroyed by a Casualty, Owner, at its expense and with due diligence, shall undertake a Restoration that will restore the Hotel to the condition of the Hotel existing immediately before the Casualty, except as required by Applicable Law; provided, however, Owner shall comply with then-current standards and image of a Brand hotel with respect to the build-out, furnishing and finishing of the Hotel. Notwithstanding the foregoing, if (a) the Hotel is damaged or destroyed to such an extent that the cost of the Restoration exceeds 30% of the replacement cost of the Hotel (excluding land, excavations, footings and foundations) and (b) Owner decides either to demolish the Hotel in its entirety or cease using the building as a hotel, then Owner may terminate this Agreement by notice to Operator within 30 days after such Casualty without incurring any further liability or obligation to Owner, except for those liabilities which expressly, or by their nature, survive termination of this Agreement. If Owner does not provide such termination notice to Operator within such time period, this Agreement shall remain in full force and effect and Owner shall be obligated to perform the Restoration. In addition, Operator shall have the right to recover any proceeds as a named insured, additional insured, loss payee or otherwise under any applicable insurance policy providing coverage for such Casualty and Operator shall have the right to deal directly with any insurer to pursue its claim under such insurance policy.

15.1.2 **Reinstatement of Agreement**. If this Agreement is terminated by Owner pursuant to Section 15.1.1 and Owner (or an Affiliate) determines at any time within three years after the date of such termination to either rebuild the Hotel or recommence using the building as a hotel, then Operator may reinstate this Agreement by notice to Owner (or its Affiliate) within 90 days after receipt by Operator of notice from Owner (or its Affiliate) of its decision to undertake a Restoration and has commenced the same; provided, however, that if Owner (or its Affiliate) fails to give such notice, then Operator may reinstate this Agreement by notice to Owner (or its Affiliate) at any time prior to the later of (a) completion of the Restoration and the full reopening of the Hotel or (b) 90 days after Operator becomes aware of the Restoration. If Owner (or its Affiliate) gives such restoration notice to Operator and Operator elects to reinstate this Agreement within such 90 day period, Owner (or its Affiliate) thereupon, at its expense, shall become obligated to complete the Restoration with due diligence. If this Agreement is terminated and then reinstated pursuant to this Section 15.1.2, then the Expiration Date shall be extended by the number of days between this Agreement's earlier termination and effective date of its reinstatement.

15.2 **Condemnation**.

15.2.1 **Restoration of Hotel**. If a Condemnation shall occur as to (a) the entire Hotel or Premises or (b) a portion of the Hotel that makes it imprudent, unsuitable or commercially impractical to Operate the remaining portion of the Hotel in accordance with the Operating Standards, then either Party may terminate this Agreement upon 90 days notice to the other Party, without incurring any further

liability or obligation to each other, except for those liabilities and obligations which expressly or by their nature survive the termination of this Agreement. If the Condemnation affects only a part of the Hotel that does not make it imprudent, unsuitable or commercially impractical to Operate the remainder of the Hotel in accordance with the Operating Standards, this Agreement shall not terminate, and Owner, at its expense and with diligence, shall undertake a Restoration in compliance with the Operating Standards and as approved by Operator prior to such Restoration.

15.2.2 <u>Condemnation Award</u>. Notwithstanding the foregoing, Operator shall have the right to institute or intervene in any available administrative proceeding or judicial action intended to determine fair compensation for such Condemnation for the purpose of representing Operator's compensable interest in any award for such Condemnation arising from this Agreement and Operator's right of quiet enjoyment hereunder. Any award made to Owner that does not recognize the separate compensable interest of Operator shall be apportioned between the Parties in consideration of all relevant factors, including: (a) recoupment by Owner of its investment, (b) return on Owner's investment to date, (c) actual loss of income (including Operator's fee income hereunder), (d) loss of reasonably anticipated future income (including Operator's fee income hereunder), (e) length of the unexpired term (including any renewals) of this Agreement and/or (f) the proportion that the Operating Fees have historically related to the return to Owner after payment of such fees. Owner and Operator shall cooperate with each other in the submission of the claim or claims so as to maximize the award available to both parties in connection with any Condemnation. If the Parties cannot agree upon such apportionment within 90 days after the amount of the award payable to Owner has been determined by settlement or a final judicial determination, either Party may submit the dispute for resolution in accordance with Article 17. Notwithstanding anything to the contrary, in no event shall Operator be entitled to any portion of an award that is intended to compensate solely for the loss of land or improvements, or to compensate Owner for Owner's cost to cure.

## ARTICLE 16

## DEFAULTS AND TERMINATIONS

16.1 <u>Event of Default</u>. The following actions or events shall constitute an "Event of Default" under this Agreement:

(a) A failure by either Party to pay any amount of money to the other Party when due and payable under this Agreement, which is not cured within 10 days after written notice to the defaulting Party;

(b) A failure by Owner to deposit in the Operating Account or Reserve Account any funds requested by Operator in a Funds Request within the time period provided in Section 5.5.2;

(c) A failure by either Party to perform any of the other covenants, duties or obligations set forth in this Agreement to be performed by such Party which has, or if left uncured will have, a material adverse effect on the Operation of the Hotel or the rights and obligations of the other Party and which is not cured within 30 days following notice of such default from the non-defaulting Party to the defaulting Party; provided, however, if (i) the default is not susceptible of cure within a 30 day period, (ii) the default cannot be cured solely by the payment of a sum of money and (iii) the default would not expose the non-defaulting Party to an imminent and material risk of criminal liability or of material damage to its business reputation, the 30 day cure period shall be extended if the defaulting Party commences to cure the default within such 30 day period and thereafter proceeds with reasonable diligence to complete such cure;

(d) A material breach by a Party of any representation or warranty expressly set forth in this Agreement;

(e) A Transfer by a Party in violation of the provisions of Article 11;

(f) (i) The insolvency of a Party, or a Party's failure generally to pay its debts as such debts become due; (ii) a general assignment by a Party for the benefit of its creditors, or any similar arrangement with its creditors by a Party; (iii) the entry of a judgment of insolvency against a Party; (iv) the filing by a Party of a petition for relief under applicable bankruptcy, insolvency or similar debtor relief laws; (v) the filing of a petition for relief under applicable bankruptcy, insolvency or similar debtor relief laws by any Person against a Party which is consented to by such Party, (vi) the appointment (or petition or application for appointment) of a receiver, custodian, trustee, conservator, or liquidator to oversee all or any substantial part of a Party's assets or the conduct of its business, (vii) any action by a Party for dissolution of its operations; or (viii) any other similar proceedings in any relevant jurisdiction affecting any Party; provided, however, that any involuntary proceeding against a Party shall not constitute an Event of Default if such Party discharges the applicable action within 120 days after the filing of such action;

(g) Operator determines in the exercise of its good faith judgment that it cannot Operate the Hotel in accordance with the Operating Standards because Owner has not provided the funds required pursuant to the terms of this Agreement (whether by refusing to approve items in the Operating Plan, provide funds pursuant to a Funds Request or otherwise);

(h) Any material Approval required for Operator's performance of its obligations under this Agreement or the Operation of the Hotel in accordance with the Operating Standards is not issued, or after issuance is suspended for a period in excess of 60 days, revoked or otherwise terminated, but only if such non-issuance, suspension, revocation or termination is due to circumstances beyond Operator's reasonable control; or

(i) The issuance of a levy or an attachment against all or any portion of the Hotel which remains unsatisfied for a period of 30 days resulting from a final judgment against a Party for which all appeal periods have expired and which is not fully covered by insurance.

OWNER ACKNOWLEDGES AND AGREES THAT IN NO EVENT SHALL OPERATOR BE DEEMED IN DEFAULT OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR APPLICABLE LAW SOLELY BY REASON OF (I) THE FAILURE OF THE FINANCIAL PERFORMANCE OF THE HOTEL TO MEET OWNER'S EXPECTATIONS, INCOME PROJECTIONS OR OTHER MATTERS INCLUDED IN THE OPERATING PLAN, (II) THE ACTS OF HOTEL PERSONNEL, (III) THE INSTITUTION OF LITIGATION OR THE ENTRY OF JUDGMENTS AGAINST OWNER OR THE HOTEL WITH RESPECT TO HOTEL OPERATIONS OR (IV) ANY OTHER ACTS OR OMISSIONS NOT OTHERWISE CONSTITUTING A DEFAULT OF OPERATOR'S OBLIGATIONS UNDER THIS AGREEMENT.

16.2 **Remedies for Event of Default**. Subject to the terms of this Agreement, if any Event of Default shall have occurred, the non-defaulting Party shall have the right to exercise against the defaulting Party any rights and remedies available to the non-defaulting Party under this Agreement or (subject to the provisions of this Agreement) at law or in equity; provided, however, neither Party shall have the right to terminate this Agreement by reason of the occurrence of an Event of Default, unless (a) the Event of Default is material in amount or in its adverse effect on the Operation of the Hotel, (b) the Event of Default constitutes intentional misconduct, reckless behavior or repeated Events of Default of a similar nature by the defaulting Party or (c) the remedies under this Agreement are inadequate to redress such

Event of Default. The Parties acknowledge that if the alleged defaulting Party disputes the non-defaulting Party's right to terminate the Agreement, such dispute shall be resolved in accordance with Article 17.

16.3   **Notice of Termination**. If termination of this Agreement is an available remedy, such remedy shall be exercised by the non-defaulting Party only by irrevocable and unconditional written notice to the defaulting Party, in which case this Agreement shall terminate on either (a) the date specified in this Agreement or (b) if not specified in this Agreement, the date specified by the non-defaulting Party in the termination notice, which date shall in no event be sooner than five days nor later than 30 days, after the delivery of such notice.

16.4   **Special Termination Rights of Operator**. In addition to any termination right that Operator may have under any other provision of this Agreement, Operator shall have the following additional rights to terminate this Agreement:

16.4.1   **Owner's Interference with Operation of the Hotel**. Operator may terminate this Agreement on at least three months' notice to Owner if, at any time during the Interim Term or Operating Term, Operator determines in the exercise of its good faith judgment that it cannot Operate the Hotel in accordance with the Operating Standards because Owner or its agents or representatives has interfered, on three or more separate occasions, in any material respect with the Operation of the Hotel, including, without limitation, as a result of the breach of Section 10.5 of this Agreement; provided, however, that if Owner has ceased such interference after receipt of such termination notice, Operator shall have the right to revoke its termination notice.

16.4.2   **Adverse Effect on Gaming Licenses**. Operator may terminate this Agreement on at least 30 days notice to Owner if, at any time during the Interim Term or Operating Term, Operator determines in the exercise of its good faith judgment that the continued Operation of the Hotel could subject Operator or any Affiliates to the loss of any Approvals under any Gaming Laws then held by Operator or any Affiliates.

16.4.3   **Violation of Anti-Terrorism Laws**. Operator may terminate this Agreement on at least 30 days notice to Owner if, at any time during the Interim Term or Operating Term, Operator determines in the exercise of its good faith judgment that the continued Operation of the Hotel would cause Operator or any of its Affiliates to be in violation of any Anti-Terrorism Laws, or subject Operator or any of its Affiliates, or any of its assets or interests, to any fines, penalties, sanctions, confiscation or similar liability or action under any Anti-Terrorism Laws.

16.4.4   **Non-Completion of Pre-Flagging PIP**. Operator may terminate this Agreement on at least 30 days notice to Owner if any of the components of the Pre-Flagging PIP has not been completed in accordance with the time periods set forth in Section 6.1.2 of the Agreement.

16.4.5   **No Release of Liability**. Notwithstanding the foregoing, no termination of this Agreement by Operator pursuant to this Section 16.4 shall relieve Owner of any liability or obligation it may have to Operator by reason of the circumstances that caused Operator to terminate this Agreement.

16.5   **Special Termination Rights of Owner – Performance Test**.

16.5.1   **Performance Test**. In addition to any termination right that Owner may have under any other provision of this Agreement, Owner shall have the right to terminate this Agreement, without payment of any termination fee, but subject to Operator's Cure Right and the other conditions for termination in this Section 16.5, and otherwise in accordance with the provisions of Section 16.8, if for any two consecutive Operating Years both of which occur after the third Full Operating Year (i.e.,

beginning with the fourth and fifth Full Operating Years), each of the following occurs in both of such Operating Years: (a) the GOP achieved by the Hotel for each Operating Year is less than 90% of the GOP set forth in the Operating Plan for such Operating Year, and (b) the Annualized RevPAR for the Hotel for each of such Operating Years is less than 85% of the Annualized RevPAR for the Competitive Set for each respective Operating Year (collectively, the "Performance Test"). If no Operating Plan has been approved by the Parties for any Operating Year, Operator shall be deemed to have achieved the Performance Test for such Operating Year. If the Performance Test is not achieved for any two consecutive Full Operating Years, then Owner may exercise its right to terminate this Agreement only by irrevocable notice of termination to Operator given within 60 days after receipt by Owner of the Certified Financial Statements for the second such Operating Year, specifying a termination date not less than 60 days nor more than 90 days after the giving of such notice. Notwithstanding the foregoing, the Performance Test shall be equitably adjusted to the extent GOP or Annualized RevPAR is not achieved as a result of: (a) a failure of Owner to provide sufficient funds as required under this Agreement (b) the impact of significant capital improvement programs at any of the hotels in the Competitive Set or (c) a Force Majeure Event. Owner expressly acknowledges that Operator's failure to achieve the Performance Test itself shall not constitute an Event of Default or otherwise result in any liability to Operator or any of its Affiliates.

        16.5.2   <u>Cure Right</u>. Notwithstanding anything to the contrary in Section 16.5.1, if Owner has the right to terminate this Agreement under Section 16.5.1 and sends a notice of termination in accordance with Section 16.5.1, Operator shall have the right (the "Cure Right"), but not the obligation, exercisable not more than two times during the Initial Term and not more than once during both Extension Terms, to pay to Owner, within 60 days after receipt by Operator of such termination notice, an amount equal to the difference between: (a) 90% of the GOP set forth in the Operating Plan for the second of the two consecutive Operating Years giving rise to Owner's right to terminate, and (b) the actual Gross Operating Profit for such Operating Year. The Operating Fees also shall be equitably adjusted upward to reflect the additional GOP being paid to Owner. If Operator elects to make such payment, Owner's notice of termination shall be deemed withdrawn and Owner shall not have the right to send another notice of termination unless the conditions of this Section 6.5.2 are met for each of two consecutive Operating Years thereafter, in which case the Cure Right may be exercised again.

        16.5.3   <u>Competitive Set</u>. The Parties shall establish a competitive set of hotels (the "Competitive Set") for the purposes of the Performance Test, which shall consist of the hotels in the Hotel's immediate market area which are most comparable to the Hotel in quality, price and market (with due consideration given to age, quality, size, amenities, amount of meeting space and business mix); provided that (a) the Competitive Set shall include at least four hotels and no more than six hotels, and (b) in no event shall any single hotel in the Competitive Set account for more than 30% of the total guest rooms of all Hotels included in the Competitive Set. For avoidance of doubt, the Hotel shall not be a part of the Competitive Set. All determinations as to which hotels are to be included in the Competitive Set shall be made by the agreement of the Parties or, if the Parties are unable to reach agreement, as determined by a nationally recognized hospitality industry consultant that is mutually acceptable to the Parties. If a material change to any hotel in the then existing Competitive Set occurs, including the cessation of operation of a hotel, or a material change in the standards of operation of a hotel, then either Party may request the replacement of such hotel in the Competitive Set, provided the replacement hotel has been in operation for at least three full years. The Initial Competitive Set as set forth in Exhibit A shall constitute the Competitive Set as of the Effective Date. The Competitive Set shall be reviewed and amended as required under this Section 16.5.3 as part of the approval of the Operating Plan.

        16.6   <u>Cross-Termination with Other Agreements</u>. Notwithstanding anything to the contrary in this Agreement, if any of the Technical Services Agreement or the Trademark License Agreement is terminated in accordance with its terms for any reason whatsoever (other than by the expiration of its

term), then this Agreement shall terminate on the effective date of such termination, with no further action by the Parties, unless Operator notifies Owner on or before the effective date of such termination that Operator elects to maintain this Agreement in effect notwithstanding such termination.

    16.7    <u>Actions To Be Taken on Termination</u>. The Parties shall take the following actions upon the expiration or termination of this Agreement:

        16.7.1    <u>Payment of Expenses for Termination</u>. All expenses arising as a result of such termination or as a result of the cessation of Hotel operations by Operator (including expenses arising under this Section 16.8) shall be for the sole account of Owner, and Owner shall reimburse Operator immediately upon receipt of any invoice from Operator for any expenses, including those arising from or in connection with severing the employment of any Hotel Personnel employed by Operator or its Affiliates (with severance benefits calculated in accordance with Operator's severance policies) incurred by Operator in the course of effecting the expiration or termination of this Agreement or the cessation of Hotel operations by Operator.

        16.7.2    <u>Payment of Amounts Due to Operator</u>. Owner shall pay to Operator all Operating Fees, Centralized Services Charges, Hotel Personnel Costs or any Hotel Personnel employed by Operator or any of its Affiliates, and all other Reimbursable Expenses and other amounts due Operator under this Agreement through the effective date of expiration or termination. This obligation is unconditional and shall survive the expiration or termination of this Agreement (including all amounts owed to Operator that are not fully ascertainable as of the expiration or termination date), and Owner shall not have or exercise any rights of setoff, except to the extent of any outstanding and undisputed payments owed to Owner by Operator under this Agreement. In the alternative, Operator shall have the right to pay itself the foregoing fees, charges, expenses and other amounts then due to Operator out of any available funds in the Bank Accounts and any such payment shall satisfy Owner's obligation with respect to the amount so paid.

        16.7.3    <u>Surrender of Premises</u>. Operator shall peacefully vacate and surrender the Hotel to Owner on the effective date of such expiration or termination, and the Parties shall execute and deliver any expiration or termination or other necessary agreements either Party shall request for the purpose of evidencing the expiration or termination of this Agreement.

        16.7.4    <u>Usage of Trademarks</u>. Neither Owner nor any Person acting for or on behalf of Owner shall identify the Hotel in any manner as an Operated Brand Hotel, any other Brand hotel or a hotel operated by Operator or its Affiliates, or otherwise associate itself or the Hotel with the Brand in any manner to the public. Owner immediately shall take all steps reasonably requested by Operator to disassociate the Hotel and Owner from the Trademarks, and shall delete all Trademarks from the Hotel's name, and cease to use all FF&E and Supplies bearing any of the Trademarks on the effective date of termination. If Owner fails to remove any exterior or interior signage at the Hotel bearing any of the Trademarks prior to the effective date of such termination, Operator shall have the right, at Owner's expense, to enter the Premises and remove and retain all such exterior and interior signage, without any liability for the cost to repair or restore the Hotel or damage to any FF&E resulting from such removal.

        16.7.5    <u>Assignment and Transfers to Owner</u>. Operator shall assign and transfer to Owner:

            (a)    all leases and contracts with respect to the Hotel (including collective bargaining agreements and pension plans, equipment leases, leases, licenses and concession agreements and maintenance and service contracts) in effect with respect to the Hotel as of the date of expiration or

termination of this Agreement, and Owner shall assume all liabilities and obligations thereunder, and if requested by Operator, Owner shall confirm its assumption of such liabilities and obligations in writing;

(b) all of Operator's right, title and interest in and to all Approvals, including liquor licenses, if any, held by Operator in connection with the Operation of the Hotel, but only to the extent such assignment or transfer is permitted under Applicable Law; provided, however, that Owner shall reimburse Operator for any funds Operator has expended in obtaining any such Approvals;

(c) all books and records of the Hotel (but excluding any Proprietary Rights); provided, however, that Owner shall retain all such books and records and make them available to Operator at the Hotel at all reasonable times for inspection, audit, examination and photocopying, at Operator's expense, for at least five years after the date of such expiration or termination;

(d) subject to Section 16.7.2 of this Agreement, all Bank Accounts; and

(e) a copy of the Hotel Guest Information.

16.7.6 Purchase of FF&E and Supplies. Operator shall have the right to purchase from Owner, for a price equal to the fair market value (but not exceeding Owner's purchase cost), all unbroken FF&E and cases of Hotel's Supplies bearing any of the any Trademarks then located at the Hotel or ordered for use at the Hotel, except in the event of a termination based on an Operator Event of Default, in which case Operator shall be obligated to purchase such unbroken equipment and unbroken cases of the Hotel's Supplies from Owner for a price equal to the fair market value thereof (but not exceeding Owner's actual purchase cost).

16.7.7 Equipment Leases for Brand Programs. If Operator has leased any computer, telephone or other telecommunications equipment for use at the Hotel in connection with any Centralized Services under this Agreement, or Technology Systems under Exhibit E, Owner shall have the right, at its option, to request that either (a) Operator transfer such lease to Owner or (b) Owner, at Owner's expense, buy out the equipment lease. Any such transfer or buy-out of the equipment lease shall be subject to the consent or approval of the third party lessor of such equipment. If the equipment lease is not transferable or cannot be bought out, Operator shall remove all such equipment from the Hotel within 30 days after the effective date of expiration or termination of this Agreement.

16.7.8 Bookings and Reservations. Owner shall honor, and shall cause any successor operator to honor, all business confirmed for the Hotel with reservations (including reservations made in good faith by Operator or Licensor for employee complimentary or discounted rooms, guest frequency program, or pursuant to Operator's or Licensor's other promotional programs) dated after the effective date of the expiration or termination in accordance with such bookings as accepted by Operator. Owner will assume responsibility for all advance deposits received by Operator for the Hotel and conveyed to Owner.

16.7.9 Survival. This Section 16.8 shall survive the expiration or termination of this Agreement.

16.8 Notice of Termination to Employees. Owner acknowledges that Owner or its Affiliates may have an obligation under Applicable Law to give advance notice to Hotel Personnel of any termination of employment, and that failure to comply with such notification obligation might give rise to certain liabilities under Applicable Law. Accordingly, notwithstanding anything to the contrary in this Agreement, the effective date of termination shall be extended to permit Operator, for and on Owner's behalf, to comply with all time periods under Applicable Law if any, unless Owner agrees in writing to

defend, indemnify and hold harmless Operator and its Affiliates in accordance with Section 12.3.1 from and against all Claims (including lost compensation, fines, penalties and attorneys fees and expenses) incurred by Operator or its Affiliates, arising thereunder as a result of such termination.

## ARTICLE 17

## DISPUTE RESOLUTION

17.1  **Alternative Dispute Resolution.**

17.1.1  **Alternative Dispute Resolution Required.** Subject to Section 17.1.6, the Parties agree for themselves, and each of their respective Equity Owners, Parent Companies and Guarantors, and each their respective Affiliates, and each of the shareholders, trustees, beneficiaries, directors, officers, employees or agents of any of the foregoing, that all controversies, disputes or claims between the Parties arising from or relating to this Agreement shall be subject to, and resolved in accordance with, this Article 17. (For the purposes of this Article 17, the term "Party" shall refer to each of the Persons referenced in this Section 17.1.1.) All such resolutions shall be conducted in the English language.

17.1.2  **Mediator.** Any controversy, dispute or claim between the Parties shall on demand of either Party be submitted to mediation administered by JAMS ("Judicial Arbitration and Mediation Service, Inc.") or its successors, and if JAMS no longer exists or is unable to administer the mediation of the dispute in accordance with this Article 17, and the Parties cannot agree on the identity of a substitute mediation service provider within 10 days after notice by the complaining Party, then such Party shall petition a court of competent jurisdiction located in the state where Operator then has its principal place of business, to identify a substitute mediation service provider, who will administer the dispute resolution process in accordance with this Article 17 (the "Mediation Service").

17.1.3  **Mediation Procedures.** In any such mediation proceeding, the complaining Party must notify the other Party that a dispute exists and then contact the Mediation Service to schedule the mediation conference. An Individual mediator (the "Mediator") will then be selected in accordance with the rules of the Mediation Service to conduct the mediation, provided that such Mediator must have experience in the hospitality industry and Operation of hotels, and must not have any conflict of interest. The Parties shall attempt to settle the dispute by participating in at least eight hours of mediation in New York, New York, or other place designated by the Mediator. The mediation will be a non-binding conference between the Parties conducted in accordance with the applicable rules and procedures of the Mediation Service. Neither Party may initiate litigation nor arbitration proceedings with respect to any dispute until the mediation of such dispute is complete with the sole exception of seeking emergency relief from a court of competent jurisdiction, as described in this Article 17. Any mediation will be considered complete: (a) if the Parties enter into an agreement to resolve the dispute, (b) with respect to the Party submitting the dispute to mediation, if the other Party fails to appear at or participate in a reasonably scheduled mediation conference or (c) if the dispute is not resolved within five days after the mediation is commenced.

17.1.4  **Arbitrator.** If any dispute remains between the Parties after the mediation is complete and the complaining Party desires to pursue such dispute, then the dispute shall be submitted to final and binding arbitration to the American Arbitration Association, or if the American Arbitration Association no longer exists or is unable to administer the arbitration of the dispute in accordance with this Article 17, and the Parties cannot agree on the identity of a substitute arbitration service provider within 10 days after notice by the complaining Party, then such Party shall petition a court of competent jurisdiction located in the state where Operator then has its principal place of business, to identify a

substitute arbitration service provider, who will administer the dispute resolution process in accordance with this Article 17 (the "Arbitration Tribunal").

17.1.5  Arbitration Procedures. In any such arbitration proceeding, each Party shall submit or file any claim which would constitute a compulsory counterclaim within the same proceeding as the claim to which it relates. Any such claim that is not submitted or filed in such proceeding shall be barred. One or more designated individual arbitrators (the "Arbitrator(s)") will then be selected in accordance with the rules of the Arbitration Tribunal to conduct the arbitration; provided, that such Arbitrators must have experience in the hospitality industry and Operation of hotels, and must not have any conflict of interest; provided, further, that if no agreement can be reached on the number of Arbitrator(s), then the number of Arbitrators shall be one. The arbitration proceedings shall be held in New York, New York, and shall be conducted in accordance with the then-current commercial arbitration rules of the Arbitration Tribunal, except the Parties shall be entitled to limited discovery at the discretion of the Arbitrator(s) who may, but are not required to, allow depositions. The Parties acknowledge that the Arbitrator(s)' discovery power is not subject to geographic limitations. The arbitration proceedings shall be conducted on an individual basis, and not on a multi-plaintiff, consolidated, collective or class-wide basis. The Arbitrator(s) shall have the right to award the relief that he or she deems proper, consistent with the terms of this Agreement, including compensatory damages (with interest on unpaid amounts from date due), specific performance, injunctive relief, legal fees and costs. The award and decision of the Arbitrator(s) shall be conclusive and binding on all parties, and judgment upon the award may be entered in any court of competent jurisdiction.

17.1.6  Alternative Dispute Resolution Not Required for Certain Disputes. Notwithstanding anything to the contrary in this Article 17, the Parties shall have the right to commence litigation or other legal proceedings with respect to any claims relating to the: (a) preservation or protection of Operator's Proprietary Rights and (b) enforcement of the dispute resolution provisions of this Agreement, including any arbitration award. In addition, the Parties shall have the right to obtain in any court of competent jurisdiction, without bond, but upon notice required under Applicable Law, any injunctive relief, including temporary restraining orders and preliminary injunctions, against conduct or threatened conduct for which no adequate remedy at law may be available, or which might cause irreparable harm to a Party or its Affiliates, and any such injunctive relief shall be in addition to such further and other relief as may be available to such Party or its Affiliates under Applicable Law.

17.1.7  Time Period for Claim. Except as otherwise prohibited or limited by Applicable Law, any failure, neglect or delay of a Party to assert any breach or violation of any legal or equitable right arising from or in connection with this Agreement shall constitute a waiver of such right and shall preclude the exercise or enforcement of any legal or equitable remedy arising from such breach or violation, unless written notice specifying such breach or violation is provided to the other Party within 24 months after the later of: (a) the date of such breach or violation; or (b) the date of discovery of the facts (or the date the facts could have been discovered, using reasonable diligence) giving rise to such breach or violation. Such written notice shall not toll any applicable statute of limitations.

17.1.8  Compensation of Mediator or Arbitrator(s). Subject to the right of the prevailing Party to seek reimbursement from the other Party pursuant to Section 17.2, the Parties agree to share equally the fees and costs of the Mediation Service or Arbitration Tribunal selected or appointed under this Article 17. As soon as practicable after selection of the Mediator or Arbitrator(s), the Mediation Service or Arbitration Tribunal or their designated representative shall determine a reasonable estimate of the anticipated fees and costs, and send a statement to each Party setting forth that Party's equal share of the fees and costs. Each Party shall deposit the required sum with the Mediation Service or Arbitration Tribunal, as applicable, within 10 days after receipt of the statement.