17.2    **Prevailing Party's Expenses**. The prevailing Party in any arbitration, litigation or other legal action or proceeding arising out of or related to this Agreement shall be entitled to recover from the losing Party all reasonable fees, costs and expenses incurred by the prevailing Party in connection with such arbitration, litigation or other legal action or proceeding (including any appeals and actions to enforce any arbitration awards and court judgments), including reasonable fees, expenses and disbursements for attorneys, experts and other third parties engaged in connection therewith and its share of Mediation Service and Arbitration Tribunal fees and costs. If a Party prevails on some, but not all, of its claims, such Party shall be entitled to recover an equitable amount of such fees, expenses and disbursements, as determined by the applicable Arbitrator(s) or court. All amounts recovered by the prevailing Party under this Section 17.3 shall be separate from, and in addition to, any other amount included in any arbitration award or judgment rendered in favor of such Party.

    17.3    **Jurisdiction and Venue**. Owner irrevocably submits to the jurisdiction of the courts of the State of New York in any litigation or other legal action or proceeding, arising out of or relating to this Agreement or any other dispute between the Parties that is not subject to arbitration under this Article 17, and Owner irrevocably agrees that all claims in respect of any such litigation, action or proceeding must be brought and/or defended in the courts of the State of New York. Owner agrees that service of process for purposes of any such litigation, action or proceeding need not be personally served or served within the State of New York, but may be served with the same effect as if Owner were served within the State of New York, by certified mail or any other means permitted by Applicable Law addressed to Owner at the address set forth herein. Nothing in this Section 17.3 shall affect Operator's rights to pursue any litigation or other legal action or proceeding in any other appropriate jurisdiction, including any litigation, action or proceeding brought by Operator to enforce any judgment against Owner entered by a court in the State of New York.

    17.4    **WAIVERS**.

    17.4.1    JURISDICTION AND VENUE. OWNER AND OPERATOR WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL DEFENSES BASED ON LACK OF JURISDICTION OR INCONVENIENT VENUE OR FORUM FOR ANY LITIGATION OR OTHER LEGAL ACTION OR PROCEEDING PURSUED BY OPERATOR OR OWNER IN THE JURISDICTION AND VENUE SPECIFIED IN SECTION 17.3.

    17.4.2    TRIAL BY JURY. EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY OF ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT.

    17.4.3    CLASS ACTIONS. OWNER AGREES THAT, FOR OPERATOR'S CHAIN OF BRAND HOTELS TO FUNCTION PROPERLY, OPERATOR SHOULD NOT BE BURDENED WITH THE COSTS OF ARBITRATING OR LITIGATING SYSTEM WIDE CLAIMS. ACCORDINGLY, OWNER AGREES THAT ANY DISAGREEMENT BETWEEN OWNER AND OPERATOR SHALL BE CONSIDERED UNIQUE AS TO ITS FACTS AND SHALL NOT BE BROUGHT AS A CLASS ACTION, AND OWNER WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO BRING A CLASS ACTION OR MULTI-PLAINTIFF, CONSOLIDATED OR COLLECTIVE ACTION AGAINST OPERATOR OR ANY OF ITS AFFILIATES.

    17.4.4    DECISIONS IN PRIOR CLAIMS. IN ADDITION, OWNER AGREES THAT IN ANY ARBITRATION OR LITIGATION BETWEEN THE PARTIES, THE ARBITRATOR(S) OR COURT SHALL NOT BE PRECLUDED FROM MAKING ITS OWN INDEPENDENT DETERMINATION OF THE ISSUES IN QUESTION, NOTWITHSTANDING THE SIMILARITY OF

ISSUES IN ANY OTHER ARBITRATION OR LITIGATION INVOLVING OPERATOR AND ANY OTHER OWNER OR ANY OF THEIR AFFILIATES, AND EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO CLAIM THAT A PRIOR DISPOSITION OF THE SAME OR SIMILAR ISSUES PRECLUDES SUCH INDEPENDENT DETERMINATION.

17.4.5 PUNITIVE DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR UNDER APPLICABLE LAW, IN ANY ARBITRATION, LAW SUIT, LEGAL ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING FROM OR RELATING TO THIS AGREEMENT OR THE HOTEL, THE PARTIES UNCONDITIONALLY AND IRREVOCABLY WAIVE AND DISCLAIM TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW ALL RIGHTS TO ANY CONSEQUENTIAL, PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES (OTHER THAN OPERATOR'S STATUTORY RIGHTS AND REMEDIES RELATING TO TRADEMARKS, COPYRIGHTS, TRADE SECRETS AND OTHER INTELLECTUAL PROPERTY), AND ACKNOWLEDGE AND AGREE THAT THE RIGHTS AND REMEDIES IN THIS AGREEMENT, AND ALL OTHER RIGHTS AND REMEDIES UNDER APPLICABLE LAW, WILL BE ADEQUATE IN ALL CIRCUMSTANCES FOR ANY CLAIMS THE PARTIES MIGHT HAVE WITH RESPECT THERETO.

17.5 **Survival and Severance.** The provisions of this Article 17 are severable from the other provisions of this Agreement and shall survive and not be merged into any termination or expiration of this Agreement or any judgment or award entered in connection with any dispute, regardless of whether such dispute arises before or after termination or expiration of this Agreement, and regardless of whether the related mediation, arbitration or litigation proceedings occur before or after termination or expiration of this Agreement. If any part of this Article 17 is held to be unenforceable, it shall be severed and shall not affect either the duties to mediate or arbitrate or any other part of this Article 17.

## ARTICLE 18

## REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGEMENTS

18.1 **Operator's Representations and Warranties.** Operator represents and warrants to Owner as of the Effective Date that:

18.1.1 **Organization and Authority.** Operator is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, is duly qualified to do business in the jurisdiction in which the Hotel is located (to the extent required by Applicable Law), and has full power, authority, and legal right to execute, perform, and timely observe all of the provisions of this Agreement to be performed or observed by Operator. Operator's execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action on the part of Operator.

18.1.2 **Enforceability.** This Agreement constitutes a valid and binding obligation of Operator and does not constitute a breach of or default under the organizational and governing documents of Operator or any Applicable Law to which Operator is subject or by which it or any substantial portion of its assets is bound or affected.

18.1.3 **Third-Party Approvals.** No approval of any third party is required for Operator's execution and performance of this Agreement that has not been obtained prior to the execution of this Agreement, other than with respect to any business license, if any, which may need to be obtained in Aruba in connection with Operator's performance of the terms of this Agreement.

18.1.4  **Brokers.**  Neither Operator nor any Affiliate has dealt with any Person who has acted as a broker, finder or similar capacity that would entitle such Person to any commission, finder's fee or similar compensation in connection with this Agreement or the transaction described herein.

18.1.5  **Litigation.**  To Operator's actual knowledge, there is no litigation, proceeding or governmental investigation pending or threatened against Operator which could adversely affect the validity of this Agreement or the ability of Operator to comply with its obligations under this Agreement.

18.2  **Owner's Representations and Warranties.**  Owner represents and warrants to Operator as of the Effective Date that:

18.2.1  **Organization and Authority.**  Owner is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, is duly qualified to do business in the jurisdiction in which the Hotel is located, and has full power, authority, and legal right to execute, perform and timely observe all of the provisions of this Agreement to be performed or observed by Owner. Owner's execution, delivery and performance of this Agreement have been duly authorized by all necessary action on the part of Owner.

18.2.2  **Enforceability.**  This Agreement constitutes a valid and binding obligation of Owner and does not and will not constitute a breach of or default under any of the organizational or governing documents of Owner or the terms, conditions, or provisions of any Applicable Law to which Owner is subject or by which it or any substantial portion of its assets (including the Hotel) is bound or affected.

18.2.3  **Third-Party Approvals and Contracts.**  No approval of any third party (including any ground lessor or the holder of any Mortgage) is required for Owner's execution and performance of this Agreement that has not been obtained prior to the execution of this Agreement. Neither Owner nor any Affiliate is a party to any agreement for the management or operation of the Hotel or any portion thereof that would conflict with this Agreement.

18.2.4  **Brokers.**  Neither Owner nor any Affiliate has dealt with any Person who has acted as a broker, finder or similar capacity that would entitle such Person to any commission, finder's fee or similar compensation in connection with this Agreement or the transaction described herein.

18.2.5  **Litigation.**  To Owner's knowledge, there is no litigation, proceeding or governmental investigation pending or threatened against Owner that could adversely affect the validity of this Agreement or the ability of Owner to comply with its obligations under this Agreement.

18.2.6  **Financial Statements.**  The financial statements and other documents submitted by Owner to Operator prior to the execution of this Agreement: (a) are accurate and complete as of their respective dates and as of the Effective Date and (b) do not omit the statement of any material fact necessary to make them not misleading.

18.2.7  **Ownership of Hotel and Owner.**  All information set forth in Exhibit A (a) is accurate and complete as of their respective dates and as of the Effective Date and (b) does not omit the statement of any material fact necessary to make them not misleading. Owner is the sole owner or lessee of the Hotel (including the building and all of its contents) and the sole owner of the fee title to, or leasehold estate in, the Premises. Owner has full power, authority and legal right to own and/or lease such real and personal property.

18.2.8 Compliance with Laws. To Owner's knowledge, the Hotel and the Premises are in compliance with all Applicable Laws (including all Approvals).

18.2.9 Gaming Laws and Anti-Terrorism Laws. Without limiting the generality of Section 18.2.8, neither Owner, nor any Equity Owner, Parent Company or Guarantor, if any, nor any of their respective Affiliates, nor the shareholders, trustees, beneficiaries, directors, officers, employees or agents of any of the foregoing, (a) is in violation of any Gaming Laws or Anti-Terrorism Laws or (b) would cause Operator or any of its Affiliates to be in violation of any Gaming Laws or Anti-Terrorism Laws. No assets or interests (including the Hotel) of Owner, nor any Equity Owner, Parent Company or Guarantor, if any, nor any of their respective Affiliates, nor the shareholders, trustees, beneficiaries, directors, officers, employees or agents of the any of the foregoing, is subject to any restrictions under any Gaming Laws or Anti-Terrorism Laws.

18.2.10 Environmental Matters. Except as set forth on Exhibit J attached hereto, without limiting the generality of Section 18.2.8, to Owner's knowledge, (a) no hazardous or toxic materials, substances or wastes are or have been manufactured, generated, processed, used, handled, stored, disposed, released or discharged at, on, in, over, under or from the Hotel, the Premises or the real property adjacent to the Hotel, (b) there are no soil, water, air, mineral, chemical or environmental conditions or contamination at, on, in, over, under or from the Hotel, the Premises or real property adjacent to the Hotel that does, or with the passage of time will, require any remediation, abatement, removal, clean up, monitoring or other corrective action, or notice or reporting to any Governmental Authority or employees or patrons of the Hotel, pose any threat to the health and safety of the employees or patrons of the Hotel or the environmental or natural resources in general, or otherwise require, based on Applicable Law or standards of prudent ownership, any remediation, abatement, removal, clean up, monitoring or other corrective action, (c) there exists no identifiable threat of the contamination of the Premises by release of hazardous or toxic materials, substances or wastes or otherwise from existing sources adjacent to the Hotel and (d) there are no underground storage tanks on the Premises.

18.2.11 Wyndham Agreements. All agreements to which Owner is a party or by which any of its assets are bound and which are with or relate to Wyndham, including, without limitation, the Wyndham Agreement, (a) gives the Owner the right to terminate such agreement with respect to the other parties thereto without such termination being a breach thereof or (b) the Owner and other parties thereto, including, without limitation, Wyndham, have executed and delivered a legally binding termination of such agreement. Neither the execution, delivery nor the performance of this Agreement or any of the other agreements contemplated hereby constitutes a violation of any such agreement with Wyndham, including without limitation, the Wyndham Agreement, or shall be deemed to cause tortious interference by Operator or any of its Affiliates resulting in any Claims against any of them by or through Wyndham. In addition, Owner has the full right, power and authority to enter into this Agreement and the other agreements contemplated hereby.

18.3 Owner's Covenants. Owner shall take (or refrain from taking) all actions as may be necessary to ensure that the representations set forth in Sections 18.2.1 and 18.2.9 remain true at all times from and after the Effective Date through the expiration of the Operating Term.

18.4 ACKNOWLEDGEMENTS. OWNER AND OPERATOR EACH ACKNOWLEDGE AND CONFIRM TO THE OTHER THAT:

18.4.1 INFORMED INVESTOR. THE ACKNOWLEDGING PARTY HAS HAD THE BENEFIT OF LEGAL COUNSEL AND ALL OTHER ADVISORS OWNER DEEMED NECESSARY OR ADVISABLE TO ASSIST IT IN THE NEGOTIATION AND PREPARATION OF THIS AGREEMENT, AND THE OTHER PARTY'S ATTORNEYS HAVE NOT REPRESENTED THE

ACKNOWLEDGING PARTY, OR PROVIDED ANY LEGAL COUNSEL OR OTHER ADVICE TO THE ACKNOWLEDGING PARTY, WITH RESPECT TO THIS AGREEMENT.

       18.4.2  BUSINESS RISKS. THE ACKNOWLEDGING PARTY (A) IS A SOPHISTICATED PERSON, (B) RECOGNIZES THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT INVOLVE SUBSTANTIAL BUSINESS RISKS, AND (C) HAS MADE AN INDEPENDENT INVESTIGATION OF ALL ASPECTS OF THIS AGREEMENT SUCH PARTY DEEMS NECESSARY OR ADVISABLE.

       18.4.3  NO ADDITIONAL REPRESENTATIONS OR WARRANTIES. NEITHER PARTY HAS MADE ANY PROMISES, REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND WHATSOEVER TO THE OTHER PARTY, EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, AND NO PERSON IS AUTHORIZED TO MAKE ANY PROMISES, REPRESENTATIONS, WARRANTIES OR GUARANTIES ON BEHALF OF EITHER PARTY, EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

       18.4.4  NO RELIANCE. NEITHER PARTY HAS RELIED UPON ANY STATEMENTS OR PROJECTIONS OF REVENUE, SALES, EXPENSES, INCOME, RATES, AVERAGE DAILY RATE, OCCUPANCY, REVENUE PER AVAILABLE ROOM, RESERVATION SYSTEM CONTRIBUTION, PROFITABILITY, VALUE OF THE HOTEL OR SIMILAR INFORMATION PROVIDED BY THE OTHER PARTY BUT HAS INDEPENDENTLY CONFIRMED THE ACCURACY AND RELIABILITY OF ANY SUCH INFORMATION AND IS SATISFIED WITH THE RESULTS OF SUCH INDEPENDENT CONFIRMATION.

       18.4.5  LIMITATION ON FIDUCIARY DUTIES. TO THE EXTENT ANY FIDUCIARY DUTIES THAT MAY EXIST AS A RESULT OF THE RELATIONSHIP OF THE PARTIES ARE INCONSISTENT WITH, OR WOULD HAVE THE EFFECT OF EXPANDING, MODIFYING, LIMITING OR RESTRICTING ANY OF THE EXPRESS TERMS OF THIS AGREEMENT, (A) THE EXPRESS TERMS OF THIS AGREEMENT SHALL CONTROL, (B) THIS AGREEMENT SHALL BE INTERPRETED IN ACCORDANCE WITH GENERAL PRINCIPLES OF CONTRACT INTERPRETATION WITHOUT REGARD TO THE COMMON LAW PRINCIPLES OF AGENCY AND (C) ANY LIABILITY OF THE PARTIES SHALL BE BASED SOLELY ON PRINCIPLES OF CONTRACT LAW AND THE EXPRESS TERMS OF THIS AGREEMENT. THE PARTIES FURTHER ACKNOWLEDGE AND AGREE THAT FOR THE PURPOSES OF DETERMINING THE NATURE AND SCOPE OF OPERATOR'S FIDUCIARY DUTIES UNDER THIS AGREEMENT, THE TERMS OF THIS AGREEMENT, AND THE DUTIES AND OBLIGATIONS SET FORTH HEREIN, ARE INTENDED TO SATISFY ALL FIDUCIARY DUTIES THAT MAY EXIST AS A RESULT OF THE RELATIONSHIP BETWEEN THE PARTIES, INCLUDING ALL DUTIES OF LOYALTY, GOOD FAITH, FAIR DEALING AND FULL DISCLOSURE, AND ANY OTHER DUTY DEEMED TO EXIST UNDER THE COMMON LAW PRINCIPLES OF AGENCY OR OTHERWISE (OTHER THAN THE DUTY OF GOOD FAITH AND FAIR DEALING IMPLIED UNDER GENERAL CONTRACT PRINCIPLES, INDEPENDENT OF THE COMMON LAW PRINCIPLES OF AGENCY). ACCORDINGLY, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, THE PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE AND DISCLAIM ANY POWER OR RIGHT SUCH PARTY MAY HAVE TO CLAIM ANY PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES OR CONSEQUENTIAL OR INCIDENTAL DAMAGES FOR ANY BREACH OF FIDUCIARY DUTIES.

       18.4.6  IRREVOCABILITY OF CONTRACT. TO REALIZE THE FULL BENEFITS CONTEMPLATED BY THE PARTIES, THE PARTIES INTEND THAT THIS AGREEMENT SHALL

BE NON-TERMINABLE, EXCEPT FOR AN EVENT OF DEFAULT AND THE SPECIFIC TERMINATION RIGHTS IN FAVOR OF A PARTY SET FORTH IN THIS AGREEMENT. ACCORDINGLY, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, THE PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE AND DISCLAIM ALL RIGHTS TO TERMINATE THIS AGREEMENT UNDER APPLICABLE LAW, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT.

## ARTICLE 19

### GENERAL PROVISIONS

19.1  **Governing Law**. This Agreement shall be construed under the laws of the State of New York, without regard to any conflict of law principles.

19.2  **Construction of this Agreement**. The Parties intend that the following principles (and nothing inconsistent with them) be applied in construing and interpreting this Agreement:

19.2.1  **Claims Limited to Contract**. Neither Party shall assert against the other Party any contractual claim arising out of this Agreement, unless the claim is based upon the express terms of this Agreement and does not seek to vary, and is not in conflict with, those express terms.

19.2.2  **Presumption Against a Party**. The terms and provisions of this Agreement shall not be construed against or in favor of a Party hereto merely because such Party is the Operator hereunder or such Party or its counsel is the drafter of this Agreement.

19.2.3  **Severability**. If any term or provision of this Agreement is held invalid, illegal or unenforceable by a court of competent jurisdiction or any Arbitrator(s) for any reason, the remainder of this Agreement shall in no way be affected and shall remain valid and enforceable for all purposes, each Party hereby declaring that it (a) would have executed this Agreement without inclusion of such term or provision and (b) execute and deliver to the other Party any additional documents that may be reasonably requested by a Party to fully effectuate this Section 19.2.3.

19.2.4  **Certain Words and Phrases**. All words in this Agreement shall be deemed to include any number or gender as the context or sense of this Agreement requires. The words "will," "shall" and "must" in this Agreement indicate a mandatory obligation. The use of the words "include," "includes" and "including" followed by one or more examples is intended to be illustrative and is not a limitation on the scope of the description or term for which the examples are provided. All dollar amounts set forth in this Agreement are stated in U.S. dollars, unless otherwise specified. The words "day" and "days" refer to calendar days unless otherwise stated. The words "month" and "months" refer to calendar months unless otherwise stated. The words "hereof", "hereto" and "herein" refer to this Agreement, and are not limited to the article, section, paragraph or clause in which such words are used.

19.2.5  **Headings**. The table of contents, headings and captions contained herein are for the purposes of convenience and reference only and are not to be construed as a part of this Agreement. All references to any article, Section or exhibits in this Agreement are to articles, sections or exhibits of this Agreement, unless otherwise noted.

19.2.6  **Approvals**. Unless expressly stated otherwise in this Agreement, whenever a matter is submitted to a Party for approval or consent in accordance with the terms of this Agreement, that Party has a duty to act reasonably and timely in rendering a decision on the matter.

19.2.7 <u>Entire Agreement</u>. This Agreement (including the attached Exhibits), together with Trademark License Agreement and the Technical Services Agreement, constitutes the entire agreement between the Parties with respect to the subject matter contemplated herein and supersedes all prior agreements and understandings, written or oral. No undertaking, promise, duty, obligation, covenant, term, condition, representation, warranty, certification or guaranty shall be deemed to have been given or be implied from anything said or written in negotiations between the Parties prior to the execution of this Agreement, except as expressly set forth in this Agreement. Neither Party shall have any remedy in respect of any untrue statement made by the other Party on which that Party relied in entering into this Agreement (unless such untrue statement was made fraudulently), except to the extent that such statement is expressly set forth in this Agreement.

19.2.8 <u>Third-Party Beneficiary</u>. No third party shall be a beneficiary of Owner's rights or benefits under this Agreement.

19.2.9 <u>Time of the Essence</u>. Time is of the essence for all purposes of this Agreement.

19.2.10 <u>Remedies Cumulative</u>. Except as otherwise expressly provided in this Agreement, the remedies provided in this Agreement are cumulative and not exclusive of the remedies provided by Applicable Law, and a Party's exercise of any one or more remedies for any default shall not preclude the Party from exercising any other remedies at any other time for the same default.

19.2.11 <u>Amendments</u>. Neither this Agreement nor any of its terms or provisions may be amended, modified, changed, waived or discharged, except (a) for Operator's right to make unilateral changes to the Operating Standards, Centralized Services and other changes permitted under this Agreement, and (b) by an instrument in writing signed by the Party against whom the enforcement of the amendment, modification, change, waiver or discharge is sought.

19.2.12 <u>Survival</u>. The expiration or termination of this Agreement does not terminate or affect Owner's or Operator's covenants and obligations that either expressly or by their nature survives the expiration or termination of this Agreement.

19.3    **Limitation on Operator's Liabilities**.

19.3.1 <u>Projections in Operating Plan</u>. Owner acknowledges that (a) all budgets and financial projections prepared by Operator or its Affiliates prior to the Effective Date or under this Agreement, including the annual Operating Plan, are intended to assist in Operating the Hotel, but are not to be relied on by Owner or any third party as to the accuracy of the information or the results predicted therein and (b) Operator does not guarantee the accuracy of the information nor the results of in such budgets and projections. Accordingly, Owner agrees that (i) neither Operator nor its Affiliates shall have any liability whatsoever to Owner or any third party for any divergence between such budgets and projections and actual operating results achieved, (ii) the failure of the Hotel to achieve any Operating Plan for any Operating Year shall not constitute a default by Operator or give Owner the right to terminate this Agreement, except as expressly provided in the Performance Test and (iii) if Owner provides any such budgets or projections to a third party, Owner shall advise such third party in writing of the substance of the disclaimer of liability set forth in this Section 19.3.1.

19.3.2 <u>Technical Advice</u>. Owner acknowledges that any review, advice, assistance, recommendation or direction provided by Operator with respect to the design, construction, equipping, furnishing, decoration, alteration, improvement, renovation or refurbishing of the Hotel (including the Conversion) (a) is intended solely to assist Owner in the development, construction, maintenance, repair and upgrading of the Hotel and Owner's compliance with its obligations under this Agreement, and (b)

does not constitute any representation, warranty or guaranty of any kind whatsoever that (i) there are no errors in the plans and specification, and (ii) there are no defects in the design of construction of the Hotel or installation of any building systems or FF&E therein or (c) the plans, specifications, construction and installation work will comply with all Applicable Laws. Accordingly, Owner agrees that neither Operator nor its Affiliates shall have any liability whatsoever to Owner or any third party for any (1) errors in the plans and specifications, (2) defects in the design of construction of the Hotel or installation of any building systems or FF&E therein or (3) noncompliance with any engineering and structural design standards or Applicable Laws.

      19.3.3  <u>Approvals and Recommendations</u>. Owner acknowledges that in granting any consents, approvals or authorizations under this Agreement, and in providing any advice, assistance, recommendation or direction under this Agreement, neither Operator nor its Affiliates guarantee success or a satisfactory result from the subject of such consent, approval, authorization, advice, assistance, recommendation or direction. Accordingly, Owner agrees that neither Operator nor its Affiliates shall have any liability whatsoever to Owner or any third person by reason of (a) any consent, approval or authorization, or advice, assistance, recommendation or direction, given or withheld by Operator, or (b) any delay or failure by Operator to provide any consent, approval or authorization, or advice, assistance, recommendation or direction.

      19.4    <u>Waivers</u>. Except as set forth in Section 17.1.7 of this Agreement, no failure or delay by a Party to insist upon the strict performance of any term of this Agreement, or to exercise any right or remedy consequent on a breach thereof, shall constitute a waiver of any breach or any subsequent breach of such term. No waiver of any default shall affect or alter this Agreement, but each and every term of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach.

      19.5    <u>Notices</u>. All notices, consents, determinations, requests, approvals, demands, reports, objections, directions and other communications required or permitted to be given under this Agreement shall be in writing and shall be delivered by (a) personal delivery, (b) overnight DHL, FedEx, UPS or other similar courier service, or (c) United States Postal Service as Express Mail or certified mail, postage prepaid, return receipt requested, addressed to the Parties at the addresses specified below, or at such other address as the Party to whom the notice is sent has designated in accordance with this Section 19.5, and shall be deemed to have been received by the Party to whom such notice or other communication is sent upon (i) delivery to the address of the recipient Party, provided that such delivery is made prior to 5:00 p.m. (local time for the recipient Party) on a business day, otherwise the following business day, or (ii) the attempted delivery of such Notice if such recipient Party refuses delivery, or such recipient Party is no longer at such address number, and failed to provide the sending Party with its current address pursuant to this Section 19.5.

| | |
|---|---|
| Operator notice address: | c/o Starwood Hotels & Resorts Worldwide, Inc.<br>1111 Westchester Avenue<br>White Plains, New York 10604<br>Attn: General Counsel |
| With a copy, which shall not constitute notice, to: | Moses & Singer LLP<br>405 Lexington Avenue<br>New York, New York 10174<br>Attn: Jeffrey M. Davis, Esq. |

| | |
|---|---|
| Owner notice address: | c/o Belfonti Associates<br>One Hamden Center<br>2319 Whitney Avenue<br>Hamden, Connecticut 06518<br>Attn: Mr. Michael Belfonti, CEO |
| With a copy, which shall not constitute notice, to: | Paul, Hastings, Janofsky & Walker LLP<br>515 South flower Street, 25th Floor<br>Los Angeles, California 90071<br>Attn: Rick S. Kirkbride, Esq. |

19.6   **Owner's Representative.** Owner, for itself and all of the Equity Owners, shall designate an Individual to act as representative for Owner and the Equity Owners ("Owner's Representative"), and Operator shall have the right, subject to the requirements regarding notices set forth in Section 19.5 above, to rely on all actions by, and communications with, Owner's Representative as binding on Owner and the Equity Owners. Owner shall provide to Operator the name, address, telephone and fax numbers, email address and other relevant contact information for the Owner's Representative as of the Effective Date and within 10 days of any change thereto.

19.7   **Further Assurances.** The Parties shall do and cause to be done all such acts, matters and things and shall execute and deliver all such documents and instruments as shall be required to enable the Parties to perform their respective obligations under, and to give effect to the transactions contemplated by, this Agreement.

19.8   **Relationship of the Parties.** The Parties acknowledge and agree that (a) the relationship between them shall be that of principal (in the case of Owner) and agent (in the case of Operator), (b) they are not joint venturers, partners or joint owners with respect to the Hotel and (c) nothing in this Agreement shall be construed as creating a partnership, joint venture or similar relationship between the Parties. The Parties further acknowledge and agree that in Operating the Hotel, including entering into leases and contracts, accepting reservations and conducting financial transactions for the Hotel, (i) Operator assumes no independent contractual liability and (ii) Operator shall have no obligation to extend its own credit with respect to any obligation incurred in Operating the Hotel or performing its obligation under this Agreement.

19.9   **Force Majeure.** In the event of a Force Majeure Event, the obligations of the Parties and the time period for the performance of such obligations (other than an obligation to pay any amount hereunder) shall be extended for each day that such Party is prevented, hindered or delayed in such performance during the period of such Force Majeure Event, except as expressly provided otherwise in this Agreement. Upon the occurrence of a Force Majeure Event, the affected Party shall give prompt notice of such Force Majeure Event to the other Party. If Operator is unable to perform its obligations under this Agreement due to a Force Majeure Event, or Operator deems it necessary to close and cease the Operation of all or any portion of the Hotel due to a Force Majeure Event to protect the Hotel or the health, safety or welfare of the its guests or Hotel Personnel, then Operator may close or cease Operation of all or a portion of the Hotel for such time and in such manner as Operator reasonably deems necessary as a result of such Force Majeure Event, and reopen or recommence the Operation of the Hotel when Operator again is able to perform its obligations under this Agreement, and determines that there is no unreasonable risk to the Hotel or health, safety or welfare or its guests or Hotel Personnel.

19.10   **Terms of Other Operating Agreements.** Operator makes no representation or warranty that any past or future forms of its operating agreement do or will contain terms substantially similar to

those contained in this Agreement. In addition, Owner acknowledges and agrees that Operator may, due to local business conditions or otherwise, waive or modify any comparable terms of other operating agreements heretofore or hereafter entered into by Operator or its Affiliates.

19.11  **Translations**. Owner shall pay the cost of any translation of this Agreement and of any other documents related to the Operation of the Hotel. Owner acknowledges and agrees that all such translated versions shall be the property of Operator.

19.12  **Foreign Corrupt Practices Act**. Neither Owner nor any Person for or on behalf of Owner, shall make, and Owner acknowledges that Operator will not make, any expenditure for any unlawful purposes in the performance of its obligations under this Agreement and in connection with its activities in relation thereto. Neither Owner nor any Person for or on behalf of Owner, shall, and Owner acknowledges that Operator will not, make any offer, payment or promise to pay, authorize the payment of any money, or offer, promise or authorize the giving or anything of value, to (a) any government official, any political party or official thereof, or any candidate for political office or (b) any other Person while knowing or having reason to know that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any such official, to any such political party or official thereof, or to any candidate for political office for the purpose of (i) influencing any action or decision of such official party or official thereof, or candidate in his or its capacity, including a decision to fail to perform his or its official functions or (ii) inducing such official party or official thereof, or candidate to use his or its influence with any Governmental Authority to effect or influence any act or decision of such Governmental Authority. Owner represents and warrants to Operator that, except as expressly disclosed in Exhibit A, no government official nor any candidate for political office has any direct or indirect ownership or investment interest in the revenues or profit of Owner or the Hotel.

19.13  **Governmental Approvals**.

19.13.1 **Execution of Agreement Subject to Governmental Approvals**. Owner, at its expense, promptly after the Effective Date shall take such actions as may be required to record or register this Agreement with, or obtain such required approval or authorization from, the applicable Governmental Authorities to make effective this Agreement and all related agreements, and permit Owner to make the payments required to be made to Operator under this Agreement and all related agreements. Operator shall have the right, at its expense, to participate in all phases of the recordation, registration, approval or authorization process. The Parties shall cooperate in all such undertakings or dealings with Governmental Authorities, and Owner shall provide reasonable notice to Operator prior to all meetings with any Government Authority for such purpose.

19.13.2 **Modification of Agreement**. If any Governmental Authority requires, as a condition of its approval of the initial effectiveness of this Agreement, directly or indirectly, the modification of any terms or provisions of this Agreement, the Parties shall use their best efforts to comply with such request; provided, however, that if such requested modification would have a material and adverse to any Party, then such Party shall have the right to terminate this Agreement by giving written notice to the other Party within 30 days after receipt of such request for modification, with no liability whatsoever to Owner for such termination.

19.14  **Execution of Agreement**. This Agreement may be executed in counterparts, each of which when executed and delivered shall be deemed an original, and such counterparts together shall constitute one and the same instrument.

19.15  **Limitation on Owner's Liability**. Notwithstanding anything to the contrary set forth in this Agreement for the purpose of determining Owner's liability with respect to its obligations under this

Agreement, including, without limitation, Owner's indemnification obligations, Operator's sole recourse against Owner shall be the interest of Owner in the Hotel (including net proceeds of sale or insurance) and without limiting the foregoing, Operator will not have any right to satisfy any judgment which it may have against Owner (a) from any other assets of Owner or (b) from any partner, shareholder, member, officer, director or other owner of Owner (except to the extent of distributions, directly or indirectly, from Owner to such Persons at a time when, or as a result of which, Owner's assets are insufficient to satisfy its obligations to Operator and Owner's other creditors).

19.16 <u>Guaranties</u>.

19.16.1 <u>Westin Guaranty</u>. Westin Hotel Management, L.P., an Affiliate of Operator ("Guarantor"), hereby unconditionally and irrevocably guaranties all obligations of Operator contained in this Agreement. Guarantor hereby acknowledges that this guaranty and its guaranteed obligations shall in no way be affected, modified, diminished, impaired or terminated by reason of any modifications, renewals, extensions or amendments of this Agreement or any agreement, instrument or document entered into pursuant hereto or in connection herewith, whether or not notice thereof is given to or consent is obtained from Guarantor. Guarantor hereby waives notice of the acceptance of this guaranty and presentment and demand for payment, notice of non-payment, notice of dishonor, protest, notice of protest, non-performance, non-observance and any other notice or demand to which Guarantor might be entitled. Guarantor hereby further waives any and all defenses available to guarantors in respect of this guaranty and the guaranteed obligations, whether at law, in equity, statutory or otherwise, and waives any and all claims, including, without limitation, by subrogation, which it may now or at any time hereafter have against Operator. This guaranty shall constitute a full, unlimited guaranty of payment and performance and not merely a guaranty of collection. Owner may enforce this guaranty against Guarantor without first pursuing or exhausting any other remedies or security, including any remedies against Operator. Guarantor hereby acknowledges and agrees to the provisions of Section 17.3 and 19.1.

19.16.2 <u>Belfonti Guaranty</u>. BCP, an Affiliate of Owner, hereby unconditionally and irrevocably guaranties all obligations of Owner with respect to the completion of the Property Improvement Plans, up to a maximum of $18,000,000, until such time as Owner and/or BCP shall have applied funds of an aggregate of $18,000,000 or more towards the completion of the Property Improvement Plans in accordance with Section 6.1 of, and Exhibit K to, this Agreement. BCP hereby acknowledges that this guaranty and its guaranteed obligations shall in no way be affected, modified, diminished, impaired or terminated by reason of any modifications, renewals, extensions or amendments of this Agreement or any agreement, instrument or document entered into pursuant hereto or in connection herewith, whether or not notice thereof is given to or consent is obtained from BCP. BCP hereby waives notice of the acceptance of this guaranty and presentment and demand for payment, notice of non-payment, notice of dishonor, protest, notice of protest, non-performance, non-observance and any other notice or demand to which BCP might be entitled. BCP hereby further waives any and all defenses available to guarantors in respect of this guaranty and the guaranteed obligations, whether at law, in equity, statutory or otherwise, and waives any and all claims, including, without limitation, by subrogation, which it may now or at any time hereafter have against Owner. This guaranty shall constitute a full, unlimited guaranty of payment and performance and not merely a guaranty of collection. Operator may enforce this guaranty against BCP without first pursuing or exhausting any other remedies or security, including any remedies against Owner. BCP hereby acknowledges and agrees to the provisions of Section 17.3 and 19.1.

*Signatures on the following page.*

IN WITNESS WHEREOF, the Parties hereto have duly executed this Operating Agreement as of the Effective Date.

OWNER:

ARUBA HOTEL ENTERPRISES N.V.

By: _____
Name: Michael Belfont
Title: Attorney-In-Fact
Attest: _____

May 3, 2006
(date signed by Owner)

OPERATOR:

WESTIN ARUBA HOTEL MANAGEMENT LLC

By: Westin Hotel Management, L.P.,
    a Delaware limited partnership, its Manager

By: Starwood Hotels & Resorts Worldwide, Inc.,
    a Maryland corporation, its General Partner

By: _____
    Name:
    Title:

_____
(date signed by Operator, constituting the "Effective Date")

As to Section 19.16 only:

WESTIN HOTEL MANAGEMENT, L.P.

By: Starwood Hotels & Resorts Worldwide, Inc.,
    a Maryland corporation, its General Partner

By: _____
    Name:
    Title:

_____
(date signed by Guarantor)

IN WITNESS WHEREOF, the Parties hereto have duly executed this Operating Agreement as of the Effective Date.

OWNER:

ARUBA HOTEL ENTERPRISES N.V.

By: _____
    Name:
    Title:

Attest: _____

_____
(date signed by Owner)

OPERATOR:

WESTIN ARUBA HOTEL MANAGEMENT LLC

By:  Westin Hotel Management, L.P.,
     a Delaware limited partnership, its Manager

By:  Starwood Hotels & Resorts Worldwide, Inc.,
     a Maryland corporation, its General Partner

By: _[signature]_____
    Name: James Sabatier
    Title: SVP - Global Investments + W Development

May 3, 2006
(date signed by Operator, constituting the "Effective Date")

As to Section 19.16 only:

WESTIN HOTEL MANAGEMENT, L.P.

By:  Starwood Hotels & Resorts Worldwide, Inc.,
     a Maryland corporation, its General Partner

By: _[signature]_____
    Name: James Sabatier
    Title: SVP - Global Investments + W Development

May 3, 2006
(date signed by Guarantor)

5/8/06

*[signature]*
(date signed by BCP)

As to Section 19.16.2 only:

BELFONTI CAPITAL PARTNERS, LLC

By: _____
Name: Michael Belfonti
Title: Chairman

EXHIBIT A TO OPERATING AGREEMENT

HOTEL AND OWNER INFORMATION; PRINCIPAL BUSINESS TERMS

I. **Hotel Information**

    A. Address and Description of Premises (metes and bounds).

A parcel of domain land located at J.E. Irausquin Boulevard in Aruba, 5.840 m2 in size, legally known as Second Division, Section C, number 431, along with a parcel of domain land located at J.E. Irausquin Boulevard in Aruba, 3.680 m2 in size, legally known as Second Division, Section C, number 432, and a parcel of domain land located at J.E. Irausquin Boulevard in Aruba, 21.120 m2 in size, legally known as Second Division, Section C, number 229; together with the buildings and hotel facilities erected thereon, locally known as Wyndham Aruba Beach Resort & Casino and locally numbered "J.E. Irausquin 77, pursuant to a long lease held by Aruba Hotel Enterprises, N.V., as tenant, by notarial deed dated May 14, 1975, executed by civil law notary Dr. J.R. Croes and registered on May 22, 1975 in Register C, Section 176 under number 69.

    B. Title to Premises.

Owner of Fee Title to the Premises: the Government of Aruba

Interest of Owner in Premises: Owner has a leasehold interest in the Premises pursuant to a long-term lease, to be extended on or before the Effective Date

Term of Lease (or Other Tenancy): 60 years

    C. Components of Hotel. The Hotel consists of the following components:

| | |
|---|---|
| Total Guest Rooms | 481 |
| - Standard Rooms | 401 |
| - Suites | 80 |
| Meeting Space | 25,500 square feet |
| Total Floors | 17 |
| Total Parking Spaces | 100 |
| Food & Beverage Facilities | 20,000 square feet |
| Entertainment Venue | 4,500 share feet |
| Casino | 13,000 square feet |
| Fitness Center and Spa | 16,000 square feet |
| Other Facilities & Amenities | Pool deck, outdoor meeting space, beach, tennis courts, and retail space |
| Year Built | 1977 |

Initial Mortgage

That certain Loan Agreement dated as of May 2, 2006 between WIBC Aruba, N.V. (as lender) and Owner (as borrower), as the same may be amended, supplemented, restated or modified from time to time.

D. Initial Competitive Set

| Name | Address |
|---|---|
| Aruba Resort Marriott & Stellaris Casino | L.G. Smith Boulevard #101<br>Palm Beach, Aruba<br>Dutch Carribean |
| Radisson Aruba Resort | J.E. Irausquin Boulevard #81<br>Palm Beach, Aruba<br>Dutch Carribean |
| Hyatt Regency Aruba | J.E. Irausquin Boulevard #85<br>Palm Beach, Aruba<br>Dutch Carribean |
| Westin St. John | U.S.V.I. P.O. Box 8310<br>Great Cruz Bay, St. John<br>U.S. Virgin Islands 00831 |

II. Owner Information

The following Persons, own, either legally or beneficially, the following Ownership Interests in Owner and any Parent Companies, if any

| Name | Address | Ownership Interest (Direct or Beneficial) | Percentage of Ownership Interest |
|---|---|---|---|
| AHE Holdings N.V. ("AHE") | § | Direct | 100% interest in Owner |
| BCP Sunset Holdings II N.V. ("Sunset II") | § | Indirect | 100% interest in AHE |
| BCP Sunset Holdings N.V. ("Sunset") | § | Indirect | 100% interest in Sunset II |
| Twilight Holdings, LLC ("Twilight") | § | Indirect | 100% interest in Sunset |
| BCP Aruba I, LLC ("BCPAI") | § | Indirect | 100% interest in Twilight |
| Aligned Holdings LLC ("Aligned") | § | Indirect | 25% interest in BCPAI |
| Belfonti Holdings LLC ("Belfonti") | § | Indirect | 25% interest in BCPAI |
| Hochfelder Family Trust ("Hochfelder") | § | Indirect | 100% interest in Aligned |
| Bravo Property Trust ("Bravo") | § | Indirect | 80% interest in Belfonti |
| Henry Hochfelder and Preston Hochfelder | § | Indirect | 100% interest each in Hochfelder |
| Michael Belfonti | § | Indirect | 25% interest in Belfonti and 100% interest in Bravo |

§ - c/o Belfonti Associates, One Hamden Center, 2319 Whitney Avenue, Hamden, Connecticut 06518.

A-2

Those Persons noted with an *, either singly or in combination with the others, so designated have the right to direct or control the management and policies of Owner, including those related to payment of financial obligations of Owner.

### III. Name of Hotel.

The approved name of the Hotel is: Westin Aruba Resort.

### IV. Principal Business Terms.

A. Expiration Date – at 11:59 p.m. (U.S. East Coast Time) on December 31 of the full year following the 20th anniversary of the Flagging Date and confirmed by execution of the Expiration Date Confirmation in Exhibit G.

B. Base Fee – 3.0% percent of Gross Operating Revenues for each month during the Interim Term and Operating Term (including any partial month at the commencement and expiration or termination of the Interim Term and Operating Term).

C. Incentive Fee – the sum of (i) 10% of Base Incentive Income, if any, and (ii) 15% of Additional Incentive Income, if any, for each Operating Year during the Operating Term.

D. Reserve Fund Contribution – 4% of Gross Operating Revenues from the commencement of the Interim Term and for all months thereafter during the Operating Term.

E. Anticipated Initial Working Capital – $500,000.