# EXHIBIT C

1

2        IN THE UNITED SATES DISTRICT COURT

3        DISTRICT OF CONNECTICUT

4        ------------------------------------X

5        ARUBA HOTEL ENTERPRISES N.V.,

6

7                        Plaintiff,

8            v.

9        MICHAEL BELFONTI, MCR PROPERTY

10       MANAGEMENT INC. and CEB

11       IRREVOCABLE TRUST,

12

13                        Defendants.

14       ------------------------------------X

15

16                     April 29, 2008

17                     10:12 a.m.

18

19            Deposition of MICHAEL BELFONTI,

20       held at the offices of Proskauer Rose LLP,

21       New York, New York, pursuant to Notice,

22       before NANCY SORENSEN, a Notary Public of

23       the State of New York.

24

25



ELISA DREIER
REPORTING CORP.    780 Third Avenue          Telephone: 212-557-5558
                   New York, New York 10017   Fax: 212-557-0050
                   Email:production@courtreportingedrc.com

1

2          A P P E A R A N C E S:

3               PROSKAUER ROSE LLP

4               Attorneys for Plaintiff

5                    1585 Broadway

6                    New York, New York  10036-8299

7          BY:   MICHAEL T. MERVIS, ESQ.

8                     - and -

9               PATRICK J. DEMPSEY, ESQ.

10

11              KOBRE & KIM LLP

12              Attorneys for Defendants

13                   800 Third Avenue

14                   New York, New York  10022

15         BY:   MICHAEL S. KIM, ESQ.

16                    - and -

17              FRANCISCO J. NAVARRO, ESQ.

18

19

20              HURWITZ, SAGARIN, SLOSSBERG & KNUFF LLC

21              Attorneys for MCR and CEB Defendants

22                   147 North Broad Street

23                   Milford, Connecticut  06460

24         BY:   DAVID A. SLOSSBERG, ESQ.

25

1

2          M I C H A E L    B E L F O N T I,    called

3     as a witness, having been duly sworn by a Notary

4     Public, was examined and testified as follows:

5     EXAMINATION BY

6     MR. MERVIS:

7          Q.     Morning, Mr. Belfonti.  Have you ever

8     had your deposition taken before?

9          A.     Yes.

10          Q.     I'm going to ask you a number of

11    questions today.  I want you to do one thing for

12    me.

13               If at any time you don't understand a

14    question I've asked you, I want you to tell me;

15    will you do that?

16          A.     Yes.

17          Q.     How many times have you had your

18    deposition taken before?

19          A.     Maybe two times.

20          Q.     When was the first time that you had

21    your deposition taken?

22          A.     Many, many years ago in the '70's.

23          Q.     Do you recall whether you were a

24    party in that matter?

25          A.     No.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

<pre>
 1                         M. Belfonti
 2        A.     I don't believe so.
 3               MR. MERVIS:  Can you mark this,
 4        please.
 5               (Belfonti Exhibit 1, a loan agreement
 6        for the Aruba Hotel Enterprises N.V., marked
 7        for identification, as of this date.)
 8        Q.     Mr. Belfonti, the reporter's placed
 9     in front of you what we have had marked for
10     identification as Belfonti Exhibit 1.
11               Take as much time as you need, but my
12     first question on this is do you recognize the
13     document?
14        A.     Yes.
15        Q.     What is it?
16        A.     It's a loan agreement for the Aruba
17     Hotel Enterprises N.V.
18        Q.     I want you to -- well, unfortunately,
19     I don't have Bates numbers on this, but if you
20     turn to page 103, with the page that has the
21     number 103 on the bottom, and I want you to then
22     turn two more pages, please?
23        A.     Okay.
24        Q.     You see a line that says, "borrower"
25     that's underlined?
</pre>

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

1                    M. Belfonti

2        A.    Yes.

3        Q.    There is a signature there.  Is that

4    your signature?

5        A.    Yes, it is.

6    -   Q.    Did you sign this loan agreement,

7    Exhibit 1, on behalf of Aruba Hotel Enterprises

8    N.V.?

9        A.    I believe so.

10        Q.    Just to save some paper, I'm going to

11    refer to Aruba Hotel Enterprises N.V. as AHE

12    during the course of this deposition; is that

13    okay with you?

14        A.    That's fine.

15        Q.    At the time that you signed this loan

16    agreement, Belfonti Exhibit 1, what role, if

17    any, did you have with AHE?

18        A.    Could you repeat the question?

19        MR. MERVIS:  Read it back.

20        (The record was read.)

21        A.    At the time of the signing?

22        Q.    Yes.

23        A.    I'd like you to rephrase the

24    question.  I'm sorry.

25        Q.    When you signed this loan agreement,

1                        M. Belfonti

2      which is dated as of May 3, 2006, between AHE

3      and WIBC Aruba N.V., did you have any role or --

4                 MR. MERVIS:  Well, let me withdraw.

5            Q.    Did you have any interest in AHE?

6            A.    After I signed, I believe I did, yes.

7            Q.    Describe for me, if you would, the

8      nature of the interest that you had?

9            A.    I had a 75 percent ownership interest

10     in the entity.

11           Q.    The entity being AHE?

12           A.    Yes.

13           Q.    That was an indirect interest;

14     correct?

15           A.    Yes.

16           Q.    Through a series of holding

17     companies?

18           A.    Yes.

19           Q.    The other 25 percent, at the time,

20     was held by Mr. Adam Hochfelder; is that right?

21           A.    I don't believe so.

22           Q.    Fair point.  A Hochfelder family

23     trust?

24           A.    Yes, I believe it was Aligned

25     Capital, to my recollection.

1                             M. Belfonti

2          Q.    Fair enough.

3                 Did you understand that Aligned

4     Capital was beneficially owned by Adam

5     Hochfelder or some trust affiliated with his

6     family?

7          A.    I think it was owned by his father,

8     Jim Hochfelder.  And the beneficiaries of

9     Aligned were his children, I believe.

10         Q.    His, being Adam Hochfelder's

11    children?

12         A.    Yes.

13         Q.    This agreement memorializes a loan;

14    does it not?

15         A.    Yes.

16         Q.    What, to your understanding, was the

17    purpose of the loan?

18         A.    The loan was made to purchase the

19    Wyndham Resort down in Aruba.

20         Q.    When you say, "to purchase," who was

21    the purchaser?

22         A.    One of our related entities.  It

23    could have been -- I'm not sure.

24         Q.    Fair enough.

25                When you say, "one of our related

M. Belfonti

entities," is it your understanding that,

ultimately, AHE was the, became the owner of the

Wyndham?

A.    I believe AHE was the owner of the

Wyndham before we purchased it.

Q.    Fair enough.

So at the time that you obtained a 75

percent ownership interest in AHE, AHE owned the

Wyndham Resort; is that correct?

A.    That is correct.

Q.    The name of the resort changed at

some point thereafter; is that right?

A.    That is correct.

Q.    What did it change to?

A.    The Aruba Hotel Resort & Casino, I

believe.

Q.    That was for a period of time;

correct?

A.    That was an interim name before we

flagged it as a Westin.

Q.    When it was flagged as a Westin, what

was the property called?

A.    The Westin Aruba.

Q.    Just again, to save paper, I'm going

1                          M. Belfonti

2       to generally be referring to that hotel property

3       as "the hotel" during the course of the

4       deposition today, is that okay with you?

5           A.      That's fine.

6           Q.      Were the proceeds of the loan that's

7       memorialized in Belfonti Exhibit 1, used by you

8       in connection with your obtaining an interest in

9       AHE?

10          A.      Yes.

11          Q.      To your knowledge, was it used for

12      any other purpose?

13              MR. MERVIS:  Withdrawn.

14          Q.      To your knowledge, were the proceeds

15      of the loan that's memorialized in Belfonti

16      Exhibit 1, used for any other purpose?

17          A.      No.

18              MR. MERVIS:  Mark this, please.

19              (Belfonti Exhibit 2, a mezzanine loan

20          agreement, marked for identification, as of

21          this date.)

22          Q.      Mr. Belfonti, the reporter's placed

23      in front of you what we have had marked for

24      identification as Belfonti Exhibit 2.

25              Again, take as much time as you need,

Elisa Dreier Reporting Corp.   (212) 557-5558
        780 Third Avenue, New York, NY 10017

16

1                    M. Belfonti

2    but my first question to you is whether you

3    recognize the document?

4        A.    Maybe could you help me, Mr. Mervis,

5    I'm looking for the amount here?

6        Q.    The amount of the loan?

7        A.    Yeah.

8        Q.    Well, if you look at the first page,

9    there's a whereas clause at the bottom of the

10   page that goes over to the second page.

11             That may help you.

12       A.    I see.  Yes, I recognize the

13   document.  Thank you.

14       Q.    What is it?

15       A.    It is a mezzanine loan agreement.

16       Q.    I want you to turn to, again, I don't

17   have Bates stamps on this.  I want you to turn

18   to page 60 or the page that has number 60 at the

19   bottom?

20             I'd like you to just turn to the next

21   page, the very next page.

22             You will see a signature on that

23   page?

24       A.    Yes.

25       Q.    Is that your signature?

1                           M. Belfonti

2          A.     It is.

3          Q.     It says on this page that you signed

4    as the president of something called BCP Florin

5    LLC; you see that?

6          A.     Yes, I do.

7          Q.     What, at the time, was BCP Florin

8    LLC?

9          A.     It was an upstream entity from AHE.

10         Q.     So an indirect parent of AHE?

11         A.     I don't know how you would legally

12   phrase it.  But it was an -- all I know, it's an

13   upstream entity.  I don't know if it's a parent,

14   but it's an upstream entity.

15         Q.     Fair enough.

16                You were a 75 percent beneficial

17   owner of BCP Florin, at the time?

18         A.     I was.

19         Q.     To your understanding, what was the

20   purpose of this document, Exhibit 2?

21         A.     This was a loan to BCP Florin from

22   Petra Capital.

23         Q.     Were you represented -- when I say

24   "you," either you or BCP Florin, represented by

25   counsel in connection with this transaction?

1                          M. Belfonti

2      memorialized in Exhibit 2 are used?

3              A.    Sure there are.

4              Q.    Where would those records be today?

5              A.    In my office.

6        -     Q.    Your office is in Manhattan?

7              A.    Connecticut.

8              Q.    In Connecticut.  What town is that

9      in?

10             A.    Hamden.

11             Q.    Do you still have an ownership

12     interest in AHE today?

13             A.    I do not.

14             Q.    When did you cease having ownership

15     interest in AHE?

16             A.    I believe it was in April of '07.

17             Q.    Same question with respect to BCP

18     Florin, do you have an ownership interest in

19     that entity today?

20             A.    I don't believe so.

21             Q.    When, to your recollection, did you

22     cease to have an ownership interest in BCP

23     Florin?

24             A.    I believe it was at the same time.

25             Q.    April 2007?

Elisa Dreier Reporting Corp.  (212) 557-5558
       780 Third Avenue, New York, NY 10017

M. Belfonti

2       A.     Yes.

3       Q.     Do you recall how it came to pass

4 that you ceased to have an ownership interest in

5 AHE in April 2007?

6       A.     There was a default under the loan,

7 and when we stopped paying the loan, it

8 automatically, the shares automatically, through

9 some procedure, which I'm not familiar with,

10 vested with the mezz lender.

11      Q.     Let me just make sure that we get

12 some clarity on that.

13         You say there was a default on the

14 loan; which loan?

15      A.     The Wachovia loan.

16      Q.     That is the loan that's memorialized

17 in Belfonti Exhibit 1?

18      A.     Correct.

19      Q.     I think you said that through some

20 procedure, the shares of AHE went to the mezz

21 lender; is that right?

22      A.     That's correct.

23      Q.     The mezz lender being Petra?

24      A.     That is correct.

25      Q.     Same question with respect to BCP

23

                              M. Belfonti

1

2       Florin.

3                Do you know how it is that you, that

4       you ceased having ownership interest in that

5       entity?

6                A.    Not clearly.

7                Q.    Fair enough.

8                      Are you familiar with a company

9       called MCR Property Management, Inc.?

10               A.    I am.

11               Q.    Again, to save paper, I'm going to

12      refer to that entity in this deposition as MCR;

13      is that okay with you?

14               A.    Sure.

15               Q.    What's the business of MCR, today?

16               A.    MCR is a property management company.

17               Q.    Has that been its business, say, for

18      the last three years?

19               A.    Yes.

20               Q.    Do the letters MCR stand for

21      anything?

22               A.    They do.

23               Q.    What?

24               A.    Michael, Richard -- oh, Constance,

25      which is my mom, and Richard, which is my dad.

Elisa Dreier Reporting Corp.   (212) 557-5558
        780 Third Avenue, New York, NY 10017

24

M. Belfonti

1

2    Q.    Michael is you?

3    A.    That's me.

4    Q.    You don't have any other siblings?

5    A.    No, I don't.

6    Q.    MCR is located where?

7    A.    In Hamden, Connecticut.

8    Q.    Today, who are the officers of MCR?

9    A.    I believe I'm an officer and a

10 gentleman by the name of Richard Tolentino.

11    Q.    Since the beginning of 2006, were

12 there any other officers of MCR?

13    A.    My dad, I believe, was an officer.

14    Q.    Richard?

15    A.    Yes.

16    Q.    Do you know month and year when he

17 ceased being an officer of MCR?

18    A.    I don't.

19    Q.    Today, who are the directors of MCR?

20    A.    I'm not sure.

21    Q.    Do you know who the directors of MCR

22 were at any time since the beginning of 2006?

23    A.    I don't.

24    MR. MERVIS:  Mark this please.

25    (Belfonti Exhibit 3, a list of

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

1                          M. Belfonti

2          employees of MCR Property Management, Inc.,

3          marked for identification, as of this

4          date.)

5          Q.    Mr. Belfonti, the reporter has --

6   actually, your lawyer has placed before you what

7   the reporter has marked as Exhibit 3.

8                I will ask you to take a moment and

9   let me know if you recognize this document?

10         A.    Yes.

11         Q.    What is it?

12         A.    It's a list of employees of MCR

13  Property Management, Inc.

14         Q.    Do you know approximately when this

15  list was created?

16         A.    No, I do not.

17         Q.    Does it look to you to be a

18  reasonably current list of MCR's employees?

19         A.    Yes.

20         Q.    It lists you as the president; you

21  see that?

22         A.    That's correct.

23         Q.    Is that your title today?

24         A.    Yes, I guess, if that's what it says.

25         Q.    Well, I understand that, but I mean

1                    M. Belfonti

2     apart from the document, do you know whether or

3     not you are the president of MCR, today?

4          A.    Yes.

5          Q.    You are?

6          A.    I think so.

7          Q.    How long have you been the president

8     of MCR?

9          A.    I think since inception.

10         Q.    Inception was 1990?

11         A.    Sounds about right.

12         Q.    In the last three years, has --

13               MR. MERVIS:  Withdrawn.

14         Q.    Since the beginning of 2006, has MCR

15    had any one individual who served in the

16    capacity as chief executive?

17         A.    Could you repeat the question,

18    please?

19               (The record was read.)

20         A.    That would be me.

21         Q.    That would be for the entire time

22    period, 2006 to date?

23         A.    Yes.

24               MR. MERVIS:  Mark this, please.

25               (Belfonti Exhibit 4, a document,

1                          M. Belfonti

2          marked for identification, as of this

3          date.)

4          Q.     Mr. Belfonti, before we get to this

5    exhibit, I want to ask you a question.

6                 Today, who are the owners of MCR?

7          A.     I believe I am an owner and my mom is

8    an owner or my mom's trust, I'm not sure.

9          Q.     Do you know approximately what

10   percentage ownership interest you have as

11   opposed to your mom or your mom's trust?

12         A.     I think approximately 50 percent.

13         Q.     So 50/50 split?

14         A.     I'm not sure exactly.

15         Q.     Prior to your father's death, the

16   split was what, a third, a third, a third?

17         A.     I don't recall.

18         Q.     Taking a look at what has been marked

19   for identification as Exhibit 4.

20                Again, take a minute, but I will ask

21   you if you recognize the document?

22         A.     I've never seen it before.

23         Q.     Fair enough.  You can put it aside.

24                Do you know, has Richard Tolentino

25   ever been the president of MCR?

28

M. Belfonti

  2   A.    Yes.

  3   Q.    When?

  4   A.    I know he has the title of MCR.  I'm
  5 not sure if it was ever formally done.

  6   Q.    Let me ask the question a little bit
  7 differently.

  8         You've testified that you were
  9 currently the president, correct, or a
 10 president?

 11   A.    Well, we have many, many different
 12 entities.  So when you ask me questions on
 13 which, who's the president, who's the secretary,
 14 I just don't know unless I looked at the papers.

 15         But it's evident here that
 16 Mr. Tolentino is the president, from this
 17 document you just showed me.

 18         MR. KIM:  I think his question was
 19     whether you testified that you thought you
 20     were the president.

 21   Q.    That was the question, but stop.
 22 We'll see if we can make it more understandable
 23 for you.

 24         I appreciate that there are many
 25 different entities.  I'm focusing right now only

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

                    M. Belfonti

1

2    on one, MCR; okay?

3        A.    Okay.

4        Q.    You are the president of MCR, today?

5        A.    Yes, I thought I was.

6        Q.    Do you have any -- have you

7    reconsidered that thought since the time that

8    you gave that testimony?

9        A.    It's possible that Mr. Tolentino is

10   the president of MCR.

11       Q.    Do you know for a fact whether

12   Mr. Tolentino held the position as president of

13   MCR at any time between January 2006 and today?

14       A.    I don't.

15       Q.    Do you know whether, at any time

16   between January 2006 and today, there have been

17   two presidents of MCR?

18       A.    I don't.

19       Q.    Is MCR a corporation?

20       A.    Yes.

21             MR. MERVIS:  Off the record.

22             (Discussion off the record.)

23       Q.    Go back to Exhibit 4 for a second?

24       A.    Sure.

25       Q.    Take a look at the third page,

M. Belfonti

1

2    please?

3                You will see at the toward the bottom

4    of the page, entry number 4, your name is there?

5        A.    Yes.

6        Q.    It's lists your title as director; do

7    you see that?

8        A.    Yes, I do.

9        Q.    Does that refresh your recollection

10   as to whether or not you are a director of MCR?

11       A.    Yes.

12       Q.    Does it refresh your recollection

13   that you are, in fact, a director of MCR?

14       A.    I have never seen the document

15   before.

16       Q.    I understand.

17       A.    But I would believe that if that's

18   what it says, if this came from the Secretary of

19   State, then I guess I am the director.

20       Q.    Do you have any recollection of

21   participating in any MCR board of directors

22   meetings in the past three years?

23       A.    No.

24       Q.    Do you know if there have been any?

25       A.    No, there has not.

M. Belfonti

    Q.    Have not been?.

    A.    No.

    Q.    You, I think, indicated a little while ago that, I think you said we have many entities or words to that effect.

        To the best of your memory, it's not, you know, it's only what you can remember sitting here today, what entities have you had a beneficial ownership interest in since 2006?

    A.    I wouldn't know the names.

    Q.    So you can't tell me the name of a single entity that you've had a beneficial ownership interest in since the beginning of 2006?

    A.    MCR Property Management.

    Q.    Anything else?

    A.    No, each asset has a -- is a single purpose asset with a different name, so no, I wouldn't know the names.

    Q.    So you'd need to see a piece of paper or something like that?

    A.    Yes.

    Q.    What do you mean when you say each entity is a single purpose asset?

1                          M. Belfonti

2    right?

3          A.    I do.

4          Q.    What business is run out of the

5    office in New York?

6          A.    None.

7          Q.    Pardon me?

8          A.    None.

9          Q.    What business is conducted out of the

10   office in New York?

11         A.    It's more a satellite office for the

12   office in Connecticut.

13         Q.    Do you have, today, do you have

14   full-time employees who spend the majority of

15   their time in your New York office?

16         A.    Just one.

17         Q.    Who?

18         A.    Marion Fedai.

19         Q.    That's your assistant?

20         A.    Yes.

21         Q.    Since 2006, and we'll put Ms. Fedai

22   aside for the moment, have you had any full-time

23   employees who spent the majority of their time

24   in your New York office?

25         A.    Yes.

```
 1                          M. Belfonti

 2        Q.     Who?

 3        A.     Are you referring to the beginning of

 4   2006?

 5        Q.     Yes, starting in January.

 6        A.     Since losing the hotel, we had maybe

 7   three or four employees, and now just have one.

 8   And those names would be Andrew Fenet, Greg --

 9   Craig Welch, D'Wayne Prieto, and Stephan

10   Resnick.

11        Q.     To make sure I understand the timing,

12   you are saying that these individuals were

13   resident in your New York office during some

14   period of time after April 2007?

15        A.     Yes.

16        Q.     Were they also resident in your

17   New York office prior to April 2007?

18        A.     Yes.

19        Q.     Were there other people who were,

20   other full-time employees, who were resident in

21   your New York office prior to 2007?

22               I'm sorry, prior to April 2007?

23        A.     Yes.

24        Q.     Who?

25        A.     Adam Hochfelder.
```

1                              M. Belfonti

2          Q.    Okay?

3          A.    Several admins.   I don't remember the

4     names.

5          Q.    Anybody else?

6          A.    No.

7          Q.    How about Ms. Carpenter?

8          A.    No.

9          Q.    She was in Connecticut?

10         A.    Yes.

11         Q.    Mr. Fenet, by what entity or by which

12    entity was Mr. Fenet employed?

13         A.    I believe of all the employees in

14    New York were paid by MCR.

15         Q.    On MCR's payroll?

16         A.    Yes.

17         Q.    Generally speaking, during the time

18    that Mr. Fenet was employed by MCR, what were

19    his duties and responsibilities?

20         A.    He was an analyst.

21         Q.    Briefly, what did -- in that role,

22    what did he do?

23         A.    He'd be responsible for due diligence

24    and then modeling numbers.

25         Q.    Is one of the purposes of modeling

1                          M. Belfonti

2    numbers to actually --

3                    MR. MERVIS:  Withdrawn.

4          Q.    Your office in Hamden, what's the

5    address?

6          A.    2319 Whitney, W-H-I-T-N-E-Y, Hamden,

7    06518 in Connecticut.

8          Q.    Has that been the address since

9    January of 2006?

10         A.    Yes.

11         Q.    What businesses are run out of --

12                    MR. MERVIS:  Withdrawn.

13         Q.    Since January 2006, what businesses

14   have been run out of that office, your

15   Connecticut office?

16         A.    All businesses.

17         Q.    So all the businesses in which you

18   have an ownership interest?

19         A.    Connecticut is our back office, so to

20   speak.

21         Q.    First of all, is Ms. Carpenter still

22   employed by one or more of your entities today?

23         A.    She's employed by MCR.

24         Q.    Has she been employed by MCR since

25   January 2006?

M. Belfonti

1     A.    Yes.

2     Q.    What have her duties and
3  responsibilities been since January 2006?

4     A.    She's a comptroller.

5     Q.    Generally speaking, what does she do
6  as your comptroller or a comptroller?

7     A.    She controls the books, checks with
8  the bookkeepers, checks payables, checks
9  receivables.  Just normal functions.

10    Q.    In fulfilling that role, has she,
11  from time to time, performed services on behalf
12  of a variety of your entities?

13    A.    Yes.

14    Q.    Would the same be true for Mr. Fenet
15  in terms of performing his former role?

16    A.    No.

17    Q.    Which entities did Mr. Fenet work
18  with?

19    A.    Anything that occurred in the
20  New York office.

21    Q.    Would that include dealings with
22  respect to the hotel?

23    A.    It would.

24    Q.    Going back to the CEB trust, do you

41

M. Belfonti

1  know if, today, anyone, any particular

2  individual has decision making authority with

3  respect to the affairs of the trust?

4  A.    I believe the trustee for the CEB

5  trust is Dana Friedman.

6  Q.    Has that been the case since January

7  of 2006?

8  A.    Yes.

9  Q.    Do you understand that, is it your

10  understanding that as the trustee, Mr. Friedman

11  has had and has sole decision making authority

12  with respect to the affairs of the trust?

13  MR. SLOSSBERG:   Objection to the form

14  of the question.

15  Q.    You can answer, if you understand the

16  question.

17  A.    I'm not sure.

18  Q.    You don't know the answer?

19  A.    No, I don't.

20  Q.    Have you, Mr. Belfonti, ever had

21  decision making authority with respect to the

22  affairs of the trust?

23  A.    I don't believe so.

24  Q.    Are you a trustee of the trust?

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

1                          M. Belfonti

2         A.      I'm not sure.

3         Q.      Do you know, Mr. Belfonti, if the CEB

4     trust has ever made any loans to anyone?

5         A.      Yes.

6         Q.      To which party or parties has the CEB

7     trust made loans?

8         A.      Many parties.

9         Q.      Has the CEB trust ever made a loan to

10    AHE?

11        A.      I believe so.

12        Q.      Do you know when that loan was made?

13              MR. MERVIS:   Withdrawn.

14        Q.      What's the basis of that belief?

15        A.      I believe in reviewing, talking with

16    my lawyers before the deposition, I think we --

17              MR. KIM:   I advise you not to reveal

18          the content of any of your communications

19          with your lawyers.

20              MR. MERVIS:   Unfortunately, I can't

21          argue with that.   Although, it's too bad

22          Mr. Kim wasn't sleeping.

23        Q.      Do you have a basis for believing

24    that the CEB trust made a loan to AHE, other

25    than from a conversation with your lawyers?

1                              M. Belfonti

2          A.     I believe that it did.

3          Q.     I guess what I'm asking you is why do

4     you believe that?

5          A.     Recollection.

6          Q.     Anything else?

7          A.     No.

8          Q.     I think I asked you a little bit

9     about Belfonti Holdings.

10               What is the -- first of all, Belfonti

11    Holdings principal office is in Connecticut?

12         A.     I believe so.

13         Q.     You say you believe so.  Is there any

14    other place that, to your understanding, it

15    might have a principal office?

16         A.     I don't think it's in New York, so it

17    would have to be in Connecticut.

18         Q.     You already told me that none of the

19    businesses operate out of New York; right?

20         A.     Except BCP.

21         Q.     Oh, I didn't understand that, all

22    right.  We'll get to BCP a little bit later.

23               What's the business of Belfonti

24    Holdings?

25         A.     It's another entity that we have.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

1                          M. Belfonti

2          Q.    Do you know what it does?

3          A.    No.

4          Q.    When you say it's an "entity that we

5    have," the "we" refers to the Belfonti family or

6    to you?

7          A.    No, to I.

8          Q.    You personally?

9          A.    Yes.

10         Q.    Your mother is not involved in the

11   business of Belfonti Holdings; right?

12         A.    I'm not sure.

13         Q.    Well, who runs Belfonti Holdings?

14         A.    It's not an operating business.

15         Q.    What's its business?

16         A.    I'm not sure.

17         Q.    Is it a holding company?

18         A.    I really don't know.

19         Q.    Are you an officer in Belfonti

20   Holdings?

21         A.    I'm not sure.

22         Q.    Does it have directors?

23         A.    Not to my knowledge.

24         Q.    Do you know what kind of entity it

25   is?

1                          M. Belfonti

2          A.    No.

3          Q.    Are you employed by Belfonti

4    Holdings?

5          A.    No.

6          Q.    Does it have any employees?

7          A.    I don't believe so.

8          Q.    The owners of Belfonti Holdings are

9    who?

10         A.    I'm not sure.

11         Q.    You are one of them; right?

12         A.    I really don't know.

13              MR. MERVIS:  Let's go off the record.

14              (Brief recess taken.)

15   FURTHER EXAMINATION

16   BY MR. MERVIS:

17         Q.    Mr. Belfonti, who has decision making

18   authority for Belfonti Holdings?

19         A.    Ultimately, me.

20         Q.    How do you know that?

21         A.    Because I have decision making of

22   most all the entities.

23         Q.    So the entities that run out of your

24   Connecticut office, you have the ultimate

25   decision making authority for every single one

M. Belfonti

1
2      Capital Partners, have you been the sole owner?

3          A.   No.

4          Q.   Who else has had an ownership

5      interest?

6          A.   Aligned Capital Holdings.

7          Q.   Does Aligned have an ownership

8      interest today?

9          A.   It does not.

10         Q.   When did Aligned cease to have an

11     ownership interest?

12         A.   Late 2007 or early 2008.  I'm not

13     sure.

14         Q.   Did that come about pursuant to a

15     settlement agreement that you reached with

16     Mr. Hochfelder?

17         A.   Yes, it did.

18         Q.   During -- I'm going to, again, to

19     save some paper, shorthand Belfonti Capital

20     Partners and call it BCP; is that okay?

21         A.   Sure.

22         Q.   During its existence, during BCP's

23     existence, have you been the ultimate decision

24     maker for the entity?

25         A.   Yes.

M. Belfonti

1

2      Q.      So you don't know how it came to be

3  that you stopped being a supervisory board

4  member?

5      A.      I think I resigned.

6      Q.      Why did you resign?

7      A.      On advice of counsel at the time.

8      Q.      Which counsel?

9      A.      Don't recall.

10          MR. MERVIS:  Mark this, please.

11          (Belfonti Exhibit 6, a letter from a

12      law firm called Sjiem Fat & Kuster, marked

13      for identification, as of this date.)

14      Q.      Mr. Belfonti, you've been handed the

15  document that we have had marked for

16  identification as Belfonti Exhibit 6.

17          Take as much time as you need, but my

18  first question is do you recognize the exhibit?

19      A.      Let me read it first.

20      Q.      Go right ahead.

21          Do you recognize it?

22      A.      I think I recognize the first page,

23  but the second two are in Dutch, so, no.

24      Q.      I'm not going to let you get off that

25  easy.  How about the fourth page?

M. Belfonti

A.    Yes.

Q.    Who prepared the fourth page,
Mr. Belfonti?

A.    I'm not sure.

Q.    So let's go to the first page.

This is a letter from a law firm
called Sjiem Fat & Kuster.

They represent you; is that correct?

A.    Yes.

Q.    They represent some of your entities;
is that correct?

A.    Yes, that is correct.

Q.    Which entities do they represent
today?

A.    I believe all four that are listed on
the front page.

Q.    Any others?

A.    I believe they also represent Diamond
Gaming.

Q.    That's a company that you own a
hundred percent; is that right?

A.    That is correct.

Q.    The four entities on the first page,
you are referring to where Mr. Sjiem Fat says,

M. Belfonti

1 "I'm writing on behalf of," and then he lists

2

3 four entities?

4   A. That is correct.

5   Q. Did you review a draft of this letter

6 before it was sent?

7   A. I don't remember.

8   Q. Did you know that this letter was

9 going to be sent before it actually was sent?

10   A. I did.

11   Q. Did you authorize that it be sent?

12   A. I did.

13   Q. Was there anyone -- apart from your

14 counsel, was there anybody, that you know of,

15 who was aware that this letter was going to be

16 sent, before it was sent?

17   A. No.

18   Q. That would include your mother?

19   A. That would include my mother, yes.

20   Q. She didn't know?

21   A. I don't believe so.

22   Q. This letter, the first page of

23 Exhibit 6 makes a demand for AHE to pay money

24 within three days of the date of the letter;

25 correct?

M. Belfonti

2        A.    That is correct.

3        Q.    To your knowledge, had any of the

4    four entities identified in this letter, ever

5    demand payment of any, of the money referenced

6    in the letter, prior to this August 21, 2007

7    letter?

8        A.    No.

9        Q.    Why not?

10        A.    I don't know.

11        Q.    Did it ever occur to you,

12    Mr. Belfonti, to cause any or all of these

13    entities to demand payment prior to August 21 of

14    2007?

15        A.    Yes.

16        Q.    When did that thought first occur to

17    you?

18        A.    After the default on the loan.

19        Q.    After BCP Florin defaulted on the

20    loan from Petra?

21        A.    Correct.

22        Q.    Do you recall approximately when you

23    had that thought?

24        A.    I don't, but there were re monies

25    owed back to my entities, and they were actual

70

1                           M. Belfonti

2        A.    I do.

3        Q.    What, to your understanding, does

4   that entry represent?

5        A.    The 4 million 873 and change are

6   monies that Belfonti Capital Partners advanced

7   as a loan in order to close the transaction with

8   AHE.

9        Q.    To what entity or entities were those

10  monies advanced as a loan?

11       A.    Various entities, but I'm not sure

12  which ones.

13              MR. KIM:  Did you say to or from?

14              MR. MERVIS:  I don't know.

15              Can you read the question back.

16              (The record was read.)

17              MR. MERVIS:  Let me restate it

18       because it wasn't so clear.

19       Q.    To which entities -- who were the

20  borrowers or who was the borrower or borrowers

21  of those, of the alleged loan?

22       A.    AHE.

23       Q.    Who, on behalf of BCP, decided to

24  make the loan?

25       A.    I did.

M. Belfonti

1

2     Q.     Who, on behalf of AHE, decided to

3     accept the loan?

4     A.     I did.

5     Q.     Was there any, to your knowledge, was

6     there any negotiation about the terms of this

7     alleged loan?

8     A.     No.

9     Q.     Were there terms for this alleged

10    loan?

11    A.     Just that it had to be paid back and

12    it would incur an interest rate.

13    Q.     Let me probe on that.

14           Was there, with respect to this

15    alleged loan, which we'll call the -- why don't

16    we call this the $4.8 million loan, just as a

17    shorthand; is that okay?

18    A.     Yes.

19    Q.     With respect to the alleged $4.8

20    million loan, was there a payment schedule?

21    A.     No.

22    Q.     Was there a maturity date?

23    A.     No.

24    Q.     Was any, was AHE required to make any

25    interest payments?

M. Belfonti

1

2      A.      No.

3      Q.      Was there any security for the loan?

4      A.      No.

5      Q.      Were there any restrictions placed on

6  how the proceeds of the alleged $4.8 million

7  loan could be used?

8      A.      No.

9      Q.      Was there any provision as to whether

10  the --

11          MR. MERVIS:  Withdrawn.

12      Q.      Was there any understanding as to

13  whether the $4.8 million alleged loan would be

14  subordinated to any of AHE's debt obligations?

15      A.      That was an understanding.

16      Q.      Who was that understanding between?

17      A.      Both me, as the lender, and me, as

18  the owner of AHE.

19      Q.      What was the understanding?

20      A.      That the first mortgage to Wachovia

21  was most important and had to be paid first.

22  And then the mezzanine loan by Petra would have

23  to be paid also.

24      Q.      Then?

25      A.      That was the most important.