1                    M. Belfonti

2          Q.    I understand that, but did you form

3    an understanding as to whether, for example,

4    those two loans had to be paid back first,

5    before there'd be repayment of this alleged $4.8

6    million loan?

7          A.    I need the question again.

8                MR. MERVIS:  Go ahead.

9                (The record was read.)

10         A.    I need it again.  Can you break it

11   down, actually?

12         Q.    Yes, I'll try to break it down.

13               Do you understand what it means for

14   debt to be subordinated?

15         A.    Yes.

16         Q.    What's your understanding of that

17   term?

18         A.    That the debt that Wachovia, as an

19   example, would give, would be in first position

20   over anything else.

21         Q.    So with respect to -- so what's your

22   understanding does that mean with respect to any

23   other indebtedness that AHE incurred?

24         A.    I'm having a tough time with the

25   question.

Elisa Dreier Reporting Corp.  (212) 557-5558
        780 Third Avenue, New York, NY 10017

1                              M. Belfonti

2          Q.      You understood, didn't you, that the,

3    that BCP Florin couldn't repay Petra's loan

4    before AHE paid off Wachovia's loan in full;

5    right?

6          A.      You need to repeat it.

7                  (The record was read.)

8          A.      That is correct.

9          Q.      Was it also your understanding that

10   AHE could not repay this alleged $4.8 million

11   loan until Wachovia's loan was repaid in full?

12         A.      No.

13         Q.      So if I have your testimony correct,

14   you felt that it was most important to pay the

15   Wachovia loan; right?

16         A.      That is correct.

17         Q.      Secondly important to pay the Petra

18   loan?

19         A.      Correct.

20         Q.      This alleged $4.8 million loan came

21   in third, basically?

22         A.      Well, depending.

23         Q.      Depending on what?

24         A.      If there was enough operating cash

25   flow from the property, we would have been able

M. Belfonti

to retire these four loans that were made.  But
unfortunately, the hotel never made money, and
we weren't able to pay these back.  These were
operational loans.

Q.    Let me make sure I understand your
testimony.

When you say "these four loans," you
are referring to what exactly?

A.    Seven loans, excuse me.

Q.    You are referring, when you say,
"seven loans," you are referring --

A.    I meant four entities, seven loans.

Q.    You are referring to the seven line
items on the chart on the fourth page of Exhibit
6; correct?

A.    I am.

Q.    When you say, "we," who is "we"?

A.    I.

Q.    Michael Belfonti?

A.    Yes.

Q.    From where, Mr. Belfonti, did --

MR. MERVIS:  Withdrawn.

Q.    With respect to this $4.8 million
alleged loan from BCP to AHE, did BCP have any

M. Belfonti

1                     M. Belfonti

2  expectation as to where the source of the funds

3  to repay the loan would come from?

4        A.    From a capital event or cash flow

5  from the property.

6        Q.    So I understand, a capital event

7  would be somebody buying the hotel?

8        A.    Could be a sale.

9        Q.    Or an outside investor coming in,

10  putting money in?

11       A.    Could be a refinance.

12       Q.    Cash flow from the property, by that

13  you mean cash generated by the operation of the

14  hotel?

15       A.    I do.

16       Q.    Did AHE attempt to find financing

17  from any other source before agreeing to accept

18  this alleged $4.8 million loan?

19       A.    No.

20       Q.    Why not?

21       A.    No one would have lent this money on

22  an unsecured basis to AHE.

23       Q.    How do you know that?

24       A.    My years and experience in the real

25  estate business.

```
1                           M. Belfonti
2          Q.    What about applying that experience
3    to the particular facts of the transaction, why
4    do you reach that conclusion?
5          A.    Well, first of all, the loans were
6    unsecured.  And I don't think anyone would have
7    lent monies unsecured, except related entities
8    that I controlled.
9               And secondly, there was no collateral
10   associated with any of these loans.
11         Q.    Again, by "these loans," you are
12   referring to the transaction identified on the
13   chart on the last page of Exhibit 6?
14         A.    I am.
15         Q.    Is there a, is this alleged $4.8
16   million loan from BCP to AHE, is there a loan
17   agreement that memorializes that alleged loan?
18         A.    There is not.
19         Q.    Is there any reading signed by AHE or
20   any representative of AHE that memorializes this
21   alleged $4.8 million loan?
22         A.    No.
23         Q.    Is there any writing signed by or by
24   a representative of BCP memorializing this
25   alleged $4.8 million loan?
```

```
 1                          M. Belfonti

 2          A.    No.

 3          Q.    To your knowledge, was --

 4                MR. MERVIS:  Withdrawn.

 5          Q.    Was AHE's supervisory board of

 6    directors ever asked to approve this alleged

 7    $4.8 million loan?

 8          A.    No.

 9          Q.    Do you know why not?

10          A.    Nobody asked.

11          Q.    I'm sorry?

12          A.    Nobody asked.

13          Q.    Who would you have expected to ask,

14    Mr. Belfonti?

15          A.    Well, this money was put up before I

16    owned AHE.  So there was nobody to ask.

17          Q.    The alleged $4.8 million loan

18    continued, at least in your view, to be a debt

19    of AHE going forward?

20          A.    That's correct, once it was put on

21    the books.

22          Q.    Why, Mr. Belfonti, if you know,

23    wasn't AHE's supervisory board asked to approve

24    the alleged loan at anytime going forward?

25          A.    I didn't think I had to.
```

M. Belfonti

1

2        Q.    Do you have any idea who calculated

3   this, the amount that is reflected in the first

4   line item of the chart on Exhibit 6, this

5   $4,873,702.86?

6        A.    Exhibit 6?

7        Q.    Yes, the fourth page.

8        A.    I would think it would be Victoria.

9        Q.    I want you to still have Exhibit 6

10  handy, because we're going to be referring to

11  it.  That's the Sjiem Fat letter.

12             It's correct, isn't it, that the

13  entirety of the alleged $4.8 million loan exists

14  of money that you spent to buy the hotel?

15       A.    That is correct.

16       Q.    You think that's a loan?

17       A.    It is a loan.

18       Q.    Do you know what a capital

19  contribution is?

20       A.    I do.

21       Q.    Is there a difference in your mind

22  between a loan and a capital contribution?

23       A.    There is.

24       Q.    What's the difference?

25       A.    Well, usually with a capital

```
 1                        M. Belfonti
 2    contribution, the money that's put in as
 3    capital.  You would get something in return for
 4    that.  So you would get ownership.
 5               None of these loans that were put up
 6    resulted in any ownership for the entities that
 7    put them up.
 8               So if I can look at your chart here,
 9    Belfonti Capital Partners LLC, Belfonti Holdings
10    LLC, Belfonti Capital Partners LLC, MCR, the
11    money that came out of my mom's trust, none of
12    those entities had a beneficial interest in AHE.
13    So how could it ever be capital?
14               MR. MERVIS:  This is probably as good
15         a time as ever if you want to break.
16               (Luncheon recess:  12:18 p.m.)
17
18
19
20
21
22
23
24
25
```

90

M. Belfonti

A F T E R N O O N    S E S S I O N

(Time noted:  1:10 p.m.)

1   M I C H A E L   B E L F O N T I,   resumed and

2   testified as follows:

3   CONTINUED EXAMINATION

4   BY MR. MERVIS:

5        Q.    Mr. Belfonti, in connection with the
alleged $4.8 million BCP loan, was BCP
represented by counsel?

6        A.    In relation to the loan?

7        Q.    In relation to the making of the
loan.

8        A.    No.

9        Q.    Was AHE represented by counsel in
connection with the receiving of the loan?

10        A.    No.

11        Q.    You mentioned, I think, an individual
who worked in your New York office named Stephan
Resnick?

12        A.    Yes.

13        Q.    Is that someone who still works for
you?

14        A.    Non.

15        Q.    When did he stop working for you?

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

M. Belfonti

    A.    Sometime in 2007.

    Q.    What was his, what were his duties and responsibilities while he worked in the New York office?

    A.    He was responsible mostly for the construction management of the hotel, converting it from a Wyndham to a Westin.

    Q.    Did he, to your knowledge, work for AHE at any time?

    A.    No.

    Q.    Provide any services for AHE?

    MR. MERVIS:  Withdrawn.  Bad question.

    Q.    Do you know where he is today?

    A.    Works for Starwood.

    Q.    Going back to the chart on the fourth page of Exhibit 6.

    Directing your attention to the second entry from the top, do you know what -- that's the one that starts July 25, 2006.

    Do you know what transaction is represented by that line?

    A.    I do.

    Q.    What transaction is that?

M. Belfonti

1

2     A.     As part of the Starwood management

3     contract, we had to keep approximately $500,000

4     in the account with them.

5          Q.     Let me back up.

6               First of all, who is "we"?

7          A.     I, AHE.

8          Q.     AHE, the entity that you were in

9     control of at the time?

10         A.     Correct.

11         Q.     Starwood, I think you described as

12    the manager of the hotel.

13               What did you mean by that?

14         A.     They were the management company of

15    the hotel.

16         Q.     That was pursuant to an agreement

17    that AHE -- that you, on behalf of AHE, entered

18    into with Starwood?

19         A.     That is correct.

20         Q.     So the figure $499.950 in the chart

21    on page 4 of Exhibit 6, that is money, that's

22    money that was given to Starwood; is that

23    correct?

24         A.     That is correct.

25         Q.     Who, what entity gave that money to

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

M. Belfonti

Starwood?

    A.    I'm not sure.

    Q.    Does the entry in the second line on this chart, on the fourth page of Exhibit 6, represent, in your mind, a loan from Belfonti Holdings to AHE?

    A.    Yes.

    Q.    All right, I think just again for brevity sake, I will refer to this as the alleged $500,000 Belfonti Holdings loan; that okay?

    A.    Sure.

    Q.    Who, with Belfonti Holdings, decided to make this loan, the alleged $500,000 loan?

    A.    It was prompted by a call from Starwood saying that we needed to put money in this working capital account.

    Q.    Who placed the call from Starwood?

    A.    I'm not sure.

    Q.    Who received the call from Starwood?

    A.    It could have been a call or an e-mail, but I don't recall.

    Q.    Who received the communication on your side?

94

M. Belfonti

    A.    It would be either me or Victoria.

    Q.    So either you or Victoria -- it came
to your attention that Starwood had made a
request for $500,000; is that right?

    A.    That is correct.

    Q.    In response to that, what did you do?

    A.    We wired a loan to AHE in the amount
of $500,000.

    Q.    Who is "we"?

    A.    I.

    Q.    From what entity did you -- did that
money come out of?

    A.    I'm not sure.  The chart here says
Belfonti Holdings, so it's stands to reason
that's who loaned the money.

         Just as a footnote, the 499,950
should be 500, but I think there was a $25 or
$50 wiring fee, and that's why it only shows
499,950.

    Q.    When you say "it should be 500," what
do you mean by the?

    A.    That's the exact number.  But there
was $50 taken off for the wire.

    Q.    In your mind, Mr. Belfonti, what was

M. Belfonti

the amount of the loan to AHE?

A.    $499,950.

Q.    So you didn't charge AHE for the $25
or $50 wire fee; is that your testimony?

A.    I guess not.

Q.    Who, what individual, on behalf of
Belfonti Holdings, agreed to make this loan?

A.    I did.

Q.    What individual, on behalf of AHE,
agreed to accept this loan?

A.    I did.

Q.    Was there any negotiation concerning
the terms of the alleged $500,000 Belfonti
Holdings loan?

A.    No.

Q.    By the way, I may have neglected to
ask this.

Going back to the $4.8 million
alleged BCP loan, was there a due date for the
loan?

In other words, a date by which it
had to be repaid?

A.    No.

Q.    With respect to the alleged $500,000

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

1                              M. Belfonti

2      Belfonti Holdings loan, was there a maturity or

3      due date for that loan?

4              A.     No.

5              Q.     Was there any payment schedule?

6              A.     No.

7              Q.     Was there any requirement that AHE

8      pay interest on the alleged loan?

9              A.     No.

10             Q.     Was any security given by AHE for the

11     alleged loan?

12             A.     No.

13             Q.     To your knowledge, were any

14     restrictions placed on how the proceeds of the

15     alleged $500,000 Belfonti Holdings loan could be

16     used?

17             A.     Yes.

18             Q.     On what restrictions were those?

19             A.     They would only remain in the

20     operating account of AHE that Starwood

21     controlled.

22             Q.     Who imposed those restrictions?

23             A.     It's part of the management

24     agreement.

25             Q.     So that wasn't a restriction imposed

M. Belfonti

1

2  by Starwood?

3      A.    That is correct.

4      Q.    It was not a restriction imposed by

5  the alleged lender; correct?

6      A.    That is correct.

7      Q.    There was no understanding between

8  the alleged lender and the alleged borrower as

9  to how the proceeds of the loan -- as to whether

10  there will be any restrictions on the proceeds

11  of the loan; is that correct?

12      A.    Could you read that?

13      Q.    I will just rephrase it.

14          Was there any understanding, was

15  there any understanding between Belfonti

16  Holdings, on the one hand, and AHE, on the other

17  hand, as to whether there were any restrictions

18  on how the proceeds of the alleged loan could be

19  used?

20      A.    It was general knowledge that it was

21  a working capital loan that Starwood was going

22  to control.

23          So I think everybody at AHE knew

24  that.  Marieta Ras knew it at AHE, and Victoria

25  knew it at Belfonti, as I did.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

M. Belfonti

1

2    Q.    Was there any understanding, either

3    on the Belfonti Holdings side or on the AHE

4    side, as to whether the alleged $500,000

5    Belfonti Holdings loan would be subordinated to

6    any other obligation of AHE?

7    A.    No.

8    Q.    From what source did Belfonti

9    Holdings expect to receive repayment of the

10    alleged $500,000 Belfonti Holdings loan?

11    A.    Again, as I stated, in the first $4.8

12    million, a capital event would have triggered a

13    payback to Belfonti Holdings, either a sale or

14    refinance or cash from operations.

15    Q.    Or cash from operations?

16    A.    Yes.

17    Q.    Did AHE make any effort to obtain

18    this amount, the $500,000 amount from any other

19    source?

20    A.    No.

21    Q.    Why not?

22    A.    As in the first $4.8 million, there

23    was no one willing to lend the $500,000 on an

24    unsecured basis, without collateral.

25    Q.    Is there any writings signed by any

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

M. Belfonti

2  representative of AHE that memorializes the

3  alleged $500,000 Belfonti Holdings loan?

4      A.    No.

5      Q.    Is there any writing signed by any

6  representative of Belfonti Holdings that

7  memorializes the alleged $500,000 Belfonti

8  Holdings loan?

9      A.    No.

10     Q.    Does Belfonti Capital Partners/BCP

11 have a general ledger?

12     A.    Yes.

13     Q.    Who maintains that?

14     A.    Our accounting department.

15     Q.    Do you have any responsibility at all

16 for the maintenance of the BCP general ledger?

17     A.    I do not.

18     Q.    Did you ever look at it?

19     A.    On occasion.

20     Q.    Do you know what any of the account

21 codes mean?

22     A.    Just to the different entities, the

23 properties that I might have.

24     Q.    Does MCR have a general ledger?

25     A.    Yes.

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

1                        M. Belfonti

2      would have recorded the alleged $500,000

3      Belfonti Holdings loan, as a loan on AHE's

4      books?

5           A.     As a loan receivable on AHE's books.

6           Q.     Pursuant to Ms. Carpenter's

7      instructions?

8           A.     Yes.

9           Q.     Was the alleged $500,000 --

10               MR. MERVIS:  Actually, withdrawn.

11          Q.     Apart from Ms. Ras, was there

12     anybody else at AHE who was aware of the alleged

13     $500,000 Belfonti Holdings loan?

14          A.     Possibly, Alcira.

15          Q.     The comptroller?

16          A.     Yes.

17          Q.     What makes you think that that's a

18     possibility?

19          A.     Well, she worked daily with Marieta,

20     and they do -- did all the books together for

21     AHE.

22          Q.     Did you ever make Alcira aware of the

23     alleged $500,000 Belfonti Holdings loan?

24          A.     No.

25          Q.     Did she ever tell you that she was

1                              M. Belfonti

2      aware of the alleged $500,000 Belfonti Holdings

3      loan?

4              A.     No.

5              Q.     Did Ms. Ras ever tell you that she

6      was aware of the alleged $500,000 Belfonti

7      Holdings loan?

8              A.     No.

9              Q.     Was Belfonti Holdings represented by

10     counsel in connection with its making of the

11     alleged $500,000 loan?

12             A.     No.

13             Q.     Was AHE represented by counsel in

14     connection with its receipt of the alleged

15     $500,000 loan?

16             A.     No.

17             Q.     Was the alleged $500,000 loan ever

18     presented to AHE's board of supervisory

19     directors for approval?

20             A.     Not that I recall.

21             Q.     I think you said that there was one,

22     during your tenure as a supervisory director of

23     AHE, that there was a grand total of one meeting

24     of the board of supervisory directors; is that

25     right?

M. Belfonti

A.    That is correct.

Q.    Was approval of the alleged $500,000 Belfonti Holdings loan on the agenda of that meeting?

A.    Not that I recall.

MR. MERVIS:  Mark this, please.

(Belfonti Exhibit 9, a document, marked for identification, as of this date.)

Q.    Mr. Belfonti, we have had marked for identification as Exhibit 9, a document that was produced by your counsel.

It's very heavily redacted, but I will ask you if you are able to recognize the exhibit, notwithstanding those redactions?

A.    No.

Q.    Taking a look at the first page on the left-hand -- well, on the left-hand side, there's a code under account I.D.; you see that 1,000?

A.    I do.

Q.    And a description cash operating.

Do you know what either of those, either the code or the description mean?

M. Belfonti

1

2          A.     No.

3          Q.     Going to the second page of the

4    exhibit, going down the page to the, on the

5    left-hand side to the third entry -- actually, I

6    guess it's the fourth entry, you will see

7    there's a code 2206; see that?

8          A.     I do.

9          Q.     Do you know what that code is for?

10          A.     I don't.

11          Q.     You will see a line that says,

12    underneath it that says, "Due to from Aruba

13    Hotel"; see that?

14          A.     I do.

15          Q.     Do you know what that description

16    means?

17          A.     I don't.

18          Q.     Is this something that, to your

19    understanding, Ms. Carpenter would have

20    knowledge of?

21          A.     Yes.

22          Q.     Okay, you can put that aside.

23                 Going back to Exhibit 6, please, and

24    to the chart, page 4, and directing your

25    attention to the third line item from the top,

1                              M. Belfonti

2    the one that has the date, starts with the date

3    December 8, 2006; do you see that?

4          A.    I do.

5          Q.    Do you have an understanding as to

6    what this line, what transaction this line

7    represents?

8          A.    I do.

9          Q.    What?

10         A.    Wachovia had set aside a $10 million

11   interest reserve account that was to be used to

12   carry the hotel as it related to any financial

13   shortfalls.

14              And by December of '06, we had gone

15   through that $10 million.  And in order to keep

16   the hotel, we need another $393,000 or risk

17   going into default on the mortgage.

18         Q.    In that answer, you used the word

19   "we" a number of times.  Who is we?

20         A.    I.  I always refer to everyone so it

21   looks like a team, so, but it's me.

22         Q.    You said there's a $10 million

23   interest reserve fund?

24         A.    There was, yes.

25         Q.    That was, that money was supposed to

1                          M. Belfonti

2        be used to make interest payments on the

3        Wachovia loan; is that right?

4              A.      It was.

5              Q.      Was it intended, was it intended in

6        any way, shape or form to actually fund the

7        operations of the hotel?

8              A.      Yes.

9              Q.      That too?

10             A.      That also.

11             Q.      So if I am understanding correctly,

12       by December of '06, you had essentially used up

13       that entire fund; is that right?

14             A.      That is correct.

15             Q.      Is that because the hotel was

16       performing less favorably than had been

17       projected?

18             A.      That is correct.

19             Q.      So if I'm understanding it correctly,

20       you, as the borrower on the Wachovia loan,

21       needed to find $393,000 to make payment; is that

22       right?

23             A.      That is correct.

24             Q.      If you hadn't made that payment, what

25       could have happened?

1                          M. Belfonti

2          A.    The loan could have gone into

3     default.

4          Q.    What effect would that have had, if

5     any, on AHE?

6          A.    They would have been in default of

7     their obligation with the Wachovia loan.

8          Q.    Would that have, for example, caused

9     the hotel to stop operating?

10         A.    No.

11         Q.    Would it have caused AHE to go out of

12    business?

13         A.    No.

14         Q.    It would have, could have caused you,

15    Michael Belfonti, to lose your equity interest

16    in AHE; correct?

17         A.    That is correct.

18         Q.    Can you think of any other

19    consequence that would have occurred, had you

20    not come up with the $393,000 to make the

21    interest payment to Wachovia?

22         A.    No.

23         Q.    Is the transaction that's reflected

24    on the third line of the chart on page 4 of

25    Exhibit 6, is that, in your mind, representative

M. Belfonti

2  of a loan to AHE?

3      A.    Which one are you referring to?

4      Q.    The one, the third line from the top,

5  the one that starts December 8, 2006.

6      A.    In the amount of 393,000?

7      Q.    That's right, that's right.

8            Is that, in your mind, a loan from

9  somebody to AHE?

10     A.    It is.

11     Q.    Who is the lender?

12     A.    Belfonti Capital Partners LLC.

13     Q.    Who is the borrower?

14     A.    AHE.

15     Q.    Who on the BCP, on the lender's side

16  --

17           MR. MERVIS:  Withdrawn.

18     Q.    Again, I'm going to shorthand this

19  and refer to it as the $393,000 BCP loan; okay?

20     A.    Yes.

21     Q.    Who on the BCP side made the decision

22  to grant this loan?

23     A.    Me.

24     Q.    Who on the lender's side, on the --

25  I'm sorry, borrower's side, AHE, made the

1                          M. Belfonti

2    decision to accept the alleged $393,000 BCP

3    loan?

4          A.     Me.

5          Q.     Was there any negotiation concerning

6    the terms of the alleged $393,000 loan?

7          A.     No.

8          Q.     Was there a maturity or due date for

9    the repayment of the alleged $393,000 BCP loan?

10         A.     No.

11         Q.     Was there a payment schedule for the

12   alleged $393,000 BCP loan?

13         A.     No.

14         Q.     Was there any requirement for --

15                MR. MERVIS:   Withdrawn.

16         Q.     Did AHE have any obligation to pay

17   interest on the alleged $393,000 BCP loan?

18         A.     Not right away.

19         Q.     What do you mean by "not right away"?

20         A.     Possibly at a later date, there would

21   have been interest charged.

22         Q.     Who -- well, at the time that the, at

23   the time that you or your company BCP, BCP made

24   this alleged loan, did you have an understanding

25   that there would be an interest charge to AHE at

Elisa Dreier Reporting Corp.   (212) 557-5558
     780 Third Avenue, New York, NY 10017

1                          M. Belfonti

2    some point in the future?

3         A.    Sometime in the future.

4         Q.    What was that understanding?

5         A.    It would have been marked at Aruban

6    rates, something fair and equitable.

7         Q.    Was that in your mind at the time

8    that you decided to make this alleged loan?

9         A.    No.

10        Q.    When did it first occur to you,

11   Mr. Belfonti, that AHE would need to pay

12   interest on the alleged $393,000 BCP loan?

13        A.    It didn't.

14        Q.    So was today the first time that that

15   thought occurred to you?

16        A.    No.

17        Q.    Let me go back to my original

18   question then.

19             Was there any obligation for AHE to

20   pay interest on the alleged $393,000 BCP loan?

21        A.    No.

22        Q.    Was any security given by AHE for the

23   alleged $393,000 BCP loan?

24        A.    No.

25        Q.    Was there any understanding that the

Elisa Dreier Reporting Corp.   (212) 557-5558
         780 Third Avenue, New York, NY 10017

M. Belfonti

1
2       alleged $393,000 BCP loan be subordinated to any

3       other obligation that AHE had at the time?

4           A.    I think that was the same question as

5       before, but I'd like to hear it again, please.

6           Q.    You can always hear it again.

7           A.    Read that back, please?

8                 (The record was read.)

9           A.    No.

10          Q.    Did BCP place any restrictions on AHE

11      as to how the proceeds of the alleged $393,000

12      BCP loan could be used?

13          A.    Well, it went directly to the lender,

14      so I guess that was a restriction.

15          Q.    Went directly to Wachovia?

16          A.    Yeah.

17          Q.    From what source did BCP expect the

18      alleged $393,000 BCP loan to be repaid?

19          A.    When there was a capital event.

20          Q.    Any other possibility that you had in

21      mind at the time?

22          A.    Just cash flow, operating cash flow.

23          Q.    From the operation of the hotel?

24          A.    Yes.

25          Q.    Did AHE attempt to secure this

114

1                              M. Belfonti

2    $393,000 from any other source?

3          A.    No.

4          Q.    Why not?

5          A.    Because no one would lend AHE this

6    money because it was unsecured, and there was no

7    collateral.

8          Q.    Is there any writing signed by a

9    representative of AHE memorializing the alleged

10   $393,000 BCP loan?

11         A.    No.

12         Q.    Is there any writing signed by any

13   representative of BCP, memorializing the alleged

14   $393,000 BCP loan?

15         A.    No.

16         Q.    Was BCP represented by counsel in

17   connection with the making of the alleged

18   $393,000 BCP loan?

19         A.    No.

20         Q.    Was AHE represented by counsel in

21   connection with the making of the alleged

22   $393,000 BCP loan?

23         A.    No.

24         Q.    Who, apart from yourself, at BCP, was

25   aware of the alleged $393,000 loan, prior to the

1                                    M. Belfonti

2       time that you lost your ownership interest in

3       AHE?

4              A.     Victoria Carpenter.

5              Q.     How was she -- how, how was she made

6       aware of the alleged $393,000 BCP loan?

7              A.     Because she booked it as a loan.

8              Q.     On whose books?

9              A.     On Belfonti Capital Partners' books.

10             Q.     Who at AHE was aware of the existence

11      of the alleged $393,000 BCP loan, prior to the

12      time that you lost your ownership interest in

13      AHE?

14             A.     Marieta Ras.

15             Q.     How do you know that?

16             A.     Because she would have been asked to

17      book it as a loan payable back to Belfonti

18      Capital Partners.

19             Q.     Asked by whom?

20             A.     By Victoria.

21             Q.     Victoria Carpenter?

22             A.     Yes.

23             Q.     Book it in whose books?

24             A.     In the books of AHE.

25             Q.     Anybody else at AHE aware of the

116

1                          M. Belfonti

2      alleged --

3              MR. MERVIS:  Withdrawn.

4          Q.     Did you ever make Ms. Ras aware of

5      the existence of the alleged $393,000 BCP loan?

6          A.     I did not.

7          Q.     Did Ms. Ras ever say to you that she

8      was aware of the existence of the alleged

9      $393,000 BCP loan?

10         A.     Not that I can remember.

11         Q.     Was there anybody else at AHE who was

12     aware of the existence of the alleged $393,000

13     BCP loan?

14         A.     Possibly, Alcira.

15         Q.     Why do you say "possibly"?

16         A.     Because I don't know for a fact if

17     she talked to her about that, but I would think

18     because she was her assistant, she might know

19     about it.

20         Q.     You never spoke with Alcira about the

21     alleged $393,000 BCP loan; correct?

22         A.     I did not.

23         Q.     Was the alleged $393,000 BCP loan

24     ever presented to AHE's supervisory board for

25     approval?

M. Belfonti

1

2    A.    No.

3    Q.    Why not?

4    A.    It was an intercompany loan, and we

5    didn't or I didn't see any reason to do so.

6    Q.    With respect to the alleged $500,000

7    Belfonti Holdings loan, why wasn't that

8    presented to the supervisory board for approval?

9    A.    Same reason.

10    Q.    Being?

11    A.    Being that I didn't think it was

12    necessary.

13    MR. MERVIS:  Mark this, please.

14    (Belfonti Exhibit 10, a document,

15    marked for identification, as of this

16    date.)

17    Q.    Mr. Belfonti, you've been handed what

18    has been marked for identification as Exhibit

19    10.

20    I will ask you, sir, if you recognize

21    the document?

22    A.    I do not.

23    Q.    There's handwriting in the middle of

24    the document.

25    Do you recognize any of that

118

1                          M. Belfonti

2      handwriting?

3           A.     I do not.

4           Q.     You can put it aside.

5                  Forgive me if I've already asked

6      this, but was BCP represented by counsel in

7      connection with the making of the alleged

8      $393,000 BCP loan?

9           A.     No.

10          Q.     Was AHE represented by counsel in

11     connection with that alleged loan?

12          A.     No.

13          Q.     Going back to Exhibit 6, please, and

14     the chart on page 4.

15                 The next two entries bear the same

16     date and the same amount; see that?

17          A.     I do.

18          Q.     Are those two entries addressed to

19     the same transaction or to different

20     transactions?

21          A.     I believe it's the same.

22          Q.     Do you know why -- well, let me ask

23     it differently.

24                 First of all, the dates are wrong;

25     aren't they?

Elisa Dreier Reporting Corp.   (212) 557-5558
     780 Third Avenue, New York, NY 10017

1                           M. Belfonti

2       to AHE?

3               A.      Yes.

4               Q.      Who, in your mind, is the lender or

5       was the lender?

6               A.      MCR Property Management.

7               Q.      Not Harlow, Adams & Friedman?

8               A.      No.

9               Q.      Who, on behalf of MCR, decided to

10      make this loan, this alleged loan?

11              A.      I did.

12              Q.      Actually, I will shorthand it and

13      we'll call this the $1.3 million MCR loan; okay?

14              A.      That's fine.

15              Q.      Who, on behalf of AHE, agreed to

16      accept the $1.3 million alleged MCR loan?

17              A.      I did.

18              Q.      Was there any negotiation concerning

19      the terms of the alleged $1.3 million MCR loan?

20              A.      No.

21              Q.      Was there a payment schedule for the

22      repayment of the alleged $1.3 million MCR loan?

23              A.      No.

24              Q.      Was there, did AHE have an obligation

25      to pay interest on the alleged $1.3 million MCR

1                          M. Belfonti

2    loan?

3            A.    No.

4            Q.    Was there a due date or a maturity

5    date for the alleged $1.3 million MCR loan?

6            A.    No.

7            Q.    Was any security given by AHE for the

8    alleged $1.3 million MCR loan?

9            A.    No.

10           Q.    Was there any understanding that the

11   alleged $1.3 million MCR loan would be

12   subordinated to any of AHE's existing

13   obligations?

14           A.    No.

15           Q.    Did MCR place any restrictions on

16   what or how AHE could use the proceeds of the

17   alleged $1.3 million MCR loan?

18           A.    It went directly to Wachovia.

19           Q.    That was to pay, that was to make

20   AHE's mortgage payment?

21           A.    Correct.

22           Q.    So that you didn't lose the hotel;

23   correct?

24           A.    Yes.

25           Q.    From what source did MCR expect to be

1                      M. Belfonti

2    repaid the $1.3 million MCR loan?

3         A.    From a capital event or from the cash

4    from operations of the hotel.

5         Q.    Did AHE attempt to obtain this

6    approximately $1.3 million from any other

7    source?

8         A.    No.

9         Q.    Why not?

10        A.    Because no other source was available

11   for an unsecured loan without collateral.

12        Q.    In other words, to your

13   understanding, no lender would agree to make

14   this loan without security?

15        A.    That is correct.

16        Q.    Is there any writing signed by AHE

17   which memorializes --

18             MR. MERVIS:   Withdrawn.

19        Q.    Is there any writing signed by a

20   representative of AHE or on AHE's behalf, that

21   memorializes the alleged $1.3 million MCR loan?

22        A.    No.

23        Q.    Is there any writing signed by a

24   representative of MCR that memorializes the

25   alleged $1.3 million MCR loan?

1                          M. Belfonti

2                  First of all, that date is wrong;

3       isn't it?

4           A.     Yes.

5           Q.     Is should be '07; right?

6           A.     It should be.

7           Q.     Do you know what transaction is

8       referenced in that line item on the chart?

9           A.     The 548?

10          Q.     Yes.

11          A.     That was a loan that the trust made.

12      I believe, I believe the trust made the loan to

13      Wachovia or excuse me, the trust made the loan

14      to AHE.

15          Q.     So your testimony is that the CEB

16      Irrevocable Trust made a loan to AHE?

17          A.     It was wired, yes, that is correct.

18          Q.     The amount of the loan was what

19      exactly?

20          A.     $548,250.

21          Q.     Let me again, for shorthand, I will

22      refer to this as the CEB loan; okay?

23          A.     Okay.

24          Q.     Who on the CEB side decided to make a

25      loan to AHE?

Elisa Dreier Reporting Corp.  (212) 557-5558
       780 Third Avenue, New York, NY 10017

129

1                       M. Belfonti

2       A.      Dana Friedman and myself.

3       Q.      Was Mr. Friedman acting as counsel in

4   making that decision?

5       A.      For the trust.

6       Q.      He was acting as counsel for the

7   trust?

8       A.      Correct.

9       Q.      To your understanding, did both of

10  you have to approve the CEB loan in order for it

11  to be made?

12      A.      I believe so.

13      Q.      Both of you did approve it?

14      A.      Yes.

15      Q.      The borrower that you approved was

16  AHE?

17      A.      Yes.

18      Q.      Who on the AHE -- who on behalf of

19  AHE agreed to accept the CEB loan?

20      A.      No one.  Again, this went directly to

21  Wachovia.

22      Q.      I understand what you are saying.

23              You are saying the funds were

24  transferred directly to Wachovia; correct?

25      A.      That is correct.

1                              M. Belfonti

2        Q.    They never went through AHE's

3    account?

4        A.    No.

5        Q.    But you claimed on you that AHE was a

6    borrower from CEB; right?

7        A.    That is correct.

8        Q.    Who from AHE agreed to be the

9    borrower?

10       A.    Me.

11       Q.    Did your mother know about this loan

12   at the time it was made, this alleged CEB loan?

13       A.    Yes.

14       Q.    Your father, did he know about this

15   alleged CEB loan at the time it was made?

16       A.    My dad might have been ill at this

17   time, so I don't know.

18       Q.    Was there any negotiation concerning

19   the terms of the alleged CEB loan?

20       A.    Dana Friedman required that my mom

21   mortgage her home.  So the trust secured its

22   $500,000 that it lent to my mom with the

23   collateral from my mom's house.

24       Q.    You are saying that CEB made a loan

25   to your mother, not to AHE?

1                           M. Belfonti

2         A.    To my mom, and then my mom, in turn,

3    gave it to AHE.

4         Q.    I see.

5         A.    I believe that's how it went.

6         Q.    Was there any negotiation between

7    CEB, on the one hand, and AHE, on the other

8    hand, concerning the terms of the alleged CEB

9    loan?

10        A.    No.

11        Q.    Was there any negotiation between

12   your mother, on the one hand, and AHE, on the

13   other hand, concerning the terms of the alleged

14   CEB loan?

15        A.    No.

16        Q.    Did you and Mr. Friedman --

17              MR. MERVIS:  Withdrawn.

18        Q.    Did Mr. Friedman negotiate with any

19   representative of AHE concerning the terms of

20   the alleged CEB loan?

21        A.    No.

22        Q.    Was there a payment schedule for the

23   alleged CEB loan?

24        A.    No.

25        Q.    Was AHE required to pay interest on

132

1                          M. Belfonti

2      the alleged CEB loan?

3          A.    Yes.

4          Q.    What were the specifics of AHE's

5      obligation to pay interest on the alleged CEB

6      loan?

7          A.    Well, as with the CEB loan and all

8      other loans before, all our intercompany loans

9      carry a rate of 12 percent, and it was an

10     implied return back to CEB of 12 percent.

11         Q.    When you say all of our intercompany

12     loans carry a rate of 12 percent, what do you

13     mean by that?

14         A.    Well, any entity that lends to

15     another entity -- take ourselves out of Aruba

16     for a second.

17         Q.    Sure.

18         A.    Any entity that lends to a

19     Connecticut entity from MCR to maybe another

20     Connecticut entity, when there is a capital

21     event like a refinance or a sale of the asset,

22     that borrowed the money from MCR or generates it

23     from cash flow, the loan is paid, the principal

24     amount of the loan is paid back.  And then

25     there's a 12 percent interest rate attached to

Elisa Dreier Reporting Corp.  (212) 557-5558
    780 Third Avenue, New York, NY 10017

1                        M. Belfonti

2        it.

3             Q.      That's true for every loan that you

4        know of between two entities that you have an

5        ownership interest in?

6             A.      Unless it's a very short-term

7        liability, like a week or something like that,

8        we probably wouldn't bother with the interest

9        rate.

10                    But anything more than a month or

11       two, there's a 12 percent coupon attached with

12       that loan.

13            Q.      So what was the principal on the CEB

14       loan?

15            A.      $548,000.

16            Q.      Is there any document anywhere that

17       reflects the obligation of AHE to pay interest

18       on the alleged CEB loan?

19            A.      No.

20            Q.      Is there any document anywhere that

21       reflects an obligation of AHE to pay interest on

22       any of the loans at issue, in either the

23       Connecticut litigation, the Connecticut Federal

24       Court litigation or the New York Federal Court

25       litigation?

Elisa Dreier Reporting Corp.   (212) 557-5558
   780 Third Avenue, New York, NY 10017

1                              M. Belfonti

2          Q.    What does that mean, Mr. --

3          A.    Well, as the, as the, as we pay the

4    loan each month, it was the priority to pay both

5    Wachovia and Petra first.

6          Q.    Was it understood that CEB could not

7    demand repayment of the alleged CEB loan until

8    the Wachovia loan had been paid off in full?

9          A.    No, I don't, I don't know.

10         Q.    When you say you don't know, you

11   don't understand the question or you don't know

12   the answer?

13         A.    I don't know the answer.

14         Q.    Who would know the answer to that?

15         A.    I guess the lawyers.  I don't know

16   what the documents say.

17         Q.    Which lawyers?

18         A.    My lawyers.

19         Q.    You didn't have an understanding one

20   way or the other; is that correct?

21         A.    At the time, no.

22         Q.    At the time that the CEB loan was

23   made, did you have an understanding as to

24   whether it could be, whether CEB could demand

25   repayment before the Wachovia -- I'm sorry,