141

M. Belfonti

1    before the Petra loan was repaid in full?

3    A.    I don't know.

4    Q.    Who would know?

5    A.    I'd have to understand the documents

6    and get some opinion on it.

7    Q.    The documents being Exhibits 1 and 2?

8    A.    No.

9    Q.    What documents are you referring to?

10   A.    The loan documents.

11   Q.    Take a look at Exhibits 1 and 2.

12   Just humor me and take them out of the pile and

13   look at them?

14   A.    One and two?

15   Q.    Yes.

16   Are those the documents you are

17   referring to, Mr. Belfonti?

18   A.    Yes.

19   Q.    So you need to gain an understanding

20   of those documents; right?

21   A.    Yes.

22   Q.    And ask the opinions of your lawyers?

23   A.    Yes.

24   Q.    Let's go back to the alleged $4.8

25   million BCP loan.

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

1                           M. Belfonti

2                   At the time that that loan was made,

3        was it your understanding that BCP could demand

4        repayment before the Wachovia loan was repaid in

5        full?

6              A.    I'm not sure.

7              Q.    What would you need to be able to

8        answer that question?

9              A.    I'd have to check with my counsel.

10             Q.    And get their take on Exhibits 1 and

11       2?

12             A.    Yes.

13             Q.    Just for the sake of completeness.

14                   At the time that the alleged $4.8

15       million BCP loan was made, did you have an

16       understanding as to whether BCP could demand

17       repayment of that loan before the Petra loan was

18       repaid in full?

19             A.    I don't know.

20             Q.    You need to get the views of your

21       counsel for that?

22             A.    I would.

23             Q.    With respect to the alleged $500,000

24       Belfonti Holdings loan, at the time that that

25       loan was made, did you have an understanding as

         Elisa Dreier Reporting Corp.   (212) 557-5558
              780 Third Avenue, New York, NY 10017

1                         M. Belfonti

2    to whether Belfonti Holdings could demand

3    repayment before the Wachovia loan was paid in

4    full?

5         A.    I believe, yes, I could.

6         Q.    Why is that, sir?

7               When you say, "I could," you believe

8    that Belfonti Holdings could demand repayment

9    before the Wachovia loan was paid in full?

10        A.    By "paid in full," what do you mean?

11        Q.    I mean all of the principal interests

12   and other amounts owed pursuant to the loan

13   agreement, Exhibit 1.

14        A.    Yeah, these are -- yes.

15        Q.    Yes what?

16        A.    Yes, I believe we could demand on the

17   loans.

18        Q.    Let me stick to the particular loan.

19              With respect to the alleged --

20   there's too many loans.  Let's just back up.

21              With respect to the alleged $500,000

22   Belfonti Holdings loan, the second from the top

23   on your chart there, Exhibit 6, at the time that

24   that loan was made, did you understand that

25   Belfonti Holdings could demand repayment, prior

Elisa Dreier Reporting Corp.  (212) 557-5558
     780 Third Avenue, New York, NY 10017

1                              M. Belfonti

2     to the time that the Wachovia loan was repaid in

3     full?

4           A.    I, I'm really not sure.

5           Q.    You need to consult with your lawyers

6     about that?

7           A.    Yes.

8           Q.    At the time that the alleged $500,000

9     Belfonti Holdings loan was made, did you have an

10    understanding as to whether Belfonti Holdings

11    could demand repayment before the Petra loan was

12    repaid in full?

13          A.    I'm not sure.

14          Q.    You need to get advice from your

15    lawyers on that?

16          A.    Yes.

17          Q.    With respect to the alleged $393,000

18    BCP loan, at the time it was made, did you have

19    an understanding as to whether BCP could demand

20    a repayment before the Wachovia loan was repaid

21    in full?

22          A.    I'm not sure.

23          Q.    You need to consult with your lawyers

24    on that?

25          A.    Yes.

```
 1                        M. Belfonti
 2         Q.    With respect to the $393,000 Belfonti
 3    capital -- I'm sorry, the alleged $393,000 BCP
 4    loan, at the time it was made, did you have an
 5    understanding as to whether BCP could demand
 6    repayment before the Petra loan was repaid in
 7    full?
 8         A.    I'm not sure.
 9         Q.    You'd have to consult with your
10    counsel?
11         A.    Yes.
12         Q.    With respect to the alleged $1.3
13    million MCR loan, at the time that was made, did
14    you have an understanding as to whether MCR
15    could demand repayment before the Wachovia loan
16    was repaid in full?
17         A.    I'd like to check with counsel.
18         Q.    You would need to consult with
19    counsel in order to answer that question?
20         A.    Yes.
21         Q.    With respect to the alleged $1.3
22    million MCR loan, at the time it was made, did
23    you have an understanding as to whether MCR
24    could demand repayment prior to the Petra loan
25    being paid in full?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
           780 Third Avenue, New York, NY 10017

1                              M. Belfonti

2          A.     I'd like to check with counsel on

3     that.

4          Q.     You need to consult with counsel in

5     order to answer that question?

6          A.     Yes.

7          Q.     Going back to the CEB loan, was -- I,

8     may have asked this, and if I did, I apologize.

9                 Was any security given for that loan?

10                MR. MERVIS:  I'm sorry, withdrawn.

11         Q.     With respect to the CEB loan, the

12    alleged CEB loan, was any security given by AHE

13    for that alleged loan?

14         A.     No.

15         Q.     How, Mr. Belfonti, were the proceeds

16    of the alleged CEB loan used?

17         A.     To pay the January '07 mortgage.

18         Q.     To Wachovia?

19         A.     Yes.

20         Q.     So that, again, that was the payment

21    that was combined with the $1.3 million from

22    MCR?

23         A.     That is correct.

24         Q.     From what source did CEB expect to be

25    repaid?

1                                M. Belfonti

2          A.      From AHE.

3          Q.      No, I'm sorry.  Where did CEB expect

4    AHE to be able to get the funds from?

5          A.      Through a capital event.

6          Q.      Any other source?

7          A.      Cash flow of the property.

8          Q.      Did AHE attempt to obtain this

9    roughly $550,00 from any other source?

10         A.      Yes.

11         Q.      What source?

12         A.      We had been having a dialogue with

13   Starwood Capital about lending us money since

14   early December, even before the $499,000 loan.

15                And although they did say they would

16   consider lending it, they said that the rate

17   would be twice as high as what Petra was

18   charging.  So 80 percent.  So I did go and try

19   to talk to them.

20         Q.      So just in a nutshell, you tried to

21   obtain some financing from Starwood Capital --

22         A.      For every one of those loans, but

23   once they said no on the first one, and we -- I

24   made some other phone calls, as well.

25         Q.      Mr. Belfonti, let's be clear on

1                          M. Belfonti

2     something.

3                    I think you just said that you sought

4     financing from Starwood Capital for every one of

5     these loans; is that what you just said?

6          A.    No, after the first one; okay.  After

7     the first one for a second loan of 499,950.

8          Q.    Right.

9          A.    And after hearing the rate and making

10    another call or two to some other lenders, it

11    wasn't evident that I was going to get the money

12    on any rate that was palatable.  So I thought it

13    prudent to put up our own money.

14         Q.    So Starwood indicated that it was

15    willing to provide AHE with a loan, but it was

16    going to be at an 80 percent interest rate or

17    something like that?

18         A.    I think that's the word they used.

19    They said twice as bad as what Petra is paying

20    you, so --

21         Q.    Approximately 80 percent, you

22    understood it to be approximately 80 percent

23    interest charge?

24         A.    Very onerous terms.

25         Q.    You claim that AHE sought financing

1                          M. Belfonti

2      from other sources, as well; is that right?

3          A.     Yes.

4          Q.     But you were unsuccessful?

5          A.     Correct.

6          Q.     In other words, nobody other than

7      Starwood was willing to lend money to AHE at

8      this time?

9          A.     I could have maybe gone to another

10     lender and pledged additional collateral and,

11     you know, done a whole bunch of things to maybe

12     get some other money, but the terms again would

13     have been very onerous.

14         Q.     Pledged what collateral?

15         A.     Additional collateral.

16         Q.     What do you mean by "additional

17     collateral"?

18         A.     Other assets that my company owns or

19     these other entities own.

20         Q.     In other words, you could have gone

21     to a lender and pledged property owned by other

22     companies that you own and control; correct?

23         A.     Maybe.

24         Q.     Maybe.  You are not talking about

25     pledging the hotel, for example?

```
 1                          M. Belfonti
 2          A.      No.
 3          Q.      That was already pledged; right?
 4          A.      Correct.
 5          Q.      Did you try do that?
 6                  Did you approach any lender and offer
 7    to put up as collateral, assets owned by
 8    companies other than AHE?
 9          A.      Terms would have been too onerous,
10    but I did investigate.
11          Q.      Your investigation proved
12    unsuccessful?
13          A.      Correct.
14          Q.      Is there any writing signed by a
15    representative of AHE that memorializes the
16    alleged CEB loan?
17          A.      No.
18          Q.      Is there any writing by any
19    representative of CEB that memorializes the
20    alleged CEB loan?
21          A.      No.
22          Q.      Has CEB ever made any loans, other
23    than this alleged loan to AHE?
24          A.      I'm not sure.
25          Q.      Was CEB represented by counsel in
```

1                          M. Belfonti

2      connection with the making of the CEB loan?

3          A.     No.

4          Q.     Was AHE represented by counsel in

5      connection with the making of the CEB loan?

6          A.     No.

7          Q.     Who, apart from yourself,

8      Mr. Belfonti, was aware that CEB had made a loan

9      to AHE?

10         A.     Victoria Carpenter.

11         Q.     How did she know that?

12         A.     She posted it in the ledger.

13         Q.     By the way, with respect to all the

14     alleged loans that we have been discussing

15     today, and I think for reach and every one of

16     them, you said that Ms. Carpenter posted them in

17     a corporate ledger as a loan; correct?

18         A.     That's right.

19         Q.     Who instructed her to do that?

20         A.     I did.

21         Q.     Anybody else on the CEB side of this

22     alleged loan, aware that CEB had made a loan to

23     AHE?

24         A.     My mother was aware of it, I believe.

25         Q.     Who told her?

Elisa Dreier Reporting Corp.  (212) 557-5558
      780 Third Avenue, New York, NY 10017

M. Belfonti

1
2     A.    I did.

3     Q.    Who at AHE made the decision to
4 accept the alleged $1.2 million MCR loan?

5     A.    I did.

6     Q.    Was there any negotiation concerning
7 the terms of the alleged $1.2 million MCR loan?

8     A.    No.

9     Q.    Was there a payment schedule for the
10 alleged $1.2 million MCR loan?

11     A.    No.

12     Q.    Did, at the time that you, on behalf
13 of AHE, decided to accept the alleged $1.2
14 million MCR loan, did you obligate AHE to pay
15 interest on that loan?

16     A.    I, as I had said in an earlier
17 statement, there was an implied interest that we
18 pay vis-a-vis our intercompany loans.

19     So AHE would have been obligated to
20 pay some interest rate.

21     Q.    Twelve percent, according to you;
22 right?

23     A.    Probably not.  Probably more of a
24 market rent because of the international nature
25 of the transaction.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

1                         M. Belfonti

2          Q.    I'm sorry, you said market -- what

3    did you say?

4          A.    A market rate.

5          Q.    Rate?

6          A.    A market rate.  I'm sorry, yes.  I

7    believe that in Aruba is 8 or 9 percent.

8    Something like that.

9          Q.    But at the time, you didn't have that

10   notion in your head; did you?

11         A.    It wasn't my intent to earn interest.

12   It was my intent to get the money back.

13         Q.    When you just gave that testimony

14   about an implied obligation to pay interest and

15   again, you used the term "we," you really mean

16   I --

17         A.    I do.

18         Q.    -- Michael Belfonti?

19         A.    Yes, I keep saying we.  And every

20   time I say we, I think we should -- it means I.

21         Q.    Was there a maturity or due date for

22   the alleged $1.2 million MCR loan?

23         A.    No, there was not.

24         Q.    Did AHE provide any security to MCR

25   for the alleged $1.2 million MCR loan?

1                              M. Belfonti

2          A.    No.

3          Q.    Did MCR place any restrictions on

4    AHE's ability to use the proceeds of the alleged

5    $1.2 million MCR loan?

6          A.    No.

7          Q.    From what source or sources did MCR

8    anticipate receiving repayment of the alleged

9    $1.2 million MCR loan?

10         A.    From a capital event, such as a

11   refinance a sale or cash flow from the property.

12         Q.    Did AHE attempt to secure this

13   approximately $1.2 million from any other

14   source?

15         A.    Not after we were rejected in earlier

16   transactions.

17         Q.    By the earlier transactions, you are

18   referring to your effort to obtain a loan from

19   Starwood Capital; right?

20         A.    That is correct.

21         Q.    The one where they wanted 80 percent

22   interest?

23         A.    Thereabouts.

24         Q.    Your efforts to investigate other

25   potential lending sources which failed; correct?

M. Belfonti

2     MR. MERVIS:  Mark this, please.

3     (Belfonti Exhibit 11, a document,

4     marked for identification, as of this

5     date.)

6     Q.   Mr. Belfonti, you've been handed what

7 we have had marked for identification as Exhibit

8 11.

9     Take as much time as you need, but my

10 first question to you, sir, is if you recognize

11 the document?

12     A.   I do.

13     Q.   When was the first time you saw this?

14     A.   I would guess sometime in January of

15 2007.

16     Q.   Who showed it to you?

17     A.   I don't know if I ever saw this.  I

18 knew about the transaction.  It was associated

19 with this, but I don't know if I ever saw the

20 document itself or the letter.

21     Q.   Tell me what your understanding of

22 the transaction associated with Exhibit 11 is?

23     A.   My mom and dad borrowed $550,000 from

24 my mom's trust.

25     Q.   They put up their house as collateral

1                              M. Belfonti

2      for that loan?

3            A.     That is correct.

4            Q.     Then they gave that loan, they gave

5      the proceeds of that loan to you; right?

6            A.     No, they gave it to Dana Friedman.

7            Q.     Right, they gave it to Dana Friedman,

8      and then you instructed Dana Friedman to send

9      that money to Wachovia Bank; right?

10           A.     With the additional 1.3.

11           Q.     So that you could make the mortgage

12     payment; right?

13           A.     So that AHE could make the mortgage

14     payment.

15           Q.     So that you could continue to own

16     AHE; correct?

17           A.     That is correct.

18           Q.     Just go to the second page of Exhibit

19     11?

20                  There's an asterisk about halfway

21     down the page.

22                  Take a moment to read that to

23     yourself and let me know when you've read it?

24           A.     (The witness complies with request.)

25     Yes, I read it.

1                           M. Belfonti

2        have marked as Exhibit 16.

3                   Again, I will ask you if you

4        recognize it?

5            A.    Yes.

6            Q.    Turn to page 13, please.  Is that

7        your signature, Mr. Belfonti?

8            A.    It is.

9            Q.    Did you sign this after reviewing all

10       of the words that came before it?

11           A.    Yes.

12           Q.    At the time that you signed Exhibit

13       16, did you believe that everything in it was

14       true and accurate?

15           A.    Yes.

16           Q.    You still believe that today?

17           A.    Yes.

18           Q.    By the way, Mr. Friedman has been

19       your lawyer for how many years?

20           A.    Approximately 15 years.

21           Q.    Do you think he's a good lawyer?

22           A.    I think he's a very good lawyer.

23           Q.    Do you think he's competent to

24       understand the meaning of corporate articles of

25       incorporation?

209

M. Belfonti

1

2        A.    Yes.

3        Q.    Do you have any reason to doubt his

4    ability to understand the meaning of the

5    provisions in Exhibit 17?

6        A.    No.

7        Q.    In fact, if you wanted to receive

8    advice about the meaning of any of the

9    provisions in Exhibit 17, Mr. Friedman would be

10   somebody who you'd be very comfortable asking,

11   would he not?

12       A.    Given the fact that Exhibit 17 comes

13   from an Aruban company, I think if I asked

14   Mr. Friedman if he properly understood it and he

15   didn't, he would tell me so, and he would seek

16   other advice to make sure he had clarity on it.

17       Q.    Going back to Exhibit 16, I want you

18   to turn to page 8, and I want to direct your

19   attention to paragraph 44.

20             You can read the whole thing, but I'm

21   going to direct your attention to a couple of

22   particular passages?

23       A.    May I read it first?

24       Q.    Absolutely.  Read as much as you need

25   to read.

M. Belfonti

1
2    Q.    Would you expect that judges in Aruba
3 would want to receive witness statements that
4 are accurate?
5    A.    I think it is accurate.
6    Q.    I will ask the question again.  Who
7 are the others, Mr. Belfonti?
8    A.    I don't know, but the 393 came from
9 Belfonti Capital Partners.
10    Q.    In referring to the others, weren't
11 you attempting to make it seem like people other
12 than you were involved in making a supposed loan
13 to AHE?
14    A.    No.
15    Q.    Isn't that the reason why "others" is
16 in that sentence?
17    A.    No.
18    Q.    You say that you were, that you and,
19 others and you were "forced to loan AHE
20 approximately $393,000."
21    What do you mean by
22 "forced"?
23    A.    I think it just means that had we not
24 paid the $393,000, we would have put the hotel
25 in jeopardy.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

M. Belfonti

1

2      Q.      What do you mean by "in jeopardy"?

3      A.      We wouldn't have been able to pay the

4    mortgage.

5      Q.      The effect of that, again, is that

6    you, Michael Belfonti, wouldn't own the hotel

7    anymore; right?

8      A.      That is correct.

9      Q.      So you had a choice to make.  You

10   could pay, make the payment, hang onto the hotel

11   for another month or could you not make the

12   payment and lose the hotel; correct?

13     A.      No.  I had a choice to borrow money

14   of $393,000 to pay the mortgage or not borrow

15   the money and not pay the mortgage.

16     Q.      Other than the prospect of a loan

17   default by AHE, was there anything else that

18   forced you and others to make a $393,000 loan to

19   AHE in December of 2006?

20     A.      No.

21     Q.      In the next sentence you say, "In

22   January 2007, we loaned AHE another $1,855,861

23   for the same purpose"; do you see that?

24     A.      I do.

25     Q.      Who is "we"?

Elisa Dreier Reporting Corp.   (212) 557-5558
        780 Third Avenue, New York, NY 10017