# EXHIBIT E

1

2

UNITED STATES DISTRICT COURT

3                DISTRICT OF CONNECTICUT

----------------------------------------------X

4   ARUBA HOTEL ENTERPRISES N.V.,

5                         Plaintiff,

6       -against-                3:07 Civ. 1297(JCH)

7   MICHAEL BELFONTI, MCR PROPERTY MANAGEMENT, INC.
    and CEB IRREVOCABLE TRUST,

8
                          Defendants.

9   ----------------------------------------------X

10

11                        May 27, 2008
                          10:05 a.m.

12

13

14            Deposition of VICTORIA CARPENTER,

15   held at the offices of Proskauer Rose, LLP, 1585

16   Broadway, New York, New York, before Nicole

17   Cannistraci, a Notary Public within and for the

18   State of New York.

19

20

21

22

23

24

25



ELISA DREIER
REPORTING CORP.

780 Third Avenue          Telephone: 212-557-5558
New York, New York 10017  Fax: 212-557-0050
                          Email:production @courtreportingedrc.com

2

1

2      A p p e a r a n c e s :

3              PROSKAUER ROSE, LLP
               Attorneys for Plaintiff
4                  1585 Broadway
                   New York, New York 10036-8299
5              BY:  MICHAEL T. MERVIS, ESQ.
               BY:  PATRICK J. DEMPSEY, ESQ.
6

7

8              KOBRE & KIM LLP
               Attorneys for Michael Belfonti
9                  800 Third Avenue
                   New York, New York 10022
10             BY:  MATTHEW I. MENCHEL, ESQ.
               BY:  FRANCISCO J. NAVARRO, ESQ.
11

12

13             HURWITZ SAGARIN SLOSSBERG & KNUFF, LLC
               Attorneys for MCR Property Management,
14             Inc. and CEB Irrevocable Trust
                   147 North Broad Street
15                 P.O. Box 112
                   Milford, Connecticut 06460-0112
16             BY:  DAVID A. SLOSSBERG, ESQ.

17

18

19

20

21

22

23

24

25

3

1

2

3              IT IS HEREBY STIPULATED AND

4       AGREED, by and between the attorneys for the

5       respective parties hereto, that the sealing

6       and filing of the within deposition be

7       waived, that such deposition may be signed

8       and sworn to before any officer authorized to

9       administer an oath with the same force and

10      effect as if signed and sworn to before a

11      Justice of this Court.

12

13

14              IT IS FURTHER STIPULATED AND AGREED

15      that all objections, except as to form, are

16      reserved to the time of trial.

17

18

19              IT IS FURTHER STIPULATED AND AGREED

20      that the within examination and any

21      corrections thereto may be signed before any

22      Notary Public with the same force and effect

23      as if signed and sworn to before this Court.

24

25

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

1                          Victoria Carpenter

2      V I C T O R I A       C A R P E N T E R, having been

3      first duly sworn by Nicole Cannistraci, a Notary

4      Public of the State of New York, was examined and

5      testified as follows:

6      EXAMINATION

7      BY MR. MERVIS:

8                    Q.    Good morning, Ms. Carpenter.

9                    A.    Good morning.

10                   Q.    Have you ever had your

11     deposition taken before?

12                   A.    Yes.

13                   Q.    How many times?

14                   A.    Twice.

15                   Q.    When was the first time that

16     you had your deposition taken?

17                   A.    When I was getting divorced.

18                   Q.    The second time?

19                   A.    During a medical malpractice

20     suit.

21                   Q.    When was that?

22                   A.    Roughly 2000.

23                   Q.    Were you a party in that

24     lawsuit?

25                   A.    Yes, I was.

1                    Victoria Carpenter

2            Q.     When you started at MCR, what

3    was your position?

4            A.     Staff accountant.

5            Q.     That was at a time when your

6    license was not in effect, your CPA license?

7            A.     Correct.

8            Q.     Were there any other accountant

9    personnel employed by MCR in 2003 when you

10   started there?

11           A.     Yes.

12           Q.     How many?

13           A.     Two full-time, one part-time.

14           Q.     And did your job position at

15   MCR change as time went forward?

16           A.     Yes.

17           Q.     What was the first such change?

18           A.     My position was from staff

19   accountant to controller.

20           Q.     So you went from -- one job

21   change, basically?

22           A.     Yes.

23           Q.     And you are still controller

24   today?

25           A.     Yes.

```
 1                    Victoria Carpenter
 2               Belfonti family entities.
 3   BY MR. MERVIS:
 4               Q.    You have been the controller at
 5   MCR from November 2006 up to today?
 6               A.    Yes.
 7               Q.    Starting in April 2006, did you
 8   perform services on behalf of any company other
 9   than MCR?
10               A.    Yes.
11               Q.    Tell me the names of the
12   companies, to the best that you can recall, that
13   you performed services for other than MCR from,
14   let's say, April 2006 right up through today.
15               A.    I will not be able to list all
16   of them, but I will give you as many as I can
17   think of.  Aruba Hotel Enterprises, Diamond
18   Gaming, Groton.  That's one of the residential
19   real estate.  I don't remember its legal name.
20               Q.    But you call it Groton?
21               A.    Yes.  Briarwood,
22   B-R-I-A-R-W-O-O-D, Brookside, Enfield,
23   E-N-F-I-E-L-D, Woods, and various other ones.
24               Q.    Aruba Hotel Enterprises,
25   approximately from when to when did you perform
```

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

1                          Victoria Carpenter

2       services for or on behalf of that entity?

3                   A.      From approximately May of '06

4       through April of '07.

5                   Q.      And Diamond Gaming Corporation,

6       from approximately when to when did you perform

7       services for or on behalf of that entity?

8                   A.      Later in '06, I can't give you

9       a specific date, through the present.

10                  Q.      When you say later in '06, did

11      you perform any services for or on behalf of

12      Diamond Gaming prior to December of 2006?

13                  A.      Yes.

14                  Q.      What kind of services did you

15      perform -- let's back up.  What was the nature

16      of the services that you performed for or on

17      behalf of Aruba Hotel Enterprises?  Take your

18      time.

19                  A.      When the Aruba Hotel

20      Enterprises was purchased by Belfonti entities,

21      I assisted with matters regarding budgets, how

22      the mechanics of the cash management agreement

23      would work, how the operating agreement would

24      work, the issues regarding the partnership, PIP,

25      which is the property improvement plan, issues

Elisa Dreier Reporting Corp. (212) 557-5558
     780 Third Avenue, New York, NY 10017

1                    Victoria Carpenter

2       regarding cash flow, issues regarding mortgage

3       payments, funding, funding to Aruba.

4                    Q.     Sorry?

5                    A.     Mortgage payments and the cash

6       flow between Aruba and Wachovia, Wachovia and

7       Aruba.   That's all I can think of right now.

8                    Q.     During this time that you

9       were -- was your only -- during the time that

10      you were performing services for Aruba -- we'll

11      shorthand it and call it AHE, okay?

12                   A.     Okay.

13                   Q.     During the time that -- during

14      the time you were performing services for AHE,

15      your sole employer was MCR?

16                   A.     Yes.

17                   Q.     How did you come to be

18      performing services for AHE?

19                   A.     As an MCR employee, I did

20      service for -- services for any of the Belfonti

21      entities.

22                   Q.     AHE was one of the entities

23      that owned one of the properties that was part

24      of the Belfonti real estate holding; is that

25      right?

```
 1                      Victoria Carpenter
 2        research and tried to put the deal together.
 3                    Q.    BCP's offices are in New York
 4        City?
 5                    A.    Yes.
 6                    Q.    Did you ever hold a position
 7        with BCP, as far as you know?
 8                    A.    My employment is MCR.
 9                    Q.    Did you act as the controller
10        of BCP?
11                          MR. SLOSSBERG:  Objection to
12                    form.
13    BY MR. MERVIS:
14                    Q.    Fair enough.  If you can
15        answer?
16                    A.    Yes.
17                    Q.    In acting as BCP's controller,
18        what were your duties and responsibilities?
19                    A.    There was very -- it would be
20        the kind of normal operating tasks of any
21        company as far as assuring that payables were
22        paid on time, rent was paid on time, funds were
23        transferred to that company as needed, preparing
24        information for reporting.
25                    Q.    Funds were transferred to that
```

```
 1                      Victoria Carpenter
 2       company as needed, the company being what?
 3                    A.      Belfonti Capital Partners.
 4                    Q.      Transferred from where?
 5                    A.      Various other Belfonti
 6       entities.
 7                            (Letter dated August 21,
 8                    2007 marked Carpenter Exhibit 1 for
 9                    identification.)
10       BY MR. MERVIS:
11                    Q.    Ms. Carpenter, the reporter has
12       placed in front of you what we've had marked for
13       identification as Carpenter Exhibit 1.  Take as
14       much time as you need, but my first question to
15       you on this is whether you recognize this
16       document or any page in the document.
17                    A.    Okay.
18                    Q.    Do you recognize the document
19       or any of its pages?
20                    A.    No.
21                    Q.    You've never seen it before?
22       That includes the chart on the last page?
23                    A.    It's that specific chart I
24       don't recognize.
25                    Q.    You can put this aside.
```

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

```
 1                    Victoria Carpenter
 2               knowledge, independent of those
 3               conversations, that the loan came
 4               from the source that was testified
 5               to, you can provide that.  Just don't
 6               provide information that you may have
 7               learned during discussions with
 8               lawyers.  Does that make sense?
 9                    THE WITNESS:  Yes.
10   BY MR. MERVIS:
11               Q.    Does that change your answer in
12   any way?
13               A.    My understanding was that the
14   loans were from Belfonti Capital, but that the
15   funds flowed through from other entities or
16   perhaps were sent directly from other entities,
17   but the intention was they were Belfonti
18   Capital.
19               Q.    My question was, from where did
20   you form that understanding?
21               A.    My general understanding of how
22   the Belfonti companies transferred funds between
23   companies.
24               Q.    What's your general
25   understanding?
```

```
 1                    Victoria Carpenter
 2              A.     My general understanding is
 3    that when an entity needs money and another
 4    entity has the money, the entity that has the
 5    money lends the money to the entity that needs
 6    the money.
 7              Q.     I understand that.  Go ahead.
 8              A.     And, conversely, it can go back
 9    and forth.
10              Q.     I understand that, but we've
11    seen, I think, on at least the first American
12    statement, that the alleged originator of funds,
13    right, was something called MAB Investments,
14    right?
15              A.     Yes.
16              Q.     And MCR, yes?
17              A.     Yes.
18              Q.     And something called Cash From
19    Borrower?
20              A.     Yes.
21              Q.     How -- you say that those funds
22    were actually intended to be loans by BCP; is
23    that right?
24              A.     Yes.
25              Q.     Why?
```

                         Victoria Carpenter

1

2              Q.    Do you know who negotiated that

3       interest rate?

4              A.    I don't know.

5              Q.    Do you know if there was any

6       negotiation at all of the interest rate?

7              A.    I don't know.

8              Q.    Do you know if anybody at AHE

9       made the affirmative decision to be the borrower

10      of this approximately $4.9 million?

11                       MR. SLOSSBERG:  Objection to

12               form.

13                       THE WITNESS:  I don't know.

14      BY MR. MERVIS:

15             Q.    Apart from the 12 percent rate

16      of interest that you mentioned, do you know

17      anything else about the terms of this alleged

18      $4.9 million loan?

19             A.    It was an intercompany loan.

20      That's my knowledge of it.

21             Q.    I understand.  You also

22      understood that there was going to be an

23      interest obligation?

24             A.    Yes.

25             Q.    Do you know anything else about

1                    Victoria Carpenter
2        the terms of this alleged $4.9 million loan?
3                    A.    As an intercompany loan, I did
4        not know anything other than it was an
5        intercompany loan and that's all.
6                    Q.    That's all?
7                    A.    Yeah.
8                    Q.    Where, physically, did the loan
9        funds come from?
10                        MR. NAVARRO:    Are you asking
11                   about the specific loans to Michael?
12       BY MR. MERVIS:
13                   Q.    The alleged $4.9 million in
14       loans, where did they come from?
15                   A.    Various Belfonti entities.
16                   Q.    Did these entities have bank
17       accounts?
18                   A.    Yes.
19                   Q.    Is that where the money came
20       from?
21                   A.    In part.
22                   Q.    In part?
23                   A.    Yes.
24                   Q.    Which part?
25                   A.    The amounts from MAB is a line

```
 1                      Victoria Carpenter
 2       of credit, so the amounts from MAB would have
 3       been from a line of credit.  The amounts from
 4       MCR would have been from MCR Property.
 5                 Q.      Where is MCR located?
 6                 A.      Hamden, Connecticut.
 7                 Q.      Where is MAB located?
 8                 A.      The address is Hamden.
 9                 Q.      And the line of credit is with
10       which institution?
11                 A.      First County Bank.
12                 Q.      Where is that located?
13                 A.      I believe Stamford,
14       Connecticut.
15                 Q.      Do you know where any of these
16       funds were sent to?
17                 A.      No.
18                 Q.      What's Belfonti Holdings LLC?
19                 A.      It's an entity that was part of
20       the stacked ownership, the various ownership
21       entities that ultimately owned Aruba Hotel
22       Enterprises.
23                 Q.      Who ran Belfonti Holdings?
24                 A.      Michael Belfonti.
25                 Q.      Who owns Belfonti Holdings?
```

1                        Victoria Carpenter

2      Withdrawn.   Did you have any duties or

3      responsibilities with respect to the operations

4      of Belfonti Holdings?

5                  A.      Could you repeat it?

6                  Q.      Did you ever act as Belfonti

7      Holdings' controller?

8                  A.      There wasn't that much

9      happening with Holdings.   It was a bank account

10     and things like that.   Yes, I would have -- I

11     don't know if I personally did it, but I would

12     have been the one to make sure that certain

13     entries were recorded, if they were related to

14     Belfonti Holdings.

15                 Q.      In other words, somebody who

16     reported to you may have actually made the

17     entries?

18                 A.      Yes.

19                 Q.      But you were actually

20     responsible for making sure those entries got

21     made?

22                 A.      Yes.

23                      MR. MERVIS:   I want to take a

24                 three-minute break.

25                      (A recess was taken.)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

```
 1                    Victoria Carpenter
 2              Q.    From where did the money come
 3        from?
 4              A.    I don't recall.
 5              Q.    Was the money a loan?
 6              A.    Yes.
 7              Q.    Who was the borrower?
 8              A.    AHE.
 9              Q.    You can put 5 aside.
10                    MR. MERVIS:  Mark this,
11              please.
12                    (People's Bank Statement
13              marked Carpenter Exhibit 6 for
14              identification.)
15        BY MR. MERVIS:
16              Q.    Ms. Carpenter, the reporter has
17        placed before you what we have marked for
18        identification as Exhibit 6.  It's been redacted
19        a bit, I assume, by the company's lawyers.  In
20        any event, do you recognize the portions that
21        are not redacted?
22              A.    Yes.
23              Q.    What is this Exhibit 6?
24              A.    This is a bank statement of
25        Belfonti Holdings LLC.
```

                        Victoria Carpenter

1

2          Q.      You'll see there's two line

3   items that are not redacted?

4          A.      Yes.

5          Q.      What are those -- what do those

6   line items represent?  What transaction does

7   that represent?

8          A.      $500,000 wire to Aruba Hotel

9   Enterprises.

10         Q.      And People's Bank is located

11  where?

12         A.      Main office is Bridgeport,

13  Connecticut.

14         Q.      Do you know to what bank

15  account these funds were wired?

16         A.      To the best of my knowledge,

17  they were wired to Aruba Hotel Enterprises.

18         Q.      Is there anything on this

19  statement that indicates that?

20         A.      No.

21         Q.      And why do you say to the best

22  of your knowledge the money was wired to AHE's

23  bank account?

24         A.      The previous exhibit you gave

25  me had a date July 25th and this disbursement is

```
 1                    Victoria Carpenter
 2                 (Lunch recess: 12:25 p.m.)
 3                 (Resumed: 1:15 p.m.)
 4    V I C T O R I A    C A R P E N T E R, having been
 5    previously duly sworn, was examined and testified
 6    further as follows:
 7    CONTINUED EXAMINATION.
 8    BY MR. MERVIS:
 9                 Q.    Ms. Carpenter, did you know
10        that Mr. Michael Belfonti had his deposition
11        taken in this litigation a little while ago?
12                 A.    Yes.
13                 Q.    Have you read the transcript of
14        his testimony?
15                 A.    No.
16                 Q.    Take a look at Exhibit 5,
17        please, second page.
18                     MR. MENCHEL:  Did you say 5?
19                     MR. MERVIS:  I did.
20    BY MR. MERVIS:
21                 Q.    Do you recognize the e-mail
22        that's in Exhibit 5, of the second page of
23        Exhibit 5?
24                 A.    Yes.
25                 Q.    What, generally speaking, is
```

1                        Victoria Carpenter

2                A.      Yes.

3                Q.      That covered the December

4       mortgage statement?

5                A.      It covered the interest

6       shortfall on the mortgage payment.

7                Q.      That allowed Mr. Belfonti to

8       continue to own the hotel?

9                A.      Yes.

10               Q.      People's Bank is the one based

11      in Connecticut; is that right?

12               A.      Yes.

13               Q.      The money was sent straight to

14      Wachovia in North Carolina, correct?

15               A.      It was wired to Wachovia, to

16      their -- per their wiring instructions, but I

17      don't recall where the funds actually wound up.

18               Q.      You can put this aside.

19                    MR. MERVIS:  Mark this,

20               please.

21                    (Wire Detail Report marked

22               Carpenter Exhibit 9 for

23               identification.)

24      BY MR. MERVIS:

25               Q.      Ms. Carpenter, the reporter has

                Elisa Dreier Réporting Corp. (212) 557-5558
                   780 Third Avenue, New York, NY 10017

```
 1                    Victoria Carpenter
 2        placed before you what we've had marked for
 3        identification as Exhibit 9.  I'll ask you if
 4        you recognize the document?
 5                   A.    Yes.
 6                   Q.    What is it?
 7                   A.    It is a confirmation of a wire
 8        initiated by MCR Property Management.
 9                   Q.    And --
10                   A.    Excuse me.  It was not
11        initiated by MCR Property Management.
12                   Q.    Okay.  Who was it initiated by?
13                   A.    Let me just see something.
14        Belfonti Capital Partners.
15                   Q.    How do you know that?
16                   A.    I recognize the account number.
17                   Q.    Where would I see the account
18        number?
19                   A.    0807009649.
20                   Q.    There is some handwriting on
21        this piece of paper.  Do you know whose
22        handwriting that is?  It could be more than one
23        person?
24                   A.    I believe it's my handwriting.
25                   Q.    All three?
```

1                    Victoria Carpenter

2          A.    No.   The bottom handwriting

3     looks like Marieta's, but I didn't write it, so

4     I can't say for sure.   It says 12/16 mortgage

5     AHE.

6          Q.    And the other two entries?

7          A.    The other two look like my

8     handwriting.

9          Q.    Who generates -- generated this

10    wire detail report, if you know?

11         A.    The report says user Emily on

12    the upper left-hand corner, one, two, three,

13    four lines down.

14         Q.    That would be Emily Rockwell?

15         A.    Rockwell.

16         Q.    So it's something generated by

17    your office?

18         A.    Yes.

19         Q.    Do you know if this was sent to

20    Marieta Ras?

21         A.    It was sent to Aruba Hotel

22    Enterprises N.V.   On the document two-thirds of

23    the way down, it says beneficiary name.   It says

24    Aruba Hotel Enterprises N.V.

25         Q.    That tells you this piece of

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

1          Victoria Carpenter

2   paper was physically sent down to Aruba?

3             A.    No, the funds were sent to

4   Aruba.

5             Q.    We'll do one thing at a time.

6   In terms of where the funds were sent, if you

7   look up the page a little bit, who was the

8   receiving bank?

9             A.    Oh, I'm sorry.  The receiving

10  bank was Wachovia.

11            Q.    What location were the funds

12  received at?

13            A.    Charlotte, North Carolina.

14            Q.    By the way, Wachovia's wire

15  instructions didn't change, did it?

16            A.    I don't know.

17            Q.    What I meant to ask is whether

18  this physical piece of paper, Exhibit 9, was

19  transmitted to Aruba?

20            A.    I don't know.

21            Q.    So if -- I realize you said you

22  weren't sure, but if the 12/16 notation were

23  Ms. Ras' handwriting, you don't know how she

24  came to make that notation; is that correct?

25            A.    That's correct.

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

1              Victoria Carpenter

2         A.    Yeah.

3         Q.    Fair enough.   There are things

4    like that in life.

5         A.    I don't remember the specifics.

6         Q.    Who, on behalf of AHE, agreed

7    to be the borrower?

8              MR. SLOSSBERG:   Objection to

9         form.

10              THE WITNESS:   I don't know.

11   BY MR. MERVIS:

12         Q.    Who negotiated the terms of

13   this alleged loan?

14              MR. SLOSSBERG:   Objection to

15         form.

16              THE WITNESS:   I don't know.

17   BY MR. MERVIS:

18         Q.    What were the terms of this

19   loan?

20              MR. SLOSSBERG:   Objection to

21         form.

22   BY MR. MERVIS:

23         Q.    The money originally came out

24   of, I think you said, the Constance E. Belfonti

25   Irrevocable Trust?

        Elisa Dreier Reporting Corp. (212) 557-5558
          780 Third Avenue, New York, NY 10017

138

```
 1                    Victoria Carpenter
 2           A.    Yes.
 3           Q.    Where is that located?
 4                    MR. SLOSSBERG:  Objection to
 5           form.
 6                    THE WITNESS:  I don't know
 7           what that means, where is it located.
 8    BY MR. MERVIS:
 9           Q.    Is the trust -- does it reside
10    in some state in the United States?
11           A.    Connecticut, I believe.
12           Q.    And Ms. Belfonti, where did she
13    live back in January of 2007?
14           A.    Connecticut.
15           Q.    The money ultimately wound up
16    with Wachovia in North Carolina; is that right?
17           A.    Yes.
18                    (An off-the-record
19           discussion took place.)
20                    (A recess was taken.)
21    BY MR. MERVIS:
22           Q.    Looking at the first page of
23    Exhibit 14, the second entry, the one we didn't
24    look at before, do you know what that -- do you
25    know what transaction that entry relates to?
```

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

1           Victoria Carpenter

2       please.

3               (Letter dated September 29,

4       2006 marked Carpenter Exhibit 20 for

5       identification.)

6  BY MR. MERVIS:

7           Q.    Ms. Carpenter, you have been

8    handed by the reporter what we've had marked for

9    identification as Exhibit 20.  I'll direct your

10   attention first to what appears to be a cover

11   letter, or maybe a copy of a cover letter, from

12   you to Situs.  Do you see that?

13          A.    Yes.

14          Q.    Is this something you wrote,

15   the first two pages?

16          A.    Yes.

17          Q.    The address at the top, Aruba

18   Hotel Enterprises N.V., what is that address?

19          A.    The Hamden office in

20   Connecticut.

21          Q.    That's the home office for all

22   the various Belfonti companies?

23          A.    Yes.

24          Q.    Why did you use that office as

25   opposed -- why did you use that address as

Elisa Dreier Reporting Corp. (212) 557-5558
   780 Third Avenue, New York, NY 10017

1                      Victoria Carpenter

2       opposed to the actual address of Aruba Hotel

3       Enterprises in Aruba?

4              A.      Because the -- it was just

5       practice that all our entities, we would have --

6       use the same address as the home address so we

7       could receive correspondence or whatever.

8              Q.      Go to the second page, please.

9       The first paragraph on that page, you write,

10      "During this time of major transition, we are in

11      the process of implementing an entirely new

12      accounting and hotel management system,

13      including hardware and software."  Do you see

14      that?

15             A.      Yes.

16             Q.      Who is the "we" you are

17      referring to in that sentence?

18             A.      The accounting department at

19      the hotel in Aruba.

20             Q.      So AHE?

21             A.      Not AHE as in -- it was the

22      division of AHE, which is the hotel, and the

23      hotel was getting completely new accounting

24      software, et cetera, from Starwood to comply

25      with Starwood requirements.

Elisa Dreier Reporting Corp. (212) 557-5558
   780 Third Avenue, New York, NY 10017

185

```
 1                    Victoria Carpenter
 2     Partners.   Do you see that?
 3               A.     Yes.
 4               Q.     Now the number is at around
 5     8.5 million.  Do you see that?
 6               A.     Yes.
 7               Q.     Do you know how the number
 8     increased from -- what was the last one we
 9     looked at?
10               A.     8.1.
11               Q.     From 8.1 to 8.5?
12               A.     No.
13               Q.     Did you review -- did you --
14     prior to today -- withdrawn.  When was the last
15     time that you reviewed all of the balance sheets
16     for AHE that you have?
17               A.     Probably a year ago.
18                    MR. MERVIS:   I need about ten
19                    minutes to review my notes.  Then
20                    I'll let you know if I have anything
21                    else.
22                         (A recess was taken.)
23     BY MR. MERVIS:
24               Q.     What you describe as
25     intercompany loans that we have been discussing
```

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

```
 1                    Victoria Carpenter
 2      today, these are not the only intercompany loans
 3      that have been made since you have been working
 4      for the Belfonti group of companies; is that
 5      right?
 6              A.     That's correct.
 7              Q.     Would you describe it as a
 8      fairly common practice?
 9              A.     Yes.
10              Q.     Have there been instances,
11      Ms. Carpenter, where money that was loaned by
12      one Belfonti entity to another Belfonti entity
13      was thereafter repaid?
14              A.     Yes.
15              Q.     First of all, who determines --
16      in your experience, who determines whether a
17      repayment should be made?
18              A.     It boils down to cash
19      available, cash requirements between entities.
20              Q.     So, if an entity is a recipient
21      of an intercompany loan within the Belfonti
22      group of companies and at some later point it
23      finds itself with a good deal of cash on hand,
24      that would be a situation where it would repay
25      the intercompany loan?
```

1                    Victoria Carpenter
2           A.    It would not necessarily happen
3    that at any time the total intercompany loan
4    would be paid.  It could be paid in small
5    amounts or large amounts.
6           Q.    Who makes the decision about
7    that sort of thing, small amounts, large
8    amounts, timing of repayment?
9           A.    Emily and me and Richard
10   would -- do look at the cash balances at least
11   weekly, sometimes more often, cash balances and
12   cash requirements.  We would look at them weekly
13   or more often and see where the money was and
14   where it was needed, and we would transfer
15   accordingly.
16          Q.    I see.  How come AHE never paid
17   back any part of what you say were monies loaned
18   to it?
19          A.    At that time the -- there was
20   not extra cash.
21          Q.    Do you know if there is any
22   cash today?
23          A.    I have no idea.
24          Q.    Has -- to your understanding,
25   has any borrower in a Belfonti intercompany loan