# EXHIBIT F

COPY

1

1

2                    UNITED STATES DISTRICT COURT

3                    DISTRICT OF CONNECTICUT

4         ------------------------------------x

5    ARUBA HOTEL ENTERPRISES N.V.,

6                         Plaintiff,

7

8          -against-                    3:07 Civ. 1297(JCH)

9    MICHAEL BELFONTI, MCR PROPERTY

10   MANAGEMENT INC. and CEB

11   IRREVOCABLE TRUST,

12                         Defendants.

13        ------------------------------------x

14                         April 17, 2008

15                         10:26 a.m.

16

17         DEPOSITION of DANA ERIC FRIEDMAN, taken by

18   Plaintiff, at the offices of Murtha Cullina LLP,

19   177 Broad Street, Stamford, Connecticut, before Amy

20   Klein, a Shorthand Reporter and Notary Public

21   within and for the State of New York.

22

23

24

25

2

1

2     A P P E A R A N C E S:

3          PROSKAUER ROSE LLP
           Attorneys for Plaintiff
4               1585 Broadway
                New York, New York    10036
5
           BY:    MICHAEL T. MERVIS, ESQ.
6

7

           KOBRE & KIM LLP
8          Attorneys for Michael Belfonti
                800 Third Avenue
9               New York, New York    10022

10         BY:    FRANCISCO J. NAVARRO, ESQ.

11

12         HURWITZ SAGARIN SLOSSBERG & KNUFF, LLC
           Attorneys for MCR Property Management Inc.
13         and CEB Irrevocable Trust
                147 North Broad Street
14              P.O. Box 112
                Milford, Connecticut    06460-0112
15
           BY:    DAVID A. SLOSSBERG, ESQ.
16                      -and-
                ALLISON M. NEAR, ESQ.
17

18
      ALSO PRESENT:
19
           CHRISTEN M. MARTOSELLA - Analyst
20         Kobre & Kim LLP

21

22

23

24

25

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

3

```
 1

 2      D A N A    E R I C    F R I E D M A N,

 3           having been first duly sworn by the Notary

 4           Public (Amy Klein), was examined and testified

 5           as follows:

 6      EXAMINATION BY

 7      MR. MERVIS:

 8           Q.    Good morning, Mr. Friedman.

 9                 Have you ever had your deposition taken

10      before?

11           A.    Yes.

12           Q.    When was the last time?

13           A.    About a year ago.

14           Q.    I'm going to be asking you a series of

15      questions this morning.  I would ask you, sir, if

16      at any time you don't understand a question that

17      I've asked, that you tell me.

18                 Will you do that for me?

19           A.    Yes.

20           Q.    What's your profession?

21           A.    I'm an attorney.

22           Q.    Have you ever been disciplined by any

23      court or professional body?

24           A.    No.

25           Q.    You graduated law school when?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

16

1                        -Friedman-

2      of latitude to ask some background questions and so

3      on, I want to make sure that we understand that

4      this is confidential and that's all.

5                    MR. MERVIS:  I don't know if it's

6      confidential or not, but you can take the position

7      that it is.  I don't necessarily agree it has

8      nothing to do with the case.  But we -- until you

9      tell him don't answer the question, we're okay.

10                   MR. SLOSSBERG:  Fair enough.

11                   MR. MERVIS:  All right.

12     BY MR. MERVIS:

13         Q.    I think my next question is whether

14     Mr. Belfonti in his individual capacity is a client

15     of your law firm.

16         A.    Are you asking me that as a question?

17         Q.    Yes, sir.

18         A.    Yes.

19         Q.    Are entities that Mr. Belfonti

20     beneficially owns or is the control person for

21     current clients of your law firm?

22                   MR. SLOSSBERG:  Objection to form.

23         A.    Yes.

24         Q.    Has that been the case, say, since

25     September of 2005?

17

1                        -Friedman-

2          A.     Yes.

3          Q.     It's not a memory test, but can you tell

4      me the names of those entities?  To the extent that

5      you can remember them.

6          A.     And you have limited that question to

7      entities owned or controlled by Michael?

8          Q.     Beneficially owned -- well, let me

9      define it carefully.

10              In which he is at least a 50 percent

11      beneficial owner and/or in which he is a control

12      person.

13              MR. SLOSSBERG:  And I'll object to the

14      form.

15              MR. MERVIS:  Okay.

16          A.     Belfonti Capital Partners LLC, BCP Aruba

17      I LLC.

18              There may be others.  I'm just not sure.

19          Q.     That's okay.  As I said, it's not a

20      memory test.

21              Let me give you some names and you can

22      tell me if it fits the definition that I've given

23      you.

24              An entity called Belfonti Holdings LLC?

25          A.     Yes.

18

```
 1                    -Friedman-
 2          Q.    Okay.
 3                Aruba Hotel Enterprises NV?
 4          A.    Currently?
 5          Q.    No.  At any time between September 2005
 6    and today.
 7          A.    Yes.
 8          Q.    BCP Florin?
 9          A.    Yes.
10          Q.    Bravo Property Trust?
11          A.    Yes.
12                Excuse me, no.
13                Yes.
14          Q.    Twilight Holdings?
15          A.    Yes.
16          Q.    BCP Sunset Holdings NV?
17          A.    Yes.
18          Q.    BCP Sunset Holdings II NV?
19          A.    Yes.
20          Q.    Diamond Gaming Corporation?
21          A.    Yes.
22          Q.    With respect to Diamond Gaming
23    Corporation, is that entity a current client of
24    your firm?
25          A.    Not currently doing any work for that
```

19

```
 1                      -Friedman-
 2      entity.
 3           Q.    Let me see if I can make a sensible
 4      question here.
 5                 Do you have a retainer relationship with
 6      that entity?
 7           A.    No.
 8           Q.    AHE Holdings?
 9                 MR. SLOSSBERG:  What's the question
10      regarding AHE?
11                 MR. MERVIS:  Were they a client -- have
12      they been a client of Mr. Friedman's firm between
13      September 2005 and today.
14           A.    Yes.
15           Q.    MCR Property Management Inc.?
16           A.    I don't think that fits within your
17      definition of control, no.
18           Q.    Understood.
19                 Notwithstanding that, have they been a
20      client of your firm between September 2005 and
21      today?
22           A.    Yes.
23           Q.    Okay.
24                 Belfonti Properties?
25           A.    I believe so.  That's the best answer I
```

20

```
 1                    -Friedman-

 2     can give you there.

 3          Q.    Okay.  Is Belfonti Properties a d/b/a

 4     for MCR Property Management?

 5          A.    I don't recall.

 6          Q.    You don't recall --

 7          A.    Oh, for MCR Property Management?

 8          Q.    Yes.

 9          A.    No.

10          Q.    CEB Irrevocable Trust?

11          A.    Yes.

12               MR. SLOSSBERG:  I'm just going to object

13     to the form.  Only because you asked two questions.

14     One was about control and one was about whether it

15     was a client of the firm.  And I'm not sure which

16     one he's answering for each one of these.

17               MR. NAVARRO:  Particularly for the last

18     one I'm not sure -- if you can clarify that.

19     BY MR. MERVIS:

20          Q.    I'll ask both questions.

21               CEB Irrevocable Trust, has that been a

22     client of yours between September 2005 and today?

23          A.    Yes.

24          Q.    I was going to get into this anyway, but

25     is that an entity that is at least 50 percent
```

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

24

1                      -Friedman-

2          Q.    What did you understand the purpose of

3     the loan that's documented by Friedman Exhibit 2 to

4     be?

5          A.    The loan was used to enable BCP Aruba I

6     and its affiliates to acquire the hotel property

7     known as the -- then known as the Windham Hotel in

8     Aruba.

9          Q.    It's now known as the Westin Aruba

10    Resort, as far as you know?

11         A.    As far as I know.

12         Q.    Well, it became known as the Westin

13    Aruba Resort sometime after this loan was made,

14    correct?

15         A.    That's my understanding.

16         Q.    You can put this aside.  We're going to

17    come back to it a little later.

18               Have you ever served as an officer in

19    any of Michael Belfonti's companies?

20         A.    Not to my knowledge.

21         Q.    Have you ever served as a director of

22    any of Michael Belfonti's companies?

23         A.    What do you mean by "Michael Belfonti's

24    companies"?

25         Q.    That's a fair question.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

25

```
 1                    -Friedman-
 2          A company that Mr. Belfonti was the
 3     majority beneficial owner of.
 4          A.    Yes.
 5          Q.    Which companies?
 6          A.    I believe Aruba Hotel Enterprises NV.
 7     It may also have been AHE Holdings.  I don't really
 8     recall.
 9          Q.    Let me see if we can shorthand it.
10          Going back, I would like to refer to
11     Aruba Hotel Enterprise NV as AHE.  Will you
12     understand if I'm referring to "AHE" that I'm
13     referring to Aruba Hotel Enterprises NV?
14          A.    Yes.
15          Q.    Your title in your role as a director of
16     AHE was what exactly?
17          A.    I believe supervisory director.
18          Q.    Okay.
19          First of all, how did you become a
20     supervisory director of AHE?
21          A.    Michael Belfonti asked if I would serve
22     in that capacity.
23          Q.    And you agreed?
24          A.    Yes.
25          Q.    At the time that you accepted that
```

34

```
 1                    -Friedman-

 2        A.    I am aware of it, yes.

 3        Q.    And your understanding is that the

 4  entity that's calling itself in Aruba CEB

 5  Irrevocable Trust is actually the Constance

 6  E. Belfonti Irrevocable Trust, correct?

 7        A.    I believe so, yes.

 8        Q.    Just to try to make things streamline

 9  going forward, I'm going to refer to the Constance

10  E. Belfonti Irrevocable Trust as the "CEB Trust."

11              Will you understand that?

12        A.    Yes.

13        Q.    Okay.

14              What role, if any, do you have today

15  with respect to the CEB Irrevocable Trust?

16        A.    I am the independent trustee of that

17  trust.

18        Q.    And for how long have you held that

19  role?

20        A.    Since 1995.

21        Q.    Are there other trustees, independent or

22  not, of the trust?

23        A.    Yes.

24        Q.    And who are they?

25        A.    Michael Belfonti is a co-trustee.
```

35

```
 1                        -Friedman-

 2         Q.    Was that the case in 2007?

 3         A.    A portion of 2007.

 4         Q.    Which portion?

 5         A.    At some point Richard Belfonti, who had

 6   been the co-trustee, resigned, and Michael became

 7   his successor.

 8         Q.    Do you know when that was?

 9         A.    I think, but I am guessing, February.

10         Q.    Of 2007?

11         A.    Yes.

12         Q.    Do you know the reason why Richard

13   Belfonti resigned and Michael Belfonti succeeded

14   him?

15         A.    Richard resigned due to health reasons,

16   and Michael Belfonti is named, I believe, as the

17   successor to Richard in the event of his inability

18   to serve.

19         Q.    Is there a grantor of the CEB

20   Irrevocable Trust?

21         A.    Yes.

22         Q.    And that's Constance Belfonti?

23         A.    Yes.

24         Q.    And that's Michael Belfonti's mother?

25         A.    Yes.
```

36

```
 1                    -Friedman-
 2         Q.    And she's still alive today?
 3         A.    Yes.
 4         Q.    How did you come to be the independent
 5    trustee of the CEB Irrevocable Trust?
 6         A.    I was asked to so act.
 7         Q.    By whom?
 8         A.    Constance Belfonti.
 9         Q.    Generally speaking, what are your duties
10    and responsibilities as the independent trustee of
11    the CEB Irrevocable Trust?
12         A.    Evaluating trust assets.  Making
13    decisions with regard to acquisitions of assets,
14    disposition of assets, disbursement of funds.
15         Q.    As the independent trustee, do you have
16    the authority to authorize the CEB Irrevocable
17    Trust to make a loan?
18         A.    The trust instrument requires that both
19    trustees are required.
20         Q.    Okay.  So it would need to be you and,
21    depending on the time frame, either Richard
22    Belfonti or Michael Belfonti?
23         A.    Correct.
24         Q.    Have you ever provided legal counsel to
25    the CEB Irrevocable Trust?
```

37

```
 1                    -Friedman-
 2        A.    Yes.
 3        Q.    Generally speaking, what types of issues
 4   have you provided legal services to the CEB
 5   Irrevocable Trust?
 6        A.    The drafting of documents in connection
 7   with transaction items.
 8        Q.    Anything else?
 9        A.    Not that I can specifically recall.
10              MR. MERVIS:  Let's take a five-minute
11   break.
12              MR. SLOSSBERG:  Sure.
13              MR. MERVIS:  Or 10.
14              (A recess was taken.)
15              (Friedman Exhibit 4 marked for
16   identification, multipage document.)
17   BY MR. MERVIS:
18        Q.    Mr. Friedman, the reporter has placed in
19   front of you what we've had marked for
20   identification as Friedman Exhibit 4.
21              Again, take as much time as you need,
22   but my first question is whether you recognize the
23   exhibit.
24        A.    Not at all.
25        Q.    You've never seen it before?
```

38

```
 1                    -Friedman-

 2         A.    No.

 3         Q.    You can put it aside.

 4               MR. NAVARRO:  I just want to note for

 5    the record, the last two pages of Exhibit 4 -- the

 6    middle page of Exhibit 4 appear to be Dutch.

 7               I don't know if you asked him if he

 8    recognizes it.  I don't know if he speaks Dutch.

 9               MR. MERVIS:  I don't know either.  But

10    let me ask it, now that you've raised the issue,

11    I'll ask another question.

12    BY MR. MERVIS:

13         Q.    Do you recognize any part of that

14    exhibit?

15         A.    No.

16         Q.    To your knowledge, did the CEB

17    Irrevocable Trust make a loan to AHE at any point

18    in time?

19         A.    No.

20         Q.    Did you, as the independent trustee of

21    the CEB Irrevocable Trust, ever authorize the trust

22    to make a loan to anyone?

23         A.    Yes.

24         Q.    To whom?

25         A.    I can specifically recall a loan to
```

39

```
 1                      -Friedman-
 2      Constance and Richard Belfonti.
 3              Q.      Okay.  And when was that?
 4              A.      I don't recall the year.
 5              Q.      Well, was it at any time between, say,
 6      January 2006 and today?
 7              A.      Yes.
 8              Q.      How much was loaned?
 9              A.      550,000.
10              Q.      Let me see if I understand.
11                      So the CEB Irrevocable Trust loaned
12      $550,000 to Constance and Richard Belfonti?
13              A.      Yes.
14              Q.      And you as independent trustee
15      authorized that loan?
16              A.      Yes.
17                      MR. MERVIS:  Mark this, please.
18              A.      And for clarification, I'm sure there
19      were other loans over the years.
20                      (Friedman Exhibit 5 marked for
21      identification, transmittal letter to John
22      Chiscoski, CPA, dated January 12, 2007, with
23      attachments.)
24                      (The witness reviews document.)
25      BY MR. MERVIS:
```

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

40

```
 1                    -Friedman-
 2        Q.    Mr. Friedman, we placed before you what
 3    has been marked as Friedman Exhibit 5, which is the
 4    document that was provided to us recently by
 5    Mr. Slossberg's firm.  And I'll ask you if you
 6    recognize the exhibit or any portion of it.
 7        A.    Yes.
 8        Q.    Tell me what's in this exhibit.
 9        A.    The first page is a transmittal letter
10    to John Chiscoski, CPA, dated January 12, 2007,
11    transmitting documents with regard the loan.
12        Q.    Okay.
13        A.    The second page is my closing statement.
14    The third is the mortgage note.  The fourth is the
15    mortgage deed, of which the note is actually part.
16              And the last portion is a title
17    policy -- title insurance policy that was issued in
18    connection with the loan.
19        Q.    Do the various documents that you've
20    just described relate to a single transaction?
21        A.    Yes.
22        Q.    What transaction is that? ·
23        A.    This was a $550,000 loan to Constance
24    and Richard Belfonti secured by a first lien
25    mortgage on their home.
```

43

```
1                      -Friedman-
2         A.      The sentence after the asterisk.
3                 The proceeds of the loan were held by
4    us -- by my firm -- and then transferred to I
5    believe either BCP Aruba I LLC, or forwarded with
6    other funds to Wachovia on behalf of Aruba Hotel
7    Enterprises.
8         Q.      Okay.
9         A.      Owned by BCP Aruba I LLC.
10        Q.      In other words, you're saying at that
11   time AHE was owned by BCP Aruba I?
12        A.      Indirectly.
13        Q.      Indirectly.  Okay.
14                And the majority beneficial owner of
15   both those entities, AHE and BCP Aruba I LLC, at
16   that time was Michael Belfonti, correct?
17        A.      Yes.
18        Q.      Okay.
19                So let's just sort of follow the way the
20   funds went.
21                CEB Irrevocable Trust made a $550,000
22   loan to Constance and Richard Belfonti?
23        A.      Right.
24        Q.      The actual money did not go into their
25   personal bank accounts, right?
```

44

```
 1                   -Friedman-
 2        A.    That's correct.
 3        Q.    It went into your firm's trust account?
 4        A.    Yes.
 5        Q.    And then your firm took that money and
 6   did what with it?
 7        A.    I believe our firm actually sent the
 8   money to Wachovia, when it was aggregated with
 9   other funds.
10        Q.    Who authorized you to transfer the
11   $550,000 loan proceeds to your firm's trust
12   account?
13        A.    Connie and Richard.
14        Q.    Constance and Richard Belfonti?
15        A.    Yes.
16        Q.    And who authorized you to subsequently
17   disburse those funds to Wachovia?
18        A.    Constance and Richard authorized me to
19   provide the funds to BCP -- Belfonti Capital
20   Partners, or Belfonti Capital -- BCP Aruba I LLC,
21   who then authorized me to take the funds and send
22   it over...
23        Q.    You're saying either Belfonti Capital
24   Partners or BCP Aruba I authorized you to release
25   the $550,000 loan proceeds to Wachovia?
```

70

```
 1                   -Friedman-

 2    was it your understanding that the Wachovia/AHE

 3    loan agreement, Friedman Exhibit 2, would have

 4    prohibited AHE from incurring an indebtedness

 5    without the consent of Wachovia?

 6                   MR. SLOSSBERG:  Objection to form.

 7         A.    I was aware that there were restrictions

 8    inside the loan document, yes -- loan agreement.

 9         Q.    To your recollection, did you as a

10    supervisory director of AHE ever consider whether

11    those restrictions had been violated in any way?

12                   MR. NAVARRO:  Objection to form.

13         A.    I'm sure I considered it.  But I don't

14    recall at this moment.

15         Q.    During your tenure as a supervisory

16    director of AHE, was it ever brought to your

17    attention that any entity affiliated with the

18    Belfonti family loaned money to AHE?

19                   MR. NAVARRO:  Objection to form.

20                   MR. SLOSSBERG:  Yes, objection to form.

21         A.    No.

22         Q.    And during your tenure as a supervisory

23    director of AHE, was it ever brought to your

24    attention that Mr. Michael Belfonti made any loans

25    to AHE?
```

71

1                        -Friedman-

2                MR. SLOSSBERG:  Objection to form.

3                MR. NAVARRO:  Objection.

4                THE WITNESS:  I'm sorry, could you read

5        that again?

6                (Requested portion of record read.)

7        A.     No.

8        Q.     And during your tenure as a supervisory

9        director of AHE was it ever brought to your

10       attention that Richard or Constance Belfonti made

11       any loans to AHE?

12               MR. SLOSSBERG:  Objection to form.

13       A.     Loans, no.

14               Was I aware that monies had been

15       forwarded?  Yes.

16       Q.     And by "monies," what are you referring

17       to?

18       A.     The proceeds of this loan to Constance

19       and Richard.

20       Q.     From the CEB Irrevocable Trust?

21       A.     Right.

22       Q.     Did anybody ever tell you during your

23       tenure as supervisory director of AHE that those

24       funds that were forwarded constituted loans to AHE,

25       in whole or in part?

72

```
 1                      -Friedman-
 2        A.    No.
 3              MR. MERVIS:  I wouldn't mind taking a
 4     break.
 5              (Discussion off the record.)
 6              (A recess was taken.)
 7     BY MR. MERVIS:
 8        Q.    Mr. Friedman, sticking with Friedman
 9     Exhibit 6 for a moment, why don't we look at the
10     second page of the exhibit.
11              If I'm understanding your testimony
12     correctly, some -- the funds that are identified on
13     this page, your understanding is that 550,000 of
14     those funds are the proceeds of the loan that you
15     documented between the CEB Irrevocable Trust on the
16     one hand and Constance and Richard Belfonti on the
17     other hand; is that right?
18        A.    I believe it was all 550, but it may
19     have been less the expenses, I don't recall.
20        Q.    I'm sorry, the expenses --
21        A.    Closing expenses.
22        Q.    Closing expenses on the loan, okay.
23              Where did the other money come from?
24     What were the other sources of the other funds
25     identified on the second page of Friedman 6?
```

73

```
 1                    -Friedman-
 2            (The witness reviews document.)
 3       A.    I don't specifically recall.
 4       Q.    Do you have any understanding as to why
 5   your client was having you route these funds to
 6   Wachovia through your firm's account?
 7            MR. NAVARRO:  Can I have the question
 8   read back, please.
 9            (Requested portion of record read.)
10            MR. SLOSSBERG:  The concern that I have
11   about the question is, again, the foundation may be
12   a privileged communication, and so we're certainly
13   not going to waive that objection -- just one
14   second.
15            (Witness and counsel confer.)
16            MR. SLOSSBERG:  Again, we're not waiving
17   that claim of privilege, but the witness can answer
18   without any waiver.  Okay?
19            MR. MERVIS:  I think I understand that.
20   Okay.
21            MR. NAVARRO:  Same for my client.
22       A.    I believe only as a matter of
23   convenience.
24       Q.    What do you mean by that?
25       A.    Just that funds were aggregated into a
```

74

1                      -Friedman-

2      single place so that a single wire could be

3      initiated.

4           Q.     Take a look at Friedman Exhibit 4.

5                  (The witness complies.)

6           Q.     I know you say you haven't seen this

7      before today.  I just wanted to use this as a

8      guidepost for some questions.

9                  Directing your attention to the first

10     page of the exhibit, do you have any information

11     concerning any loan made by Belfonti Holdings LLC

12     to AHE?

13          A.     No.

14          Q.     Do you have any information concerning

15     any loan made by Belfonti Capital Partners LLC to

16     AHE?

17          A.     I'm going to correct what I just said

18     and respond to this the same way.

19                 I know there are -- the subject matter

20     of this case involves loans.  Or claims of loans.

21     But that's it.

22          Q.     Okay.  I appreciate that answer, and I

23     thank you for it.

24                 Apart from knowing what the case is

25     about, the litigation is about, I want to be a

75

```
 1                    -Friedman-
 2      little more specific:
 3                  Do you have any information that there
 4      actually were loans made to AHE by Belfonti
 5      Holdings LLC?
 6           A.    No.
 7           Q.    Do you have any information that there
 8      were loans made to AHE by Belfonti Capital Partners
 9      LLC?
10           A.    No.
11           Q.    Do you have any information that there
12      were loans made by MCR Property Management, Inc. to
13      AHE?
14           A.    No.
15           Q.    And do you have any information that
16      there were loans made by CEB Irrevocable Trust to
17      AHE?
18           A.    No.
19           Q.    Based on your understanding as -- based
20      on your understanding of the role of the
21      supervisory -- the board of supervisory directors
22      of AHE, if a loan was proposed to be made by an
23      entity owned or controlled by a member of the
24      Belfonti family to AHE, would that transaction have
25      to be presented to the board?
```

76

```
 1                        -Friedman-
 2              MR. NAVARRO:  Objection to form.
 3              Can I have the question read back,
 4      please?
 5              MR. MERVIS:  Sure.
 6              MR. SLOSSBERG:  Objection to form.
 7              (Requested portion of record read.)
 8              MR. NAVARRO:  Michael, are you asking
 9      for his understanding sitting here today, or what
10      he thought while he was member of the supervisory
11      board?
12              MR. MERVIS:  At any time.
13              MR. NAVARRO:  At any time.
14        Q.    You can answer.
15        A.    It was my understanding that decisions
16      were made by the managing director, who then had
17      the responsibility of bringing items before the
18      supervisory board for consideration, ratification
19      or whatever.
20        Q.    Okay.
21              Based again on your understanding as
22      a -- about what the role of the supervisory board
23      of directors of AHE was, would the managing
24      director of AHE have been required to put before
25      the supervisory board a proposed loan by an entity
```

77

1                          -Friedman-

2      owned or controlled by any member of the Belfonti

3      family to AHE?

4                  MR. SLOSSBERG:   Objection to form.

5          A.    I think the managing director would have

6      the duty to put certain loans before -- I can't say

7      all -- but certainly certain loans before the

8      supervisory board, either before or after the fact,

9      by way of ratification.

10         Q.    Okay.

11               And when you say "certain loans," what

12     types of loans?

13         A.    I can't speak, because I don't recall

14     what the requirements are of the organizational

15     documents.

16         Q.    Fair enough.

17               Actually, let me show you the

18     organizational documents.

19               (Friedman Exhibit 7 marked for

20     identification, English translation of Aruba Hotel

21     Enterprises NV's articles of incorporation.)

22     BY MR. MERVIS:

23         Q.    Mr. Friedman, before you look at that,

24     in connection with your role as a supervisory

25     director of AHE, did you have occasion to review

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

78

1                          -Friedman-

2       AHE's articles of incorporation?

3             A.      I reviewed the articles of incorporation

4       at the time the entity was formed, in connection

5       with its formation, wearing perhaps two hats at

6       that time.

7             Q.      What were the two hats?

8             A.      The two hats were advising Belfonti

9       Capital Partners, BCP Aruba I, about what these

10      documents said, and then after I was told I was a

11      supervisory director, in that capacity.

12            Q.      You understood on or about May 3 of 2006

13      that there was certain amendments made to AHE's

14      articles of incorporation at the insistence of

15      Wachovia, correct?

16            A.      Yes.

17            Q.      The reporter has placed in front of you

18      what we have marked for identification as Exhibit

19      7, which I'll represent to you is an English

20      translation of AHE's articles of incorporation.

21                    I'll ask you if you recognize the

22      document.

23                    (The witness reviews document.)

24            A.      Yes.

25            Q.      What is it?

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

79

```
 1                        -Friedman-
 2            A.    It is a styled amendment to the articles
 3       of incorporation of Aruba Hotel Enterprises NV.
 4            Q.    And you've reviewed this document before
 5       today; is that correct?
 6            A.    I reviewed this document in 2006.
 7            Q.    Turn to the eighth page, please.  Or
 8       page 8.
 9                  MR. MERVIS:  Off the record.
10                  (Discussion off the record.)
11                  MR. MERVIS:  Back on the record.
12       BY MR. MERVIS:
13            Q.    I want you to take a look, Mr. Friedman,
14       or actually just read to yourself what appears to
15       be Article 15.1.h.
16            A.    Yes.
17            Q.    What's your understanding of that
18       provision?
19            A.    I think it speaks for itself, but it
20       says:  "The resolution of the managing director on
21       the subject of entering into bank credit agreements
22       and debenture loans for account of the corporation,
23       with the exception of the loan stated in Article
24       13A, are subject to the approval of the board of
25       supervisory directors."
```

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

80

1                          -Friedman-

2          Q.     Meaning that if there were such a

3     transaction it would require approval or

4     ratification of the board of supervisory directors?

5          A.     Yes.

6          Q.     Could you look at or read to yourself

7     Article 15.1.i.

8          A.     Yes.

9          Q.     What is your understanding of that

10    provision?

11         A.     Again, subject to the approval of the

12    board of supervisory directors, the managing

13    directors would have the right to loan money or

14    borrow money, "not including the use of a bank

15    credit granted to the corporation as meant under h

16    above."

17         Q.     So, again, based on your understanding

18    of the role of the board of supervisory directors

19    of AHE, what loans to AHE did not require the

20    approval of the board of supervisory directors?

21         A.     I think --

22                MR. NAVARRO:  Objection to form.

23                Go ahead.  You can answer.

24         A.     I think borrowing money required

25    approval.

81

1                          -Friedman-

2          Q.    To your recollection, no approval was

3    ever sought during your tenure as supervisory

4    director for AHE for AHE to borrow money?

5                MR. NAVARRO:  Objection to form.

6          A.    To my recollection, yes.

7          Q.    During Mr. Belfonti's tenure as the

8    majority beneficial owner of AHE, were you involved

9    in any transaction between AHE on the one hand and

10   Belfonti Holdings LLC on the other hand?

11               MR. SLOSSBERG:  Objection to form.

12         Q.    That you can recall?

13         A.    Not that I can recall, no.

14         Q.    During Mr. Belfonti's tenure as the

15   majority beneficial owner of AHE, were you involved

16   in any transactions between AHE and BCP Florin?

17               MR. SLOSSBERG:  Same objection.

18         A.    I probably should have asked this

19   before, but what do you mean by "transactions" in

20   this case?

21         Q.    Well, what I mean by "transactions"

22   would be any -- well, any agreement, I guess,

23   between the two parties that I identified.

24               MR. SLOSSBERG:  That's the gist of my

25   objection.  Objection to form.  But he can answer.