PROSKAUER ROSE LLP
*Attorneys for Plaintiff*
*Aruba Hotel Enterprises N.V.*
Richard M. Goldstein
Michael T. Mervis
Eric H. Blinderman
Patrick J. Dempsey
1585 Broadway
New York, New York 10036
(212) 969-3000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ARUBA HOTEL ENTERPRISES N.V.,

     Plaintiff,

   v.

MICHAEL BELFONTI, BELFONTI HOLDINGS
LLC, and BELFONTI CAPITAL PARTNERS,
LLC,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**3:07 Civ. 07564 (PAC)**

**ECF FILING**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................. iii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ................................................................ 3

    Belfonti's Purchase of AHE and the Hotel ......................................................... 3

    Belfonti's Defaults ............................................................................................. 4

    The Alleged "Lenders" ....................................................................................... 5

    The Alleged "Loans" .......................................................................................... 5

    The "Terms" of the Alleged "Loans" ................................................................. 8

    AHE's Articles of Incorporation ........................................................................ 9

ARGUMENT ............................................................................................................ 10

    I.      CHOICE OF LAW ....................................................................... 10

          The Alleged $548,250 "Loan" By BCP ......................................... 11

          The Alleged $499,950 "Loan" By Belfonti Holdings ..................... 12

          The Alleged $4,873,702.86 "Loan" By BCP ................................. 12

          BCP's Alleged "Loan" of $393,000 .............................................. 13

    II.    THE ALLEGED "LOANS" VIOLATE THE STATUTE OF FRAUDS ..................... 13

          A.    The Alleged "Loans" Are Barred By Conn. Gen. Stat. § 52-550(a)(6) ................................................................. 13

          B.    The Doctrine of Partial Performance Is Inapplicable ......... 13

    III.   IN ANY CASE, THE ALLEGED "LOAN AGREEMENTS" ARE UNENFORCEABLE FOR LACK OF DEFINITENESS ............................. 18

    IV.   THE EVIDENCE CANNOT SUPPORT A FINDING OF UNJUST ENRICHMENT ........................................................................... 21

i

V.      A PERMANENT INJUNCTION IS WARRANTED AND NECESSARY .................. 23

CONCLUSION...................................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................10

*China Trade & Dev. Corp. v. M.V. Choong Yong*,
837 F.2d 33 (2d Cir. 1987) ....................................................................................23, 24

*Conn. Nat'l Bank v. Lewis*,
1994 WL 228309 (Conn. Super. Ct. May 19, 1994) ..............................................13

*Farrell Lines v. Columbus Cello-Poly Corp.*,
32 F. Supp. 2d 118 (S.D.N.Y. 1997) .....................................................................23, 24

*Fieger v. Pitney Bowes Credit Corp.*,
251 F.3d 386 (2d Cir. 2001),
*aff'd*, 69 Fed. Appx. 31 (2d Cir. 2003) ..................................................................11

*Gianascio v. Giordano*,
2003 WL 22999454 (S.D.N.Y. Dec. 19, 2003) ...................................................19, 20

*Heublein v. Rudder*,
2007 WL 2472018 (D. Conn. Aug. 29, 2007) .......................................................11

*In re Adelphia Communication Corp.*,
2006 WL 687153 (Bankr. S.D.N.Y. Mar. 6, 2006) ..............................................16

*In re Autostyle Plastics, Inc.*,
269 F.3d 726 (6th Cir. 2001) ........................................................................16, 17, 18

*In re Hedged-Investments Assocs., Inc.*,
380 F.3d 1292 (10th Cir. 2004) .............................................................................15

*In re Interstate Cigar Co.*,
182 B.R. 675 (Bankr. E.D.N.Y. 1995) ..........................................................15, 17, 18

*In re Submicron Sys. Corp.*,
432 F.3d 448 (3rd Cir. 2006) .................................................................................16

*In re Ticketplanet.com*,
313 B.R. 46 (Bankr. S.D.N.Y. 2004)....................................................................15, 16

*Kaye v. Grossman*,
202 F.3d 611 (2d Cir. 2000) ..................................................................................22

*Kulick v. City of Hartford*,
2007 WL 4707809 (Conn. Super Ct. Dec. 10, 2007) ...........................................19

*Laker Airways, Ltd. v. Sabena, Belgian World Airlines,*
    731 F.2d 909 (1984) ...........................................................................................23, 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)....................................................................................................10

*Md. Cas. Co. v. Cont'l Cas. Co.,*
    332 F.3d 145 (2d Cir. 2003) ......................................................................................10

*Palmieri v. Scaniffe,*
    2008 WL 1971026 (Conn. Super. Ct. Apr. 23, 2008) ......................................19, 20

*Paoletta v. Anchor Reef Club at Branford, LLC,*
    2008 WL 256575 (Conn. Super. Ct. Jan. 11, 2008) .........................................21, 22

*Roulley v. Inex Co.,*
    677 F.2d 14 (2d Cir. 1982) ........................................................................................20

*SS-II, LLC v. Bridge Street Assocs.,*
    2008 WL 1948075 (Conn. Super. Ct. Apr. 18, 2008) .......................................13, 14

## STATUTES

CONN. GEN. STAT. § 52-550......................................................................................13

CONN. GEN. STAT. § 52-550(a)..................................................................................13

CONN. GEN. STAT. § 52-550(a)(6)..............................................................................13

## OTHER AUTHORITIES

Fed. R. Civ. P. 56.......................................................................................................10

Fed. R. Civ. P. 56(e) ..................................................................................................10

Restatement (Second) of Conflict of Laws................................................................11

Plaintiff, Aruba Hotel Enterprises N.V. ("AHE"), respectfully submits this memorandum of law in support of its motion for summary judgment against defendants Michael Belfonti ("Belfonti"), Belfonti Holdings LLC ("Belfonti Holdings") and Belfonti Capital Partners, LLC ("BCP") (collectively, "Defendants").

## PRELIMINARY STATEMENT

In April 2006, Belfonti became the majority beneficial owner of AHE. AHE's principal asset was a resort hotel located on the island of Aruba (the "Hotel"). To finance the transaction, Belfonti caused AHE to enter into a $230 million mortgage loan agreement with an affiliate of Wachovia Bank, National Association ("Wachovia"). Belfonti also caused certain of his corporate affiliates to contribute approximately $4.9 million towards the purchase price. Thereafter, Belfonti caused certain of his affiliates to contribute millions of additional dollars so that he could retain his investment in AHE. These additional monies were used to fund AHE's mortgage payments to Wachovia and, in one instance, to pay the company that Belfonti hired to operate the Hotel. It appears that all or substantially all of the funds contributed by Belfonti's corporate affiliates originated from Connecticut, the state in which Belfonti resides and from which he runs his various entities.

Eventually, in April 2007, Belfonti made the decision not to invest any more money in AHE. He caused AHE to default on the mortgage loan and, in consequence, he lost control of AHE and the Hotel. Several months later -- after other litigation had broken out between Belfonti and the New York-based investment firm that assumed ownership of AHE following Belfonti's default -- Belfonti's entities claimed, for the first time, that the monies Belfonti had caused them to invest in AHE were actually "loans" that had to be immediately "repaid" by AHE. During the course of litigation brought by Belfonti's entities against AHE in Aruba to enforce the alleged "loans," Belfonti's entities changed their story and contended that even if the monies were not loans AHE is nonetheless required to "repay" them under a theory of "unjust enrichment."

1

By this action, AHE seeks a declaratory judgment that the transactions at issue are not loans and cannot be enforced as loans, under a theory of unjust enrichment or otherwise. AHE also seeks a permanent injunction restraining the U.S.-based Defendants from attempting to seek "repayment" of the amounts at issue in any other jurisdiction.

Because the material facts are undisputed, summary judgment should now be granted in AHE's favor. Those facts include that:

- There are no loan agreements or other writings signed by AHE memorializing any obligation on the part of AHE to "repay" to Belfonti's entities the sums they contributed to Belfonti's investment in AHE;

- The "loans" were "agreed to" by Belfonti only, acting on behalf of both the alleged "lenders" and AHE;

- The "loans" have no terms; and

- Critically, Belfonti says that he did not expect AHE to "repay" the alleged "loans" until AHE's operations became sufficiently profitable or he was able to sell AHE or obtain third-party financing. There is no evidence that any of those things have come to pass.

Thus, what Belfonti and his entities now contend are "loans" were, quite clearly, capital investments in AHE made on Belfonti's behalf. Belfonti's investment in AHE ultimately failed, and he eventually made the decision not to fund it any further. That being the case, there is no basis in law or equity for Belfonti's entities to recover the investments in AHE that they made on Belfonti's behalf.

As a matter of law, the alleged "loans" cannot be enforced as such because -- there being no loan agreement or any writing executed by AHE acknowledging a repayment obligation -- the "loans" run afoul of the statute of frauds under applicable Connecticut law. Moreover, even if the statute of frauds were not applicable, there simply is no evidence of any agreement by AHE to repay the amounts at issue. Rather, the undisputed evidence is that there was no such agreement. Moreover, AHE cannot be required to disgorge the funds at issue under a theory of unjust enrichment because, among other

reasons, it cannot be "unjust" for AHE to retain funds that even Belfonti says would not become "due" until his investment in AHE proved successful (which it did not).

Finally, AHE is entitled to a permanent injunction prohibiting Defendants from attempting to enforce the alleged "loans" as loans, under a theory of unjust enrichment or otherwise. This is necessary to ensure that the U.S.-based Defendants are not able "to paralyze the jurisdiction" of this Court by trying to obtain in a foreign jurisdiction the relief they cannot obtain in this Court.

## STATEMENT OF UNDISPUTED FACTS

### Belfonti's Purchase of AHE and the Hotel

In May 2006, Belfonti became the beneficial owner and control person of AHE. (Declaration of Michael T. Mervis ("Mervis Decl.," submitted herewith) Ex. A, Response to Interrogatory 10; Belfonti Tr. at 11-12).[1] AHE's principal asset was, and is, the Hotel. (Belfonti Tr. at 13-14; Declaration of Joseph Iacono ("Iacono Decl.," submitted herewith) at ¶2). To finance this transaction, Belfonti arranged for two *actual* loans. The first loan (the "Mortgage Loan") was made to AHE by WIBC Aruba N.V. ("WIBC") (an affiliate of Wachovia) in the amount of $230,000,000.00. (Iacono Decl. ¶2; Belfonti Tr. at 10-15). The terms of the Mortgage Loan were memorialized in a loan agreement between AHE and WIBC, dated May 3, 2006 (the "Mortgage Loan Agreement"). (Iacono Decl. at ¶2 and Ex. A thereto).

The second loan (the "Mezzanine Loan") was made by Petra Mortgage Capital Corp. LLC ("Petra Mortgage") to a Belfonti-controlled entity called BCP Florin, LLC ("BCP Florin") in the amount of $19,450,000.00. (Iacono Decl. ¶3; Belfonti Tr. at 15-17). The terms of the Mezzanine Loan were memorialized in a loan and security agreement executed on or about June 9, 2006 (the

---

[1] Cited pages from the transcript of the deposition of Michael Belfonti, taken on April 29, 2008, are annexed to the Mervis Decl. as Exhibit C. The parties have agreed that deposition testimony taken in the companion action pending in the United States District Court for the District of Connecticut, No. 3:07 Civ. 01297 (JCH) (the "Connecticut Action"), can also be used in this action.

"Mezzanine Loan Agreement").  (Iacono Decl. ¶3 and Ex. B thereto; Belfonti Tr. at 15-17).[2]  Petra

Mortgage subsequently assigned its rights under the Mezzanine Loan Agreement to Petra Fund REIT

Corp. ("Petra REIT").  (Iacono Decl. ¶3).[3]

The Mezzanine Loan was secured by a first priority security interest in one hundred percent of

the issued and outstanding equity of Twilight Holdings, LLC ("Twilight").  (*Id.* ¶4 and Ex. B thereto,

§ 2.02(kk)).  Twilight -- a Delaware limited liability company that was, at the time, majority

beneficially owned by Belfonti -- was an indirect subsidiary of BCP Florin.  (Mervis Decl. Ex. A,

Response to Interrogatory 6; Iacono Decl. ¶4).  At the time the Mezzanine Loan was made, AHE was

an indirect subsidiary of BCP Florin and Twilight.  (Iacono Decl. ¶4; Belfonti Tr. at 17).

Under Section 3.1.24(d) of the Mortgage Loan Agreement, AHE was not permitted to incur

indebtedness of the type alleged by Defendants to have been created by AHE to them.  (Iacono Decl.

Ex. A, § 3.124(d)).  A breach of Section 3.1.24(d) of the Mortgage Loan Agreement gives rise to a

default under the Mortgage Loan Agreement for which there is no right to cure.  (*Id.* at § 10.1(a)(xii)).

One of the lender's remedies upon such a default is to foreclose on the Hotel.  (*Id.* at § 10.2(a)).

**Belfonti's Defaults**

In April 2007, AHE defaulted on the Mortgage Loan and BCP Florin defaulted on the

Mezzanine Loan.  (Iacono Decl. ¶5; Belfonti Tr. at 21-22).  Thereafter, Petra voluntarily cured the

default on the Mortgage Loan, foreclosed on its security interest in Twilight under the Mezzanine Loan

and, in consequence, became the beneficial owner of Twilight's indirect subsidiary, AHE.  (Iacono

Decl. ¶5).  On August 21, 2007, BCP and Belfonti Holdings asserted, *for the first time*, that they had

made "loans" to AHE and demanded immediate "repayment."  (*Id.* ¶6 and Ex. C; Belfonti Tr. at 60-

63).

---

[2] Belfonti signed both the Mortgage Loan Agreement and the Mezzanine Loan Agreement on behalf of the borrowers.
(Iacono Decl. Exs. A and B thereto; Belfonti Tr. at 10-11).

[3] Petra Mortgage and Petra REIT will hereinafter be referred to, individually and collectively, as "Petra."

**The Alleged "Lenders"**

**BCP:** Belfonti is "the beneficial owner of 100 percent of the limited liability company interests of BCP." (Mervis Decl. Ex. A, Response to Interrogatory No. 2). Belfonti is and has always been the ultimate decision-maker for BCP. (Belfonti Tr. at 53).

**Belfonti Holdings:** Belfonti is and has always been "the beneficial owner of 100% of [Belfonti Holdings'] limited liability company interests . . . ." (Mervis Decl. Ex. A, Response to Interrogatory 3). Belfonti has the ultimate decision-making authority for Belfonti Holdings. (Belfonti Tr. at 45).

Although Belfonti has a "satellite" office in New York City, all of his businesses are run out of Connecticut. (*Id.* at 24, 36, 39, 43). Indeed, Belfonti sometimes even held AHE out as a Connecticut-based business. (Carpenter Tr. at 170-171).[4]

**The Alleged "Loans"**

BCP alleges that it made the following "loans" to AHE:

**$4,873,702.86:** This sum is comprised entirely of money that Belfonti allegedly spent to buy AHE and the Hotel. (Belfonti Tr. at 88). Of this sum, $1.5 million originated from MCR Property Management, Inc. ("MCR") (another entity that Belfonti controls) (*id.* at 25-31) and $2 million originated from a line of credit with First County Bank in Stamford, Connecticut belonging to another Belfonti entity, MAB Investments LLC ("MAB"). (Carpenter Tr. at 84-86; Mervis Decl. Ex. D). Both MCR and MAB are located in Connecticut. (Carpenter Tr. at 84-86). Defendants have produced no evidence as to the source of the funds for the balance of this alleged "loan"; there is no evidence that any funds were actually provided by BCP or, for that matter, to whom they were actually paid (if at all).

---

[4] Cited pages from the transcript of the deposition of Victoria Carpenter, taken on May 27, 2008, are annexed to the Mervis Decl. as Exhibit E. Ms. Carpenter is and was during the relevant time period the Controller for Belfonti's various entities. (Carpenter Tr. at 17, 54, 87).

**$393,000:** This sum was paid directly to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan. (Carpenter Tr. at 103-107, 109-110; Belfonti Tr. at 106-108). As Belfonti admitted in his deposition, the only beneficiary of this transaction (and, indeed, of any of the sums "loaned" to AHE and used to make payments on the Mortgage Loan) was him:

> Q. So if I'm understanding it correctly, you, as the borrower on the Wachovia loan, needed to find $393,000 to make payment; is that right?
>
> A. That is correct.
>
> Q. If you hadn't made that payment, what could have happened?
>
> A. The loan could have gone into default.
>
> Q. What effect would that have had, if any, on AHE?
>
> A. They would have been in default of their obligation with the Wachovia loan.
>
> Q. Would that have, for example, caused the hotel to stop operating?
>
> A. No.
>
> Q. Would it have caused AHE to go out of business?
>
> A. No.
>
> Q. It would have, could have caused you, Michael Belfonti, to lose your equity interest in AHE; correct?
>
> A. That is correct.
>
> Q. Can you think of any other consequence that would have occurred, had you not come up with the $393,000 to make the interest payment to Wachovia?
>
> A. No.

(Belfonti Tr. 108-109; *see also* Belfonti Tr. at 211-212, Carpenter Tr. at 105-107).

**$548,250:** This sum was originally claimed by Belfonti to have been a loan by his mother's trust to AHE. (Iacono Decl. ¶6 and Ex. C). Following the deposition testimony of the trustee that the

6

trust had never made a loan to AHE (Friedman Tr. at 34, 36, 38),[5] Belfonti changed his story and asserted that BCP was actually the "lender." (Mervis Decl. Ex. I). The money was paid from the bank account of Belfonti's Connecticut attorneys directly to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan. (Carpenter Tr. at 137-138; Belfonti Tr. at 128-130, 146). This allowed Belfonti to continue to own AHE (and, thus, the Hotel). (Belfonti Tr. at 167-168).

Belfonti Holdings alleges that it made a "loan" to AHE in the amount of $499,950. According to Belfonti, this sum was used by AHE to make a payment to the company that Belfonti had contracted with to manage the Hotel, Westin Aruba Hotel Management LLC ("Westin"). (Belfonti Tr. at 91-93). According to the Operating Agreement entered into between AHE and Westin and signed by Belfonti on behalf of AHE (Iacono Decl., Ex. D), AHE was required to provide to Westin the "financial and other resources" necessary to permit the Hotel to be operated in accordance with Westin's standards. (*Id.*, § 5.5). This included the "initial working capital required for the commencement of Operations at the Hotel . . .", which was anticipated to be $500,000. (*Id.*, Article 5.5.1 and p. A-3; Belfonti Tr. at 92). Failure to pay any amounts due to Westin could have ultimately resulted in a default under the Operating Agreement. (Iacono Decl., Ex. D, Article 16.1(a) (listing as an event of default "[a] failure by either Party to pay any amount of money to the other Party when due and payable under this Agreement")). According to § 10.1(a)(xvi) of the Mortgage Loan Agreement, a default under the Operating Agreement constitutes an event of default under the Mortgage Loan Agreement (which, as discussed *supra*, allows the lender to foreclose on AHE's principal asset, the Hotel). (Iacono Decl. Ex. A at § 10.1(a)(xvi)). Thus, by causing Belfonti Holdings to make this alleged "loan," Belfonti was able to avoid a default and retain control over the Hotel.

---

[5] Cited pages from the transcript of the deposition of Dana Eric Friedman, taken on April 17, 2008, are annexed to the Mervis Decl. as Exhibit F. Friedman has been Belfonti's long-time attorney and, like Belfonti, was a member of AHE's Supervisory Board of Directors while Belfonti was in control of AHE. (Freidman Tr. at 16-20, 25).

**The "Terms" of the Alleged "Loans"**

With respect to each of the alleged "loans," Belfonti was the one who decided on behalf of the alleged "lender" to make the "loan" *and* the one who "agreed" on behalf of AHE to "accept" the "loan." (Belfonti Tr. at 70-71, 95, 110-111, 130). There were no negotiations regarding the terms of any of the alleged "loans." (*Id.* at 71, 95, 111, 131). There is no writing signed by any representative of the alleged "lender" *or* AHE which memorializes any of the alleged "loans." (*Id.* at 77-78, 98-99, 114, 150). Neither the alleged "lenders" nor AHE were represented by counsel in connection with any of the alleged "loans." (*Id.* at 90, 104, 114, 118, 150-151).

There is no maturity date or payment schedule for any of the alleged "loans." (*Id.* at 71, 95-96, 111, 131, 137-138). With respect to interest, Belfonti testified variously that no interest had to be paid by AHE (*id.* at 71-72, 96, 112); that interest would be paid at the rate of 12% (since, according to Belfonti, that is the rate he typically applies in the case of "loans" between his various entities) (*id.* at 132-133); and that an interest rate of 8 to 9% (or "something like that") would be applied "because of the international nature of the transaction." (*Id.* at 160-161). Regardless, Belfonti's testimony makes clear that interest was not something he thought of when he decided to approve each "loan." (*Id.* at 161).

There was no security pledged for any of the alleged "loans." (*Id.* at 72, 96, 112, 138). With one exception, AHE (acting through Belfonti) did not even seek financing from any other source. (*Id. at* 76-77, 98, 113-114, 147-150). As Belfonti testified, "I don't think anyone would have lent monies unsecured, except related entities that I controlled." (*Id.* at 77). Belfonti testified that the alleged "loans" were either not subordinated to AHE' s pre-existing loan obligations or that he did not know whether they were subordinated and would need to consult his attorneys for an answer. (*Id.* at 98, 112-113, 140-146).

Notably, Belfonti testified that he did not expect AHE to repay the "loans" made by his "lender" entities until such time as AHE was able to meet both its operational needs and its obligations with respect to the Mortgage Loan from the cash flow generated by the operation of the Hotel, a sale of the Hotel or third-party refinancing. (*Id.* at 72-76, 98, 113, 146-147).[3]  There is no evidence that any of these scenarios have come to pass.

It is not surprising that the alleged "loans" have no actual terms.  In truth, the transactions do not reflect loans, but rather Belfonti's practice of moving money between his various entities (using them as his corporate "piggy banks") in order to fund his various investments.  The Controller for Belfonti's entities, Victoria Carpenter (Carpenter Tr. at 21-23, 54-55, 86-87; Belfonti Tr. at 39-40), described the practice this way:

> A.   My understanding was that the loans were from Belfonti Capital, but that the funds flowed through from other entities or perhaps were sent directly from other entities, but the intention was they were Belfonti Capital.
>
> Q.   My question was, from where did you form that understanding?
>
> A.   My general understanding of how the Belfonti companies transferred funds between companies.
>
> Q.   What's your general understanding?
>
> A.   *My general understanding is that when an entity needs money and another entity has the money, the entity that has the money lends the money to the entity that needs the money.*

(Carpenter Tr. at 73-74 (emphasis supplied)).

## AHE's Articles of Incorporation

AHE's Articles of Incorporation during the relevant time period prohibited AHE from incurring indebtedness without the approval of AHE's Board of Supervisory Directors.  (*See* Iacono Decl. Ex. E, Articles 15(1)(h) and 15(1)(i)).  This was confirmed by Dana Friedman, Belfonti's lawyer and fellow

---

[3] *See also* Carpenter Tr. at 185-187 (practice within Belfonti entities regarding "repayment" of "loans" between them "boils down to cash available, cash between entities."  AHE did not "repay" alleged "loans" because "there was not extra cash").

member of AHE's Board of Supervisory Directors. (Friedman Tr. at 16-17, 24-25, 77-81).[4] It is

undisputed that, despite Belfonti being one of the members of AHE's Board of Supervisory Directors

(Belfonti Tr. at 56-57), none of the alleged "loans" was presented to or approved by AHE's

Supervisory Board. (Belfonti Tr. at 78, 104, 116-117; Friedman Tr. at 70-72, 74-75).

## ARGUMENT

Summary judgment under Fed. R. Civ. P. 56 must be granted when the pleadings and

supplementary evidentiary materials "show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247, 250 (1986). Once a properly supported motion for summary judgment has been

made, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a

genuine issue for trial." Fed. R. Civ. P. 56(e). Thus, to withstand the motion, the nonmovant must do

more than present evidence that is merely colorable, conclusory or speculative; it must present

"concrete evidence from which a reasonable [fact-finder] could return a verdict in [its] favor."

*Anderson*, 477 U.S. at 256. The nonmovant must do more than show "some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Applying these standards to the undisputed material facts in this case, it is clear that summary

judgment should be granted in favor of AHE.

## I.    CHOICE OF LAW

In a diversity suit, such as this one, the District Court should apply the choice-of-law rules of

the state in which it sits. *See, e.g., Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003)

(citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). To determine what

substantive law applies in contract cases, a New York court is to "evaluate[] the 'center of gravity' or

---

[4] Belfonti testified that Friedman was well qualified to explain the requirements of AHE's Articles or Incorporation. (Belfonti Tr. at 208-209).

'grouping of contacts', with the purpose of establishing which state has 'the most significant relationship to the transaction and the parties.'" *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001), *aff'd*, 69 Fed. Appx. 31 (2d Cir. 2003) (*citing Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317 (1994)). "In developing this test, the New York Court of Appeals relied on the Second Restatement of Conflict of Laws," which considers the "place of contracting," as well as "the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." *Id.*

Applying these standards to the transactions at issue in this case, it is clear that the substantive law of Connecticut (and, in one instance, possibly New York substantive law) governs.[6]  Indeed, it appears that all of the "loan" funds originated in Connecticut (or, in limited instances, possibly New York) and, with one limited exception, none of the funds ever touched the island of Aruba.

## The Alleged $548,250 "Loan" By BCP

This sum was originally claimed by Belfonti to have been a loan by his mother's trust. (Iacono Decl. Ex. C).  After litigation ensued, Belfonti claimed, through his entities, that the assertion of a loan by his mother's trust was actually a "mistake"[7] and that the alleged "lender" was, instead, BCP. (Mervis Decl., Ex. I).[8]  The money at issue originated as an actual loan from the trust of Belfonti's mother to Belfonti's parents, which was evidently secured by a first lien mortgage on their home in North Haven, Connecticut.  (Friedman Tr. at 40).  This money (which was held in the bank account of

---

[6] AHE initially argued, in opposition to Defendants' Motion to Dismiss, that New York law governed the transactions at issue (except for the alleged $548,250 "loan," which was, at the time, not part of this case).  Discovery has now made clear, however, that Connecticut law is applicable.

[7] The claim of a "mistake" occurred only after the trustee of the trust testified that the trust had made no such loan. (Friedman Tr. at 34, 36, 38).

[8] This alleged "loan" was originally at issue in the Connecticut Action.  In that case, Belfonti and the other defendants admitted "that, under Connecticut's choice of law provisions, Connecticut substantive law applies . . . ."  (Mervis Decl., Ex. B).  Given that Connecticut's choice-of-law rules are substantially similar to New York's, Belfonti and BCP cannot now be heard to argue that Connecticut law does not apply under New York's choice-of-law rules as well.  *See, e.g., Heublein v. Rudder*, 2007 WL 2472018, at *3 (D. Conn. Aug. 29, 2007) (stating that Connecticut courts apply the Restatement (Second) of Conflict of Laws test -- the same test applied in New York -- in a contract choice-of-law analysis).

Belfonti's Connecticut attorneys) was then allegedly loaned by Belfonti's parents to BCP and paid directly to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan. (Carpenter Tr. at 137-138; Belfonti Tr. at 128-130, 146). From the time the initial "loan" was made from the trust to Belfonti's parents until just prior to the transfer of the funds to Wachovia, the funds never left Connecticut. (Friedman Tr. at 43-44). Further, Belfonti himself works in Hamden, Connecticut. (Belfonti Tr. at 21). It follows, then, that the purported decision by Belfonti to make and receive this alleged "loan" (*id.* at 128-30) most likely took place in Connecticut. This is, in fact, the case with respect to all of the alleged "loans." (Belfonti Tr. at 70-71, 95, 110-11).

**The Alleged $499,950 "Loan" By Belfonti Holdings**

Belfonti Holdings, the alleged "lender," has its principal place of business in Hamden, Connecticut, where Belfonti himself works. (*Id.* at 21). The funds for this alleged "loan" originated from Belfonti Holdings' bank account in Bridgeport, Connecticut. (Carpenter Tr. at 91).

**The Alleged $4,873,702.86 "Loan" By BCP**

BCP, the alleged "lender," is a Delaware limited liability company with its principal place of business (at least on paper) in New York. However, all of the employees in New York were paid by MCR, which is located in Hamden, Connecticut. (Belfonti Tr. at 24, 38). According to Belfonti, the New York office is merely a "satellite office"; all of Belfonti's businesses were run out of his office in Hamden, Connecticut. (*Id.* at 36, 39). Further, at least $3.5 million of the approximately $4.9 million allegedly "loaned" to AHE originated in Connecticut: $1.5 million originated from MCR, located in Hamden, Connecticut, and $2 million originated from MAB's line of credit with First County Bank in Stamford, Connecticut. (Carpenter Tr. at 84-86; Mervis Decl. Ex. D).[9]

---

[9] Again, the discovery record is devoid of evidence regarding the whereabouts of the funds that comprise the balance of this alleged "loan." Further, there is no evidence as to who actually received any of these funds or where they were paid (if they were paid at all).

**BCP's Alleged "Loan" of $393,000**

      All of the factors applicable to the other alleged BCP "loans" apply to this alleged "loan" as well, except that it is unclear where any of the funds for the transaction originated (although they presumably originated from Connecticut or New York). Therefore, either Connecticut or New law applies.

## II.    THE ALLEGED "LOANS" VIOLATE THE STATUTE OF FRAUDS

### A.  The Alleged "Loans" Are Barred By CONN. GEN. STAT. § 52-550(a)(6)

Connecticut's statute of frauds, CONN. GEN. STAT. § 52-550, provides, in relevant part, that:

> [n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars.

*Id.* § 52-550(a). "The statute of frauds bars actions where there is not a sufficient memorandum in writing signed by the party charged." *Conn. Nat'l Bank v. Lewis*, 1994 WL 228309, at *6 (Conn. Super. Ct. May 19, 1994) (quoting *Booth v. Flanagan*, 23 Conn. App. 579, 584 (1990)) (internal quotations omitted). The transactions at issue are each in excess of $50,000 (Iacono Decl. Ex. C), and none are evidenced by a writing signed by AHE. (Belfonti Tr. at 77-78, 98-99, 114, 150). They are all, therefore, barred by Connecticut's statute of frauds.

### B.  The Doctrine of Partial Performance Is Inapplicable

      Further, Defendants cannot rely on the doctrine of partial performance to save the alleged "loans" from the bar imposed by the statute of frauds. Under that doctrine, "[c]ontracts that would otherwise be unenforceable without a writing sufficient to comply with the Statute of Frauds . . . are nonetheless enforceable because of part performance if two separate but related criteria are satisfied." *Lewis*, 1994 WL 228309, at *6. The acts of part performance on the part of the party seeking to enforce the contract must "clearly refer to some contract in relation to the matter in dispute." *SS-II, LLC v. Bridge Street Assocs.*, 2008 WL 1948075, at *3 (Conn. Super. Ct. Apr. 18, 2008) (citing

13

*Electrical Wholesalers, Inc. v. M.J.B. Corp.*, 99 Conn. App. 294, 306 (2007)). "The acts generally must be . . . in pursuance of the contract, and with the design of carrying the same into execution, and must also be done with the assent, express or implied, or knowledge of the other party, and be such acts as alter the relations of the parties." *Id.* "The acts also must be of such a character that they can be naturally and reasonably accounted for *in no other way than by the existence of some contract* in relation to the subject matter in dispute." *Lewis*, 1994 WL 228309, at *6 (emphasis in original).

Here, Defendants' actions in transferring monies amongst the various Belfonti entities so that Belfonti could purchase AHE and the Hotel and retain control of them are plainly *not* "of such a character that they can be naturally and reasonably accounted for in no other way than by the existence of some contract . . . ." *Id.* Given Belfonti's practice of shuffling funds back and forth amongst his assorted entities depending on their capital needs, the transactions at issue can clearly be characterized as (and, indeed, obviously *were*) investments of risk capital made by Belfonti's entities on his behalf during the time that he was in control of AHE. Each time these "loans" were allegedly made -- whether it was to purchase the Hotel initially, to pay to Wachovia AHE's monthly mortgage obligations or to pay Westin so that Belfonti would not default under the Operating and Mortgage Loan Agreements and lose control of AHE and the Hotel -- Belfonti was faced with a choice: he either could invest the money he needed to buy AHE and hold onto it until such time as AHE's operations became sufficiently cash positive, or he could say "enough," literally "cut his losses" (as he eventually did in April 2007) and lose ownership of AHE and the Hotel. Even according to Belfonti, his "lender" entities had no expectation of being repaid the "loaned" sums until his investment in AHE was a success. (Belfonti Tr. at 72-76, 98, 113, 146-147; *see also* Carpenter Tr. at 185-187). This is the very definition of investment, *not* "lending."

This conclusion is confirmed by application of analogous "recharacterization" case law developed in the bankruptcy context. Typically, recharacterization cases involve a scenario where,

prior to filing for bankruptcy protection, the soon-to-be-bankrupt entity receives a cash infusion from an affiliated entity, and the transaction is structured like and labeled as a "loan" so as to afford the affiliated entity priority over the creditors of the "borrower." *See, e.g.*, *In re Interstate Cigar Co.*, 182 B.R. 675 (Bankr. E.D.N.Y. 1995) (involving a situation where unsecured creditors challenged a cash advance made by a sister corporation to the debtor, arguing that the transaction was, in fact, a capital infusion).[10]  In such a situation, however, form does not trump substance, and a court can "effectively ignore the label attached to the transaction at issue and instead recognize its true substance." *In re Hedged-Investments Assocs., Inc.*, 380 F.3d 1292, 1297 (10th Cir. 2004).[11]  In such a case, "funds advanced are no longer considered a loan which must be repaid . . . but are instead treated as a capital contribution." *Id.*

"A significant test for capital contribution is whether a disinterested lender would have made such loans at the same time." *In re Interstate Cigar Co.*, 182 B.R. at 679.  However, the "third party lender test need not stand alone; not less than eleven factors may be applied by a court to determine whether cash advances to a corporation are loans or capital investments." *Id.*  The factors are:

> (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of repayments; (v) the adequacy or inadequacy of capitalization; (vi) the identity of interest between the creditor and the stockholder; (vii) the security, if any for the advances; (viii) the corporation's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were subordinated to the claim of

---

[10] Although the instant case is not a bankruptcy proceeding, recharacterization case law is highly instructive inasmuch as the circumstances in which Belfonti and his entities seek to require "repayment" of alleged "loans" to AHE -- the entity that Belfonti once owned but lost control of because of his inability to fund AHE's *actual* debt to its *actual* lenders (Wachovia and Petra) -- is essentially the same as a claim by an affiliate of a bankrupt entity that the affiliate's capital contributions were really "loans."

[11] In opposing this motion, Defendants will no doubt harp on the fact that the alleged "loans" were carried on AHE's unaudited books as "long term liabilities" to BCP. Whatever *accounting* significance this may or may not have, it has no relevance to whether there actually exist any enforceable loan agreements.  The *label* given to the transactions in AHE's unaudited books is beside the point; what matters is what the undisputed facts concerning the *substance* of the transactions show them to be.

outside creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments.

*In re Ticketplanet.com*, 313 B.R. 46, 71-72 (Bankr. S.D.N.Y. 2004).

"While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else." *In re Adelphia Communication Corp.*, 2006 WL 687153, at *10 (Bankr. S.D.N.Y. Mar. 6, 2006).[12] A court's ultimate determination as to whether an advancement of funds was a capital contribution or a loan "is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)." *In re Submicron Sys. Corp.*, 432 F.3d 448, 456 (3rd Cir. 2006).

When the undisputed facts of the instant case are applied to these legal standards, each and every factor strongly indicates that the alleged "loans" were capital contributions. For one thing, there are no written loan agreements or any other type of signed writing memorializing the "terms" of the claimed "loans." (Belfonti Tr. at 77-78, 98-99, 114, 150). "The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *In re Autostyle Plastics, Inc.,* 269 F.3d 726, 750 (6th Cir. 2001).

Similarly, "[t]he absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans." *Id.* "[T]he absence of a set schedule of repayment of principal weighs in favor of equity . . . ." *Id.* Here, there is neither a fixed maturity date nor a set schedule of repayment. (Belfonti Tr. at 71, 95-96, 111, 131, 137-38).

---

[12] Of course, in this case, there were no "instruments" at all.

16

Yet another factor favoring recharacterization in this case is the absence of a fixed rate of interest and interest payments, which "is a strong indication that the advances were capital contributions rather than loans." *Autostyle*, 269 F.3d at 750. Belfonti's testimony with regard to whether any interest rate was applicable to the alleged "loans" varied from an admission that no interest was called for (Belfonti Tr. at 71-72, 96, 112, 122-23) to claims that various rates might apply. (*Id.* at 132-33, 160-61). In any event, there is no evidence that Belfonti's entities required AHE to make any interest payments and it is, at best, uncertain whether Belfonti had any requirement to pay interest in mind when he decided to move money from his entities to AHE in order to make, and then protect, his investment in AHE and the Hotel.

Critically, where "the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *Autostyle*, 269 F.3d at 751. Here, Belfonti testified that he did not expect AHE to repay the "loans" made by his "lender" entities until such time as AHE was able to meet both its operational needs and its obligations with respect to the Mortgage Loan from the cash flow generated by the operation of the Hotel, a sale of the Hotel or a third-party refinancing. (Belfonti Tr. at 72-76, 98, 113, 146-47). This makes clear that Belfonti's claimed "expectation of repayment" depended entirely on the success of AHE's business.

"The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans." *Autostyle*, 269 F.3d at 752. Here, there was no security pledged for any of the alleged "loans." (Belfonti Tr. at 72, 96, 112, 138).

Also indicative of a capital contribution is the fact "that no legitimate unrelated third party lender would have made the advances . . . ." *In re Interstate Cigar*, 182 B.R. at 679. As Belfonti made clear, "I don't think anyone would have lent monies unsecured, except related entities that I controlled." (Belfonti Tr. at 77).

"Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." *Autostyle*, 269 F.3d at 752. Although Belfonti testified that the alleged "loans" were either not subordinated to AHE's pre-existing loan obligations or that he did not know whether they were subordinated and would need to consult his attorneys to find out (Belfonti Tr. at 98, 112-13, 140-46), Belfonti also testified that it was AHE's priority to pay the Wachovia Mortgage Loan and the Petra Mezzanine Loan first. (*Id.* at 140).

"Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *Autostyle*, 269 F.3d at 752. With respect to BCP's alleged "loan" of $4,873,702.86, those funds were supposedly used entirely to buy AHE and the Hotel. (Belfonti Tr. at 88). And, with respect to the other "loans," each was made to prevent AHE from defaulting under the Mortgage Loan Agreement so that Belfonti could hold on to AHE and the Hotel. (*Id.* at 91-93; 106-08; 128-30, 146; Carpenter Tr. at 103-07; 137-38).

"The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." *Autostyle*, 269 F.3d at 753. Here, there is no evidence that any sort of fund was set aside to repay the alleged "loans."

In short, "there is no evidence of debt instruments or loan documentation to suggest a maturity date, payment schedule, or interest provision. No evidence has been offered that interest was ever paid for any of the funds advanced." *Interstate Cigar*, 182 B.R. at 679. "The compelling testimony and documentary evidence establish the cash advances as capital infusions to a financially bleeding organization." *Id.* at 681.

## III.  IN ANY CASE, THE ALLEGED "LOAN AGREEMENTS" ARE UNENFORCEABLE FOR LACK OF DEFINITENESS

Assuming that the alleged "loans" somehow fall outside the statute of frauds, and regardless of whether Connecticut or New York law applies, there are no enforceable loan agreements (which "agreements" would have been made between Belfonti and himself) between AHE and any of the

alleged "lenders." For there to be valid, enforceable loan agreements between AHE and the alleged "lenders," they must show that they reached specific agreements with AHE which were definite and certain as to their essential terms and requirements. There is no such proof because there were no such agreements.

It is hornbook contract law that in order to form a valid and binding contract, "there must be a mutual understanding of the terms that are definite and certain between the parties." *Palmieri v. Scaniffe*, 2008 WL 1971026, at *2 (Conn. Super. Ct. Apr. 23, 2008) (citing *Suffield Dev. Assoc. Ltd. P'ship v. Soc'y for Sav.*, 243 Conn. 832, 843 (1998)); *Gianascio v. Giordano*, 2003 WL 22999454, at *3 (S.D.N.Y. Dec. 19, 2003) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms"). "An agreement must be definite and certain as to its terms and requirements." *Palmieri*, 2008 WL 1971026, at *2; *see also Gianascio*, 2003 WL 22999454, at *3. "In other words, 'to prove the terms of an oral agreement our case law requires definite agreement on the essential terms of an enforceable agreement.'" *Kulick v. City of Hartford*, 2007 WL 4707809, at *2 (Conn. Super Ct. Dec. 10, 2007) (quoting *111 Whitney Ave., Inc. v. Comm'r of Mental Retardation*, 70 Conn. App. 692, 699 (2002)). "So long as any essential matters are left open for further consideration, the contract is not complete." *Palmieri*, 2008 WL 1971026, at *2; *see also Gainascio*, 2003 WL 22999454, at *3 ("A court cannot enforce an agreement unless it can determine what the parties have agreed to. Obviously if it cannot be ascertained what the agreement is, it cannot be determined whether a party has breached that agreement").

*Gianascio v. Giordano* is particularly instructive. In that case, the plaintiff attempted to collect on an outstanding $100,000 "loan" he allegedly made to defendants. 2003 WL 22999454, at *1. Defendants, however, contended that the $100,000 was not a loan but rather the initial installment of the plaintiff's promise to invest two million dollars toward the purchase of a brokerage firm. *Id.*

Deciding the issue on summary judgment, the court found unequivocally that "there [wa]s no mutual agreement as to the essential terms of a loan agreement because, as plaintiff acknowledges, there were never any terms." *Id.* at *3. "The loan period was not particularized, there was no schedule for payments, and an interest rate was not specified." *Id.* As such, the court found, "[t]he alleged agreement lacks the most fundamental element, a promise to do, or not do, a particular thing. No essential material terms, or any other terms for that matter, were ever agreed upon by the parties." *Id.* at *4 (internal quotes omitted). Thus, plaintiff's breach of contract claim was dismissed "as there was no meeting of the minds or objective manifestation of an agreement between the parties." *Id; see also Roulley v. Inex Co.*, 677 F.2d 14, 15 (2d Cir. 1982) (finding that both the "interest rate of the loan and the time of its maturity" are essential terms of a loan contract).

For each of the alleged "loans" at issue in this case, there is no evidence of a definite agreement as to the essential terms: there was no negotiation over any terms; there was no payment schedule, or even a maturity date as to when repayment was due; there was no definitive rate of interest; there was no security pledged for any of the alleged "loans"; and there was no clear understanding as to whether the alleged "loans" were subordinated to AHE's pre-existing loan obligations. It is no surprise, then, that there is no written agreement of any kind memorializing any of the alleged "loans" or their nonexistent "terms." (Belfonti Tr. at 77-78, 98-99, 114, 150).

Given all this, there is no question that, under either New York or Connecticut law, there were no loan agreements to be enforced by any "lender." *Palmieri*, 2008 WL 1971026, at *1-3 (finding that defendants were not "legally obligated" to return money and jewelry allegedly loaned to defendants where, *inter alia*, "defendant promised to repay the money, but there were no terms for the repayment regarding how much was to be repaid or over what period of time"); *Gianascio v. Giordano*, 2003 WL 22999454 at *3-4 (dismissing breach of contract claim on summary judgment where the alleged agreement had no set terms, including no schedule for payments and a specified interest rate). Further,

even accepting Defendants' version of events as true, Defendants' demand for the return of money allegedly loaned to AHE is, at best, premature and in contravention of Belfonti's purported agreement with himself that the alleged "loans" would not be "repaid" until such time as AHE was able to meet both its operational needs and its obligations with respect to the Mortgage Loan from the cash flow generated by the operation of the Hotel, or there was a sale of the Hotel or third-party refinancing. (Belfonti Tr. at 72-76, 98, 113, 123-124, 146-147, 162). There is no evidence that any of these things has occurred.

Moreover, that there could not have been any loan agreements is confirmed by the fact that AHE was prohibited under the Mortgage Loan Agreement from incurring the indebtedness that Defendants claim they caused AHE to incur. (Iacono Decl. Ex. A, § 3.124(d)). It is also confirmed by the fact that although AHE's Articles of Incorporation required approval of the alleged "loans" by AHE's Supervisory Board of Directors, (Iacono Decl. Ex. E, Articles 15(1)(h) and 15(1)(i); Friedman Tr. at 16-17, 24-25, 77-81), such approval was neither sought nor obtained with regard to any of the alleged "loans." (Belfonti Tr. at 78, 104, 116-117; Friedman Tr. at 70-72, 74-75). Of course, neither the Mortgage Loan Agreement nor AHE's Articles of Incorporation prohibited Belfonti and his entities from infusing capital into AHE for the purpose of investment. That is, unquestionably, what the transactions at issue in this case were.

## IV.   THE EVIDENCE CANNOT SUPPORT A FINDING OF UNJUST ENRICHMENT

Based on the discovery record, this Court should also find, as a matter of law, that AHE is under no obligation to "repay" the alleged "loans" under the equitable theory of unjust enrichment. Regardless of whether the law of Connecticut or New York applies, the standard is the same: "Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Paoletta v. Anchor Reef Club at Branford, LLC*, 2008 WL

256575, at *6 (Conn. Super. Ct. Jan. 11, 2008) (citing *Paulsen v. Kronberg*, 66 Conn. App. 876, 878 (2001)); *see also Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) ("To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that "equity and good conscience" require restitution"). "The word 'unjustly' as used in the equitable maxim that one shall not be allowed unjustly to enrich himself at another's expense means unlawfully." *Paoletta*, 2008 WL 256575, at *6. "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Id.*

The undisputed facts here preclude any claim by Defendants of unjust enrichment. First and foremost, it cannot be "unjust," much less "*unlawful*," for AHE to not have "reimbursed" Belfonti's entities for the sums at issue because, even according to Belfonti, Defendants understood and expected that there might not be any "repayment." Again, Belfonti admitted that his entities would not be "repaid" unless and until his investment in AHE panned out (whether it be through generating sufficient cash from AHE's operations, a sale or third-party financing). (Belfonti Tr. at 72-76, 98, 113, 146-47).

Moreover, there is no evidence that AHE was in any way "enriched" by the sums at issue. Rather, the lone beneficiary of the transactions was Belfonti. According to Belfonti, BCP's alleged "loan" of $4,873,702.86 allowed him to purchase AHE and the Hotel. (Belfonti Tr. at 88). The other two BCP "loans" were used to satisfy AHE's monthly payment obligation under the Mortgage Loan. (Carpenter Tr. at 103-107, 109-110; Belfonti Tr. at 106-108). As Belfonti admitted in his deposition, the only beneficiary of those payments was him. (Belfonti Tr. 108-109; *see also* Belfonti Tr. at 211-212, Carpenter Tr. at 105-107). Likewise, the alleged "loan" made by Belfonti Holdings in the amount of $499,950 had the effect of avoiding a default by AHE under the Mortgage Loan Agreement which,

in turn, allowed Belfonti to hang on to AHE and the Hotel. (Iacono Ex. D, Articles 5.5, 5.5.1, 16.1(a);

Belfonti Tr. at 92; Iacono Ex. A, § 10.1(a)(xvi)).

Finally, it cannot be said that Defendants have suffered any detriment by virtue of AHE's

"failure" to "repay" the alleged "loans" because, according to Belfonti, that possibility (*i.e.*, that the

alleged "loans" would not be "repaid" until Belfonti's investment in AHE was successful) was

expected by him and his "lender" entities from the very beginning.

## V.    A PERMANENT INJUNCTION IS WARRANTED AND NECESSARY

Because summary judgment is appropriate here, this Court should also issue a permanent

injunction prohibiting Defendants from attempting to obtain repayment of the alleged "loans" at issue,

through litigation in another forum or otherwise, so as to protect the integrity of this Court's judgment.

This is not an idle concern, as the U.S.-based Defendants are continuing to press their "loan" claims in

a foreign jurisdiction. (Mervis Decl. Exs. G - J).

In determining whether to enjoin parties from proceeding with a suit in a foreign jurisdiction,

the Court must first determine whether the parties are the same in both suits and also "whether the

resolution of the case before the enjoining court would be dispositive of the enjoined action." *Farrell*

*Lines v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 129 (S.D.N.Y. 1997). If these two threshold

requirements are met, the court can then determine whether an injunction is appropriate. In the Second

Circuit, "an injunction may issue only where . . . the foreign proceeding presents a threat to the public

policy or to the jurisdiction of the enjoining forum . . . ." *Id.* at 130 (citing *China Trade & Dev. Corp.*

*v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987)). However, this standard is relaxed considerably

when the injunction is requested after a previous judgment on the merits. *Id.* at 131; *see also Laker*

*Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927-28 (1984). This is because

"[c]ourts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to

provide full justice to litigants. Thus, when the action of a litigant in another forum threatens to

23

paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceedings." *Laker Airways*, 731 F.2d at 927. "When the injunction is requested after a previous judgment on the merits, there is little interference with the rule favoring parallel proceedings in matters subject to concurrent jurisdiction. Thus, a court may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation." *Id.* at 928.

Here, "the two threshold requirements [are] met, since in both actions the parties and the issues of liability are the same." *China Trade*, 837 F.2d at 35. AHE and each of the "lender" Defendants -- BCP and Belfonti Holdings -- are parties to both this action and the action proceeding in Aruba. (Mervis Decl. Exs. G - J). Further, a finding by this Court that the alleged "loans" are not enforceable as loans or under any other theory would certainly be dispositive of the Aruba action -- BCP and Belfonti Holdings are seeking to enforce the very "loans" there that AHE is seeking here to have declared unenforceable here and, as U.S. businesses controlled by a U.S. citizen, they can be expected to obey an injunction of this Court and discontinue their foreign litigation. *See, e.g.*, *Farrell Lines*, 32 F. Supp. 2d at 130 (finding that resolution of the domestic action was dispositive of the foreign action as both actions concerned the same underlying issue of liability for damage to cargo). As such, since summary judgment on the merits is appropriate here, so too is an injunction to ensure the validity and integrity of this Court's judgment. *Farrell Lines*, 32 F. Supp. 2d at 131 (enjoining defendants from proceeding with a suit in Italy after granting plaintiff's request for partial summary judgment in action in this Court).

## CONCLUSION

For all of the foregoing reasons, AHE respectfully submits that this Court should grant summary judgment to AHE and enter a permanent injunction restraining Defendants from attempting to enforce the alleged "loans" at issue in this case under any theory of liability in any forum.

Dated: New York, New York
      July 25, 2008

                PROSKAUER ROSE LLP


                By:                   
                    Richard M. Goldstein
                    Michael T. Mervis
                    Eric H. Blinderman
                    Patrick J. Dempsey
              1585 Broadway
              New York, New York  10036
              (212) 969-3000

              *Attorneys for Plaintiff Aruba Hotel Enterprises N.V.*