UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
ARUBA HOTEL ENTERPRISES N.V.,          :
                                       :
                    Plaintiff,         :
                                       :   3:07 Civ. 07564 (PAC)
          v.                           :
                                       :   ECF FILING
MICHAEL BELFONTI, BELFONTI HOLDINGS    :
LLC, and BELFONTI CAPITAL PARTNERS,    :
LLC,                                   :
                                       :
                    Defendants.        :
------------------------------------X

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO L.CIV.R. 56.1

In accordance with Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, plaintiff Aruba Hotel Enterprises N.V. ("AHE") respectfully submits this statement of material facts as to which there is no genuine issue to be tried with respect to the claims asserted in AHE's Second Amended Complaint.

**Belfonti's Purchase of AHE and the Hotel**

1.  In May 2006, defendant Michael Belfonti ("Belfonti") became the beneficial owner and control person of AHE. (Declaration of Michael T. Mervis ("Mervis Decl.," submitted herewith) Ex. A, Response to Interrogatory 10; Belfonti Tr. at 11-12).[1] AHE's principal asset was, and is, a resort hotel located on the island of Aruba (the "Hotel"). (Belfonti Tr. at 13-14; Declaration of Joseph Iacono ("Iacono Decl.," submitted herewith) at ¶2).

---

[1] Cited pages from the transcript of the deposition of Michael Belfonti, taken on April 29, 2008, are annexed to the Mervis Decl. as Exhibit C. The parties have agreed that deposition testimony taken in the companion action pending in the United States District Court for the District of Connecticut, No. 3:07 Civ. 01297 (JCH), can also be used in this action.

2.  To finance this transaction, Belfonti arranged for two loans. The first loan (the "Mortgage Loan") was made to AHE by WIBC Aruba N.V. ("WIBC") (an affiliate of Wachovia Bank, National Association ("Wachovia")) in the amount of $230,000,000.00. (Iacono Decl., ¶2; Belfonti Tr. at 10-15). The terms of the Mortgage Loan were memorialized in a loan agreement between AHE and WIBC, dated May 3, 2006 (the "Mortgage Loan Agreement"). (Iacono Decl. at ¶2 and Ex. A thereto).

3.  The second loan (the "Mezzanine Loan") was made by Petra Mortgage Capital Corp. LLC ("Petra Mortgage") to a Belfonti-controlled entity called BCP Florin, LLC ("BCP Florin") in the amount of $19,450,000.00. (Iacono Decl. ¶3; Belfonti Tr. at 15-17). The terms of the Mezzanine Loan were memorialized in a loan and security agreement executed on or about June 9, 2006 (the "Mezzanine Loan Agreement").[2] (Iacono Decl. ¶3 and Ex. B thereto; Belfonti Tr. at 15-17). Belfonti signed both the Mortgage Loan Agreement and the Mezzanine Loan Agreement on behalf of the borrowers. (Iacono Decl. Exs. A and B thereto; Belfonti Tr. at 10-11).

4.  The Mezzanine Loan was secured by a first priority security interest in one hundred percent of the issued and outstanding equity of Twilight Holdings, LLC ("Twilight"). (*Id.* ¶4 and Ex. B thereto, § 2.02(kk)). Twilight -- a Delaware limited liability company that was, at the time, majority beneficially owned by Belfonti -- was an indirect subsidiary of BCP Florin. (Mervis Decl. Ex. A, Response to Interrogatory 6; Iacono Decl. ¶4). At the time the Mezzanine

---

[2] Petra Mortgage subsequently assigned its rights under the Mezzanine Loan Agreement to Petra Fund REIT Corp. ("Petra REIT"). (Iacono Decl. ¶3). Petra Mortgage and Petra REIT will hereinafter be referred to, individually and collectively, as "Petra."

Loan was made, AHE was an indirect subsidiary of BCP Florin and Twilight. (Iacono Decl. ¶4; Belfonti Tr. at 17).

5.  Under Section 3.1.24(d) of the Mortgage Loan Agreement, AHE was not permitted to incur indebtedness of the type alleged by Defendants to have been created by AHE to them. (Iacono Decl. Ex. A, § 3.124(d)). A breach of Section 3.1.24(d) of the Mortgage Loan Agreement gives rise to a default under the Mortgage Loan Agreement for which there is no right to cure. (*Id.* at § 10.1(a)(xii)). One of the lender's remedies upon such a default is to foreclose on the Hotel. (*Id.* at § 10.2(a)).

**Belfonti's Defaults**

6.  In April 2007, AHE defaulted on the Mortgage Loan and BCP Florin defaulted on the Mezzanine Loan. (Iacono Decl. ¶5; Belfonti Tr. at 21-22). Thereafter, Petra voluntarily cured the default on the Mortgage Loan, foreclosed on its security interest in Twilight under the Mezzanine Loan and, in consequence, became the beneficial owner of Twilight's indirect subsidiary, AHE. (Iacono Decl. ¶5).

7.  On August 21, 2007, AHE received a letter from attorney Johan P. Sjiem Fat of Sjiem Fat & Kuster in Aruba. This letter -- which was sent on behalf of defendant Belfonti Holdings, LLC ("Belfonti Holdings"), defendant Belfonti Capital Partners, LLC ("BCP"), MCR Property Management Inc. ("MCR") and CEB Irrevocable Trust ("CEB") -- claimed that all four of these entities made purported loans to AHE during the time that Belfonti was the controlling principal of AHE. (*Id.* ¶6 and Ex. C thereto). The letter demanded payment of the purported loans by August 24, 2007 at 12:00 noon. (*Id.*). This letter was the first time that

any demand was made on AHE by any of these entities for repayment of the purported loans. (Iacono Decl. ¶6; Belfonti Tr. at 60-63).

**The Alleged "Lenders"**

8.  **BCP:** Belfonti is "the beneficial owner of 100 percent of the limited liability company interests of BCP." (Mervis Decl. Ex. A, Response to Interrogatory No. 2). Belfonti is and has always been the ultimate decision-maker for BCP. (Belfonti Tr. at 53).

9.  **Belfonti Holdings:** Belfonti is and has always been "the beneficial owner of 100% of [Belfonti Holdings'] limited liability company interests . . . ." (Mervis Decl. Ex. A, Response to Interrogatory 3). Belfonti has the ultimate decision-making authority for Belfonti Holdings. (Belfonti Tr. at 45).

10. Although Belfonti has a "satellite" office in New York City, all of his businesses are run out of Connecticut, and all of the employees in New York were paid by MCR, which is located in Hamden, Connecticut. (*Id.* at 24, 36, 38-39, 43). Belfonti sometimes held AHE out as a Connecticut-based business. (Carpenter Tr. at 170-171).[3] Belfonti himself works in Hamden, Connecticut. (Belfonti Tr. at 21).

**The Alleged "Loans"**

11. BCP alleges that it made a loan to AHE in the amount of $4,873,702.86. (Iacono Decl. Ex. C). This sum is comprised entirely of money that Belfonti spent to buy AHE and the Hotel. (Belfonti Tr. at 88). Of this sum, $1.5 million originated from MCR (another entity that Belfonti controls) (*id.* at 25-31) and $2 million originated from a line of credit with

---

[3] Cited pages from the transcript of the deposition of Victoria Carpenter, taken on May 27, 2008, are annexed to the Mervis Decl. as Exhibit E. Ms. Carpenter is and was during the relevant time period the Controller for Belfonti's various entities. (Carpenter Tr. at 17, 54, 87).

4

First County Bank in Stamford, Connecticut belonging to another Belfonti entity, MAB Investments LLC ("MAB"). (Carpenter Tr. at 84-86; Mervis Decl. Ex. D). Both MCR and MAB are located in Connecticut. (Carpenter Tr. at 84-86). Defendants have produced no evidence as to the source of the funds for the balance of this alleged loan; there is no evidence that any funds were actually provided by BCP or to whom they were actually paid (if at all).

12. BCP also alleges that it made a loan to AHE in the amount of $393,000. (Iacono Decl. Ex. C). This sum was paid directly to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan. (Carpenter Tr. at 103-107, 109-110; Belfonti Tr. at 106-108). The only beneficiary of this transaction (and of any of the sums allegedly loaned by Belfonti's entities to AHE and used to make payments on the Mortgage Loan) was Belfonti: failure to pay Wachovia would not have caused the hotel to stop operating or AHE to go out of business, but it would have caused Belfonti to lose his equity interest in AHE. (Belfonti Tr. 108-109; *see also* Belfonti Tr. at 211-212, Carpenter Tr. at 105-107).

13. BCP also alleges that it made a third purported loan to AHE in the amount of $548,250. (Iacono Decl. Ex. C). This sum was originally claimed by Belfonti to have been a loan by his mother's trust, CEB, to AHE. (Iacono Decl. ¶6 and Ex. C). Following the deposition testimony of the trustee that CEB had never made a loan to AHE (Friedman Tr. at 34, 36, 38),[4] Belfonti asserted that BCP was actually the purported lender. (Mervis Decl. Ex. I). The money was paid from the bank account of Belfonti's Connecticut attorneys directly to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan.

---

[4] Cited pages from the transcript of the deposition of Dana Eric Friedman, taken on April 17, 2008, are annexed to the Mervis Decl. as Exhibit F. Friedman has been Belfonti's long-time attorney and, like Belfonti, was a member of AHE's Supervisory Board of Directors while Belfonti was in control of AHE. (Freidman Tr. at 16-20, 25).

5

(Carpenter Tr. at 137-138; Belfonti Tr. at 128-130, 146). This allowed Belfonti to continue to own AHE (and, thus, the Hotel). (Belfonti Tr. at 167-168).

14. Belfonti Holdings alleges that it made a loan to AHE in the amount of $499,950. According to Belfonti, this sum was used by AHE to make a payment to the company that Belfonti had contracted with to manage the Hotel, Westin Aruba Hotel Management LLC ("Westin"). (Belfonti Tr. at 91-93). According to the Operating Agreement entered into between AHE and Westin and signed by Belfonti on behalf of AHE (Iacono Decl., Ex. D), AHE was required to provide to Westin the "financial and other resources" necessary to permit the Hotel to be operated in accordance with Westin's standards. (*Id.*, § 5.5). This included the "initial working capital required for the commencement of Operations at the Hotel . . .", which was anticipated to be $500,000. (*Id.*, Article 5.5.1 and p. A-3; Belfonti Tr. at 92). Failure to pay these fees could ultimately result in a default under the Operating Agreement. (Iacono Decl., Ex. D, Article 16.1(a) (listing as an event of default "[a] failure by either Party to pay any amount of money to the other Party when due and payable under this Agreement")).

15. According to § 10.1(a)(xvi) of the Mortgage Loan Agreement, a default under the Operating Agreement constitutes an event of default under the Mortgage Loan Agreement (which, as discussed *supra*, allows the lender to foreclose on AHE's principal asset, the Hotel). (Iacono Decl. Ex. A at § 10.1(a)(xvi)). Thus, by causing Belfonti Holdings to make this alleged loan, Belfonti was able to retain control over the Hotel.

**The "Terms" of the Alleged "Loans"**

16. With respect to each of the alleged loans, Belfonti was the one who decided on behalf of the alleged lender to make the loan *and* the one who "agreed" on behalf of

AHE to "accept" the alleged loan. (Belfonti Tr. at 70-71, 95, 110-111, 130). There were no negotiations regarding the terms of any of the alleged loans. (*Id.* at 71, 95, 111, 131). There is no writing signed by any representative of the alleged lender or AHE which memorializes any of the alleged loans. (*Id.* at 77-78, 98-99, 114, 150). Neither the alleged lenders nor AHE were represented by counsel in connection with any of the alleged loans. (*Id.* at 90, 104, 114, 118, 150-151).

17.   There is no maturity date or payment schedule for any of the alleged loans. (*Id.* at 71, 95-96, 111, 131, 137-138). With respect to interest, Belfonti testified variously that no interest had to be paid by AHE (*id.* at 71-72, 96, 112); that interest would be paid at the rate of 12% (since, according to Belfonti, that is the rate he typically applies in the case of purported loans between his various entities) (*id.* at 132-133); and that an interest rate of 8 to 9% (or "something like that") would be applied "because of the international nature of the transaction." (*Id.* at 160-161). Regardless, interest was not something that Belfonti thought about when he decided to approve each loan. (*Id.* at 161).

18.   There was no security pledged for any of the alleged loans. (*Id.* at 72, 96, 112, 138). With one exception, AHE (acting through Belfonti) did not seek financing from any other source. (*Id.* at 76-77, 98, 113-114, 147-150). Belfonti testified that the alleged loans were either not subordinated to AHE's pre-existing loan obligations or that he did not know whether they were subordinated and would need to consult his attorneys for an answer. (*Id.* at 98, 112-113, 140-146).

19.   According to Belfonti, he did not expect AHE to repay the alleged loans made by his alleged lender entities until such time as AHE was able to meet both its operational

7

needs and its obligations with respect to the Mortgage Loan from the cash flow generated by the operation of the Hotel, a sale of the Hotel or third-party refinancing. (*Id.* at 72-76, 98, 113, 146-147; *see also* Carpenter Tr. at 185-187). There is no evidence that any of these scenarios have come to pass.

20. The alleged loan transactions at issue are consistent with Belfonti's practice of moving money between his various entities in order to fund his various investments. When a Belfonti entity needs money and another entity has money, the entity that has the money lends the money to the entity that needs the money. (Carpenter Tr. at 73-74).

**AHE's Articles of Incorporation**

21. AHE's Articles of Incorporation during the relevant time period prohibited AHE from incurring indebtedness without the approval of AHE's Board of Supervisory Directors. (*See* Iacono Decl. Ex. E, Articles 15(1)(h) and 15(1)(i); Friedman Tr. at 16-17, 24-25, 77-81). None of the alleged loans was presented to or approved by AHE's Supervisory Board. (Belfonti Tr. at 78, 104, 116-117; Friedman Tr. at 70-72, 74-75).

Dated: New York, New York
       July 25, 2008

                              PROSKAUER ROSE LLP

                              By: /s/ Richard M. Goldstein
                                  Richard M. Goldstein
                                  Michael T. Mervis
                                  Eric H. Blinderman
                                  Patrick J. Dempsey
                              1585 Broadway
                              New York, New York  10036
                              (212) 969-3000

                              *Attorneys for Plaintiff Aruba Hotel Enterprises N.V.*