UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARUBA HOTEL ENTERPRISES N.V.,

                                    Plaintiff

              vs.

MICHAEL BELFONTI, BELFONTI                    07 Civ. 7564 (PAC)
HOLDINGS, LLC, AND BELFONTI
CAPITAL PARTNERS, LLC,
                                              **ORAL ARGUMENT REQUESTED**
                            Defendants

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT DENYING AHE'S REQUEST FOR A
PERMANENT INJUNCTION**

KOBRE & KIM LLP

800 Third Avenue
New York, New York  10022
Tel: 212.488.1200
Fax: 212.488.1220

*Counsel for Michael Belfonti, Belfonti
Holdings, LLC, and Belfonti Capital
Partners, LLC.*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................... iv

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF RELEVANT FACTS ................................................... 2

I.      Michael Belfonti's And The Hochfelder Family's Purchase Of AHE .................. 2

II.     The Transactions At Issue In This Litigation And The Parallel Actions Ongoing In The Connecticut District Court And The Courts Of Aruba ................ 3

      A.     The $4.8 Million Loan By BCP (At Issue In This Litigation) ............... 3

      B.     The $499,950 Loan By Belfonti Holdings (At Issue In This Litigation) ....................................................................... 4

      C.     The $393,000 Loan By BCP (At Issue In This Litigation) .................... 5

      D.     The $548,250 Loan By BCP (At Issue In This Litigation) .................... 5

      E.     The MCR Loans At Issue In The District Of Connecticut Action ......... 6

      F.     The Loans At Issue Benefited AHE ....................................... 7

III.    Petra Forecloses On AHE And Takes Over Ownership Of The Hotel .................. 7

      A.     Defendants Demand Repayment And File Suit After AHE's Refusal ....................................................................... 8

      B.     AHE's Flip-Flop Regarding The Alleged Loans ................................. 8

IV.     AHE's Claims Of Irreparable Harm And Its Deception Regarding Wachovia ...................................................................... 9

ARGUMENT .......................................................................................12

I.      AHE'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE ARE MATERIAL DISPUTES OF FACT THAT MUST BE RESOLVED AT TRIAL ......................................... 12

      A.     There Is A Disputed Issue Of Material Fact As To Whether The Transactions At Issue Were Intended To Be Debt Or Equity .............. 12

1.    The Financial Documents Evidencing The Transfers, Including AHE's Own Records, Refer To Them As Liabilities .................................................................................. 14

2.    The Defendants Did Not Receive Additional Equity As A Result Of The Transactions At Issue .......................................... 14

3.    At The Time Many Of The Loans Were Made, Mr. Belfonti Was Aware That There Was A Realistic Possibility That He Would Lose Control Of AHE ..................... 16

B.    There Is A Material Issue Of Disputed Fact As To Whether Defendants Are Entitled To Recover Under A Theory Of Unjust Enrichment .......................................................................................... 16

II.    AHE'S MOTION FOR SUMMARY JUDGMENT MUST FAIL BECAUSE UNDER CONNECTICUT LAW LOANS THAT HAVE ALREADY BEEN PAID FALL OUTSIDE THE STATUTE OF FRAUDS .......................................................................................... 17

III.    DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S REQUEST FOR AN ANTI-FOREIGN SUIT INJUNCTION ................................................ 19

A.    Summary Judgment Should Be Granted Against AHE Because There Is No Threat Of Irreparable Harm To AHE .............................. 20

B.    Partial Summary Judgment Should Also Be Granted Against AHE Because It Cannot Meet The China Trade Requirements For Such Relief ....................................................................................... 20

1.    AHE Does Not Satisfy The Threshold Requirements For An Anti-Foreign Suit Injunction ................................................. 21

2.    The Balancing Of The Equities Weighs In Favor Of Defendants In Light Of AHE's Significant Misrepresentation To The Court ................................................. 22

3.    AHE Does Not Satisfy The Other China Trade Factors For An Anti-Foreign Suit Injunction .......................................... 22

IV.    AHE's Motion For Summary Judgment Must Also Be Denied Because Discovery Has Not Concluded .............................................................. 23

CONCLUSION .................................................................................................... 25

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) .......................................................... 12

*American Home Assurance Corp. v. Ins. Corp. of Ireland*, 603 F.Supp. 636
(S.D.N.Y. 1984)......................................................................................................... 21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................................... 12

*Bacchiocchi v. Altschuler*, No. CV-064018253S, 2008 WL 901847 (Conn.Super.
Mar. 14, 2008) ......................................................................................................... 19

*Byerlite Corp. v. Williams*, 286 F.2d 285 (6th Cir. 1960)........................................ 13, 14

*China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987).............. 20, 22, 23

*Energy Capital Co. v. Caribbean Trading & Fidelity Corp.*, No. 93 Civ 8100, 1996
WL 157498, (S.D.N.Y. Apr. 4, 1996) ..................................................................... 20

*Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F.Supp. 2d 130 (S.D.N.Y.,
1997)......................................................................................................................... 22

*Garpeg, Ltd. v. United States*, 583 F. Supp. 789 (S.D.N.Y. 1984)............................... 20

*George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554
F.2d 551 (2d Cir. 1977) ........................................................................................... 24

*Hellstrom v. United States Dep't of Veterans. Affairs*, 201 F.3d 94 (2d Cir. 2000) ..................... 24

*In re Adelphia Comm. Corp.*, Bankruptcy No. 02-41729, 2006 WL 687153 (Bankr.
S.D.N.Y. 2006)..................................................................................................... 13, 14

*In re Autostyle Plastics, Inc.*, 269 F.3d 750 (6th Cir. 2001) ................................... 14, 16

*In re Hedged-Investments Assoc., Inc.*, 380 F.3d 1299 (10th Cir. 2004)....................... 14

*In re Interstate Cigar Co.,* 182 B.R. 679 (Bankr. E.D.N.Y. 1995)................................. 13

*In re SubMicron Sys. Corp.,* 432 F.3d 457 (3d Cir. 2006)............................................ 13

*Markley v. Lewis*, No. CV-044000119S, 2006 WL 240499 (Conn.Super. Jan. 6, 2006)................................................................................................................. 18, 19

*Meloff v. New York Life Ins. Co.*, 51 F.3d 372 (2d Cir. 1995)....................................... 24

*National Trust Co. v. American Home Assur. Co.*, No. 86 Civ. 1406, 1987 WL 5837, (S.D.N.Y. Jan. 22, 1987) ........................................................................................ 20

*New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989) ............ 20

*Patterson v. County of Oneida*, 375 F.3d 206 (2d Cir. 2004)....................................... 12

*Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999) ................................................... 20

*Sarfaty v. PNN Enters., Inc.*, No. CV-020280255, 2007 WL 2317843 (Conn.Super. Jul. 24, 2007) ......................................................................................... 16, 17, 18, 19

*Sutera v. Schering Corp.*, 73 F.3d 13 (2d Cir. 1995)................................................... 24

## **Statutes**

*Conn. Gen. Stat.* 52-550(a)(6)...................................................................................... 18

## **Rules**

Fed.R.Civ.P. 56(c) ........................................................................................................ 12

Fed.R.Civ.P. 56(f)......................................................................................................... 23

Fed.R.Evid. 408 ........................................................................................................... 17

## PRELIMINARY STATEMENT

This case turns on the contemporaneous intent of the parties regarding transactions consummated in 2006 and 2007.  When Defendant Michael Belfonti was *one of several* beneficial owners of AHE (the Aruban hotel that is at the center of this dispute), Defendants transferred funds from their own bank accounts to pay AHE's obligations.   Defendants contend that these were intended as loans that AHE would have to repay; AHE contends in this lawsuit that they were intended as "capital contributions" (since Mr. Belfonti had an ownership interest in AHE at the time) which do not have to be repaid.

The evidence developed to date demonstrates that there are good reasons to credit Defendants' claims and that, in any event, there are issues of fact that render AHE's request for summary judgment inappropriate.  For example: (1) the documentary evidence shows that the transactions at issue were contemporaneously recorded on AHE's ledgers by AHE officers (who are the very personnel bringing this declaratory judgment action) as **liabilities** due to the Defendants; (2) Defendants' witnesses that have been deposed have all corroborated Defendants' claim that the transactions were intended to be loans, *ab initio*, and  (3) documentary evidence and deposition testimony demonstrate that AHE only began to claim the transactions were intended as capital contributions, not loans, **after** Petra took over ownership of AHE.[1]

Partial summary judgment should be entered *against* AHE, however, on its request for an injunction precluding Defendants from prosecuting their *contemporaneously filed* Aruban action regarding the transactions. AHE originally justified its request for injunction by arguing that if the Defendants were to prevail in convincing a court in Aruba that the transactions at issue in this case

---

[1] As explained below, Defendants have not yet been able to depose Petra Capital Management, LLC's ("Petra") Principals Kenneth Kornblau and Joseph Iacono, or AHE's Accountant/Controller Alcira Croes.  Petra is the entity that has owned and controlled AHE since April 2007.  The testimony of these witnesses will be critical to supporting Defendants' contentions that the transactions at issue were loans *ab initio* and that Petra/AHE's recent claims to the contrary are the result of improper litigation tactics that weigh against AHE's request for injunctive relief.

are loans, such a finding would constitute "serious, irreparable harm" because it would cause AHE's default of an agreement with its lender, Wachovia Bank, and would allow Wachovia to foreclose on it.  Based on this claimed danger of foreclosure, AHE had asked this Court to issue a "preliminary and permanent injunction enjoining the Defendants from attempting to obtain repayment of the monies allegedly advanced to AHE, by pursuing litigation in another forum or otherwise."  (Second Amended Complaint ("SAC") at 9).  Defendants designed their defense to focus on this argument and spent significant resources in discovery and other legal work to address this argument.  (*See* Affidavit of Francisco J. Navarro, ¶ 38) ("Navarro Aff.").

What AHE neglected to tell the Court until August 19, 2008 (and, as explained below, only after attempting to evade the matter) is that, ***three days before*** it filed its Second Amended Complaint with the Court, it entered into a secret side-agreement with Wachovia that prevents Wachovia from foreclosing on it even if these transactions are declared by a court to be loans.  In other words, AHE's Second Amended Complaint asserted a threat of irreparable harm (to get the requested injunction) even though it knew that no such threat actually existed.  And even knowing that its complaint was false on this point, AHE filed the instant summary judgment motion requesting an injunction based on factual assertions that were simply untrue.  Given that AHE will not suffer irreparable harm if the transactions are to be declared to be loans by the Aruban courts, we respectfully submit that Defendants are entitled to a ruling that AHE is not entitled to the injunctive relief they seek as a matter of law.

<u>STATEMENT OF RELEVANT FACTS</u>

I.     **Michael Belfonti's And The Hochfelder Family's Purchase Of AHE**

On or about May 3, 2006, Michael Belfonti and his then-business partners, certain members of the Hochfelder Family, closed on their purchase of AHE, the Aruban entity that owns what is now known as the Westin Aruba Resort (the "Westin Aruba" or the "Hotel").  (Navarro Aff. Ex. A

at 32). Mr. Belfonti ultimately became the beneficial owner of 75% of the Hotel and the Hochfelder Family became owner of the remaining 25%. *Id.* at 33. In order to finance their investment, Mr. Belfonti and the Hochfelder Family arranged for two loans. The first loan was made to AHE by Wachovia in the amount of $230,000,000 (the "Mortgage Loan"). (Iacono Decl. ¶2; Belfonti Tr. at 10-15).[2] The terms of the Mortgage Loan were memorialized in a loan agreement dated May 3, 2006. (Iacono Decl., Ex. A). The second loan was made by Petra Mortgage Capital Corp. LLC to BCP Florin, LLC, AHE's parent entity, in the amount of $19,450,000 (the "Mezzanine Loan"). (Iacono Decl. ¶3; Belfonti Tr. at 15-17). The terms of the Mezzanine Loan were memorialized in an agreement dated June 9, 2006. (Iacono Decl., Ex. B).

## II.     The Transactions At Issue In This Litigation And The Parallel Actions Ongoing In The Connecticut District Court And The Courts Of Aruba

During the period of time that Mr. Belfonti and the Hochfelder Family owned the Hotel, AHE received the benefit of funds from other companies with whom Mr. Belfonti (or his family) is affiliated. These transfers of funds are what Defendants contend are loans and Plaintiff contends are capital contributions. Four of these transfers are at issue in this litigation, while two are at issue in parallel ongoing litigation in the United States District Court for the District of Connecticut (the "Connecticut Action"). All are at issue in the Aruban litigation.

### A. The $4.8 Million Loan By BCP (At Issue In This Litigation)

In early May 2006, AHE needed cash to pay the closing costs associated with its sale, including lawyers' fees, accounting fees, tax opinions, and appraisals. (Belfonti Tr. at 70-71, 83; Carpenter Tr. at 71).[3] Having already borrowed $250,000,000 to finance the purchase of the Hotel,

---

[2] Cited pages from the transcript of the deposition of Michael Belfonti, taken on April 29, 2008, are annexed to the Navarro Aff. as Exhibit B. The parties have agreed that deposition testimony taken in the Connecticut Action can also be used in this action.

[3] Cited pages from the transcript of the deposition of Victoria Carpenter, taken on May 27, 2008, are annexed to the Navarro Aff. as Exhibit C.

AHE decided to borrow the necessary funds from Belfonti Capital Partners, LLC ("BCP"). (Belfonti Tr. at 71). Specifically, on or about May 3, 2006, AHE borrowed $4,873,702.86 from BCP to pay the closing-related expenses. (Belfonti Tr. at 70-71, 83; Carpenter Tr. at 74). Both Michael Belfonti and Defendants' Controller, Victoria Carpenter, testified that this transaction was *intended at the time it was made to be a loan that would be repaid*. (Belfonti Tr. at 71-73; Carpenter Tr. at 80-81). At the time the loan was made, an entry in the exact amount of $4,873,702.86 was entered at the direction of AHE's CEO and Managing Director, Marieta Ras (the same person who is the CEO of AHE today, and who authorized the pursuit of the instant action), on AHE's financial records as a "long-term liabilit[y]" due to BCP. (Navarro Aff., Ex. D; Ras Tr. at 175).[4] Contemporaneously, the $4,873,702.86 was recorded as "intercompany loans" on the financial records of the Belfonti related companies. (Carpenter Tr. at 60).

### B. The $499,950 Loan By Belfonti Holdings (At Issue In This Litigation)

In July 2006, AHE found itself again short of the cash necessary to meet its working capital requirements. Specifically, AHE was contractually required pursuant to its agreement with Westin Aruba Hotel Management, LLC to contribute $500,000 of working capital. (Iacono Decl., Ex. D; Belfonti Tr. at 91-93). On or about July 25, 2006, AHE borrowed approximately $499,950.00 from Belfonti Holdings.[5] (Belfonti Tr. at 95).

Both Michael Belfonti and Defendants' Controller, Victoria Carpenter testified that the July 25, 2006, transaction was *intended at the time it was made to be a loan that would be repaid*. (*Id.* at 157-159). At the time the loan was made, an entry in the exact amount of $499,950 was entered

---

[4] Cited pages from the transcript of the deposition of Marieta Ras, taken on July 22, 2008, are annexed to the Navarro Aff. as Exhibit E.

[5] The $50 difference is the result of wiring fees incurred by Belfonti Holdings. Belfonti Holdings is an investment company that is 80% controlled by the Bravo Property Trust, which is a Connecticut Trust that was established by various members of the Belfonti Family. (Navarro Aff., Ex. F at 8). Michael Belfonti is the ultimate beneficiary of the Bravo Property Trust. (Navarro Aff., Ex. G at 1). The remaining 20% interest in Belfonti Holdings is owned by Michael Belfonti in his individual capacity. (See Navarro Aff. Ex. F at 8).

at the direction of Ms. Ras on AHE's financial records as a "long-term liabilit[y]." (Navarro Aff., Ex. D; Ras Tr. at 205). A mirror image entry was made on the financial records of Belfonti Holdings showing a loan to AHE for $499,950. (Navarro Aff., Ex. H; Carpenter Tr. at 94-97). ***Notably, Belfonti Holdings did not receive any additional capital or equity in AHE in return for the monies.*** (Belfonti Tr. at 89; Ras Tr. at 219). That is, even after this loan, Michael Belfonti (indirectly through Belfonti Holdings) remained a 75% beneficial owner of AHE and the Hochfelder Family remained a 25% beneficial owner of AHE.

### C. The $393,000 Loan By BCP (At Issue In This Litigation)

In December 2006, AHE was short of funds sufficient to meet its monthly payment obligation under the Mortgage Loan. (Carpenter Tr. at 103-104; Belfonti Tr. at 106-108). Accordingly, on or about December 8, 2006, AHE borrowed approximately $393,000 from BCP. (Belfonti Tr. at 110-111). Both Michael Belfonti and Defendants' Controller, Victoria Carpenter, testified that the transaction was ***intended at the time it was made to be a loan that would be repaid***. (Belfonti Tr. at 110-11, 157-159; Carpenter Tr. at 111). At the time the loan was made, an entry in the exact amount of $393,000 was entered at the direction of Ms. Ras on AHE's financial records as a "long-term liabilit[y] due to BCP." (Navarro Aff. Ex. D; Ras Tr. at 222). A mirror image entry was made on the financial records of BCP showing a loan in the exact amount of $393,000.00 to AHE. (Navarro Aff., Ex. I; Carpenter Tr. at 113-114).

### D. The $548,250 Loan By BCP (At Issue In This Litigation)

In January 2007, AHE was again short of funds sufficient to meet its monthly payment obligation under the Mortgage Loan. (Belfonti Tr. at 119-120; Carpenter Tr. at 119). Accordingly, on or about January 8, 2007, AHE borrowed approximately $548,250 from BCP. (Belfonti Tr. at 128-130, 146). The $548,250 BCP loan was aggregated with a separate loan to AHE made by MCR Property Management, Inc. ("MCR") (described below) in the amount of $1,307,611.80 and

the combined $1,855,861.80 was paid directly to Wachovia to satisfy AHE's monthly payment obligation under the Mortgage Loan. (Belfonti Tr. at 128-30, 146, 167-68; Carpenter Tr. at 137-38). Both Michael Belfonti and Defendants' Controller, Victoria Carpenter, testified that the transaction was ***intended at the time it was made to be a loan that would be repaid***. (Belfonti Tr. at 157-159; Carpenter Tr. at 135-136). At the time the loan was made, an entry in the exact amount of $1,855,861.80 was entered at the direction of Ms. Ras on AHE's financial records as a "long-term liabilit[y]." (Navarro Aff., Ex. D; Ras Tr. at 237).

### E. The MCR Loans At Issue In The District Of Connecticut Action

Two other loans are at issue in a parallel litigation in the District of Connecticut. Both of these loans were made by MCR, which is a management company that at the relevant time was owned by Richard and Constance Belfonti, Michael Belfonti's parents. (Belfonti Tr. at 119-122, 154-155). Michael Belfonti had no beneficial interest in MCR. (Friedman Tr. at 29-30).[6] Specifically, on or about January 8, 2007, AHE borrowed approximately $1,307,611.80 from MCR in order to make its monthly payment obligation to Wachovia. This loan was aggregated with the aforementioned $548,250 loan from BCP and the combined $1,855,861.80 was paid directly to Wachovia to satisfy AHE's monthly payment obligation under the Mortgage Loan. (Belfonti Tr. at 128-30, 146, 167-68; Carpenter Tr. at 137-38). The second loan at issue in the Connecticut Action was from MCR to AHE on or about March 9, 2007 in the amount of $1,161,872. This amount was paid directly to Wachovia by MCR to satisfy AHE's monthly obligation under the Mortgage Loan. (Belfonti Tr. at 154-155; Carpenter Tr. at 138-140).

Michael Belfonti and Defendants' Controller, Victoria Carpenter, testified that both of the MCR transactions were ***intended at the time they were made to be loans that would be repaid***. (Belfonti Tr. at 157-159; Carpenter Tr. at 135-136). At the time the respective loans were made,

---

[6] Cited pages from the deposition of Dana Friedman, taken on April 17, 2008, are annexed to the Navarro Aff. as Exhibit J.

entries in the exact amounts of $1,855,861.80 and $1,161,872 were entered at the direction of Ms. Ras on AHE's financial records as "long-term liabilit[ies]." (Navarro Aff., Ex. D; Ras Tr. at 237). Mirror image entries were made in the financial records of MCR. (Navarro Aff., Ex. K; Carpenter Tr. at 133-34). MCR did not receive any capital or equity in AHE in return for the monies. (Belfonti Tr. at 88-89). That is, even after these loans were made, Michael Belfonti (indirectly through Belfonti Holdings) remained a 75% beneficial owner of AHE and the Hochfelder Family remained a 25% beneficial owner of AHE.

**F. The Loans At Issue Benefited AHE**

The loans at issue benefited AHE as they kept AHE out of default, which would have had significant negative consequences for the Hotel and its operations. Among other things, a default (and concomitant change in ownership) would likely have resulted in a "run on the bank" whereby vendors and creditors of the Hotel would demand immediate payment on outstanding bills and invoices. (*See* Navarro Aff., Ex. L). Moreover, if word that AHE was financially unstable were to become public, it would negatively affect future hotel bookings. *Id*. These precise threats to AHE's viability were articulated by Victoria Carpenter in an email dated February 21, 2007, which was forwarded to Petra that same day. *Id*. Similarly, in a January 31, 2007 email, Ms. Ras acknowledged that a foreclosure would have a negative effect on timeshare sales at the Hotel. (*See* Navarro Aff., Ex. M) ("[I]f potential Timeshare buyers starts [sic] to ***hear*** issues of changing in ownership, foreclosure, etc., and ***if*** something happens, trust me for the first one to two years they will sit in their sales office and look at the ceiling, because there will not be anything else to do.") (emphasis in original).

**III. Petra Forecloses On AHE And Takes Over Ownership Of The Hotel**

In April 2007, after Mr. Belfonti spent months trying to maintain AHE as a going concern, AHE defaulted on the Mortgage Loan and BCP Florin, LLC defaulted on the Mezzanine Loan.

(Iacono Decl. ¶5; Belfonti Tr. at 21-22).  Thereafter, Petra foreclosed on its security interests and became the beneficial owner of AHE.  (Iacono Decl. ¶5).  At the time that Petra took over control of AHE, all of the above-mentioned loans were still on AHE's books as liabilities due to the Defendants.  (Navarro Aff., Ex. D).[7]

### A.  Defendants Demand Repayment And File Suit After AHE's Refusal

On August 21, 2007, Aruban counsel for the Defendants wrote to AHE demanding payment of the loans that are now at issue in this and the Connecticut actions.  (Navarro Aff., Ex. O).  The letter indicated that failure to repay the loans by August 24, 2007, would result in the filing of a monetary judgment claim in the Aruban courts, a draft of which was attached to the letter.  *Id*.  On August 23, 2007, AHE responded and indicated that it would not repay the loans.  (Navarro Aff., Ex. P).  Upon receiving AHE's response, the Defendants filed a complaint in Aruba seeking repayment of the loans.  (Mervis Decl., Ex. G).

In response to Defendants' demand letter, AHE raced to the District of Connecticut and to this Court to file nearly identical declaratory judgment actions seeking a declaration from a United States court that the monies demanded in the August 21 letter are not loans and cannot be enforced as loans.[8]  (Navarro Aff., Ex. Q-R)  Additionally, AHE seeks "a permanent injunction enjoining Defendants from attempting to obtain repayment of the monies allegedly advanced by AHE, by pursuing litigation in [Aruba]." (SAC at 9).

### B.  AHE's Flip-Flop Regarding The Alleged Loans

Despite the fact that the transactions at issue were booked by AHE as liabilities due to the Defendants, AHE has recently reversed course and now claims that the transactions were always

---

[7] The ledgers showing the entries as long-term liabilities were shared with, among others, AHE's outside auditor PricewaterhouseCoopers ("PwC") at the time they were made and thereafter.  It was not until after Petra had taken over ownership of AHE, that it first claimed to PwC that the transactions at issue were not loans.  (Navarro Aff., Ex. N).

[8] The Aruban and Southern District actions were both filed on August 24, 2008 and it is unclear which action was filed first.  (The Connecticut Action followed three days later).  However, AHE cannot deny that its actions in the US were precipitated by Defendants' August 21, 2008 demand letter which threatened action in the Aruban courts.

intended to be capital contributions.  Ms. Ras' explanation for her and AHE's flip-flop (which only took place *after* Petra took over ownership of AHE) is that she instructed that the transactions be entered in the liabilities column as a "placeholder" entry.  (*See generally* Ras Tr.).  That is, Ms. Ras now claims that she always intended these transactions to be considered as capital contributions instead of loans and had only booked them as liabilities temporarily.

There is evidence in the record that undermines this contention, and reveals instead that Ms. Ras tried to revise history after the change in ownership of the hotel.  Specifically, an e-mail AHE produced in discovery in which PwC, AHE's auditors, noted that, "***Due to the departure of Belfonti from the project***, management claims that the [loans at issue] are no longer payable."  (Navarro Aff., Ex. S) (emphasis added).  Similarly, in an e-mail dated August 21, 2007 (approximately five months after the last loan at issue was made), Ms. Ras wrote to Petra Principals Kenneth Kornblau and Joseph Iacono that "the fact that the owner funded without outlining the terms for repayment from AHE, *one could argue* that it was payment on equity and not necessarily a loan payable to owner."  (Navarro Aff., Ex. T).[9]

## IV.    AHE's Claims Of Irreparable Harm And Its Deception Regarding Wachovia

AHE alleged that if the Defendants were to prevail in convincing the Aruban courts that the transactions at issue in this case are loans that AHE would have to repay, such a finding would constitute, "serious, irreparable harm" because it would cause AHE to be in default of the Mortgage

---

[9] Defendants expect to further develop evidence regarding AHE's "flip-flop" through the depositions of AHE's Accountant/Controller, Alcira Croes and the two Petra Principals chiefly responsible for the Aruban project, Kenneth Kornblau and Joseph Iacono.  Ms. Ras testified that Ms. Croes "was responsible [for] keeping the records and filed all of the financial information," that she communicated with Ms. Croes regarding the transactions at issue at the time they were made, and that Ms. Croes communicated with PwC who is currently conducting an audit of AHE.  (Ras Tr. at 167-68).  Ms. Croes should be able to testify as to what instructions she received regarding the transactions as well as what Ms. Ras (and possibly others) thought the transactions were (*i.e.* loans or capital contributions) at the time they were made.  The Petra Principals should be able to testify about what instructions, if any, they gave to Ms. Ras, other AHE personnel, and/or PwC regarding what position they should take with respect to the transactions at issue.  They should also be able to testify about their involvement, if any, in the negotiation, execution, and cover-up of the Wachovia agreement described below.

Loan, and would allow Wachovia to foreclose on it.   Specifically, AHE's Second Amended

Complaint, filed with this court on June 26, 2008, alleges as follows:

> If [the transactions at issue] are characterized as 'loans,' or as an obligation that AHE must otherwise repay, it would cause AHE, and its new ownership, to be in default on the Mortgage Loan.   This would cause **serious, irreparable harm to AHE** . . . [because] [u]nder section 3.1.24(d) of the Mortgage Loan, AHE was not permitted to incur indebtedness of the type alleged by Defendants to have been created by AHE to them . . . [and a] breach of section 3.1.24(d) of the Mortgage Loan Agreement gives rise to **a default for which there is no right to cure**."

(SAC ¶¶ 9-10, 22-23) (emphasis added).   Based on this claimed danger of default (and foreclosure),

AHE asked this Court to issue a "preliminary and permanent injunction enjoining the Defendants

from attempting to obtain repayment of the monies allegedly advanced to AHE, by pursuing

litigation in another forum or otherwise."   (SAC at ¶9).    AHE subsequently moved for summary

judgment and an injunction on this record.

What AHE had neglected to tell the Court (and actually attempted to shield from discovery)

is that it entered into a secret side agreement with Wachovia on June 23, 2008 (three days **before** its

Second Amended Complaint was filed) that prevents Wachovia from defaulting or foreclosing on it

even if these transactions were to be declared by a court to be loans.   (Navarro Aff., Ex. U).   The

chart below sets forth in chronological order the relevant events related to this subject:

| Date | Relevant Event |
|---|---|
| June 23, 2008 | AHE and Petra enter into a secret side agreement with Wachovia under which Wachovia agrees it will not foreclose on AHE even if a court declares the transactions at issue to be enforceable as loans.  (Navarro Aff., Ex.U). |
| June 26, 2008 | AHE files its SAC, which makes no mention of the secret side-agreement and instead alleges that the threat of Wachovia foreclosure as a result of the loans constitutes a threat of "serious, irreparable harm." (*See generally*, SAC). |
| July 15, 2008 | AHE makes its first and only document production in this case.  The production does ***not*** include a copy of (and makes no mention of) the secret side agreement with Wachovia.[10] |

---

[10] The document was clearly responsive to Defendants' document requests, which sought, *inter alia*, "all documents and communications referring to or relating to AHE's allegation that any attempt to enforce the Loans could force AHE into default and/or foreclosure on the [Wachovia Mortgage Loan]".  (Navarro Aff., Ex. V at Request No. 8).

| July 25, 2008 | AHE files a Memorandum of Law in Support of its Motion for Summary Judgment containing references to the false allegations from the Second Amended Complaint related to threat of "serious, irreparable injury," but makes no mention to secret side agreement with Wachovia. (*See generally*, AHE Memo of Law). |
|---|---|
| July 25, 2008 | AHE files a Rule 56.1 Statement containing references to the false allegations from the Second Amended Complaint related to the threat of "serious, irreparable injury," but makes no mention to secret side agreement with Wachovia (*See generally*, AHE's Rule 56.1 Statement). |
| July 25, 2008 | Portions of the Wachovia Loan Agreement which AHE falsely claims would cause it "serious, irreparable harm" are annexed to the Declaration of Joseph Iacono in support of AHE's Motion for Summary Judgment, but no mention is made of the secret side agreement with Wachovia. (See Iacono Decl., Ex. A). |
| July 25, 2008 | Petra Capital Management, LLC and Petra Fund REIT Corp. serve Objections and Responses to Subpoenas Duces Tecum served by Defendants. The subpoenas seek, *inter alia*, "[a]ll documents and communications with Wachovia referring to or relating to the Loans."<br>The Petra entities respond that, "documents responsive to this Request, if any, have already been produced under the bates stamped prefix AHE and/or in the [related New York Supreme Court litigation between the parties.]" (However, to date, a copy of the secret side agreement with Wachovia has **not** been produced in any of the lawsuits between the parties). (Navarro Aff., Ex. W). |
| August 8, 2008 | AHE files a Second Amended Complaint in the District of Connecticut action making the same false allegations about "serious, irreparable harm" contained in their Second Amended Complaint in this action and similarly seeking a declaratory judgment and permanent injunction. No mention is made of the secret deal that was reached with Wachovia on June 23, 2008. (*See* Navarro Aff., Ex. X). |
| August 18, 2008 | After Defendants write to this Court seeking to compel AHE to produce communications with Wachovia, AHE objects and attempts to moot the issue without needing to disclose the secret side agreement with Wachovia by claiming in its letter to the Court that it will no longer claim that it "is currently exposed to a risk of foreclosure by its lender on account of the alleged 'loans' at issue in this case." ***No mention is made in AHE's letter of the secret deal that was reached with Wachovia on June 23, 2008.*** (*See* Navarro Aff., Ex. Y). |
| August 19, 2008 at approximately 12:05pm | AHE files a motion for summary judgment (and supporting papers) in the District of Connecticut Action based on the same false allegations about "serious, irreparable harm" contained in their summary judgment papers that were filed in this action. No mention is made of the secret deal that was reached with Wachovia on June 23, 2008. (*See* Navarro Aff., Ex. Z). |
| August 19, 2008 at approximately 3:00pm | At a discovery conference before this Court, under direct questioning, AHE *for the first time* reveals the existence of the secret side agreement with Wachovia and informs the Court of its belief that Wachovia can no longer default or foreclose on AHE irrespective of whether the transactions at issue in this case are held to be enforceable loans. |

## **ARGUMENT**

The Court may grant summary judgment only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *see Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995).  A "genuine issue" exists where the evidence before the court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986).  The Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004).

As discussed below, AHE's motion for summary judgment should be denied because there is a fundamental dispute in this case regarding what the parties intended these transactions to be at the time they were entered that can only be resolved at trial.  In contrast, Defendant's counter-motion for partial summary judgment should be granted because there is no longer any factual dispute regarding whether AHE would suffer irreparable harm if a court were to declare these transactions to be loans. In any event, AHE is certainly not entitled to summary judgment on this issue because the equities weigh in favor of Defendants and AHE cannot satisfy the *China Trade* test for anti-foreign suit injunctions.

I.        **AHE'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE ARE MATERIAL DISPUTES OF FACT THAT MUST BE RESOLVED AT TRIAL**

   A.        **There Is A Disputed Issue Of Material Fact As To Whether The Transactions At Issue Were Intended To Be Debt Or Equity**

The law is clear that the contemporaneous intent of the parties is the critical element that a Court must weigh to determine whether monetary infusions are loans or capital contributions. Because, as discussed above, there is a fundamental dispute of fact in this case regarding the intent

of the parties at the time the transactions were consummated, summary judgment is not appropriate for this reason alone.[11]

Ignoring the dispute regarding the intent of the parties, AHE cites to a string of bankruptcy court cases that have conducted a "re-characterization" analysis to determine whether a transaction should properly be classified as a loan or a capital investment.  The case law is clear that the principal focus of this analysis is to determine the ***intent*** of the parties.  *See, e.g., In re SubMicron Sys. Corp.,* 432 F.3d 448, 457 (3d Cir. 2006) ("The determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction."); *In re Interstate Cigar Co.,* 182 B.R. 675, 679 (Bankr. E.D.N.Y. 1995) (stating that intent must be closely examined); *Byerlite Corp. v. Williams*, 286 F.2d 285, 290 (6th Cir. 1960) (same).  Indeed, the cases cited by AHE undermine its claim that this case can be resolved on summary judgment because they stand for the proposition that the question of whether advances are loans or capital contributions is inherently one of fact.  *See, e.g. SubMicron* at 457; *In re Adelphia Comm. Corp.*, Bankruptcy No. 02-41729, 2006 WL 687153 (Bankr. S.D.N.Y. 2006).  Moreover, the other factors that these courts examine, which all go toward illuminating the intent of the parties, raise further questions of fact regarding the parties' intent in this particular case.[12]

As discussed below, where some factors that bankruptcy courts examine weigh in favor of a characterization of the infusions as capital (such as the absence of notes), and yet others suggest

---

[11] In its opening brief, AHE admits that Michael Belfonti acted as both the "one who decided on behalf of the alleged lender to make the loan and the one who agreed on behalf of AHE to accept the loan." (AHE Memo of Law at 8) (internal quotations omitted).  Given that intent is the most important factor and if one were to adopt AHE's view that Michael Belfonti's intent is the only one that governs, which intent was to make and receive a loan, AHE's motion for summary judgment should fail on this point alone.

[12] Those factors include: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditors and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were used to acquire capital assets; (10) the presence or absence of a sinking fund to provide repayments; and (11) the extent to which the advances were subordinated to the claims of outside creditors.  *See, e.g. In re Adelphia* at *9.

these funds were intended as loans (such as the contemporaneous recordings of these transactions as liabilities due to be paid back to Defendants), summary judgment is inappropriate.  *See Adelphia* 2006 WL 687153 at \*10 ("The Court cannot make the determination on the contradictory record before it.  Summary judgment is therefore denied to both parties . . ."); *Byerlite* 286 F.2d at 290-91 (denying re-characterization of debt as equity where four factors weighed in favor of re-characterization but the purported loans were booked on the financial records of the parties as loans); *In re Hedged-Investments Assoc., Inc.*, 380 F.3d 1292, 1299 (10th Cir. 2004) (denying re-characterization of debt as equity where six factors weighed against re-characterization and three in favor).

### 1.  The Financial Documents Evidencing The Transfers, Including AHE's Own Records, Refer To Them As Liabilities

The instruments evidencing the transfers in this case (*i.e.*, the official books and records of the parties) ***all*** refer to them as debts due back to the Defendants from AHE.  (See Navarro Aff., Exs. D, F, H, I, K).  Similarly, the transactions were recorded as loans on the financial records of the Defendants.  The fact that all of the relevant parties recorded these transactions ***at the time they were made*** as loans that needed to be repaid is strong evidence that the parties ***intended*** them as such at the time.[13]  *Compare with In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 750 (6th Cir. 2001) (noting that the absence of any written evidence of indebtedness is an indication of a capital contribution).[14]

### 2.  The Defendants Did Not Receive Additional Equity As A Result Of The Transactions At Issue

---

[13] As discussed above, it was only after Petra took over ownership of AHE that Ms. Ras "flip-flopped" and began to claim that the transactions were capital contributions *ab initio*.  Given that AHE's revenues during 2006 and 2007 were $4 million and $7 million respectively, it simply defies logic for Ms. Ras and AHE to now claim that its records were off by approximately $8 million, yet made no mention of this to anyone for months, including AHE's auditors or Starwood (the company managing the hotel), until new ownership took over.  (*See* Ras Tr. at 120-121).

[14] The *Autostyle* court also noted that even the absence of a formal note or repayment schedule is not dispositive that contributions are equity because rigid application of such a rule "would create a *per se* rule that use of a demand note by an insider would always be indicative of an equity contribution rather than a loan."

As noted above, Michael Belfonti was not (either directly or indirectly) the 100% owner of AHE during the time these transactions took place. Rather, he owned 75% of the hotel and the Hochfelder Family owned the other 25%. The reason this is significant is that AHE claims that the transactions at issue in this and the Connecticut Action were all of the same character and should all be characterized as capital contributions that Michael Belfonti (through various entities) made to AHE. The problem with AHE's argument – a problem that it completely ignores in its summary judgment papers – is that ***AHE's CEO admitted in her deposition that Defendants did not receive any equity or capital in exchange for the infusions of money***. (Ras Tr. at 219). Since Mr. Belfonti did not receive any capital or equity in exchange for these infusions of money, by definition they could not be capital contributions, especially given that the ownership percentages between the contributing owner (Mr. Belfonti) and the non-contributing owners (the Hochfelder Family) remained identical before and after these transfers.

For example, on July 25, 2006 Belfonti Holdings transferred $499,950 to AHE. Belfonti Holdings is an entity of which Michael Belfonti is the 100% beneficial owner. If this transaction were truly a capital contribution of $500,000 as AHE claims, then one would expect one of two things also to have happened. Either (1) one would expect to see the Hochfelder Family having made it own capital contribution of approximately $166,666 to AHE so that Mr. Belfonti and the Hochfelder Family would, on the whole, be contributing capital in proportion to their overall investment in AHE (*i.e.*, Michael Belfonti contributing 75% and the Hochfelder Family contributing 25% of a $666,666 capital contribution); or (2) one would expect that Michael Belfonti (or Belfonti Holdings) would have received additional equity in AHE that they did not have before in exchange for having put in $500,000 extra at a time when the Hochfelder Family contributed nothing. However, neither of these things happened – the Hochfelder Family contributed no money on or around July 25, 2006 and, as Ms. Ras admits, Michael Belfonti did not receive any additional

15

equity.  That is, even as Mr. Belfonti infused millions of extra dollars into AHE in 2006 and 2007 (as the Hochfelder Family infused nothing), Mr. Belfonti remained 75% owner and Mr. Hochfelder remained 25% owner of AHE.  *See Autostyle* at 269 F.3d at 751 (noting that if stockholders make advances in proportion to their respective ownership, an equity contribution is indicated).  Clearly, Mr. Belfonti was loaning money to AHE.

### 3.  At The Time Many Of The Loans Were Made, Mr. Belfonti Was Aware That There Was A Realistic Possibility That He Would Lose Control Of AHE

At the time many of the loans at issue were made, Mr. Belfonti was aware that there was a realistic possibility that he would lose control of AHE.  (*See, e.g.,* Belfonti Tr. at 108-09, 154-55, 119-121).  This raises a strong inference that he would have extended loans and not made capital contributions he might never recover.  Moreover, it is logical in such a scenario for many of the other re-characterization factors to carry less weight.  *See In re SubMicron*, 432 F.3d at 457 (holding that when existing lenders make loans to a distressed company, traditional factors such as capitalization, solvency, collateral, ability to pay cash interest, and debt capacity ratios do not apply as they would when lending to a financially healthy company).[15]

### B.  There Is A Material Issue Of Disputed Fact As To Whether Defendants Are Entitled To Recover Under A Theory Of Unjust Enrichment

For the same reasons that summary judgment must be denied on the contractual issues, summary judgment must be denied on the issue of whether AHE has been unjustly enriched at the expense of Defendants.  *See Sarfaty v. PNN Enters., Inc.*, No. CV020280255, 2007 WL 2317843, *2 (Conn.Super. Jul. 24, 2007).  Unjust enrichment can apply when no remedy is available pursuant to a contract.  Recovery is proper "if the defendant was benefited, the defendant did not pay for the

---

[15] Additionally, none of the advances were used to acquire capital assets but rather used for working capital, which is a factor cited by courts to indicate that funds were more likely a loan rather than a capital contribution.  Rather, they were used to meet the operating needs of AHE and to pay its monthly mortgage obligation to Wachovia.  Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets "is indicative of bona fide indebtedness."  *AutoStyle*, 269 F.3d at 752 ("The defendants have presented undisputed evidence that the funds were . . . used for working capital that enabled AutoStyle to meet daily operating needs").

benefit and the failure of payment operated to the detriment of the plaintiff." *Id* at *6 (holding that the plaintiff was entitled to recover the loans at issue under both contract and unjust enrichment theories even though the purported lender "received no promissory notes in connection with said transfers or any documentation of any kind showing the terms and conditions for the repayment of these funds.").

AHE denies that it was enriched in any way as a result of the transfers at issue and claims that Michael Belfonti was the lone beneficiary of the transactions. (*See* AHE Memo of Law at 22). Setting aside the fact that AHE received a benefit in the form of millions of dollars to which it was not entitled as a result of the loans, AHE completely ignores evidence in the record showing that if AHE failed to meet its obligations under the Mortgage Loan, it would have a significant negative impact on AHE. For example, the loans held off a default which could have adversely affected future bookings and resulted in a "credit call" by AHE's vendors. (*See* Navarro Aff., Ex. L).

II.     **AHE'S MOTION FOR SUMMARY JUDGMENT MUST FAIL BECAUSE UNDER CONNECTICUT LAW LOANS THAT HAVE ALREADY BEEN PAID FALL OUTSIDE THE STATUTE OF FRAUDS**[16]

AHE's contention that the transactions at issue are barred by Connecticut's Statute of Frauds is wrong because under Connecticut law the Statute of Frauds does not apply to loans that have already been made. *See Sarfaty* 2007 WL 2317843 at *5. The Connecticut Statute of Frauds provides, in relevant part:

---

[16] **Defendants concede for purposes of this motion that under New York choice of law rules, Connecticut substantive law applies to the transactions at issue.** Defendants reserve the right to present arguments to the courts of Aruba that: (1) under Aruban choice of law provisions, Aruban substantive law should apply; and (2) under Aruban substantive law, these transactions are enforceable loans. Defendants recognize that there is uncertainty under Connecticut law regarding the application of the Statute of Frauds to the instant case, which is one of the considerations that led to Defendants' offered concession in the Connecticut action, but believe that in light of recent developments in Connecticut law, AHE's motion for summary judgment should be denied. AHE's reliance on the purported admission made by Michael Belfonti in the Connecticut action is wholly inappropriate under Fed.R.Evid. 408; for purposes of reaching an agreement to dismiss the Connecticut Action, the Defendants in that case offered to stipulate that under Connecticut choice of law rules, the loans at issue in that action were not enforceable loans. However, this stipulation was rejected by AHE and thus, not entered by the court. That offered stipulation has no place in a motion for summary judgment which must necessarily be decided on the basis of admissible evidence. *See* Fed.R.Evid. 408 (precluding evidence gathered in attempts to compromise or settle a claim).

> [n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the page of the party, to be charged . . . (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars.

*Conn. Gen. Stat.* 52-550(a)(6).  AHE contends that because the transactions at issue are in excess of $50,000, and they are not memorialized by any writing, they are barred by this provision.  (*See* AHE Memo of Law at 13).  However, the Connecticut courts have recently held that loans that have already been disbursed fall outside the Connecticut Statute of Frauds.  *Sarfaty* 2007 WL 2317843 at *5.  In *Sarfaty*, the plaintiff transferred $1,155,000 to the defendant with the intent that they were loans that would be repaid at some unspecified future point.  *Id*. at *2.  However, the plaintiff "received no promissory notes in connection with said transfers or any documentation of any kind showing the terms and conditions for the repayment of these funds."  *Id.*  Upon defendant's refusal to repay the loans, the plaintiff brought an action to enforce the loans under theories of breach of contract and unjust enrichment.  The defendant alleged, like AHE does here, that the Connecticut Statute of Frauds barred the action.

After examining the plain language of the Statute and the legislative history, the court concluded that it was:

> abundantly clear that although a civil action may not be brought to enforce ***an oral promise to make a loan*** over $50,000, oral loans actually made over $50,000 are outside the statute and may be enforced by our courts.  Any other meaning would bring the absurd and unjust result of oral loans being transformed into gifts without a writing to the contrary.

*Id*. at *5 (emphasis in original).[17]  *See also Markley v. Lewis*, No. CV044000119S, 2006 WL 240499, *5 (Conn.Super. Jan. 6, 2006) (holding that where a lender produced a check receipt stub stating that the amount was for a loan and where testimony demonstrated that the parties had a meeting of the minds as to the purpose of the funds, the statute of frauds would not preclude an award to the lender).

---

[17] The Court also held that the loans were enforceable under a theory of unjust enrichment.

Here, as in *Sarfaty*, there is evidence that supports Defendants' contention that they transferred the monies at issue to AHE with the intent that they would be repaid as loans. (Belfonti Tr. 157-159). Indeed, the instant action is an even stronger case for the inapplicability of the Statute of Frauds than *Sarfaty* because there are contemporaneous writings in the form of accounting entries made by the borrower (AHE) to support Defendant's claim that AHE intended for the transactions to be loans at the time they were made. *See Markley*, 2006 WL 240499 at *2. Because there is a material factual dispute, a trial must be held where the jury can assess the credibility of the witnesses before reaching a verdict. *See Bacchiocchi v. Altschuler*, No. CV-064018253S, 2008 WL 901847, *7 (Conn.Super. Mar. 14, 2008) (holding that uncertainty regarding a party's part performance of a contract required that summary judgment be denied, for when "[c]onfronted with a motion for summary judgment, a trial court may not conclude the nature of a party's conduct in the area of contract law.").

## III.    DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S REQUEST FOR AN ANTI-FOREIGN SUIT INJUNCTION

Summary judgment should be granted ***against*** AHE with respect to its request for an anti-foreign suit injunction because (1) based on a recent concession by AHE, there is no longer a dispute of fact regarding whether the transactions at issue in this case pose a threat of "irreparable harm" to AHE; (2) AHE cannot satisfy the threshold *China Trade* requirements for an anti-foreign suit injunction; and (3) the balance of the equities, which Courts are required to consider when determining whether to grant a foreign anti-suit injunction, weigh in favor of Defendants (and against AHE) in light of AHE's significant misrepresentations to the Court.[18]

---

[18] Defendants are not suggesting that Proskauer Rose LLP attempted to deceive the Court, but rather that AHE and Petra knew the underlying facts and apparently permitted Proskauer Rose LLP to press factually incorrect argument (even swearing out affidavits) without informing them of the relevant change in facts.

**A.    Summary Judgment Should Be Granted Against AHE Because There Is No Threat Of Irreparable Harm To AHE**

To obtain a permanent injunction, a party must show the absence of an adequate remedy at law *and irreparable harm* if the relief is not granted.  *See, e.g., Rodriguez v. DeBuono*, 175 F.3d 227, 235, n.9 (2d Cir. 1999) ("[A] showing of 'irreparable harm' is required for the imposition of *any* injunctive relief, preliminary or permanent") (emphasis added); *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) (same).  Because the only claim of irreparable harm in AHE's Second Amended Complaint is based on the allegation that Wachovia could foreclose on AHE, which as discussed above is a claim that has now been rendered moot, this Court should deny AHE's request for a permanent injunction enjoining Defendants from pursuing their Aruban action on this basis alone.[19]

**B.    Partial Summary Judgment Should Also Be Granted Against AHE Because It Cannot Meet The *China Trade* Requirements For Such Relief**

Although federal courts have the power to enjoin foreign suits, due regard for principles of international comity require that this power be "used sparingly" and anti-suit injunctions should be "granted only with care and great restraint."  *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987).  To determine whether to enjoin a foreign suit under *China Trade* and its progeny, a court must determine whether the parties to both suits are the same and whether the "resolution of the case before the enjoining court would be dispositive of the enjoined action."  *Id.* at 36.  If the case meets these two threshold requirements, the court must then consider whether: (1)

---

[19] In response to Defendants' letter to this Court seeking a pre-motion conference in connection with Defendants' anticipated motion to strike AHE's request for injunctive relief, AHE argues that a showing of irreparable harm is not required when the injunction in question is an anti-foreign suit injunction.  Although it is certainly true that courts weigh other factors (*i.e.*, the *China Trade* factors) when determining whether to issue an anti-foreign suit injunction, courts in this district have indicated that a showing of irreparable harm is nonetheless required before such an injunction will issue.  *See Energy Capital Co. v. Caribbean Trading & Fidelity Corp.*, No. 93 Civ 8100, 1996 WL 157498, *9 (S.D.N.Y. Apr. 4, 1996) ("A federal court has the power to enjoin a party before it from prosecuting similar litigation in a foreign tribunal if the foreign action presents a threat of *irreparable harm* to the party seeking injunctive relief."); *See also National Trust Co. v. American Home Assur. Co.*, No. 86 Civ. 1406, 1987 WL 5837, *6 (S.D.N.Y. Jan. 22, 1987) ("To prevent *irreparable harm*, a federal court has the power to enjoin a party from pursuing similar litigation in a foreign tribunal."); *Garpeg, Ltd. v. United States*, 583 F. Supp. 789, 798 (S.D.N.Y. 1984) (same).

the foreign proceeding would frustrate a policy in the enjoining forum; (2) the foreign action would be vexatious; (3) the foreign action is a threat to the issuing court's in rem or quasi in rem jurisdiction; (4) the proceedings in the other forum prejudice other equitable consideration; or (5) adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment. *American Home Assurance Corp. v. Ins. Corp. of Ireland*, *Ltd.* 603 F.Supp. 636, 643 (S.D.N.Y. 1984).

### 1. AHE Does Not Satisfy The Threshold Requirements For An Anti-Foreign Suit Injunction

In this case, summary judgment against Plaintiff is appropriate because Plaintiff cannot satisfy the threshold requirement that "resolution of the case before the enjoining court would be dispositive of the enjoined action." *China Trade*, 837 F.2d at 36. Specifically, the Defendants are seeking a ruling from the Aruban courts that (1) under **Aruban** choice of law provisions, **Aruban** substantive law applies to this dispute; and (2) under **Aruban** substantive law, these transactions are enforceable as loans. (Mervis Decl., Ex. G). In contrast, Plaintiff in the instant litigation is seeking a ruling on summary judgment that (1) under **New York** choice of law provisions, **Connecticut** substantive law applies; and (2) under **Connecticut** substantive law, these transactions are not enforceable as loans. (*See generally*, AHE Memo of Law).

Accordingly, even if the Court were inclined to grant summary judgment in favor of Plaintiff (*i.e.*, even if the Court were to rule that Connecticut law applies and that these transactions are not enforceable as loans under Connecticut law), such a ruling would not be dispositive of the Aruban action. Regardless of what this Court finds these transactions to be under Connecticut law, the Aruban courts would still need to resolve the question of how to treat these transactions under Aruban law. Indeed, Judge Hall recognized this very concept when she denied Defendants' motion to dismiss in the Connecticut Action at the outset of this case. That is, Judge Hall found that, although it was "unclear what effect, if any, a declaration by this court would have on settling the

controversy between the parties as to the ongoing litigation in Aruba," her exercise of jurisdiction in the Connecticut Action was warranted since "given that the law of Connecticut appears to be the governing law…a declaration by this court may settle the controversy between the parties and serve a useful purpose in that an Aruban court would presumably be persuaded by an American court's ruling under governing American law."  (Navarro Aff., Ex. AA at 5-7).  This court is not being asked to answer the same question that is before the Aruban courts.  Therefore, Defendants respectfully submit that resolution of this case will not be dispositive of the Aruban action.

### 2.   The Balancing Of The Equities Weighs In Favor Of Defendants In Light Of AHE's Significant Misrepresentation To The Court

As noted above, AHE has made multiple representations in court-filed documents suggesting that a threat of irreparable harm existed even after it had finalized an agreement with Wachovia that indisputably removed that threat.  Further, in an apparent attempt to avoid revealing the existence of the secret side agreement, when pressed by Defendants for discovery on this issue, AHE crafted a concession that it claimed would moot the issue.  Because *China Trade* requires the court to weigh the equities before issuing an anti-foreign suit injunction, AHE's conduct should bar it from getting the injunctive relief it seeks even if it can meet the other *China Trade* and irreparable harm factors (which it cannot).  *See China Trade* 837 F.2d at 35 (directing that courts consider equitable considerations before deciding whether to grant an anti-foreign suit injunction).

### 3.   AHE Does Not Satisfy The Other *China Trade* Factors For An Anti-Foreign Suit Injunction

In addition to not meeting the threshold requirements for an anti-foreign suit injunction, the remaining factors also counsel against the entry of such an injunction. [20]  Indeed, the Second Circuit

---

[20] AHE relies on *Farrell Lines* for the proposition that the *China Trade* standard is relaxed after a judgment on the merits. *Farrell Lines* is distinguishable, however, because it presented "the rare situation where defendants concede[d] that they sued in a foreign forum to evade not one, but two important policies."  *Farrell Lines Inc. v. Columbus Cello-Poly Corp.,* 32 F.Supp.2d 118, 130 (S.D.N.Y., 1997).  Here, AHE is an Aruban corporation and the loans at issue were all related to real property located on Aruba.  Therefore, it was completely appropriate and logical for Defendants to

has refused to issue anti-foreign suit injunctions in cases where the five factors enumerated in *China Trade* counseled more strongly in favor of an injunction than they do in this case. For example, in the seminal *China Trade* case, the Second Circuit refused to issue an injunction where the plaintiffs were clearly seeking to strip the US courts of jurisdiction. In *China Trade*, the plaintiff brought an action in the Southern District of New York seeking damages for a breach of contract. Both parties took "extensive discovery" that included depositions and document production that required trips to South Korea and China. ***While discovery was still progressing***, the defendants filed a complaint in the South Korean courts for a declaratory judgment regarding the same matters at issue in the Southern District. *Id.* at 34-35. The plaintiff then moved for an injunction against further prosecution of the South Korean action. In refusing to issue the injunction, the Second Circuit noted that there was no threat to the jurisdiction of the district court because the South Korean court had not attempted to enjoin the district court proceedings. *Id.* at 37. Conversely, in this case, the Aruban action was contemporaneously-filed and Defendants have not (and will not) seek an injunction from the Aruban courts seeking to enjoin this action or the Connecticut action. As such, there is no threat to the jurisdiction of this court and an injunction would be unnecessary and contrary to the well-established principle in favor of parallel proceedings.[21]

IV.     **AHE's Motion For Summary Judgment Must Also Be Denied Because Discovery Has Not Concluded**

In addition to the reasons stated above, summary judgment must also be denied to AHE pursuant to Fed.R.Civ.P. 56(f) because Defendants have not yet been able to take the depositions of

---

seek relief from the Aruban courts. Additionally, the *Farrell Lines* defendants filed suit in Italy two months ***after*** the commencement of the Southern District action. Here, the Aruban action was contemporaneously-filed.

[21] AHE will no doubt argue that an anti-foreign suit injunction is necessary because a judgment of this Court ***may*** not be enforceable in Aruba. However, this justification for an injunction has been explicitly rejected by the Second Circuit. *See China Trade*, 837 F.2d at 37 ("[t]he possibility that a United States judgment might be unenforceable in [a foreign court] is no more than speculation about the race to judgment that may ensue whenever courts have concurrent jurisdiction.")

three critical witnesses, AHE's Accountant/Controller and the two Petra Principals chiefly responsible for the Aruban Hotel project.

It is well established in the Second Circuit that, because the nonmoving party must have the opportunity to unearth facts essential to its claims, "[o]nly in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery." *Hellstrom v. United States Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). The Second Circuit has repeatedly reversed district courts when the party against whom judgment was sought did not have the opportunity to take discovery. *See id.* at 98 (reversing summary judgment where non-moving party was precluded from taking depositions and only had access to a limited document production); *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 376 (2d Cir. 1995) (reversing summary judgment where non-moving party was not able to take depositions and received limited discovery from defendants shortly before summary judgment briefing); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 555 (2d Cir. 1977) (reversing summary judgment where non-moving party had "little opportunity for discovery"); *Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir. 1995) (same). This is especially so, where, as here, Defendants have had limited access to discovery of AHE and critical witnesses have not yet been made available for depositions. Additionally, AHE has argued in its brief that the loans are not due because Mr. Belfonti imputed terms to them that they would not have to be paid back until the happening of a capital event, re-financing, or other infusion of money into AHE. (AHE Memo of Law at 21). Setting aside the fact that the relief AHE is asking for (*i.e.*, that it **never** has to repay the loans) goes too far, AHE has rebuffed Defendants' requests for financial documentation that would allow Defendants to test the veracity of AHE's claim that such an infusion of monies has not occurred. (Navarro Aff., Ex. BB at Request No. 1).

24

## **CONCLUSION**

For all the foregoing reasons, Defendants respectfully submit that this Court should deny summary judgment to AHE and grant partial summary judgment in favor of Defendants on AHE's request for a permanent injunction.

Dated: New York, New York
      September 5, 2008

                          KOBRE & KIM LLP

                          _____/S/_____

                          Michael S. Kim (MK – 0308)
                          Matthew I. Menchel (MM – 0675)
                          Jonathan D. Cogan (JC – 4474)
                          Francisco J. Navarro (FN – 1874)

                          800 Third Avenue
                          New York, New York 10022
                          Tel:  212.488.1200
                          Fax: 212.488.1220

                          *Counsel for Michael Belfonti, Belfonti Holdings, LLC, and Belfonti Capital Partners, LLC.*