# EXHIBIT A

# OPERATING AGREEMENT

## OF

## BCP Aruba I, LLC

MBNY114596

# OPERATING AGREEMENT

## OF

## BCP Aruba I, LLC

**THIS OPERATING AGREEMENT** (the "*Operating Agreement*") of BCP Aruba I, LLC (the "*Company*") is entered into by the Company, Belfonti Holdings, LLC ("*Belfonti*" or the "*Class A Member*"), any additional Persons (the "*Additional Class A Members*" and together with the Initial Class A Member, the "*Class A Members*") who become Class A Members of the Company in accordance with the provisions hereof and Aligned Capital Holdings, LLC, a Delaware limited liability company ("*Aligned*" or the "*Initial Class B Member*"), any additional Persons (the "*Additional Class B Members*" and together with the Initial Class B Member, the "*Class B Members*") who become Class B Members of the Company in accordance with the provisions hereof. In consideration of the covenants, conditions and agreements contained herein, the parties hereto hereby agree as follows:

**WHEREAS,** the Company was formed under the Delaware Limited Liability Company Act (the "*Act*") upon the filing, on March [  ], 2006, of a Certificate of Formation with the Delaware Secretary of State (the "*Secretary of State*") pursuant to Title 6 §18-201 of the Act; and

**WHEREAS,** the Initial Class A Member has made a capital contribution to the Company as set forth on Schedule A in exchange for the Class A Interest set forth on Schedule A; and

**WHEREAS,** the Initial Class B Member has made a capital contribution to the Company as set forth on Schedule A in exchange for the Class B Interest set forth on Schedule A; and

**WHEREAS,** the parties desire to set forth their agreement with respect to (a) the business of the Company, (b) the conduct of the Company's affairs, and (c) the rights, powers, preferences, limitations and responsibilities of the Members of the Company,

MBNY114597

**NOW, THEREFORE,**

## ARTICLE I.

## ORGANIZATION OF THE COMPANY

Section 1.01    Formation.

The Company is a limited liability company organized under the provisions of the Act. The Certificate of Formation (the "*Certificate*") was filed on March 13, 2006 with the Secretary of State of the State of Delaware. The Company was formed upon the issuance by Secretary of State of the State of Delaware of the Certificate for the Company.

Section 1.02    Name.

The name of the Company is, and the business of the Company shall be conducted under the name of, "*BCP Aruba I, LLC*." The name of the Company may be changed from time to time by amendment of the Certificate. If the Company does business under a name other than the name set forth in the Certificate of Formation (such other name being referred to as an "*Assumed Name*"), the Company shall comply with the requirements of the law of State of Delaware regarding doing business under any name other than a real name.

Section 1.03    Term.

The Company shall continue in existence in perpetuity or until the earlier termination of the Company pursuant to the provisions of this Operating Agreement.

Section 1.04    Purpose.

The Company is organized to (1) act as the sole member of Twilight Holdings, LLC, a Delaware limited liability company, and (2) engage in any other businesses in furtherance of such activities that may be undertaken by limited liability companies under the Act.

Section 1.05    Offices.

The Company's principal place of business shall be located at 31 West 52nd Street, Suite 1770, New York, New York, or such other place determined from time to time by the Manager. The Company may have such other business offices within or without the State of Delaware as determined from time to time by the Manager.

{00304625.DOC;6}    3

MBNY114598

Section 1.06    Qualification in Other Jurisdictions.

The Company shall be qualified or registered to do business in any jurisdiction in which the Company transacts business and in which such qualification or registration is required by law or deemed advisable by the Company. The Secretary of the Company, as an authorized person within the meaning of the Act, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any such jurisdiction.

Section 1.07    Fiscal Year.

The fiscal year of the Company (the "*Fiscal Year*") shall end on the 31st day of December in each year.  The Company shall have the same fiscal year for income tax and for financial and accounting purposes.

# ARTICLE II.

## DEFINITIONS

When used in this Operating Agreement, the following terms shall have the respective meanings assigned to them in this Article or in the Sections referenced below.

"*Accounting Period*"  The initial "*Accounting Period*" shall be deemed to have commenced as of the date hereof.  Each subsequent "*Accounting Period*" shall commence immediately after the close of the next preceding "*Accounting Period*".  Each "*Accounting Period*" shall close at the close of business on the first to occur of (i) the last day of a fiscal year of the Company, (ii) the date of the Company's liquidation provided that an Accounting Period may be subject to earlier termination by virtue of changes in the Members or their Capital Contribution as determined by the Manager with consultation with the Company's accountant.

"*Act*" means the Limited Liability Company Law of the State of Delaware, as amended from time to time.

"*Adjusted Book Value*" with respect to any Company property means the adjusted basis of such property for federal income tax purposes unless such property has been contributed to the Company, in which event it shall mean the Fair Market Value of such property at the date of contribution minus all Depreciation taken with respect to such property.

"*Adjusted Capital Account*" means, with respect to any Member, such Member's Capital Account, increased for the amount such Member is deemed obligated to restore pursuant to (A) the penultimate sentences of Treasury Regulations Section 1.704-2(g)(l) and 1.704-2(i)(5) and (B) Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), as of the end of the Company's Fiscal Year or other applicable period, and reduced for the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

MBNY114599

"*Affiliate*" means, with respect to any specified Person, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified; provided however that Adam Hochfelder is deemed to be an Affiliate of Aligned; and provided further that Michael Belfonti is deemed to be an Affiliate of Belfonti.

"*Allocation Regulations*" means Treasury Regulation 1.704-1(b), Treasury Regulation 1.704-2 and Treasury Regulation 1.704-3 (including temporary regulations), as such regulations may be amended and in effect from time to time and any corresponding provisions of succeeding regulations.

"*Assignee*" means a person to whom an Interest has been transferred in a manner permitted under this Operating Agreement, and who thereby has an interest in the Company equivalent to that of a Member but (i) limited to the rights and obligations appurtenant to an Interest to share in the allocations and distributions, including liquidating distributions, of the Company, and (ii) otherwise subject to the limitations under the Act on the rights of an assignee.

"*Available Cash*" means the cash of the Company available for distribution from any source; provided, however, that the Company may at the time of its first distributions pursuant to *Section 5.07* hereof, withhold an amount (the "*Holdback*"), of no more than $1,000,000 in the aggregate, equal to current expenses (excluding Member Loans), known and reasonably ascertainable future expenses (excluding Member Loans) and reserves for the funding of any anticipated investments by the Company, which Holdback shall be applied to such expenses and funding and shall only be distributed to the Members pursuant to *Section 5.07* in the discretion of the Manager.

"*Capital Account*" means the account established and maintained for each Member in the manner described in *Section 4.05*.

"*Capital Contribution*" means the amount of cash or other consideration contributed to the Company by each Member in exchange for its Interest.

"*Class A Interest*" means the Interest of a Class A Member.

"*Class A Interest Percentage*" means as to a Class A Member, the percentage arrived at by dividing the Interest Percentages issued to such Class A Member as of the date such Class A Interest Percentage is measured by the total Interest Percentages issued to all Class A Members as of such date.

"*Class B Interest*" means the Interest of a Class B Member.

"*Class B Interest Percentage*" means as to a Class B Member, the percentage arrived at by dividing the Interest Percentages issued to such Class B Member as of the date such Class B Interest Percentage is measured by the total Interest Percentages issued to all Class B Members as of such date.

MBNY114600

"***Class Interest Percentage***" means as to a Member, the percentage arrived at by dividing the Interest Percentage issued to such Member as of the date such Class Interest Percentage is measured by the total Interest Percentages issued to all Members in the Class to which such Member belongs as of such date.

"***Code***" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"***Company***" means BCP Aruba I, LLC, a limited liability company organized under the laws of the State of Delaware.

"***Confidential Information***" means any lists of persons and addresses, and the names and addresses thereon, and any and all other matters of a technical nature, including without limitation, trade secrets, systems, software and hardware, techniques, copyrighted matters, patented or patentable inventions, plans, business methods, drawings, data, tables, calculations, documents or other paperwork and computer programs, and matters of a business nature, including without limitation, business and marketing plans, dealings, arrangements, objectives, locations, client information (including names and addresses), plans for future development, information about costs, profits, pricing policies, markets or sales and any other information of a similar nature not available to the general public.

"***Depreciation***" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowed or allowable for federal income tax purposes with respect to an asset for such Fiscal Year or other period; provided, however that, except as otherwise provided in Treasury Regulations Section 1.704-2, if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis; provided, further, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"***Fair Market Value***" means the value of an asset in question, as reasonably determined by the Manager.

"***Funding***" means all monies provided by Members pursuant to ***Section 4.04*** and ***Section 4.06.***

"***Gross Asset Value***" means, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes, except as follows:

      (a)    the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset (computed without

MBNY114601

taking Section 7701(g) of the Code into account) without reduction for liabilities, as determined by the contributing Member and the Company;

(b)    if the Manager reasonably determines that an adjustment is necessary or appropriate to reflect the relative economic interests of the Members, the Gross Asset Values of all Company assets shall be adjusted in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) and (g) to equal their respective gross fair market values, without reduction for liabilities, as reasonably determined by the Manager, as of the following times:

(i)    a Capital Contribution (other than a de minimis Capital Contribution) to the Company by a new or existing Member as consideration for a Company Interest; or

(ii)    the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for the redemption of a Company Interest; or

(iii)    the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

(c)    the Gross Asset Value of any asset distributed to any Member shall be the gross fair market value of such asset (computed without taking Section 7701(g) of the Code into account) without reduction for liabilities, as reasonably determined by the Manager as of the date of distribution; and

(d)    the Gross Asset Values of the Company's assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this paragraph (d) to the extent that the Manager reasonably determines that an adjustment pursuant to paragraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d).

At all times, Gross Asset Values shall be adjusted by any Depreciation taken into account with respect to the Company's assets for purposes of computing net profits and net losses.

"*Indebtedness*" means (i) all indebtedness, whether or not represented by bonds, debentures, notes or other securities, for the repayment of money borrowed, (ii) all guaranties, endorsements (other than endorsements in the ordinary course of business), and assumptions, in respect of, or to purchase or to otherwise acquire, indebtedness of others relating to the repayment of money borrowed, and (iii) all capitalized lease obligations (excluding obligations under operating lease).

{00304625.DOC;6}                                    7

MBNY114602

"*__Interest__*" means the entire limited liability company interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which such Member may be entitled as provided in this Operating Agreement, together with the obligations of such Member to comply with all terms and provisions of this Operating Agreement.

"*__Interest Percentage__*" means the percentage interest of a Member in the Company. The Interest Percentages of the Members are set forth on *Schedule A*.

"*__Manager__*" means Belfonti Capital Partners, LLC, a Delaware limited liability company, and any replacement appointed in accordance with this Operating Agreement.

"*__Member__*" means a person who holds an Interest and has become a member of the Company in accordance with this Operating Agreement.

"*__Person__*" means any individual, firm, corporation, trust, association, company, limited liability company, joint stock company, partnership, joint venture or other entity or enterprise.

"*__Profits__*" and "*__Losses__*" means, for any fiscal period, an amount equal to the Company's taxable income or loss for the year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses will be added to taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses will be subtracted from taxable income or loss;

(c)    Gain or loss resulting from any disposition of Company property will be computed by reference to the Adjusted Book Value of the property disposed of, notwithstanding that the Adjusted Book Value differs from the adjusted basis of the property for federal income tax purposes; and

(d)    In lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there will be taken into account the Depreciation for such Fiscal Year or other period.

"*__Treasury Regulations__*" means the Regulations of the Treasury Department of the United States issued pursuant to the Code.

MBNY114603

## ARTICLE III.

## MANAGEMENT OF THE COMPANY

Section 3.01    The Manager.

(a) General.  Except as otherwise provided by the Act or in this Agreement, the business and affairs of the Company shall be managed by or under the direction of the Manager.  Other than with respect to rights and powers expressly reserved to Members under **Sections 8.01 and 8.02** of this Agreement or the Act and subject to **Section 3.02** hereof, the Manager shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company, and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company as set forth herein. The Manager is hereby designated as an "**authorized person**", within the meaning of the Act, to execute, deliver and file any amendments and/or restatements of the Certificate and any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business. The Manager shall have the power and authority to bind the Company.  Any action taken by the Manager, or any duly appointed and acting Officer, in accordance with this Agreement shall constitute the act of, and shall serve to bind, the Company.

(b) Duties.  The Manager and the Officers shall be obligated to devote only as much of their time to the Company's business as shall be reasonably required in light of the Company's business and objectives. The Manager and each Officer shall perform his or her duties in good faith, in a manner it, he or she reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

(c) Replacement and Vacancy.  If there is no Manager by reason of the death, disability, or resignation of the Manager, the holders of the Class A Interests are entitled to select, by a vote as a class with each Class A Member's vote to be proportionate to its Class A Interest Percentage, a replacement to serve as the Manager. The Members shall take any action necessary to cause the replacement of the Manager selected by the Class A Members to be appointed as Manager.

(d) Restrictions on the Manager.  The Manager shall not (i) do any act in contravention of any applicable law or regulation, or provision of this Agreement; or (ii) have any interest in any property of the Company or possess Company property for other than a Company purpose.

Section 3.02    INTENTIONALLY OMITTED.

Section 3.03    Compensation.

MBNY114604

The Manager shall receive no compensation for its services; provided, however, the Manager shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of its services hereunder.

Section 3.04    INTENTIONALLY OMITTED.


## ARTICLE IV.

### MEMBERSHIP INTERESTS
### AND CAPITAL CONTRIBUTIONS

Section 4.01    Membership Interests.

(a) *Classes.* The Interests of the Company shall be divided into classes, which initially shall be referred to herein as Class A Interests and the Class B Interests.

(b) *Voting.* The Voting Rights of Members are set forth in *Articles III and VIII* hereof.

(c) *Exclusion of Other Rights.* Except as may otherwise be required by law, the Interests shall not have any preferences or relative, participating, optional, or special rights, other than those specifically set forth herein (as such may be amended from time to time).

Section 4.02    Initial Capital Contributions.

Each Member shall make his initial Capital Contribution and shall receive in return an Interest with the initial Interest Percentage as set forth on *Schedule A.*

Section 4.03    Interest on and Return of Capital Contributions.

Except as specifically provided in *Section 4.06* of this Operating Agreement, no Member shall be entitled to interest on any Capital Contribution or Member Loan or on such Member's Capital Account balance and no Member shall have the right to withdraw or to demand the return of all or any part of his Capital Contribution.

Section 4.04    Additional Capital Contributions[1].

(a) Notice. If at any time and from time to time, the Manager and the Class B Members holding a majority of the Class B Interest Percentages determine that the Company requires additional funds in excess of the then existing Capital Contributions ("**Additional Contributions**"), written notice shall be given to each Member of (i) the total amount of Additional Contributions required, (ii) the reason the Additional Contribution is required, (iii) each Member's proportionate share of the total Additional Contribution (determined in

---

[1]    Consider replacing with statement that no additional capital contributions will be required.

MBNY114605

accordance with this Section), and (iv) the date each Member's Additional Contribution is due and payable, which date shall be no sooner than ten (10) days after the notice has been given.

(b) Member's Share. Unless otherwise agreed in writing by all Members, all Additional Contributions shall be provided by the Initial Class A Member.

(c) Form of Payment. A Member's proportionate share of the Additional Contributions shall be payable in cash or by certified check, wire transferred federal funds or bank cashier's check or in such other form as the Manager approves.

(d) No Additional Contributions Required. Except as set forth in this Section, no Member shall be required to make any additional Contributions to the Company.

(e) Failure to Make Capital Contribution. If a Member fails to pay when due all or any portion of any Additional Contribution (each, a "**Non-Paying Member**"), the Members electing to pay an Additional Contribution (each, a "**Contributing Member**") shall have the option to pay the entire unpaid amount of the Non-Paying Member's Additional Contribution (the "**Unpaid Contribution**") multiplied by a fraction the numerator of which is such Contributing Member's Interest Percentage and the denominator of which is the Interest Percentage of all of the Contributing Members. If any Contributing Member elects not to pay its proportion of the Unpaid Contribution, then the other Contributing Members shall have the option to pay all or part of any unfunded portion of the Unpaid Contribution. The amount advanced by each Contributing Member pursuant to this *Section 4.04 (e)* shall be a loan of the Non-Paying Member to such Contributing Member and shall be repaid to it by such Non-Contributing Member and such loan shall bear interest at 12% per annum from the date such Contributing Member advanced the applicable amount (the "Commencement Date"), if such loan is not repaid by the Non-Contributing Member within 90 days of the Commencement Date, thereafter, at the option of the Contributing Members, the Non-Paying Member's Interest Percentage shall be reduced and the Interest Percentage of the Contributing Members shall be increased, so that each Member's Interest Percentage is equal to a fraction, the numerator of which is equal to the sum of such Member's Capital Contributions including the amount of all Additional Contributions and Unpaid Contributions contributed by such Member, and the denominator of which is the sum of the total Capital Contributions of all Members including the amount of all Additional Contributions and Unpaid Contributions contributed by the Members. Schedule A hereto shall be amended to reflect such changes.

Section 4.05    Capital Accounts.

(a)    The Company shall maintain for each Member a separate Capital Account in accordance with the provisions of *Article V* hereof; the Capital Accounts at the date hereof are set forth on *Schedule A*. Such Capital Account shall be increased by (a) (i) the cash or Fair Market Value of any property contributed to the Company by the Member (net of any liabilities secured by the property that the Company is considered to assume or take subject to under Section 752 of the Code) and (ii) all items of Company income and gain (as computed in accordance with the Allocation Regulations) allocated to such Member pursuant to *Article V* hereof; and decreased by (b)(i) the cash or Fair Market Value of any property (net of any

MBNY114606

liabilities secured by the property that the Member is considered to assume or take subject to under Section 752 of the Code) distributed to the Member, (ii) allocations to the Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code, and (iii) all items of Company loss and deductions (as computed in accordance with the Allocation Regulations) allocated to such Member pursuant to *Article V* hereof.

(b)  Any Capital Contributions or distributions made in a form other than cash shall be valued at the Fair Market Value of such property as of the date of such Capital Contribution or distribution as determined in good faith by the Manager.

Section 4.06    Advances.

Belfonti has heretofore extended advances for the prosecution of the business of the Company in the amount set forth on Schedule 4.6, which sums shall bear interest at the rate of 12% per annum from the date of each such advance.  In addition, Belfonti, from time to time, but only to the extent necessary for the Company to meet working capital or other financial requirements, may, but shall have no obligation to, advance funds to the Company in excess of its Capital Contributions.  If Belfonti shall elect not to make an advance necessary for the Company to meet working capital or other financial requirements, Belfonti shall give written notice of such fact to Aligned, which may, in its sole discretion, advance funds for such purposes.  The amount of such advance shall neither increase the making Member's Capital Account nor entitle it to any increase in its share of the distributions of the Company.  The amount of any such advance shall be a debt obligation of the Company to such Member and shall be repaid to it by the Company, and shall bear interest at 12% per annum.  Subject to the preceding sentence, any such advance shall be payable and collectible only out of Company assets, and no Member shall be personally obligated to repay any part thereof.  No Person who makes any loan to the Company shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital, membership interests or property of the Company, other than as a creditor.  For purposes of this Section 4.6, all sums, including without limitation attorneys fees and disbursements, reasonably paid (provided all amounts paid following a Company default shall be deemed to have been reasonably paid) by a Member, a principal or Affiliate of any Member, or a family member of any principal or any Affiliate of any Member, pursuant to or under a guaranty made or given for and on account of an obligation of Company, or otherwise required to be given to a lender or other creditor of Company in connection with the business of Company, shall be deemed an advance and a Member Loan made by the applicable Member, bearing interest at the rate of twelve (12%) percent per annum from the date so paid.  All loans and advances referred to in this paragraph shall be referred to as *"Member Loans."*

The Members agree that repayments of Member Loans shall be applied first to accrued and unpaid interest and then to principal.

Section 4.07    Negative Capital Accounts.

No Member shall be required to make up a negative balance in its Capital Account.

MBNY114607

Section 4.08    Members.

(a) Member Interests as Personal Property.  Each Member hereby agrees that its Interests shall for all purposes be personal property.  A Member has no interest in any property of the Company.

(b) Partition.  Each Member waives any and all rights that it may have to maintain an action for partition of the property of the Company.

(c) Liability of Members.  Except as otherwise provided by the Act, (i) the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company and (ii) no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member of the Company.

## ARTICLE V.

## ALLOCATIONS AND DISTRIBUTIONS

Section 5.01    Special Allocations.

Notwithstanding anything in this Agreement to the contrary:

(a)  All nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) shall be charged to the Capital Accounts of the Members in proportion to their Interest Percentages.

(b)  No Member shall be allocated any item of loss or deduction to the extent said allocation will cause or increase any deficit in said Member's Adjusted Capital Account.  If any Member with a deficit in its Adjusted Capital Account unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), then Company items of income and gain shall be specifically allocated to such Member in an amount and manner sufficient to eliminate the deficit in said Member's Adjusted Capital Account created by such adjustment, allocation or distribution as quickly as possible.  The Members intend that the provisions set forth in this clause will constitute a "*Qualified Income Offset*" as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

(c)  The following provisions shall be applicable beginning in the first taxable year in which the Company has "*nonrecourse deductions*" as defined in Treasury Regulations Section 1.704-2(b)(1):

(i)    For purposes of this **Section 5.01(c)** "*Minimum Gain*" means the total gain which the Company would realize if it sold, in a taxable disposition, each of its assets that were subject to nonrecourse liabilities in full satisfaction of the liabilities.  In computing

MBNY114608

such gain, only the portion of the assets' tax bases allocated to nonrecourse liabilities of the Company shall be taken into account.

(ii)     If in any Fiscal Year of the Company there is a net decrease in Minimum Gain, then each Member with a share of Minimum Gain (as determined in accordance with Treasury Regulations Section 1.704-2(g)(1)) as of the beginning of such year shall be allocated items of income and gain for such year (and, if necessary, for succeeding years), equal to that Member's share of the net decrease in Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(g)(2)).  In allocating the income and gain pursuant to the previous sentence, gains recognized from the disposition of Company assets subject to nonrecourse liabilities of the Company shall be allocated first to the extent of the decrease in Minimum Gain attributable to the disposition of said asset.  Thereafter, any income and gain to be allocated shall consist of a pro rata amount of other Company income and gain for that year. The Members intend that this clause (ii) will constitute a "*Minimum Gain Chargeback*" as set forth in Treasury Regulations Section 1.704-2(f).

(iii)     If any Member bears the "*economic risk of loss*" (within the meaning of Treasury Regulations Section 1.752-2) with respect to any nonrecourse loan of the Company, then (A) the losses, deductions or Section 705(a)(2)(B) expenditures that are attributable to such nonrecourse loan for any fiscal year or other period shall be allocated to the Members who bear the burden of such economic risk of loss in accordance with Treasury Regulations Section 1.704-2(i), and (B) if in any taxable year there is a net decrease in Partner Nonrecourse Debt Minimum Gain (as determined in accordance with Treasury Regulations Section 1.704-2(i)(4)) attributable to such nonrecourse loan, each Member with a share of Partner Nonrecourse Debt Minimum Gain (as defined in Treasury Regulations Section 1.704-2(i)(2)) attributable to such nonrecourse loan (as determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the year shall be allocated items of income and gain for the year (and, if necessary, for succeeding years), equal to that Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain (as determined in accordance with Treasury Regulations Section 1.704-2(i)(4)).

Section 5.02    Regulatory Provisions.

The provisions of *Section 5.01* (collectively, the "*Regulatory Provisions*") are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all allocations pursuant to the Regulatory Provisions shall be offset either with other allocations pursuant to the Regulatory Provisions or, if necessary, with curative allocations of other items of income, gain, loss or deduction pursuant to this *Section 5.02*.  Therefore, notwithstanding any other provision of this Agreement, other than the Regulatory Provisions, allocations pursuant to the Regulatory Provisions shall be taken into account in allocating other items of income, gain, expense or loss among the Members so that, to the extent possible, the net amount of such allocations of other items and the allocations pursuant to the Regulatory Provisions to each member are equal to the net amount that would have been allocated to such Member if the Regulatory Provisions were not part of this Agreement.  In applying this *Section 5.02*, there shall be taken into account (a) future allocations under *Section*

{00304625.DOC;3}                              14

MBNY114609

*5.01(c)(ii)* that, although not yet made, are likely to offset other allocations previously made under *Section 5.01(a), and (b)* future allocations under *Section 5.01(c)(iii)(B)* that, although not yet made, are likely to offset other allocations previously made under *Section 5.01(c)(iii)(a)*.

Section 5.03    Code Section 704(c) Allocations.

Notwithstanding any other provision in this Article, in accordance with Code Section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value on the date of contribution.

If, under Treasury Regulations Section 1.704-1(b)(2)(iv)(f), Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a Gross Asset Value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its Gross Asset Value in the same manner as variations between the adjusted tax basis and Gross Asset Value of property contributed to the Company are taken into account (as provided in the preceding paragraph) in determining the Members' shares of tax items under Section 704(c) of the Code.

Section 5.04    INTENTIONALLY OMITTED.

Section 5.05    Other Allocation Rules.

(a)    Upon any change in the relative interests of the Members in the Company, whether by reason of the admission or withdrawal of a Member, the transfer by any Member of all or any part of its interest, or otherwise, the Members' shares of all Company items shall be determined by reference to any method acceptable under the Regulations under Section 706 of the Code, as determined by the Manager.

(b)    Items of Company income and gain (as computed in accordance with the Allocation Regulations) shall be allocated to the Members in proportion to their Interest Percentages;

(c)    All allocations among only Class B Members shall be made in accordance with the Class B Interest Percentages with respect to the Class B Interests held by such Class B Members at the time of the allocations.  All allocations among only Class A Members shall be made in accordance with the Class A Interest Percentages with respect to the Class A Interests held by such Class A Members at the time of the allocations. All allocations among all Members shall be made in accordance with the Interest Percentages with respect to the Interests held by such Members at the time of the allocations.

Section 5.06    Allocations for Tax Purposes.

MBNY114610

(a) For federal income tax purposes, except as otherwise provided in the Code or Treasury Regulations, each item of income and gain of the Company shall be allocated 75% to Belfonti and 25% to Aligned.

Losses and deductions shall be allocated among Members on a pari passu basis based on their Interest Percentages.

Section 5.07    Distribution of Cash and Other Property.

(a)    Other than in respect of the winding up of the Company, distributions of cash or property of the Company shall be made within five business days of its receipt and subject to applicable law, unless otherwise unanimously agreed to by the Members in writing, all Available Cash will be distributed and no Available Cash shall be retained.

(b) Subject to applicable law, distributions of Available Cash shall be made in the following manner:

(1) first, to the repayment of any Member Loans plus accrued interest; and

(2)second, the balance 75% to Belfonti and 25% to Aligned; provided, however that Aligned shall utilize any monies distributed to it in the following manner:

(i)    first, to the repayment of that certain promissory note dated May 16, 2005 in the principal amount of $60,000 issued by Aligned to Constance Belfonti plus accrued interest;

(ii)    second, if after January 27, 2007, to the repayment of that certain promissory note dated January 27, 2005 in the principal amount of $200,000 issued by Adam Hochfelder and Amy Hochfelder to Constance Belfonti plus accrued interest; and

(iii)    third, if after November 1, 2007, to the repayment of that certain promissory note dated November 1, 2005 in the principal amount of $253,500 issued by Adam Hochfelder and Amy Hochfelder to Constance Belfonti plus accrued interest; and

(iv)    fourth, in the discretion of Aligned.

(c)    Any assets distributed in kind shall be valued for this purpose at the Fair Market Value as of the date it is determined to make such a distribution.  Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

(d)    In all calculations of interest, simple interest shall be used.

MBNY114611

Section 5.08    Limitations on Distribution.

Notwithstanding any provisions of this Article to the contrary, no distribution shall be made if such distribution would violate any contract or agreement to which the Company is then a party or any law then applicable to the Company, including the provisions of the Act.

Section 5.09    Withholding Taxes.

The Company is authorized to withhold from distributions to a Member, or with respect to allocations to a Member, and to pay over to a Federal, state or local government, any amounts required to be withheld pursuant to the Code or any provisions of any other Federal, state or local law. Any amounts so withheld shall be treated as having been distributed to such Member for all purposes of this Agreement, and shall be offset against the current or next amounts otherwise distributable to such Member.


# ARTICLE VI.

## TRANSFER OF MEMBERSHIP INTERESTS

Section 6.01    Restrictions on Transfer.

(a) General.  Each Member agrees that such Member will not, directly or indirectly, sell, hypothecate, give, bequeath, transfer, assign, pledge or in any other way whatsoever encumber or dispose of (any such event, a "**Transfer**") any Interests now or hereafter at any time owned by such Member (or any interest therein) to another Person ("**Transferee**"), except to the extent such Transfer is permitted by this Agreement.  The Company shall not transfer upon its books any Interests to any Person to the extent prohibited by this Agreement and any purported transfer in violation hereof shall be null and void and have no effect.

(b) Compliance with Securities Laws.  No Member shall transfer any Interest, and the Company shall not transfer on its books any Interest, unless (a) the Transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended, and the rules and regulations of the Securities and Exchange Commission ("**SEC**") thereunder, all as the same shall be in effect at the time (the "**Securities Act**") and is in compliance with any applicable state securities or blue sky laws or (b) such Member shall have furnished the Company with an opinion of counsel, to the extent reasonably required by the Company, which opinion and counsel shall be reasonably satisfactory to the Company, to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act, and no such compliance is necessary; provided, however, that the conditions set forth in this **Section 6.01(b)** shall not apply to any sale of an Interest pursuant to an effective registration statement under the Securities Act or, provided such sale is not to an affiliate of the Company, pursuant to Rule 144 promulgated pursuant to the Securities Act, as such Rule may be

MBNY114612

amended from time to time, or any other similar regulation hereafter adopted by the SEC ("**Rule 144**").

(c) <u>Agreement to be Bound</u>.  No Transfer of Interests by a Member shall be effective (and the Company shall not transfer on its books any Interest) unless the Transferee shall have executed and delivered to the Company, as a condition precedent to such transfer, an instrument or instruments in form and substance satisfactory to the Company confirming that the Transferee agrees to be bound, as a Member, by the terms of this Agreement and accepts the rights and obligations set forth hereunder.

Section 6.02    <u>Permitted Transfers</u>.

Subject to the provisions of **Section 6.03**, the following transfers of Interests are permitted at any time (each a "**Permitted Transfer**").

(a) Transfer by any Member who is a natural person to such Member's spouse or children or to a trust the principal beneficiaries of which are his or her spouse and/or children provided that such Member shall maintain voting control with respect to such Interest pursuant to an agreement or instrument acceptable to the Company;

(b) Transfer by reason of the death of any Member to such Member's heirs or estate.

(c)  Transfer by any Member that is not a natural person to an Affiliate of such Member.

(d)  Transfer of an Interest with the prior written approval of the Manager, which approval shall not be unreasonably withheld or delayed.

Section 6.03    <u>Additional Requirements of Transfer</u>.

Any Transfer permitted by this Agreement shall be further subject to and conditioned upon full compliance by the transferor and Transferee with each of the following conditions:

(a) Any Transfer, conveyance or other taxes resulting from such Transfer, and any costs or expenses incurred by the Company in connection with such Transfer shall be borne, jointly and severally, by the transferor and/or the Transferee and each transferor and Transferee do hereby jointly and severally agree to indemnify and hold harmless each other party hereto from such taxes and jointly and severally indemnify and hold harmless the Company from such costs or expenses, and agree to promptly reimburse the Company or such other party, as the case may be, for any such taxes, costs or expenses.

(b) The transferor and Transferee shall have delivered to the Company such other agreements, instruments and other documents (including opinions of counsel reasonably

MBNY114613

satisfactory to the Company) as the Company shall request in order to demonstrate compliance of any such transfer with the provisions of this Agreement and applicable law.

(c)  The Manager shall cooperate in admitting any Person who acquires an Interest in compliance with this Article as a Member of the Company.

(d)  Notwithstanding anything to the contrary herein, no Transfer shall be permitted under this Agreement if in the reasonable opinion of tax counsel to the Company it would result in materially adverse tax consequences to the Company or the Members.

Section 6.04    <u>Transferees Bound</u>.

Any Interest owned by a transferee shall for all purposes be subject to the terms of this Agreement, whether or not such transferee has executed a consent to be bound by this Agreement, provided nothing in this *Section 6.04* shall be deemed to authorize any transfer prohibited by this Agreement.

MBNY114614

Section 6.05    Assignee Status.

Any Transferee who is not admitted as a Member of the Company shall have the status of an Assignee.

## ARTICLE VII.

## MEMBERSHIP WITHDRAWAL; ADMISSION OF NEW MEMBERS

Section 7.01    Withdrawal.

A Member may not withdraw from the Company without the written consent of the Manager.

Section 7.02    Admission of New Members.

A person may become a new Member of the Company upon (i) receiving the consent of the Manager to such admission and to the amount of the Capital Contribution to be made by such new Member, (ii) making the Capital Contribution to the Company and (iii) executing a signature page to this Operating Agreement which by its terms (a) binds such new Member to the terms and conditions set forth herein, (b) recites the Capital Contribution to be made by such new Member and (c) sets forth the Interest to be received by such new Member in exchange for his Capital Contribution.

## ARTICLE VIII.

## VOTING, QUORUM, AND MEETINGS OF MEMBERS

Section 8.01    Powers of Members.

Except as otherwise provided in *Section 8.02* hereof or the Act, the Members in their individual capacity as Members of the Company shall have no right or power to take part in the management of the Company including the power to transact any business in the Company's name, sign documents for or otherwise bind the Company. Subject to the provisions of the Act and the Certificate, the Members hereby delegate any or all such powers to the Manager of the Company to carry out the business affairs of the Company on the Members' behalf. Any power not expressly reserved to the Members or delegated to the Officers of the Company shall remain with the Manager. The Manager shall be Belfonti, subject to the provisions of *Article III*.

MBNY114615

Section 8.02    <u>Voting and Approval Rights</u>.

The only matters to be submitted to the Members shall be matters expressly required to be submitted to the Members pursuant to this Agreement and the provisions of the Act; <u>provided, however</u>, that, the matters set forth on ***Schedule 8.02*** must be (i) recommended by the Manager and (ii) approved in writing by Class B Members holding a majority of the Class B Interest Percentages.

Section 8.03    <u>Voting Power</u>.

The Members shall not be permitted to vote on any matter other than matters expressly required to be submitted to them pursuant to the provisions of the Act or this Agreement and to the extent they are entitled to vote each Member shall vote in proportion to its Interest Percentage. If a quorum of the Members of a particular class exists, the affirmative vote of the majority of the Interested Percentages represented at the meeting and entitled to vote on the subject matter shall be the act of the Members as to such matter, unless the vote of a greater or lesser amount or approval by other voting groups is required by the Act, the Certificate, or this Operating Agreement.

Section 8.04    <u>Quorum</u>.

Members owing a majority of the Interest Percentages entitled to vote on the subject matter, in person or by proxy, shall constitute a quorum for the transaction of business as to such subject matter by such Members.

Section 8.05    <u>Meetings of Members</u>.

Upon the written request of the Manager, the Company shall call a meeting of the Members.

Section 8.06    <u>Place of Meeting</u>.

The Manager may designate any place, either in or out of the State of Delaware, as the place of meeting for any meeting of the Members. If no designation is made the place of meeting shall be the Company's principal office. Telephonic meetings are permitted.

Section 8.07    <u>Notice of Meetings</u>.

Written notice stating the date, time and place of the meeting and a description of the purpose or purposes for which the meeting is called, shall be mailed, unless oral notice is reasonable under the circumstances, not fewer than ten nor more than thirty days before the date of the meeting, by or at the direction of the Manager to each Member of record entitled to vote at the meeting. If mailed, such notice is effective when mailed addressed to the Member's address shown in the Company's current record of the Member, with postage prepaid.

MBNY114616

Section 8.08    Action Without a Meeting.

Any action required or permitted to be approved by a certain Class(es) by vote may be taken without a meeting by written consent of Members of such Class(es) having not less than the minimum of votes that would be necessary to authorize or take such action at a meeting. The consent shall set forth the actions so taken and be signed by such Members of such Class(es).

Section 8.09    Waiver of Notice.

(a) a Member may waive any notice required by this Operating Agreement before or after the date and time stated in the notice. The waiver must be in writing, be signed by the Member entitled to the notice, and be delivered to the Manager.

(b) a Member's attendance at a meeting: (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting or promptly upon the Member's arrival objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

## ARTICLE IX.

## TERM AND TERMINATION

Section 9.01    Term of Agreement.

The term of this Agreement shall be 50 years, unless terminated sooner as herein provided.

Section 9.02    Termination.

(a) This Agreement shall terminate with respect to the Company and all Members upon the occurrence of any of the following events:

(i) The expiration of the term;

(ii) The merger or consolidation of the Company with, or the acquisition of all or substantially all of the Interests or assets of the Company by, a Person at least fifty percent (50%) of the voting securities of which are beneficially owned by Persons other than Persons who beneficially owned Interests in the Company immediately prior to such merger, consolidation or acquisition; provided however, that *Section 5.07* shall survive any such termination resulting from a sale of substantially all of the assets of the Company;

MBNY114617

(iii) The execution of a written instrument by the Company and each of the Members then holding Interests;

(iv) Subject to *Section 8.01* hereof, any public offering of membership interests in or other equity securities of the Company; or

(v) At any time upon the unanimous written agreement of the Members.

(b) This Agreement shall automatically terminate with respect to a Member in the event that its interest in its Interest completely terminates and, upon such complete termination, such Member shall have no further rights or obligations hereunder other than those rights and obligations arising prior to such termination. If such Member subsequently acquires or reacquires any Interests, it shall automatically become bound once again by the terms of this Agreement. This paragraph (b) in no event shall be interpreted so as to relieve a Member of liability for its breach of or failure to comply with any term or provision hereof arising or existing prior to or at the time of the termination of this Agreement.

Section 9.07    Redemptions.

Other than as specifically provided in this Agreement the Company shall not have the right to require Members to resell their Interests to the Company. The Company shall not, as long as there are any Class B Members, redeem or repurchase any Class A Interests without the written consent of Class B Members holding a majority of the Class B Interest Percentages.

## ARTICLE X

## DISSOLUTION

Section 10.01    Events Requiring Dissolution.

The Company shall be dissolved upon the happening of any of the following events:

(a) termination of this Agreement in accordance with expiration of its period of duration as set forth in *Section 9.01* hereof;

(b) the occurrence of any event which would make unlawful under the laws of Delaware or the United States of America the continuing existence of the Company;

(c) the affirmative vote of either (i) Class A Members holding a majority of the Class A Interest Percentages or (ii) Class B Members holding a majority of the Class B Interest Percentages; provided, however, no such vote shall be effective if same would result in a violation of the terms of any mortgage loan or other agreement affecting Company, any

MBNY114618

subsidiary of Company, or, so long as that certain hotel and casino property currently known as the Aruba Wyndham Hotel and Casino (the "*Property*") is owned by the Company directly or indirectly, the Property; or

(d) the entry of a decree of judicial dissolution pursuant to the Act.

MBNY114619

Section 10.02    Liquidating Distribution.

(a) If the Company is dissolved and its affairs are to be wound up, the Manager shall (1) sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to the Members in kind), (2) allocate any net profits or net losses resulting from such sales to the Members' Capital Accounts in accordance with *Article V* hereof, (3) discharge all liabilities of the Company (other than liabilities to Members), whether by payment or the making of reasonable provision for payment thereof, including all costs relating to the dissolution, winding up, and liquidation and distribution of assets, (4) establish such reserves as may be reasonably necessary to provide for contingent, conditional and unmatured liabilities of the Company, (5) discharge any liabilities of the Company to the Members (including on account of Member Loans) other than on account of their Interests and their interest in the Company's capital or profits, and (6) distribute the remaining assets as follows:

(iv)    first, to the Members on a pari passu basis based on their Interest Percentages until their Capital Contributions have been returned to them in full; and

(v)    second, the balance, 75% to Belfonti and 25% to Aligned.

(b) Notwithstanding anything to the contrary in this Agreement, upon a liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g), if any Member has a negative Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

(c) Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(d) The Manager shall comply with any applicable requirements of applicable law pertaining to the winding up of the Company and the final distribution of its assets.

Section 10.03    Claims of the Members.

The Members shall look solely to the Company's assets for the return of their Capital Contributions or satisfaction of any obligations respecting any loans made by a Member to the Company, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions or to satisfy any obligation respecting such loans, the Members and former Members shall have no recourse against any Member, the Manager or their Affiliates.

MBNY114620

# ARTICLE XI.

## TAX MATTERS

Section 11.01  Preparation of Tax Returns.

The Manager shall arrange for the preparation and timely filing of all returns of Company income, gains, deductions, losses and other items required of the Company for federal and state income or franchise tax purposes and shall use all reasonable efforts to furnish, within 90 days of the close of each taxable year of the Company, the tax information reasonably required by Members for federal and state income or franchise tax reporting purposes. The classification, realization and recognition of income, gain, losses and deductions and other items shall be accounted for on the cash basis for federal income tax purposes.

Section 11.02  Tax Elections.

Except as otherwise provided herein, the Manager shall in its sole discretion determine whether to make any available election pursuant to the Code. All Members agree that the Company will be treated as a partnership for federal income tax purposes and no election will be made to treat the Company as an association for federal income tax purposes.

Section 11.03  Tax Controversies.

Subject to the provisions hereof, Belfonti is hereby designated the "**Tax Matters Partner**" (as defined in Section 6231 of the Code) for the Company, and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member and Assignee agrees to cooperate with the Tax Matters Partner and to do or refrain from doing any or all things reasonably required by the Tax Matters Partner to conduct such proceedings.

Section 11.04  Withholding.

Notwithstanding any other provision of this Operating Agreement, the Manager shall be authorized to take any action that they determine in their sole discretion to be necessary or appropriate to cause the Company to comply with any withholding requirements established under the Code or any other federal, state or local law, including, without limitation, pursuant to Sections 1441, 1442, 1445 and 1446 of the Code. To the extent that the Company is required to withhold and pay over to any taxing authority any amount resulting from the allocation or distribution of income to any Member or Assignee (including, without limitation, by reason of Section 1446 of the Code), the amount withheld shall be treated as a distribution of cash in the amount of such withholding from such Member or Assignee.

MBNY114621

## ARTICLE XII.

## GENERAL PROVISIONS

Section 12.01   Addresses and Notices.

A All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and signed by the party giving such notice and shall be deemed to have been duly given or made: if by hand, immediately upon delivery with receipt acknowledged; if by telecopier or similar electronic device, two (2) hours after sending, provided it is received during regular business hours during a business day, but if not, then immediately upon the beginning of the first business day after being sent, if confirmed by evidence or confirmation of receipt; if by Federal Express, Express Mail or any other overnight delivery service, on the first business day after dispatch with proof of delivery by such service; and if mailed by certified mail, return receipt requested, three (3) business days after mailing. All notices, requests, and demands are to be given or made to the parties at the addresses set forth on Schedule A (or to such other address as any party may designate by notice in accordance with the provisions of this paragraph), provided, however that in the case of notices to Belfonti, courtesy copies shall be sent as follows:

> MCR Property Management, Inc.
> 2319 Whitney Avenue
> Suite 1A
> Hamden, Connecticut 06518
>
> and
>
> Dana Eric Friedman, Esq.
> Harlow, Adams & Friedman, P.C.
> 300 Bic Drive
> Milford, CT 06460

provided, further that in the case of notices to Aligned, courtesy copies shall be sent as follows:

> Robert R. Leinwand, Esq.
> Robinson, Brog, Leinwand, Greene, Genovese & Gluck
> 1345 Avenue of Americas
> New York, New York 10015
> Facsimile: (212) 956-2164

Section 12.02   Titles and Captions.

All article or section titles or captions in this Operating Agreement are for convenience only. They shall not be deemed part of this Operating Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

{00304625.DOC;6}                                27

Section 12.03  <u>Pronouns and Plurals</u>.

Whenever the context may require, any pronoun used in this Operating Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

Section 12.04  <u>Governing Law; Successors; and Severability</u>.

This Operating Agreement shall be governed by and construed in accordance with the laws of the State of Delaware and, subject to the restrictions on transferability set forth in this Operating Agreement, shall bind and inure to the benefit of the heirs, executors, personal representatives, successors and assigns of the Members.  The rights and liabilities of the Members and the Manager under this Operating Agreement shall be as provided by Delaware law.

Section 12.05  <u>Entire Agreement</u>.

This Operating Agreement constitutes the sole operating agreement of the Company and constitutes the entire agreement among the parties.  This Operating Agreement supersedes any prior agreements or understandings, oral or written, between the parties with respect to the limited liability company formed herein, all of which are hereby canceled.

Section 12.06  <u>Amendment</u>.

(a)  <u>Agreement May Be Modified</u>.  This Agreement may be modified only as provided in this *Section 12.06*.  Subject to *Section 12.06(b)* no Member shall have any vested rights in this Agreement which may not be modified through an amendment to this Agreement.

(b)  <u>Amendment or Modification of Agreement</u>.  Subject to *Section 8.02*, this Agreement may be amended or modified from time to time only by a written instrument adopted by the Manager; <u>provided</u> that any modifications of this Agreement which increases the financial obligations or liabilities of any Class of Members or reduces the economic rights or voting rights of any Class of Members must be consented to by the Class of Members so affected.

Section 12.07  <u>Dispute Resolution</u>.

Any dispute arising out of or relating to this Operating Agreement or the breach, termination or validity hereof shall be finally settled by binding arbitration conducted expeditiously in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect from time to time, and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof. The place of arbitration shall be in New York, New York.

MBNY114623

**ARTICLE XIII.**

**INDEMNIFICATION; AFFILIATE TRANSACTIONS; RESTRICTIVE COVENANT; CONFIDENTIAL INFORMATION**

Section 13.01   Indemnification of Members, Managers and Officers.

(a) A Member, Manager or Officer shall not be liable to the Company or any other Member, Manager or Officer for any act or omission based upon errors of judgment or other fault in connection with the business or affairs of the Company if the Member's, Manager's or Officer's conduct shall not have constituted fraud or willful misconduct.

(b) To the fullest extent permitted by law, each Member, Manager and Officer shall be indemnified and held harmless by the Company from and against any and all losses, claims, damages, settlements" and other amounts (collectively, *"Losses"*) arising from any and all claims (including attorneys' fees and expenses, as such fees and expenses are incurred), demands, actions, suits or proceedings (civil, criminal, administrative or investigative), in which he may be involved, as a party or otherwise, by reason of the management of the affairs of the Company, whether or not he continued to be a Member, Manager or Officer or involved in management of the affairs of the Company at the time any such liability or expense is paid or incurred; provided that the Member, Manager or Officer shall not be entitled to the foregoing indemnification if a court of competent jurisdiction shall have determined that such Losses resulted primarily from the fraud or willful misconduct of such Member, Manager or Officer. The termination of a proceeding by judgment, order, settlement or conviction under a plea of nolo contendere, or its equivalent, shall not, of itself, create any presumption that such Losses resulted primarily from the fraud or willful misconduct of the Member, Manager or Officer or that the conduct giving rise to such liability was not in the best interest of the Company The Company shall also indemnify a Member, Manager or Officer who was or is a party or is threatened to be made a party to any threatened, pending or completed action by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Member, Manager or Officer is or was an agent of the Company, against any Losses incurred by such Member, Manager or Officer in connection with the defense or settlement of such action; provided that no Member, Manager or Officer shall be entitled to the foregoing indemnification if a court of competent jurisdiction shall have determined that any such Losses resulted from the fraud or willful misconduct of such Member, Manager or Officer.  The Company may advance to the Member, Manager or Officer any expenses (including, without limitation, attorneys' fees and expenses) incurred as a result of any demand, action, suit or proceeding referred to in this paragraph (b) provided that (i) the legal action relates to the performance of duties or services by the Member, Manager or Officer on behalf of the Company; and (ii) the Member, Manager or Officer provides a written undertaking to repay to the Company the amounts of such advances in the event that the Member, Manager or Officer is determined to be not entitled to indemnification hereunder

(c) The indemnification provided by paragraph (b) of this *Section 13.01* shall not be deemed to be exclusive of any other rights to which a Member, Manager or Officer may

MBNY114624

be entitled under any agreement, as a matter of law, in equity or otherwise, and shall continue as to a Member, Manager or Officer who has ceased to have an official capacity and shall inure to the benefit of the heirs, successors and administrators of the Member, Manager or Officer

(d) Any indemnification pursuant to this *Section 13.01* will be payable only from the assets of the Company.

Section 13.02     <u>Transactions with a Member, Manager or Officer.</u>

A Member, Manager or Officer, on behalf of the Company, may enter into contracts or transactions with itself, himself or herself or any of its, his or her Affiliates, provided that any such contract or transaction shall be on terms no more favorable to the Member, Manager or Officer or its, his or her Affiliates than generally afforded to unrelated parties in a similar transaction.

Section 13.03  <u>Non-Disclosure.</u>

Each Member agrees that he shall not use for itself or others, or publish, disclose or otherwise reveal or divulge, any Confidential Information (as such term is defined below) known by such Member as a consequence of or through his association with the Company.  Each Member shall, (1) maintain all Confidential Information in the strictest confidence and keep the same secret using at least the same degree of care as he uses for his personal confidential information, (2) retain all Confidential Information in trust in a fiduciary capacity for the sole and absolute benefit of the Company, and (3) refrain from using or allowing to be used any Confidential Information for his own benefit or for the benefit of any third party, <u>provided, however</u>, that in the event disclosure of Confidential Information is requested (i) by governmental agencies under color of law or applicable regulation, (ii) pursuant to subpoena or other compulsory process, or (iii) otherwise as may be required by law, each such Member to the extent lawfully possible will give the Company at least five (5) days prior written notice before his disclosure and will provide the Company with copies of any responsive materials.

Section 13.04  <u>Breach; Injunctive Relief.</u>  If any Member commits a breach, or threatens to commit a breach, of any of the provisions of *Section 13.03*, the Company shall have the following rights and remedies, each of which shall be independent of the others and shall be severally enforceable, and all of such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity:

(a)      <u>Specific Performance.</u>  The right and remedy to have such provisions of this Article specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company and the Company and that money damages will not provide an adequate remedy at law; and in connection therewith the right to obtain, without notice to such Member and without the need to post any bond, a temporary restraining order, an injunction and any other equitable relief.  Such right of injunctive relief shall be cumulative and in addition to whatever other

MBNY114625

remedies Company may have at law or in equity, including the right of the Company to recover monetary damages from such Member on account thereof.

Section 13.05  Severability and Construction.

(a)     The provisions of this Article are severable, and if any provision or any part of any provision of this Article is found to be invalid or unenforceable, the balance of that provision and the other provisions hereof shall be given full force and effect and remain fully valid and enforceable.

(b)     If any one, or any part, of the covenants contained in this Article is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, said provision shall then be enforceable.

(c)     The parties hereto intend to and hereby confer jurisdiction to enforce the covenants contained in this Article upon the courts of any state within the geographical scope of such covenants.  In the event that the courts of any one or more of such states shall hold such covenants wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect in the courts of any other states within the geographical scope of such covenants the Company's right to the relief for breaches of such covenants in such other states, the above covenants as they relate to each state being, for this purpose, severable into diverse and independent covenants.

## ARTICLE XIV.

## SUBJECT TO ALL LAWS

Section 14.01  Subject to All Laws.

The provisions of this Operating Agreement shall be subject to all valid and applicable laws, including, without limitation, the Act, as now or hereafter amended, and in the event that any of the provisions of this Operating Agreement are found to be inconsistent with or contrary to any such valid laws, the latter shall be deemed to control and this Operating Agreement shall be deemed modified accordingly, and, as so modified, to continue in full force and effect.

MBNY114626

## SIGNATURE PAGE

**IN WITNESS WHEREOF,** each of the undersigned has executed or caused to be executed by itself or an officer or agent duly authorized, the Operating Agreement on the date or dates set forth below.

**BCP Aruba I, LLC**
**By:    Belfonti Capital Partners, LLC**
       **Its Manager**

Dated: ____5/3/06____

Name:  Michael Belfonti
Title:   Manager


**THE INITIAL CLASS A MEMBER:**

BELFONTI HOLDINGS, LLC

Dated: ____5/3/06____

   Name:  Michael Belfonti
   Title:   Manager


**THE INITIAL CLASS B MEMBER**

ALIGNED CAPITAL HOLDINGS, LLC
By:    The Hochfelder Family Trust
      Its Member

Dated:_____

   Name:  James Hochfelder
   Title:   Trustee

MBNY114627

## SIGNATURE PAGE

**IN WITNESS WHEREOF,** each of the undersigned has executed or caused to be executed by itself or an officer or agent duly authorized, the Operating Agreement on the date or dates set forth below.

**BCP Aruba I, LLC**
**By:    Belfonti Capital Partners, LLC**
**Its Manager**

Dated:_____

_____
Name:  Michael Belfonti
Title:   Manager

**THE INITIAL CLASS A MEMBER:**

BELFONTI HOLDINGS, LLC

Dated:_____

_____
Name:  Michael Belfonti
Title:   Manager

**THE INITIAL CLASS B MEMBER**

ALIGNED CAPITAL HOLDINGS, LLC
By:    The Hochfelder Family Trust
Its Member

Dated:__5/3/06_____

_____
Name:  James Hochfelder
Title:   Trustee

{00304625.DOC;3}                                    32

MBNY114628

**SCHEDULE A**
**TO**
**SIGNATURE PAGE**
**TO THE OPERATING AGREEMENT OF**
**BELFONTI CAPITAL PARTNERS, LLC**

| Date | Member's name, address and social security number | Class | Initial Capital Account | Interest Percentage |
|------|-----------------------------------------------------|-------|-------------------------|---------------------|
|  | Belfonti Holdings, LLC c/o Michael Belfonti 31 West 52nd Street Suite 1770 New York, New York 10019 [          ] | Class A | $750.00 | 75% |
|  | Aligned Capital Holdings 31 West 52nd Street Suite 1770 New York, New York 10019 [          ] | Class B | $250.00 | 25% |

MBNY114629

### SIGNATURE PAGE FOR ADDITIONAL
### MEMBERS CONSENTING TO THE OPERATING
### AGREEMENT OF BCP Aruba I, LLC

**IN WITNESS WHEREOF,** the new Member has executed this Operating Agreement effective for all purposes as of the _____ day of _____, 200__.

The undersigned member has entered into transactions pursuant to which it will be issued membership interests as set forth on *Schedule 1* hereto in BCP Aruba I, LLC, a Delaware limited liability company (the "*Company*"), under the BCP Aruba I, LLC Operating Agreement dated as of March ___, 2006 (the "*Operating Agreement*"). This page constitutes the signature page to the Operating Agreement respecting such members.

The undersigned hereby represents and warrants that the person executing the Operating Agreement has all requisite authority to enter into the Operating Agreement.

**IN WITNESS WHEREOF,** the undersigned has executed or caused to be executed by itself or an officer or agent duly authorized, the Operating Agreement on the date or dates set forth below.

Dated:_____          BCP Aruba I, LLC


                                 By:_____
                                 Title:


Dated:_____          MEMBER:


                                 By: _____
                                 Name:
                                 Title:

MBNY114630

**SCHEDULE 1**
**TO**
**SIGNATURE PAGE FOR ADDITIONAL MEMBERS**
**TO THE OPERATING AGREEMENT OF**
**BCP Aruba I, LLC**

| Date | Member's name, address and social security number | Class | Aggregate Capital Contribution | Interest Percentage |
|---|---|---|---|---|
| | | | | |
| | | | | |

2

---

2       This represents the date the Interests were issued to the Member.  Any distributions made by the Company for the next ending calendar quarter shall be prorated based upon the number of days in said quarter after the date of issuance set forth above.

MBNY114631

## Schedule 8.02

    (i)   require Additional Contributions;

   (ii)   issuance of any membership interests;

  (iii)   redemption of any membership interests;

  (iv)   approving any payment by the Company to a Member for services rendered and

   (v)   amending the Operating Agreement in a manner which increases the financial obligations or liabilities of the Class B Members or reduces the economic rights or voting rights of the Class B Members

MBNY114632

Schedule 4.6

MBNY114633

**Schedule 4.6**
**Belfonti Capital Partners**
**Aruba Expenditures As of April 24, 2006**

| Date | Payee | Amount |
|---|---|---|
| 04/07/05 | American Express | 1,218.41 |
| 04/21/06 | Harlow Adams & Friedman | 1,020.00 |
| 03/23/06 | IVI /Due Dilligence Services | 8,000.00 |
| 10/03/05 | IVI /Due Dilligence Services | 5,400.00 |
| 11/02/05 | Lodgiong Investment Advisors | 20,000.00 |
| 06/17/05 | Lodgiong Investment Advisors | 30,000.00 |
| 10/14/05 | MCR re American Express | 2,854.50 |
| 08/05/05 | MCR re American Express | 3,725.00 |
| 09/06/05 | MCR re American Express | 698.58 |
| 11/17/05 | MCR re American Express | 2,589.00 |
| 03/22/06 | MCR re American Express | 6,881.42 |
| 01/09/06 | MCR re American Express | 3,574.70 |
| 02/06/06 | MCR re American Express | 1,852.00 |
| 02/01/06 | Pricewaterhouse Coopers | 60,530.00 |
| 02/02/06 | Pricewaterhouse Coopers | 30,000.00 |
| 02/09/06 | Pricewaterhouse Coopers | 5,775.21 |
| 04/08/06 | Pricewaterhouse Coopers | 42,812.50 |
| 12/06/05 | PricewaterhouseCoopers | 20,000.00 |
| 04/07/06 | Promes Van Doorne | 15,606.51 |
| 08/05/05 | Sjiem Fat & Co. | 3,970.00 |
| 08/12/05 | Sjiem Fat & Co. | 14,895.00 |
| 08/12/05 | Sjiem Fat & Co. | 11,550.00 |
| 12/06/06 | Sjiem Fat & Co. | 10,395.00 |
| 02/24/06 | Sjiem Fat & Co. | 38,446.65 |
| 03/06/06 | Sjiem Fat & Co. | 35,000.00 |
| 03/22/06 | Sjiem Fat & Co. | 2,129.45 |
| 04/07/06 | Sjiem Fat & Co. | 34,190.00 |
| 01/31/06 | Stronsk Translation NV | 214.30 |
| 04/19/06 | Surveying Unlimited Aruba | 10,559.70 |
| 11/02/05 | Urban Systems The innov Grp | 4,500.00 |
| 01/09/06 | Urban SystemsThe Innov Grp | 17,421.39 |
| 04/07/06 | expense report | 196.42 |
| 02/23/06 | expense report | 1,280.16 |
| 10/24/05 | expense report | 383.75 |
| 07/21/05 | expense report | 1,474.33 |
| 06/21/05 | expense report | 125.00 |
| 09/01/05 | Deposit puchase agreement | 1,000,000.00 |
| 12/05/05 | Deposit puchase agreement | 1,000,000.00 |
| 02/13/06 | Deposit Financing Aruba | 1,000,000.00 |

**3,449,268.98** *

* Total disbursments through 4/24/06. Additional disbursments made between 4/25/06 and closing
of purchase to be added to this amont.

MBNY114634