EXHIBIT Z

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ARUBA HOTEL ENTERPRISES N.V.,

        Plaintiff,

    v.                         **3:07 Civ. 1297 (JCH)**

MICHAEL BELFONTI and MCR PROPERTY
MANAGEMENT INC.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff, Aruba Hotel Enterprises N.V. ("AHE"), respectfully submits this memorandum of law in support of its motion for summary judgment against defendants Michael Belfonti ("Belfonti") and MCR Property Management Inc. ("MCR") (collectively, "Defendants").

## PRELIMINARY STATEMENT

In April 2006, Belfonti became the majority beneficial owner of AHE. AHE's principal asset was a resort hotel located on the island of Aruba (the "Hotel"). To finance the transaction, Belfonti caused AHE to enter into a $230 million mortgage loan agreement with an affiliate of Wachovia Bank, National Association ("Wachovia"). Thereafter, Belfonti caused certain of his affiliated entities, including MCR, to contribute millions of additional dollars so that he could retain his investment in AHE. The additional monies contributed by MCR were used to fund AHE's mortgage payments to Wachovia; all of these funds originated from Connecticut, where MCR is located and where Belfonti resides.

Eventually, in April 2007, Belfonti made the decision not to invest any more money in AHE. He caused AHE to default on the mortgage loan and, in consequence, he lost control of AHE and the Hotel. Several months later -- after other litigation had broken out between Belfonti and the New York-based investment firm that assumed ownership of AHE following Belfonti's default -- MCR and certain of Belfonti's other entities claimed, for the first time, that the monies Belfonti had caused them to invest in AHE were actually "loans" that had to be immediately "repaid" by AHE. During the course of litigation brought by Belfonti's entities (including MCR) against AHE in Aruba to enforce the alleged "loans," Belfonti's entities changed their story and contended that even if the monies were not loans AHE is nonetheless required to "repay" them under a theory of "unjust enrichment."

By this action, AHE seeks a declaratory judgment that the MCR transactions at issue are not loans and cannot be enforced as loans, under a theory of unjust enrichment or otherwise. AHE also seeks a permanent injunction restraining the U.S.-based Defendants from attempting to seek "repayment" of the amounts at issue in any other jurisdiction.

Because the material facts are undisputed, summary judgment should now be granted in AHE's favor. Those facts include that:

- There are no loan agreements or other writings signed by AHE memorializing any obligation on the part of AHE to "repay" to Belfonti's entity, MCR, the sums it contributed to Belfonti's investment in AHE;

- The "loans" were "agreed to" by Belfonti only, acting on behalf of both the alleged "lender" (MCR) and the alleged "borrower" (AHE);

- The "loans" have no terms; and

- Critically, Belfonti says that he did not expect AHE to "repay" the alleged "loans" until AHE's operations became sufficiently profitable or he was able to sell AHE or obtain third-party financing. There is no evidence that any of those things have come to pass.

Thus, what Belfonti and MCR now claim to be "loans" were, quite clearly, capital investments in AHE made by MCR on Belfonti's behalf. Belfonti's investment in AHE ultimately failed, and he eventually made the decision not to fund it any further. That being the case, there is no basis in law or equity for MCR to recover the investments in AHE that it made on Belfonti's behalf.

As a matter of law, the alleged "loans" cannot be enforced as such because -- there being no loan agreement or any writing executed by AHE acknowledging a repayment obligation -- the "loans" run afoul of the statute of frauds under applicable Connecticut law. Moreover, even if the statute of frauds were not applicable, there simply is no evidence of any agreement by AHE to repay the amounts at issue. Rather, the undisputed evidence is that there was no such agreement. Moreover, AHE cannot be required to disgorge the funds at issue under a theory of unjust enrichment because, among other reasons, it cannot be "unjust" for AHE to retain funds that even Belfonti says would not become "due" until his investment in AHE proved successful (which it did not).

Finally, AHE is entitled to a permanent injunction prohibiting Defendants from attempting to enforce the alleged "loans" as loans, under a theory of unjust enrichment or otherwise. This is necessary to ensure that the U.S.-based Defendants are not able "to paralyze the jurisdiction" of this Court by trying to obtain in a foreign jurisdiction the relief they cannot obtain in this Court.

## STATEMENT OF UNDISPUTED FACTS

### Belfonti's Purchase of AHE and the Hotel

In May 2006, Belfonti became the beneficial owner and control person of AHE. (Local Rule 56(a)(1) Statement ("Statement," submitted herewith), ¶1). AHE's principal asset was, and is, the Hotel. (*Id.*). To finance this transaction, Belfonti arranged for two loans from recognized financiers on normal business terms. The first loan (the "Mortgage Loan") was made to AHE by

3

WIBC Aruba N.V. ("WIBC") (an affiliate of Wachovia) in the amount of $230,000,000.00. (*Id.*, ¶2). The terms of the Mortgage Loan were memorialized in a loan agreement between AHE and WIBC, dated May 3, 2006 (the "Mortgage Loan Agreement"). (*Id.*).

The second loan (the "Mezzanine Loan") was made by Petra Mortgage Capital Corp. LLC ("Petra Mortgage") to a Belfonti-controlled entity called BCP Florin, LLC ("BCP Florin") in the amount of $19,450,000.00. (*Id.*, ¶3). The terms of the Mezzanine Loan were memorialized in a loan and security agreement executed on or about June 9, 2006 (the "Mezzanine Loan Agreement"). (*Id.*).[1] Petra Mortgage subsequently assigned its rights under the Mezzanine Loan Agreement to Petra Fund REIT Corp. ("Petra REIT"). (*Id.*, ¶3, n.2).[2]

The Mezzanine Loan was secured by a first priority security interest in one hundred percent of the issued and outstanding equity of Twilight Holdings, LLC ("Twilight"). (*Id.*, ¶4). Twilight -- a Delaware limited liability company that was, at the time, majority beneficially owned by Belfonti -- was an indirect subsidiary of BCP Florin. (*Id.*). At the time the Mezzanine Loan was made, AHE was an indirect subsidiary of BCP Florin and Twilight. (*Id.*).

Under Section 3.1.24(d) of the Mortgage Loan Agreement, AHE was not permitted to incur indebtedness of the type alleged by Defendants to have been created by AHE to them. (*Id.*, ¶5). A breach of Section 3.1.24(d) of the Mortgage Loan Agreement gives rise to a default under the Mortgage Loan Agreement for which there is no right to cure. (*Id.*). One of the lender's remedies upon such a default is to foreclose on the Hotel. (*Id.*).

---

[1] Belfonti signed both the Mortgage Loan Agreement and the Mezzanine Loan Agreement on behalf of the borrowers. (Statement, ¶3).

[2] Petra Mortgage and Petra REIT will hereinafter be referred to, individually and collectively, as "Petra."

**Belfonti's Defaults**

In April 2007, AHE defaulted on the Mortgage Loan and BCP Florin defaulted on the Mezzanine Loan. (*Id.*, ¶6). Thereafter, Petra voluntarily cured the default on the Mortgage Loan, foreclosed on its security interest in Twilight under the Mezzanine Loan and, in consequence, became the beneficial owner of Twilight's indirect subsidiary, AHE. (*Id.*). On August 21, 2007, MCR asserted, *for the first time*, that it had made "loans" to AHE and demanded immediate "repayment." (*Id.*, ¶7).

**The Alleged "Lender"**

MCR is owned by Belfonti and either his mother or her trust. (*Id.*, ¶8). Since the beginning of 2006, Belfonti has been MCR's chief executive. (*Id.*). MCR's offices are located in Hamden, Connecticut. (*Id.*). Although Belfonti has a "satellite" office in New York City, all of his businesses are run out of this office, and all of his employees are paid by MCR. (*Id.*, ¶9). Indeed, Belfonti sometimes even held AHE out as a Connecticut-based business. (*Id.*).

**The Alleged "Loans"**

MCR alleges that it made the following "loans" to AHE:

**$1,307,611:** This sum was paid directly to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan. (*Id.*, ¶10). The money was paid from the bank account of Belfonti's Connecticut attorneys directly to Wachovia in North Carolina. (*Id.*). This allowed Belfonti to continue to own AHE (and, thus, the Hotel). (*Id.*).

**$1,161,874:** This sum was paid directly from MCR's Connecticut bank account to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan. (*Id.*, ¶11). The payment was made so that Belfonti could continue to own AHE and the Hotel. (*Id.*).

5

As Belfonti admitted during his deposition when discussing another "loan" made by another Belfonti entity to fund a payment on the Mortgage Loan, the only beneficiary of these transactions was him:[3]

> Q. So if I'm understanding it correctly, you, as the borrower on the Wachovia loan, needed to find $393,000 to make payment; is that right?
>
> A. That is correct.
>
> Q. If you hadn't made that payment, what could have happened?
>
> A. The loan could have gone into default.
>
> Q. What effect would that have had, if any, on AHE?
>
> A. They would have been in default of their obligation with the Wachovia loan.
>
> Q. Would that have, for example, caused the hotel to stop operating?
>
> A. No.
>
> Q. Would it have caused AHE to go out of business?
>
> A. No.
>
> Q. It would have, could have caused you, Michael Belfonti, to lose your equity interest in AHE; correct?
>
> A. That is correct.
>
> Q. Can you think of any other consequence that would have occurred, had you not come up with the $393,000 to make the interest payment to Wachovia?
>
> A. No.

(*Id.*, ¶12).

---

[3] This "loan" and others purportedly made by Belfonti entities Belfonti Capital Partners, LLC ("BCP") and Belfonti Holdings LLC are the subject of a similar action pending in the Southern District of New York captioned *Aruba Hotel Enterprises N.V. v. Michael Belfonti, et al.*, 07 Civ. 07564 (PAC).

**The "Terms" of the Alleged "Loans"**

With respect to each of the alleged "loans," Belfonti was the one who decided on behalf of the alleged "lender" to make the "loan" *and* the one who "agreed" on behalf of AHE to "accept" the "loan." (*Id.*, ¶13). There were no negotiations regarding the terms of any of the alleged "loans." (*Id.*). There is no writing signed by any representative of the alleged "lender", MCR, *or* AHE which memorializes any of the alleged "loans." (*Id.*). Neither MCR nor AHE were represented by counsel in connection with any of the alleged "loans." (*Id.*).

There is no maturity date or payment schedule for any of the alleged "loans." (*Id.*, ¶14). With respect to interest, Belfonti testified variously that no interest had to be paid by AHE; that interest would be paid at the rate of 12% (since, according to Belfonti, that is the rate he typically applies in the case of "loans" between his various entities); and that an interest rate of 8 to 9% (or "something like that") would be applied "because of the international nature of the transaction." (*Id.*). Regardless, Belfonti's testimony makes clear that interest was not something he thought of when he decided to approve each "loan." (*Id.*).

There was no security pledged for any of the alleged "loans." (*Id.*, ¶15). With one exception, AHE (acting through Belfonti) did not even seek financing from any other source. (*Id.*). As Belfonti testified, "I don't think anyone would have lent monies unsecured, except related entities that I controlled." (*Id.*). Belfonti testified that the alleged "loans" were either not subordinated to AHE's pre-existing loan obligations or that he did not know whether they were subordinated and would need to consult his attorneys for an answer. (*Id.*, ¶16).

Notably, Belfonti testified that he did not expect AHE to repay the "loans" made by his "lender" entities until such time as AHE was able to meet both its operational needs and its obligations with respect to the Mortgage Loan from the cash flow generated by the operation of

the Hotel, a sale of the Hotel or third-party refinancing. (*Id.*, ¶17).[4] There is no evidence that any of these scenarios have come to pass.

It is not surprising that the alleged "loans" have no actual terms. In truth, the transactions do not reflect loans, but rather Belfonti's practice of moving money between his various entities (using them as his corporate "piggy banks") in order to fund his various investments. The Controller for Belfonti's entities, Victoria Carpenter, described the practice this way:

> A.   My understanding was that the loans were from [BCP], but that the funds flowed through from other entities or perhaps were sent directly from other entities, but the intention was they were [BCP].
>
> Q.   My question was, from where did you form that understanding?
>
> A.   My general understanding of how the Belfonti companies transferred funds between companies.
>
> Q.   What's your general understanding?
>
> A.   *My general understanding is that when an entity needs money and another entity has the money, the entity that has the money lends the money to the entity that needs the money.*

(*Id.*, ¶18 (emphasis supplied)).

## AHE's Articles of Incorporation

AHE's Articles of Incorporation during the relevant time period prohibited AHE from incurring indebtedness without the approval of AHE's Board of Supervisory Directors. (*Id.*, ¶19). This was confirmed by Dana Friedman, Belfonti's lawyer and fellow member of AHE's Board of Supervisory Directors. (*Id.*).[5] It is undisputed that, despite Belfonti being one of the

---

[4] Carpenter also stated that the practice within Belfonti entities regarding "repayment" of "loans" between them "boils down to cash available, cash between entities." AHE did not "repay" alleged "loans" because "there was not extra cash." (Statement, ¶17).

[5] Friedman has been Belfonti's long-time attorney and, like Belfonti, was a member of AHE's Supervisory Board of Directors while Belfonti was in control of AHE. (Statement, ¶19). Belfonti testified that Friedman was well qualified to explain the requirements of AHE's Articles or Incorporation. (*Id.*).

members of AHE's Board of Supervisory Directors (Belfonti Tr. at 56-57), none of the alleged

"loans" was presented to or approved by AHE's Supervisory Board. (Belfonti Tr. at 78, 104,

116-117; Friedman Tr. at 70-72, 74-75).

## ARGUMENT

Summary judgment under Fed. R. Civ. P. 56 must be granted when the pleadings and

supplementary evidentiary materials "show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247, 250 (1986). Once a properly supported motion for summary

judgment has been made, the burden shifts to the nonmoving party to "set forth specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Thus, to withstand the

motion, the nonmovant must do more than present evidence that is merely colorable, conclusory

or speculative; it must present "concrete evidence from which a reasonable [fact-finder] could

return a verdict in [its] favor." *Anderson*, 477 U.S. at 256. The nonmovant must do more than

show "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986).

Applying these standards to the undisputed material facts in this case, it is clear that

summary judgment should be granted in favor of AHE.

## I.    CHOICE OF LAW

In a diversity suit, such as this one, the District Court should apply the choice-of-law

rules of the state in which it sits. *See, e.g., Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151

(2d Cir. 2003) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). To

determine what substantive law applies in contract cases, a Connecticut court is to "apply the

'most significant relationship' test of § 188 of the Restatement (Second) of Conflict of Laws

(1971) to determine which state's law applies." *Heublein v. Rudder*, 2007 WL 2472018, at *3

(D. Conn. Aug. 29, 2007) (Exhibit A) (citing *Am. States Ins. Co. v. Allstate Ins. Co.*, 282 Conn. 454, 459 (2007)). "Courts should weigh considerations including (1) the place of contracting, (2) where the negotiations took place, (3) the place of performance, (4) the location of the contract's subject matter, and (5) the domicile or residence of the parties when conducting this analysis." *Heublein*, 2007 WL 2472018, at *3 (citing *Reichhold Chems., Inc. v. Hartford Accident & Indem. Co.*, 243 Conn. 401, 409-10 (1997)). "The Connecticut Supreme Court has also adopted a 'general presumption . . . that unless another state has an overriding policy-based interest in the application of its law, the law of the state in which the bulk of the contracting transactions took place should be applied." *Id.*

Applying these standards to the transactions at issue in this case, it is clear that the substantive law of Connecticut governs both alleged loans. Indeed, Defendants have admitted, in a filing made in this case, "that, under Connecticut's choice of law provisions, Connecticut substantive law applies . . . ." (Affidavit of Michael T. Mervis ("Mervis Aff.," submitted herewith), Ex. B).

**The Alleged $1,307,611 "Loan"**

MCR, the alleged "lender," has its principal place of business in Hamden, Connecticut, where Belfonti himself works. (Statement, ¶8). It follows, then, that the purported decision by Belfonti to make and receive this alleged "loan" (*id.*, ¶13) most likely took place in Connecticut. This is, in fact, the case with respect to both of the alleged "loans." (*Id.*). Further, the funds originated from MCR's bank account in Connecticut and, after first being held in the bank account of Belfonti's Connecticut attorneys, were transferred directly to Wachovia in North Carolina. (*Id.*, ¶ 10).

**The Alleged $1,161,874 "Loan"**

All of the factors applicable to the other alleged MCR "loan" apply to this alleged "loan" as well, except that in this case the funds were paid directly from MCR's bank account with People's Bank in Connecticut to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan. (*Id.*, ¶11).

## II.    THE ALLEGED "LOANS" VIOLATE THE STATUTE OF FRAUDS

### A.    The Alleged "Loans" Are Barred By CONN. GEN. STAT. § 52-550(a)(6)

Connecticut's statute of frauds, Conn. Gen. Stat. § 52-550, provides, in relevant part, that:

> [n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars.

*Id.* § 52-550(a). "The statute of frauds bars actions where there is not a sufficient memorandum in writing signed by the party charged." *Conn. Nat'l Bank v. Lewis*, 1994 WL 228309, at *6 (Conn. Super. Ct. May 19, 1994) (Exhibit B) (quoting *Booth v. Flanagan*, 23 Conn. App. 579, 584 (1990)) (internal quotations omitted). The transactions at issue are each in excess of $50,000 (Statement, ¶¶ 10-11) and none are evidenced by a writing signed by AHE. (*Id.*, ¶ 13). They are all, therefore, barred by Connecticut's statute of frauds.

### B.    The Doctrine of Partial Performance Is Inapplicable

Defendants cannot rely on the doctrine of partial performance to save the alleged "loans" from the bar imposed by the statute of frauds. Under that doctrine, "[c]ontracts that would otherwise be unenforceable without a writing sufficient to comply with the Statute of Frauds . . . are nonetheless enforceable because of part performance if two separate but related criteria are satisfied." *Lewis*, 1994 WL 228309, at *6. The acts of part performance on the part of the party seeking to enforce the contract must "clearly refer to some contract in relation to the matter in dispute." *SS-II, LLC v. Bridge Street Assocs.*, 2008 WL 1948075, at *3 (Conn. Super. Ct. Apr.

18, 2008) (Exhibit C) (citing *Electrical Wholesalers, Inc. v. M.J.B. Corp.*, 99 Conn. App. 294, 306 (2007)). "The acts generally must be . . . in pursuance of the contract, and with the design of carrying the same into execution, and must also be done with the assent, express or implied, or knowledge of the other party, and be such acts as alter the relations of the parties." *Id.* "The acts also must be of such a character that they can be naturally and reasonably accounted for *in no other way than by the existence of some contract* in relation to the subject matter in dispute." *Lewis*, 1994 WL 228309, at *6 (emphasis in original).

Here, Defendants' actions in transferring monies amongst the various Belfonti entities (including MCR) so that Belfonti could retain control of AHE are plainly not "of such a character that they can be naturally and reasonably accounted for in no other way than by the existence of some contract . . . ." *Id.* Given Belfonti's practice of shuffling funds back and forth amongst his assorted entities depending on their capital needs, the transactions at issue can clearly be characterized as investments of risk capital made by Belfonti's entities (including MCR) on his behalf during the time that he was in control of AHE. Each time the MCR "loans" were allegedly made, Belfonti was faced with a choice: he either could invest the money he needed to hold onto AHE until such time as AHE's operations became sufficiently cash positive, or he could say "enough," literally "cut his losses" (as he eventually did in April 2007) and lose ownership of AHE and the Hotel. Even according to Belfonti, MCR had no expectation of being repaid the "loaned" sums until his investment in AHE was a success. (Statement, ¶17). This is the very definition of investment, not "lending."

This conclusion is confirmed by application of analogous "recharacterization" case law developed in the bankruptcy context. Typically, recharacterization cases involve a scenario where, prior to filing for bankruptcy protection, the soon-to-be-bankrupt entity receives a cash

12

infusion from an affiliated entity, and the transaction is structured like and labeled as a "loan" so

as to afford the affiliated entity priority over the creditors of the "borrower." *See, e.g., In re*

*Interstate Cigar Co.*, 182 B.R. 675 (Bankr. E.D.N.Y. 1995) (involving a situation where

unsecured creditors challenged a cash advance made by a sister corporation to the debtor,

arguing that the transaction was, in fact, a capital infusion).[6]  In such a situation, however, form

does not trump substance, and a court can "effectively ignore the label attached to the transaction

at issue and instead recognize its true substance." *In re Hedged-Investments Assocs., Inc.*, 380

F.3d 1292, 1297 (10th Cir. 2004).[7]  In such a case, "funds advanced are no longer considered a

loan which must be repaid . . . but are instead treated as a capital contribution." *Id.*

     "A significant test for capital contribution is whether a disinterested lender would have

made such loans at the same time." *In re Interstate Cigar Co.*, 182 B.R. at 679.  However, the

"third party lender test need not stand alone; not less than eleven factors may be applied by a

court to determine whether cash advances to a corporation are loans or capital investments." *Id.*

The factors are:

> (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the
> presence or absence of a fixed maturity date and schedule of payments; (iii) the presence
> or absence of a fixed rate of interest and interest payments; (iv) the source of repayments;
> (v) the adequacy or inadequacy of capitalization; (vi) the identity of interest between the
> creditor and the stockholder; (vii) the security, if any for the advances; (viii) the
> corporation's ability to obtain financing from outside lending institutions; (ix) the extent
> to which the advances were subordinated to the claim of outside creditors; (x) the extent

---

[6] Although the instant case is not a bankruptcy proceeding, recharacterization case law is highly instructive
inasmuch as the circumstances in which Belfonti and MCR seek to require "repayment" of alleged "loans" to AHE -
- the entity that Belfonti once owned but lost control of because of his inability to fund AHE's *actual* debt to its
*actual* lenders (Wachovia and Petra) -- is essentially the same as a claim by an affiliate of a bankrupt entity that
the affiliate's capital contributions were really "loans."

[7] In opposing this motion, Defendants will no doubt focus on the fact that the alleged "loans" were carried on AHE's
unaudited books as "long term liabilities" to BCP (but, notably, *not* MCR).  Whatever *accounting* significance this
may or may not have, it has no relevance to whether there actually exist any enforceable loan agreements.  The *label*
given to the transactions in AHE's unaudited books is beside the point; what matters is what the undisputed facts
concerning the *substance* of the transactions show them to be.

to which the advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments.

*In re Ticketplanet.com*, 313 B.R. 46, 71-72 (Bankr. S.D.N.Y. 2004).

"While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else." *In re Adelphia Communication Corp.*, 2006 WL 687153, at *10 (Bankr. S.D.N.Y. Mar. 6, 2006) (Exhibit D).[8] A court's ultimate determination as to whether an advancement of funds was a capital contribution or a loan "is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)." *In re Submicron Sys. Corp.*, 432 F.3d 448, 456 (3rd Cir. 2006).

When the undisputed facts of the instant case are applied to these legal standards, each and every factor strongly indicates that the alleged "loans" were capital contributions. For one thing, there are no written loan agreements or any other type of signed writing memorializing the "terms" of the claimed "loans." (Statement, ¶13). "The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *Autostyle*, 269 F.3d at 750.

Similarly, "[t]he absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions not loans." *Id.*, 269 F.3d at 750. "[T]he absence of a set schedule of repayment of principal weighs in favor of equity . . . ." *Id.* Here, there is neither a fixed maturity date nor a set schedule of repayment. (Statement, ¶14).

---

[8] Of course, in this case, there were no "instruments" at all.

14

Yet another factor favoring recharacterization in this case is the absence of a fixed rate of interest and interest payments, which "is a strong indication that the advances were capital contributions rather than a loan." *Autostyle*, 269 F.3d at 750. Belfonti's testimony with regard to whether any interest rate was applicable to the alleged "loans" varied widely, from an admission that no interest was called for to claims that various rates might apply. (Statement, ¶14). In any event, there is no evidence that MCR required AHE to make any interest payments and it is, at best, uncertain whether Belfonti had any requirement to pay interest in mind when he decided to move money from MCR to AHE in order to make and protect his investment in the Hotel.

Critically, where "the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *Autostyle*, 269 F.3d at 751. Here, Belfonti testified that he did not expect AHE to repay the "loans" made by "lender" MCR until such time as AHE was able to meet both its operational needs and its obligations with respect to the Mortgage Loan from the cash flow generated by the operation of the Hotel, a sale of the Hotel or a third-party refinancing. (Statement, ¶17). This makes clear that MCR's "expectation of repayment" depended entirely on the success of AHE's business.

"The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans." *Autostyle*, 269 F.3d at 752. Here, there was no security pledged for any of the alleged "loans." (Statement, ¶15).

Also indicative of a contribution is the fact "that no legitimate unrelated third party lender would have made the advances . . . ." *In re Interstate Cigar*, 182 B.R. at 679. As Belfonti made clear, "I don't think anyone would have lent monies unsecured, except related entities that I controlled." (Statement, ¶15).

"Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." *Autostyle*, 269 F.3d at 752. Though Belfonti testified that the alleged "loans" were either not subordinated to AHE's pre-existing loan obligations or that he did not know whether they were subordinated and would need to consult his attorneys to find out (Statement, ¶16), Belfonti also testified that it was AHE's priority to pay the Wachovia Mortgage Loan and the Petra Mezzanine Loan first. (*Id.*).

"Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *Autostyle*, 269 F.3d at 752-53. Each alleged "loan" was made to cover AHE's mortgage payment and, in turn, prevent AHE from defaulting under the Mortgage Loan Agreement so that Belfonti could hold on to AHE and the Hotel. (Statement, ¶¶10-11).

"The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." *Autostyle*, 269 F.3d at 753. Here, there is no evidence that any sort of fund was set aside to repay the alleged "loans." On the contrary, Belfonti testified that he expected the alleged "loans" to be repaid from the cash flow generated by the operation of the Hotel, a sale of the Hotel or third-party financing. (Statement, ¶17).

In short, "there is no evidence of debt instruments or loan documentation to suggest a maturity date, payment schedule, or interest provision. No evidence has been offered that interest was ever paid for any of the funds advanced." *Interstate Cigar*, 182 B.R. at 680. "The compelling testimony and documentary evidence establish the cash advances as capital infusions to a financially bleeding organization." *Id.* at 681.

## III.    IN ANY CASE, THE ALLEGED "LOAN AGREEMENTS" ARE UNENFORCEABLE FOR LACK OF DEFINITENESS

Assuming that the alleged "loans" somehow fall outside the statute of frauds, there are no enforceable loan agreements (which "agreements" would have been made between Belfonti and himself) between AHE and the alleged "lender," MCR.  For there to be valid, enforceable loan agreements between AHE and MCR, Defendants must show that MCR reached specific agreements with AHE which were definite and certain as to their essential terms and requirements.  There is no such proof because there were no such agreements.

It is hornbook contract law that in order to form a valid and binding contract, "there must be a mutual understanding of the terms that are definite and certain between the parties." *Palmieri v. Scaniffe*, 2008 WL 1971026, at *2 (Conn. Super. Ct. Apr. 23, 2008) (Exhibit E) (citing *Suffield Dev. Assoc. Ltd. P'ship v. Soc'y for Sav.*, 243 Conn. 832, 843 (1998)).  "An agreement must be definite and certain as to its terms and requirements." *Palmieri*, 2008 WL 1971026, at *2.  "In other words, 'to prove the terms of an oral agreement our case law requires definite agreement on the essential terms of an enforceable agreement.'" *Kulick v. City of Hartford*, 2007 WL 4707809, at *2 (Conn. Super Ct. Dec. 10, 2007) (Exhibit F) (quoting *111 Whitney Ave., Inc. v. Comm'r of Mental Retardation*, 70 Conn. App. 692, 699 (2002)).  "So long as any essential matters are left open for further consideration, the contract is not complete." *Palmieri*, 2008 WL 1971026, at *2.

A case decided by the Southern District of New York, *Gianascio v. Giordano*, is particularly instructive.  In that case, the plaintiff attempted to collect on an outstanding $100,000 "loan" he allegedly made to defendants.  2003 WL 22999454, at *1 (S.D.N.Y. Dec. 19, 2003) (Exhibit G).  Defendants, however, contended that the $100,000 was not a loan but rather the initial installment of the plaintiff's promise to invest two million dollars toward the purchase

of a brokerage firm. *Id.* Deciding the issue on summary judgment, the court found

unequivocally that "there [wa]s no mutual agreement as to the essential terms of a loan

agreement because, as plaintiff acknowledges, there were never any terms." *Id.* at *3. "The loan

period was not particularized, there was no schedule for payments, and an interest rate was not

specified." *Id.* As such, the court found, "[t]he alleged agreement lacks the most fundamental

element, a promise to do, or not do, a particular thing. No essential material terms, or any other

terms for that matter, were ever agreed upon by the parties." *Id.* at *4 (internal quotes omitted).

Thus, plaintiff's breach of contract claim was dismissed "as there was no meeting of the minds

or objective manifestation of an agreement between the parties." *Id; see also Roulley v. Inex

Co.*, 677 F.2d 14, 15 (2d Cir. 1982) (finding that both the "interest rate of the loan and the time

of its maturity" are essential terms of a loan contract).

      For both of the alleged "loans" at issue in this case, there is no evidence of a definite

agreement as to the essential terms: there was no negotiation over any terms; there was no

payment schedule, or even a maturity date as to when repayment was due; there was no

definitive rate of interest; there was no security pledged for any of the alleged "loans"; and there

was no clear understanding as to whether the alleged "loans" were subordinated to AHE's pre-

existing loan obligations. (Statement, ¶¶13-16). It is no surprise, then, that there is no written

agreement of any kind memorializing any of the alleged "loans" or their nonexistent "terms."

(*Id.*, ¶13).

      Given all this, there is no question that there were no loan agreements to be enforced by

the alleged "lender." *Palmieri*, 2008 WL 1971026, at *1-3 (finding that defendants were not

"legally obligated" to return money and jewelry allegedly loaned to defendants where, *inter alia*,

"defendant promised to repay the money, but there were no terms for the repayment regarding

how much was to be repaid or over what period of time"); *Gianascio v. Giordano*, 2003 WL

22999454 at *3-4 (dismissing breach of contract claim on summary judgment where the alleged

agreement had no set terms, including no schedule for payments and a specified interest rate).

Further, even accepting Defendants' version of events as true, MCR's demand for the return of

money allegedly loaned to AHE is, at best, premature and in contravention of Belfonti's

purported agreement with himself that the alleged "loans" would not be "repaid" until such time

as AHE was able to meet both its operational needs and its obligations with respect to the

Mortgage Loan from the cash flow generated by the operation of the Hotel, or there was a sale of

the Hotel or third-party refinancing. (Statement, ¶17). There is no evidence that any of these

things has occurred.

Moreover, that there could not have been any loan agreements is confirmed by the fact

that AHE was prohibited under the Mortgage Loan Agreement from incurring the indebtedness

that Defendants claim they caused AHE to incur. (Statement, ¶5). It is also confirmed by the

fact that although AHE's Articles of Incorporation required approval of the alleged "loans" by

AHE's Supervisory Board of Directors, (*Id.*, ¶19), such approval was neither sought nor obtained

with regard to any of the alleged "loans." (*Id.*). Of course, neither the Mortgage Loan

Agreement nor AHE's Articles of Incorporation prohibited Belfonti and his entities from

infusing capital into AHE for the purpose of investment. That is, unquestionably, what the

transactions at issue in this case were.

## IV.    THE EVIDENCE CANNOT SUPPORT A FINDING OF UNJUST ENRICHMENT

Based on the discovery record, this Court should also find, as a matter of law, that AHE

is under no obligation to "repay" the alleged "loans" under the equitable theory of unjust

enrichment. Under Connecticut law, "Plaintiffs seeking recovery for unjust enrichment must

prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the

plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment."

*Paoletta v. Anchor Reef Club at Branford, LLC*, 2008 WL 256575, at *6 (Conn. Super. Ct. Jan.

11, 2008) (Exhibit H) (citing *Paulsen v. Kronberg*, 66 Conn. App. 876, 878 (2001)). "The word

'unjustly' as used in the equitable maxim that one shall not be allowed unjustly to enrich himself

at another's expense means unlawfully." *Paoletta*, 2008 WL 256575, at *6. "A right of

recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a

given situation it is contrary to equity and good conscience for one to retain a benefit which has

come to him at the expense of another." *Id.*

      The undisputed facts here preclude any claim by Defendants of unjust enrichment.  First

and foremost, it cannot be "unjust," much less "*unlawful*," for AHE to not have "reimbursed"

MCR for the sums at issue because, even according to Belfonti, Defendants understood and

expected that there might not be any "repayment."  Again, Belfonti admitted that his entities

(including MCR) would not be "repaid" unless and until his investment in AHE panned out

(whether it be through generating sufficient cash from AHE's operations, a sale or third-party

financing).  (Statement, ¶17).

      Moreover, there is no evidence that AHE was in any way "enriched" by the sums at issue.

Rather, the lone beneficiary of the transactions was Belfonti.  According to Belfonti, both of the

alleged MCR "loans" were used to satisfy AHE's monthly payment obligation under the

Mortgage Loan.  (*Id.*, ¶¶10-11).  As Belfonti admitted in his deposition, the only beneficiary of

such payments was him.  (*Id.*, ¶12).

      Finally, it cannot be said that Defendants have suffered any detriment by virtue of AHE's

"failure" to "repay" the alleged "loans" because, according to Belfonti, that possibility (*i.e.*, that

the alleged "loans" would not be "repaid" until Belfonti's investment in AHE was successful) was expected by him and MCR from the very beginning.

## V.    A PERMANENT INJUNCTION IS WARRANTED AND NECESSARY

Because summary judgment is appropriate here, this Court should also issue a permanent injunction prohibiting Defendants from attempting to obtain repayment of the alleged "loans" at issue, through litigation in another forum or otherwise, so as to protect the integrity of this Court's judgment. This is not an idle concern. MCR, along with other U.S.-based Belfonti entities, are continuing to press their "loan" claims in a foreign jurisdiction. (Mervis Aff. Exs. G - J).

In determining whether to enjoin parties from proceeding with a suit in a foreign jurisdiction, the Court must first determine whether the parties are the same in both suits and also "whether the resolution of the case before the enjoining court would be dispositive of the enjoined action." *Farrell Lines v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 129 (S.D.N.Y. 1997). If these two threshold requirements are met, the court can then determine whether an injunction is appropriate. In the Second Circuit, "an injunction may issue only where . . . the foreign proceeding presents a threat to the public policy or to the jurisdiction of the enjoining forum . . . ." *Id.* at 130 (citing *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987)). However, this standard is relaxed considerably when the injunction is requested after a previous judgment on the merits. *Id.* at 131; *see also Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927-28 (1984). This is because "[c]ourts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants. Thus, when the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceedings." *Laker Airways*, 731

F.2d at 927.  "When the injunction is requested after a previous judgment on the merits, there is little interference with the rule favoring parallel proceedings in matters subject to concurrent jurisdiction.  Thus, a court may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation."  *Id.* at 928.

Here, "the two threshold requirements [are] met, since in both actions the parties and the issues of liability are the same."  *China Trade*, 837 F.2d at 35.  AHE and MCR are parties to both this action and the action proceeding in Aruba.  (Mervis Aff. Exs. G - J).  Further, a finding by this Court that the alleged "loans" are not enforceable as loans or under any other theory would certainly be dispositive of the Aruba action -- MCR is seeking to enforce the very "loans" there that AHE is seeking here to have declared unenforceable and, as a U.S. business controlled by a U.S. citizen, MCR can be expected to obey an injunction of this Court and discontinue its foreign litigation.  *See, e.g., Farrell Lines*, 32 F. Supp. 2d at 130 (finding that resolution of the domestic action was dispositive of the foreign action as both actions concerned the same underlying issue of liability for damage to cargo).  As such, since summary judgment on the merits is appropriate here, so too is an injunction to ensure the validity and integrity of this Court's judgment.  *Farrell Lines*, 32 F. Supp. 2d at 131 (enjoining defendants from proceeding with a suit in Italy after granting plaintiff's request for partial summary judgment in action in this Court).

## **CONCLUSION**

For all of the foregoing reasons, AHE respectfully submits that this Court should grant summary judgment to AHE and enter a permanent injunction restraining Defendants from attempting to enforce the alleged "loans" at issue in this case under any theory of liability in any forum.

Dated: August 19, 2008
      New York, New York

By____/s/ Patrick J. Dempsey_____
      Patrick J. Dempsey

PROSKAUER ROSE LLP
Richard M. Goldstein*
Michael T. Mervis*
Patrick J. Dempsey*
1585 Broadway
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
(* *admitted pro hac vice*)

-and-

Lissa J. Paris – ct04251
MURTHA CULLINA LLP
CityPlace I, 185 Asylum Street
Hartford, CT 06103-3469
Telephone: (860) 240-6000
Facsimile: (860) 240-6150
Email: lparis@murthalaw.com

*Attorneys for Aruba Hotel Enterprises N.V.*