UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARUBA HOTEL ENTERPRISES N.V.,

Plaintiff

v.

MICHAEL BELFONTI, BELFONTI
HOLDINGS, LLC, AND BELFONTI
CAPITAL PARTNERS, LLC,

Defendants

07 Civ. 7564 (PAC)

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York, Defendants Michael Belfonti, Belfonti Holdings, LLC, and

Belfonti Capital Partners, LLC respectfully submit their response to Plaintiff's Statement of

Undisputed Material Facts as well as Additional Facts In Support of Defendants' Motion for

Partial Summary Judgment.

1.      In May 2006, Defendant Michael Belfonti ("Belfonti") became the beneficial owner

and control person of AHE.  (Declaration of Michael T. Mervis ("Mervis Decl.," submitted

herewith) Ex. A, Response to Interrogatory 10; Belfonti Tr. At 11-12)).  AHE's principal asset

was, and is, a resort hotel located on the island of Aruba (the "Hotel").  (Belfonti Tr. At 13-14;

Declaration of Joseph Iacono ("Iacono Decl.," submitted herewith) at ¶2)).

**DEFENDANTS' RESPONSE:**  Defendants deny that Michael Belfonti was "*the* beneficial

owner and control person of AHE."  Defendants state that on or about May 3, 2006, Michael

Belfonti and the Hochfelder Family closed on their purchase of AHE, the Aruban entity that

owns what is now known as the Westin Aruba Resort (the "Westin Aruba" or the "Hotel"). Michael Belfonti ultimately became the beneficial owner of 75% of the Hotel and the Hochfelder Family became the owner of the remaining 25%. AHE's day to day activities were controlled by Marieta Ras, the Managing Director of AHE, and Petra (its present owner) had the legal power to control the majority composition of the directors who ultimately control AHE. Defendants do not dispute that AHE's principal asset was, and is, a resort hotel located on the island of Aruba.

2.      To finance this transaction, Belfonti arranged for two loans. The first loan (the "Mortgage Loan") was made to AHE by WIBC Aruba N.V. ("WIBC") (an affiliate of Wachovia Bank, National Association ("Wachovia")) in the amount of $230,000,000.00. (Iacono Decl., ¶2; Belfonti Tr. At 10-15). The terms of the Mortgage Loan were memorialized in a loan agreement between AHE and WIBC, dated May 3, 2006 (the "Mortgage Loan Agreement"). (Iacono Decl. at ¶2 and Ex. A thereto).

**DEFENDANTS' RESPONSE**: Based on present knowledge, Defendants do not dispute these facts.

3.      The second loan (the "Mezzanine Loan") was made by Petra Mortgage Capital Corp. LLC ("Petra Mortgage") to a Belfonti-controlled entity called BCP Florin, LLC ("BCP Florin") in the amount of $19,450,000.000. (Iacono Decl. ¶3; Belfonti Tr. At 15-17). The terms of the Mezzanine Loan were memorialized in a loan and security agreement executed on or about June 9, 2006 (the "Mezzanine Loan Agreement"). (Iacono Decl. ¶3 and Ex. B thereto; Belfonti Tr. At 15-17). Belfonti signed both the Mortgage Loan Agreement and the Mezzanine Loan Agreement on behalf of the borrowers. (Iacono Decl. Exs. A and B thereto; Belfonti Tr. At 10-11).

**DEFENDANTS' RESPONSE**:  Defendants deny that BCP Florin, LLC was a "Belfonti-

controlled entity". Based on present knowledge, Defendants do not dispute the remaining facts.

4.     The Mezzanine Loan was secured by a first priority security interest in one hundred percent of the issued and outstanding equity of Twilight Holdings, LLC ("Twilight"). (*Id.* ¶4 and Ex. B thereto, § 2.02 (kk)). Twilight – a Delaware limited liability company that was, at the time, majority beneficially owned by Belfonti – was an indirect subsidiary of BCP Florin. (Mervis Decl. Ex. A, Response to Interrogatory 6; Iacono Decl. ¶4). At the time the Mezzanine Loan was made, AHE was an indirect subsidiary of BCP Florin and Twilight. (Iacono Decl. ¶4; Belfonti Tr. At 17).

   **DEFENDANTS' RESPONSE**: Based on present knowledge, Defendants do not dispute these facts.

5.     Under Section 3.1.24(d) of the Mortgage Loan Agreement, AHE was not permitted to incur indebtedness of the type alleged by Defendants to have been created by AHE to them. (Iacono Decl. Ex. A, § 3.1.24(d)). A breach of Section 3.1.24(d) of the Mortgage Loan Agreement gives rise to a default under the Mortgage Loan Agreement for which there is no right to cure. (*Id.* At § 10.1(a)(xii)). One of the lender's remedies upon such a default is to foreclose on the Hotel. (*Id.* at § 10.2(a)).

   **DEFENDANTS' RESPONSE**: Defendants dispute these facts. As a threshold matter, Defendants contend that AHE was in fact permitted to incur indebtedness of the type alleged by Defendants. Defendants also contest AHE's claims of risk of default to Wachovia. On June 23, 2008, AHE reached an agreement with Wachovia that eliminated the risk of default or foreclosure with regard to the transactions that are at issue in this case. Until August 19, 2008, AHE neglected to tell the Court (and had actually attempted to shield from discovery)

that it had entered into this secret side agreement with Wachovia.

6.      In April 2007, AHE defaulted on the Mortgage Loan and BCP Florin defaulted on the Mezzanine Loan. (Iacono Decl. ¶5; Belfonti Tr. At 21-22).  Thereafter, Petra voluntarily cured the default on the Mortgage Loan, foreclosed on its security interest in Twilight under the Mezzanine Loan and, in consequence, became the beneficial owner of Twilight's indirect subsidiary, AHE. (Iacono Decl. ¶5).

**DEFENDANTS' RESPONSE**: Based on present knowledge, Defendants do not dispute these facts.

7.      On August 21, 2007, AHE received a letter from attorney Johan P. Sjiem Fat of Sjiem Fat & Kuster in Aruba.  This letter – which was sent on behalf of defendant Belfonti Holdings, LLC ("Belfonti Holdings"), defendant Belfonti Capital Partners, LLC ("BCP"), MCR Property Management Inc. ("MCR") and CEB Irrevocable Trust ("CEB") – claimed that all four of these entities made purported loans to AHE during the time that Belfonti was controlling principal of AHE. (Id. ¶6 and Ex. C thereto).  The letter demanded payment of the purported loans by August 24, 2007 at 12:00 noon. (Id.).  This letter was the first time that any demand was made on AHE by any of these entities for repayment of the purported loans.  (Iacono Decl. ¶6; Belfonti Tr. At 60-63).

**DEFENDANTS' RESPONSE**: Based on present knowledge, Defendants do not dispute these facts.

8.      **BCP**:  Belfonti is "the beneficial owner of 100 percent of the limited liability company interests of BCP." (Mervis Decl. Ex. A, Response to Interrogatory No. 2).  Belfonti is and has always been the ultimate decision-maker for BCP. (Belfonti Tr. At 53).

**DEFENDANTS' RESPONSE**: Defendants do not dispute that Michael Belfonti is currently

the 100 percent beneficial owner of the limited liability company interests of BCP. However, Defendants state that at the time the transactions at issue took place, Michael Belfonti was the indirect beneficial owner of 75 percent of the limited liability company interest of BCP. The remaining 25 percent interest in BCP was then indirectly owned by the Hochfelder Family through Aligned Capital Holdings, LLC.

9.      Belfonti Holdings: Belfonti is and has always been the "beneficial owner of 100% of [Belfonti Holdings'] limited liability company interests..." (Mervis Decl. Ex. A, Response to Interrogatory 3). Belfonti has the ultimate decision-making authority for Belfonti Holdings. (Belfonti Tr. At 45).

**DEFENDANTS' RESPONSE**: Based on present knowledge, Defendants do not dispute these facts.

10.      Although Belfonti has a "satellite" office in New York City, all of his businesses are run out of Connecticut, and all of the employees in New York are paid by MCR, which is located in Hamden, Connecticut. (*Id.* At 24, 36, 38-39, 43). Belfonti sometimes held AHE out as a Connecticut-based business. (Carpenter Tr. at 170-171). Belfonti himself works in Hamden, Connecticut. (Belfonti Tr. at 21).

**DEFENDANTS' RESPONSE**: Defendants dispute that all of Michael Belfonti's businesses are run out of Connecticut. During the relevant period, Michael Belfonti maintained business operations in Connecticut, New York, and Aruba, stationed employees in all three locations, and split his time between those locations.

11.      BCP alleges that it made a loan to AHE in the amount of $4,873,702.86. (Iacono Decl. Ex. C). This sum is comprised entirely of money that Belfonti spent to buy AHE and the Hotel. (Belfonti Tr. at 88). Of this sum, $1.5 million originated from MCR (another entity that

Belfonti controls) (id. At 25-31) and $2 million originated from a line of credit with First County Bank in Stamford, Connecticut belonging to another Belfonti entity, MAB Investments LLC ("MAB"). (Carpenter Tr. at 84-86; Mervis Decl. Ex. D). Both MCR and MAB are located in Connecticut. (Carpenter Tr. at 84-86). Defendants have produced no evidence as to the source of the funds for the balance of this alleged loan; there is no evidence that any funds were actually provided by BCP or to whom they were actually paid (if at all).

> **DEFENDANTS' RESPONSE:** Defendants dispute that this sum is comprised entirely of money that Michael Belfonti spent to buy AHE and the Hotel. Defendants also dispute that they have produced "no evidence" as to the source of the funds for the balance of this alleged loan. There is evidence that the funds were provided to BCP as explained below. Defendants further state that in early May 2006, AHE needed cash to pay the closing costs associated with its sale, including lawyers' fees, accounting fees, tax opinions, and appraisals. (Belfonti Tr. at 70-71, 83; Carpenter Tr. at 71). Having already borrowed $230,000,000 to finance the purchase of the Hotel, AHE decided to borrow the necessary funds from BCP. (Belfonti Tr. at 71). Specifically, on or about May 3, 2006, on or about May 3, 2006, AHE borrowed $4,873,702.86 from BCP to pay the closing-related expenses. (Belfonti Tr. at 70-71, 83; Carpenter Tr. at 74). Both Michael Belfonti and Defendants' Controller, Victoria Carpenter testified that this transaction was *intended at the time it was made to be a loan that would be repaid.* (Belfonti Tr. at 71-73; Carpenter Tr. at 80-81). At the time the loan was made, an entry in the exact amount of $4,873,702.86 was entered at the direction of AHE's CEO and Managing Director, Marieta Ras (the same person who is the CEO of AHE today, and who authorized the pursuit of the instant action), on AHE's financial records as a "long-term liabilit[y]" due to BCP. (Navarro Aff., Ex. D; Ras Tr. at

175).  Contemporaneously, the $4,873,702.86 was recorded as "intercompany loans" on the financial records of the Belfonti related companies.  (Carpenter Tr. at 60).  (Carpenter Tr. at 60).

12.     BCP also alleges that it made a loan to AHE in the amount of $393,000.  (Iacono Decl. Ex. C).  This sum was paid directly to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan.  (Carpenter Tr. at 103-107, 109-110; Belfonti Tr. at 106-108).  The only beneficiary of this transaction (and of any of the sums allegedly loaned by Belfonti's entities to AHE and used to make payments on the Mortgage Loan) was Belfonti: failure to pay Wachovia would not have caused the hotel to stop operating or AHE to go out of business, but it would have caused Belfonti to lose his equity interest in AHE. (Belfonti Tr. 108-109; *see also* Belfonti Tr. at 211-212, Carpenter Tr. at 105-107).

**DEFENDANTS' RESPONSE**: Defendants deny that the only beneficiary of this transaction (and of any of the sums allegedly loaned by Michael Belfonti's entities to AHE and used to make payments on the Mortgage Loan) was Michael Belfonti.  The loans at issue benefited AHE as they kept AHE out of default, which would have had significant, negative consequences for the Hotel and its operations.  Among other things, a default (and concomitant change in ownership) would likely have resulted in a "run on the bank" whereby vendors and creditors of the hotel would demand immediate payment on outstanding bills and invoices.  (*See* Navarro Decl., Ex. L).  Moreover, if word that AHE was financially unstable were to become public, it would negatively affect future hotel bookings.  *Id.*  These precise threats to AHE's viability were articulated by Victoria Carpenter in an email dated February 21, 2007, which was forwarded to Petra that same day.  *Id.*  Similarly, in a January 31, 2007 email, AHE's CEO and Managing Director, Marieta Ras acknowledged that a

foreclosure would have a negative effect on timeshare sales at the Hotel. (*See* Navarro Decl., Ex. M) ("[I]f potential Timeshare buyers starts [sic] to **hear** issues of changing in ownership, foreclosure, etc., and **if** something happens, trust me for the first one to two years they will sit in their sales office and look at the Ceiling, because there will not be anything else to do.") (emphasis in original).

Defendants further state that in December 2006, AHE was short of funds sufficient to meet its monthly payment obligation under the Mortgage Loan. (Carpenter Tr. at 103-104; Belfonti Tr. at 106-108). Accordingly, on or about December 8, 2006, AHE borrowed approximately $393,000 from BCP. (Belfonti Tr. at 110-111). Both Michael Belfonti and Defendants' Controller, Victoria Carpenter testified that the transaction was **intended at the time it was made to be a loan that would be repaid.** (Belfonti Tr. at 110-11, 157-159; Carpenter Tr. at 111). At the time the loan was made, an entry in the exact amount of $393,000 was entered at the direction of Ms. Ras on AHE's financial records as a "long-term liabilit[y] due to BCP. (Navarro Aff. Ex. D; Ras Tr. at 222). A mirror image entry was made on the financial records of BCP showing a loan in the exact amount of $393,000.00 to AHE. (Navarro Aff., Ex. I; Carpenter Tr. at 113-114).

Finally, as explained elsewhere, AHE was at the time co-owned by Belfonti and the Hochfelder family, so it is inaccurate to say that funds used for AHE's purposes benefited only Belfonti.

13.    BCP also alleges that it made a third purported loan to AHE in the amount of $548,250. (Iacono Decl. Ex. C.). This sum was originally claimed by Belfonti to have been a loan by his mother's trust, CEB, to AHE. (Iacono Decl. ¶6 and Ex. C). Following the deposition testimony of the trustee that CEB had never made a loan to AHE (Friedman Tr. at 34, 36, 38),

Belfonti asserted that BCP was actually the purported lender. (Mervis Decl. Ex. I). The money was paid from the bank account of Belfonti's Connecticut attorneys directly to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan. (Carpenter Tr. at 137-138; Belfonti Tr. at 128-130, 146). This allowed Belfonti to continue to own AHE (and, thus, the Hotel). (Belfonti Tr. at 167-168).

**DEFENDANTS' RESPONSE**: Defendants admit these facts, except for the last sentence, which Defendants dispute given that there were numerous factors that were relevant to whether Belfonti continued as a part-owner of AHE during the relevant period. Defendants further state that in January 2007, AHE was again short of funds sufficient to meet its monthly payment obligation under the Mortgage Loan. (Belfonti Tr. at 119-120; Carpenter Tr. at 119). Accordingly, on or about January 8, 2007, AHE borrowed approximately $548,250 from BCP. (Belfonti Tr. at 128-130, 146). The $548,250 BCP loan was aggregated with a separate loan to AHE made by MCR Property Management, Inc. ("MCR") (described below) in the amount of $1,307,611.80 and the combined $1,855,861.80 was paid directly to Wachovia to satisfy AHE's monthly payment obligation under the Mortgage Loan. (Belfonti Tr. at 128-30, 146, 167-68; Carpenter Tr. at 137-38). Both Michael Belfonti and Defendants' Controller, Victoria Carpenter testified that the transaction was *intended at the time it was made to be a loan that would be repaid*. (Belfonti Tr. at 157-159; Carpenter Tr. at 135-136). At the time the loan was made, an entry in the exact amount of $1,855,861.80 was entered at the direction of Ms. Ras on AHE's financial records a "long-term liabilit[y]." (Navarro Aff., Ex. D; Ras Tr. at 237).

14.    Belfonti Holdings alleges that is made a loan to AHE in the amount of $499,950. According to Belfonti, this sum was used by AHE to make a payment to the company that Belfonti had contracted with to manage the Hotel, Westin Aruba Hotel management LLC

("Westin"). (Belfonti Tr. at 91-93). According to the Operating Agreement entered into between AHE and Westin and signed by Belfonti on behalf of AHE (Iacono Decl., Ex. D), AHE was required to provide to Westin the "financial and other resources" necessary to permit the Hotel to be operated in accordance with Westin's standards. (Id at § 5.5). This included the "initial working capital required for the commencement of Operations at the Hotel...", which was anticipated to be $500,000. (*Id.*, Article 4.4.1 and p. 1-3; Belfonti Tr. at 92). Failure to pay these fees could ultimately result in a default under the Operating Agreement. (Iacono Decl., Ex. D, Article 16.1(a) (listing as an event of default "[a] failure by either Party to pay any amount of money to the other Party when due and payable under this Agreement")).

**DEFENDANTS' RESPONSE**: Based on present knowledge, Defendants do not dispute these facts. Defendants further state that in July 2006, AHE found itself again short of the cash necessary to meet its working capital requirements. Specifically, AHE was contractually required pursuant to its agreement with Westin Aruba Hotel Management, LLC to contribute $500,000 of working capital. (Iacono Decl., Ex. D; Belfonti Tr. at 91-93). On or about July 25, 2006, AHE borrowed approximately $499,950.00 from Belfonti Holdings. (Belfonti Tr. at 95). Belfonti Holdings is an investment company that is 80% controlled by the Bravo Property Trust which is a Connecticut Trust that was established by various members of the Belfonti Family. (Navarro Aff., Ex. F). Michael Belfonti is the ultimate beneficiary of the Bravo Property Trust. (Navarro Aff., Ex. G). The remaining 20% interest in Belfonti Holdings is owned by Michael Belfonti in his individual capacity. (*See* Navarro Aff. Ex. F).

Both Michael Belfonti and Defendants' Controller, Victoria Carpenter testified that the July 25, 2006, transaction was ***intended at the time it was made to be a loan that would be repaid.*** (*Id.* at 157-159) At the time the loan was made, an entry in the exact amount of

$499,950 was entered at the direction of Ms. Ras on AHE's financial records as a "long-term liabilit[y]." (Navarro Aff., Ex. D; Ras Tr. at 205). A mirror image entry was made on the financial records of Belfonti Holdings showing a loan to AHE for $499,950. (Navarro Aff., Ex. H; Carpenter Tr. at 94-97). ***Notably, Belfonti Holdings did not receive any additional capital or equity in AHE in return for the monies.*** (Belfonti Tr. at 89; Ras Tr. at 219). That is, even after this loan, Michael Belfonti (indirectly through Belfonti Holdings) remained a 75% beneficial owner of AHE and the Hochfelder Family remained a 25% beneficial owner of AHE.

15.    According to § 10.1(a)(xvi) of the Mortgage Loan Agreement, a default under the Operating Agreement constitutes an event of default under the Mortgage Loan Agreement (which, as discussed supra, allows the lender to foreclose on AHE's principal asset, the Hotel). (Iacono Decl. Ex. A at § 10.1(a)(xvi)). Thus, by causing Belfonti Holdings to make this alleged loan, Belfonti was able to retain control over the Hotel.

> **DEFENDANTS' RESPONSE**: Based on present knowledge, Defendants do not dispute these facts, except the last sentence in that Defendants state that there were numerous factors relevant to whether Belfonti was able to retain control over the Hotel. Also, on the point regarding control, as stated above, Marieta Ras the CEO of AHE was in day-to-day control over AHE.

16.    With respect to each of the alleged loans, Belfonti was the one who decided on behalf of the alleged lender to make the loan and the one who "agreed" on behalf of AHE to "accept" the alleged loan. (Belfonti Tr. at 70-71, 95, 110-111, 130). There were no negotiations regarding the terms of any of the alleged loans. (*Id.* at 71, 95, 111, 131). There is no writing signed by any representative of the alleged lender or AHE which memorializes any of the alleged loans. (*Id.* at 77-78, 98-99, 113,150-151).

11

**DEFENDANTS' RESPONSE**: Defendants dispute that there are no writings signed by any representative of AHE which memorialize any of the alleged loans – as stated in our papers, the loans were at the time memorialized in accounting records and in correspondence. All of the loans at issue were booked on the ledgers of AHE by AHE personnel as long-term liabilities due to the Defendants. Based on present knowledge, Defendants do not dispute the remaining facts.

17.    There is no maturity date or payment schedule for any of the alleged loans. (*Id.* at 71, 95-96, 111, 131,137-138). With respect to interest, Belfonti testified variously that no interest had to be paid by AHE (*id.* at 71-72, 96, 112); that interest would be paid at the rate of 12% (since, according to Belfonti, that is the rate he typically applies in the case of purported loans between his various entities) (*id.* at 132-133); and that an interest rate of 8 to 9% (or "something like that") would be applied "because of the international nature of the transaction." (*Id.* at 160-161). Regardless, interest was not something that Belfonti thought about when he decided to approve each loan. (*Id.* at 161).

**DEFENDANTS' RESPONSE**: Based on present knowledge, Defendants do not dispute these facts.

18.    There was no security pledged for any of the alleged loans. (*Id.* at 72, 96, 112,138). With one exception, AHE (acting through Belfonti) did not seek financing from any other source. (*Id.* at 76-77, 98, 113-114, 147-150). Belfonti testified that the alleged loans were either not subordinated to AHE's pre-existing loan obligations or that he did not know whether they were subordinated and would need to consult his attorneys for an answer. (*Id.* at 98, 112-113, 140-146).

**DEFENDANTS' RESPONSE**: Based on present knowledge, Defendants do not dispute these facts.

19.    According to Belfonti, he did not expect AHE to repay the alleged loans made by his alleged lender entities until such time as AHE was able to meet both its operational needs and its obligations with respect to the Mortgage Loan from the cash flow generated by the operation of the Hotel, a sale of the Hotel or third-party refinancing. (*Id.* at 72-76, 98, 113, 146-147; *see also* Carpenter Tr. at 185-187). There is no evidence that any of these scenarios have come to pass.

**DEFENDANTS' RESPONSE**: Defendants dispute that there is no evidence that any of the scenarios have come to pass. Defendants have requested discovery related to this point from AHE and AHE has refused to produce such discovery. (Navarro Ex. BB at Request No. 1) Due to AHE's recalcitrance, there is no evidence in the record that the above-described events have not occurred. Based on present knowledge, Defendants do not dispute the remaining facts.

20.    The alleged loan transactions at issue are consistent with Belfonti's practice of moving money between his various entities in order to fund his various investments. When a Belfonti entity needs money and another entity has money, the entity that has the money lends the money to the entity that needs the money. (Carpenter Tr. at 73-74).

**DEFENDANTS' RESPONSE**: Defendants dispute this fact. Plaintiff crucially omits that Michael Belfonti and Victoria Carpenter have both testified that when money is moved from one Belfonti entity to the other the transaction is always booked as an intercompany loan. (Belfonti Tr. at 80; Carpenter Tr. at 60-61).

21.    AHE's Articles of Incorporation during the relevant time period prohibited AHE from incurring indebtedness without the approval of AHE's Board of Supervisory Directors. (See Iacono Decl. Ex. E, Articles 15(1)(h) and 15(1)(i); Friedman Tr. at 16-17, 24-25, 77-81). None of the alleged loans was presented to or approved by AHE's Supervisory Board. (Belfonti Tr. at

78, 104, 116-117; Friedman Tr. at 70-72, 74-75).

**DEFENDANTS' RESPONSE**: Defendants dispute these facts. AHE's Articles of Incorporation only prohibited the Managing Director or the Board of Managing Directors from incurring indebtedness of certain types without the approval of AHE's Board of Supervisory Directors. At the relevant times, Michael Belfonti was not a Managing Director or on the Board of Managing Directors of AHE. Rather, Mr. Belfonti was a member of the Board of Supervisory Directors to whom the above-cited Articles do not apply. (*See generally* Belfonti Tr.).

**ADDITIONAL FACTS IN DISPUTE**

1. Despite the fact that the transactions at issue were booked by AHE as liabilities due to the Defendants, AHE has recently reversed course and now claims that the transactions were always intended to be capital contributions. Ms. Ras' explanation for her and AHE's flip-flop (which only took place *after* Petra took over ownership of AHE) is that she instructed that the transactions be entered in the liabilities column as a "placeholder" entry. (*See generally* Ras Tr.). That is, Ms. Ras now claims that she always intended these transactions to be considered as capital contributions instead of loans and had only booked them as liabilities temporarily.

2. There is evidence in the record that undermines this contention and reveals instead that Ms. Ras tried to revise history after the change in ownership of the hotel. Specifically, an e-mail AHE produced in discovery in which PricewaterhouseCoopers ("PwC"), AHE's auditors, noted that, "***Due to the departure of Belfonti from the project***, management claims that the [loans at issue] are no longer payable." (Navarro Aff., Ex. S) (emphasis added). Similarly, in an e-mail dated August 21, 2007 (approximately five months after

14

the last loan at issue was made), Ms. Ras wrote to Petra Principals, Kenneth Kornblau

and Joseph Iacono, that "the fact that the owner funded without outlining the terms for

repayment from AHE, *one could argue* that it was payment on equity and not necessarily

a loan payable to owner." (Navarro Aff., Ex. T).

### STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S REQUEST FOR AN ANTI-SUIT INJUNCTION

1. AHE alleged that if the Defendants were to prevail in convincing the Aruban courts that the transactions at issue in this case are loans that AHE would have to repay, such a finding would constitute "serious, irreparable harm" because it would cause AHE to be in default of the Mortgage Loan and would allow Wachovia to foreclose on it.

2. AHE did not tell the court until August 19, 2008 that on June 23, 2008 AHE entered into a side agreement with Wachovia that prevents Wachovia from foreclosing on it even if these transactions were to be declared by a court to be loans. (Navarro Aff. Ex. U).

3. On June 26, 2008 AHE filed its Second Amended Complaint, which made no mention of the secret side agreement and instead alleged that the threat of Wachovia foreclosure as a result of the loans constituted a threat of "serious, irreparable harm." (*See generally*, SAC).

4. Specifically, AHE's Second Amended Complaint, filed with this court on June 26, 2008, alleged as follows:

   If [the transactions at issue] are characterized as 'loans,' or as an obligation that AHE must otherwise repay, it would cause AHE, and its new ownership, to be in default on the Mortgage Loan. This would cause *serious, irreparable harm to AHE* . . . [because] [u]nder section 3.1.24(d) of the Mortgage Loan, AHE was not permitted to incur indebtedness of the type alleged by Defendants to have been created by AHE to them . . . [and a] breach of section 3.1.24(d) of the Mortgage Loan Agreement gives rise to *a default for which there is no right to cure*." (SAC ¶¶ 9-10, 22-23). (emphasis added).

15

5. Based on this claimed danger of default (and foreclosure), AHE has asked this Court to issue a "preliminary and permanent injunction enjoining the Defendants from attempting to obtain repayment of the monies allegedly advanced to AHE, by pursuing litigation in another forum or otherwise." (SAC at ¶ 9).

6. On July 15, 2008, AHE made its first and only document production in this case. The production did *not* include a copy of (and made no mention of) the secret side agreement with Wachovia. The document was clearly responsive to Defendants' document requests, which sought, *inter alia*, "all documents and communications referring to or relating to AHE's allegation that any attempt to enforce the Loans could force AHE into default and/or foreclosure on the [Wachovia Mortgage Loan]". (Navarro Aff., Ex. V).

7. On July 25, 2008, AHE filed a Memorandum of Law in Support of its Motion for Summary Judgment containing references to the false allegations from the Second Amended Complaint related to threat of "serious, irreparable harm," but makes no mention to secret side agreement with Wachovia. (*See generally*, AHE Memo of Law).

8. On July 25, 2008, AHE filed a Rule 56.1 Statement containing references to the false allegations from the Second Amended Complaint related to the threat of "serious, irreparable harm" but makes no mention to secret side agreement with Wachovia (*See generally*, AHE's Rule 56.1 Statement).

9. On July 25, 2008, portions of the Wachovia Loan Agreement that AHE falsely claims would cause it "serious, irreparable harm" were annexed to the Declaration of Joseph Iacono in support of AHE's Motion for Summary Judgment, but no mention is made of the secret side agreement with Wachovia. (*See* Iacono Decl., Ex. A).

10. On July 25, 2008, Petra Capital Management, LLC and Petra Fund REIT Corp. served
    Objections and Responses to Subpoenas Duces Tecum served by Defendants. The
    subpoenas sought, *inter alia*, "[a]ll documents and communications with Wachovia
    referring to or relating to the Loans." The Petra entities responded that, "documents
    responsive to this Request, if any, have already been produced under the bates stamped
    prefix AHE and/or in the [related New York Supreme Court litigation between the
    parties]." (However, to date, a copy of the secret side agreement with Wachovia has *not*
    been produced in any of the lawsuits between the parties). (Navarro Aff., Ex. W).

11. AHE filed a Second Amended Complaint in the District of Connecticut action making the
    same false allegations about "serious, irreparable harm" contained in their Second
    Amended Complaint in this action and similarly seeking a declaratory judgment and
    permanent injunction. No mention was made of the secret deal that was reached with
    Wachovia on June 23, 2008. (*See* Navarro Aff., Ex. X).

12. On August 18, 2008, after Defendants wrote to this Court seeking to compel AHE to
    produce communications with Wachovia, AHE objected and attempted to moot the issue
    without needing to disclose the secret side agreement with Wachovia by claiming in its
    letter to the Court that it will no longer claim that it "is currently exposed to a risk of
    foreclosure by its lender on account of the alleged 'loans' at issue in this case." *No*
    *mention was made in AHE's letter of the secret deal that was reached with Wachovia*
    *on June 23, 2008.* (*See* Navarro Aff., Ex. Y).

13. On August 19, 2008 at approximately 12:05pm AHE filed a motion for summary
    judgment (and supporting papers) in the District of Connecticut Action based on the same
    false allegations about "serious, irreparable harm" contained in their summary judgment

papers that were filed in this action. No mention was made of the secret deal that was reached with Wachovia on June 23, 2008. (*See* Navarro Aff., Ex. Z).

14. On August 19, 2008 at approximately 3:00pm at a discovery conference before this Court, under direct questioning, AHE *for the first time* revealed the existence of the secret side agreement with Wachovia and informed the Court of its belief that Wachovia can no longer default or foreclose on AHE irrespective of whether the transactions at issue in this case are held to be enforceable loans.

15. AHE's only claim of irreparable harm in the Second Amended Complaint, which is based on the allegation that Wachovia could foreclose on AHE, has now been rendered moot.

16. Until August 19, 2008, Defendants had expended significant resources on, among other things, discovery and legal research to counter AHE's claim that the threat of default and/or foreclosure by Wachovia constituted irreparable harm which entitled AHE to an injunction.


Dated: New York, New York
September 5, 2008

Michael S. Kim (MK-0308)
Matthew I. Menchel (MM-0675)
Jonathan D. Cogan (JC-474)
Francisco J. Navarro (FN-1874)

Kobre & Kim LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

*Counsel for Michael Belfonti, Belfonti Holdings, LLC, and Belfonti Capital Partners, LLC.*